IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE WALKING COMPANY HOLDINGS, | ) Case No.: 18-10474 (___) |
| INC., et al.,[1] | ) Joint Administration Requested |
| | ) |
| Debtors. | ) |

## DECLARATION OF ANDREW D. FESHBACH
## IN SUPPORT OF FIRST DAY MOTIONS

I, Andrew D. Feshbach, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.     I am the President and Chief Executive Officer of the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors"). I submit this declaration (the

"Declaration") in support of the Debtors' petition and "first day" motions and pleadings,

described further below (collectively, the "First Day Motions"). Except as otherwise indicated,

all statements in this Declaration are based upon my personal knowledge, my review of the

Debtors' books and records, relevant documents and other information prepared or collected by

the Debtors' employees, or my opinion based on my experience with the Debtors' operations and

financial condition. In making my statements based on my review of the Debtors' books and

records, relevant documents and other information prepared or collected by the Debtors'

employees, I have relied upon these employees accurately recording, preparing or collecting such

documentation and other information.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: The Walking Company Holdings, Inc. (8665); The Walking Company (2061); Big Dog USA, Inc. (5316); and FootSmart, Inc. (9736). The headquarters and service address for the above-captioned Debtors is 25 W. Anapamu, Santa Barbara, CA 93101.

2.     If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

3.     Part I of this Declaration describes the business of the Debtors, the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the terms of the *Debtors' Joint Plan of Reorganization* (the "Plan").  Part II sets forth the relevant facts in support of the First Day Motions filed by the Debtors concurrently herewith in support of their chapter 11 cases.  Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## PART I

## BACKGROUND

**A.     Description and History of the Debtors' Business**

4.     The Debtors are The Walking Company Holdings, Inc., a Delaware corporation ("Holdings"), and its three wholly owned subsidiaries, The Walking Company, a Delaware corporation ("TWC"), Big Dog USA, Inc., a California corporation, d/b/a Big Dog Sportswear ("Big Dog"), and FootSmart, Inc., a Delaware corporation ("FootSmart").

5.     Headquartered in Santa Barbara, California, the Debtors maintain two distinct business operations: (i) the design, manufacture and sale of comfort footwear, which business the Debtors conduct though their TWC and FootSmart subsidiaries;[2] and (ii) the design,

---

[2] FootSmart functions as a division of TWC, thus henceforth the businesses of TWC and FootSmart will be referred to collectively as "TWC," unless otherwise indicated.

manufacture and sale of graphic T-shirts, casual sportswear and accessories, which business the

Debtors conduct through their Big Dog subsidiary. TWC, which generated approximately 97%

of the Debtors' sales in 2017, is the primary focus of the Debtors' business. The Debtors employ

over 1,600 people across the country.

6.      Holdings, the parent company of TWC, FootSmart and Big Dog, is a

Delaware holding company. Holdings formerly operated as a publicly reporting company

trading on the NASDAQ under the symbol "WALK"; however, in 2009, it deregistered with the

SEC and delisted from the NASDAQ (a limited number of shares continue to trade over the

counter, i.e., on the "Pink Sheets"). Holdings' assets consist primarily of the stock of its

subsidiaries and the trademarks, copyrights and other intellectual property used in the operation

of TWC and FootSmart (but not of Big Dog), which Holdings licenses to such subsidiaries.

### *The Walking Company*

7.      TWC was founded in 1991 as a retailer of European comfort shoes. In

subsequent years, TWC expanded its chain of "The Walking Company" retail stores, located

largely in regional malls. TWC later moved away from its original focus on small stores selling

comfort shoes, to larger stores selling a broader assortment of clothing and other "lifestyle"

merchandise. The Debtors purchased TWC in 2004.

8.      The Debtors returned TWC to its original focus upon smaller stores

focused on European comfort shoes, improved its operating systems, and obtained more capital

to support it. These changes resulted in a strong increase in TWC's sales and profitability. The

Debtors then rapidly grew the TWC store chain during the 2005-2008 period to over 200 stores.

The Debtors financed the cost of that expansion by the liquidation of another business owned by

the Debtors (Big Dog, discussed below), the issuance in 2007 of $18.5 million of 8.375% Convertible Notes due 2015 (the "Notes"), and revenues generated by TWC. During this period, in order to build TWC's omni-channel distribution and vertically integrate its business, the Debtors also developed and expanded TWC's internet sales and developed proprietary shoe brands for sale through TWC's stores and internet site.

9. As a result of many factors including among them, challenging negotiations with landlords which did not provide the Debtors with the rent relief they believe they needed, and the state of the national economy, by late 2008 TWC found that nearly 100 of the newer stores it opened during this expansion period were not generating the sales and profits expected.

10. In addition, during the expansion period leading up to that, the Debtors had been downsizing their Big Dogs business and were using the revenues generated by such liquidation partially to fund the growth of TWC. However, by 2008, Big Dogs' business had collapsed more rapidly than the Debtors had anticipated. Big Dogs was in the business of selling moderately priced, casual apparel through a chain of specialty retail stores (Big Dogs stores) located around the country. The rapid growth of big-box, mass-market retailers during this period put great pricing pressure on retailers of moderately priced, casual apparel, putting many of them out of business.

11. In 2008 and continuing into 2009, the general economy, and retail in particular, went into serious decline during the Great Recession. The decline in mall traffic and retail sales, combined with the costs related to the expansion of TWC and the collapse of Big Dogs, resulted in the Debtors generating a loss from operations in 2008 and 2009. In late 2009,

the Debtors sought to obtain rent concessions from its TWC landlords to strengthen its financial position. TWC failed to obtain such concessions and, in December 2009, the Debtors commenced a reorganization proceeding under Chapter 11.

12.     In Chapter 11, the Debtors obtained voluntary rent concessions from the TWC landlords and certain other concessions from key vendors, which allowed TWC to secure debtor-in-possession financing and exit financing from Wells Fargo and a capital infusion of $10 million from an investor group led by Richard Kayne of Kayne Anderson Capital Advisors, LP (the "KA Investors"). As a result, the Debtors were able to emerge from bankruptcy in early 2010.

### Big Dog

13.     The Debtors acquired Big Dog in 1992. Founded in 1983, Big Dog's product line is concentrated on a branded collection of T-shirts and other casual apparel featuring graphic designs focused on the BIG DOGS® trademarks and a dog character known as "Big Dog." Big Dogs sells its product through an internet website at BigDogs.com. It formerly operated Big Dog retail stores, and it is in the process of closing the remaining few that exist. Big Dog generated approximately 3% of the Debtors' sales in 2017.

14.     In return for the KA Investors' $10 million capital infusion obtained in connection with the Debtors' 2010 reorganization discussed above, the Debtors issued to the KA Investors shares of a new class of Preferred Stock of Holdings. Under the terms of the Preferred Stock, if it was not redeemed by Spring 2011, Holdings could be required to conduct a rights offering that would have severely diluted the common stockholders. Accordingly, in early 2011, the Debtors agreed with the KA Investors that (i) Holdings would sell its Big Dog-related

trademarks and other intellectual property (the "Big Dog IP") to Big Dog Licensing LLC

("BDL"), a company owned by the KA Investors and Andrew Feshbach, the CEO of the

Debtors, for $5 million, (ii) BDL would license the Big Dog IP back to Big Dog through

December 31, 2013, and (iii) Holdings would redeem the Preferred Stock for $5 million. The

License Agreement provides that upon its termination, the Debtors are required to convey to

BDL (without payment) $2.5 million in Big Dog inventory (or in cash). Since that time, the

Debtors and BDL have agreed to a series of extensions of the License Agreement, most recently

extending it through December 31, 2019.

### *FootSmart*

15.     In 2016, the Debtors acquired FootSmart, a retailer of comfort footwear

and accessories that distributed its product through an internet site at FootSmart.com and a

catalog (which the Debtors discontinued). At this time, FootSmart effectively operates as a

division of TWC. Rather than merely seek to migrate FootSmart customers over to TWC, TWC

has continued to operate the FootSmart website as a "value-oriented" alternative to the TWC

site. TWC has also used the FootSmart site as a vehicle to expand the distribution of ABEO

product.

### B.     Prepetition ABL Debt

16.     As of the Petition Date, the Debtors had outstanding secured debt to

various lenders pursuant to that certain *Third Amended and Restated Loan and Security*

*Agreement* dated as of June 5, 2014 (as amended, modified and supplemented from time to time,

the "Prepetition Senior Loan Agreement" and together with all related documents, guaranties and

agreements, the "Prepetition Senior Loan Documents"), by and among (a) the Lead Borrower,

(b) the other Borrowers party thereto from time to time, (c) the Guarantors party thereto from time to time, (d) Wells, as administrative agent and collateral agent (in such capacities herein, the "Prepetition Senior Agent") for its own benefit and the benefit of the other "Secured Parties" (as defined therein), (e) Wells, as term agent (in such capacity, the "Prepetition Term Agent") and (f) the Lenders from time to time party thereto (currently, only Wells) (the "Prepetition Senior Lenders" and each a "Prepetition Senior Lender"; the Prepetition Senior Agent, the Prepetition Term Agent, the Prepetition Senior Lenders and the other "Secured Parties" under the Prepetition Senior Loan Documents are collectively referred to herein as the "Prepetition Senior Creditors").

17.    *Prepetition Senior Obligations.*  As of the Petition Date, the aggregate outstanding principal amount owed by the Debtors under the Prepetition Senior Loan Documents was not less than $40,383,176.89, consisting of revolving credit loans in the outstanding principal amount of $33,133,176.89 (the "Prepetition Revolving Credit Loans") and a term loan in the outstanding principal amount of $7,250,000 (the "Prepetition Term Loan") (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Loan Documents, and further including all "Obligations" as described in the Prepetition Senior Loan Agreement, including all obligations with respect to cash management services and bank products, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Senior Obligations").  As more fully set forth in the Prepetition Senior Loan Documents, prior to the Petition Date, the Debtors granted first-priority security interests in and liens on substantially all personal property of the Debtors, including, without limitation, accounts, inventory,

equipment and general intangibles (collectively, the "Prepetition Collateral"), to the Prepetition

Senior Agent (collectively, the "Prepetition Senior Liens") to secure repayment of the Prepetition

Senior Obligations.

18.     As of the Petition Date, the Debtors had outstanding secured debt to (a)

the holders (collectively, the "Prepetition Subordinated Noteholders") of a series of separate

8.375% Convertible Notes Due 2019 re-issued on May 23, 2014 by Parent in favor of each of the

Prepetition Subordinated Noteholders (collectively, and together with all related guarantees,

security documents, financing statements and other documents entered into in connection

therewith, the "Prepetition Subordinated Note Documents"); (b) Simon Property Group, L.P.

("Simon") pursuant to that certain Promissory Note (together with all guarantees and security

documents entered into in connection therewith, the "Simon Indebtedness Documents"), dated as

of September 29, 2017, by TWC in favor of Simon; and (c) Galleria Mall Investors LP

("Galleria" and together with the Prepetition Subordinated Noteholders and Simon, collectively,

the "Prepetition Subordinated Creditors") pursuant to that certain Amended and Restated

Promissory Note (together with all guarantees and security documents entered into in connection

therewith, the "Galleria Indebtedness Documents"; the Galleria Indebtedness Documents

together with the Prepetition Subordinated Note Documents and the Simon Indebtedness

Documents, collectively, the "Subordinated Indebtedness Documents"), dated as of November 6,

2017, by TWC in favor of Galleria.  As of the Petition Date, the aggregate outstanding principal

amount owed by the Debtors under the Subordinated Note Documents was not less than

$11,744,000 (including capitalized interest) in principal obligations (plus all accrued and unpaid

interest thereon, and all outstanding fees, costs and other charges or amounts paid, incurred or

accrued prior to the Petition Date in accordance with the Prepetition Subordinated Note Documents, the "Prepetition Subordinated Note Obligations" and together with any obligations under the Galleria Indebtedness Documents and Simon Indebtedness Documents the "Prepetition Subordinated Obligations").

