IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WALKING COMPANY HOLDINGS, INC., et al.,[1] | ) | Case No.: 18-10474 (___) |
| | ) | Joint Administration Requested |
| | ) | |
| Debtors. | ) | |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) GRANTING RELATED RELIEF, AND (VII) SCHEDULING A FINAL HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an interim order on an expedited basis (the "Interim Order") substantially in the form attached hereto as **Exhibit 1**, and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the Debtors to incur postpetition debt and to use cash collateral, (ii) granting liens and superpriority claims in

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers include: The Walking Company Holdings, Inc. (8665); The Walking Company (2061); Big Dog USA, Inc. (5316); and FootSmart, Inc. (9736). The headquarters and service address for the above-captioned Debtors is 25 W. Anapamu Street, Santa Barbara, CA 93101.

favor of the DIP Secured Parties (as defined below), and granting adequate protection in favor of the Prepetition Senior Creditors (as defined below) and Prepetition Subordinated Creditors (as defined below), (iii) modifying the automatic stay, (iv) scheduling a final hearing, as described herein, and (v) granting related relief.

The Debtors have the consent of the Prepetition Senior Creditors and the Prepetition Subordinated Creditors to obtain financing and access cash collateral on the terms described herein.

## Overview

1.      By this Motion, the Debtors seek authority to consummate a new $57.25 million senior, secured debtor-in-possession financing facility (the "DIP Facility") with Wells Fargo Bank, National Association ("Wells") on the terms set forth in the DIP Agreement (as defined below), consisting of a revolving facility in an amount up to $50 million and a term loan facility in an amount up to $7.25 million. The proceeds of the DIP Facility will be used to repay the existing Prepetition Revolving Credit Obligations and Prepetition Term Loan Obligations (as defined below), and to provide continued access to financing for the Debtors on a postpetition basis pending consummation of the Debtors' chapter 11 reorganization plan. Wells also has committed to provide exit financing to the Debtors pursuant to that certain *Senior Secured Credit Exit Facility Commitment Letter* dated March 5, 2018 (the "Exit Facility Commitment Letter").[2]

---

[2] Concurrently herewith, the Debtors have filed the *Motion of Debtors for Entry of Order Authorizing the Debtors to (I) Assume the Exit Facility Commitment Letter, (II) Pay and Reimburse Related Fees and Expenses, and (III) Indemnify the Parties Thereto.*

2.     The DIP Facility will consensually prime the Prepetition Senior Obligations and the Prepetition Subordinated Obligations (as defined below). Each of the Debtors is a Loan Party under the DIP Facility. The lead borrower is The Walking Company (the "Lead Borrower" or "TWC"), and the remaining borrowers are Footsmart, Inc. ("FootSmart") and Big Dog USA, Inc. ("Big Dog"). The Walking Company Holdings, Inc. is party to the DIP Facility as the parent ("Parent").

3.     The DIP Facility presents these estates with the best economic terms available that will allow the Debtors to repay the existing Prepetition Senior Obligations, while providing adequate liquidity to maintain operations in the ordinary course and satisfy ongoing administrative expenses associated with these cases. Accordingly, by this Motion, the Debtors seek the entry of an Interim Order and a Final Order, *inter alia*:

(i)     authorizing, under sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority post-petition loans, advances and other financial accommodations, on an interim basis for a period through and including the date of the Final Hearing (as defined below), pursuant to the terms and conditions of that certain *Debtor In Possession Loan and Security Agreement* attached as Exhibit A to the proposed Interim Order (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Loan Agreement") by and among (a) Debtor TWC as the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the Guarantors[3] party thereto from time to time, (d) Wells, as administrative agent and collateral agent (in such capacities herein, the "DIP Agent") for its own benefit and the benefit of the other Secured Parties, (e) Wells, as term agent (in such capacity, the "DIP Term Agent") and (f) the Lenders from time to time party thereto (currently, only Wells) (the "DIP Lenders" and each a "DIP Lender"; the DIP Agent, the DIP Term Agent, the DIP Lenders and the other Secured Parties under the DIP Loan Documents (as defined below) are collectively referred to herein as the "DIP Secured Parties"); and

(ii)     authorizing the Debtors to execute and deliver the DIP Loan Agreement and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "DIP

---

[3] Capitalized terms used by not defined have the meanings given to them in the DIP Loan Documents (as defined below).

Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents; and

(iii)     until the Termination Date, and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and the Interim Order, authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $25,000,000 at any one time outstanding (the "Interim Financing"); and

(iv)     granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases and any Successor Cases to all obligations owing under the DIP Loan Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Loan Agreement, including all obligations with respect to cash management services, bank products and letters of credit issued or deemed issued under the DIP Loan Agreement, respectively, and, together, the "DIP Obligations"), subject to the priorities set forth herein; and

(v)     authorizing the Debtors to use "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, that the Debtors are holding or may obtain, pursuant to Bankruptcy Code sections 361 and 363 and Bankruptcy Rules 4001(b) and 6004; and

(vi)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (collectively, the "DIP Liens"), which DIP Liens shall be subject to the priorities set forth herein; and

(vii)     authorizing and directing the Debtors to pay the principal, interest, fees, costs, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, continuing commitment fees, closing fees, administrative fees, any additional fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisers, accountants, and other consultants, and all related costs and expenses of the DIP Secured Parties; and

(viii)     authorizing and directing the Debtors to pay in full the Prepetition Senior Obligations (as defined herein) upon the entry of the Final Order (as defined herein), subject to the rights of parties in interest described in paragraphs 34 and 35 of the Interim Order; and

(ix)     providing adequate protection to the Prepetition Senior Creditors (as defined herein) to the extent set forth herein; and

(x)     providing adequate protection to the Prepetition Subordinated Creditors (as defined herein) to the extent set forth herein; and

(xi)     waiving any applicable stay (including under Bankruptcy Rule 6004) and provisions for immediate effectiveness of the Interim Order; and

(xii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order; and

(xiii)  granting related relief; and

(xiv)  scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

4.  The Debtors are an operating retail business with hundreds of employees, vendors, and customers that depend on the Debtors' continuing performance of their ongoing business obligations.  The Debtors have an urgent and immediate need to obtain financing and for authority to use Cash Collateral subject to the terms of this Motion in order to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with employees, vendors, and customers; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs.  The foregoing expenditures are critically necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Debtors' proposed chapter 11 reorganization plan.  Without access to funding under the DIP Facility and use of Cash Collateral, the Debtors would be forced to cease operations and liquidate their assets.

5.  The Debtors intend to continue operations with their ordinary course prepetition practices, without material interruption or alteration.  Further, the Debtors have the consent of the Prepetition Senior Creditors and Prepetition Subordinated Creditors, pursuant to applicable intercreditor agreements, to implement the DIP Facility and access Cash Collateral on the terms set forth in this Motion.

## Jurisdiction and Venue

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b), 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

8.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      On the Petition Date, the Debtors filed their chapter 11 reorganization plan contemplating an equity infusion of $10 million, an extension of maturity of the Prepetition

Subordinated Note Obligations for three (3) years, and the restructuring of the Debtors' leasehold portfolio.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Andrew D. Feshbach, President and Chief Executive Officer, in Support of First Day Pleadings* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference.

### Relevant Factual Background

**A.     The Debtors' Ongoing Business**

11.     As noted above, the Debtors are an operating business. The Debtors market, sell, and distribute premium footwear. The Debtors' products are distributed through wholesale and retail channels on six continents and on their websites. As of the Petition Date, the Debtors have over 1,600 employees.

12.     The Debtors intend to continue operations in the ordinary course during these chapter 11 cases, and to preserve going concern value for the benefit of all constituents.