19.    *Prepetition Subordinated Liens.*  Prior to the Petition Date, as more fully set forth in the applicable Subordinated Indebtedness Documents and the applicable Subordination Agreements (as defined below), (a)  Parent, TWC, and Big Dog granted to the Prepetition Subordinated Noteholders subordinated security interests in and liens on substantially all of their respective assets (the "Prepetition Subordinated Noteholders Liens") to secure the obligations under the Prepetition Subordinated Note Documents; (b) TWC granted to Simon subordinated security interests in and liens on certain equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property of TWC located on the premises leased to TWC by Simon (the "Prepetition Subordinated Simon Lien") to secure the obligations under the Simon Indebtedness Documents; and (c) TWC granted to Galleria subordinated security interest in and liens on certain equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property of TWC located on the premises leased to TWC by Galleria (the "Prepetition Subordinated Galleria Lien" and together with the Prepetition Subordinated Noteholders Liens and the Prepetition Subordinated Simon Lien, collectively, the "Prepetition Subordinated Liens") to secure the obligations under the Galleria Indebtedness Documents.  It is my understanding that Simon and Galleria did not file UCC financing statements to properly perfect the Prepetition Subordinated Simon Lien or Prepetition Subordinated Galleria Lien.

**B.    Events Leading to the Bankruptcy Filing and**
**Commencement of the Chapter 11 Case**

20.    Following its emergence from its 2009 reorganization through 2012,

TWC's core business significantly improved.  TWC then had a better rent structure for its newer

stores, and it ceased the prior expansion of its store base.  During this period, the Debtors turned

to significantly increasing the development of TWC's proprietary lines of comfort footwear and

accessories, which contributed significantly greater profit margins to TWC than its sales of third-

party brands.  The most successful line by far has been the ABEO brand.  Introduced in 2010,

ABEO annual sales have increased to over $112 million by 2017, constituting 55% of TWC

sales.  During this period, the Debtors also focused on increasing TWC's direct-to-consumer

sales though an expansion of its internet business and development of website sales through its

stores (a.k.a. "kiosk" sales).

21.    Moreover, in pursuit of the continued development of the ABEO brand,

Debtors have in recent years expanded ABEO's distribution to wholesale and international

distribution.  While still in its early expansion phase, the Debtors sell ABEO product wholesale

to independent comfort shoe retailers around the United States whose geographic sales areas do

not conflict those of The Walking Company stores.  The Debtors also sell ABEO products to

certain foreign retailers under distribution and licensing agreements.

22.    The Debtors' development and expansion of these initiatives continued

through the years of 2013 through 2017.  During this period, however, the increasing power of

internet retailers made the traditional business of retail stores selling products manufactured by

others increasingly difficult, and it also had an increasingly negative impact on customer traffic

in shopping malls. The Debtors' initiatives of developing its own proprietary shoe brands and increasing its direct-to-consumer business (internet and kiosk) were designed to offset these negative forces, and they were successful at doing so to a significant degree. However, at the end of 2016, TWC's largest footwear vendor, Deckers Outdoor Corporation (the manufacturer of UGG footwear) terminated its vendor relationship with TWC. While TWC had previously phased out the distribution of other footwear brands and managed to replace the lost sales with sales of other brands (third party or private label), as a result of the difficult environment for store-based retailing in 2017, TWC could not replace the lost UGG sales fast enough.

23. During mid- to late-2017, the Debtors sought rent concessions from TWC's mall landlords. While the Debtors obtained a degree of concessions, for example in the form of deferred rent, the overall amount of these concessions was insufficient to offset both the continued soft sales in TWC's mall stores during the 2017 holiday season and the loss of UGG sales. In addition, TWC then suffered a significant adverse impact when the firm providing appraisals on TWC's inventory to its lender, Wells Fargo, unexpectedly reduced its valuation of TWC's inventory. This resulted in a reduction of the amount of capital available to TWC under its credit line with Wells Fargo in spring of 2017 followed by a second, and even more unexpected, reduction in value in December of 2017.

## C. The Debtors' Reorganization Plan

24. The Debtors enter chapter 11 having already obtained the support of its major shareholders. The Plan has been substantially pre-negotiated, and the Debtors are seeking to move quickly through the reorganization process, with it lasting no more than 90 days. The Debtors have secured $10 million in equity commitments from their largest shareholders and $50

million in financing to both support the Debtors' operations and provide "exit" financing that will allow the Debtors to exit chapter 11 as a substantially stronger company. However, such stakeholders made their commitments and support expressly contingent upon the Debtors obtaining substantial rent relief by conforming their lease portfolio to market rents. The Debtors commenced negotiations with landlords in February 2018, seeking concessions that would rationalize the Debtors' lease portfolio so that it is more in line with current market rent. As a result, the Debtors have filed a motion to reject leases at the following The Walking Company and Big Dog store locations: Store # 246 – Dallas, TX; Store # 416 – Oklahoma City, OK; Store # 272 – Madison, WI; Store #517 – Chesterfield, MO, and Store #403 – Syracuse, NY.

25.     Meanwhile, rent reduction negotiations are ongoing with landlords at virtually all of the Debtors' remaining store locations.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

26.     In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 case, the Debtors have requested various types of relief in the First Day Motions filed simultaneously with this Declaration. A summary of the relief sought in each First Day Motion is set forth below.[3]

27.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge,

---

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day Motions.

information and belief, and I believe that the type of relief sought in each of the First Day

Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption;

and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates

and creditors.

A.    **Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (i) Approving Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying Automatic Stay, (vi) Granting Related Relief, and (vii) Scheduling a Final Hearing**

28.    The Debtors seek authority to consummate a new $57.25 million senior,

secured debtor-in-possession financing facility (the "DIP Facility") with Wells Fargo Bank,

National Association ("Wells") on the terms set forth in the DIP Agreement (as defined below),

consisting of a revolving facility in an amount up to $50 million and a term loan facility in an

amount up to $7.25 million.  The proceeds of the DIP Facility will be used to repay the existing

Prepetition Revolving Credit Obligations and Prepetition Term Loan Obligations, and to provide

continued access to financing for the Debtors on a postpetition basis pending consummation of

the Debtors' chapter 11 reorganization plan.  Wells also has committed to provide exit financing

to the Debtors pursuant to that certain *Senior Secured Credit Exit Facility Commitment Letter*

dated March 5, 2018 (the "Exit Facility Commitment Letter"), addressed further below.

29.    The DIP Facility will consensually prime the Prepetition Senior

Obligations and the Prepetition Subordinated Obligations.  Each of the Debtors is a Loan Party

under the DIP Facility.  The lead borrower is The Walking Company (the "Lead Borrower" or

"TWC"), and the remaining borrowers are FootSmart, Inc. ("FootSmart") and Big Dog USA,

Inc. ("Big Dog").  The Walking Company Holdings, Inc. is party to the DIP Facility as the parent ("Parent").

30.     The DIP Facility presents these estates with the best economic terms available that will allow the Debtors to repay the existing Prepetition Senior Obligations, while providing adequate liquidity to maintain operations in the ordinary course and satisfy ongoing administrative expenses associated with these cases.   The Debtors are an operating retail business with hundreds of employees, vendors, and customers that depend on the Debtors' continuing performance of their ongoing business obligations.  The Debtors have an urgent and immediate need to obtain financing and for authority to use Cash Collateral in order to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with employees, vendors, and customers; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs.  The foregoing expenditures are critically necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Debtors' proposed chapter 11 reorganization plan.  Without access to funding under the DIP Facility and use of Cash Collateral, the Debtors would be forced to cease operations and liquidate their assets.

31.     The Debtors intend to continue operations with their ordinary course prepetition practices, without material interruption or alteration.  Further, the Debtors have the consent of the Prepetition Senior Creditors and Prepetition Subordinated Creditors, pursuant to applicable intercreditor agreements, to implement the DIP Facility and access Cash Collateral.

32.     As part of the Debtors' restructuring efforts, the Debtors coordinated with the Prepetition Senior Creditors and the Debtors' equity holders, and obtained commitments for financing from both groups. Specifically, the Prepetition Senior Creditors indicated a willingness to continue funding the Debtors on a postpetition basis through the DIP Facility, and to provide exit financing pursuant to the terms of the Exit Facility Commitment Letter. The Debtors' equity holders have committed to an infusion of $10 million under the proposed plan, and the Prepetition Subordinated Noteholders have agreed to extend the maturity dates under the Subordinated Note Documents by three (3) years.

33.     Separately, the Debtors performed due diligence regarding the reasonableness of the terms proposed for the DIP Facility, including by comparing such terms to five (5) debtor-in-possession credit facilities provided to retail and consumer products companies and originated within the last 12 months. Based on such analysis, the Debtors believe that the DIP Facility is provided on reasonable market terms. In addition, the Debtors contacted six (6) prospective lenders about the terms under which such lenders would provide debtor-in-possession funding to the Debtors through a refinancing of the Prepetition Senior Obligations. No lender would be willing to provide financing to the Debtors on an unsecured or subordinated basis, or on materially better terms than Wells. Further, alternative financing would require the Debtors to pay prepayment fees of over $400,000 in connection with the Prepetition Senior Obligations that Wells is prepared to waive if, among other conditions, the transactions contemplated under the Exit Facility Commitment Letter actually close.

34.     After careful review of their financing options, the Debtors concluded that Wells' proposed terms would allow the Debtors to meet their goals and provide the Debtors with

sufficient liquidity on the best available economic terms. As noted above, Wells has also provided the Exit Facility Commitment Letter, through which the Debtors will continue to have access to sufficient liquidity for their ongoing operations as well as to provide confidence to vendors and employees that the Debtors will be able to operate successfully post-emergence. All negotiations with Wells were conducted at arms' length and in good faith and proceeded over several weeks as the Debtors sought to secure the best possible terms under the circumstances. The outcome of such negotiations is the DIP Loan Agreement and the Exit Facility Commitment Letter pending before this Court.

35.     The Debtors now seek to move forward with the proposed DIP Facility on the terms set forth in the DIP Loan Agreement and any ancillary documents or agreements. Pursuant to the DIP Facility, the Debtors intend to repay the Prepetition Senior Obligations, initially as a creeping roll-up of the Prepetition Revolving Credit Loans following entry of the Interim Order, and then repayment of the remaining Prepetition Senior Obligations, including the Prepetition Term Loan, upon entry of the Final Order. The Debtors also will draw on the DIP Facility in order to satisfy the Debtors' ongoing working capital needs. The Debtors believe that the Prepetition Senior Obligations are substantially oversecured and that payment of the Prepetition Senior Obligations is necessary in order to obtain access to the DIP Facility.

36.     The Debtors view the DIP Facility as an important step toward the successful consummation of their chapter 11 reorganization plan, including the closing of an exit facility in accordance with the Exit Facility Commitment Letter. In the Debtors' exercise of business judgment, the DIP Facility consists of terms that are fair, reasonable and appropriate under the circumstances, and should be approved.

**B.**   **Motion for Entry of Order Authorizing the Debtors to (i) Assume Exit Facility Commitment Letter, (ii) Pay and Reimburse Related Fees and Expenses, and (iii) Indemnify the Parties Thereto**

37.     The Debtors have proposed the Plan, which contemplates a new senior secured exit financing facility in order to repay the proposed DIP Facility addressed above, and to provide additional working capital liquidity to the reorganized Debtors on a post-emergence basis. The proposed exit facility with Wells satisfies this requirement.

38.     Consistent with the Plan, the Debtors negotiated the terms of the Exit Facility Commitment Letter with Wells and agreed upon such commitment prior to the commencement of these bankruptcy cases. The Debtors believe that the financing contemplated under the Exit Facility Commitment Letter is advantageous to the Debtors given the low interest rate that will be charged and the amount of liquidity (up to $55 million) that will be made available to the reorganized Debtors, subject to the borrowing base and other conditions set forth in the Exit Facility Commitment Letter. By entering into the Exit Facility Commitment Letter, the Debtors are providing all stakeholders, customers, vendors, contract counterparties, and other interested parties with evidence that the Plan is not only feasible, but also will be consummated within the milestones set forth in the DIP Facility.