**B.     Prepetition ABL Debt**

13.     *Prepetition Senior Loan Documents*. As of the Petition Date, the Debtors had outstanding secured debt to various lenders pursuant to that certain *Third Amended and Restated Loan and Security Agreement* dated as of June 5, 2014 (as amended, modified and supplemented from time to time, the "Prepetition Senior Loan Agreement" and together with all related documents, guaranties and agreements, the "Prepetition Senior Loan Documents"), by

and among (a) the Lead Borrower, (b) the other Borrowers party thereto from time to time, (c) the Guarantors party thereto from time to time, (d) Wells, as administrative agent and collateral agent (in such capacities herein, the "Prepetition Senior Agent") for its own benefit and the benefit of the other "Secured Parties" (as defined therein), (e) Wells, as term agent (in such capacity, the "Prepetition Term Agent") and (f) the Lenders from time to time party thereto (currently, only Wells) (the "Prepetition Senior Lenders" and each a "Prepetition Senior Lender"; the Prepetition Senior Agent, the Prepetition Term Agent, the Prepetition Senior Lenders and the other "Secured Parties" under the Prepetition Senior Loan Documents are collectively referred to herein as the "Prepetition Senior Creditors").

14. *Prepetition Senior Obligations.* As of the Petition Date, the aggregate outstanding principal amount owed by the Debtors under the Prepetition Senior Loan Documents was not less than $40,383,176.89, consisting of revolving credit loans in the outstanding principal amount of $33,133,176.89 (the "Prepetition Revolving Credit Loans") and a term loan in the outstanding principal amount of $7,250,000 (the "Prepetition Term Loan") (collectively, together with any interest, fees (including, without limitation, any early termination and prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Senior Loan Documents, and further including all "Obligations" as described in the Prepetition Senior Loan Agreement, including all obligations with respect to cash management services and bank products, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Senior Obligations"). As more fully set forth in the Prepetition Senior Loan Documents, prior to

the Petition Date, the Debtors granted first-priority security interests in and liens on substantially all personal property of the Debtors, including, without limitation, accounts, inventory, equipment and general intangibles (collectively, the "Prepetition Collateral"), to the Prepetition Senior Agent (collectively, the "Prepetition Senior Liens") to secure repayment of the Prepetition Senior Obligations.

15.     *Validity, Perfection and Priority of Prepetition Senior Liens and Obligations.*  Without limiting the rights of other parties in interest under paragraphs 34 and 35 of the Interim Order:  (a) the Prepetition Senior Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable and properly perfected, (b) the Prepetition Senior Liens have priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain liens otherwise permitted by the Prepetition Senior Loan Documents (to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Senior Liens as of the Petition Date, the "Prepetition Permitted Liens") and otherwise had priority over any and all other liens on the Prepetition Collateral,[4] provided that, in no event shall any alleged right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) be deemed or treated hereunder as a Prepetition Permitted Lien; (c) the Prepetition Senior Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and constitute "allowed claims" within the meaning of

---

[4] Nothing herein shall constitute an acknowledgement that any such Prepetition Permitted Liens are valid, senior, enforceable, perfected or non-avoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the DIP Agent, the DIP Term Agent and the Committee, if any, to challenge, consistent with the terms of the Interim Order, the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Prepetition Permitted Lien and/or security interest.  The rights and remedies of any holder of a Prepetition Permitted Lien pursuant to the applicable documents and applicable law are reserved.

Section 502 of the Bankruptcy Code; (d) no offsets, challenges, objections, defenses, claims, impairments or counterclaims of any kind or nature to any of the Prepetition Senior Liens or the Prepetition Senior Obligations exist, and no portion of the Prepetition Senior Liens or the Prepetition Senior Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, recoupment, reduction, setoff or subordination (whether equitable, contractual or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, counterclaims, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Senior Creditors or any of their respective affiliates, subsidiaries, parents, officers, members, shareholders, directors, employees, attorneys, advisors, professionals or agents, past, present and future, or their respective heirs, predecessors, successors and assigns arising out of, based upon or related to the Prepetition Senior Loan Documents; and (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Senior Obligations exceeded the amount of those obligations, and accordingly the Prepetition Senior Obligations are allowed secured claims within the meaning of Section 506 of the Bankruptcy Code, together with accrued and unpaid and hereafter accruing interest, fees (including, without limitation, attorneys' fees and related expenses of the Prepetition Senior Creditors' attorneys, advisers, accounts, and other consultants), costs and other charges, and further including the Prepetition Indemnity Reserve (as defined in the Interim Order).

16.   *Cash Collateral.*  All of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitute Cash Collateral and is Prepetition Collateral of the Prepetition Senior Creditors and the Prepetition Subordinated Creditors (as defined below).

17.   *Default by the Debtors.*  The Debtors are in default under each of the Prepetition Senior Loan Documents and the Prepetition Subordinated Note Documents.

18.   *No Other Liens.*  As of the Petition Date, other than the Prepetition Permitted Liens, Prepetition Subordinated Liens (as defined below), or liens as otherwise permitted by the Prepetition Loan Documents, there were no security interests or liens on the Prepetition Collateral other than the Prepetition Senior Liens.

19.   *Release.*  Pursuant to the Interim Order, the Debtors will forever, unconditionally and irrevocably release, discharge and acquit the Prepetition Senior Agent, the Prepetition Term Agent, the DIP Agent, the DIP Term Agent, the DIP Secured Parties, the Prepetition Senior Creditors, the Prepetition Subordinated Noteholders, and each of their respective affiliates, subsidiaries, parents, officers, members, shareholders, directors, employees, attorneys, advisors, professionals and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses, debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the negotiations over and entry into the DIP Facility or the DIP Loan Documents, the Prepetition

Senior Loan Documents, the Prepetition Senior Liens, the Prepetition Subordinated Note Documents, the Prepetition Subordinated Noteholders Liens, and/or the transactions contemplated hereunder or thereunder including (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims, causes of action, challenges, objections and/or choses in action arising out of, based upon, or related to the validity, priority, perfection or avoidability of the DIP Liens, DIP Loan Documents, DIP Obligations, Prepetition Senior Liens, Prepetition Senior Loan Documents, Prepetition Senior Obligations, Prepetition Subordinated Noteholders Liens, Prepetition Subordinated Note Documents, and Prepetition Subordinated Note Obligations. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Senior Obligations, Prepetition Subordinated Note Obligations, and the DIP Obligations that the Debtors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering the Interim Order and, if applicable, the Final Order.

20. *Subordinated Indebtedness Documents.* As of the Petition Date, the Debtors had outstanding secured debt to (a) the holders (collectively, the "Prepetition Subordinated Noteholders") of a series of separate 8.375% Convertible Notes Due 2019 re-issued on May 23, 2014 by Parent in favor of each of the Prepetition Subordinated Noteholders (collectively, and together with all related guarantees, security documents, financing statements and other documents entered into in connection therewith, the "Prepetition Subordinated Note

Documents"); (b) Simon Property Group, L.P. ("Simon") pursuant to that certain Promissory Note (together with all guarantees and security documents entered into in connection therewith, the "Simon Indebtedness Documents"), dated as of September 29, 2017, by TWC in favor of Simon; and (c) Galleria Mall Investors LP ("Galleria" and together with the Prepetition Subordinated Noteholders and Simon, collectively, the "Prepetition Subordinated Creditors") pursuant to that certain Amended and Restated Promissory Note (together with all guarantees and security documents entered into in connection therewith, the "Galleria Indebtedness Documents"; the Galleria Indebtedness Documents together with the Prepetition Subordinated Note Documents and the Simon Indebtedness Documents, collectively, the "Subordinated Indebtedness Documents"), dated as of November 6, 2017, by TWC in favor of Galleria. As of the Petition Date, the aggregate outstanding principal amount owed by the Debtors under the Subordinated Note Documents was not less than $11,744,000 (including capitalized interest) in principal obligations (plus all accrued and unpaid interest thereon, and all outstanding fees, costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Subordinated Note Documents, the "Prepetition Subordinated Note Obligations" and together with any obligations under the Galleria Indebtedness Documents and Simon Indebtedness Documents the "Prepetition Subordinated Obligations").