39.     The Debtors seek to assume the Exit Facility Commitment Letter in order to ensure that the funding contemplated thereunder will be available to the Debtors following confirmation of the Plan, and to allow the Debtors to proceed promptly to consummate the Plan in accordance with the milestones in the DIP Facility. By assuming the Exit Facility Commitment Letter, the Debtors will be agreeing to two basic obligations: (a) to reimburse Wells for its reasonable fees and expenses in connection with its due diligence and preparation of

definitive documents with respect to the contemplated exit facility, and (b) to indemnify Wells as to any damages or losses that Wells or its affiliated persons may incur as a result of, or in connection with, the exit facility.

40.     Under the Exit Facility Commitment Letter, Wells has agreed to act as the sole administrative and collateral agent under the Exit Facility. The Exit Facility Commitment Letter sets forth certain of the anticipated terms and conditions of the Exit Facility, as summarized further below. Consummation of the Exit Facility will be subject to the completion of definitive documentation, the satisfaction of certain conditions, including this Court's approval thereof, and the payment by the Debtors of required fees and expenses.

41.     The proceeds of the Exit Facility, upon closing, would be used to (a) repay or refinance the DIP Facility, (b) pay fees and expenses related to this transaction, (c) satisfy ongoing capital expenditures, and (d) provide for the ongoing growth and working capital needs of the Debtors.

42.     Interest on the indebtedness under the Exit Facility is expected to accrue based on the applicable LIBOR-based rate, as set forth in the Exit Facility Commitment Letter. The obligations of the Debtors and their existing and future subsidiaries are, subject to certain conditions, to be secured by a first priority perfected security interest in substantially all of the Debtors' assets.

43.     Pursuant to the Exit Facility Commitment Letter, the Debtors are required to jointly and severally reimburse Wells from time to time on demand for all reasonable out-of-pocket fees, costs, and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of Choate, Hall & Stewart LLP, as counsel to Wells, and of

special and local counsel to Wells, and (b) due diligence costs and expenses) incurred in connection with the Exit Facility and the Exit Facility Commitment Letter (including, without limitation, in connection with the due diligence, approval, negotiation, preparation of the definitive documentation therefor, and closing), and the other transactions contemplated thereby. The Debtors also will agree to jointly and severally pay all costs and expenses of Wells (including, without limitation, fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights and remedies under the Exit Facility Commitment Letter. Together, the foregoing fees, costs, expenses of Wells outlined in this paragraph are referred to herein as the "Wells Expenses."

44. Further, the Exit Facility Commitment Letter contains a standard indemnification provision in favor of Wells, pursuant to which the Debtors agree to indemnify and hold harmless Wells and each lender and each of their respective affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by the Exit Facility Commitment Letter or any related transactions or (b) the Exit Facility and any other financings, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a

final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

45.     The Exit Facility Commitment Letter expires on June 14, 2018, if the initial borrowing under the Exit Facility has not occurred by then.

46.     The Debtors have determined, in the exercise of their business judgment, that it is critical to the execution of the Plan and the Debtors' operations post-emergence to assume the Exit Facility Commitment Letter. Given the importance of the Exit Facility to a successful reorganization in these cases, the Debtors have determined that obtaining Court approval to assume the Exit Facility Commitment Letter is in the best interests of their estates. The Debtors believe that, in light of all of the facts and circumstances of these cases, the terms of the Exit Facility Commitment Letter are fair, reasonable, and appropriate and are integral to assuring that the Debtors' estates can maximize their value for all stakeholders.

47.     The terms of the Exit Facility Commitment Letter are the product of good faith and arm's length negotiations among the Debtors and Wells, as well as their respective counsel and financial advisors. Under the Exit Facility Commitment Letter, the Debtors are committing to reimburse Wells for its reasonable expenses (*i.e.*, the Wells Expenses) incurred as part of its due diligence in connection with the Exit Facility and the preparation and negotiation of definitive documentation relating thereto. As is customary, Wells would not undertake the significant investment of time and resources involved in originating the Exit Facility absent the Debtors' agreement to reimburse the Wells Expenses.

48.     Further, the indemnification provisions under the Exit Facility Commitment Letter offer standard protections by the Debtors to the Indemnified Parties

(including Wells) to ensure that such parties can turn to these estates for reimbursement in the event that they suffer losses through their financing efforts in support of these cases.

49. The Debtors believe that the terms and conditions set forth in the Exit Facility Commitment Letter are well within the range of "market" fees, protections and other terms typically received by parties entering into similar agreements and reflect an exercise of their sound business judgment. Accordingly, in the exercise of their business judgment, the Debtors have determined that the reimbursement provisions of the Exit Facility Commitment Letter and the indemnification provision therein should be approved.

**C. Motion for Order Under Sections 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts, Checks and Related Forms; (iii) Continued Performance of Intercompany Transactions; (iv) Limited Waiver of Section 345(b) Deposit and Investment Requirements and (v) Granting Related Relief**

50. The Debtors seek (a) authority to (i) maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institutions where the Debtors' bank accounts are maintained and to continue to use their existing business forms and check stock; (ii) continue to use their existing Cash Management System, as provided in the motion; (iii) continue to perform intercompany transactions among the Debtors; and (iv) obtain a limited waiver of the requirements pursuant to section 345(b) of the Bankruptcy Code to the extent required.

51. The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. The Cash Management System currently consists of seven bank accounts, which includes approximately

21

30 subaccounts at selected banks whose branches are located near the Debtors' various store locations. The Cash Management System is designed to effectuate the collection of revenue from customers, pay operating expenses, and maintain payroll obligations. Any disruption caused by requiring the Debtors to close its existing bank accounts, open new bank accounts and establish a new cash management system would jeopardize the Debtors' ability to satisfy post-petition obligations and maintain their relationships with customers.

52. Thirty-nine of the fifty-two depository accounts are with banks that have been approved as a depository for funds of debtors in possession by the United States Trustee for Region 3. The remaining thirteen accounts are with banks that have not been pre-approved by the United States Trustee for Region 3. However, the Debtors have confirmed that each of the depository accounts is FDIC insured. Further, the amounts deposited in the depository accounts rarely exceed $30,000 and would never approach the FDIC insurance limits. Thus, the funds maintained in the depository accounts are not at risk.

53. Consequently, I believe that maintaining the existing Cash Management System and approval of the Cash Management Motion is not only essential, but is in the best interests of the Debtors' estates, their creditors, and parties in interest

**D. Motion for Interim and Final Orders (a) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (b) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (c) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (d) Granting Related Relief**

54. The Debtors seek entry of interim and final orders (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting

Utility Companies from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

55.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telecommunications (including telephone and internet/data), water, waste disposal, and other similar services from a number of utility companies or brokers.

56.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations. The Debtors' operations require electricity and gas for lighting, heating, trash, sewer services, air conditioning, and telecommunications (including telephone and internet/data). Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to operate their business. Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

57.     The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner. Cash held by the Debtors, cash generated in the ordinary course of business, and cash available to the Debtors through their debtor in possession financing facility, will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with prepetition practice.

58.     To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $111,000, which represents an amount equal to approximately one half of the Debtors' average monthly cost of Utility Services. The Adequate Assurance Deposit will be held in the segregated account for the duration of these chapter 11 cases. The

Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in accordance with prepetition practice, constitutes sufficient adequate assurance to the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code.

59.     Based on the foregoing, the relief requested in the Utilities Motion is not prejudicial to any party-in-interest and, in fact, only benefits the Debtors' estates and their creditors. Accordingly, I submit that the proposed adequate assurance is sufficient and that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and parties-in-interest.

**E.      Motion Pursuant to Sections 105(a), 507(a)(8), and 541(d) of the Bankruptcy Code for an Order Authorizing Payment of Prepetition Sales, Use and Franchise Taxes and Similar Taxes and Fees**

60.     The Debtors seek entry of an order authorizing the Debtors to pay any Sales and Use Taxes, Franchise Taxes, Personal Property Taxes and Business Fees in the ordinary course of the Debtors' business, including, without limitation, Sales and Use Taxes or Franchise Taxes subsequently determined on audit to be owed for periods prior to the Petition Date, authorizing banks and financial institutions to honor and process checks and transfers related thereto.

61.     The Debtors further seek authority to remit Prepetition Tax Obligations in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared[4] and amounts that may be subsequently determined on sales tax audit or adjustment to be owed a particular Taxing Authority or party who ordinarily collects the Prepetition Tax Obligations) not

---

[4] The Debtors request authority to reissue any amounts paid by check prepetition that have not cleared as of the Petition Date and are dishonored.

to exceed $1,300,000, without prejudice to the Debtors' rights to contest the amounts of any

Prepetition Tax Obligations on any grounds they deem appropriate.

62.     The Debtors estimate that, as of the Petition Date, they owe the

approximate amount in Prepetition Tax Obligations:

| Type of Tax | Prepetition Amount |
|---|---|
| Sales & Use Tax | $900,000 |
| Franchise Tax | $100,000 |
| Personal Property Tax | $200,000 |
| Business Licenses, Permits & Other Fees | $100,000 |
| **Total** | $1,300,000.00 |

63.     Accordingly, I believe payment of the Prepetition Tax Obligations is in the

best interest of the Debtors' estates and therefore request that the motion be granted.

**F.     Motion for Entry of an Order Authorizing the Debtors to (i) Pay and/or Honor Prepetition Wages, Salaries, Commissions, Incentive Payments, Employee Benefits, and Other Compensation and Pay Third Party and Contract Workers; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests**

64.     The Debtors request, in their sole discretion, the authority (a) to pay and

honor, *inter alia*, certain prepetition claims of their Employees for Wages and pay Third Party

Labor Provider Costs, (b) pay and honor employee benefits and expense reimbursements  and

honor and pay commissions and incentive payments owed to certain non-insider Employees

(collectively, the "Benefits" and, together with Wages, the "Wages and Benefits");  (c) remit

withholding obligations and employee deductions and withholdings, and (d) to continue to pay

and honor such Wages and Benefits as they become due postpetition in the ordinary course of the

Debtors' business.

65.     As of the Petition Date, the Debtors employed 1,602 Employees, of which 929 are employed full-time and 673 are employed part-time. Full-time Employees are those normally scheduled to work on average of 32 or more hours per week while part-time Employees are those normally scheduled to work on average of less than 32 hours per week. Except as otherwise noted, the Benefits are generally limited to full-time Employees. 110 Employees are salaried (the "Salaried Employees") and 1,492 Employees are paid on an hourly basis (the "Hourly Employees"). The Employees are not unionized.

66.     The Debtors' Employees are paid in arrears. Salaried Employees and Hourly Employees are each paid every other Friday (each, a "Bi-weekly Pay Date"), with the exception of approximately 20 Employees in Rhode Island and New Hampshire who receive paychecks on every Friday (each, a "Weekly Pay Date" and together with each Bi-weekly Pay Date, a "Pay Date"). The next Bi-weekly Pay Date will be on March 16, 2018, and the next Weekly Pay Date also will be on March 16, 2018.[5] As of the Petition Date, the Debtors estimate they owed approximately $800,000 on account of accrued, but unpaid wages, for Hourly Employees and approximately $300,000 for Salaried Employees, for a total of approximately $1,100,000[6] (the "Unpaid Wages").

67.     The Debtors seek authority to permit Paylocity to continue to process the Debtors' payroll obligations in the ordinary course of business. On a monthly basis, and subject to seasonal payroll adjustments, the Debtors pay Paylocity fees monthly, in arrears, to process their payroll. The Debtors believe that they are current in fees owing to Paylocity. In an

---

[5] On March 5, 2018, the Debtors paid Rhode Island and New Hampshire Employees for weekly payroll that would otherwise be paid on March 9, 2018. Funds were wired to Paylocity on March 5, and all Employees in those locations are paid by direct deposit.
[6] Inclusive of estimated Commissions (defined and discussed below).

abundance of caution, to the extent that any prepetition fees are still outstanding to Paylocity as of the Petition Date, the Debtors request authority, in their discretion, to remit such amounts, not to exceed $7,500.