21. *Prepetition Subordinated Liens.* Prior to the Petition Date, as more fully set forth in the applicable Subordinated Indebtedness Documents and the applicable Subordination Agreements (as defined below), (a) Parent, TWC, and Big Dog granted to the Prepetition Subordinated Noteholders subordinated security interests in and liens on substantially

all of their respective assets (the "Prepetition Subordinated Noteholders Liens") to secure the obligations under the Prepetition Subordinated Note Documents; (b) TWC granted to Simon subordinated security interests in and liens on certain equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property of TWC located on the premises leased to TWC by Simon (the "Prepetition Subordinated Simon Lien") to secure the obligations under the Simon Indebtedness Documents; and (c) TWC granted to Galleria subordinated security interest in and liens on certain equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property of TWC located on the premises leased to TWC by Galleria (the "Prepetition Subordinated Galleria Lien" and together with the Prepetition Subordinated Noteholders Liens and the Prepetition Subordinated Simon Lien, collectively, the "Prepetition Subordinated Liens") to secure the obligations under the Galleria Indebtedness Documents. Simon and Galleria did not file UCC financing statements to properly perfect the Prepetition Subordinated Simon Lien or Prepetition Subordinated Galleria Lien.

22. *Validity, Perfection and Priority of Prepetition Subordinated Note Obligations and Prepetition Subordinated Noteholders Liens.* Without limiting the rights of other parties in interest under paragraphs 34 and 35 of the Interim Order: (a) the Prepetition Subordinated Noteholders Liens on the Prepetition Collateral is valid, binding, enforceable, non-avoidable and properly perfected, (b) except for the Prepetition Senior Liens, the Prepetition Subordinated Noteholders Liens has priority over any and all other liens, if any, on the Prepetition Collateral, subject only to certain Prepetition Permitted Liens, provided that, in no

event shall any alleged right of reclamation or return (whether asserted under Section 546(c) of the Bankruptcy Code or otherwise) be deemed or treated hereunder as a Prepetition Permitted Lien; (c) the Prepetition Subordinated Note Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and constitute "allowed claims" within the meaning of Section 502 of the Bankruptcy Code; (d) no offsets, challenges, objections, defenses, claims, impairments or counterclaims of any kind or nature to any of the Prepetition Subordinated Noteholders Liens or the Prepetition Subordinated Note Obligations exist, and no portion of the Prepetition Subordinated Noteholders Liens or the Prepetition Subordinated Note Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, recoupment, reduction, setoff or subordination (whether equitable, contractual or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, counterclaims, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against any of the Prepetition Subordinated Noteholders or any of their respective affiliates, subsidiaries, parents, officers, members, shareholders, directors, employees, attorneys, advisors, professionals or agents, past, present and future, or their respective heirs, predecessors, successors and assigns arising out of, based upon or related to the Subordinated Note Documents.

23. *Subordination Agreements.* As more fully set forth in those certain (a) First Amended and Restated Subordination Agreements of Junior Creditor, dated as of March 20, 2009, by and between Parent, TWC, Big Dog, the Prepetition Senior Agent and the Prepetition

Subordinated Noteholders party thereto (as supplemented by that certain Reaffirmation and Confirmation Agreement (Convertible Notes), dated as of June 5, 2014, by and between Parent, TWC, Big Dog, the Prepetition Senior Agent and the Prepetition Subordinated Noteholders party thereto and as may be further amended, modified or supplemented from time to time, the "Subordinated Noteholders Subordination Agreement"), (b) Subordination Agreement, dated as of September 29, 2017, by and between the Prepetition Senior Agent, Prepetition Term Agent, Simon and TWC (as amended, modified or supplemented from time to time, the "Simon Subordination Agreement"), and (c) Subordination Agreement, dated as of September 29, 2017, by and between the Prepetition Senior Agent, Prepetition Term Agent, Galleria and TWC (as amended, modified or supplemented from time to time, the "Galleria Subordination Agreement" and together with the Subordinated Noteholders Subordination Agreement and the Simon Subordination Agreement, collectively, the "Subordination Agreements"), each of the Prepetition Subordinated Creditors has agreed, among other things (x) that their respective Prepetition Subordinated Liens are subordinate and junior to the liens securing the Prepetition Senior Obligations and the DIP Obligations and (y) the obligations under the applicable Subordinated Indebtedness Documents are subordinated in all respects to the prior payment in full of the Prepetition Senior Obligations and the DIP Obligations. Each Subordination Agreement is a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and the respective interests thereunder shall continue to be governed by each applicable Subordination Agreement unless otherwise expressly provided by the Interim Order. The DIP Agent has advised the Debtors that its willingness to provide the DIP Facility is conditioned on, among

other things, the DIP Agent (in addition to the Prepetition Senior Agent) having all rights of the Prepetition Senior Agent under the subordination provisions set forth in each Subordination Agreement.

**C.  Background to Proposed DIP Facility**

24.     As part of the Debtors' restructuring efforts, the Debtors coordinated with the Prepetition Senior Creditors and the Debtors' equity holders, and obtained commitments for financing from both groups. Specifically, the Prepetition Senior Creditors indicated a willingness to continue funding the Debtors on a postpetition basis through the DIP Facility, and to provide exit financing pursuant to the terms of the Exit Facility Commitment Letter. The Debtors' equity holders have committed to an infusion of $10 million under the proposed plan, and the Prepetition Subordinated Noteholders have agreed to extend the maturity dates under the Subordinated Note Documents by three (3) years.

25.     Separately, the Debtors performed due diligence regarding the reasonableness of the terms proposed for the DIP Facility, including by comparing such terms to five (5) debtor-in-possession credit facilities provided to retail and consumer products companies and originated within the last 12 months. Based on such analysis, the Debtors believe that the DIP Facility is provided on reasonable market terms. In addition, the Debtors contacted six (6) prospective lenders about the terms under which such lenders would provide debtor-in-possession funding to the Debtors through a refinancing of the Prepetition Senior Obligations. No lender would be willing to provide financing to the Debtors on an unsecured or subordinated basis, or on materially better terms than Wells. Further, alternative financing would require the

Debtors to pay prepayment fees of over $400,000 in connection with the Prepetition Senior Obligations that Wells is prepared to waive if, among other conditions, the transactions contemplated under the Exit Facility Commitment Letter actually close.

26. After careful review of their financing options, the Debtors concluded that Wells' proposed terms would allow the Debtors to meet their goals and provide the Debtors with sufficient liquidity on the best available economic terms. As noted above, Wells has also provided the Exit Facility Commitment Letter, through which the Debtors will continue to have access to sufficient liquidity for their ongoing operations as well as to provide confidence to vendors and employees that the Debtors will be able to operate successfully post-emergence. All negotiations with Wells were conducted at arms' length and in good faith and proceeded over several weeks as the Debtors sought to secure the best possible terms under the circumstances. The outcome of such negotiations is the DIP Loan Agreement and the Exit Facility Commitment Letter pending before this Court.

27. The Debtors now seek to move forward with the proposed DIP Facility on the terms set forth in the DIP Loan Agreement and any ancillary documents or agreements. Pursuant to the DIP Facility, the Debtors intend to repay the Prepetition Senior Obligations, initially as a creeping roll-up of the Prepetition Revolving Credit Loans following entry of the Interim Order, and then repayment of the remaining Prepetition Senior Obligations, including the Prepetition Term Loan, upon entry of the Final Order. The Debtors also will draw on the DIP Facility in order to satisfy the Debtors' ongoing working capital needs. The Debtors believe that the Prepetition Senior Obligations are substantially oversecured and that payment of the

Prepetition Senior Obligations is necessary in order to obtain access to the DIP Facility. Further, repayment of the Prepetition Senior Obligations is subject to customary challenge rights in favor of parties in interest, including a creditors' committee if one is appointed.