68. *Gross Pay Deductions and Payroll Taxes*. For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans.

69. On average, the Debtors' payroll Deductions total approximately $150,000 each Bi-Weekly Pay Date and, for New Hampshire and Rhode Island Employees, $1,000 each Weekly Pay Date, which the Debtors remit to the appropriate third-party recipients. As of the Petition Date, certain of the Deductions may not yet have been transmitted to the appropriate third party recipients and the Debtors request authority to transfer any Deductions to the appropriate third party recipients or as may be required under applicable nonbankruptcy law.

70. In addition to the Deductions, federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtors must also pay, from their own funds, for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes").[7] On average, the Payroll Taxes

---

[7] In addition, certain states charge the Debtors for taxes and other amounts relating to payroll items, such as temporary disability insurance charged by Hawaii and New York (which are handled through third-party insurance companies) and city-sponsored health insurance charged by the City of San Francisco. These amounts are paid quarterly, in arrears. The Debtors believe that any such amounts that may be owed as of the Petition Date are de

for each Bi-weekly Pay Date, including both the Employee and employer portions, totaled

approximately $525,000. For New Hampshire and Rhode Island Employees, on average the

Payroll Taxes for each pay period, including both the Employee and employer portions, totals

approximately $4,000.

71.     To the extent any of the prepetition Deductions or Payroll Taxes have not

yet been forwarded to the appropriate third-party recipients, the Debtors seek authority to

forward such amounts (and to continue to forward Deductions and Payroll Taxes on a

postpetition basis whether or not related to the prepetition period) to the applicable third-party

recipients in the ordinary course of business and consistent with past practice.

72.     *Reimbursable Expenses.* Employees customarily incur business expenses

in the ordinary course of performing their duties on behalf of the Debtors. Such expenses may

include, but are not limited to, cell phone expenses, office supply purchases and business-related

travel expenses, including air travel, car rental, lodging, meal charges, ground transportation, and

miscellaneous other allowed travel expenses (the "Reimbursable Expenses"). In addition, certain

Employees have corporate-issued American Express credit cards upon which Reimbursable

Expenses are charged and for which the Employees are personally responsible, but which

invoices are paid by the Debtors to the extent the charges are authorized.

73.     In the aggregate, the Employees incur, on average, approximately

$110,000 per month in Reimbursable Expenses, including corporate credit card expenses. The

Debtors seek authority to pay unpaid prepetition Reimbursable Expenses owed as of the Petition

---

minimis and do not exceed $10,000 in the aggregate. These amounts are included in the estimated Payroll Taxes set
forth in this paragraph.

Date, not to exceed $150,000, and to continue to honor, reimburse, and pay postpetition Reimbursable Expenses in the ordinary course of business in their discretion.

74.     *Third Party Labor Providers.*  The Debtors utilize the services of certain staffing firms to provide labor service for the Debtors' distribution center (collectively, the "Third Party Labor Providers"). Without the Third Party Labor Providers, the Debtors would not be able to fulfill orders and process inventory. Due to the seasonal nature of the Debtors' business, the Debtors need the flexibility to hire and downsize such labor depending upon the Debtors' needs, which can change quickly. As of the Petition Date, the Debtors estimate that they may owe up to $25,000 to the staffing agencies on account of Third Party Labor Provider Costs. The Debtors seek authority, in their discretion, to pay up to $50,000 in prepetition Third Party Labor Provider Costs, and to continue to use the services of the Third Party Labor Providers and pay postpetition Third Party Labor Provider Costs in the ordinary course of business and in their discretion.

75.     *Commissions.*  The Debtors provide approximately 1,300 Employees, who are employed as retail sales associates, commissions based on the achievement of certain product sales (the "Commission Program"). These commissions are considered part of the recipient Employees' overall compensation even though they are tied to the successful sale of the Debtors' merchandise. As of the Petition Date, the Debtors estimate that they may owe up to $100,000 in accrued but unpaid commissions owed under the Commission Program (the "Prepetition Commissions").[8] The Debtors seek authority to pay up to $100,000 in unpaid Prepetition Commissions. The Debtors also seek to continue to pay commission amounts that arise

---

[8] Included in the unpaid prepetition Wages figure above.

postpetition pursuant to the Commission Program in the ordinary course of business in the Debtors' discretion.

76.      *Retail Incentive Program Payments.*  The Debtors provide certain Employees with a retail incentive bonus program based on, among other things, the achievement of certain sales metrics; the successful opening, training, and service of third party retail sales outlets for the Debtors' products within a specified time period (the "Retail Incentive Program").[9]  As of the Petition Date, the Debtors estimate they may owe up to $85,000 on account of earned and accrued unpaid incentive payments owed under the Incentive Program (the "Retail Incentive Program Payments").  None of the Employees to whom Retail Incentive Program Payments will be paid pursuant to this Motion are insiders of the Debtors.  The Debtors wish to honor the prepetition amounts owed to their Employees for Retail Incentive Program Payments as these amounts are an element of compensation that is relied upon by participating Employees.  The Debtors seek authority, in their discretion, to pay the Retail Incentive Program Payments up to $85,000 in the aggregate, and to continue to pay the Retail Incentive Program Payments that may arise postpetition in the ordinary course of business and in the Debtors' discretion.

77.      *Closed Store Manager Payments.*  The Debtors entered into certain prepetition arrangements to provide incentive payments with certain of their store managers and other personnel for stores that either closed prepetition, or which were in the process of being closed postpetition, to ensure the orderly wind-down and closure of these stores (the "Closed

---

[9]  In addition, the Debtors also provide discretionary annual incentive program payments with respect to certain corporate Employees.  The Debtors do not seek to pay any Incentive Program Payments for these corporate Employees through this Motion, but reserve the right to seek approval of such amounts at a later date, if any.

Store Manager Payments"). The Debtors estimate that they may owe up to $10,000 on account of prepetition Closed Store Manager Payments. The Debtors require the services of these store managers to ensure that store closings are wound down in an orderly and cost effective manner. The Debtors seek authority, in their discretion, to pay the Closed Store Manager Payments up to $65,000 in the aggregate, and to continue to pay any Closed Store Manager Payments that may arise postpetition in the ordinary course of business and in the Debtors' discretion.

78. *Recruiting Incentive Payments*. The Debtors offer incentive payments in the amount of $250 to certain of their personnel to recruit new employees to work at the Debtors' retail stores (the "Recruiting Incentive Payments" and, together with the Retail Incentive Program Payments and Closed Store Manager Payments, the "Incentive Program Payments"). To trigger payment, the new Employee must successfully complete 90 days of employment. The referring Employee must be in active employment status with the Debtors in order to be eligible to receive the Recruiting Incentive Payment. Historically, the cost of the Recruiting Incentive Payments has been approximately $1,250 to $1,750 annually. The Debtors do not believe that they owe any prepetition Recruiting Incentive Payments. The Debtors seek authority, in their discretion, to continue to pay any Recruiting Incentive Payments that may arise postpetition in the ordinary course of business and in the Debtors' discretion.

79. *Health Benefits*. The Debtors provide health insurance to Employees, including, *inter alia*, medical, dental, vision, disability, COBRA, flexible spending accounts, health reimbursement accounts, and dependent care benefits (collectively, the "Health Plans"), as described in more detail below. Each pay period, Employees make contributions toward the Health Plan premiums for medical, dental and vision coverage, and the Debtors deduct the

Employees' portions of the premiums, if applicable, owing under the Health Plans from their Wages as Deductions.

80. *Medical and Dental Plans.* The Debtors offer all regular full-time employees and legal dependents company-subsidized medical and dental insurance. The Debtors are self-insured for their medical and dental insurance and use UnitedHealthCare as their plan administrator. The Debtors also implement a specific stop-loss program whereunder any individual medical claim exceeding $150,000 is fully covered by Berkley Accident and Health. To administer its plan, the Debtors pay each of UnitedHealthCare and Berkley a monthly fee at the beginning of the month for that coming month. The Debtors are paid current on administrative fees to UnitedHealthCare and Berkley. The Debtors also make a $104,000 deposit at the start of the plan year which the Debtors replenish as UnitedHealthCare draws down on the account every Wednesday for medical and dental claims paid on the Debtors' behalf during the previous week. Participating Employees' contributions to the medical and dental plans are deducted from such Employees' bi-weekly pay.

81. The Debtors offer eligible Employees who reside in Hawaii (the "Hawaiian Medical Plan") through Hawaii Medical Assurance Association ("HMAA"), a PPO plan, which allows Employees to use any doctor or hospital, with savings through in-network providers and facilities. The Debtors pay a portion of the premiums to HMAA, and the Employees are responsible for a portion of such premiums deducted through payroll withholdings.

82. The Debtors paid approximately $3,088,000 (not including approximately $1,555,000 of Employee contributions) in annual administration fees, premiums, and claims in

the aggregate on account of the Medical Plans. It is unknown at any given time what is outstanding on account of claims under the Medical Plan. The Debtors seek authority to continue to pay postpetition amounts under the Medical Plans in the ordinary course of business and in the Debtors' discretion.

83. Additionally, to limit its exposure to claim costs due to the self-insured nature of the Debtors' medical and dental insurance, the Debtors provide a $1,750 annual "Alternative Coverage Bonus" for Employees who decline coverage under the Debtors' medical and dental insurance plan provided they prove coverage under a spouse's plan or other insurance plan. The Alternative Coverage Bonus is paid out over 26 pay periods. The Motion seeks authority to continue to honor its obligation to pay the Alternative Coverage Bonus, at the Debtors' discretion.

84. Lastly, the Debtors provide a supplemental health benefit to certain key employees, whereby all medical and dental expenses incurred by the participating employees, including but not limited to deductibles and co-pays, which are not otherwise covered under the Employees' insurance, are reimbursed by the Debtors. There is no prepetition liability for this supplemental health benefit. The Motion seeks only authority to continue the benefit at the Debtors' discretion.

85. *Vision Plan.* The Debtors also provide full-time Employees with vision insurance through a premium-based policy issued by VSP (the "Vision Plan"). The Vision Plan provides several types of services, including eyeglass lenses, frames, and contact lenses. The Vision Plan provides both in-network and out-of-network services. The Vision Plan is 100% funded by Employees through withholdings from payroll. The Debtors seek authority to

continue to offer the Vision Plan, administer Employee withholdings, and pay to VSP amounts owed under the Vision Plan post-petition in the ordinary course of business and in the Debtors' discretion.

86. *Pharmacy Benefit.* The Debtors offer a pharmacy benefit (the "Pharmacy Benefit") to Employees who participate in the Debtors' Health Plan. Rx-N-Go is a discounted mail-order pharmacy service and provides an economical alternative to discounted retail pharmaceuticals. The program is free to Employees. Previously, the Debtors have paid approximately $2,000 monthly in the aggregate on account of the Pharmacy Benefit. However, it is a relatively new benefit that the Debtors believe is experiencing increased usage by Employees. The Debtors, therefore, seek authority to pay up to $4,000 on account of prepetition amounts owed with respect to the Pharmacy Benefit and to continue to pay postpetition amounts related thereto in the ordinary course of business and in the Debtors' discretion.

87. *COBRA.* Former Employees electing to receive COBRA benefits pay a fixed premium to UnitedHealthCare, the Debtors' COBRA administrator, totaling approximately $5,200 per month. As of the Petition Date, the Debtors are unaware of any outstanding prepetition administrative COBRA fees that may be owed. Out of an abundance of caution, the Debtors seek authority to pay any unpaid prepetition COBRA administrative fees up to $500 to UnitedHealthCare, and to continue to pay postpetition COBRA administrative fees in the ordinary course of business and in the Debtors' discretion.