### Concise Statement of Relief Requested

28.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2, below is a summary[5] of the terms of the proposed financing and use of cash collateral:

| | |
|---|---|
| **LEAD BORROWER:** | The Walking Company. |
| **REMAINING BORROWERS:** | The remaining Debtors. |
| **DIP AGENT:** | Wells Fargo Bank, National Association. |
| **DIP LENDERS:** | Wells Fargo Bank, National Association. |
| **DIP FACILITY:** | A revolving credit facility and term loan in an aggregate principal amount of up to (i) $50 million in revolving obligations and (ii) $7.25 million in term obligations. Revolving obligations include a $10 million sublimit for the issuance of letters of credit (the "Letters of Credit"). Revolver borrowings under the DIP Facility for purposes of the Interim Order shall not exceed $25 million. The term loan under the DIP Facility is subject to entry of the Final Order. |
| **USE OF PROCEEDS:** | The proceeds of the DIP Facility shall be used solely for, in each case in a manner consistent with the terms and conditions herein and, in each case, in accordance with the Approved Budget (as defined below), subject to the variances described under the heading "Budget Compliance," below (a) working capital and Letters of Credit, (b) other general corporate purposes of the Borrower, (c) for payment of costs of administration of the chapter 11 cases, and (d) for payment of such other prepetition obligations as the DIP Agent shall reasonably agree and the Bankruptcy Court shall approve. Specifically, the DIP Facility will be utilized by the Debtors to repay the Prepetition Revolving Credit Loans as a |

---

[5]  The summaries and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the proposed Interim Order. In the event there is any conflict between this Motion and the Interim Order, the Interim Order will control in all respects.

creeping roll-up following entry of the Interim Order, and to repay the remaining Prepetition Senior Obligations, including the Prepetition Term Loan, upon entry of the Final Order.

**BORROWING BASE:**   Advances under the DIP Facility may be made to the Borrower on a revolving basis up to the full amount of the revolver portion of the DIP Facility and Letters of Credit may be issued up to the sublimit for Letters of Credit, in each case, subject to compliance with a borrowing base (the "***Borrowing Base***") equal to: (i) ninety percent (90%) times the sum of Big Dog's then extant Net Liquidation Value of Big Dog Eligible inventory, plus (ii) ninety percent (90%) times the sum of TWC's then extant Net Liquidation Value of TWC Eligible Inventory, plus (iii) eighty-five percent (85%) times the face amount of Eligible Wholesale Receivables (net of Receivables Reserves applicable thereto), plus (iv) eighty-five percent (85%) of the Eligible Credit Card Receivables; minus (v) the aggregate amount of other Reserves including, without limitation, the Minimum Excess Availability Reserve. "Minimum Excess Availability Reserve" shall mean an amount not less than the greater of (a) $5,000,000 and (b) ten percent (10%) of the aggregate Revolving Loan Commitments.

**RESERVES:**   The DIP Agent shall have the right to establish, modify or eliminate Reserves or to establish or adjust any eligibility criteria in its reasonable (from the perspective of a secured asset-based lender) business judgment.

**CLOSING DATE:**   The Closing Date shall occur as promptly as is practical after entry of the Interim Order and once all conditions precedent set forth in the DIP Loan Agreement are satisfied.

**MATURITY:**   The earliest of (a) October 2, 2018, (b) if the Order is not entered on or before April 10, 2018, immediately thereafter, (c) upon the effective date of a confirmed plan of reorganization under Section 1129 of the Bankruptcy Code, and (d) the closing of a sale of all or substantially all of the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code.

**BUDGET:**   The use of borrowings and Letters of Credit under the DIP Facility shall be limited in accordance with the budget (the "Approved Budget"), which budget shall include a weekly cash budget, including information on a cumulative basis by category (except with respect to professional fees and expenses, which shall be on a line item basis) as to (w) projected cash receipts, (x) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses

of the DIP Agent, DIP Term Agent and the DIP Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (y) projected inventory levels, and (z) a calculation of Availability, which shall be in form and substance acceptable to the DIP Agent and DIP Term Agent.

**BUDGET COMPLIANCE:** Commencing with the third full calendar week following the Petition Date and for each calendar week thereafter, the Borrowers shall strictly perform in accordance with the Approved Budget, including having made all scheduled payments to the "Lenders" (as defined in the Pre-Petition Credit Agreement) and Lenders, as applicable, as and when required, subject to the following (the "Permitted Variance"): (a) the Borrowers' actual sales and cash receipts shall not be less than 85% of the projected amounts set forth in the Approved Budget, (b) the Borrowers' actual expenses and cash expenditures shall not be greater than 115% of the projected amounts set forth in the Approved Budget on an aggregate basis (other than with respect to professional fees and expenses, which shall be tested on a separate aggregate basis), and (c) the Borrowers' Inventory shall not be less than 85% of the projected amounts set forth in the Approved Budget. Each of the foregoing covenants shall be tested on Sunday of each week (commencing with the third (3rd) week after the Petition Date) on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis, pursuant to the Approved Budget Variance Report delivered by the Lead Borrower to the Agent.

**CARVE-OUT:** As used in the Interim Order, the term "Carve Out" means, collectively, the sum of: (i) all allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of the Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of the Court; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of all unpaid all fees, costs and expenses allowed at any time by the Court, whether by interim order, procedural order, or otherwise (the "Allowed Professional Fees"), and incurred by professionals retained by the Debtors or the Committee, if any, in accordance with a final order of the Court (which order has not been reversed, vacated or stayed) under sections 327(a) or 1103(a) of the Bankruptcy Code (the "Case Professionals"), and the reimbursement of all out-of-pocket expenses at any time allowed by the Court, whether by interim order, procedural order, or otherwise, and incurred by the members of the Committee, if any, in the performance of their duties (but excluding any fees, costs

and expenses of third party professionals employed by such members) (the "Committee Expenses"), which aggregate amount under this clause (iii) shall not exceed the sum of: (x) commencing with the week ending March 10, 2018, an aggregate amount per week limited to the amount set forth in the Approved Budget for such week for the delivery of a Carve Out Trigger Notice (as defined below), which amount shall be funded into the Professional Fee Escrow Account on Wednesday of each week (or such other day of the week selected by the Debtors) in accordance with the Approved Budget provided that (I) the Debtors have sufficient Availability on such date (if not, the Debtors shall promptly notify the Case Professionals), (II) the Termination Date has not occurred, and (III) no Event of Default has occurred and is continuing, plus (y) $250,000 for Allowed Professional Fees and Committee Expenses incurred from and after the delivery of a written notice by the DIP Agent to the Debtors and their counsel, the Prepetition Senior Agent, the U.S. Trustee, and counsel to the Committee, if any, which notice may be delivered at any time following the occurrence and continuance of any Event of Default (a "Carve-Out Trigger Notice"). The DIP Agent shall at all times maintain, as part of the Carve-Out Reserve (as defined in the DIP Loan Agreement), a reserve in an amount not less than the amounts set forth in paragraphs 30(a)(i),(ii) and (iii)(y) of the Interim Order. Further, no portion of the Carve-Out, nor any cash collateral or proceeds of the DIP Facility may be used in violation of the Interim Order, including paragraph 31 therein. Notwithstanding anything to the contrary contained in the Interim Order, (A) until an Event of Default or the Termination Date has occurred, the Debtors shall be permitted to borrow under the DIP Loan Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) above in this Carve-Out paragraph, subject to there being sufficient Availability for such borrowings, (B) the Debtors shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals and the Committee Expenses regardless of whether an Event of Default or the Termination Date has occurred, and (C) the aggregate amount of Allowed Professional Fees of Case Professionals and Committee Expenses paid by the Debtors prior to the delivery of a Carve-Out Trigger Notice from any retainers held by such Case Professionals and from any amounts funded into the Professional Fee Escrow Account pursuant to clause (x) above in this Carve-Our paragraph, shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Approved Budget (in an aggregate amount for each Case Professional). Any amounts in the

Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals and Committee Expenses pursuant to final fee applications and orders shall be returned to the DIP Agent, which amounts shall be applied to the DIP Obligations in the order proscribed in Section 18.7(c) of the DIP Loan Agreement. The DIP Liens will attach to the Debtors' residual interest in such excess.

**SECURITY:** Subject to the Carve-Out and Prepetition Permitted Liens, the DIP Facility and the obligations of the Loan Parties thereunder will be entitled to (a) super priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code and (b) will be secured by a fully perfected security interest pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d)(1) of the Bankruptcy Code in all property and assets of the Loan Parties (that shall be senior to the super priority claim and lien status applicable to any prepetition obligations), as set forth below:

A valid and perfected *first* priority lien and security interest in all of the following (the "***DIP Collateral***"): all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including, but not limited to, (a) proceeds of leased real property, inventory and other goods, all rights of an unpaid vendor with respect to inventory, accounts receivable, credit card receivables, bank accounts, deposit accounts, general intangibles (including, for the avoidance of any doubt, payment intangibles), securities accounts and financial assets, investment property, chattel paper, insurance proceeds, contract rights, documents, instruments, indemnification rights, tax refunds, cash and money, cash equivalents, books and records, supporting obligations, letters of credit and letter of credit rights, commercial tort claims or other claims and causes of action and all proceeds and products of any of the foregoing, all unencumbered assets, actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral, (b) subject to entry of a Final Order, the proceeds of any avoidance actions brought under Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) (together, the "Bankruptcy Recoveries"), and (c) subject to entry of a Final Order, the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof (the preceding clauses (a) through (c), collectively).