88. *Flexible Spending Accounts and Dependent Care Spending Accounts.* The Debtors offer eligible Employees the ability to contribute a portion of their pre-tax compensation to pay for certain health care and expenses or dependent care expenses through a program (the

"Flexible/Dependent Care Spending Account Program") managed by UnitedHealthCare. Flexible spending accounts and dependent care spending accounts are funded with Deductions from participating Employees' pre-tax payroll, all pursuant to applicable IRS guidelines. The Debtors estimate that they withhold approximately $6,500 per month to fund participating Employees' flexible spending accounts and dependent care spending accounts as Deductions. The Debtors have funded an escrow account with $5,000 from which UnitedHealthCare deducts claims each Wednesday. Each week, the Debtors replenish the account balance to $5,000. In addition, the Debtors pay $1,600 per month in fees to administer the Flexible Spending Account Program. The Debtors seek authority to honor its obligations under the Flexible Spending Account Program, and to continue to pay any amounts under the Flexible Spending Account Program in the ordinary course of business and in their discretion.

89.     *Life Insurance, Accidental Death & Dismemberment, and Disability Plans.* The Debtors provide basic life and accidental death and dismemberment coverage of a maximum $30,000 benefit to full-time Employees participating in the Debtors' medical plan (the "Basic Life and AD&D Insurance Plan") through UnitedHealthCare at no cost to eligible Employees. The Debtors pay all premiums in connection with the Basic Life and AD&D Insurance Plan.

90.     Additionally, the Debtors offer supplemental life, short term and long term disability insurance to their eligible Employees with Lincoln Financial Group (the "Disability and Supplemental Life Insurance Plan"). The Debtors pay 100% of premiums for a long-term disability benefit for certain Employees who are Vice Presidents. Employees may voluntarily elect supplemental life, short term and long term disability insurance under the Disability and

Supplemental Life Insurance Plan. The Debtors pay Lincoln Financial Group premiums in the approximate aggregate amount of $9,000 per year, and Employees cover the balance of the cost of the Disability and Supplemental Life Insurance Plan out of payroll deductions.[10]

91. The Debtors estimate that they remit approximately $10,000 per month on account of premiums and administrative fees under the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan. The Debtors seek authority to pay unpaid prepetition amounts on account of the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan up to $15,000, and to continue to pay postpetition premium amounts on account of the Basic Life and AD&D Insurance Plan and Disability and Supplemental Life Insurance Plan in the ordinary course of business and in the Debtors' discretion.

92. *Holidays, Vacation and Sick Time.* The Debtors provide holiday pay for full-time Employees. The Debtors also provide their full-time Employees vacation time ("PTO") as follows:

| Continuous Employment | Maximum Hours Accrued Per Year[11] | Maximum Total Accrual Hours |
|---|---|---|
| Year 1 | 40 | 40 |
| Years 2-5 | 80 | 120 |
| Year 6 and thereafter | 120 | 180 |

93. The Debtors also offer full-time Employees paid sick time ("Sick Time").[12] The Debtors' Sick Time benefits consist of five days per year based on the

---

[10] The Debtors also provide term life insurance for certain of its executives (the "Executive Life Insurance Plan"). The Debtors pay approximately $22,000 per year in premiums on account of the Executive Life Insurance Plan. The Debtors are not seeking authorization herein to continue the Executive Life Insurance Plan and reserve the right to seek separate authority to do so.

[11] The Debtors have on occasion agreed to provide certain new hires with two weeks of PTO, on a negotiated basis.

[12] Some local and state jurisdictions mandate sick time benefits for part-time employees. The Debtors comply with all applicable laws with regard to its sick time policies.

Employee's anniversary date. Unused sick leave may be accumulated from year to year. If unused sick leave reaches more than 10 days (80 hours), as a show of appreciation, the employee may request either: (1) a bonus check for 50% of the value of the hours over 80, or (2) vacation time equal to half of any accrued sick leave over 80 hours (provided that moving these hours does not cause the employee to exceed the 120 or 80 hour vacation ceiling). Unused Sick Time is not paid at the time of termination. By this Motion, the Debtors seek authority to continue to honor their PTO and Sick Time programs in the ordinary course of business by allowing Employees to use accrued prepetition PTO and Sick Time postpetition in the Debtors' discretion. The Debtors also seek authority, but not the obligation, in their sole discretion, to pay out any accrued and prepetition PTO and Sick Time amounts that are owed to Employees solely to the extent their employment with the Debtors is terminated postpetition, provided that no Employee shall be paid more than $12,850 on account of all payments of accrued and prepetition amounts owing to such Employee for wages and benefits including such PTO and Sick Time.

94.      *401(k) Plan.* The Debtors provide full-time Employees with a 401(k) retirement plan (the "401(k) Plan"). The Debtors also match, depending on Employee tenure, 50% of the first 6% of Employee contributions (capped at $1,000 per year) up to 100% of Employee contributions (capped at $2,000 per year). Employee contributions are withheld from paychecks as Deductions. The Debtors' matching contributions are made to the 401(k) Plan in connection with each applicable payroll and are subsequently deposited to the participating Employees' respective 401(k) accounts by Fidelity as Deductions. In 2017, the Debtors matched

approximately $652,000 of Employee contributions to the 401(k) Plan.[13]  To the extent any

prepetition 401(k) Deductions have not yet been made, the Debtors seek authority to process

those Deductions.  The Debtors also seek authority, in their discretion, to continue to their 401(k)

Plan postpetition in the ordinary course of business, including continuing to match Employee

contributions to the 401(k) Plan consistent with their 401(k) Plan policy.

        95.     The Debtors employ Decker, Farrell & McCoy, LLP ("DFM") to audit the

401(k) Plan (the "401(k) Plan Audit").  The annual 401(k) Plan Audit fee is approximately

$10,000.  Although the Debtors believe they are current on their obligations with respect to the

401(k) Plan Audit, out of an abundance of caution, the Debtors seek authority pursuant to this

Motion to pay up to $20,000 on account of prepetition amounts owed to DFM and to continue to

pay postpetition amounts with respect to the 401(k) Plan Audit in the ordinary course of business

and in their discretion.

        96.     *Other Benefits*.  The Debtors offer certain additional Benefits to their

Employees, the continuation of which is critical postpetition in order to prevent disruption within

the Debtors' workforce (the "Other Benefits"), including customer service for Employee

participants in the Debtors' Health Plan, parking reimbursement for Employees of the Debtors'

office in Santa Barbara, California, and auto reimbursement.  The average aggregate monthly

cost of the Other Benefits is approximately $9,055.  The Debtors seek authorization to pay

prepetition amounts owing on account of the Other Benefits up to a maximum aggregate amount

---

[13]  The net expense of the Debtors' match in 2017 was approximately $452,000, after application of a forfeiture account in the approximate amount of $200,000.

of $25,000 and to continue to provide the Other Benefits to Employees postpetition, in the Debtors' discretion.

97.    *Workers' Compensation Insurance.*  Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide Employees with coverage for injury claims arising from or related to their employment with the Debtors (the "WC Claims").  The Debtors workers' compensation program is fully insured ("WC Program"). For the current coverage year, the Debtors will pay an estimated annual premium to Zurich American Insurance Co. ("Zurich") in the amount of $965,000 to be trued up based on actual wages after the coverage year ends.  Of the $965,000 annual premium, $256,000 was paid at the commencement of the current coverage year August 2017 through July 2018 with the balance payable in nine (9) equal monthly installments of $78,000.  As of the Petition Date, the Debtors still owed three (3) monthly installments for the months of March through May 2018.  The Debtors hereby seek authorization to pay the WC Program Installments to Zurich as they come due in the ordinary course.

98.    For the Debtors' Employees employed in Ohio, the Debtors have state-mandated compensation insurance fund coverage (the "Ohio Program").  Under the Ohio Program, the Debtors' premiums are generally based on the number of Employees insured during each policy year.  The Debtors make monthly payments in the estimated amount of $1,285 to the Bureau of Workers' Compensation ("BWC"), and then true-up annually based on actual wages. The Debtors seek authorization to pay any amounts owed or that may be payable to the BWC, which relate to the prepetition period, when they come due in the ordinary course of business, up

to a maximum of $10,000 and to continue to pay postpetition amounts the BWC in the ordinary course of business in the Debtors' discretion.

99. For the Debtors' Employees employed in Washington, the Debtors have workers' compensation insurance fund coverage similar to that of Ohio that is paid through the Washington State Department of Labor and Industries (the "<u>Washington Agency</u>"). The Debtors make payments calculated on the amounts of hours worked by the Washington Employees. The Debtors seek authority to pay any amounts owed or that may be payable to the Washington Agency, which relate to the prepetition period, when they come due in the ordinary course of business, up to a maximum of $10,000[14] and to continue to pay postpetition amounts to the Washington Agency in the ordinary course of business in the Debtors' discretion.

100. In addition, for the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate WC Claims during these chapter 11 cases. Thus, the Debtors request that the automatic stay be modified to allow them to continue to assess, determine and adjudicate unpaid WC Claims in the ordinary course of the Debtors' business. In addition, to the extent any employees assert claims under the WC Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employees to proceed with their claims under the WC Program and to allow Zurich to administer, handle, defend, settle and/or pay a claim covered by the WC Program and the costs related thereto in accordance with the WC Program. For avoidance of doubt, this

---

[14] Amounts owing to the Washington Agency are calculated by Paylocity and paid/remitted through the Debtors' payroll processes, along with payroll taxes.

requested modification of the automatic stay described in this paragraph pertains solely to claims under the WC Program, and not to other claims made under different insurance policies.

101.     Accordingly, I believe payment of the Wages and Benefits is in the best interest of the Debtors' estates and therefore request that the motion be granted.

**G.     Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs in the Ordinary Course of Business**

102.     The Debtors seek entry of an order (a) authorizing, but not obligating, the Debtors in their sole discretion, (1) to maintain and administer the Customer Programs and (2) honor prepetition obligations to customers related thereto in the ordinary course of business; (b) continue, replace, implement, modify and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court.

103.     Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' reorganization efforts. In addition, the Debtors must maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to purchase the Debtors' products during the pendency of these chapter 11 cases.

104.     Specifically, the Customer Programs generally relate to the Debtors' programs in which they offer gift cards, refunds and exchanges, customer reward programs, and coupons to retail customers. The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to meet competitive market pressures, and to

ensure customer satisfaction, in order to retain current customers, attract new ones, and, ultimately, enhance revenue and profitability for the benefit of all the Debtors' stakeholders

### Customer Programs

105.    *Gift Cards.*  In the ordinary course of business, the Debtors sell gift cards (the "Gift Cards") to customers.  The Gift Cards do not have any expiration dates.  As of the Petition Date, the Debtors estimate that their customers hold Gift Cards with an outstanding aggregate value in excess of $1,700,000.  The redemption rate of the Gift Cards fluctuates depending on a given month or season, but generally averages $165,000 per month.  Gift Cards cannot be redeemed for cash except Gift Cards with de minimis value as required by applicable state law.  The Debtors request authority but not the obligation and in their sole discretion, to honor all Gift Cards purchased prior to the Petition Date and to continue honoring Gift Cards in the ordinary course of business.

106.    *Returns and Exchanges.*  Except for final clearance or special-order items which cannot be returned, the Debtors generally have a 30-day return policy for ecommerce and retail sales for either defective merchandise or original merchandise that is: (i) unworn, (ii) unused, and (iii) is accompanied with the original tags attached and/or sales receipts (the "Refund and Exchange Program").  Cash and check purchases of over $100.00 can be refunded by check issued within fifteen (15) business days of the receipt of the returned item.  Credit card purchases will be refunded by credit card chargeback.  Unworn merchandise without a sales receipt can be returned for store credit.