Subject to the entry of the Final Order, (a) the DIP Agent and DIP Lenders shall each be entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and

(b) the DIP Agent and DIP Lenders shall each be entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

All such superpriority claims, security interests and liens will survive any conversion of any of the Cases to a case under Chapter 7.

**ADEQUATE PROTECTION:** To the extent of any Diminution in Value, replacement liens and superiority claims (junior to the DIP Facility) in favor of the Prepetition Senior Creditors and payment of ongoing principal and interest obligations, plus reimbursement of lender fees and expenses, and the funding of an indemnity reserve in the amount of $250,000.

To the extent of any Diminution in Value, replacement liens and superiority claims (junior to the DIP Facility and the adequate protection in favor of the Prepetition Senior Creditors) in favor of the Prepetition Subordinated Creditors, plus reimbursement of lender fees. Further, the Prepetition Subordinated Noteholders shall capitalize unpaid interest accrued during the post-petition period at a rate per annum of 10.375%.

**CASH MANAGEMENT:** The Loan Parties and their subsidiaries shall establish cash management procedures reasonably acceptable to the DIP Agent.

**DOCUMENTATION:** The DIP Loan Agreement will contain customary representations and warranties, funding and yield protection provisions, conditions precedent, affirmative, negative and financial reporting covenants, indemnities, events of default and remedies and other provisions appropriate for transactions agented by the DIP Agent of this size, type and purpose and shall be reasonably acceptable to the DIP Agent, the DIP Lenders and their counsel and the Debtors and their counsel. All orders of the Bankruptcy Court approving, authorizing, or amending the DIP Facility, and all motions relating thereto, shall be in form and substance acceptable to the DIP Agent.

**INTEREST RATES:** Except as provided in clause (c) below, (i) all Obligations under the Term Loan shall bear interest on the Daily Balance thereof at a rate per annum equal to the Term Loan Interest Rate (*i.e.*, greater of (A) LIBOR Rate and (B) one percent (1%) *plus* (ii) 10.50%), and (ii) all other Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows: (A) if the relevant Obligation is an Advance that is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin

(as set forth in the grid below), and (B) otherwise, at a per annum rate equal to the Alternative Base Rate plus the Alternative Base Rate Margin (as set forth in the grid below):

**Margin Pricing Grid**

| LIBOR Rate Margin | Alternative Base Rate Margin | Documentary L/Cs | Standby L/Cs | Unused Line Fee |
|---|---|---|---|---|
| 4.50% | 3.50% | 4.00% | 4.50% | 0.375% |

During the continuance of any default under the DIP Facility, the obligations under the DIP Facility shall bear interest at a rate that is increased by 2% per annum.

**FEES:** Usual and customary commitment and Letter of Credit fees for facilities of this type and purpose, including a closing fee of $250,000 payable to the DIP Agent on account of the revolving facility and $36,250 payable to the DIP Term Agent on account of the term facility.

Further, pursuant to the Prepetition Senior Loan Agreement, the Borrowers are indebted to the Prepetition Senior Agent in an amount equal to $187,500 (the "Prepetition Revolver Call Protection") and to the Prepetition Term Agent in an amount equal to $217,500 (the "Prepetition Term Loan Call Protection", and together with the Prepetition Revolver Call Protection, the "Prepetition Prepayment Fees"). The Borrowers acknowledge and agree that such Prepetition Prepayment Fees are fully earned and due and payable by the Borrowers (without offset, defense or counterclaim) as a result of the occurrence of the Termination Date under the Prepetition Senior Loan Agreement; notwithstanding, the Prepetition Senior Agent and the Prepetition Term Agent agree that such amounts shall be paid upon the earlier of (a) an Event of Default under the Prepetition Senior Loan Agreement, and (b) the Termination Date under the Prepetition Senior Loan Agreement. Notwithstanding the foregoing, the Prepetition Senior Agent and the Prepetition Term Agent agree to waive the Prepetition Prepayment Fees provided that the following conditions are satisfied: (i) the Court enters the Financing Orders as and when required under the DIP Loan Agreement, (ii) no Challenge (as such term is defined in the Financing Orders) is commenced as to the Prepetition Senior Obligations or the Prepetition Senior Liens granted thereunder, (iii) the Court enters an order confirming an Acceptable Plan as and when required under the DIP Loan Agreement, (iv) the Obligations under the DIP Loan Agreement

are Paid in Full and (v) the Prepetition Senior Agent and the Prepetition Term Agent provide senior secured emergence financing for the Loan Parties in accordance with the provisions of the Exit Facility Commitment Letter.

**DIP MILESTONES:**     On or before the third (3rd) Business Day following the Petition Date, the filing of an Acceptable Plan, Disclosure Statement, and plan solicitation process, upon terms and conditions acceptable to the Agent in its reasonable discretion;

No later than March 8, 2018, the Bankruptcy Court shall have entered the Interim Order;

No later than April 10, 2018, the Bankruptcy Court shall have entered the Final Order;

On or before April 25, 2018, the Bankruptcy Court shall have held a hearing seeking approval of the Disclosure Statement;

On or before April 26, 2018, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

On or before April 30, 2018, the Loan Parties shall have commenced solicitation with respect to an Acceptable Plan;

On or before June 4, 2018, the Bankruptcy Court shall have held a hearing seeking confirmation of an Acceptable Plan;

On or before June 5, 2018, the Bankruptcy Court shall have entered an order confirming the Acceptable Plan; and

On or before June 14, 2018, consummation of the Acceptable Plan, including, without limitation, the irrevocable Payment in Full of all Pre-Petition Obligations and Obligations on the date of such consummation.

In addition, no later than March 19, 2018, the Loan Parties shall file a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before April 5, 2018, the Bankruptcy Court shall have entered the Lease Extension Order.

The Loan Parties are also required to fund the Professional Fee Escrow Account on a weekly basis in accordance with the Approved Budget, as and when permitted under the Financing Orders.

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the DIP Facility will be subject to satisfaction of customary closing conditions for transactions of this type, including, without limitation, the following conditions precedent:

(i) Borrowers shall have paid all fees and expenses required to be paid to the Agent, Term Agent, and Lenders under this Agreement, the Fee Letter, and any other Loan Document shall have been paid in full;

(ii) Collateral Agent shall have filed all Code financing statements and intellectual property related filings required by Collateral Agent and Collateral Agent shall have received searches reflecting (x) the filing of all such financing statements and (y) that Lenders' Liens in the Collateral are (after giving effect to this Agreement and subject to the Permitted Liens and any UCC-3 termination statements which Collateral Agent has been duly authorized to file) perfected first priority security interests;

(iii) Administrative Agent and Term Agent shall have received and reviewed lien and judgment search results for the jurisdiction of organization of each Loan Party, the jurisdiction of the chief executive office of each Loan Party and all jurisdictions in which assets of the Loan Parties are located, which search results shall be in form and substance satisfactory to Administrative Agent and Term Agent;

(iv) Administrative Agent and Term Agent shall have received searches of ownership of intellectual property, and any liens thereon, in the appropriate governmental offices of such patent/trademark/copyright filings as requested by Administrative Agent and Term Agent;

(v) Administrative Agent and Term Agent shall have received evidence that originals of the shares of the stock certificates, if any, representing all of the issued and outstanding shares of the Stock of each Loan Party (and any other Person) that is owned by any Loan Party, in each case together with stock powers duly executed in blank with respect thereto have been delivered to the Collateral Agent;