107.    For merchandise which has already been returned, the Debtors estimate that they have refund obligations to customers in the amount of approximately $150,000.00

(including issued and outstanding prepetition refund checks that were still uncashed as of the Petition Date) (the "Pending Refund Requests"). As a result of the of the uncertain nature of the Refund and Exchange Program, the Debtors are unable to estimate the amount of potential returns and exchanges with respect thereto as of the Petition Date. Accordingly, the Debtors request authority, but not the obligation, in their discretion to (i) honor the Pending Refund Requests in an amount not to exceed $150,000.00; (ii) continue to offer and honor the Refund and Exchange Program for eligible merchandise purchased prepetition; and (iii) to continue to honor the Refund and Exchange Program postpetition in the ordinary course of business.

108. *Customer Rewards Programs.* The Debtors offer their customers three levels of customer rewards programs (the "Customer Rewards Programs"). At the initial level, the *Rewards* program, customers earn one point for every $1.00 spent. For every 500 points earned, the customer receives a $20 *Rewards* certificate which can be applied towards purchases. For every 1500 points accrued, a free pair of shoes is earned. At the second level – *Rewards Plus* – customers receive the same benefits as at the initial level *Rewards* program plus free in-store shoe refreshing, bonus points and advance notice of special events and promotions. At the top level, *Rewards Elite* program customers earn free 2nd day business shipping, special savings and concierge services. The redemption rate under the Customer Rewards Programs fluctuates from month to month, although the Debtors believe that they have in excess of $200,000 value in *Rewards* points under this program as of the Petition Date. Accordingly, the Debtors request authority, but not the obligation, in their discretion to honor prepetition obligations with respect to Customer Rewards Programs and to continue to honor their Customer Rewards Programs postpetition in the ordinary course of business.

109.     *Coupons.* Debtors TWC and Big Dogs entered into a promotion contract with Groupon and sold coupons (the "Coupons") between August and October 2017 (the "2017 Coupon Program"). The Debtors estimate their liability to customers for Coupons at $40,000.00 as of the Petition Date. The Debtors do not currently offer a coupon program but the Debtors request the authority to honor the 2017 Coupon Program and initiate another such program postpetition as their determine in their sole discretion.

110.     *Kiosk Orders.* The Debtors' TWC retail stores collect money from customers for orders placed via their on-line kiosk store. The items purchased on-line are shipped from the Debtors' North Carolina distribution center directly to the customer. The Debtors estimate that they have collected approximately $145,000.00 from customers where the merchandise has not yet shipped. Accordingly, the Debtors request authority, but not the obligation, in their discretion to honor and ship any kiosk order placed prepetition where the product has not yet shipped.

**H.      Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Debtors to Pay Prepetition Claims of Shippers and Customs Representatives and Granting Related Relief**

111.     The Debtors seek the authority to continue to pay, in the ordinary course of business certain prepetition claims of the Debtors' shippers (including Freight Forwarders and Common Carriers as defined herein), shipping and delivery logistics agents, customs representatives and warehousemen (the "Shippers and Customs Representatives") who have (or may have) non-bankruptcy law remedies available to secure payment of their claims. The Debtors propose to pay such claims, when the Debtors, in their sole discretion, determine that such creditors' exercise of their remedies would unduly disrupt the Debtors' business. The

Debtors request the authority, but not the obligation, to pay up to $600,000.00 on account of such claims (the "Shipping and Custom Charges"). The Debtors also seek authority for all banks and financial institutions to honor any checks or requests for payment related to Shipping and Customs Charges whether presented prepetition or postpetition. Finally, the Debtors also seek authority to retain or obtain any Customs Bond needed, in their discretion.

112.     The Debtors sell Merchandise directly to consumers in the United States through the Debtors' retail stores ("Retail Stores"), specialty wholesaler ("Wholesale Customers"), and through electronic commerce sales directly to consumers ("E-commerce Consumers").

113.     The Merchandise is manufactured within the United States and elsewhere. The Debtors' business depends on the daily process of importing and shipping the Merchandise to stock the Retail Stores, Wholesale Customers and to make direct sales to E-commerce Consumers. The Merchandise is received into the Debtors' North Carolina distribution center (the "Distribution Center") and then shipped from there to the Retail Stores, Wholesale Customers or directly to E-commerce Consumers. The Debtor also has certain merchandise drop-shipped directly from its wholesale vendors to the consumer. The flow of Merchandise to and from the Debtors is dependent on the services provided by custom brokers, freight forwarders, and common carriers.

114.     *Freight Forwarders.* The Debtors engage the services of Freight Forwarders that contract for, coordinate, and ensure the transportation of the Merchandise to and from the Distribution Center. The Merchandise is manufactured within and outside the United States and must be shipped from the domestic or international manufacturing site to the

Distribution Center. Merchandise shipped internationally is subject to custom import duties upon arrival in the United States.

115. *Customs Brokers*. The Debtors rely on Customs Brokers to obtain possession of this Merchandise as it arrives in the United States from abroad and to expeditiously process the release of the Merchandise so it can be delivered to the Distribution Center.

116. *Common Carriers*. Merchandise at the Distribution Center is intended for sales through the Retail Stores, Wholesale Customers and E-commerce Consumers. After the Merchandise is brought to the Distribution Center by the Freight Forwarders, the Debtors then engage the services of certain Common Carriers to expedite shipment of Merchandise from the Distribution Center to the Retail Stores, Wholesale Customers and E-Commerce Consumers.

117. The estimated retail value of the Merchandise being transported and/or processed as of the Petition Date by the Shippers and Customs Representatives substantially outweighs the outstanding Shipping and Custom Charges. The Debtors' ability to pay the Shippers and Customs Representatives that are involved in the daily transportation of the Merchandise to the Distribution Center and then from the Distribution Center to the Retail Stores, Wholesale Customers and E-commerce Consumers is critically important to the Debtors' business operations.

118. The Debtors owe the Shippers and Customs Representatives approximately $1,000,000.00 for prepetition shipping, custom duties, and similar charges. In the event that such charges remain unpaid, the Shippers and Customs Representatives likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release goods in their possession until their claims are paid and their liens satisfied.

119. As noted above, the value of the Merchandise that is in transit with the Shippers and Customs Representatives substantially outweighs the Shipping and Custom Charges. The Debtors anticipate that the Shippers and Customs Representatives will demand immediate payment from the Debtors. Even absent a valid lien, the Shippers and Customs Representatives' mere possession (and retention) of the Debtors' Merchandise could severely disrupt the Debtors' operations and restructuring efforts.

120. Accordingly, I believe that the total proposed amount to be paid to the Shippers and Customs Representatives is justified and reasonable compared to the importance and necessity of the Shippers and Customs Representatives' releasing the merchandise worth tens of millions of dollars and delivery of same and the losses the Debtors may suffer if their operations and the administration of their estates are disrupted. Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers and Customs Representatives that are to be paid pursuant to this Motion.

121. *Customs Bond.* The Debtors have a Customs Bond in place to provide assurance of payment of United States Customs ("U.S. Customs") duties upon importation of goods into the United States. The Debtors do not anticipate any change in the existing Customs Bond and intend to keep the Customs Bond in place and renew or obtain any customs bond which may be needed going forward in the ordinary course of their businesses. Should the Customs Bond expire or otherwise be unavailable, clearance of certain Merchandise through U.S. Customs would be delayed or blocked which would be detrimental to the Debtors' business. Maintenance of any appropriate or required Customs Bond will ensure proper clearance of the Debtors' merchandise and avoid disruption in the Debtors' business.

## I. Motion for Entry of an Order (a) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and (b) Granting Related Relief

122.    The Debtors seek the entry of an order, (i) authorizing the Debtors to pay any prepetition amounts owing to the Critical Vendors in the ordinary course of business up to the Critical Vendor Cap, and (ii) approving of the form of the Vendor Agreement which may be utilized by the Debtor.

123.    The Debtors' business relies on their access to and relationship with a network of vendors and suppliers. Any disruption in the Debtors' supply of merchandise would have a far-reaching economic and operational impact on their business. The vast majority of the Debtors' merchandise is provided by a broad network of vendors that, for the most part, conduct business with the Debtors on an invoice by invoice or purchase order by purchase order basis, and not pursuant to long-term contracts. The Debtors also rely on key service providers. These vendors typically supply their customers with services and products on trade terms based on their experience with and perceived risk of conducting business with such customers.

124.    The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether a vendor is a sole-source or primary provider of services or products; (ii) whether certain customizations, specifications, or volume requirements prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; and (iii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured. As a result of their critical review and evaluation, the Debtors have identified a narrow subset of vendors as Critical Vendors.

125.     The Critical Vendors do not operate under formal contracts with the Debtors. Instead, the Critical Vendors rely on prompt and full payment. Absent assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods or services to the Debtors. The Debtors believe that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtors' business. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

126.     As of the Petition Date, the Debtors will owe amounts to certain Critical Vendors (a) that have been billed and invoiced and/or (b) that have accrued immediately prior to the Petition Date for which they have not yet been invoiced or payment is not yet due. The Debtors anticipate the total amount of Critical Vendor Claims will be approximately $1,500,000.00.

127.     Given the importance of the goods or services provided by the Critical Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Critical Vendors up to the Critical Vendor Cap, as any disruption in the Debtors' ability to adequately stock their retail stores and provide merchandise directly to their customers would cause immediate and irreparable damage to the Debtors' business.

128.     Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve its business as a going concern. To that end, in return for paying the Critical Vendors Claims, the Debtors propose that they be authorized to require that the Critical Vendors provide favorable trade terms for the postpetition

delivery of goods and services. Specifically, the Debtors propose to condition the payment of the Critical Vendor Claims upon the Critical Vendors' agreement to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms at least as favorable as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place 12 months prior to the Petition Date, or such other trade terms that are acceptable to the Debtors in their discretion (the "Customary Trade Terms").

129.    In addition, the Debtors request that, regardless of whether a Critical Vendor enters into a Vendor Agreement, if the Critical Vendors accept payment pursuant to the relief requested by this Motion and thereafter do not continue to provide goods or services on Customary Trade Terms, then: (a) the Debtors may then take any and all appropriate steps to cause such Critical Vendors to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to re-characterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

**J.    Motion for Entry of an Order (I) Authorizing and
Approving the Debtors' Key Employee Retention Program for
Certain Non-Insider Employees and (II) Granting Related Relief**

130.    The Debtors seek entry of an order (i) authorizing and approving the

Debtors' Key Employee Retention Program (the "KERP"), for forty-three (43) key non-insider

employees (collectively, the "Eligible Employees"), providing for a total award pool of $315,000

in the aggregate. The Eligible Employees are the lifeblood of the Debtors' business. The

Eligible Employees consist of highly qualified personnel who possess the knowledge,

experience, and expertise essential to preserving the Debtors' operational stability and

maximizing estate value. The Eligible Employees also cannot be easily replaced. Absent the

KERP, the Debtors believe that there is significant risk of employee attrition that could disrupt

the Debtors' ability to operate their business and impair stakeholder value pending

consummation of the Debtors' proposed chapter 11 reorganization plan (the "Plan").

131.    The KERP specifically targets the Eligible Employees whose continued

retention and employment is most necessary in order to preserve and maximize going concern

value. Under the KERP, the Debtors propose to provide an aggregate payment pool of $315,000,

with an average award opportunity of $7,500 per participant. No single Eligible Employee will

be eligible for an award totaling more than $20,000. Importantly, no insider is an Eligible

Employee.

132.    Each Eligible Employee shall earn and be entitled to receive the full

amount of his or her retention payment on the KERP Payment Date (as defined below), so long

as he or she is employed by the Debtors as of the earlier of: (a) the effective date of the Plan or

(b) the closing or completion date of the sale of all or substantially all of the Company's assets,

either as a going concern sale or through a full-chain liquidation sale (the "Effective Date"). The "KERP Payment Date" is, (x) in the event of item (a) above, November 15, 2018, and (y) in the event of item (b) above, within ten (10) business days following the closing or completion of such sale.