(vi) Agent, Term Agent, and Lenders shall have received (or confirmed its receipt of) executed loan documents, in form and substance satisfactory to Agent, Term Agent Lenders in their Permitted Discretion, duly executed, and each such document shall be in full force and effect

(v) Agent shall have received a Borrowing Base Certificate, dated as of March 5, 2018;

(vi) Agent and Term Agent shall have received a certificate from the Secretary (or other officer acceptable to the Agent and Term Agent in their Permitted Discretion) of each Borrower and Parent attesting to the resolutions of such Borrower's or Parent's Board of Directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which such Person is a party and authorizing specific officers of such Borrower or Parent to execute the same;

(vii) Agent and Term Agent shall have received copies of each Borrowers' and Parent's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the Secretary of each respective Loan Party and, each in form and substance satisfactory to Administrative Agent and Term Agent in their Permitted Discretion;

(viii) Agent and Term Agent shall have received an Officer's Closing Certificate, the form and substance of which shall be satisfactory to Agent, Term Agent and each Lender, and Agent, Term Agent and each Lender shall otherwise be satisfied, in their Permitted Discretion, with the capital structure of the Borrowers and their Affiliates;

(ix) Agent and Term Agent shall have received a certificate of status with respect to each Borrower and Parent, dated within thirty (30) days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of the applicable Borrower or Parent, which certificate shall indicate that such Borrower or Parent is in good standing in such jurisdiction;

(x) Agent and Term Agent shall have received such certificates of insurance, together with the endorsements thereto, as are required by the DIP Loan Agreement the form and substance of which shall be satisfactory to Agent, Term Agent, and Lenders in their Permitted Discretion;

(xi) Agent, Term Agent, and Lenders shall have completed any updated business, legal, and collateral due diligence, including (i) a collateral audit and review of Borrowers' books and records and verification of Borrowers' representations and warranties to the Agent and each Lender, the results of which shall be satisfactory to Agent and each Lender, and (ii) an inspection of each of the locations where Inventory is located, the results of which shall be satisfactory to Agent and each Lender in their sole discretion;

(xii) Agent and Term Agent shall have received an appraisal of the Net Liquidation Value and Net Liquidation Percentage applicable to Borrowers' Inventory, the results of which shall be satisfactory to Agent, Term Agent, and each Lender in their Permitted Discretion;

(xiii) Term Agent shall have received an appraisal of the Intellectual Property, the results of which shall be satisfactory to Term Agent in its Permitted Discretion;

(xiv) Borrower shall have paid all Lender Expenses incurred in connection with the transactions evidenced by this Agreement and the other Loan Documents, and otherwise incurred by Agent or Lender in connection with therewith (including, without limitation, the fees, charges and disbursements of counsel to the Agent and Term Agent);

(xv) Agent shall have received evidence satisfactory in Agent's, Term Agent's and Lenders' Permitted Discretion that: (i) the Loan Parties have received all consents, licenses, approvals or evidence of other actions required by any Person, including any Governmental Authority, in connection with the execution and delivery by the Loan Parties of this Agreement or any other Loan Document or with the consummation of the transactions contemplated hereby and thereby (other than UCC and intellectual property security interest filings to be made on the Closing Date), (ii) the consummation of the transactions contemplated hereby shall not violate and Applicable Law or Governing Document, and (iii) the conditions in Section 4.2 of the DIP Loan Agreement have been satisfied;

(xvi) The Agent and Term Agent shall have received the initial Approved Budget;

(xvii) Agent and Term Agent shall have received an updated reference check with respect to Loan Parties' senior management, the results of which are satisfactory to Agent, Term Agent, and each Lender in their sole discretion;

(xviii) All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered and executed and shall be in form and substance satisfactory to Agent, Term Agent, and Lenders;

(xix) No material adverse change in governmental regulation or policy affecting the Agent, Term Agent, Lender, any Loan Party or this Agreement;

(xx) No material misstatements in or omissions in fact from the materials previously furnished to Administrative Agent, Term Agent, and/or Lenders by or on behalf of the Loan Parties shall have been made;

(xxi) Except with respect to the filing of the Chapter 11 Case and any Material Adverse Effect resulting from the Events and Circumstances, no Material Adverse Change shall have occurred since the date of the last audited financial statements;

(xxii) Borrowers shall have Excess Availability of not less than $5,000,000 after giving effect to the Advances and Letters of Credit made on the Closing Date;

(xxiii) Agent, Term Agent, Lenders, and Issuing Lender shall have completed all requirements related to the Patriot Act, anti-money laundering rules and regulations, and all other "know your customer" requirements with respect to Borrowers and Guarantors and their Affiliates;

(xxiv) The Note Financing Subordination Agreement, Galleria Subordination Agreement, Simon Subordination Agreement, and Intercompany Note shall be in full force and effect;

(xxv) The Agent shall have received duly executed copies of the engagement letter for Consensus Advisors LLC as a Consultant, which shall be on terms and conditions reasonably acceptable to the Agent;

(xxvi) (a) The Bankruptcy Court shall have entered the Interim Order and the Cash Management Order, and (b) neither of such orders shall have been (1) stayed, vacated or reversed (in whole or in part) or (2) amended or modified other than with the consent of the Agent; and

(xxviii) The Borrowers shall have delivered to the Agent, each in form and substance acceptable to the Agent, the following exit commitment letters (collectively, the "Exit Commitment Letters"): (a) a commitment from Agent and Term Agent for a senior secured revolving and term facility in an amount not less than $55 million, (b) a commitment from the Noteholders to, among other things, extend the maturity of the Note Financing, and (c) a commitment from certain equity holders of the Parent to make an investment of $10,000,000 in the Loan Parties.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary representations and warranties for transactions of this type.

**AFFIRMATIVE AND
NEGATIVE COVENANTS:**  Usual and customary covenants for transactions of this type, including, without limitation, usual and customary financial reporting requirements, each of which shall be in form and substance reasonably acceptable to the Administrative Agent.

**COMPANY ADVISORS:**  The Debtors will retain Consensus Advisors, LLC to assist with the Debtors' restructuring. The Debtors and the Debtor's advisors will grant access and cooperate with the DIP Agent and its advisors.

**EVENTS OF DEFAULT:**  Usual and customary events of defaults for facilities of this type and purpose.

**REMEDIES:**  Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Agent may in its discretion (or shall in accordance with the DIP Loan Documents) (i) declare the DIP Facility terminated (such declaration, a "Termination Declaration") or (ii) send a reservation of rights notice to the Debtors, which notice may advise the Debtors that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent and/or DIP Lenders. Upon the Termination Date: (I) all or any portion of the Commitments of the DIP Agent, the DIP Term Agent and DIP Lenders to make loans or otherwise extend credit may be suspended or terminated in accordance with the DIP Loan Documents; (II) all DIP Obligations may be deemed immediately due and payable in accordance with the DIP Loan Documents; (III) subject to the Remedies Notices Period, the DIP Agent, the DIP Term Agent and DIP Lenders may exercise all other rights and remedies available to them under Article 10 of the DIP Loan Agreement; and (IV) after expiration of the Remedies Notice Period (as defined herein), any right or ability of the Debtors to use any Cash Collateral may be terminated, reduced or restricted by the DIP Agent, provided that, during the Remedies Notice Period, the Debtors may use Cash Collateral solely as set forth in paragraph 11 herein. With respect to the DIP Collateral, following the Termination Declaration, subject to the Remedies Notice Period, the DIP Secured Parties and the Prepetition Senior Creditors may exercise all rights and remedies available to them under the DIP Loan Documents or the Prepetition Senior Loan Documents, as applicable, or applicable law against the DIP Collateral and without limiting the foregoing, the DIP Secured Parties and the Prepetition Senior Creditors may, subject to the Remedies Notice Period, (i) subject to paragraph 24(d) of the Interim Order, enter onto the premises of any Debtor in connection with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and remedies provided under the DIP Loan

Documents or the Prepetition Senior Loan Documents, as applicable, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to the Interim Order and the Final Order. For the avoidance of doubt, no party-in-interest (other than (A) the DIP Secured Parties, (B) the Prepetition Senior Agent, and (C) solely with respect to any particular DIP Collateral that is the subject of a Prepetition Permitted Lien, holders of such Prepetition Permitted Lien) may at any time exercise any rights and remedies available to them against the DIP Collateral until the DIP Obligations and the Prepetition Senior Obligations are indefeasibly paid in full in cash.