133.     Except as provided in the KERP, (i) payments under the KERP will be in lieu of any other performance bonus, retention, or severance compensation otherwise payable to the Eligible Employees by the Company pursuant to any prepetition bonus plan or employment agreement between the Eligible Employee and the Company, and (ii) the Eligible Employees, in consideration of the benefits offered hereunder, shall release the Company and all of the Company's present or former managers, equity holders, officers, agents, financial advisors, attorneys, employees, partners, affiliates, representatives and their respective property from any and all claims and causes of action which the Eligible Employees may have in connection with their employment by the Company in any capacity whatsoever, including as managers and/or officers of the Company, and including, but not limited, to any claim or cause of action the Eligible Employees may have for unpaid salary, commissions and any claims arising under any employment agreement by and between any Eligible Employee and the Company (the "Claims"), provided, however, that the foregoing shall not operate as a waiver of or release of any Claims that an Eligible Employee may have for claims against the Company for (a) payment of wages earned by the employee but which remain unpaid, (b) retention payments earned and due under the KERP, or (c) indemnification that arises from such employee's status, to the extent applicable, as an officer or representative of the Company pursuant to applicable law and/or pursuant to an indemnification agreement between such employee and the Company.

134.     Notwithstanding the foregoing, if an Eligible Employee's employment with the Company is terminated prior to the Effective Date without Cause, or due to death or disability, then such Eligible Employee shall earn and be entitled to receive the retention payment on the KERP Payment Date.

135.     I believe that the KERP is consistent with programs implemented by similarly-situated chapter 11 debtors and will provide stability to the Debtors' operations and drive value for the benefit of all economic stakeholders. The KERP also has the support of the Debtors' principal secured creditor constituents.

**K.    Motion for Order Under Sections 105, 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 (a) Authorizing the Debtors to (i) Maintain and Renew Existing Insurance Policies; (ii) Continue Insurance Premium Financing Programs; (iii) Pay Insurance Premium Financing Obligations Arising Thereunder; and (B) Authorizing Financial <u>Institutions to Honor All Obligations Related Thereto</u>**

136.     In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, inter alia, commercial general liability, umbrella liability, shipping and cargo, cyber liability, property, foreign liability and fiduciary liability, (collectively, the "<u>Policies</u>"). The Debtors seek entry of an order (i) authorizing the Debtors to (a) maintain and renew existing insurance policies and pay all policy premiums and brokers' fees arising thereunder or in connection therewith, (b) continue insurance premium financing programs, and (c) pay insurance premium obligations arising thereunder or in connection therewith; and (ii) authorizing financial institutions to honor all obligations related thereto.

137.    *Direct-Pay Policies.*  The Debtors make monthly installment payments directly to High Ground Insurance ("High Ground"), the carrier of the Debtors' umbrella, general liability and auto coverage (the "Direct-Pay Policies").  The Debtors are paying their annual premium to High Ground pursuant to the following terms:  (i) 25% deposit of $40,392 which was paid in August 2017; and (ii) the balance over nine monthly installments of $13,429 each, from September 2017 through May 2018.  The Debtors are current on payments owing to High Ground.

138.    *The Financed Policies.*  The Debtors obtain their crime policy from National Union Fire Insurance Co. PA ("National"), their fiduciary and liability policies from Great American Assurance Co. ("GAAC"), their cargo policy from Global Group ("Global"), their cyber liability from Beazley Insurance Co ("Beazley") and their general liability, auto, umbrella, workers compensation, and foreign package policy from Zurich American Insurance Co. ("Zurich," and together with National, GAAC, Global and Beazley, the "Financed Insurance Providers" and, together with High Ground, the "Insurance Providers").  The premiums owed to the Financed Insurance Providers are financed through the First Insurance of California Funding ("FICF") discussed below.

139.    *Premium Financing Agreement.*  The Debtors currently have a prepetition Insurance Premium Finance Agreement (the "PFA") with an insurance financier, FICF (the "Insurance Financier") in order to finance the cost of the insurance premiums for the crime, cargo, fiduciary and foreign policies (the "Financed Policies".  In the PFA, the Debtors, among other things, grant the Insurance Financier security interests in the Financed Policies and the Debtors' unearned premiums, return premiums, dividend payments and loss payments which

reduce unearned premiums under the Financed Policies and appoints the Insurance Financier "attorney in fact" with respect to the Financed Policies.

140.     Pursuant to the PFA, the Insurance Financier agreed to pay each Financed Insurance Provider the entire premium on the respective Financed Policies.  In return, the Debtors paid the Insurance Financier a down payment and ten (10) monthly installments with respect to the Financed Policies.  The interest rate as set forth in the PFA is 6.55% per annum. The aggregate monthly installment amount paid on account of the PFA is $7,784.36 per month, which includes applicable broker's fees.  The Financed Policies provide coverage through July 31, 2018, except the cyber liability policy with Beazley, which provides coverage through August 27, 2018.  The final payment under the PFA comes due on June 1, 2018.

141.     These Policies are essential to the preservation of the Debtors' business, and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.

142.     Accordingly, I believe that it is in the best interests of the estates for the Debtors to continue to pay the amounts due under the Policies and the PFA regardless of whether a given payment became due prior to or after the Petition Date.

L.     **Motion for an Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof**

143.     In order for the Debtors to properly make distributions under a chapter 11 plan in these Cases, the Debtors require, among other things, complete and accurate information, regarding the nature, validity and amount of claims that will be asserted in the Cases.  In addition, the Debtors believe that establishing the First Administrative Expense Bar Date will

help facilitate an orderly confirmation and consummation of a plan, by providing the Debtors with greater certainty regarding the extent of Administrative Expense Claims prior to the confirmation of a plan. Consequently, the Debtors request that the Court establish Bar Dates and related claims procedures and approve the form and manner of notice thereof.

144. *General Bar Date*. The General Bar Date will apply to all claims of any kind that arose prior to the Petition Date (the "General Claims"), whether administrative, secured, priority (including, without limitation, claims entitled to priority under sections 503(b)(9), 507(a)(4) or 507(a)(5) of the Bankruptcy Code) or unsecured nonpriority claims. The Debtors request that the Court establish May 22, 2018 at 5:00 p.m. (Eastern Time) as the General Bar Date, which is expected to be approximately 45 days after the Service Date. Providing more than 30 days' notice complies with Bankruptcy Rule 2002(a)'s requirement of at least 21 days' notice of the bar date as well as Bankruptcy Rule 2002(p)'s requirement of at least 30 days' notice of the bar date for foreign creditors.

145. *Governmental Bar Date*. Pursuant to section 502(b)(9) of the Bankruptcy Code, a proof of claim filed by a Governmental Unit in these Cases is deemed timely if it is filed within 180 days after the Petition Date, or by September 3, 2018. The Debtors therefore request that the Court establish September 3, 2018 at 5:00 p.m. Eastern Time as the Governmental Bar Date in these Cases.

146. *Rejection Bar Date*. The Debtors anticipate that certain entities may assert claims in connection with the Debtors' rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. The Debtors propose that, for any claim relating to a Court approved rejection of an executory contract or unexpired lease, in accordance

with section 365 of the Bankruptcy Code and pursuant to either (i) a rejection notice (a "Rejection Notice") as requested by the Debtors' *Motion for an Order (I) Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property and (II) the Abandonment of any Personal Property that Remains on the Premises* (the "Rejection Procedures Motion") concurrently filed herewith, or (ii) any other order of the Court in these Cases, the Rejection Bar Date for such a claim will be the later of (a) the General Bar Date; (b) for executory contracts and unexpired leases rejected pursuant to a Rejection Notice, the later of (a) the General Bar Date; (b) for executory contracts and unexpired leases rejected pursuant to a Rejection Notice, twenty-one (21) days after the later of (i) the date of the Rejection Notice, (ii) the date of the surrender of the leased property to the affected lessor, and (iii) any alternative date provided in the Rejection Notice; and (c) any other date set by an order of the Court.

147.    *Amended Schedules Bar Date.*  The Debtors propose that they will retain the right to: (a) dispute, or assert offsets or defenses against, any filed proofs of claim, or any claim listed or reflected in the Schedules as to nature, amount, liability, classification or otherwise; (b) subsequently designate any scheduled claim as disputed, contingent or unliquidated; and (c) otherwise amend or supplement the Schedules.  If the Debtors amend or supplement the Schedules (such Schedules, the "Amended Schedules") after the Service Date, the Debtors propose that they will give notice pursuant to Local Rule 1009-2 of any Amended Schedules to the holders of claims affected thereby, including notice of the Amended Schedules Bar Date to file proofs of claim in response to the amendment or supplement to the Schedules. In particular, if a Debtor amends or supplements its Schedules to reduce the undisputed,

noncontingent and liquidated amount, to change the nature, classification or characterization of a claim against the Debtor or to add a new claim in the Amended Schedules, any affected entities that dispute such changes must, by the Amended Schedules Bar Date, file a proof of claim or amend any previously filed proof of claim in respect of the Amended Schedules claim in accordance with the procedures described herein. The Debtors request that the Court establish the Amended Schedules Bar Date as the later of: (a) the General Bar Date; and (b) 30 days after the date that the notice of the Amended Schedules is served on the entity. Notwithstanding the foregoing, nothing contained herein shall preclude the Debtors from objecting to any claim, whether scheduled or filed, on any grounds.

148. The timing of the Bar Dates will ensure that potential claimants known as of the date hereof will receive approximately 30 days' (or more) notice by mail of the Bar Dates.

149. Accordingly, I believe that as a result of these procedures, as well as the anticipated and ongoing public attention to the Debtors' chapter 11 cases and the establishment of the Bar Dates as requested in this Motion, claimants will have or should have the information necessary to be able to file claims in these Cases, and therefore the dates and procedures should be approved.

**M.      Motion for the Entry of an Order Authorizing the Debtors to (A) Reject Certain Unexpired Leases Pursuant to 11 U.S.C. § 365, (B) Abandon any Remaining Personal Property Located at the Leased Premises Pursuant to 11 U.S.C. § 554; and (c) fix a bar date for claims of counterparties**

150. The Debtors seek the entry of an order, (a) authorizing and approving the Debtors' rejection of six (6) Leases, effective as of the Rejection Effective Date (b) to abandon

any personal property located at the Leased Premises on the Rejection Effective Date, and (c) fixing a bar date for claims, if any, of the Counterparties to each Rejected Lease.

151.   *The Rejected Leases.*  The six Leases subject to the rejection motion are for the following locations:  (1) Store # 246 – Dallas, TX; (2) Store # 416 – Oklahoma City, OK; (3) Store # 272 - Madison, WI; (4) Store # 403 – Syracuse, NY; (5) Store #517 – Chesterfield, MO; and (6) Satellite Office – Franklin TN.

152.   Accordingly, I believe that the relief requested herein is in the best interest of the Debtors' estates and creditors because the Debtors have ceased or will cease operations at the Leased Premises, have no further use for the Leased Premises, have vacated or will vacate each of the Leased Premises by the Rejection Effective Date, and I further believe that that the Rejected Leases do not have any net value to the Debtors' estates.

**N.   Motion for an Order Establishing Procedures for (I) the Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property and (II) the Abandonment of any Personal Property that Remains on the Leased Premises**

153.   Given the substantial number of Contracts and Leases the Debtors are seeking to reject, obtaining Court approval of each rejection would impose unnecessary burdens on the Debtors and the Court and result in costs to the Debtors' estates that would correspondingly decrease the economic benefit of rejection.  Accordingly, the Debtors propose to streamline the process as set forth in the Rejection Procedures, consistent with applicable law, in order to minimize costs to the Debtors' estates and reduce the burden on the Court's docket, while protecting Counterparties and Landlords by providing such parties notice and an opportunity to object to the proposed rejection.  For the foregoing reasons, I believe that the

adoption of the Rejection Procedures is in the best interest of their estates, their creditors and all other parties in interest.