In addition, if a Specified Sale Process Default (as defined in the DIP Loan Agreement) occurs and is continuing (*i.e.*, an event of default relating to non payment, breach of budget covenants, or the DIP milestones occurs or is continuing), the DIP Agent (with the consent of the DIP Term Agent solely with respect to any DIP Collateral that constitutes Term Loan Priority Collateral) may direct the Debtors to commence a process for the sale of all or any portion of the DIP Collateral (the "Sales Process"), pursuant to which the Debtors must: (a) within three (3) Business Days after the expiration of a Remedies Notice Period triggered by a Specified Sale Process Default, obtain entry of an Order from the Court, in form and substance approved by the DIP Agent, designating a liquidating stalking horse bidder(s) for the Sales Process consented to by the DIP Agent in its sole discretion and, solely with respect to the sale of any DIP Collateral that constitutes Term Loan Priority Collateral, the DIP Term Agent in its sole discretion, and approving bidding and sales procedures with respect to the Sales Process; (b) within seven (7) Business Days after the expiration of a Remedies Notice Period triggered by a Specified Sale Process Default, complete an auction for the Sale Process and declare a "successful bidder" or "successful bidder(s)" for the Sales Process on terms and conditions consented to by the DIP Agent in its sole discretion and, solely with respect to the sale of any DIP Collateral that constitutes Term Loan Priority Collateral, the DIP Term Agent in its sole discretion; (c) within eight (8) Business Days after the expiration of a Remedies Notice Period triggered by a Specified Sale Process Default, obtain entry of an Order from the Court (the "Sale Order"), in form and substance acceptable to the DIP Agent and, solely with respect to the sale of any DIP Collateral that constitutes Term Loan Priority Collateral, the DIP Term Agent, approving the Sales Process; and (d) within one (1) Business Day following entry of the Sale Order after the expiration of a Remedies Notice Period triggered by a Specified Sale Process Default, execute an agency agreement for

the Sales Process approved by the DIP Agent in its sole discretion and, solely with respect to the sale of any DIP Collateral that constitutes Term Loan Priority Collateral, the DIP Term Agent in its sole discretion, in connection with the Sales Process and commence the Sales Process pursuant to the applicable approved agency agreement and the Sale Order.

**WAIVERS AND AMENDMENTS:** Usual and customary terms for facilities of this type and purpose.

**EXPENSES AND INDEMNIFICATION:** Usual and customary terms for facilities of this type and purpose.

**GOVERNING LAW:** Commonwealth of Massachusetts.

## Disclosures

29. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

a. Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to a prepetition secured creditor in connection with the debtor's cash collateral usage or additional financing. **The proposed Interim Order does not provide for the granting of cross-collateralization protection to any prepetition secured creditor (except as adequate protection to the Prepetition Senior Creditors and Prepetition Subordinated Creditors against any Diminution in Value).**

b. Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of a secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. **The proposed Interim Order contains findings or admissions by the Debtors relating to the validity, perfection, enforceability and amount of the Prepetition Senior Creditors' and Prepetition Subordinated Creditors' prepetition liens and claims, subject to a challenge period for any committee or other party in**

interest by no later than (a) with respect to the Creditors' Committee (if appointed), sixty (60) calendar days from the appointment of the Creditors' Committee and (b) seventy-five (75) calendar days after entry of the Interim Order, subject to further extension by written agreement of the secured parties. **Interim Order ¶34-35.**

     c.     Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order provides, subject to entry of the Final Order, that each Prepetition Senior Creditor and each Prepetition Subordinated Noteholders is entitled to a waiver of (a) the provisions of Section 506(c) of the Bankruptcy Code and (b) any "equities of the case" claims under Section 552(b) of the Bankruptcy Code. Interim Order ¶37, 39.**

     d.     Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. **The proposed Interim Order expressly carves out any liens on Bankruptcy Recoveries, but subject only to and effective upon entry of the Final Order, the DIP Collateral will include Bankruptcy Recoveries. Interim Order ¶6.**

     e.     Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **The proposed Interim Order contemplates a creeping roll-up of the Prepetition Revolving Credit Loans and the Final Order provides for a complete roll-up of the remaining Prepetition Senior Obligations, including the Prepetition Term Loan. Interim Order ¶3.**

     f.     Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. **The proposed Interim Order does not provide for disparate treatment for committee professionals, aside from projecting lower fees for committee professionals than Debtor professionals in the Approved Budget.**

     g.     Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order does not provide for the priming of any secured lien without consent of that lienholder.**

     h.     Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order specifies the adequate protection to be provided to the Prepetition Senior Creditors and Prepetition Subordinated Creditors. Interim Order ¶¶12, 13.**

i.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order describes the modification of the automatic stay to the extent necessary to implement the Interim Order. Interim Order ¶16.**

j.      Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order includes provisions that provide for the automatic perfection and validity of the DIP Liens without the necessity of any further filing or recording under the laws of any jurisdiction. Interim Order ¶17.**

### Need for Financing and Use of Cash Collateral

30.      The Debtors have an urgent and immediate need for access to funds available under the DIP Facility and the use of the Cash Collateral. Such funding is necessary in order for the Debtors to have sufficient liquidity to operate their business, satisfy their vendor and customer obligations, and pay their employees. Without immediate access to the DIP Facility and Cash Collateral, the Debtors would be forced to terminate operations and liquidate their assets, which would put hundreds of the Debtors' dedicated employees out of work and irreparably damage the Debtors' efforts to maintain going concern value or to maximize recoveries for all stakeholders through the proposed chapter 11 reorganization plan. Accordingly, the Debtors strongly urge the Court to authorize the DIP Facility and continued use of Cash Collateral on the terms contemplated herein, initially on an interim basis and, following a final hearing, on a final basis. The Debtors have the consent of the Prepetition Senior Creditors and Prepetition Subordinated Creditors, pursuant to applicable intercreditor agreements, to implement the DIP Facility and access Cash Collateral on the terms set forth in this Motion.

A.    **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

31.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> > (A)    the [debtor] is unable to obtain credit otherwise; and
> >
> > (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

32.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;
>
> c.    the terms of the credit agreement are fair, reasonable, and adequate;

d.      the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

e.      the proposed financing agreement adequately protects the prepetition secured parties.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

33.      For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in these cases on a secured superpriority and priming lien basis as to the DIP Collateral under sections 364(c)(1), (2) and (3) of the Bankruptcy Code.

**B.     The Debtors Were Unable to Obtain Financing on More Favorable Terms**

34.      The Debtors are already highly leveraged and the principal goal of these cases is to effectuate a chapter 11 reorganization. Under current circumstances, the Debtors are not able to obtain alternative financing from outside parties on an unsecured or junior secured basis.

35.      As outlined above, the Debtors engaged in a prepetition marketing process in order to obtain exit and debtor-in-possession financing. The DIP Agent offered the best available economic proposal for a combination of exit and DIP financing. The DIP Agent is unwilling to lend into the DIP Facility except on a fully secured and senior (*i.e.*, priming) basis as to the DIP Primary Collateral.

36.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.     The Proposed Financing is Necessary to Maximize the Value of the Debtors' Estates**

37.     The Debtors seek to use the proceeds of the DIP Facility to repay the existing Prepetition Senior Obligations, and for general working capital purposes in accordance with the Approved Budget. The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

38.     The Debtors believe that the Prepetition Senior Obligations are substantially oversecured and that payment thereof is necessary in order to obtain access to the DIP Facility. Further, the repayment of the Prepetition Senior Obligations is subject to customary challenge rights in favor of parties in interest, including a creditors' committee if one is appointed.

39.     The Debtors view the DIP Facility as an important step toward the successful consummation of their chapter 11 reorganization plan, including the closing of an exit facility in accordance with the Exit Facility Commitment Letter. The DIP Facility also has the support of the Prepetition Senior Creditors and Prepetition Subordinated Creditors.