**O.      Motion for an Order Authorizing the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business**

154.    The Debtors seek entry of an order by this Court authorizing them to (a) retain and employ the Ordinary Course Professionals on an "as needed" basis without the submission of separate, formal retention applications for each Ordinary Course Professional, and (b) to pay, without formal application to and order from this Court, one hundred percent (100%) of the fees and expenses of each Ordinary Course Professional upon submission to, and approval by, the Debtors of an appropriate billing statement setting forth in reasonable detail the nature of the postpetition services rendered and expenses actually incurred; *provided, however*, that such fees and expenses do not exceed the maximum authority under the authorized caps. Further, the Debtors will not pay any fees or expenses to an Ordinary Course Professional unless (i) the professional has filed its Affidavit, (ii) the Objection Period has expired, and (iii) no timely objection is pending, or if a timely objection is received, no payment will be made until such objection is (a) resolved and withdrawn or (b) otherwise approved by the Court.

155.    The Debtors propose that they be permitted to pay fees and expenses of an Ordinary Course Professional, without formal application to this Court by any one Ordinary Course Professional, provided, however, that (i) the fees and disbursements for any one Ordinary Course Professional shall not exceed a total of $50,000 per month on average over a rolling four-month period to any Ordinary Course Professional, unless otherwise authorized by this Court and

(ii) the aggregate monthly payments to Ordinary Course Professionals be limited to $100,000.00 unless otherwise authorized by this Court.

156.     If fees and disbursements for any one Ordinary Course Professional exceeds a total of $50,000 per month on average over a rolling four-month period, such Ordinary Course Professional shall be required to apply for approval by the Court of such excess Ordinary Course Professional's fees and expenses for such month, but may otherwise be paid for amounts incurred in accordance with the procedures.

157.     The Debtors will file and serve a payment summary statement with this Court not more than thirty (30) days after the last day of March, June, September and December of each year these Cases are pending, or such other period as this Court directs, which includes: (a) the name of the Ordinary Course Professional; (b) the aggregate amounts paid as compensation for services rendered and reimbursement of expenses incurred by such Ordinary Course Professional during the statement period; and (c) a brief statement of the type of services rendered.

158.     The Debtors and their estates will be well served by authorizing the retention of the Ordinary Course Professionals because of such professionals' past relationship with, and understanding of, the Debtors and their operations.  Therefore, I believe it is in the best interest of all of the parties and the creditors to avoid any disruption in the professional services rendered by the Ordinary Course Professionals in the day-to-day operations of the Debtors' business.

**P.    Motion for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals**

159.    The Debtors request the entry of an order approving the Compensation Procedures for an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses, and for reimbursement of reasonable out-of-pocket expenses incurred by members of any official committee of unsecured creditors that may be appointed in these cases.

*Compensation Procedures*

160.    On or before the 25th day of each calendar month, or as soon as practicable thereafter (but not earlier than the 15th day of each calendar month), each Professional may file an application (a "Monthly Fee Application") with the Court for interim approval and allowance of compensation for services rendered and reimbursement of expenses incurred during any preceding month or months. Any Professional that fails to file a Monthly Fee Application for a particular month or months may subsequently submit a consolidated Monthly Fee Application including any prior month or months.

161.    Notice Parties will have 21 days after service of the Monthly Fee Application to object. Provided no objections have been served with respect to a Monthly Fee Application, the Debtors are authorized and directed to pay the Professional an amount equal to 80% of the fees and 100% of the expenses requested in the applicable Monthly Fee Application (the "Maximum Monthly Payment"). If an objection was timely received and remains

unresolved, the Debtors are authorized and directed to pay the Professional an amount equal to the lesser of (i) the Maximum Monthly Payment and (ii) 80% of the fees and 100% of the expenses not subject to an objection.

162.     At three-month intervals or such other intervals convenient to the Court (the "Interim Fee Period"), each of the Professionals may file and serve a request (an "Interim Fee Application Request") for interim Court approval and allowance of the payment of compensation and reimbursement of expenses sought by such Professional in its Monthly Fee Applications, including any holdbacks, filed during the Interim Fee Period. Objections, if any, to the Interim Fee Application Requests shall be filed and served upon the Professional that filed the Interim Fee Application and the other Notice Parties so as to be received on or before 4:00 p.m. prevailing Eastern Time on the 21st day (or the next business day if such day is not a business day) following service of the applicable Interim Fee Application Request. The Debtors will request that the Court schedule a hearing on the Interim Fee Application Requests at least once every six months. The Debtors, however, may request that a hearing be held every three months or at such other intervals as the Court deems appropriate.

163.     The Debtors further request that each member of any Committee be permitted to submit statements of expenses (excluding third-party counsel expenses of individual Committee members) with supporting vouchers to Committee counsel, which counsel shall collect and submit the Committee member's request for reimbursement in accordance with the Compensation Procedures. Approval of these Compensation Procedures, however, will not authorize payment of such expenses to the extent that such payment is not authorized under the Bankruptcy Code, Bankruptcy Rules, Local Rules, or the practice of this Court.

164.    Accordingly, I believe that the above procedures will streamline the professional compensation process and allow the Court and other parties to more effectively monitor the professional fees and expenses incurred in these cases.

**Q.    Motion for Order Directing Joint Administration**
**of Related Chapter 11 Cases for Procedural Purposes Only**

165.    With four affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk with the volume of paper.

166.    The Debtors have requested that the Court jointly administer these cases, for procedural purposes, only because (a) the Debtors' financial affairs and business operations are closely related and (b) such administration will ease the administrative burden on the Court and other parties. With respect to the proximity of relations, the Debtors are under common ownership and management. They also share many creditors and parties in interest. As a result, joint administration will prevent duplicative efforts and unnecessary expenses, without any risk of prejudice.

167.    Joint administration will permit the Clerk to use a single general docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. Joint administration also will protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases. Accordingly, I believe that

joint administration of the Debtors cases is in the best interest of the Debtors, their estates and

creditors.

**R.  Motion for Order: (i) Authorizing Debtors to File (a) Consolidated List of Creditors and (b) Consolidated List of Debtors' Top Thirty Unsecured Creditors; and (ii) Granting Related Relief**

      168.  The Debtors seek entry of an order (i) authorizing the Debtors to file (a) a

consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and

(b) a consolidated list of the Debtors' thirty (30) largest unsecured creditors.

      169.  Requiring the Debtors to submit Debtor-specific creditor matrices for each

of the Debtors would be an unnecessarily burdensome task and would likely result in duplicate

mailings.  Further, because the Top 20 Lists could overlap, and certain Debtors may have fewer

than twenty identifiable unsecured creditors, the Debtors submit that filing separate Top 20 Lists

for each Debtor would be of limited utility.  In addition, given the worldwide location of many of

their general unsecured creditors, the exercise of compiling separate Top 20 Lists for each

individual Debtor could consume an excessive amount of the company's limited time and

resources, and could constitute a distraction of management's attention otherwise needed on

operations at the start of these chapter 11 cases.  Accordingly, I believe a single, consolidated list

of the company's thirty (30) largest unsecured, non-insider creditors will aid the U.S. Trustee in

its efforts to communicate with these creditors, and that such relief is not only appropriate under

the circumstances, but necessary for the efficient and orderly administration of these cases.

**S.** **Application Pursuant to Section 327(A) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

170.    The Debtors seek to employ and retain Pachulski Stang Ziehl & Jones LLP ("PSZ&J") as its bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases and all related proceedings.

171.    The Debtors propose to pay PSZ&J its customary hourly rates and reimburse PSZ&J for all reasonable out-of-pocket expenses incurred in connection with the services provided to the Debtors.  The current standard hourly rates of PSZ&J's professionals are:

| | | |
|---|---|---|
| a. | Partners | $650.00 to $1,295.00 |
| b. | Of Counsel | $595.00 to $1,025.00 |
| c. | Associates | $495.00 to $595.00 |
| d. | Paraprofessionals | $295.00 to $395.00 |

172.    PSZ&J has received payments from the Debtors during the year prior to the Petition Date in the amount of $515,000 including the Debtors' aggregate filing fees for these cases, in connection with its prepetition representation of the Debtors.

173.    I understand that PSZ&J hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of this Court for all services performed and expenses incurred after the Petition Date.  Accordingly, I

believe that it is in the best interest of the Debtors, their estates and creditors to employ PSZ&J as the Debtors' bankruptcy counsel.

**T.     Application for Entry of An Order, Pursuant to 28 U.S.C. § 156(c), Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, *Nunc Pro Tunc* to the Petition Date**

174.    The Debtors seek to retain the services of Kurtzman Carson Consultants LLC ("KCC"), pursuant to the terms of the Services Agreement, as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk"), *nunc pro tunc* to the Petition Date.

175.    Prior to the Petition Date, the Debtors provided KCC a retainer in the amount of $20,000.  KCC seeks to first apply the retainer to all pre-petition invoices, and thereafter, to have the retainer replenished to the original retainer amount, and thereafter to hold the retainer under the Services Agreement during these chapter 11 cases as security for the payment of fees and expenses incurred under the Services Agreement.  Part of the overall compensation payable to KCC under the terms of the Services Agreement, the Debtors have agreed to certain indemnification and contribution obligations as set forth in the Services Agreement, to the extent permitted by applicable law and as modified by the Court.

176.    I understand that KCC hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of this Court for all services performed and expenses incurred after the Petition Date.  Accordingly, I believe that it is in the best interest of the Debtors, their estates and creditors to employ KCC as the Debtors' claims and noticing agent.

U. **Application for Entry of an Order Authorizing the Employment and Retention of Consensus Advisory Services LLC as Financial Advisor for the Debtors, *Nunc Pro Tunc* to the Petition Date, and Waiving Certain Information Disclosure Requirements**

177. The Debtors seek to employ Consensus, effective as of the Petition Date, to perform certain financial advisory services pursuant to the Engagement Letter. In collaboration with the chief executive officer, the chief financial officer and other senior personnel of the Debtors, Michael A. O'Hara and other affiliates of Consensus (the "Consensus Personnel") will assist the Debtors in evaluating and implementing various strategic, tactical and operational initiatives to maximize the enterprise value of the Debtors.

178. Under the Engagement Letter, in consideration for the compensation contemplated thereby, Consensus has provided and has agreed to provide the following services to the extent The Walking Company Holdings, Inc. and its Debtor affiliates deem necessary, appropriate and feasible: (a) reviewing and analyzing the Debtors' business plans and capital needs; (b) providing strategic advice with respect to financial structure and alternatives; and (c) reviewing and analyzing cash flows and reporting on the same to the Debtors' stakeholders as required or otherwise requested by the Debtors. Consensus is not expected to be involved in negotiations with the Debtors' existing stockholders, noteholders or secured lender (Wells Fargo).

179. The Debtors have agreed to pay Consensus the proposed compensation:

a. Retainers: The Debtors have provided Consensus with the following prepetition payments (the "Retainer Fees"): (i) a retainer of $50,000.00, which was paid in connection with the Original Agreement on January 5, 2018, and (ii) a retainer of $50,000, which was paid shortly before the Petition Date. The Retainer Fees shall be applied to the final payment owed under the Engagement Letter.

b.     _Advisory Fees_.  For its advisory services under Section 1(A) of the Engagement Letter, Consensus shall be paid a fee by the Debtors equal to the hours worked in such regard by Consensus personnel multiplied by the rate of $425 per hour, which reflects a blended hourly rate for all such personnel agreed upon by the parties through negotiation.

c.     _Expense Reimbursement_.  In addition to any fees payable by the Debtors to Consensus hereunder, the Debtors shall reimburse Consensus for Consensus's actual out-of-pocket expenses incurred in connection with or arising out of Consensus's activities under or contemplated by this engagement. Out-of-pocket expenses shall include, but not be limited to, fees, disbursements and other charges associated with Consensus's travel and lodging expenses, outside database charges, communication charges, document production charges, courier services and other necessary expenses.

180.    As a material part of the consideration for which Consensus has agreed to provide the Services, the Debtors have agreed to the indemnification provisions in Exhibit B of the Engagement Letter.

181.    I understand that, notwithstanding any provisions to the contrary in the Engagement Letter, Consensus intends to apply to the Court for allowance of compensation and reimbursement of expenses for their Services.

182.    For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

*[remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _March 6_, 2018

_____
Andrew D. Feshbach
President and Chief Executive Officer