**D.    The Terms of the Proposed Financing are Fair, Reasonable, and Appropriate**

40.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

41.    The terms of the DIP Agreement were negotiated in good faith and at arm's-length between the Debtors and the DIP Agent, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets through the plan confirmation process. The proposed terms are fair, reasonable and appropriate under the circumstances, and should be approved. *See, e.g., Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets).

**E.    Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment**

42.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

43.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

44.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

45.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Facility in order to allow the Debtors to gain access to needed financing and thereby maximize value for all constituents.

**F.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

46.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

47.     By this Motion, the Debtors seek authority to use the Prepetition Collateral, including Cash Collateral, pursuant to the Approved Budget and on terms consistent with the proposed Interim Order.

48.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *see also In re Ames Dep't Stores Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the

14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

49.    As previously noted, in order to continue to operate their business and maintain going concern value, the Debtors require access to the DIP Facility and the Prepetition Collateral, including the use of Cash Collateral.  Such use will provide the Debtors with the necessary funds to fully honor all of their ongoing obligations to employees, vendors, and customers and allow the Debtors to proceed promptly towards confirmation of their proposed chapter 11 reorganization plan.  The Debtors' goal is to make this bankruptcy process as seamless as possible from the perspective of the Debtors' employees, vendors, and customers.

50.    Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm.  The Debtors' business would be shut down and their assets liquidated, which would result in the termination of hundreds of the Debtors' employees and loss of going concern value at the expense of the Debtors' stakeholders.  Thus, immediate access to Cash Collateral is essential to the Debtors' continued viability and ability to successfully reorganize.

**G.    Sections 105 and 363 of the Bankruptcy Code Authorize the Debtors' Use of Cash Collateral**

51.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the court approves the use of cash collateral after notice and a hearing.  11 U.S.C. § 363(c).  Section 105(a) of the Bankruptcy Code provides that the court may issue any order that is necessary or appropriate to carry out the provisions of title 11.  11 U.S.C. § 105(a).

52.     Here, the Debtors have the consent of the Prepetition Senior Creditors and Prepetition Subordinated Creditors to access Cash Collateral on the terms described in the Motion and set forth in the Interim Order and Final Order.  In addition, the Prepetition Senior Creditors' and Prepetition Subordinated Creditors' interests in the Prepetition Collateral are adequately protected by a combination of protections proposed in the Interim Order and through the preservation of going concern value in the Debtors' assets.

**H.     The Proposed Adequate Protection of the Prepetition Secured Parties is Warranted**

53.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Courts typically authorize a debtor to use cash collateral to continue operations so long as the interests asserted by affected creditors in such collateral, which equal the value of the collateral rather than of the debt, are adequately protected or they consent to such use.  *Id.*; *U.S. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (interest in property referenced in 11 U.S.C. § 363(e) refers to the value of the collateral as opposed to the value of the loan).  What constitutes adequate protection must be decided on a case-by-case basis.  *See, e.g., MBank Dallas v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (citing *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985)); *Metro. Life Ins. Co. v. Monroe Park (In re Monroe Park)*, 17 B.R. 934, 940 (D. Del. 1982) (citations omitted).

54.     Section 361 of the Bankruptcy Code authorizes a debtor to provide

adequate protection by granting replacement liens, making periodic cash payments, or granting

such other relief "as will result in the realization by such entity of the indubitable equivalent of

such entity's interest in such property." 11 U.S.C. § 361.  According to the legislative history of

section 361 of the Bankruptcy Code, a finding of adequate protection is "left to case-by-case

interpretation and development.  It is expected that the courts will apply the concept [of adequate

protection] in light of the facts of each case and general equitable principles."  H.R. Rep. No.

595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; *see also*

*O'Connor*, 808 F.2d at 1396-97 ("[T]he courts have considered 'adequate protection' a concept

which is to be decided flexibly on the proverbial 'case-by-case' basis.").

55.     The Interim Order authorizes the Debtors to use Cash Collateral in

exchange for providing adequate protection to the Prepetition Senior Creditors and Prepetition

Subordinated Creditors by: (i) granting, solely to the extent of any Diminution of Value,

additional and replacement security interests in and liens on the Debtors' assets (including in the

case of the Prepetition Senior Creditors the Bankruptcy Recoveries, subject to entry of the Final

Order); (ii) granting, solely to the extent of any Diminution of Value, to the extent provided by

sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative claim in these

chapter 11 cases; and (iii) making adequate protection payments in the form of principal, interest,

and the funding of an indemnity reserve in favor of the Prepetition Senior Creditors, plus

reimbursement of the reasonable fees and costs incurred by the advisors to the Prepetition Senior

Creditors and the reasonable fees of the Prepetition Subordinated Noteholders in connection with

these bankruptcy cases. Further, the Debtors request to modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order.

56. The various cash collateral protections described above are sufficient under the present circumstances to provide adequate protection to the Prepetition Senior Creditors and Prepetition Subordinated Creditors. The Approved Budget contemplates that the Debtors will use the Cash Collateral to satisfy their ordinary course obligations. Hence, the Debtors' business will continue to be operated consistent with prepetition practices, with virtually no perceptible change to employees, vendors, or customers.

57. In sum, the proposed adequate protection components described above are fair and reasonable and compensate the Prepetition Senior Creditors and Prepetition Subordinated Creditors for any possible diminution in value of the Debtors' assets securing the secured parties' liens. Given the significant value that the Debtors stand to lose in the event that they are denied access to the continued use of Cash Collateral, such protections are appropriate. Without the use of Cash Collateral, the Debtors' operations will cease and the Debtors' estates and their creditors will be irreparably damaged.

### Interim Order and Final Hearing

58. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

59.     The urgent need to preserve going concern value, and avoid immediate

and irreparable harm to all of the Debtors' estates, makes it imperative that the Debtors be

authorized to access the DIP Facility and use Cash Collateral, pending the Final Hearing, in

order to continue their operations and to allow the Debtors to administer their cases. Without the

ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be

unable to meet their ongoing obligations and would be unable to fund their working capital

needs, thus causing irreparable harm to the Debtors and the value of these estates. Accordingly,

the Debtors respectfully request that, pending the hearing on a Final Order, the Interim Order be

approved in all respects and that the terms and provisions of the Interim Order be implemented

and be deemed binding and that, after the Final Hearing, the Final Order be approved in all

respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### Notice of Motion

60.     The Debtors will provide notice of this Motion to the following parties, or

their counsel, if known: (a) the U.S. Trustee for the District of Delaware; (b) the Internal

Revenue Service; (c) the parties included on the Debtors' consolidated list of the thirty (30)

largest unsecured creditors; (d) counsel to each of the Prepetition Senior Agent and the

Prepetition Term Agent; (e) any party of record that has asserted a lien in the Debtors' assets; (f)

respective counsel to each of the Prepetition Subordinated Creditors; (g) all parties who have

filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002;

and (h) applicable state taxing authorities. As the Motion is seeking "first day" relief, within two

business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any

order entered respecting the Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## Notice with Respect to Final Hearing

61.     No trustee, examiner or statutory committee has been appointed in the Debtors' cases. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon the following parties, or their counsel, if known: (a) the U.S. Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of the thirty (30) largest unsecured creditors; (d) counsel to each of the Prepetition Senior Agent and the Prepetition Term Agent; (e) any party of record that has asserted a lien in the Debtors' assets; (f) respective counsel to each of the Prepetition Subordinated Creditors; (g) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002; and (h) applicable state taxing authorities. The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## No Prior Request

62.     No prior request for the relief requested herein has been made to this or any other court. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

WHEREFORE, the Debtors request entry of the Interim Order and the Final Order under sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m), (i) authorizing the Debtors to obtain postpetition financing and use cash collateral, (ii) granting adequate protection, (iii) modifying the automatic stay, and (iv) scheduling a final hearing, as described herein.

Dated:   March 6, 2018

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
Jeffrey W. Dulberg (CA Bar No. 181200)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100
Fax: (302) 652-4400
E-mail:  jpomerantz@pszjlaw.com
            jdulberg@pszjlaw.com
            mlitvak@pszjlaw.com
            joneill@pszjlaw.com

Proposed Attorneys for Debtors and Debtors in Possession