**Exhibit A**
(DIP Loan Agreement
without Schedules or Exhibits)

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

by and among

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative, Collateral Agent, and Term Agent

**THE REVOLVING CREDIT LENDERS**
Named Herein,

**THE TERM LENDERS**
Named Herein,

**THE WALKING COMPANY HOLDINGS, INC.**
as Parent,

and

**BIG DOG USA, INC., THE WALKING COMPANY, and FOOTSMART, INC.**
as Borrowers

Dated as of March 6, 2018

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION. | 2 |
| | 1.1. Definitions. | 2 |
| | 1.2. Accounting Terms. | 42 |
| | 1.3. Code. | 43 |
| | 1.4. Construction. | 43 |
| | 1.5. Schedules and Exhibits. | 43 |
| | | |
| 2. | REVOLVING CREDIT LOAN, TERM LOAN, AND TERMS OF PAYMENT. | 43 |
| | 2.1. Term Loan and Revolving Credit Advances. | 43 |
| | 2.2. Advances in Excess of Borrowing Base (Overadvances). | 45 |
| | 2.3. Borrowing Procedures. | 45 |
| | 2.4. Payments. | 46 |
| | 2.5. Overadvances. | 47 |
| | 2.6. Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations. | 47 |
| | 2.7. Cash Management. | 49 |
| | 2.8. Crediting Payments. | 50 |
| | 2.9. Disbursement Account. | 51 |
| | 2.10. Maintenance of Loan Account and Term Loan Account and Statements of Obligations. | 51 |
| | 2.11. Fees. | 52 |
| | 2.12. Letters of Credit. | 52 |
| | 2.13. LIBOR Option. | 62 |
| | 2.14. Capital Requirements. | 64 |
| | 2.15. Lenders' Commitments. | 64 |
| | 2.16. Mitigation. | 66 |
| | 2.17. Designation of Lead Borrower as Borrowers' Agent. | 66 |
| | 2.18. Joint and Several Liability of Borrowers. | 66 |
| | 2.19. Release. | 69 |
| | 2.20. Waiver of any Priming Rights. | 69 |
| | | |
| 3. | Intentionally Omitted. | 70 |
| | | |
| 4. | CONDITIONS; TERM OF AGREEMENT. | 70 |
| | 4.1. Conditions Precedent to the Initial Extension of Credit. | 70 |
| | 4.2. Conditions Precedent to all Extensions of Credit. | 73 |
| | 4.3. Term. | 73 |
| | 4.4. Effect of Termination. | 73 |
| | 4.5. Early Termination by Borrower; Reduction of Commitment. | 74 |
| | | |
| 5. | CREATION OF SECURITY INTEREST. | 75 |
| | 5.1. Grant of Security Interest. | 75 |
| | 5.2. Control of Collateral. | 75 |
| | 5.3. Negotiable Collateral. | 75 |
| | 5.4. Collection of Accounts, General Intangibles, and Negotiable Collateral. | 75 |
| | 5.5. Delivery of Additional Documentation Required. | 75 |
| | 5.6. Power of Attorney. | 76 |
| | 5.7. Control Agreements. | 76 |
| | 5.8. Right to Inspect. | 76 |

6.  REPRESENTATIONS AND WARRANTIES...........................................................77
    6.1.  No Encumbrances..........................................................................77
    6.2.  Eligible Credit Card Receivables........................................................78
    6.3.  Eligible Inventory.......................................................................78
    6.4.  Equipment................................................................................78
    6.5.  Location of Inventory and Equipment.....................................................78
    6.6.  Inventory Records........................................................................78
    6.7.  Legal Status.............................................................................78
    6.8.  Due Organization and Qualification; Subsidiaries........................................78
    6.9.  Due Authorization; No Conflict..........................................................79
    6.10. Litigation...............................................................................80
    6.11. No Material Adverse Change...............................................................80
    6.12. Fraudulent Transfer......................................................................80
    6.13. Employee Benefits........................................................................80
    6.14. Environmental Condition..................................................................80
    6.15. Brokerage Fees...........................................................................81
    6.16. Intellectual Property....................................................................81
    6.17. Leases...................................................................................81
    6.18. DDAs.....................................................................................81
    6.19. Credit Card Receipts.....................................................................81
    6.20. Indebtedness.............................................................................81
    6.21. Filing of Tax Returns and Payment of Taxes..............................................82
    6.22. Complete Disclosure......................................................................82
    6.23. OFAC; Sanctions..........................................................................82
    6.24. Insurance................................................................................83
    6.25. Requirements of Law......................................................................83
    6.26. No Margin Stock..........................................................................83
    6.27. Investment Company Status................................................................83
    6.28. Accounts.................................................................................83
    6.29. Consignment.............................................................................83
    6.30. No Events of Default.....................................................................83
    6.31. Use of Proceeds..........................................................................83
    6.32. Investments.............................................................................84
    6.33. Material Agreements......................................................................84
    6.34. Reserved................................................................................84
    6.35. Shareholder Agreements..................................................................84
    6.35. Bankruptcy Matters.......................................................................84

7.  AFFIRMATIVE COVENANTS.........................................................................85
    7.1.  Accounting System........................................................................85
    7.2.  Collateral Reporting.....................................................................85
    7.3.  Financial Statements, Reports, Certificates.............................................85
    7.4.  Return...................................................................................88
    7.5.  Maintenance of Properties................................................................88
    7.6.  Tax Matters.............................................................................88
    7.7.  Insurance................................................................................88
    7.8.  Location of Inventory and Equipment.....................................................89
    7.9.  Compliance with Laws.....................................................................90
    7.10. Leases...................................................................................90
    7.11. Brokerage Commissions....................................................................90
    7.12. Existence................................................................................90

7.13. Environmental..................................................................................................90
7.14. Investment Proceeds, Etc..................................................................................91
7.15. Immediate Notice to Administrative Agent and Term Agent.............................91
7.16. Disclosure Updates...........................................................................................92
7.17. Reserved............................................................................................................92
7.18. Line of Business...............................................................................................92
7.19. Additional Subsidiaries.....................................................................................92
7.20. Retention of Consultants; Communication with Accountants and Other
        Financial Advisors............................................................................................92
7.21. Performance within Budget..............................................................................93
7.22. Bankruptcy Related Affirmative Covenants.....................................................93
7.23. Lease Extension................................................................................................94
7.24. Financing Orders..............................................................................................94
7.25. Exit Commitments............................................................................................94

8.    NEGATIVE COVENANTS..................................................................................95
8.1.  Indebtedness.......................................................................................................95
8.2.  Liens..................................................................................................................96
8.3.  Restrictions on Fundamental Changes..............................................................96
8.4.  Disposal of Assets............................................................................................96
8.5.  Change of Name or Address.............................................................................96
8.6.  Guarantee...........................................................................................................96
8.7.  TWC-Bermuda...................................................................................................96
8.8.  Prepayments and Amendments.........................................................................97
8.9.  Change of Control.............................................................................................97
8.10. Consignments....................................................................................................97
8.11. Distributions and Payments..............................................................................97
8.12. Accounting Methods.........................................................................................97
8.13. Investments.......................................................................................................97
8.14. Transactions with Affiliates..............................................................................97
8.15. Store Openings and Closings............................................................................98
8.16. Suspension.........................................................................................................98
8.17. Sale Leaseback..................................................................................................98
8.18. Use of Proceeds................................................................................................98
8.19. Inventory and Equipment with Bailees.............................................................98
8.20. Securities Accounts...........................................................................................98
8.21. Reserved............................................................................................................98
8.22. Benefit Plans.....................................................................................................99
8.23. Shareholder Agreements...................................................................................99
8.24. Fiscal Year........................................................................................................99
8.25. Reclamation Claims..........................................................................................99
8.26. Payments in Respect of Debt............................................................................99
8.27. Simon/Galleria Agreements..............................................................................99
8.28. Bankruptcy Related Negative Covenants..........................................................99
8.28. Professional Fee Escrow Account....................................................................100

9.    EVENTS OF DEFAULT.....................................................................................100
9.1.  Payment............................................................................................................100
9.2.  Covenants.........................................................................................................100
9.3.  Attachment.......................................................................................................100
9.4.  Reserved...........................................................................................................100

| | | | |
|---|---|---|---|
| | 9.5. | Reserved. | 101 |
| | 9.6. | Injunction. | 101 |
| | 9.7. | Levy. | 101 |
| | 9.8. | Judgment. | 101 |
| | 9.9. | Material Agreements. | 101 |
| | 9.10. | Cessation of Business. | 101 |
| | 9.11. | Subordinated Payments. | 101 |
| | 9.12. | Misrepresentation. | 101 |
| | 9.13. | Guaranty. | 101 |
| | 9.14. | Liens. | 101 |
| | 9.15. | Loan Documents. | 102 |
| | 9.16. | Material Adverse Change. | 102 |
| | 9.17. | Change of Control. | 102 |
| | 9.18. | Material Restraint. | 102 |
| | 9.19. | Guarantor. | 102 |
| | 9.20. | License. | 102 |
| | 9.21. | Indictment. | 102 |
| 10. | THE AGENT'S RIGHTS AND REMEDIES. | | 104 |
| | 10.1. | Rights and Remedies. | 104 |
| | 10.2. | Remedies Cumulative. | 109 |
| 11. | TAXES AND EXPENSES. | | 109 |
| | 11.1. | Third Party Payments. | 109 |
| | 11.2. | Taxes. | 110 |
| 12. | WAIVERS; INDEMNIFICATION. | | 112 |
| | 12.1. | Demand; Protest; etc. | 112 |
| | 12.2. | Collateral Agent's Liability for Collateral. | 112 |
| | 12.3. | Indemnification. | 112 |
| | 12.4. | Costs and Expenses of the Agent and Lenders. | 113 |
| 13. | NOTICES. | | 113 |
| 14. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | | 115 |
| 15. | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS. | | 116 |
| | 15.1. | Assignments and Participations. | 116 |
| | 15.2. | Successors. | 117 |
| 16. | AMENDMENTS; WAIVERS. | | 117 |
| | 16.1. | Amendments and Waivers. | 117 |
| | 16.2. | No Waivers; Cumulative Remedies. | 117 |
| | 16.3. | Replacement of Holdout Lender. | 117 |
| 17. | DISTRIBUTIONS AND REVOLVING CREDIT FUNDINGS. | | 118 |
| | 17.1. | Distributions. | 118 |
| | 17.2. | Revolving Credit Funding Procedures. | 119 |
| | 17.3. | Administrative Agent's Covering of Fundings. | 119 |
| 18. | ACCELERATION AND LIQUIDATION. | | 121 |

18.1. Acceleration Notices. ................................................................................ 121
18.2. Acceleration. ............................................................................................... 121
18.3. Initiation of Liquidation. ............................................................................ 121
18.4. Actions At and Following Initiation of Liquidation. .................................... 121
18.5. Agent's Conduct of Liquidation. ................................................................. 121
18.6. Distribution of Liquidation Proceeds by Collateral Agent. .......................... 122
18.7. Distributions of Liquidation Proceeds by Administrative Agent and Ordinary
Loan Payments. ........................................................................................... 123

19. THE AGENT. .......................................................................................................... 124
19.1. Appointment of The Agent. ......................................................................... 124
19.2. Responsibilities of Agents. .......................................................................... 125
19.3. Concerning Distributions By the Agents; Lenders' Exercise of Set-Off. ...... 127
19.4. Distributions of Notices and Other Documents. .......................................... 128
19.5. Confidential Information. ............................................................................. 128
19.6. Reliance by Agent. ...................................................................................... 128
19.7. Non-Reliance on Agents and Other Lenders. .............................................. 129
19.8. Indemnification. .......................................................................................... 129
19.9. Resignation of Agent. .................................................................................. 130
19.10. Separate Claims and Separate Classifications. ............................................ 130

20. ACTION BY AGENT - CONSENTS - AMENDMENTS - WAIVERS. ................... 131
20.1. Administration of Credit Facilities. ............................................................. 131
20.2. Actions Requiring or On Direction of Majority Lenders. ............................ 131
20.3. Actions Requiring Certain Consent. ............................................................ 131
20.4. Actions Requiring Agents' or Issuing Lender's Consent. ............................ 134
20.5. Miscellaneous Actions. ............................................................................... 134
20.6. Actions Requiring Lead Borrower's Consent. .............................................. 135
20.7. Actions Requiring Agent's Consent. ............................................................ 135

21. GENERAL PROVISIONS. ...................................................................................... 135
21.1. Effectiveness. .............................................................................................. 135
21.2. Section Headings. ........................................................................................ 135
21.3. Interpretation. .............................................................................................. 135
21.4. Severability of Provisions. .......................................................................... 135
21.5. Amendments in Writing. .............................................................................. 135
21.6. Counterparts; Telefacsimile Execution. ....................................................... 135
21.7. Revival and Reinstatement of Obligations. .................................................. 136
21.8. Integration. .................................................................................................. 136
21.9. Right of Set-Off. .......................................................................................... 136
21.10. Pledges To Federal Reserve Banks. ............................................................. 136
21.11. Maximum Interest Rate. .............................................................................. 136
21.12. Credit Decisions. ......................................................................................... 136
21.13. Confidentiality. ........................................................................................... 137
21.14. Release of Collateral. .................................................................................. 137
21.15. Dispute Resolution. ..................................................................................... 137
21.16. Press Releases. ............................................................................................ 137
21.17. No Strict Construction. ................................................................................ 138
21.18. [Reserved .................................................................................................... 138
21.19. [Reserved.]. ................................................................................................. 138
21.20. Keepwell ..................................................................................................... 138

v

21.21.  USA PATRIOT Act Notice and Anti-Money Laundering & Anti-Terrorism Compliance ........................................................................................... 138

21.22.  Foreign Asset Control Regulations; Sanctions ....................................... 138

8478014v8

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit C-2 | Form of Credit Card Notices |
| Exhibit C-3 | Form of Collateral Access Agreements |
| Exhibit D | Cash Management Order |
| Exhibit E | Interim Financing Order |
| Exhibit F | Initial Approved Budget |
| | |
| Exhibit L-1 | Form of LIBOR Notice |
| Exhibit 2.1(a) | Form of Term Loan Note |
| Exhibit 2.1(b) | Form of Revolving Credit Note |
| Exhibit 2.15 | Commitments |
| Exhibit 15.1(a) | Form of Assignment and Acceptance |
| | |
| Schedule A-1 | Agent's Account |
| Schedule B-1 | Disbursement Account |
| Schedule C-1 | Real Property |
| Schedule D-1 | Permitted Liens |
| Schedule E-1 | Landlord Deferred Payments |
| Schedule F-1 | Existing Letters of Credit |
| Schedule 2.7 | Cash Management Banks and Accounts |
| Schedule 6.5 | Inventory and Equipment |
| Schedule 6.8(a) | Good Standing |
| Schedule 6.8(b) | Authorized Stock of Borrower |
| Schedule 6.8(c) | List of Loan Parties' Subsidiaries |
| Schedule 6.9 | Consents, Approvals, Registration |
| Schedule 6.10(a) | Litigation Case List |
| Schedule 6.10(c) | List of Borrowers' Commercial Tort Claims |
| Schedule 6.11 | Material Adverse Change |
| Schedule 6.14 | Hazardous Materials |
| Schedule 6.16 | Intellectual Property |
| Schedule 6.16(b) | Excluded "Big Dog" Intellectual Property |
| Schedule 6.18 | DDAs |
| Schedule 6.19 | Credit Card Processors |
| Schedule 6.20 | Permitted Indebtedness |
| Schedule 6.24 | Insurance |
| Schedule 6.32 | Investments |
| Schedule 6.35 | Shareholder Agreements |
| Schedule 7.2 | Collateral Reporting |
| Schedule 8.6 | Guarantees |

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "**Agreement**") is entered into as of March 6, 2018 by and among **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association with offices at One Boston Place, Boston, Massachusetts 02108, as administrative agent (in such capacity, the "**Administrative Agent**") and collateral agent (in such capacity, the "**Collateral Agent**");

The **REVOLVING CREDIT LENDERS** identified on the signature pages of this Agreement and any Person who becomes a "Revolving Credit Lender" in accordance with the provisions of Section 15.1 of this Agreement (the "**Revolving Credit Lenders**");

The **TERM LENDERS** identified on the signature pages of this Agreement and any Person who becomes a "Term Lender" in accordance with the provisions of Section 15.1 of this Agreement (the "**Term Lenders**"; together with the Revolving Credit Lenders, the "**Lenders**");

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association with offices at One Boston Place, Boston, Massachusetts 02108, as term agent (in such capacity, the "**Term Agent**");

**THE WALKING COMPANY HOLDINGS, INC.**, a Delaware corporation, as a debtor and a debtor-in-possession (the "**Parent**"), **BIG DOG USA, INC.**, a California corporation, as a debtor and a debtor-in-possession ("**Big Dog**"), **THE WALKING COMPANY**, a Delaware corporation as a debtor and a debtor-in-possession ("**TWC**"), and **FOOTSMART, INC.**, a Delaware corporation, as a debtor and a debtor-in-possession ("**Footsmart**"; Footsmart, TWC and Big Dog each, a "**Borrower**" and collectively "**Borrowers**"; Borrowers, together with the Parent, the "**Loan Parties**"), each, with its principal executive offices at 25 W. Anapamu St., Santa Barbara, CA 93101.

### RECITALS

**WHEREAS**, on March 6, 2018 (the "Petition Date"), the Loan Parties commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case numbers _____ and _____ (collectively, the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrowers have requested, and the Agent, Term Agent and the Lenders have agreed, upon the terms and conditions set forth in this Agreement, to make available to the Borrowers a senior secured credit facility in an aggregate principal amount not to exceed $57,250,000, consisting of a $50,000,000 senior secured revolving credit facility and a $7,250,000 senior secured term loan facility, in order to (a) repay the Pre-Petition Obligations as provided herein, (b) fund the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance), (c) make certain other payments on the Closing Date as more fully provided in this Agreement, and (d) provide working capital for the Borrowers and the other Loan Parties during the pendency of the Chapter 11 Case in accordance with the Approved Budget and as provided herein (subject to the Permitted Variance).

**WHEREAS**, the Borrowers and the other Loan Parties desire to secure the Obligations under the Loan Documents by granting to the Agent, on behalf of itself and the other Secured Parties, a security

interest in and liens upon substantially all of their assets, whether now existing or hereafter acquired, in each instance as more fully set forth in the Loan Documents and in the Financing Orders.

**WHEREAS**, all Obligations of the Loan Parties to the Agent, Term Agent and the Lenders hereunder and under the other Loan Documents shall be full recourse to each of the Loan Parties, secured by the Agent's security interest in and liens on all or substantially all of the assets of the Loan Parties included in the Collateral and entitled to super-priority administrative claim status under the Bankruptcy Code as provided herein and in the Financing Orders.

**NOW THEREFORE**, in consideration of the mutual covenants contained herein and the benefits to be derived herefrom, the parties hereto agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

1.1. <u>Definitions</u>. As used in this Agreement, the following terms shall have the following definitions:

"ABL Exit Commitment": has the meaning set forth in Section 4.1(dd).

"Acceleration": means making of demand or declaration that any Indebtedness, not otherwise due and payable, is due and payable. Derivations of the word "Acceleration" (such as "<u>Accelerate</u>") are used with like meaning in this Agreement.

"Acceleration Notice": means written notice of Acceleration provided in accordance with Section 18.

"Acceptable Plan": means a Chapter 11 plan of reorganization proposed by the Loan Parties in the Chapter 11 Case that is in form and substance acceptable to the Agent, in its discretion, together with all modifications and amendments that are in form and substance acceptable to the Agent in its discretion, and which, among other matters, provides for the Payment in Full in cash of the Obligations and the Pre-Petition Obligations on the date of such consummation, unless otherwise consented to by each of the Secured Parties in their sole discretion.

"Account Debtor": means any Person who is or who may become obligated under, with respect to, or on account of, an Account, Chattel Paper, or a General Intangible.

"Account Reserves": means such Reserves as Administrative Agent determines from time to time in its Permitted Discretion as being appropriate to reflect impediments to the Lenders' ability to realize upon any Account included in the Borrowing Base. Without limiting the generality of the foregoing, Account Reserves may include (but are not limited to) Reserves based upon the following but without duplication of items to the extent excluded from being eligible for inclusion in the Borrowing Base in the applicable definition of any item of eligible Collateral: (a) any Account or portion thereof which is past due or delinquent beyond normal credit terms or otherwise at material risk of non-payment, (b) any Account or portion thereof which is subject to a bona fide counterclaim, defense, or dispute, (c) any Account or portion thereof which is subject to setoff or chargeback, (d) any facts, events or circumstances which materially impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder beyond normal credit terms, (e) any material adverse change in the financial condition of any Credit Card Processor or Administrative Agent, in its Permitted Discretion, no longer deems any Credit Card Processor as creditworthy, (f) any event of default under any Credit Card Agreement, which event of default gives the Credit Card Processor the right to setoff against amounts otherwise payable to a Loan Party or the right to establish reserves or establish or

2

demand collateral and (g) finance and other non-purchase related charges and late fees with respect to credit card receivables.

"Accounts" and "Accounts Receivable": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as such term is defined from time to time in the Code), and any and all supporting obligations in respect thereof.

"ACH Transactions": means any cash management or related services (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) provided by Wells Fargo or its Affiliates for the account of a Borrower or its Subsidiaries.

"Additional Amount": is defined in Section 11.2.

"Additional Documents": has the meaning set forth in Section 5.5.

"Administrative Agent": is defined in the preamble of this Agreement.

"Administrative Agent's Cover": is defined in Section 17.3(c)(i).

"Advances": has the meaning set forth in Section 2.1(b) (which, for the avoidance of doubt, shall include all L/C Advances), and shall include, where context requires, the Term Loan.

"Affiliate": means, as applied to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of Section 8.14 hereof: (a) any Person which owns directly or indirectly twenty percent (20%) or more of the securities having ordinary voting power for the election of directors or other members of the governing body of a Person or twenty percent (20%) or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed to control such Person; (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person; and (c) each partnership or joint venture in which a Person is a partner or joint venturer shall be deemed to be an Affiliate of such Person.

"Agency Agreement": means one or more agency agreements entered into from time to time on terms satisfactory to the Agent, among the Loan Parties and an Approved Liquidator relating to a Permitted Store Closing, as may be amended with the consent of the Agent.

"Agent": when not preceded by "Administrative" or "Collateral", the term "Agent" or "Agents" refers collectively and individually to the Administrative Agent and the Collateral Agent.

"Agent's Account": means that account described on Schedule A-1.

"Agent's Closing Fee": has the meaning set forth in the Fee Letter.

"Agent's Rights and Remedies": means the rights and remedies set forth in Section 10.1 hereof.

"Agreement": has the meaning set forth in the Preamble of this Agreement.

"Alternate Base Rate": shall mean, for any day, a rate per annum (rounded upward, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the Base Rate in effect on such day, (b) the LIBOR

Rate for a one month, two month, or three month Interest Period as in effect on such day plus 1.00% and (c) the Federal Funds Effective Rate in effect on such day plus 0.50%. If the Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (c) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate, the LIBOR Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate, LIBOR Rate or the Federal Funds Effective Rate, respectively.

"Alternative Base Rate Margin": means the "Alternative Base Rate Margin" specified in the Margin Pricing Grid as provided herein.

"Applicable Law": as to any Person: (i) All statutes, rules, regulations, orders, or other requirements having the force of law, and (ii) all court orders and injunctions, arbitrator's decisions, and/or similar rulings, in each instance ((i) and (ii)) of or by any federal, state, municipal, and other Governmental Authority, or court, tribunal, panel, or other body which has or claims jurisdiction over such Person, or any property of such Person, or of any other Person for whose conduct such Person would be responsible.

"Approved Budget": means the debtor-in-possession thirteen (13) week budget prepared by the Lead Borrower and furnished to the Agent and Term Agent on or before the Closing Date, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as provided in Section 7.3(c) which budget shall include a weekly cash budget, including information on a cumulative basis by category (except with respect to professional fees and expenses, which shall be on a line item basis) as to (w) projected cash receipts, (x) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses), capital expenditures, asset sales and fees and expenses of the Agent, Term Agent and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (y) projected inventory levels, and (z) a calculation of Availability, which shall be in form and substance acceptable to the Agent and Term Agent.

"Approved Budget Variance Report": means a weekly report provided by the Lead Borrower to the Agent and Term Agent in accordance with Section 7.3(c): (i) showing on a cumulative basis by category (except with respect to professional fees and expenses, which shall be on a line item basis) actual receipts for both inventory and revenues, actual disbursement amounts, cash on hand, actual invoiced and unpaid professional fees (other than counsel for the Agent, Term Agent, and the Lenders) and Availability as of Sunday of each week on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis at all times thereafter, noting therein all variances, on a cumulative or line item basis, as applicable, from amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by an Authorized Person of the Lead Borrower.

"Approved Liquidator" shall mean one or more professional liquidators, brokers or other advisors acceptable to the Agent.

"Authorized Person": means the Chief Executive Officer or the Chief Financial Officer of the Lead Borrower or any other officer of Lead Borrower designated in writing by Lead Borrower to Agent as an Authorized Person.

"Availability": the lesser of (a) or (b), where:

4

(a)     is the result of

  (i)     The Revolving Credit Ceiling

          *Minus*

  (ii)    The aggregate unpaid balance of the Loan Account

          *Minus*

  (iii)   The aggregate undrawn Stated Amount of all then outstanding L/Cs.

          *Minus*

  (iv)    The Pre-Petition Total Revolving Outstandings.

(b)     is the result of

  (i)     The Borrowing Base

          *Minus*

  (ii)    The aggregate unpaid balance of the Loan Account

          *Minus*

  (iii)   The aggregate undrawn Stated Amount of all then outstanding L/Cs.

          *Minus*

  (iv)    The Pre-Petition Total Revolving Outstandings.

"Availability Reserves": means such Reserves as Administrative Agent from time to time determines, in its Permitted Discretion, as being appropriate (a) to reflect the impediments to Lenders' ability to realize upon the Collateral, (b) to reflect claims and liabilities that may be needed to be satisfied in connection with the realization upon Collateral or paid in connection with the Chapter 11 Case, including, without limitation, amounts entitled to priority under Section 503(b) of the Bankruptcy Code, as reasonably determined by the Agent, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base or the assets, businesses, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default exists. Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on the following but without duplication of items excluded from being eligible for inclusion in the Borrowing Base in the applicable definition of any item of eligible Collateral: (a) book overdrafts of historical practices with respect thereto or any retail store location following the occurrence and during the continuation of an Event of Default or in conjunction with a Liquidation; (b) Merchandise Liabilities, including returns, customer credits, gift cards, gift certificates and frequent shopper programs; (c) payables (based upon payables which are thirty (30) days or more past due); (d) customer deposits; (e) Taxes and other governmental charges, including Tax Liens, ad valorem, personal property, sales, and other Taxes which may have priority over the security interests of the Collateral Agent in the Collateral; (f) cash management reserves, including with respect to held or post-dated checks issued by any Loan Party; (g) any judgment lien against any Loan Party or any Collateral; (h) any Loan Party's failure to pay when due and payable any liabilities owing to any trade creditor;

5

(i) salaries, wages, vacation pay and benefits due to any employee of any Loan Party; (j) Bank Product Reserves; (k) Priority Payables; (l) Landlord Reserve; (m) Permitted Store Closing Reserve; (n) upcoming reductions in the Net Liquidation Value; (o) the Consultant Fee Reserve, (p) the Minimum Excess Availability Reserve and (q) the Carve-Out Reserve. Initially, and without limitation of the Administrative Agent's rights, in its Permitted Discretion, to establish Availability Reserves, the Administrative Agent shall implement the "Availability Reserves" listed on the form of Borrowing Base Certificate attached as Exhibit B-1 attached hereto delivered by Borrowers to Agent on the Closing Date.

"Bailee Acknowledgment": means a record in form and substance satisfactory to Collateral Agent, in its Permitted Discretion, authenticated by any bailee, warehouseman or other third party in possession of any Equipment or Inventory acknowledging that it holds possession of the applicable Inventory and/or Equipment for the benefit of Agent and Lenders.

"Bank Product Agreements": means those certain cash management service agreements entered into from time to time by a Borrower or its Affiliates in connection with any of the Bank Products.

"Bank Product Obligations": means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by a Borrower or its Affiliates to Wells Fargo or any of its Affiliates pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that a Borrower is obligated to reimburse to Wells Fargo or its Affiliates as a result of Wells Fargo or its Affiliates purchasing participations or executing indemnities or reimbursement obligations with respect to the Bank Products provided to a Borrower or its Subsidiaries pursuant to the Bank Product Agreements.

:"Bank Product Reserves": means, as of any date of determination, the amount of Reserves that Administrative Agent has established (based upon Wells Fargo's or any of its Affiliate's reasonable determination of the credit exposure in respect of then extant Bank Products) for Bank Products then provided or outstanding.

"Bank Products": means any commercial banking or financial service or facility extended to Borrower or its Affiliates by Wells Fargo or any of its Affiliates including: (a) credit card processing services, (b) credit or debit cards, (c) ACH Transactions, (d) cash management, including controlled disbursement accounts, or services, (e) purchase cards, (f) Factored Receivables and other arrangements with respect to the factoring, sale, put, or other conditional sale or transfer of any Accounts of a Borrower or accounts payable of a Borrower, (g) Hedge Agreements, and (h) leasing.

"Bankruptcy Code": has the meaning specified in the Recitals hereto.

"Bankruptcy Court": has the meaning specified in the Recitals hereto.

"Base Rate": means, the rate of interest announced by Wells Fargo at its principal office in San Francisco as its "prime rate". The "prime rate" is a rate set by Wells Fargo based upon various factors including Wells Fargo's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Wells Fargo shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan": means each portion of an Advance that bears interest at a rate determined by reference to the Alternative Base Rate.

6

"Benefit Plan": means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which the Borrowers or any Subsidiaries or ERISA Affiliate of the Borrowers has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Big Dog Eligible Inventory": means all Eligible Inventory owned by Big Dog.

"Big Dog License Agreement": means that certain Amended and Restated License Agreement, dated as of June 7, 2012, among Big Dog Licensing, LLC and Big Dog (as amended by that certain Extension Agreement, dated as of December 31, 2013, among Big Dog Licensing, LLC and Big Dog; as further amended by that certain Extension Agreement, dated as of December 31, 2015, among Big Dog Licensing, LLC and Big Dog; as further amended by that certain Extension Agreement, dated as of December 1, 2017, among Big Dog Licensing, LLC and Big Dog; and as otherwise in effect on the Closing Date).

"Big Dog": has the meaning set forth in the preamble of this Agreement.

"Blocked Account": any account, including, without limitation, any DDA, over which one or more of the Agent exercise control pursuant to a Control Agreement.

"Board of Directors": means the board of directors (or comparable managers) of each Loan Party or any committee thereof duly authorized to act on behalf thereof.

"Books": means all of each Loan Party's and its Affiliates' now owned or hereafter acquired books and records (including all of its Records indicating, summarizing, or evidencing its assets (including the Collateral) or liabilities, all each of Loan Party's or its Affiliates' Records relating to its or their business operations or financial condition, and all of its or their goods or General Intangibles related to such information).

"Borrower" or "Borrowers": has the meaning set forth in the preamble of this Agreement.

"Borrowing": means a borrowing hereunder consisting of Advances or Letters of Credit made or issued on the same day by the Agent or Issuing Lender, as applicable, or the Term Borrowing, as context may require.

"Borrowing Base": means, as of any date of determination, an amount equal to the result of:

(a) ninety percent (90%) times the sum of Big Dog's then extant Net Liquidation Value of Big Dog Eligible Inventory, plus

(b) ninety percent (90%) times the sum of TWC's then extant Net Liquidation Value of TWC Eligible Inventory, plus

(c) eighty-five percent (85%) times the face amount of Eligible Wholesale Receivables (net of Receivables Reserves applicable thereto), plus

(d) eighty-five percent (85%) of the Eligible Credit Card Receivables; minus

(e) the aggregate amount of other Reserves.

"Borrowing Base Certificate": means a certificate in the form of Exhibit B-1, as such form may be revised from time to time by Administrative Agent.

"Business Day": means any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures": means expenditures for the purchase or construction of fixed assets, plant and equipment, which are capitalized in accordance with GAAP, but excluding expenditures made in connection with the replacement, substitution or restoration of assets to the extent (a) financed from insurance proceeds (or similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored or (b) financed with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced. In respect to tenant improvements, Capital Expenditures shall be determined based on the gross amount expended therefor without regard to any tenant improvement allowances received or to be received.

"Capital Lease": means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capitalized Lease Obligation": means any Indebtedness represented by obligations under a Capital Lease.

"Carve-Out" has the meaning specified therefor in the Financing Orders.

"Carve-Out Reserve" means a Reserve established by the Agent from time to time in the amount of the Carve-Out, other than to the extent funded into the Professional Fee Escrow Account.

"Case Professionals" has the meaning specified in the Financing Orders.

"Cash Collateralize": has the meaning set forth in Section 2.12.

"Cash Management Account": has the meaning set forth in Section 2.7(a) hereof.

"Cash Management Agreements": means those certain cash management service agreements, each in form and substance satisfactory to Administrative Agent in its Permitted Discretion and each of which is among the applicable Loan Party, Agent, and one of the Cash Management Banks.

"Cash Management Bank(s)": has the meaning set forth in Section 2.7(a) hereof.

"Cash Management Order": means the order of the Bankruptcy Court entered in the Chapter 11 Case, together with all extensions, modifications and amendments that are in form and substance acceptable to the Agent and Term Agent, which, among other matters, authorizes the Loan Parties to use their cash management system, substantially in the form of Exhibit D or in another form satisfactory to the Agent.

"Change in Law": means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel

8

Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control": means (a) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than any Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), whether directly or indirectly, of more than 50%, of the Stock of Parent having the right to vote for the election of members of the Board of Directors of Parent, and the Permitted Holders, as a group, do not have the right or ability by voting power, contract or otherwise to elect or designate or nominate for election a majority of the members of the Board of Directors of Parent and the Board of Directors thereafter terminates any of Andrew Feshbach, Roberta Morris or Anthony Wall as the Chief Executive Officer, Chief Financial Officer and general Counsel, respectively, of Parent or such person or group exercises such control to change the identity of a majority of the members of the Board of Directors of Parent; (b) a majority of the members of the Board of Directors of Parent do not constitute Continuing Directors; (c) Parent ceases to own or control, directly or indirectly, 100% of the outstanding capital Stock of Big Dog, TWC, FootSmart, and any other Subsidiary of Parent extant as of the Petition Date; or (d) Borrowers cease to own and control, directly or indirectly, one hundred percent (100%) of the outstanding capital Stock or limited liability company membership interests of any other direct or indirect Subsidiaries.

"Chapter 11 Case" has the meaning specified in the Recitals hereto.

"Chattel Paper": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "chattel paper", including, without limitation, "tangible chattel paper" and "electronic chattel paper", as such terms are defined from time to time in the Code, and any and all supporting obligations in respect thereof.

"Closing Date": means the date on which all conditions precedent set forth in Section 4.1 are satisfied.

"Code": means the Uniform Commercial Code, as in effect from time to time in Massachusetts; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Massachusetts, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Collateral": means all of each Loan Party's now owned or hereafter acquired right, title, and interest in and to all real and personal property, including, without limitation, each of the following:

(a) Accounts and accounts receivable,

(b) Chattel Paper,

(c) DDAs,

(d) Documents,

(e)     General Intangibles,

(f)     Goods (including, without limitation, Inventory, Fixtures and Equipment),

(g)     Instruments,

(h)     Investment Property,

(i)     Letters of Credit, Letter of Credit Rights and Payment Intangibles,

(j)     Commercial Tort Claims,

(k)     Supporting Obligations,

(l)     money or other assets of such Loan Party that now or hereafter come into the possession, custody, or control of any Agent, Term Agent, or Lender or any affiliate thereto,

(m)     proceeds from the sale, assignment or other disposition of Real Property and Leasehold Interests,

(n)     All money, policies and certificates of insurance, deposits, impressed accounts, compensating balances, cash, cash equivalents or other property,

(o)     all owned Real Property,

(p)     (i) all proceeds of any recovery or settlement arising under Section 549 of the Bankruptcy Code and (ii) other than as set forth in clause (i) and subject to approval by the Bankruptcy Court in the Final Financing Order, all proceeds of claims or causes of action that the Loan Parties may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Loan Parties or the estates of the Loan Parties under Chapter 5 or Section 724(a) of the Bankruptcy Code and any and all recoveries and settlements thereof,

(q)     subject to approval by the Bankruptcy Court in the Final Financing Order, the Loan Parties' rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof;

(r)     All insurance policies proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds and premium rebates arise out of any of the foregoing (subparagraphs (a) through (q) hereof) or otherwise,

(s)     All liens, guarantees, rights, remedies and privileges pertaining to any of the foregoing (subparagraphs (a) through (r) hereof), including the right of stoppage in transit,

(t)     All books, records, and information relating to any of the foregoing and/or to the operation of any Loan Party's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained, and

(u)     to the extent not otherwise covered by clauses (a) through (t) above, all other personal property of each Loan Party, whether tangible or intangible, and any and all proceeds

10

and products, whether tangible or intangible, of any of the foregoing (subparagraphs (a) through (t) hereof and this subparagraph (u)), including all rents, profits, and products of each of the foregoing and all proceeds of insurance, indemnity, warranty or guaranty covering any or all of the foregoing, and any and all Accounts, Books, General Intangibles, Goods (including without limitation Equipment and Inventory), Investment Property, Negotiable Collateral, money, DDAs, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof, and all accessions to, substitutions and replacements of each of the foregoing.

"Collateral Access Agreement":  means a waiver or consent in the form attached hereto as Exhibit C-3 or otherwise in form and substance satisfactory to Administrative Agent in its Permitted Discretion, executed by a lessor of Real Property leased by any Loan Party, or by any other Person having a Lien upon, or having rights or interests in the Equipment or Inventory.

"Collateral Agent":  is defined in the preamble of this Agreement.

"Collections":  means all cash, checks, credit card slips or receipts, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, proceeds of debt or equity issuances, cash proceeds of Dispositions (including, but not limited to, the net proceeds of a Disposition of Big Dog's assets or stock), and tax refunds) of any Loan Party from whatever source and however derived.

"Commitment" means, as to each Lender, such Lender's Revolving Loan Commitment or Term Commitment, as applicable.

"Commercial Tort Claim":  means any now existing or hereafter arising "commercial tort claim", as such term is defined from time to time in the Code.

"Compliance Certificate":  means a certificate substantially in the form of Exhibit C-1 delivered by the chief financial officer of each Borrower to Agent, Term Agent, and Lenders.

"Concentration Account":  means (i) account number ending in -8053 held in the name of TWC at Wells Fargo subject to a Control Agreement in favor of the Agent and (ii) account number ending in -3549 held in the name Big Dog at Wells Fargo subject to a Control Agreement in favor of the Agent if so requested.

"Confirmation Agreement":  means that certain Confirmation and Ratification of Loan Documents, dated as of the Closing Date, and entered into by and between the Loan Parties and the Agent, as same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Consent":  means actual consent given by the Lender from whom such consent is sought; or the passage of five (5) Business Days from receipt of written notice to a Lender from an Agent of a proposed course of action to be followed by an Agent or Term Agent, as applicable, without such Lender's giving that Agent or Term Agent, as applicable, written notice of that Lender's objection to such course of action, provided that Agent or Term Agent, as applicable, may rely on such passage of time as consent by a Lender only if such written notice states that consent will be deemed effective if no objection is received within such time period.

"Consolidated":  means when used to modify a financial term, test, statement, or report, refers to the application or preparation of such term, test, statement or report (as applicable) based upon the

consolidation, in accordance with GAAP, of the financial condition or operating results of the Loan Parties.

"Consultant": means Consensus Advisors LLC, or other consulting firms acceptable to the Agent and Term Agent in their Permitted Discretion.

"Consultant Fee Reserve": means such Reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated fees and expenses due to one or more Consultants under the Agency Agreement or such other agreement between Loan Parties and such Consultant.

"Continuing Director": means (a) any member of the Board of Directors who was a director (or comparable manager) of such Loan Party on the Closing Date, and (b) any individual who becomes a member of the Board of Directors of a Loan Party after the Closing Date if such individual was designated, elected or appointed or nominated for election to such Board of Directors by one or more Permitted Holders or a majority of the Board of Directors of Parent then in office, but excluding any such individual originally proposed for election in opposition to such Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of such Loan Party (as such terms are used in Rule 14a-11 under the Exchange Act) and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control Agreement": means an agreement, in form and substance satisfactory to Collateral Agent, in its Permitted Discretion, executed and delivered by the applicable Loan Party, Collateral Agent, and the applicable securities intermediary or bank, which agreement is sufficient to give Collateral Agent "control" over the subject Securities Account, DDA or Investment Property as provided in the Code.

"Cost": means the lower of:

    (a)    the calculated cost of purchases, based upon a Borrower's accounting practices, on a first-in, first-out (FIFO) basis, in accordance with GAAP, which practices are in effect on the date on which this Agreement was executed as such calculated cost is determined from invoices received by a Borrower; such Borrower's purchase journal; or such Borrower's stock ledger; and

    (b)    the cost equivalent of the lowest ticketed price at which the subject Inventory is offered to the public, after all ticketed mark-downs (whether or not such price is then reflected on a Borrower's accounting system), determined in accordance with the cost method of accounting and reflecting a Borrower's practices in the ordinary course of a Borrower's business;

*provided that* "Cost" shall not include Inventory capitalization costs or other non-purchase price charges (such as freight charges and UNICAP) used in a Borrower's calculation of cost of goods sold.

"Credit Card Notice": means those certain credit card notices, each substantially in the form attached as Exhibit C-2 hereto, and otherwise satisfactory to Agent in its Permitted Discretion.

"Credit Card Processor": means any Person that acts as a credit card clearinghouse or processor of credit card payments accepted by a Loan Party, including, but not limited to, the major credit card processors listed under the definition of "Eligible Credit Card Receivables" and, in each case, if such processor is (and remains) acceptable to Administrative Agent in its Permitted Discretion.

"Custom Brokers Agreement": means a tri-party agreement in form satisfactory to the Collateral Agent, in its Permitted Discretion, among the applicable Loan Party, Collateral Agent and a customs broker or other carrier, in which the customs broker or such carrier acknowledges that it has control over and holds the Documents evidencing ownership of Inventory of such Loan Party for the benefit of the Agent and Lenders and agrees, upon notice from the Collateral Agent, to hold and dispose of such Inventory solely as directed by Collateral Agent.

"Daily Balance": means, with respect to each day during the term of this Agreement, the amount of an Obligation owed at the end of such day.

"DDA": means any checking or other "Deposit Account" maintained by any Loan Party.

"Default": means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate": means the applicable interest as set forth in Section 2.6(c).

"Delinquent Lender": as defined in Section 17.3.

"Deposit Account": has the meaning given that term in the Code and also includes all demand, time, savings, passbook, or similar accounts maintained with a bank.

"Disbursement Account": as defined in Section 2.9 hereof.

"Disbursement Letter": means an instructional letter executed and delivered by Borrowers to Administrative Agent and Term Agent regarding the extensions of credit to be made on the Closing Date, the form and substance of which is satisfactory to Administrative Agent and Term Agent in their Permitted Discretion.

"Disclosure Statement": means the disclosure statement with respect to the Acceptable Plan filed by the Loan Parties in the Chapter 11 Case, which shall be in form and substance acceptable to the Agent in its discretion, together with all modifications and amendments that are in form and substance acceptable to the Agent in its discretion.

"Disposition": means for any Person any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of such Person's or their respective Subsidiaries' assets (including Accounts Receivable and Stock of Subsidiaries) to any other person in a single transaction or series of transactions.

"Distribution": means, with respect to any Person, (a) the declaration or payment of any dividend on or in respect of any shares of any class of capital Stock of such Person, other than dividends payable solely in shares of common Stock of such Person, (b) the purchase, redemption, or other retirement of any shares of any class of capital Stock of such Person, directly or indirectly, (c) the return of capital by such Person to its shareholders or other interest holders, or (d) any other distribution on or in respect of any shares of any class of capital Stock of such Person with the understanding that each reference to "capital Stock" in this definition includes a reference to any preferred Stock.

"Document": all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to any "document" as such term is defined in the Code, and any and all supporting obligations in respect thereof.

"<u>Documentary Letters of Credit</u>": has the meaning set forth in <u>Section 2.12</u>.

"<u>Dollars</u>" or "<u>$</u>": means United States dollars.

"<u>Domestic Subsidiary</u>": means any Subsidiary of the Parent that is not a Foreign Subsidiary.

"<u>Eligible Assignee</u>": means (a) a commercial bank organized under the laws of the United States, or any state thereof, and, in the case of an assignment of a Revolving Loan Commitment or if such Commitments have been terminated, outstanding Revolving Credit Loans, having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and, in the case of an assignment of a Revolving Loan Commitment or if such Commitments have been terminated, outstanding Revolving Credit Loans, which has total assets in excess of $250,000,000, provided that, in all cases, such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000, (d) any Affiliate (other than individuals) of a Lender that was party hereto as of the Closing Date, and (e) (i) in the case of an assignment of a Revolving Loan Commitment or if such Commitments have been terminated, outstanding Revolving Credit Loans, any other Person approved the Agent, and (ii) in the case of an assignment of any portion of the Term Loan, any other Person approved the Term Agent.

"<u>Eligible Credit Card Receivables</u>": means the "payment intangibles" (as defined in the Code) or other rights to payment due to a Borrower on a non-recourse basis from major Credit Card Processors which have been outstanding for no more than four (4) Business Days, and which are otherwise acceptable to the Administrative Agent in its Permitted Discretion. For the purposes of this provision, major credit card processors shall include, without limitation, Visa, MasterCard, Discover and American Express.

"<u>Eligible In-Transit Inventory</u>": means, as of any date of determination thereof, without duplication of other Eligible Inventory, Inventory of TWC which meets the criteria below and that the Administrative Agent does not otherwise exclude from Eligible In-Letter of Credit Inventory, in its Permitted Discretion. Without limitation of the Administrative Agent's Permitted Discretion to exclude items from Eligible In-Transit Inventory, Eligible In-Transit Inventory must be Inventory owned by TWC:

(a)     Reserved;

(b)     which has been shipped from a location outside of the United States for receipt by TWC, but which has not yet been delivered to TWC, which Inventory has been in transit for forty five (45) days or less from the date of shipment of such Inventory and is to be delivered to a location set forth on Schedule 6.5 hereto, provided, however, that if such location is located in a Landlord Lien State or is a distribution center or warehouse leased from a third party, it must be subject to a Collateral Access Agreement (or the Agent shall establish a Landlord Reserve in an amount acceptable to Collateral Agent in its Permitted Discretion in respect thereto);

(c)    for which the applicable purchase order is in the name of TWC and title has passed to TWC;

(d)     which either (1) is the subject of a negotiable bill of lading (x) that is consigned to Collateral Agent (either directly or by means of endorsements satisfactory to Collateral Agent),

(y) that was issued by the carrier respecting the subject Inventory, and (z) that either is (I) in the possession of Collateral Agent or a customs broker or freight forwarder that has executed a Custom Brokers Agreement or Freight Forwarders Agreement with Collateral Agent, or (II) the subject of a telefacsimile copy that Collateral Agent has received from the Underlying Issuer which issued the Underlying Letter of Credit and as to which Collateral Agent also has received a confirmation from such Underlying Issuer that such document is in-transit by air-courier to Collateral Agent or a customs broker or freight forwarder, or (2) is the subject of a negotiable cargo receipt and is not the subject of a bill of lading (other than a negotiable bill of lading consigned to, and in the possession of, a consolidator or Collateral Agent, or their respective agents) and such negotiable cargo receipt is (x) consigned to Collateral Agent (either directly or by means of endorsements), (y) was issued by a consolidator respecting the subject Inventory, and (z) either is (I) in the possession of Collateral Agent or a customs broker or freight forwarder that has executed a Custom Brokers Agreement or Freight Forwarders Agreement with Collateral Agent, or (II) the subject of a telefacsimile copy that Agent has received from the Underlying Issuer which issued the Underlying Letter of Credit and as to which Collateral Agent also has received a confirmation from such Underlying Issuer that such document is in-transit by air-courier to Collateral Agent or a customs broker or freight forwarder that has executed a Custom Brokers Agreement or Freight Forwarders Agreement with Collateral Agent; and

     (e)    which is insured to the reasonable satisfaction of the Collateral Agent;

provided that the Collateral Agent, may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Collateral Agent determines that such Inventory is subject to any Person's right or claim which is (or is capable of being) senior to, or pari passu with, the Lenders' Liens (such as, without limitation, a right of stoppage in transit) or may otherwise adversely impact the ability of the Agent to realize upon such Inventory. Notwithstanding anything contained herein to the contrary, the amount of Availability generated by Eligible In-Transit Inventory shall not at any time exceed $7,500,000. In determining the amount to be so included, Inventory shall be valued at the lower of Cost or market on a basis consistent with TWC's historical accounting practices as acceptable to Agent in its Permitted Discretion.

"Eligible Inventory": means collectively, and without duplication, Eligible Landed Inventory and Eligible In-Transit Inventory.

"Eligible Landed Inventory": means Inventory of the applicable Borrower that consists of first quality Landed Goods or other first quality goods held for sale in the ordinary course of such Borrower's business located at one of such Borrower's business locations set forth on Schedule 6.5 (or in-transit between any such locations) and complies with each of the representations and warranties respecting Eligible Inventory made under the Loan Documents, and that is not excluded as ineligible by Agent, in its Permitted Discretion, including, but not limited to, by virtue of one or more of the criteria set forth below; provided, however, that such criteria may be fixed and revised from time to time by Agent in Agent's Permitted Discretion. In determining the amount to be so included, Inventory shall be valued at the lower of Cost or market on a basis consistent with the applicable Borrower's historical accounting practices as acceptable to Agent in its Permitted Discretion. Without limitation of Administrative Agent's discretion to determine what Inventory constitutes Eligible Landed Inventory as provided above, an item of Inventory shall not be included in Eligible Landed Inventory if:

     (a)    the applicable Borrower does not have good, valid, and marketable title thereto,

     (b)    it is not subject to a valid and perfected first priority Lenders' Lien,

(c)       it consists of goods returned or rejected by the applicable Borrower's customers,

(d)       it consists of goods that are obsolete or slow moving, restrictive or custom items, work-in-process, raw materials, perishable food product, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in any Loan Party's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment,

(e)       it is (i) operating supplies, packaging or shipping materials, cartons, labels or other such materials not considered used for sale in the ordinary course of business by the Agent in its Permitted Discretion (ii) work in process, raw materials, (iii) not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (iv) bill and hold goods,

(f)       it is located in any store of the Borrowers which is permanently closed or otherwise has been closed for business for more than twenty (20) days in any fiscal quarter,

(g)       it has been presold (but not delivered) to a customer which has paid a deposit equal to one hundred percent (100%) of the purchase price of such Inventory or is on layaway or as to which the applicable Borrower has accepted a deposit with respect to such Inventory from a third party,

(h)       it is not located at one of the locations in the United States set forth on Schedule 6.5, as supplemented or otherwise amended from time to time in accordance with Section 7.8 of this Agreement or is not in transit from one such location to another such location,

(i)       it is located at a warehouse or distribution center or in a fulfillment center or contract warehouse, in each case, unless it is subject to a Collateral Access Agreement executed by lessor, fulfillment services provide or other applicable third party,

(j)       it is located at a retail store location in a Landlord Lien State leased by the applicable Borrower where either it is not subject to a Collateral Access Agreement or the landlord has not otherwise waived any and all Liens and other rights of distraint in form and substance reasonably satisfactory to the Agent and Term Agent; provided that as to any such locations the Administrative Agent, from time to time in its Permitted Discretion, may require a Collateral Access Agreement (except to the extent that a Landlord Reserve is in effect in an amount acceptable to Collateral Agent in its Permitted Discretion),

(k)       it is located in a contract warehouse or is otherwise stored with a bailee, warehouseman or similar third party unless it is subject to a Bailee Acknowledgment or Collateral Access Agreement executed by the bailee, warehouseman, or other third party, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(l)       it is in transit from a vendor and has not yet been received into a distribution center or retail store,

(m)       it is Inventory which exhibits, includes or is identified by any trademark, trade name or other intellectual property right which as a result of an infringement claim in regard thereto, the applicable Borrower's sale of such Inventory is subject to injunctive relief that could reasonably be expected to adversely affect the Agent's ability to liquidate such Inventory,

16

(n)     it is Inventory that is not insured in compliance with the provisions of Section 7.8 hereof,

(o)     it is "return to vendor" goods, or

(p)     Inventory held for rental by customers in the ordinary course of business.

"Eligible Wholesale Receivables": means Accounts deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base arising from the sale of TWC's Inventory (but excluding, for the avoidance of doubt, Credit Card Receivables) that satisfy the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to TWC from an account debtor, and in each case originated in the ordinary course of business of such TWC, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (u) below as determined by the Agent in its Permitted Discretion. Without limiting the foregoing, to qualify as an Eligible Wholesale Receivable, an Account shall indicate no Person other than TWC as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that TWC may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by TWC to reduce the amount of such Eligible Wholesale Receivable. Except as otherwise agreed by the Agent, any Account included within any of the following categories shall not constitute an Eligible Wholesale Receivable:

(a)     Accounts that are not evidenced by an invoice;

(b)     Accounts that have been outstanding for more than sixty (60) days from the date of sale or more than forty-five (45) days past the due date;

(c)     Accounts due from any account debtor which is obligated on any accounts described in clause (b), above, unless the applicable account described in clause (b) above is subject to a bona fide dispute;

(d)     All Accounts owed by an account debtor and/or its Affiliates together exceed twenty-five percent (25%) of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of the applicable percentages may be deemed Eligible Wholesale Receivables, in the Agent's Permitted Discretion);

(e)     Accounts (i) that are not subject to a perfected first priority security interest in favor of the Agent, or (ii) with respect to which TWC does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Loan Documents and the Pre-Petition Liens);

(f)     Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(g)     Accounts which arise out of any sale made not in the ordinary course of business, made on a basis other than upon terms, including credit terms, usual to the business of TWC (for the avoidance

17

of doubt, consignment sales in the ordinary course of the Wholesale Account Locations shall not be excluded solely as a result of this clause (g));

(h)     Accounts which are owed by any account debtor whose principal place of business is not within the continental United States (or which Person is organized outside the continental United States);

(i)     Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)     Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agent have been duly obtained, effected or given and are in full force and effect;

(k)     Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)     Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States of America and has complied with the Federal Assignment of Claims Act of 1940 and any similar state legislation;

(m)     Accounts (i) owing from any Person that is also a supplier to or creditor of a Loan Party or any of its Subsidiaries or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom;

(n)     Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, or sale on approval basis (other than consignments in connection with the Wholesale Account Locations) or subject to any right of return, set off or charge back;

(o)     Accounts payable other than in Dollars;

(p)     Accounts evidenced by a promissory note or other instrument;

(q)     Accounts consisting of amounts due from vendors as rebates or allowances;

(r)     Accounts which are in excess of the credit limit for such account debtor established by the Loan Parties in the ordinary course of business and consistent with past practices;

(s)     Accounts owing from any franchisees as franchise fees;

(t)     Accounts which include extended payment terms (datings) beyond those generally furnished to other account debtors in the ordinary course of business (for the avoidance of doubt, consignment sales in the ordinary course of the Wholesale Account Locations shall not be excluded solely as a result of this clause (t));

(u)     Accounts which are owed by a Sanctioned Person or Sanctioned Entity; or

(v)     Accounts which either the Agent or Term Agent determine in their Permitted Discretion to be unacceptable for borrowing.

"Encumbrance": means each of the following:

18

(a)     A Lien or agreement to create or grant a Lien; the interest of a lessor under a Capital Lease; conditional sale or other title retention agreement; sale of accounts receivable or chattel paper; or other arrangement pursuant to which any Person is entitled to any preference or priority with respect to the property or assets of another Person or the income or profits of such other Person; each of the foregoing whether consensual or non-consensual and whether arising by way of agreement, operation of law, legal process or otherwise.

(b)     The filing of any financing statement under the Code or comparable law of any jurisdiction.

"Enforcement Action" means the exercise by the Agent in good faith of any of its enforcement rights and remedies as a secured creditor hereunder or under the other Loan Documents, Applicable Law or otherwise at any time upon the occurrence and during the continuance of an Event of Default (including, without limitation, the solicitation of bids from third parties to conduct the liquidation of the Collateral, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting and selling the Collateral, the commencement of any action to foreclose on the security interests or Liens of Agent in or on all or any material portion of the Collateral, notification of account debtors to make payments to the Agent, any action to take possession of all or any portion of the Collateral or commencement of any legal proceedings or actions against or with respect to all or any portion of the Collateral.

"Environmental Actions": means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials from (a) any assets, properties, or businesses of any Borrower or any predecessor in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrower or any predecessor in interest.

"Environmental Law": means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, to the extent binding on the Borrowers, relating to the environment, employee health and safety, or Hazardous Materials, including CERCLA; RCRA; the Federal Water Pollution Control Act, 33 USC § 1251 et seq. the Toxic Substances Control Act, 15 USC, § 2601 et seq. the Clean Air Act, 42 USC § 7401 et seq.; the Safe Drinking Water Act, 42 USC. § 3803 et seq.; the Oil Pollution Act of 1990, 33 USC. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 USC. § 11001 et seq.; the Hazardous Material Transportation Act, 49 USC § 1801 et seq.; and the Occupational Safety and Health Act, 29 USC. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); any state and local or foreign counterparts or equivalents!, in each case as amended from time to time.

"Environmental Liabilities and Costs": means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, l sanctions, and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any Environmental Action.

19

"Environmental Lien": means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"Equipment": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "equipment" (as such term is defined from time to time in the Code), fixtures and vehicles (including motor vehicles), including all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing.

"ERISA": means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate": means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which a Borrower is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with a Borrower and whose employees are aggregated with the employees of a Borrower under IRC Section 414(o).

"Event of Default": has the meaning set forth in Article 9.

"Events and Circumstances": has the meaning assigned to such term in the definition of "Material Adverse Effect".

"Excess Availability": means the amount, as of the date any determination thereof is to be made, equal to Availability *minus* the aggregate amount, if any, of all trade payables of a Borrower aged in excess of their historical levels with respect thereto and all book overdrafts in excess of their historical practices with respect thereto, in each case as determined by Agent in its Permitted Discretion.

"Exchange Act": means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Taxes": means, with respect to Taxes imposed on the Agent, Term Agent, or any Lender, (a) Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by any jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, and (b) any branch profits Taxes imposed by the United States of America or similar Tax imposed by any other jurisdiction in which a Borrower is located.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion

20

of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Existing Letters of Credit": means those letters of credit identified on Schedule F-1 hereto which were issued by Wells Fargo in connection with the Pre-Petition Credit Agreement.

"Exit Commitment Letters": has the meaning set forth in Section 4.1(dd).

"Factored Receivables": means any accounts of any Borrower which have been factored, sold, transferred, conditionally sold or assigned by an Account Debtor of such Borrower to Wells Fargo or an Affiliate thereof which is party to a Bank Product Agreement with such Borrower pursuant to a factoring arrangement or otherwise.

"Family Member": means, with respect to any individual, any other individual having a relationship by blood (to the second degree of consanguinity), marriage, or adoption to such individual.

"Family Trusts": means, with respect to any individual, trusts or other estate planning vehicles established for the benefit of such individual and Family Members of such individual and in respect of which such individual serves as trustee or in a similar capacity.

"Federal Funds Effective Rate": means for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter": means that certain Fee Letter between Agent, Term Agent, and Borrowers dated as of the Closing Date, as it may be subsequently amended, restated or replaced from time to time.

"Final Financing Order": means, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent, which, among other matters but not by way of limitation, authorizes the Borrowers and applicable Guarantors to obtain credit, incur the Obligations, grant Liens, and otherwise perform their obligations under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders.

"Final Order Entry Date": means the date on which the Bankruptcy Court enters the Final Financing Order.

"Financing Orders": means the Interim Financing Order and Final Financing Order, as applicable.

"Fiscal": means, when followed by "month" or "quarter" or "year", the relevant fiscal period based on the Borrowers' fiscal year and accounting conventions (e.g. a reference to "April Fiscal 2010" is to the fiscal month of April of the Borrowers' 2010 fiscal year) and when followed by reference to a specific year, the fiscal year which encompasses the majority of months in such fiscal year (e.g. if the

Borrower's 2010 fiscal year ends in February 2011 reference to that year would be to the Borrower's "Fiscal 2010").

"Fixtures": has the meaning given that term in the Code.

"FootSmart": has the meaning set forth in the Preamble to this Agreement.

"Foreign Subsidiary": means (i) a Subsidiary treated as a corporation for U.S. federal income tax purposes that is formed or incorporated outside of the United States, (ii) a Subsidiary substantially all of whose assets consist, directly or indirectly, of Subsidiaries described in clause (i) of this definition or (iii) an entity treated as disregarded for U.S. federal income tax purposes that owns more than 65% of the voting stock of a Subsidiary described in clauses (i) or (ii) of this definition.

"Freight Forwarder's Agreement": means a tri-party agreement in form satisfactory to the Administrative Agent in its Permitted Discretion, among the Collateral Agent, applicable Loan Party and a freight forwarder, in which the freight forwarder acknowledges that it has control over and holds the Documents evidencing ownership of the Inventory of the Loan Party for the benefit of Collateral Agent and agrees, upon notice by the Collateral Agent, to hold and dispose of the subject Inventory solely as directed by Collateral Agent.

"Funding Date": means the date on which a Borrowing occurs.

"Funding Losses": has the meaning set forth in Section 2.13(b)(ii).

"GAAP": means generally accepted accounting principles set forth in the accounting standards codification of the Financial Accounting Standards Board or such other statements by such or any other entity as may be approved by a significant segment of the accounting profession of the United States.

"Galleria Fifth Lease Amendment": means that certain Fifth Lease Amendment, dated as of September 29, 2017, by and among TWC and Galleria Mall Investors LP (as amended by that certain letter agreement dated as of November 3, 2017).

"Galleria Guaranty": means that certain Guaranty, dated as of September 29, 2017, by and among Parent, TWC and Galleria Mall Investors LP.

"Galleria Note": means that certain amended and restated promissory note, dated as of November 6, 2017, by TWC in favor of Galleria Mall Investors LP.

"Galleria Subordination Agreement": means that certain Subordination Agreement, dated as of September 29, 2017, by and among Wells Fargo, in its capacity as Administrative Agent and Collateral Agent, Galleria Mall Investors LP., the Parent, Big Dog, TWC and Footsmart, as amended and in effect from time to time.

"General Intangibles": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "general intangibles" (as such term is defined from time to time in the Code), and any and all supporting obligations in respect thereof including, but not limited to, Intellectual Property.

"Goods": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "goods", as that term is defined from time to time in the Code, including, without limitation, any and all Inventory and Equipment.

22

"Governing Documents": means, with respect to any Person, the certificate or articles of incorporation, certificate of formation, by-laws, operating agreement or other organizational documents of such Person.

"Governmental Authority": means any federal, state, local, or other governmental or administrative body, instrumentality, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor": means Parent and each other Subsidiary of Parent that guarantees any of the Obligations for the benefit of the agent and lenders.

"Guaranty": means that certain Guaranty by Parent to Agent for the benefit of the Lenders, the form and substance of which is satisfactory to Agent and Term Agent, as amended, restated or otherwise modified from time to time.

"Hazardous Materials": means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million.

"Hedge Agreement": means any and all transactions, agreements, or documents now existing or hereafter entered into between a Borrower or its Subsidiaries and Wells Fargo or its Affiliates, which provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Borrowers' or their Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices, including, without limitation, any transactions or agreements with respect to all Swap Obligations.

"Holdout Lender": has the meaning set forth in Section 16.3 hereof.

"Honor Date": has the meaning set forth in Section 2.12(c)(i) hereof

"Indebtedness": means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of Borrowers or their Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations for the deferred purchase price of assets (other than trade debt incurred in the ordinary course of business and repayable in accordance with customary trade practices), and (f) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person.

"Indemnified Liabilities": has the meaning set forth in Section 12.3 hereof.

"Indemnified Person": has the meaning set forth in Section 12.3 hereof.

"Indemnified Taxes": means Taxes other than Excluded Taxes.

"Insolvency Proceeding": means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Instruments": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "instruments", including, without limitation, any "promissory notes", as such terms are defined from time to time in the Code, and any and all supporting obligations in respect thereof

"Intangible Assets": means, with respect to any Person, that portion of the book value of all of such Person's assets that would be treated as intangibles under GAAP.

"Intellectual Property": means the following:

    (i)    all of each Loan Party's owned trademarks, any registrations and applications for registration thereof, any and rights under any trademark licenses to which it is a party, including those referred to on Schedule 6.16 hereto;

    (ii)    all of each Loan Party's copyrights, copyright applications and copyright licenses to which it is a party, including those referred to on Schedule 6.16 hereto;

    (iii)    all of each Loan Party's patents, patent applications and patent licenses to which it is a party, including those referred to on Schedule 6.16 hereto;

    (iv)    all of each Loan Party's customer lists, brands and brand names;

    (v)    all of each Loan Party's websites, domain names and URL's;

    (vi)    all good will associated with the foregoing; and

    (vii)    all proceeds of the foregoing;

provided, however, the term "Intellectual Property" shall not include the "Big Dog" intellectual property licensed to one or more of the Loan Parties and referred to on Schedule 6.16(b).

"Intellectual Property Security Agreement": means that certain Intellectual Property Security Agreement executed and delivered by Loan Parties and Collateral Agent, the form and substance of which shall be satisfactory to Collateral Agent and Term Agent, in their Permitted Discretion, as amended, restated or otherwise modified from time to time.

"Interim Financing Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing, substantially in the form attached hereto as Exhibit E and/or otherwise in form and substance satisfactory to the Agent, together with all extension, modifications, and amendments thereto approved by the Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers to obtain credit and the Borrowers and Guarantors to incur the Obligations, grant Liens, and otherwise perform their obligations under this Agreement and the other

Loan Documents, as the case may be, and provides for the super-priority of the claims of the Agent and Lenders.

"Intercompany Advances": means loans or advances (i) from either Borrower to each other or Parent, any Subsidiary or any Affiliate, or (ii) from Parent, any Subsidiary or any Affiliate to either Borrower.

"Intercompany Subordination Agreement": means a subordination agreement, in form and substance satisfactory to Agent and Term Agent in their Permitted Discretion executed and delivered by Borrowers, Parent, Subsidiary or another Affiliate, as applicable, and Agent in which Parent, Subsidiary or another Affiliate, as applicable, subordinate the obligations of the Borrowers to Parent, Subsidiary or Affiliate, as applicable, to the Obligations of the Borrowers to Agent, Term Agent, and Lenders hereunder.

"Interest Period": means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such Loan and ending 1 month thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the applicable LIBOR Rate, from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable, and (e) Borrower may not elect an Interest Period which will end after the Maturity Date.

"Inventory": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to inventory, including goods held for sale or lease or to be furnished under a contract of service, goods that are leased by a Loan Party as lessor, goods that are furnished by a Loan Party under a contract of service, and raw materials, work in process, or materials used or consumed in a Loan Party's business.

"Inventory Reserves": means such reserves as Administrative Agent determines from time to time in its Permitted Discretion as being appropriate to reflect the impediments to Administrative Agent's ability to realize upon the Inventory Collateral. Without limiting the generality of the foregoing, Inventory Reserves may include (but are not limited to) reserves based on the following, but without duplication of items excluded from being eligible for inclusion in the Borrowing Base in the applicable definition of any item of eligible Collateral, (and without duplication of any Reserves to the extent, (x) already reflected in the Cost of an item on the books of the Borrowers or (y) reflected in the Net Liquidation Percentage): (a) the extent to which Inventory consists of goods that (i) are obsolete, slow-moving, restrictive or custom items, bill and hold goods, defective, damaged, prepared for return to vendor, not first quality goods, work-in-process or raw materials or (ii) constitute spare parts, packaging and shipping materials or supplies; (b) Shrinkage Reserve; (c) imbalance or change in Inventory character, composition or mix; (d) markdowns; (e) customs duties, freight charges and other costs to release, Inventory which is being imported into the United States, (f) Reserves for reasonably anticipated changes in the Net Retail Liquidation value of Eligible Inventory between appraisals, (f) the estimated costs relating to unpaid warehousing or storage charges, Taxes, duties, and other similar unpaid costs associated with the acquisition of Eligible Inventory by Borrowers, (g) the estimated reclamation claims of unpaid sellers of Inventory sold to Borrowers, and (h) Landing Costs. Initially, and without limitation

of the Administrative Agent's right, in its Permitted Discretion, to establish Inventory Reserves, the Administrative Agent shall implement the "Inventory Reserves" as set forth on the form of the Borrowing Base Certificate attached as Exhibit B-1 attached hereto.

"Investment": means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding, in all cases, to the extent outstanding on the Petition Date, (a) commissions, travel, and similar advances to officers and employees of such Person made in the ordinary course of business consistent with past practices, and loans to officers and employees of such Person not to exceed $100,000.00 in the aggregate at any one time, and (b) bona fide Accounts arising in the ordinary course of business consistent with past practices, purchases or other acquisitions for consideration of Indebtedness or Stock, and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP).

"Investment Property": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "investment property", as such term is defined from time to time in the Code, and any and all supporting obligations in respect thereof.

"IRC": means the Internal Revenue Code of 1986, as in effect from time to time.

"Issuer Documents": means with respect to any Letter of Credit, the Letter Credit Application, and any other document, agreement and instrument entered into by, among or between the Issuing Lender, Administrative Agent and Borrower (or any Subsidiary) or in favor of the Administrative Agent or Issuing Lender and relating to any such Letter of Credit.

"Issuing Lender": means, Wells Fargo or any other institution that, with the consent of Administrative Agent, agrees, in Administrative Agent's sole discretion, to become an Issuing Lender for the purpose of issuing L/Cs or L/C Undertakings pursuant to Section 2.12 hereof.

"Landed Goods": means (a) embellished articles of apparel held for sale in the ordinary course of a Borrower's business located at one of the business locations set forth on Schedule C-1 (or in transit between any such locations), (b) unembellished articles of apparel that are readily saleable in their current condition and that are either at one of the business locations set forth on Schedule C-1 (or in transit between such locations) or with a contractor who has executed a Collateral Access Agreement (or in transit between such contractor and one of the business locations set forth on Schedule C-1), or (c) embellished articles of apparel that are readily saleable in their current condition and that are with a contractor who has executed a Collateral Access Agreement or a tri-party agreement (or in transit between such contractor and one of the business locations set forth on Schedule C-1).

"Landing Costs": means customs, duty, freight, and other out-of-pocket costs and expenses which will be expended by a Borrower to "land" in transit Inventory.

"Landlord Lien State": means each of Washington, Texas, Virginia and Pennsylvania or any other state which may now or subsequently enact a provision of law granting a landlord or lessor Liens on any of the Collateral senior to the Lenders' Liens.

"Landlord Reserve": means with respect to each leased location (i) at which each Borrower stores Inventory in a state that has a landlord lien or similar statute with respect to commercial property, including without limitation, as of the Closing Date, the states of Pennsylvania, Virginia and Washington, and (ii) for which either (I) a Collateral Access Agreement has not been received by Agent, or (II) the underlying lease agreement does not contain a provision that waives the Lien rights that the landlord may

26

have in and to the Inventory, including without limitation all rights of levy or distraint for rent; a Reserve in an amount equal to the greater of (a) the number of months' rent for which a landlord will have, under the applicable statutory lien, a Lien in the assets of the applicable Borrower to secure the payment of rent or other amounts under a lease, or (b) one (1) month's rent under the lease.

"L/C":  has the meaning set forth in Section 2.12(a) hereof.

"L/C Advance":  has the meaning set forth in Section 2.12(c)(iii) hereof.

"L/C Borrowing":  has the meaning set forth in Section 2.12(c)(iii) hereof.

"L/C Commitment":  means the commitment of the Issuing Lender to issue L/Cs from time to time in an aggregate face amount not to exceed the Letter of Credit Sublimit at any time.

"L/C Disbursement":  means a payment made by the Issuing Lender pursuant to a Letter of Credit.

"L/C Fee":  means, as of any date of determination, (i) for documentary Letters of Credit, the L/C Fee shall be the applicable margin specified under the "Documentary L/C" column of the Margin Pricing Grid, and (ii) for standby Letters of Credit, the L/C Fee shall be the applicable margin specified under the "Standby L/C" column of the Margin Pricing Grid.

"L/C Undertaking":  has the meaning set forth in Section 2.12(a) hereof.

"Lead Borrower":  has the meaning set forth in Section 2.17 hereof.

"Lease Extension Order":  has the meaning set forth in Section 7.23 hereof.

"Leasehold Interests":  means each of the Loan Party's leasehold estate or interest in each of the properties at or upon which the Loan Party conducts business or maintains any of the Collateral, together with the Loan Party interest in any of the improvements and fixtures located upon or appurtenant to each leasehold interest, including without limitation, any rights of the Loan Party to payments, proceeds of value of any kind or nature realized upon the sale or transfer of such estate or interest.

"Leasehold Threshold":  shall mean, as of the date of determination, a default by Parent or any of its Subsidiaries under (a) any lease related to a distribution center or warehouse, or (b) three (3) or more leases related to retail stores.

"Lender" and "Lenders":  means the Revolving Credit Lenders or Term Lenders, or any one of them, as the context requires.

"Lender Expenses":  means all (a) costs or expenses (including Taxes, and insurance premiums) required to be paid by a Borrower under any of the Loan Documents that are paid or incurred by the Administrative Agent, the Collateral Agent, Term Agent, and any Lender, (b) reasonable and documented fees or charges paid or incurred by Administrative Agent, the Collateral Agent, Term Agent, and any Lender in connection with their transactions with Borrowers, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and Code searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic Collateral appraisals or business valuations (up to the amount of any limitation contained in this Agreement), real estate surveys, real estate title policies and endorsements, and environmental audits,

27

(c) reasonable and documented costs and expenses incurred by Administrative Agent, the Collateral Agent, Term Agent, and any Lender in the disbursement of funds to or for the account of a Borrower (by wire transfer or otherwise), (d) charges paid or incurred by Administrative Agent, the Collateral Agent, Term Agent, and any Lender resulting from the dishonor of checks, (e) reasonable and documented costs and expenses paid or incurred by the Administrative Agent, the Collateral Agent, Term Agent, or any Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses of Administrative Agent, the Collateral Agent, Term Agent, or any Lender related to audit examinations of the Books ( up to the amount of any limitation) contained in this Agreement, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Administrative Agent, the Collateral Agent, or any Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Administrative Agent, the Collateral Agent, or any Lender's relationship with any Loan Party, (h) Administrative Agent, the Collateral Agent, Term Agent, or any Lender's reasonable fees and expenses (including attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering, or amending the Loan Documents, and (i) Administrative Agent, the Collateral Agent, Term Agent, or any Lender's reasonable fees and expenses (including reasonable and documented attorneys' fees) incurred in terminating, enforcing (including attorneys' fees and expenses incurred in connection with a "workout," a "restructuring," or similar negotiation concerning the Borrowers or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral; provided that the Borrowers shall only be responsible for the fees of one legal counsel to the Lenders, the Administrative Agent, the Collateral Agent, and Term Agent plus any local counsel (absent a conflict of interest, in which case such Persons may engage and be reimbursed for additional legal counsel).

"Lender Group Consultant": has the meaning set forth in Section 7.20(c) hereof.

"Lender-Related Person": means any Lender, together with such Lender's Affiliates, and the officers, directors, employees, of such Lender.

"Lenders' Liens": means the Liens granted by any Loan Party to Collateral Agent for the benefit of the Agent, Term Agent, and Lenders, under this Agreement or the other Loan Documents or otherwise arising by operation of law.

"Letter of Credit": means an L/C or an L/C Undertaking, as the context requires, and shall include all Existing Letters of Credit.

"Letter of Credit Application": has the meaning set forth in Section 2.12.

"Letter of Credit Expiration Date": has the meaning set forth in Section 2.12.

"Letter of Credit Rights": means all of each Loan Party's now owned or hereafter acquired right, title, and interest with respect to "letter of credit rights", as that term is defined from time to time in the Code, and any and all supporting obligations in respect thereof.

"Letter of Credit Sublimit": means, the maximum amount of Letters of Credit which may be outstanding under this Agreement in an amount at any one time not to exceed $10,000,000.

"<u>Letter of Credit Usage</u>": means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit <u>plus</u> 100% of the amount of outstanding time drafts accepted by an Underlying Issuer as a result of drawings under Underlying Letters of Credit.

"<u>LIBOR Deadline</u>": has the meaning set forth in <u>Section 2.13(b)(i)</u> hereof.

"<u>LIBOR Notice</u>": means a written notice in the form of <u>Exhibit L-1</u>.

"<u>LIBOR Rate</u>": means the rate per annum rate as reported on Reuters Screen LIBOR01 page (or any successor page) two (2) Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Borrowers in accordance with the Agreement (and, if any such rate is below zero, the LIBOR Rate shall be deemed to be zero), which determination shall be made by Agent or Term Agent, as applicable, and shall be conclusive in the absence of manifest error.

"<u>LIBOR Rate Loan</u>": means each portion of an Advance that bears interest at a rate determined by reference to the LIBOR Rate.

"<u>LIBOR Rate Margin</u>": means the "LIBOR Rate Margin" specified in the Margin Pricing Grid.

"<u>Lien</u>": means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, whether such interest shall be based on the common law, statute, or contract, whether such interest shall be recorded or perfected, and whether such interest shall be contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, including the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also including reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"<u>Liquidation</u>": the exercise, by Collateral Agent, of Agent's Rights and Remedies or any other rights afforded to it under this Agreement or the other Loan Documents or applicable law as a creditor of the Borrowers following and on account of the occurrence of an Event of Default, looking towards the realization on the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with the meaning in this Agreement. "Liquidation" shall include the conduct of sale or disposition of a material portion of the Collateral (other than in the ordinary course of business) including, without limitation, through the conduct of "going out of business", "store closing" or similar sales.

"<u>Loan Account</u>": has the meaning set forth in <u>Section 2.10</u> hereof.

"<u>Loan Documents</u>": means this Agreement, the Revolving Credit Notes, the Term Loan Notes, the Confirmation Agreement, the Fee Letter, the Financing Orders, Subordination Agreements (and any confirmations thereof), Intercompany Subordination Agreement, the Bank Product Agreements, the Cash Management Agreements, the Disbursement Letter, the L/Cs, the Perfection Certificate, the Intellectual Property Security Agreement, the Guaranty, the Pledge Agreement, any certificates (including without limitation, the Borrowing Base Certificate, the Officer's Closing Certificate, and the Compliance Certificate) from time to time delivered by any Loan Party pursuant to this Agreement or any other Loan Document, any note or notes executed by any Loan Party in connection with this Agreement and payable to any Lender, and any other agreement entered into, now or in the future, by any Loan Party and any

Lender, or Agent or Term Agent in connection with this Agreement or the transactions contemplated herein.

"Loan Party": means Borrowers, Parent, and each other Subsidiary of Parent which becomes a Borrower hereunder or guarantees any of the obligations for the benefit of the Agent and Lenders collectively.

"Majority Lenders": means the Majority Revolving Lenders and Majority Term Lenders.

"Majority Revolving Lenders": means, (a) if only one (1) Revolving Credit Lender, then such Revolving Credit Lender, and (b) if more than one (1) Revolving Credit Lender, then at least two (2) unaffiliated Revolving Credit Lenders (other than Delinquent Lenders) holding more than fifty percent (50%) in principal amount of the Revolving Loan Commitments (other than such Revolving Loan Commitments held by a Delinquent Lender, or if the Revolving Commitments have been terminated, at least two (2) unaffiliated Revolving Credit Lenders holding in the aggregate more than fifty percent (50%) of the total outstanding Revolving Credit Loans.

"Majority Term Lenders": means, (a) if only one (1) Term Lender, then such Term Lender, and (b) if more than one (1) Term Lender, then at least two (2) unaffiliated Term Lenders holding more than fifty percent (50%) of the then outstanding principal balance of the Term Loan.

"Margin Pricing Grid": means the pricing grid set forth below:

### Margin Pricing Grid

| LIBOR Rate Margin | Alternative Base Rate Margin | Documentary L/Cs | Standby L/Cs | Unused Line Fee |
|---|---|---|---|---|
| 4.50% | 3.50% | 4.00% | 4.50% | 0.375% |

"Material Adverse Change": means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of the Loan Parties taken as a whole, (b) a material impairment of any Loan Party's ability to perform its obligations under the Loan Documents to which it is a party or of the Agent's, or Lenders' ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Lenders' Liens with respect to the Collateral. Notwithstanding the foregoing, (i) the filing of the Chapter 11 Case (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court), (ii) events specifically described in the declaration of Andrew D. Feshbach in support of Chapter 11 Case, dated on or about the date hereof and (iii) the incurrence of any claim or liability that is Pre-Petition, unsecured and junior in priority to the Obligations (each of the foregoing clauses (i), (ii) and (iii), collectively, the "Events and Circumstances"), will, individually and collectively, each not be deemed to have a Material Adverse Effect.

"Material Adverse Effect": means the effect of a Material Adverse Change.

"Maturity Date":  means the earliest of (a) October 2, 2018, (b) if the Final Financing Order is not entered on or before April 10, 2018, immediately thereafter, (c) upon the effective date of a confirmed plan of reorganization under Section 1129 of the Bankruptcy Code, and (d) the closing of a sale of all or substantially all of the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code.

"Merchandise Liabilities":  means gift certificates, customer deposits, merchandise credits, layaway obligations, frequent shopper programs, and similar liabilities of any Loan Party to its retail customers and prospective customers.

"Minimum Excess Availability Reserve":  means a Reserve in an amount equal to the greater of (a) ten percent (10%) of the aggregate Revolving Loan Commitments, and (b) $5,000,000, subject to Agent's right to modify such Reserve pursuant to Section 2.1 hereof.

"Negotiable Collateral":  means all of each Loan Party's now owned and hereafter acquired right title and interest with respect to letters of credit, Instruments, Documents, Goods covered by Documents, Chattel Paper and all supporting obligations of the foregoing.

"Net Liquidation Percentage":  means, at any date of determination, the percentage of the Cost of the applicable Borrower's Eligible Inventory that is estimated to be recoverable in an orderly liquidation of such Borrower's Eligible Inventory, net of liquidation expenses, such percentage to be as determined from time to time by Administrative Agent in its Permitted Discretion or by a qualified appraisal company selected by Administrative Agent.

"Net Liquidation Value":  means, with respect to the applicable Borrower's Eligible Inventory, at any date of determination, the result (expressed in Dollars) of the Net Liquidation Percentage times the Cost of such Borrower's Eligible Inventory as of such date:

"Net Proceeds":  means, with respect to any casualty or condemnation event or Disposition, (a) the gross cash proceeds received in respect of such event or Disposition, including (i) any cash received in respect of any non-cash proceeds, but only as and when received, (ii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) all reasonable and customary, legal, investment banking, underwriting, brokerage, accounting and title and recording fees, tax expenses, transfer taxes and sales commissions and disbursement paid by any Loan Party in connection with such event or Disposition, and (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by any Loan Party as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness (other than the Obligations) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, or a Permitted Lien that is senior to the Lenders' Liens.

"Note Financing":  means the 8.375% Convertible Notes Due 2019 issued by the Parent pursuant to that certain Convertible Note Purchase Agreement, dated as of April 13, 2007, by Parent in the original aggregate amount of $18,500,000, as amended and in effect on the date hereof.

"Note Financing Subordination Agreement":  means that certain First Amended and Restated Subordination Agreement dated as of March 20, 2009 by, among others, the Noteholders, the Loan Parties and Administrative Agent, in form and substance satisfactory to the Agent and Term Agent, as ratified pursuant to those certain Reaffirmation and Confirmation Agreements dated as of April 27, 2010 and as of June 5, 2014, and as may be further amended, restated, or otherwise modified from time to time.

31

"Noteholders": mean each of the holders of any "Convertible Notes" issued pursuant to the Note Financing.

"Obligations": means (a) all loans (including Revolving Credit Loans and the Term Loan), Advances (including, without limitation, Overadvance and Protective Overadvances), debts, principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), contingent reimbursement obligations with respect to outstanding Letters of Credit, Bank Product Obligations, premiums, liabilities (including all amounts charged to the Loan Account or Term Loan Account pursuant hereto), obligations, fees, charges, costs, Lender Expenses (including any fees or expenses that, but for the provisions of the Bankruptcy Code, would have accrued), lease payments, guaranties, covenants, and duties of any kind and description owing by any Loan Party to any Lender or any Agent or Term Agent pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Expenses that the Loan Parties are required to pay or reimburse by the Loan Documents, by law, or otherwise, and (b) all Bank Product Obligations; provided, however, that the "Obligations" shall not include any Excluded Swap Obligations. For the avoidance of doubt, as of the Closing Date, all Existing Letters of Credit and Bank Products existing under, or otherwise provided in connection with, the Pre-Petition Credit Agreement and the "Loan Documents" (as such terms are defined in the Pre-Petition Credit Agreement) shall be deemed issued and part of the "Obligations" under this Agreement.

"Obsolete Copyright": means any copyright of a Person that, in such Person's good faith determination (a) is no longer sold or marketed by such Person, (b) is not generating any material amount of revenues of such Person, or (c) does not have a material fair market value.

"Other Taxes": has the meaning set forth in Section 11.2(c) hereof.

"Over Advance": has the meaning set forth in Section 2.5 hereof.

"Paid in Full" or "Payment in Full": means the indefeasible payment in full in cash (including the cash collateralization of any outstanding Letters of Credit and all known indemnification obligations under the Loan Documents) of an Obligation due hereunder and/or the Pre-Petition Obligations, as applicable.

"Participant": has the meaning set forth in Section 15.1 hereof.

"Payment Intangible": as defined in the Code and also any general intangible under which an Account Debtor's primary obligation is a monetary obligation.

"Perfection Certificate": means the certificate submitted by Borrowers and Parent to Administrative Agent with respect to the Borrowers' and Parent's completed responses to the inquiries set forth therein, the form and substance of such responses to be satisfactory to Administrative Agent.

"Permitted Discretion": means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions": means any of the following:

(a)     sales or other dispositions by the Borrowers or its Subsidiaries of Equipment (i) that is substantially worn, damaged, obsolete or surplus in the ordinary course of business, or (ii) in accordance with any Permitted Store Closing;

32

(b)     sales by Borrowers or their Subsidiaries of Inventory to buyers or lessees in the ordinary course of business,

(c)     sales by Borrowers or their Subsidiaries of Inventory in accordance with any Permitted Store Closing; and

(d)     delivery of Inventory and Equipment on consignment in connection with the Wholesale Account Locations solely to the extent, and in such amounts, permitted under this Agreement.

"Permitted Distributions": means, provided in each case that no Event of Default has occurred and is then continuing:

(a)     cash Distributions by Borrowers to Parent for the sole purpose of permitting Parent to pay federal and state income taxes solely attributable to its ownership of the capital Stock of Borrowers, and

(b)     cash Distributions by Subsidiaries to Parent.

"Permitted Holder": means each of Fred Kayne, Richard Kayne, and Andrew Feshbach, and each of their respective Family Members and Family Trusts.

"Permitted Intercompany Advance": means Intercompany Advances (including, but not limited to, proper allocations of shared corporate overhead or shared goods and services) made amongst the Loan Parties, provided that, in all cases, all Permitted Intercompany Advances are expressly subordinate to the Obligations of the Loan Parties to the Lenders pursuant to the Intercompany Subordination Agreement.

"Permitted Investments": means (a) Reserved, (b) investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, (d) investments resulting from Permitted Intercompany Advances, (e) Permitted Intercompany Advances, (f) investments listed on Schedule 6.32 (but not any increase in the amount thereof or other modification of the terms thereof), and (g) investments made in Cash Management Accounts, in each case, so long as no Default or Event of Default has occurred and is continuing or would result from such loan investment or advance being made.

"Permitted Liens": means (a) Liens held by Agent for the benefit of Agent and the Lenders pursuant to this Agreement and the other Loan Documents, (b) Liens for unpaid taxes that either (i) are not yet delinquent, or (ii) do not constitute a Default or an Event of Default hereunder and are the subject of Permitted Protests, (c) Liens set forth on Schedule D-1 as in effect on the Closing Date, (d) the interests of lessors under operating leases, (e) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness pursuant to Section 8.1 and so long as such Lien attaches only to the asset purchased or acquired and the proceeds thereof, (f) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of Borrowers' business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent by more than thirty 30 days, or (ii) are the subject of Permitted Protests, (g) Liens arising from deposits made in connection with obtaining worker's compensation or other unemployment insurance, (h) Liens or deposits to secure performance of bids, tenders, or leases incurred in the ordinary course of Borrowers' business and not in connection with the borrowing of money, (i) Liens granted as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of Borrowers' business, not in excess of $50,000 (j) Liens resulting from any judgment or award that is not a Default or an Event of Default hereunder, (k) with respect to any real property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof by Borrowers,

33

(l) Pre-Petition and adequate protection Liens securing the Note Financing, and Borrowers' guarantees of the Note Financing, which Liens shall be subject and subordinate in all respects to the Liens securing the Obligations to Agent and Lenders under this Agreement and the other Loan Documents pursuant to the terms of the Note Financing Subordination Agreement, (m) the Pre-Petition Liens, (n) adequate protection Liens granted under the Financing Orders, and (o) Pre-Petition and adequate protection Liens granted by TWC to (1) Simon Property Group, LP pursuant to the Simon Master Agreement and (2) Galleria Mall Investors LP pursuant to the Galleria Fifth Lease Amendment, which Liens, in each case, (i) are solely on TWC's equipment, furniture, furnishings, appliances, goods, trade fixtures, inventory, chattels and personal property which are located on the premises leased to TWC by, as applicable, (x) Simon Property Group, LP and listed on Exhibit A of the Simon Master Agreement and (y) Galleria Mall Investors LP at Galleria Dallas, Dallas, Texas, (ii) secure only TWC's obligations with respect to the Total Deferred Amount (as such term is defined in the Simon Master Agreement) and the Deferred Amount (as such term is defined in the Galleria Master Agreement), as applicable and (iii) are subject and subordinate in all respects to the Liens securing the Obligations to Agent and Lenders under this Agreement and the other Loan Documents pursuant to the terms of the Simon Subordination Agreement or Galleria Subordination Agreement, as applicable.

"Permitted Protest":  means the right of any Loan Party or any of its Subsidiaries, as applicable, to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll Taxes or Taxes that are the subject of a notice of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on the Books of such Loan Party in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party or any of its Subsidiaries, as applicable, in good faith, and (c) Administrative Agent is satisfied in its Permitted Discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Lenders' Liens.

"Permitted Purchase Money Indebtedness":  means, as of any date of determination, Purchase Money Indebtedness incurred prior to the Petition Date.  In no event shall Permitted Purchase Money Indebtedness include Indebtedness incurred for the purpose of financing all or any part of the acquisition cost of any Inventory.

"Permitted Store Closings: means the closing of certain of the Borrowers' store locations, the rejection or termination of leases in connection therewith and the Dispositions of the Inventory and Equipment of a Loan Party at such store location not to exceed: (a) up to twenty (20) TWC store locations and up to two (2) Big Dog store locations so long as such Disposition of the Inventory and Equipment is subject to an arms' length transaction; plus (b) up to fifty (50) additional TWC store locations and one (1) additional Big Dog store location, so long as the Disposition of the Inventory and Equipment at such store locations closed under this clause (b) conducted by an Approved Liquidator in accordance with an Agency Agreement or otherwise on terms and conditions acceptable to the Agent; provided that all Net Proceeds received in connection with any Permitted Store Closing shall be applied to the Obligations if then required in accordance with this Agreement.

"Permitted Store Closing Reserve":  means such Reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate with respect to Inventory at locations subject to the Permitted Store Closings.

"Permitted Variance": has the meaning set forth in Section 7.21.

"Person":  means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or

34

other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof

"Personal Property Collateral": means all Collateral other than Real Property.

"Petition Date": has the meaning set forth in the preamble of this Agreement.

"Pledge Agreements": means a stock pledge agreement, in form and substance satisfactory to Agent, executed and delivered by Parent and Borrowers to Agent with respect to the pledge of the Stock owned by Parent and Borrowers, as amended, restated or otherwise modified from time to time.

"Portal": has the meaning specified in Section 2.3 hereof.

"Post Foreclosure Asset": all or any part of the Collateral, ownership of which is acquired by the Agent or any Lender or a nominee on account of the "bidding in" at a disposition as part of a Liquidation or by reason of a "deed in lieu" type of transaction.

"Pre-Petition": means the period prior to the commencement of the Chapter 11 Case.

"Pre-Petition Credit Agreement": means that certain Third Amended and Restated Loan and Security Agreement dated as of June 5, 2014, by, among others, certain of the Borrowers and certain of the Parent, Wells Fargo Bank, National Association, as administrative agent, collateral agent and term loan agent, and the lenders from time to time party thereto, as amended or otherwise modified prior to and in effect on the Petition Date.

"Pre-Petition Indebtedness": means Indebtedness of any Loan Party that was incurred or accrued prior to the commencement of the Chapter 11 Case.

"Pre-Petition Liens": means Liens in favor of Wells Fargo as collateral agent for its benefit and the benefit of the lenders and other credit parties under the Pre-Petition Credit Agreement.

"Pre-Petition Obligations": means all "Obligations" as such term is defined in the Pre-Petition Credit Agreement.

"Pre-Petition Total Revolving Outstandings": means, as of any date of determination thereof, the then outstanding principal amount of all "Advances" as such term is defined in the Pre-Petition Credit Agreement (for the avoidance of doubt, excluding any advances made under the Pre-Petition Term Loan).

"Pre-Petition Term Loan": means the "Term Loan" as defined in the Pre-Petition Credit Agreement, plus all interest on and fees related thereto.

"Priority Payables": means, (a) the full amount of the liabilities of the Loan Parties which (i) have a trust imposed to provide for payment or a security interest, pledge, lien or charge ranking; (ii) in the Permitted Discretion of Administrative Agent, are capable of ranking senior to or pari passu with Liens securing the Obligations on any of the Accounts of the Loan Parties under federal, state, county, district, municipal, or local law; or (iii) in the Permitted Discretion of Administrative Agent, may otherwise be required to be paid under Applicable Law or otherwise in connection with a Liquidation, including, but not limited to, claims for unremitted and/or accelerated rents, Taxes, wages, withholding Taxes, and other amounts payable to an insolvency administrator, employee withholdings or deductions and vacation pay, workers' compensation obligations, government royalties or pension fund obligations in each case to the extent such trust, or security interest, lien or charge has been or may be imposed or

8478014v8

which would otherwise rank senior to or pari passu with Liens securing the Obligations or be required to be paid in conjunction with a Liquidation.

"Professional Fee Escrow Account": means an escrow account established and maintained by the Borrowers (or Pachulski Stang Ziehl & Jones LLP on behalf of the Borrowers) solely for the purpose of collecting and paying the Carve-Out as provided in this Agreement, the Financing Orders and orders regarding the payment of fees and expenses of Case Professionals and Committee Expenses (as such term is defined in the Financing Orders) issued by the Bankruptcy Court.

"Protective Overadvances": Revolving Credit Loans which are Overadvances, but solely made or undertaken in Agent's discretion to protect and preserve the interests of the Agents and Lenders in the Collateral or to enlarge their recovery in a Liquidation.

"Purchase Money Indebtedness": means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred at the time of, or within twenty (20) days after, the acquisition, construction or improvement of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

"Purchaser": shall have the meaning given to such term in Section 4.5(b) hereof.

"Qualified ECP Guarantor": means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Import Letter of Credit": means a Letter of Credit that (a) is issued to facilitate the purchase by a Borrower of Eligible Inventory, (b) is in form and substance acceptable to Administrative Agent in its Permitted Discretion, and (c) is issued to support an Underlying Letter of Credit that only is drawable by the beneficiary thereof by the presentation of, among other documents, either (i) a non-negotiable bill of lading that is consigned to Administrative Agent (either directly or by means of endorsements) and that was issued by the carrier respecting the subject Eligible Inventory, or (ii) a non-negotiable cargo receipt that is consigned to Administrative Agent (either directly or by means of endorsements) and that was issued by a consolidator respecting the subject Eligible Inventory; provided, however, that, in the latter case, no bill of lading shall have been issued by the carrier (other than a bill of lading consigned to the consolidator or to Administrative Agent).

"Real Property": means any fee, leasehold or other estate or interest in real property now or hereafter owned or leased hereafter acquired by the Loan Parties and the improvements thereto.

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Wholesale Receivables, including, without limitation, on account of dilution.

"Record": means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Register": has the meaning set forth in Section 15.1(d) hereof.

8478014v8

"Reimbursement Obligations": means the obligation of the Borrowers to reimburse the Agent and Lenders for amounts payable by the Agent and Lenders under a Letter of Credit together with interest thereon as provided in Section 2.12.

"Remedial Action": means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (d) conduct any other actions authorized by 42 USC § 9601.

"Replacement Lender": has the meaning set forth in Section 16.3 hereof.

"Reporting Date": has the meaning set forth in Section 6.17(b) hereof.

"Reserve Percentage": means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Reserves": means collectively, all Inventory Reserves, Account Reserves, Availability Reserves, Bank Products Reserves, the Landlord Reserve, the Shrink Reserve, the Minimum Excess Availability Reserve, Receivables Reserves, and any other Reserve created by Administrative Agent hereunder with respect to Revolving Credit, in its Permitted Discretion, but without duplication of items to the extent excluded from being eligible for inclusion of the Borrowing Base in the applicable definition of any item of eligible Collateral. Initially, and without limitation of the Administrative Agent's right, in its Permitted Discretion, to establish the "Reserves" hereunder, the Reserves shall be set as set forth on the form of Borrowing Base Certificate attached hereto as Exhibit B-1.

"Restricted Payment": means (i) any direct or indirect Distribution on or on account of any shares of any class of stock of any Loan Party now or hereafter outstanding (other than Permitted Distributions); (ii) any Distribution in respect of, or redemption, purchase or other acquisition, direct or indirect, of any shares of any class of stock of any Loan Party now or hereafter outstanding or of any warrants, options or rights to purchase any such stock (including, without limitation, the repurchase of any such stock, warrant, option or right or any refund of the purchase price thereof in connection with the exercise by the holder thereof of any right of rescission or similar remedies with respect thereto); and (iii) any direct salary, non-salary managerial fees, fee (consulting, management or other), fringe benefit, allowance or other expense directly or indirectly paid or payable by any Loan Party (as compensation or otherwise) to any other shareholder or Affiliate of any Loan Party (other than to a director, employee or officer, to the extent of such director's, officer's or employee's compensation).

"Reuters Screen LIBOR01 Page" means the display page LIBOR01 on the Reuters service or any successor display page, other published source, information vendor or provider that has been designated by the sponsor of Reuters Screen LIBOR01 page.

"Revolver Usage": means, as of any date of determination, the sum of (a) the principal amount of outstanding Advances (other than Advances made under the Term Loan), plus (b) the then extant amount of the Letter of Credit Usage.

37

"Revolving Credit": has the meaning set forth in Section 2.1(b) hereof.

"Revolving Credit Ceiling": means $50,000,000.

"Revolving Credit Lenders": means each Revolving Credit Lender to which reference is made in the preamble of this Agreement and any other Person who becomes a "Revolving Credit Lender" in accordance with the provisions of this Agreement.

"Revolving Credit Loans": means Advances made under the Revolving Credit, except that where the term "Revolving Credit Loan" is used with reference to available interest rates applicable to Advances under the Revolving Credit, it refers to so much of the unpaid principal balance of the Advances as bears the same rate of interest for the same Interest Period.

"Revolving Credit Note": as defined in Section 2.1(b).

"Revolving Loan Commitment Percentage": means, as to each Revolving Credit Lender, such Revolving Credit Lender's pro-rata share of the aggregate Revolving Loan Commitment, as set forth on Exhibit 2.15 annexed hereto (as such amounts may change in accordance with the provisions of this Agreement).

"Revolving Loan Commitments": means the Dollar amount set forth on Exhibit 2.15 hereto as the amount of each Revolving Credit Lender's commitment to make Advances and to participate in Letters of Credit up to the Letter of Credit Sublimit hereunder.

"Revolving Loan Priority Collateral": means all now owned or hereafter acquired Collateral that constitutes:

      (a)      Inventory and Credit Card Receivables;

      (b)      General Intangibles, Chattel Paper, Instruments, Payment Intangibles and Documents that relate to Inventory and Credit Card Receivables;

      (c)      permits and licenses related to any of the foregoing;

      (d)      all books and records related to the foregoing; and

      (e)      all products and proceeds of any and all of the foregoing in whatever form received, including proceeds of insurance and claims against third parties.

"Risk Participation Liability": means, as to each Letter of Credit, all Reimbursement Obligations of Borrowers to the Issuing Lender with respect to an L/C Undertaking, consisting of (a) the amount available to be drawn or which may become available to be drawn, (b) all amounts that have been paid by the Issuing Lender to the Underlying Issuer to the extent not reimbursed by Borrowers, whether by the making of an Advance or otherwise, and (c) all accrued and unpaid interest, fees, and expenses payable with respect thereto.

"Sanctioned Entity": means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

38

"Sanctioned Person": means, at any time, (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) a Canadian Blocked Person, (e) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions": means individually and collectively, respectively, any and all economic, trade, financial or other sanctions laws, regulations or embargoes imposed, administered or enforced from time to time by: (a) the United States of America, including, without limitation, those administered by the Office of Foreign Assets Control (OFAC) of the U.S. Department of Treasury, the U.S. Department of State, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, (e) the government of Canada or (e) any other governmental authority in any jurisdiction in which any Loan Party or any of its Subsidiaries is located or doing business.

"SEC": means the United States Securities and Exchange Commission and any successor thereto.

"S&PU": means Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc., and any successor company thereto which is a nationally recognized statistical rating organization and is otherwise reasonably acceptable to Agent in its Permitted Discretion.

"Secured Parties": collectively, the Administrative Agent and its Affiliates, the Collateral Agent and its Affiliates, the Term Agent and its Affiliates, the Lenders, the Issuing Lender, and any other Person to whom any Obligations are due from time to time.

"Securities Account": means a "securities account" as such term is defined from time to time in the Code.

"Shareholder Agreements": is defined in Section 6.35 hereof.

"Shrink Reserve": means a Reserve established by Agent to account for shrinkage, markdowns (to the extent not taken into account in the calculation of "Cost"), seasonality and other such categories of reasons which the Agent may establish, in its Permitted Discretion, which reflect other factors which affect the market value of Eligible Inventory.

"Simon Guaranty": means that certain Guaranty, dated as of September 29, 2017, by and among Parent, TWC and Simon Property Group, LP.

"Simon Master Agreement": means that certain Master Agreement, dated as of September 29, 2017, by and among TWC and Simon Property Group, LP.

"Simon Note": means that certain promissory note, dated as of September 29, 2017, by TWC in favor of Simon Property Group, LP.

"Simon Subordination Agreement": means that certain Subordination Agreement, dated as of September 29, 2017, by and among Wells Fargo, in its capacity as Administrative Agent and Collateral Agent, Simon Property Group, LP, the Parent, Big Dog, TWC and Footsmart, as amended and in effect from time to time.

"<u>Simon/Galleria Subordinated Debt</u>": means, collectively, (i) the "Subordinated Debt" as defined in the Simon Subordination Agreement and (ii) the "Subordinated Debt" as defined in the Galleria Subordination Agreement.

"<u>Specified Sale Process Default</u>": has the meaning set forth in <u>Section 7.22(b)</u> herein.

"<u>Standby L/C</u>": Letters of Credit issued pursuant to this Agreement, the drawing under which does not require the delivery of bills of lading, airway bills or other similar types of documents of title, or which are customarily referred to as standby letters of credit.

"<u>Stated Amount</u>": means the maximum amount for which a Letter of Credit may be honored.

"<u>Statutory Committee</u>": means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

"<u>Stock</u>": means all shares, options, warrants, interests, participations or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"<u>Subordinated Debt</u>": means Indebtedness of any Loan Party that is subordinate in right of payment and priority to the Obligations in a manner which is satisfactory to the Administrative Agent and Term Agent in their Permitted Discretion. Subordinated Debt shall include, without limitation, the Note Financing and the Simon/Galleria Subordinated Debt.

"<u>Subordination Agreement</u>": means any agreement, in form and substance satisfactory to Agent, Term Agent, and Lenders in their Permitted Discretion subordinating the Liens securing and any other obligations with respect to, any Indebtedness owed by a Loan Party to any other Person in favor of the Secured Parties. The definition of "Subordination Agreement" shall include, without limitation, the Simon Subordination Agreement and the Galleria Subordination Agreement.

"<u>Subsidiary</u>": of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity. For purposes of this Agreement and the other Loan Documents, TWC-Bermuda shall not be considered a "<em>Subsidiary</em>".

"<u>Super Majority Revolving Lenders</u>": means, (a) if only one (1) Revolving Credit Lender, then such Revolving Credit Lender, and (b) if more than one (1) Revolving Credit Lender, then at least two (2) unaffiliated Revolving Credit Lenders (other than Delinquent Lenders) holding 66 2/3% or more of the outstanding principal amount of the Revolving Loan Commitments, or if the Revolving Commitments have been terminated, at least two (2) unaffiliated Revolving Credit Lenders holding 66 2/3% of the outstanding Revolving Credit Loans (other than any amounts held by Delinquent Lenders).

"<u>Super Majority Term Lenders</u>": means at least two (2) unaffiliated Term Lenders holding 66 2/3% or more of the outstanding principal amount of the Term Loan.

"<u>Supplemental Collateral Agent</u>": has the meaning set forth in <u>Section 18.2(j)</u> hereof.

8478014v8

"Supporting Obligation": has the meaning given that term in the Code and also refers to a Letter-of-Credit Right or secondary obligation which supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, an Instrument, or Investment Property.

"Swap Obligation" means any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Taxes": means all present or future taxes, levies, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Agent": means Wells Fargo Bank, National Association, in such capacity.

"Term Agent's Closing Fee": has the meaning set forth in the Fee Letter.

"Term Borrowing": means the borrowing of the Term Loan made by each of the Term Lenders Term Loan Funding Date pursuant to Section 2.1(a).

"Term Commitment": means the Dollar amount set forth on Exhibit 2.15 hereto as the amount of each Term Lender's commitment to make a portion of the Term Loan. As of the Closing Date, the aggregate amount of the Term Commitments shall be the lesser of (x) $7,250,000 or (y) the outstanding amount of the Pre-Petition Term Loan as of the Term Loan Funding Date.

"Term Lender": means each Term Lender to which reference is made in the preamble of this Agreement and any other Person who becomes a "Term Lender" in accordance with the provisions of this Agreement

"Term Loan": means the term loan made by the Term Lenders on the Term Loan Funding Date pursuant to the Final Financing Order and Section 2.1(a) hereof.

"Term Loan Account": has the meaning set forth in Section 2.10 hereof.

"Term Loan Action Notice": shall have the meaning set forth in Section 10.1(d) hereof.

"Term Loan Funding Date": means the date, on or no later than one (1) Business Day after the Final Order Entry Date, that the Term Loan is funded pursuant to Section 2.1(a) hereof.

"Term Loan Interest Rate" means a per annum rate equal to: (i) the greater of (A) LIBOR Rate and (B) one percent (1%) *plus* (ii) 10.50%.

"Term Loan Note": means a promissory note made by the Borrowers in favor of a Term Lender evidencing the Term Loan made by such Term Lender, substantially in the form of Exhibit 2.1(a).

"Term Loan Priority Collateral": means all now owned or hereafter acquired Collateral other than Revolving Loan Priority Collateral.

"Termination Date": the earliest of (a) the Maturity Date; (b) the occurrence of any Event of Default described in Section 9.4 or 9.5 below; (c) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Section 18, or (d) that date which is ten (10) Business Days after irrevocable written notice provided by the Lead Borrower to the Administrative Agent and Term Agent of

Borrowers' intention to Pay in Full the Obligations and terminate all of the Revolving Loan Commitments hereunder prior to the Maturity Date pursuant to Section 4.5 hereof.

"TWC": has the meaning set forth in the preamble of this Agreement.

"TWC-Bermuda": means The Walking Company International, Limited, a Bermuda corporation.

"TWC Eligible Inventory": means all Eligible Inventory owned by TWC.

"Unanimous Consent": shall mean Consent of Lenders (other than Delinquent Lenders) holding 100% of the Revolving Loan Commitments, or if the Revolving Commitments have been terminated, 100% of the total outstanding Revolving Credit Loans (other than any amounts held by Delinquent Lenders) and the outstanding principal amount of the Term Loan.

"Underlying Issuer": means a third Person which is the beneficiary of an L/C Undertaking and which has issued an L/C at the request of the Issuing Lender for the benefit of Borrowers and, in the case of a proposed Qualified Import Letter of Credit, has agreed, in writing, to hold documents of title as agent for the Agent and Lenders.

"Underlying Letter of Credit": means a letter of credit that has been issued by an Underlying Issuer.

"Unreimbursed Amount": has the meaning set forth in Section 2.12 hereof.

"Unused Line Fee": has the meaning set forth in Section 2.11(a) hereof.

"Use Period": means the period commencing on the date that the Agent commences the Liquidation of the Revolving Loan Priority Collateral and ending one hundred and twenty (120) days thereafter. If any stay or other order that prohibits the Agent from commencing and continuing any Enforcement Action or to Dispose of the Revolving Loan Priority Collateral has been entered by a court of competent jurisdiction, such 120-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

"Voidable Transfer": has the meaning set forth in Section 21.7 hereof.

"Wells Fargo": means Wells Fargo Bank, National Association, a national banking association.

"Wholesale Account Location" has the meaning set forth in Section 7.8 hereof.

1.2. Accounting Terms. Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements and reports of Borrowers most recently received by Agent prior to the date hereof provided that notwithstanding any other provision set forth herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election (or the effects of any such election) under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities and/or Indebtedness at the fair value thereof. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to

mean Borrowers and their Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

1.3.  Code. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth from time to time in the Code unless otherwise defined herein.

1.4.  Construction. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a Record and any Record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

1.5.  Schedules and Exhibits. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2.  REVOLVING CREDIT LOAN, TERM LOAN, AND TERMS OF PAYMENT.

2.1.  Term Loan and Revolving Credit Advances.

(a)  Term Loan.  Subject to the terms and conditions set forth herein, each Term Lender severally made a loan to the Borrowers on the Term Loan Funding Date in a principal amount not to exceed the Term Commitment (as in effect on such date) of such Term Lender. Amounts repaid in respect of the Term Loan may not be reborrowed, and upon each Term Lender's making of such Term Loan on the Term Loan Funding Date Date, the Term Commitment of such Term Lender shall be terminated. As of the Closing Date, prior to the making of the Term Loan, each Term Lender's "Term Commitment" is set forth on Exhibit 2.15, annexed hereto. The obligation to repay the Term Loan, with interest as provided herein, shall be evidenced by the "Term Loan Notes" in the form of Exhibit 2.1(a) annexed hereto executed by the Borrowers. Neither the original nor a copy of the Term Loan Note shall be required, however, to establish or prove any Obligations. In the event that a Term Loan Note is ever lost, mutilated, or destroyed, the Borrowers shall execute a replacement thereof and deliver such replacement to the Term Agent upon receipt from the applicable Lender of a lost note affidavit and reasonably satisfactory indemnification from the applicable Lender. All amounts borrowed under the Term Loan shall be due and payable on the earlier of the Termination Date and the date such Obligations are accelerated in accordance with Section 18 of this Agreement. The proceeds of the Term Loan shall be used to refinance and make Payment in Full on the Pre-Petition Term Loan.

43

(b)  Revolving Credit Advances.

(i)  Subject to the terms and conditions of this Agreement, and during the term of this Agreement, the Revolving Credit Lenders agree to make in each case, cash advances ("Advances") to Borrowers in an amount which (i) would not cause the Revolver Usage *plus the* Pre-Petition Total Revolving Outstandings, after giving effect to such Advance, to exceed the Revolving Credit Ceiling, or (ii) would not exceed Availability as in effect immediately prior to such Advance. Such Advances shall be subject to Availability as determined by Administrative Agent based on Borrowing Base Certificates furnished by Borrowers to Administrative Agent pursuant to Section 7.2 below. The obligation to repay Advances under the Revolving Credit, with interest as provided herein, shall be evidenced by the "Revolving Credit Notes" in the form of Exhibit 2.1(b) annexed hereto executed by the Borrowers. Neither the original nor a copy of the Revolving Credit Note shall be required, however, to establish or prove any Obligations. In the event that a Revolving Credit Note is ever lost, mutilated, or destroyed, the Borrowers shall execute a replacement thereof and deliver such replacement to the Administrative Agent upon receipt from the applicable Lender of a lost note affidavit and reasonably satisfactory indemnification from the applicable Lender. The Advances to be made under this Section 2.1(b) shall be referred to as the "Revolving Credit".

(ii)  Anything to the contrary in this Section 2.1 notwithstanding, and regardless of whether a Default of Event of Default then exists, Administrative Agent shall have the right, to reduce its advance rates, adjust the Net Liquidation Percentage or establish or modify Reserves (including Account Reserves, Bank Products Reserves, Inventory Reserves, Landlord Reserve, Shrinkage Reserve, Minimum Excess Availability Reserve, Availability Reserves and any other Reserves) in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, against the Borrowing Base, including, without limitation, with respect to (i) sums that Borrowers are required to pay (such as Taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and have failed to pay under any Section of this Agreement or any other Loan Document, (ii) amounts as determined by Agent in its Permitted Discretion based on noncompliance with the covenants set forth in Sections 7 and 8, and (iii) amounts owing by Borrowers to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than any Permitted Lien set forth on Schedule D-1 which is specifically identified thereon as entitled to have priority over the Lenders' Liens), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Lenders' Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for Taxes where given priority under Applicable Law) in and to such item of the Collateral, (iv) Merchandise Liabilities, (v) Landing Costs, and (vi) customer returns of Inventory.

(iii)  The Revolving Credit Lenders and Issuing Lender shall have no obligation to make additional Advances or issue Letters of Credit hereunder (i) to the extent that (A) such additional Advances or Letters of Credit would cause the Revolver Usage to exceed the Revolving Credit Ceiling or (B) the amount of such Advance or Letter of Credit would exceed Availability as in effect immediately prior to such Advance or Letter of Credit or (ii) Default or an Event of Default has occurred and is continuing.

44

(iv)        Amounts borrowed under the Revolving Credit pursuant to this Section may be repaid and, subject to the terms and conditions of this Agreement, may be reborrowed at any time during the term of this Agreement. At no time shall the Borrowers request, or the Issuing Lender be obligated to issue, Letters of Credit or L/C Undertaking in excess of the Letter of Credit Sublimit then in effect.

(v)        All amounts borrowed under the Revolving Credit pursuant to this Section, together with all other Obligations (other than Obligations under the Term Loan, which are addressed in <u>Section 2.1(a)</u> above), shall be due and payable on the earlier of the Termination Date and the date such Obligations are accelerated in accordance with <u>Section 18</u> of this Agreement; provided, however, that Agent or any of its Affiliates may determine, in their sole and absolute discretion and with no obligation to do so, to extend the termination or maturity date for any Bank Product Obligations beyond the Termination Date subject to the applicable Borrower's satisfaction of any conditions therefor required by Agent or its Affiliate.

2.2.    <u>Advances in Excess of Borrowing Base (Overadvances)</u>.

(a)        No Revolving Credit Lender or Issuing Lender, as applicable, has any obligation to the Borrowers to make any Advance, or issue any Letter of Credit or otherwise to provide any credit to or for the benefit of the Borrowers where the result of such Advance, Letter of Credit or other credit is an Overadvance.

(b)        The Revolving Credit Lenders' providing of an Overadvance on any one occasion does not affect the obligations of Borrowers hereunder (including Borrowers' obligation to immediately repay any amount which otherwise constitutes an Over Advance) nor obligate the Revolving Credit Lenders to do so on any other occasion.

(c)        All Over Advances shall be due on demand including, without limitation, Protective Overadvances.

(d)        Except as expressly provided in <u>Section 20.3(1)</u> to the contrary, Agent may make Protective Overadvances in its discretion without the consent of Lenders; provided, however, unless the Term Agent shall otherwise agree: (i) the aggregate amount of all Permitted Overadvances outstanding at any time shall not exceed five percent (5.0%) of the Borrowing Base *plus* the amount of the Loan Parties' payroll obligations for two (2) weeks at such time, and (ii) unless a Liquidation is occurring, no Protective Overadvance shall remain outstanding for more than forty-five (45) consecutive Business Days.

2.3.    <u>Borrowing Procedures</u>.

(a)        Each Borrowing shall be made, (i) in the case of a request for an Advance bearing interest at the Alternative Base Rate, by an irrevocable electronic request of the Lead Borrower through Administrative Agent's Commercial Electronic Office Portal or through such other electronic portal provided by Administrative Agent (the "<u>Portal</u>"), which request must be made by an Authorized Person and which notice must be received by Administrative Agent no later than 1:00 p.m. (Boston, Massachusetts time) on the day of the requested Funding Date, or (ii) in the case of a request for an Advance bearing interest at the LIBOR Rate, by an irrevocable written request by an Authorized Person of the Lead Borrower, which much be received at least three (3) Business Days prior to the date that is the requested

Funding Date, and in each case specifying (A) the amount of such Borrowing, and (B) the requested Funding Date, which shall be a Business Day. At Administrative Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Administrative Agent telephonic notice of such request by the required time, with such telephonic notice to be confirmed in accordance with the above procedures within twenty-four (24) hours of the giving of such notice. On the requested date of any LIBOR Rate Loan, (i) in the event that Advances bearing interest at the Alternative Base Rate are outstanding in an amount equal to or greater than the requested LIBOR Rate Loan, all or a portion of such Advances bearing interest at the Alternative Base Rate shall be automatically converted to a LIBOR Rate Loan in the amount requested by the Lead Borrower, and (ii) if Advances bearing interest at the Alternative Base Rate are not outstanding in an amount at least equal to the requested LIBOR Rate Loan, the Lead Borrower shall make an electronic request via the Portal for additional Advances bearing interest at the Alternative Base Rate in an such amount, when taken with the outstanding Advances bearing interest at the Alternative Base Rate (which shall be converted automatically at such time), as is necessary to satisfy the requested LIBOR Rate Loan. If the Lead Borrower fails to make such additional request via the Portal as required pursuant to clause (ii) of the foregoing sentence, then the Borrowers shall be responsible for all amounts due pursuant to this Agreement arising on account of such failure. If the Lead Borrower fails to give a timely notice with respect to any continuation of a LIBOR Rate Loan, then the applicable Advances shall be converted to Advances bearing interest at the Alternative Base Rate effective as of the last day of the Interest Period then in effect with respect to the applicable LIBOR Rate Loans.

2.4. <u>Payments</u>.

    (a)    <u>Payments by Borrowers</u>.

        (i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account and shall be made in immediately available funds, no later than 2:00 p.m. (Boston, Massachusetts time) on the date specified herein. Any payment received by Administrative Agent later than 2:00 p.m. (Boston, Massachusetts time), shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

        (ii)    Unless Administrative Agent receives notice from Lead Borrower prior to the date on which any payment is due to a Lender hereunder that Borrowers will not make such Payment in Full as and when required, Administrative Agent and Lenders may assume that Borrowers have made (or will make) such Payment in Full to Administrative Agent on such date in immediately available funds and Administrative Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such Payment in Full to Administrative Agent on the date when due, each Lender severally shall repay to Administrative Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

        (iii)    Commencing on the Term Loan Funding Date, the Borrowers shall make monthly principal payments on the Term Loan in the amount of $150,000 each,

commencing on March 31, 2018. Any remaining amounts shall be due and payable on the Maturity Date.

      (iv)     The Borrowers shall be required to prepay the Term Loan with the Net Proceeds received by the Loan Parties from the Disposition or other sale of all Term Loan Priority Collateral received in excess of $50,000 per annum.

      (v)     No later than one (1) Business Day after the Final Order Entry Date, the Borrowers shall Pay in Full: (A) with the proceeds of the Term Loan, the total outstanding amount of the Pre-Petition Term Loan, and (B) with the proceeds of Advances hereunder, the total outstanding amount of the remainder of the Pre-Petition Obligations.

      (b)     <u>Application of Payments</u>. Except as otherwise provided in the Loan Documents, (i) all payments shall be remitted to Administrative Agent on behalf of Revolving Credit Lenders and all such payments and all proceeds of Revolving Loan Priority Collateral received by Administrative Agent, shall be applied to the Obligations in a manner determined by Administrative Agent from time to time in its Permitted Discretion, and (ii) all payments shall be remitted to Administrative Agent on behalf of Term Agent and Term Lenders and all such payments and all proceeds of Term Loan Priority Collateral received by Administrative Agent, shall be applied to the outstanding Term Loan in the inverse order of principal payments due pursuant to <u>Section 2.4(a)(iii)</u> in accordance with the percentage of outstanding Term Loans owed to each Term Lender.

    2.5.    <u>Overadvances</u>. If, at any time or for any reason, the amount of Obligations owed by Borrowers to the Revolving Credit Lenders or their Affiliates is greater than the formula limitations set forth in Section 2.1 (an "<u>Overadvance</u>"), Borrowers shall immediately (or, upon demand from Administrative Agent, if such Overadvance exists on account of a Protective Over Advance), pay to Administrative Agent, in cash, the amount of such excess, which amount shall be applied by Administrative Agent to the Obligations in accordance with Section 2.4(b). In addition, Borrower hereby promises to Pay in Full the Obligations (including principal, interest, fees, costs, and expenses) in Dollars to the Revolving Credit Lenders as and when due and payable under the terms of this Agreement and the other Loan Documents.

    2.6.    <u>Interest Rates and Letter of Credit Fee: Rates, Payments, and Calculations</u>.

      (a)     <u>Interest Rates</u>. Except as provided in clause (c) below, (i) all Obligations under the Term Loan shall bear interest on the Daily Balance thereof at a rate per annum equal to the Term Loan Interest Rate, and (ii) all other Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows: (A) if the relevant Obligation is an Advance that is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate <u>plus</u> the LIBOR Rate Margin, and (B) otherwise, at a per annum rate equal to the Alternative Base Rate <u>plus</u> the Alternative Base Rate Margin.

      (b)     <u>Letter of Credit Fee</u>. As to each outstanding Letter of Credit, Borrower shall pay Agent an L/C Fee (in addition to the charges, commissions, fees, and costs set forth in <u>Section 2.12(g)</u>) which shall accrue at a rate equal to the aggregate L/C Fees applicable to such Letters of Credit times the Daily Balance of the undrawn amount of all outstanding standby and documentary Letters of Credit.

(c)     Default Rate.  Upon the occurrence and during the continuation of an Event of Default (and at the election of Administrative Agent or, with respect to the Term Loan, the Term Agent),

(i)     all Obligations under the Term Loan shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.0%) percentage points above the per annum rate otherwise applicable hereunder, and

(ii)     all other Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.0%) percentage points above the per annum rate otherwise applicable hereunder, and

(iii)     the L/C Fees provided for above shall be increased to two percent (2.0%) percentage points above the per annum rate otherwise applicable hereunder.

the interest rates set forth in these subsections (i), (ii), and (iii) of this Section 2.6(c) shall each be referred to individually as the "Default Rate".

(d)     Payment.  Except as otherwise stated herein, interest, Letter of Credit fees, and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Revolving Loan Commitments are outstanding except for interest in respect to Revolving Credit Loans that are LIBOR Rate Loans, which shall be due and payable, in arrears, on the last day of the applicable LIBO Interest Period.  Borrowers hereby authorize Administrative Agent, from time to time, without prior notice to Borrowers, to charge such interest and fees, all Lender Expenses (as and when incurred), the charges, commissions, fees, and costs provided for in Section 2.12(e) (as and when accrued or incurred), the fees and costs provided for in Section 2.11 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including any amounts due and payable to Wells Fargo or its Affiliates in respect of Bank Products up to the amount of the then extant Bank Products Reserve) to Borrowers' Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances hereunder.  Any interest not paid when due shall be compounded by being charged to Borrowers' Loan Account and shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans hereunder.  The Administrative Agent shall provide the Lead Borrower with copies of invoices it receives in respect to Lender Expenses upon request.

(e)     Computation.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)     Intent to Limit Charges to Maximum Lawful Rate.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Agent, Term Agent, Borrowers and the Lenders, in

48

executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess or held as Collateral for the Obligations in Collateral Agent's Permitted Discretion.

2.7.    Cash Management.

(a)    Borrowers shall (i) establish and maintain cash management services of a type and on terms satisfactory to Agent, in its Permitted Discretion, at one or more of the banks set forth on Schedule 2.7 (each a "Cash Management Bank"), and shall request in writing and otherwise take such reasonable steps to ensure that all of its Account Debtors forward payment of the amounts owed by them directly to one of the cash management accounts at such Cash Management Banks, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all Collections (including those sent directly by Account Debtors to a Cash Management Bank and all cash proceeds of a Disposition) into one of the DDAs set forth on Schedule 2.7 (a "Cash Management Account") at one of the Cash Management Banks. If, notwithstanding the provisions of this Section 2.7, any Borrower receives or otherwise has dominion over or control of any Collections, such Borrower shall hold such Collections in trust for Agent, Term Agent, and Lenders and shall not commingle such Collections with any Person's other funds or deposit such Collections in any account of Borrowers or any other Person except as instructed by Agent.

(b)    Except with respect to Concentration Accounts and Disbursement Accounts (which are addressed in clause (c) below), the Loan Parties shall establish and maintain Cash Management Agreements with Agent and each Cash Management Bank set forth on Schedule 2.7 and, upon the request of Agent at any time, at any other DDA. Each such Cash Management Agreement shall be a Control Agreement and provide, among other things, that (i) the Cash Management Bank will comply with instructions of Agent directing the disposition of funds in the Cash Management Account without further consent by the Loan Parties, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) the Cash Management Bank immediately will forward by daily sweep all amounts in the applicable Cash Management Account to the Concentration Account,  and (iv) the Loan Parties shall have no (A) access to such Cash Management Account(s) or the contents thereof and (B) right to direct the distribution of any funds from such Cash Management Account(s).

(c)    Borrower has or shall establish and maintain a Cash Management Agreement with Collateral Agent and each Cash Management Bank that maintains a Concentration Account or Disbursement Account (which shall govern such Concentration Account or Disbursement Account).  Such Cash Management Agreement(s) shall each be a Control Agreement and provide, among other things, that (i) (y) with respect to a Cash Management Agreement covering any Concentration Account, such Cash Management Bank will comply with instructions of Collateral Agent directing the disposition of funds in any Concentration Account without further

49

consent by the Borrowers and (x) with respect to a Cash Management Agreement covering any Disbursement Account, upon notice from the Collateral Agent, such Cash Management Bank will comply with the instructions of the Collateral Agent directing the disposition of funds in any such Disbursement Account without further consent by the Borrower, (ii) such Cash Management Bank has no rights of setoff or recoupment or any other claim against such Concentration Account or Disbursement Account, other than for payment of its service fees and other charges directly related to the administration of any Concentration Account or Disbursement Account and for returned checks or other items of payment, (iii) in respect to a Concentration Account, (A) the Cash Management Bank immediately will forward by daily sweep all amounts in such Concentration Account to the Agent's Account; (B) Borrower shall have no access to such Concentration Account or the contents thereof and (C) Borrower shall have no right to direct the distribution of any funds from such Concentration Account.

(d) Borrower shall deliver to the Collateral Agent, at the Collateral Agent's request, Credit Card Notices for all Credit Card Processors in respect to which Agent does not enter into a Credit Card Agreement. Each such Credit Card Agreement or Credit Card Notice shall provide, among other things that each such Credit Card Processor shall transfer all proceeds of credit card charges for sales by such Borrower received by it (or other amounts payable by such Credit Card Processor) into a designated Cash Management Account on a daily basis. Borrowers shall not attempt to change any direction or designation set forth in the Credit Card Agreements regarding payment of charges without the prior written consent of Agent.

(e) At the request of the Collateral Agent, the Loan Parties have or shall deliver to the Collateral Agent notification, executed by the applicable Loan Party, to each depository institution at which a Loan Party maintains any DDA (other than DDAs established for petty cash and wages), in form and substance satisfactory to the Collateral Agent in its Permitted Discretion, of the Lenders' Liens in such DDA and, shall instruct such depository institution, upon direction of the Collateral Agent, to remit all amounts deposited from time to time in the DDA to the Agent's Account or as otherwise directed from time to time by the Collateral Agent. Loan Parties shall not establish any DDA hereafter unless, contemporaneous with such establishment, such Loan Party notifies Collateral Agent and, if requested by Collateral Agent, delivers to such depository institution the notification described herein and the Loan Parties shall not change such direction or designation without the prior written consent of the Collateral Agent.

(f) Borrower shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within thirty (30) days of notice from Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within sixty (60) days of notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Agent's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Agent's reasonable judgment.

(g) The Cash Management Accounts, Concentration Accounts, Disbursement Accounts and all other DDAs of the Loan Parties shall be cash collateral accounts, with all cash, checks and similar items of payment in such accounts securing payment of the Obligations, and in which the Loan Parties are hereby deemed to have granted a Lien on each such account to Agent.

2.8. <u>Crediting Payments</u>. The receipt of any payment item by Agent (whether from transfers to Agent by the Cash Management Banks pursuant to the Cash Management Agreements or otherwise)

shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 1:00 p.m. (Boston, Massachusetts time). If any payment item is received into the Agent's Account on a non-Business Day or after 1:00 p.m. (Boston, Massachusetts time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.9. <u>Disbursement Account</u>. Revolving Credit Lenders are authorized to make the Advances and Issuing Lender is authorized to issue the Letters of Credit and Term Lenders are authorized to make the Term Loan, in each case, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person, or without instructions if pursuant to <u>Section 2.6(d)</u>. Borrowers agree to establish and maintain the Disbursement Account (identified on <u>Schedule B-1</u> attached hereto) with Wells Fargo (the "<u>Disbursement Account Bank</u>") for the purpose of receiving the proceeds of the Advances requested by Borrower and made by Revolving Credit Lenders hereunder. So long as no Default or Event of Default has occurred and is continuing, Borrower may add or replace, the Disbursement Account Bank or the Disbursement Account on thirty (30) days prior written notice to Administrative Agent; <u>provided</u>, <u>however</u>, that (i) such prospective Disbursement Account Bank shall be satisfactory to Administrative Agent in its Permitted Discretion and Administrative Agent shall have consented in writing in advance to the opening of such Disbursement Account with the prospective Disbursement Account Bank, and (ii) prior to the time of the opening of such Disbursement Account, Borrower, Administrative Agent and such prospective Disbursement Account Bank shall have executed and delivered to Administrative Agent a Control Agreement with respect to the Disbursement Account. Unless otherwise agreed by Administrative Agent and Borrowers, any Advance requested by Borrowers and made by Revolving Credit Lenders or the Term Loan made by the Term Lenders hereunder shall be made to the Disbursement Account.

2.10. <u>Maintenance of Loan Account and Term Loan Account and Statements of Obligations</u>. Administrative Agent shall maintain an account on its books in the name of Borrowers (the "<u>Loan Account</u>") on which Borrowers will be charged with all Advances made by Revolving Credit Lenders, to Borrowers or for Borrowers' account, the Letters of Credit issued by Issuing Lender for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents (except for the Term Loan and Bank Product Obligations), including, accrued interest, fees and expenses, which are then due and payable hereunder, and Lender Expenses which are then due and payable herewith. Term Agent shall maintain an account on its books in the name of Borrowers (the "<u>Term Loan Account</u>") on which Borrowers will be charged with all Term Loans made by Term Lenders, to Borrowers or for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents with respect to the Term Loan, including, accrued interest, fees and expenses, which are then due and payable hereunder, and Lender Expenses which are then due and payable herewith (without duplication of any Lender Expenses charged to the Loan Account). In accordance with <u>Section 2.8</u>, the Loan Account or Term Loan Account, as applicable, will be credited with all payments received by Administrative Agent from Borrowers or for Borrowers' account, including all amounts received in the Agent's Account from any Cash Management Bank; <u>provided</u>, <u>however</u>, notwithstanding anything herein to the contrary: (1) prior to the Payment in Full of the Pre-Petition Obligations (other than the Pre-Petition Term Loan), rather than being applied to the "Loan Account" hereunder, all amounts so received by the Administrative Agent shall be credited to the "Loan Account" (as defined in the Pre-Petition Credit Agreement) for application to the Pre-Petition Obligations (other than the Pre-Petition Term Loan) in accordance with Section 18.7(c) thereof, and (2) prior to the Payment in Full of the Pre-Petition Term Loan, rather than being applied to the "Term Loan Account" hereunder, all amounts so received by the

51

Administrative Agent shall be credited to the "Term Loan Account" (as defined in the Pre-Petition Credit Agreement) for application to the Pre-Petition Term Loan in accordance with Section 18.7(d) thereof.

Administrative Agent shall render statements regarding the Loan Account to Borrowers and Term Agent shall render statements regarding the Term Loan Account to Borrowers, including principal, interest, fees, and including an itemization of all charges and expenses constituting the applicable Lender Expenses owing, and such statements shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Administrative Agent or Term Loan Agent, as applicable, unless, within thirty (30) days after receipt thereof by Lead Borrower, Lead Borrower shall deliver to Administrative Agent and Term Agent written objection thereto describing the error or errors contained in any such statements.

2.11. <u>Fees.</u> Borrower shall pay to the Agent, Term Agent, and Lenders, as applicable, the following fees and charges, which fees and charges shall be non-refundable when paid (irrespective of whether this Agreement is terminated thereafter):

(a) <u>Unused Line Fee.</u> On the first day of each month during the term of this Agreement, an unused line fee in an amount equal to the applicable "Unused Line Fee Percentage" specified in the Margin Pricing Grid for such date times the result of (a) the Revolving Credit Ceiling less the average daily balance of Revolver Usage during the immediately preceding month.

(b) <u>Agent's Fees.</u> Borrowers shall pay Administrative Agent, for its sole account, and pursuant to the Fee Letter, the Agent's Closing Fee on the Closing Date. The Agent's Closing Fee shall be fully earned and payable on the Closing Date and non-refundable when paid. The Borrowers shall pay to the Administrative Agent for its own account such other fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c) <u>Audit, Appraisal, Valuation, and Consultant Charges.</u> For the separate account of Agent, Borrowers shall, to the extent provided for in <u>Section 5.8</u>, pay all audit, appraisal, valuation fees and the fees of any advisor or consultant <u>plus</u> out-of-pocket expenses, for each audit, appraisal, and valuation of the Collateral performed by or at the request of Agent, or each advisor or consultant retained by or at the request of the Agent, or the actual charges paid or incurred by Agent if it elects to employ the services of one or more third Persons to perform financial audits of Borrowers, to appraise the Collateral, or any portion thereof, or to assess Borrowers' business valuation and operations.

(d) <u>Reserved.</u>

(e) <u>Term Agent's Fees.</u> Borrowers shall pay Term Agent, for its sole account, and pursuant to the Fee Letter, the Term Agent's Closing Fee on the Closing Date. The Term Agent's Closing Fee shall be fully earned and payable on the Closing Date and non-refundable when paid. The Borrowers shall pay to the Term Agent for its own account such other fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.12. <u>Letters of Credit.</u>

(a) <u>The Letter of Credit Commitment.</u>

(i)     Subject to the terms and conditions set forth herein, (A) the Administrative Agent, in reliance upon the agreements of the Revolving Credit Lenders set forth in this Section 2.12 shall endeavor to cause the Issuing Lender from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue letters of credit for the account of the Borrowers (each, an "L/C") or to undertake to purchase participations or execute indemnities or Reimbursement Obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer (as of the Closing Date, the prospective Underlying Issuer is Wells Fargo) for the account of Borrowers, and to amend or extend Letters of Credit previously issued by the Issuing Lender, in accordance with Section 2.12(b) below and (B) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued for the account of the Borrowers and any drawings thereunder; provided that (w) after giving effect to the issuance of any requested Letter of Credit, Revolver Usage plus Pre-Petition Total Revolving Outstandings shall not exceed the Revolving Credit Ceiling, (x) such Letter of Credit shall not be issued in an amount which would exceed Availability as in effect immediately prior to its issuance, (y) any Revolving Credit Lender's Commitment Percentage of Revolver Usage shall not exceed such Revolving Credit Lender's individual Revolving Loan Commitment as set forth on Exhibit 2.15, (y) Letter of Credit Usage shall not exceed the Letter of Credit Sublimit, and (z) the expiry date of the proposed Letter of Credit is no later than thirty (30) days prior to the Maturity Date (the "Letter of Credit Expiration Date"). Each request by the Lead Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrowers that the issuance or amendment so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)     No Letter of Credit shall be issued, if:

(I)     with respect to Standby L/C, subject to Section 2.12(b)(iii), the expiry date of such requested Standby L/C would occur more than twelve months after the date of issuance or last extension, unless the Majority Revolving Lenders have approved such expiry date; or

(II)     with respect to Documentary Letters of Credit, subject to Section 2.12(b)(iii), the expiry date of such requested Documentary Letter of Credit would occur more than one hundred twenty (120) days after the date of issuance or last extension, unless the Majority Revolving Lenders have approved such expiry date; or

(III)     the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the Letter of Credit Expiration Date or all the Lenders have approved such expiry date.

(iii)     No Letter of Credit shall be issued without the prior consent of the Administrative Agent and Issuing Lender if:

(I)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Lender from issuing such Letter of Credit, or any Applicable Law or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Lender shall prohibit, or request that the Issuing Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Lender is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the Issuing Lender any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which the Issuing Lender in good faith deems material to it;

(II)     the issuance of such Letter of Credit would violate one or more policies of the Issuing Lender applicable to letters of credit generally;

(III)     such Letter of Credit is to be denominated in a currency other than Dollars; provided that if the Issuing Lender, in its discretion and with the consent of the Administrative Agent, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars; or

(IV)     a default of any Revolving Credit Lender's obligations to fund under Section 2.12(c) exists or any Lender is at such time a Defaulting Lender hereunder, unless the Administrative Agent or the Issuing Lender has entered into satisfactory arrangements with the Borrowers or such Defaulting Lender to eliminate the Issuing Lender's risk with respect to such Lender.

(iv)     The Issuing Lender shall not amend any Letter of Credit if the Issuing Lender would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or if the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(v)     The Issuing Lender shall act on behalf of the Revolving Credit Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Lender shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article 19 with respect to any acts taken or omissions suffered by the Issuing Lender in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article 19 included the Issuing Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Lender.

(b)     Procedures for Issuance and Amendment of Letters of Credit.

(i)     Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Lead Borrower delivered to the Administrative Agent in the form of a Letter of Credit application in form and substance satisfactory to the Issuing Lender,

54

in its Permitted Discretion, (the "Letter of Credit Application"), appropriately completed and signed by an Authorized Person. Any Letter of Credit Application or other document delivered hereunder that is signed by an Authorized Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action and such Authorized Person shall be conclusively presumed to have acted on behalf of the Borrowers. Such Letter of Credit Application must be received by the Administrative Agent not later than 1:00 p.m., Boston, Massachusetts time, at least two (2) Business Days (or such other date and time as the Administrative Agent may agree in a particular instance in its sole discretion) prior to the proposed issuance date or date of amendment, as the case may be. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Administrative Agent, in its Permitted Discretion, and Issuing Lender: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the Administrative Agent or Issuing Lender may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the Administrative Agent and Issuing Lender in their Permitted Discretion: (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Administrative Agent and Issuing Lender may require in their Permitted Discretion. Additionally, the Borrowers shall furnish to the Issuing Lender and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the Issuing Lender or the Administrative Agent may reasonably require.

(ii) Immediately upon the issuance or amendment of each Letter of Credit, each Lender shall be deemed to (without any further action), and hereby irrevocably and unconditionally agrees to, purchase from the Issuing Lender, without recourse or warranty, a risk participation in such Letter of Credit in an amount equal to the product of such Revolving Credit Lender's Revolving Loan Commitment Percentage times the amount of such Letter of Credit. Upon any change in the Revolving Loan Commitments under this Agreement, it is hereby agreed that with respect to all L/C Usage, there shall be an automatic adjustment to the participations hereby created to reflect the new Revolving Loan Commitment Percentages of the assigning and assignee Revolving Credit Lenders.

(iii) Reserved..

(iv) Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the Issuing Lender will make available to the Borrowers and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c) Drawings and Reimbursements; Funding of Participations.

(i)     Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the Issuing Lender shall notify the Administrative Agent thereof and the Administrative Agent shall notify the Borrowers; provided, however, that any failure to give or delay in giving such notice shall not relieve the Borrowers of its obligation to reimburse the Issuing Lender and the Revolving Credit Lenders with respect to any such payment.  Not later than 1:00PM on the date of any payment made by the Issuing Lender under a Letter of Credit if such notice of a Letter of Credit drawing is received by the Lead Borrower before 12:00PM on such date or 1:00PM on the first Business Day immediately following the date of any payment made by the Issuing Lender under a Letter of Credit if such notice of a Letter of Credit drawing is received after 1:00PM (each such date, an "Honor Date"), the Borrowers shall reimburse the Issuing Lender through the Administrative Agent in an amount equal to the amount of such drawing.  If the Borrowers fail to so reimburse the Issuing Lender by such time, the Administrative Agent shall promptly notify each Revolving Credit Lender of the Honor Date, the amount of the unreimbursed drawing (the "Unreimbursed Amount"), and the amount of such Revolving Credit Lender's Revolving Loan Commitment Percentage thereof.  In such event, the Borrowers shall be deemed to have requested a Borrowing of Base Rate Loans to be disbursed on the Honor Date in an amount equal to the Unreimbursed Amount subject to the amount of the unutilized Revolving Loan Commitments and the conditions set forth in Section 4.2.  Any notice given by the Issuing Lender or the Administrative Agent pursuant to this Section 2.12(c)(i) may be given by telephone or electronic means.

(ii)     Each Revolving Credit Lender shall upon any notice pursuant to Section 2.12(c)(i) make funds available to the Administrative Agent for the account of the Issuing Lender in an amount equal to its Revolving Loan Commitment Percentage of the Unreimbursed Amount not later than 1:00 p.m., Boston, Massachusetts time, on the Business Day specified in such notice by the Administrative Agent, whereupon, subject to the provisions of Section 2.12(c)(iii), each Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount.  The Administrative Agent shall remit the funds so received to the Issuing Lender.

(iii)     With respect to any Unreimbursed Amount that is not fully refinanced by a Borrowing of Base Rate Loans because the conditions set forth in Section 4.2 cannot be satisfied or for any other reason, the Borrowers shall be deemed to have incurred from the Issuing Lender a Borrowing in the amount of the Unreimbursed Amount that is not so refinanced (such Borrowing, an "L/C Borrowing"), which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate.  In such event, each Revolving Credit Lender's payment to the Administrative Agent for the account of the Issuing Lender pursuant to Section 2.12(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an Advance from such Revolving Credit Lender in satisfaction of its participation obligation under this Section 2.12 (each such Advance, an "L/C Advance").

(iv)     Until each Revolving Credit Lender funds its Base Rate Loan or L/C Advance pursuant to this Section 2.12(c) to reimburse the Issuing Lender for any amount drawn under any Letter of Credit, interest in respect of such Revolving Credit Lender's Revolving Loan Commitment Percentage of such amount shall be solely for the account of the Issuing Lender.

56

(v)     Each Revolving Credit Lender's obligation to make Base Rate Loans or L/C Advances to reimburse the Issuing Lender for amounts drawn under Letters of Credit, as contemplated by this Section 2.12(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Credit Lender may have against the Issuing Lender, the Borrowers or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default or Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing. No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrowers to reimburse the Issuing Lender for the amount of any payment made by the Issuing Lender under any Letter of Credit, together with interest as provided herein.

(vi)     If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Issuing Lender any amount required to be paid by such Revolving Credit Lender pursuant to the foregoing provisions of this Section 2.12(c) by the time specified in Section 2.12(c)(ii), the Issuing Lender shall be entitled to recover from such Revolving Credit Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Issuing Lender at a rate per annum equal to the greater of the Base Rate and a rate determined by the Issuing Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Issuing Lender in connection with the foregoing. If such Revolving Credit Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Credit Lender's Advance included in the relevant Borrowing or L/C Advance in respect of the relevant L/C Borrowing, as the case may be. A certificate of the Issuing Lender submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)     Repayment of Participations.

(i)     At any time after the Issuing Lender has made a payment under any Letter of Credit and has received from the Administrative Agent a Lender's L/C Advance in respect of such payment in accordance with Section 2.12(c), if the Administrative Agent receives for the account of the Issuing Lender any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrowers or otherwise, including proceeds of Cash Collateral, in form and substance satisfactory to Agent, applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Revolving Credit Lender its Revolving Loan Commitment Percentage thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the Administrative Agent for the account of the Issuing Lender pursuant to Section 2.12(c)(i) is required to be returned under any of the circumstances described in Section 21.7 (including pursuant to any settlement entered into by the Issuing Lender in its discretion), each Revolving Credit Lender shall pay to the Administrative Agent for the account of the Issuing Lender its Revolving Loan Commitment Percentage thereof on demand of the Administrative Agent, plus interest

57

thereon from the date of such demand to the date such amount is returned by such Revolving Credit Lender, at a rate per annum equal to the Base Rate from time to time in effect. The obligations of the Revolving Credit Lenders under this clause shall survive the Payment in Full of the Obligations and the termination of this Agreement.

(e)     Obligations Absolute. The obligation of the Borrowers to reimburse the Issuing Lender for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that the Borrowers or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the Issuing Lender or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit, provided that the Issuing Lender has acted commercially reasonably;

(iv)     any payment by the Issuing Lender under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the Issuing Lender under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any Insolvency Proceeding;

(v)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrowers or any of its Subsidiaries; or

(vi)     the fact that any Default or Event of Default shall have occurred and be continuing.

Borrowers shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrowers' instructions or other irregularity, the Lead Borrower will immediately notify the Administrative Agent and the Issuing Lender. The Borrowers shall be conclusively deemed to have waived any such claim against the Issuing Lender and its correspondents unless such notice is given as aforesaid.

(f)     Role of Issuing Lender. Each Revolving Credit Lender and each Borrower agree that, in paying any drawing under a Letter of Credit, the Issuing Lender shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents

expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Issuing Lender, the Administrative Agent or each of their respective Affiliates, officers, directors, employees, agents, attorneys, and attorneys-in-fact nor any correspondent, participant or assignee of the Issuing Lender shall be liable to any Revolving Credit Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Majority Revolving Lenders, as applicable; (ii) any action taken or omitted in the absence of a breach of this Agreement, violation of Applicable Law, gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. Each Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Issuing Lender, the Administrative Agent, any of their respective officers, directors, employees, agents, attorneys, and attorneys-in-fact nor any correspondent, participant or assignee of the Issuing Lender shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.12(e); provided, however, that anything in such clauses to the contrary notwithstanding, the Borrowers may have a claim against the Issuing Lender, and the Issuing Lender may be liable to the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrowers which the Borrowers prove were caused by the Issuing Lender's breach of this Agreement, violation of Applicable Law, willful misconduct or gross negligence or the Issuing Lender's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, the Issuing Lender may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the Issuing Lender may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit), and the Issuing Lender shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g) <u>Underlying L/Cs</u>.

(i) Each Borrower agrees to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit. Each Borrower understands that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer. Each Borrower hereby agrees to indemnify, save, defend, and hold the Issuing Lender harmless with respect to any loss, cost, expense (including reasonable attorneys' fees), or liability incurred by the Issuing Lender under any L/C Undertaking as a result of the Issuing Lender's indemnification of any Underlying Issuer; provided, however, that Borrowers shall not be obligated hereunder to indemnify for any loss, cost, expense, or

liability that is caused by the gross negligence or willful misconduct of the Issuing Lender.

(ii)     Each Borrower hereby authorizes and directs any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(iii)    Any and all charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Agent Expenses for purposes of this Agreement and immediately shall be reimbursable by Borrowers to Agent for the account of the Issuing Lender; it being acknowledged and agreed by Borrowers that, as of the Closing Date, the issuance charge imposed by the prospective Underlying Letter of Credit is 0.825% per annum times the face amount of each Underlying Letter of Credit, that such issuance charge may be changed from time to time, and that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

(h)     Increased Cost.

If by reason of any Change in Law:

(I)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(II)    there shall be imposed on the Underlying Issuer, Issuing Lender or the Agent any other condition regarding any Underlying Letter of Credit or any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to the Underlying Issuer, Issuing Lender, or Agent of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by the Underlying Issuer, Issuing Lender, or Agent, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify the Lead Borrower (or Agent may so notify Lead Borrower on Issuing Lender's behalf), and Borrowers shall pay on demand such amounts as Agent may specify to be necessary to compensate for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until Payment in Full thereof at the rate then applicable to Base Rate Loans hereunder. The determination by Underlying Issuer, Issuing Lender, or Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto. This Section 2.12(h) shall not require the Borrowers to pay any additional amount it has already paid pursuant to Section 11.2 hereof.

(i)     Cash Collateral. Upon the request of the Administrative Agent, (i) if the Issuing Lender has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then extant Letter of Credit Usage. For purposes of this Section 2.12, "Cash Collateralize" means to pledge and deposit with or deliver to the Collateral Agent, for the benefit of the Issuing Lender and the Revolving Credit Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% (in the case of

60

Letters of Credit denominated in a currency other than Dollars in an amount at least equal to 110%) of the then extant Letter of Credit Usage, pursuant to documentation in form and substance satisfactory to the Collateral Agent and the Issuing Lender in their Permitted Discretion (which documents are hereby Consented to by the Revolving Credit Lenders). Derivatives of such term have corresponding meanings. The Borrowers hereby grant to the Collateral Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at Wells Fargo or an account maintained by the Administrative Agent. If at any time the Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than the aggregate L/C Usage, the Borrowers will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate outstanding amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under Applicable Law, to reimburse the Issuing Lender and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(j) . <u>Documentary and Processing Charges Payable to Issuing Lender</u>. The Borrowers shall pay to the Administrative Agent on behalf of the Issuing Lender for the Issuing Lender's own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the Issuing Lender relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k) <u>Consignment of Bill of Lading</u>. The Borrowers shall upon the request of the Administrative Agent consign to the Collateral Agent, or the Issuing Lender any bill of lading which Inventory which is supported by a Documentary Letter of Credit issued by the Issuing Lender.

(l) <u>Conflict with Issuer Documents</u>. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(m) <u>Indemnification</u>. The Borrowers hereby agree to indemnify, save, defend, and hold Agent, Issuing Lender and each Revolving Credit Lender harmless from any loss, cost, expense, or liability, and reasonable attorneys' fees incurred by Agent, Issuing Lender or any Revolving Credit Lender arising out of or in connection with any Letter of Credit including any such loss or claim due to any action taken by any Issuing Lender; <u>provided</u>, <u>however</u>, that Borrowers shall not be obligated hereunder to indemnify the Agent, Issuing Lender or any Revolving Credit Lender for any loss, cost, expense, or liability that is caused by the bad faith, gross negligence or willful misconduct of such Person. The Borrowers further agree to hold Agent and each Lender harmless from any errors or omission, negligence or misconduct by the Issuing Lender. Each Borrower agrees to be bound by the Agent's, Issuing Lender's or Underlying Issuer's regulations and interpretations of any Letter of Credit, even though this interpretation may be different from a Borrowers' own, and the each Borrower understands and agrees that none of the Agent, the Lenders, or any Issuing Lender shall be liable for any error, negligence, or mistake, whether of omission or commission, in following the Borrower's instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto other than those caused by its own bad faith, gross negligence or willful misconduct. The Borrowers understand that L/C Undertakings may require Revolving Credit

61

Lender to indemnify the Issuing Lender for certain costs or liabilities arising out of claims by the Borrowers against such Issuing Lender. Each Borrower hereby agrees to indemnify, save, defend, and hold each Revolving Credit Lender harmless with respect to any loss, cost, expense (including reasonable attorneys' fees), or liability incurred by Lender under any L/C Undertaking as a result of Lender's indemnification of any Underlying Issuer; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability that is caused by the bad faith, gross negligence or willful misconduct of such Revolving Credit Lender.

(n)     Existing Letters of Credit.     The Loan Parties and the Secured Parties hereby acknowledge and agree that all Existing Letters of Credit shall constitute Letters of Credit under this Agreement on and after the Closing Date with the same effect as if such Existing Letters of Credit were issued by L/C Issuer at the request of the Borrowers on the Closing Date.

2.13.   LIBOR Option.

(a)     Interest and Interest Payment Dates.     In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option (the "LIBOR Option") to have interest on all or a portion of the Advances be charged at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the first Business Day of each calendar month after the Closing Date; (ii) the occurrence of an Event of Default in consequence of which the Agent elects or is directed by the Lenders to accelerate the maturity of all or any portion of the Obligations; or (iii) termination of this Agreement pursuant to the terms hereof. On the last day of each applicable Interest Period, unless Borrowers properly have exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, Borrowers no longer shall have the option to request that Advances bear interest at the LIBOR Rate and Administrative Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans (other than with respect to the Term Loan) to the rate then applicable to Base Rate Loans hereunder.

(b)     LIBOR Election.

(i)     Borrowers may, at any time, and from time to time so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Administrative Agent prior to 1:00 p.m. (Boston, Massachusetts time) at least three (3) Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of Borrowers' election of the LIBOR Option for a permitted portion of the Advances and an Interest Period pursuant to this Section shall be made by delivery to Administrative Agent of a LIBOR Notice received by Administrative Agent before the LIBOR Deadline, or by telephonic notice received by Administrative Agent before the LIBOR Deadline (to be confirmed by delivery to Administrative Agent of a LIBOR Notice received by Lender prior to 5:00 p.m. (Boston, Massachusetts time) on the same day). Promptly upon its receipt of each such LIBOR Notice, Administrative Agent shall provide a copy thereof to each of the Revolving Credit Lenders having a Revolving Loan Commitment.

(ii)     Each LIBOR Notice shall be irrevocable and binding on Borrowers. In connection with each LIBOR Rate Loan, Borrower shall indemnify, defend, and hold

Administrative Agent and Revolving Credit Lenders harmless against any loss, cost, or expense incurred by Administrative Agent or Revolving Credit Lenders as a result of (a) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses"). Funding Losses shall, with respect to Revolving Credit Lenders, be deemed to equal the amount determined by Administrative Agent to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which Revolving Credit Lenders would be offered were it to be offered, at the commencement of such period, or Dollar deposits of a comparable amount and period in the London interbank market. A certificate of Administrative Agent delivered to Lead Borrower setting forth any amount or amounts that Revolving Credit Lenders are entitled to receive pursuant to this Section shall be conclusive absent manifest error.

(iii)     Borrowers shall have not more than five (5) LIBOR Rate Loans in effect at any given time under the Revolving Credit Loan. Borrowers only may exercise the LIBOR Option for LIBOR Rate Loans of at least $1,000,000 and integral multiples of $500,000 in excess thereof.

(c)     Prepayments. Borrowers may prepay LIBOR Rate Loans under the Revolving Credit Loan at any time; provided, however, that in the event that such LIBOR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Administrative Agent of proceeds of Collections in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, Borrowers shall indemnify, defend, and hold Agent and Revolving Credit Lenders and their respective Participants harmless against any and all Funding Losses in accordance with clause (b)(ii) above.

(d)     Special Provisions Applicable to LIBOR Rate.

(i)     The LIBOR Rate may be adjusted by Administrative Agent on a prospective basis to take into account any additional or increased costs to the Revolving Credit Lenders of maintaining or obtaining any eurodollar deposits or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the Administrative Agent shall give Lead Borrower of such a determination and adjustment and, upon its receipt of the notice from the Administrative Agent, Lead Borrower may, by notice to the Administrative Agent (y) require the Administrative Agent to furnish to

Lead Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (z) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under clause (b)(ii) above).

(ii)      In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of the Administrative Agent, make it unlawful or impractical for the Revolving Credit Lenders to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, the Administrative Agent shall give notice of such changed circumstances to Lead Borrower and (y) in the case of any LIBOR Rate Loans that are outstanding, the date specified in the Administrative Agent's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of the Revolving Credit Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrowers shall not be entitled to elect the LIBOR Option until the Administrative Agent determines that it would no longer be unlawful or impractical to do so.

(e)      <u>No Requirement of Matched Funding</u>. Anything to the contrary contained herein notwithstanding, neither Agent nor Revolving Credit Lenders, nor any of their respective Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of this Section shall apply as if the Revolving Credit Lenders or Participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

2.14.    <u>Capital Requirements</u>. If, after the date hereof, the Agent or any Revolving Credit Lender determines that any Change in Law will have the effect of reducing the return on the Agent's or Revolving Credit Lender's or such holding company's capital as a consequence of its commitments hereunder to a level below that which the Agent or Revolving Credit Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the Agent's or Revolving Credit Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by the Agent or Revolving Credit Lender to be material, then the Agent may notify Borrowers thereof. Following receipt of such notice, Borrowers agree to pay the Agent or the affected Lenders on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within ninety (90) days after presentation by the Agent of a statement in the amount and setting forth in reasonable detail the Agent's or Revolving Credit Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).

2.15.    <u>Lenders' Commitments</u>.

(a)    Subject to <u>Section 15.1</u> (which provides for assignments and assumptions of Commitments), each Revolving Credit Lender's "Revolving Loan Commitment Percentage", and "Revolving Loan Commitment" and Term Lender's "Term Loan Commitment Percentage" and "Term Loan Commitment" (respectively so referred to herein) is set forth on <u>Exhibit 2.15</u>, annexed hereto.

64

(b)     The obligations of each Term Lender are several and not joint. No Term Lender shall have any obligation to make any portion of the Term Loan in excess of that Term Lender's Term Loan Commitment Percentage.

(c)     The obligations of each Revolving Credit Lender are several and not joint. No Revolving Credit Lender shall have any obligation to make any Advance under the Revolving Credit in excess of either of the following:

(i)     That Revolving Credit Lender's Commitment Percentage of the subject Advance or of Availability.

(ii)     Any Advance which, when aggregated with (i) all other Advances made by that Revolving Credit Lender (either under this Agreement or the Pre-Petition Credit Agreement) then outstanding and (ii) the amount of the Lender's Revolving Loan Commitment Percentage of the Stated Amount of all Letters of Credit outstanding, exceed that Revolving Credit Lender's Revolving Loan Commitment.

(d)     No Lender shall have any liability to the Borrowers on account of the failure of any other Lender to provide any Advance or any portion of the Term Loan nor any obligation to make up any shortfall which may be created by such failure.

(e)     The Revolving Loan Commitments, Revolving Loan Commitment Percentages, and identities of the Revolving Credit Lenders may be changed, from time to time by the reallocation or assignment of Revolving Loan Commitments and Revolving Loan Commitment Percentages amongst the Revolving Loan Lenders or with other Persons who determine to become "Revolving Credit Lenders" pursuant to Section 15.1 hereof. The identities of the Term Lenders may be changed, from time to time by the reallocation or assignment of outstanding principal amounts of the Term Loan amongst the Term Lenders or with other Persons who determine to become "Term Lenders" pursuant to Section 15.1 hereof

(f)     Upon written notice given to the Lead Borrower from time to time by the Administrative Agent, of any assignment or allocation referenced herein:

(i)     Borrowers shall execute one or more replacement Revolving Credit Notes or Term Loan Notes to reflect such changed Commitments (or, if such Commitments have been terminated, the outstanding Revolving Credit Loans or Term Loan, as applicable) and related percentages, and identities, and shall deliver such replacement Revolving Credit Notes or Term Loan Notes to the Administrative Agent or Term Agent, as applicable (which promptly thereafter shall deliver to the Borrowers the Revolving Credit Notes or Term Loan Notes so replaced) provided however, in the event that a Revolving Credit Note or Term Loan Note is to be exchanged following its acceleration or the entry of an order for relief under the Bankruptcy Code with respect to the Borrowers, the Administrative Agent, in lieu of causing the Borrowers to execute one or more new Revolving Credit Notes or Term Loan Notes, may issue a certificate confirming the resulting Commitments (or, if such Commitments have been terminated, the outstanding Revolving Credit Loans or Term Loan, as applicable) and related percentages.

(ii)     Such change shall be effective from the effective date specified in such written notice and any Person added as a Revolving Credit Lender or Term Lender, as applicable, shall have all rights and privileges of a Revolving Credit Lender or Term

8478014v8

Lender, as applicable, hereunder thereafter as if such Person had been a signatory to this Agreement and any other Loan Document to which a Revolving Credit Lender or Term Lender, as applicable, is a signatory and any Person removed as a Revolving Credit Lender or Term Lender, as applicable, shall be relieved of any obligations or responsibilities of a Revolving Credit Lender or Term Lender, as applicable, hereunder thereafter.

2.16.   Mitigation. If any Lender requests compensation under Sections 2.12(h), 2.13(d) or 2.14 or Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender, then such Lender shall, if requested by Borrowers, use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder, to assign its rights and obligations hereunder to another of its offices, branches or affiliates or to take such other actions as such Lender or Agent or Term Agent determines, if, in the good faith judgment of such Lender, such designation, assignment or other action (i) would eliminate or reduce amounts payable pursuant to such Sections in the future and (ii) would not subject Agent, Term Agent, or such Lender to any unreimbursed cost or expense and Agent, Term Agent, or such Lender would not suffer any economic, legal or regulatory disadvantage.  Borrowers hereby agree to pay on demand all reasonable costs and expenses incurred by Agent, Term Agent, or any Lender in connection with any such designation or assignment.

2.17.   Designation of Lead Borrower as Borrowers' Agent.

(a)     Each Borrower hereby irrevocably designates and appoints TWC as that Borrower's agent (in such capacity, the "Lead Borrower") to obtain the Term Loan and Advances and the issuance of Letters of Credit, the proceeds of which shall be available to each Borrower for those uses permitted hereunder.  As the disclosed principal for its agent, each Borrower shall be obligated to the Agents, Term Agent, and each Lender, as applicable, on account of Advances, or Letters of Credit so made as if made directly by the Revolving Credit Lenders or Term Lenders, as applicable, to that Borrower, notwithstanding the manner by which such Advances are recorded on the books and records of the Lead Borrower and of any Borrower.

(b)     Each Borrower recognizes that credit available to it under the Revolving Credit and Term Loan is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facilities contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to fully, faithfully, and punctually discharge all Obligations of all of the Borrowers.

(c)     The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested an Advance.

(d)     The proceeds of each Advance which is requested by the Lead Borrower shall be deposited into the Disbursement Account or as otherwise indicated by the Lead Borrower.  The Lead Borrower shall cause the transfer of the proceeds thereof to the (those) Borrower(s) on whose behalf such Advance was obtained.  None of the Agent, Term Agent or any Lender shall have any obligation to see to the application of such proceeds by the Lead Borrower.

2.18.   Joint and Several Liability of Borrowers.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agent, Term Agent, and Lenders under this Agreement, for the mutual benefit, directly and

66

indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.18), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Person composing Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this Section 2.18 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Advances or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent, Term Agent, or any Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by Applicable Law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent, Term Agent, or any Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent, Term Agent, or any Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Person composing Borrowers. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the Agent, Term Agent, or any Lender with respect to the failure by any of the Borrowers to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.18 afford grounds for terminating, discharging or relieving any Person composing Borrowers, in whole or in part, from any of its Obligations under this Section 2.18, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrower under this Section 2.18 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.18 shall not be diminished or rendered unenforceable by any

winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Person composing Borrowers, Agent, Term Agent, or any Lender. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of any of the Persons composing Borrowers, the Agent, Term Agent, or any Lender.

(f)        Each Person composing Borrowers represents and warrants to Agent, Term Agent, and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Person composing Borrowers further represents and warrants to Agent, Term Agent, and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Person composing Borrowers hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)        Each of the Persons composing Borrowers waives all rights and defenses arising out of an election of remedies by the Agent, Term Agent, or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Agent's, Term Agent's, or any Lender's rights of subrogation and reimbursement against such Borrower by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise.

(h)        The provisions of this Section 2.18 are made for the benefit of the Agent, Term Agent, and Lenders, and their successors and assigns, and may be enforced by Agent, Term Agent, or them from time to time against any or all of the Persons composing Borrowers as often as occasion therefor may arise and without requirement on the part of the Agent, Term Agent, or any Lender, successor or assign first to marshal any of its claims or to exercise any of its rights against any of the other Persons composing Borrowers or to exhaust any remedies available to it against any of the other Persons composing Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.18 shall remain in effect until all of the Obligations shall have been Paid in Full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Agent, Term Agent, or any Lender upon the insolvency, bankruptcy or reorganization of any of the Persons composing Borrowers, or otherwise, the provisions of this Section 2.18 will forthwith be reinstated in effect, as though such payment had not been made.

(i)        Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agent, Term Agent, or any Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been Paid in Full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent, Term Agent, or any Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior Payment in Full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any

68

Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be Paid in Full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(j)     Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior Payment in Full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been Paid in Full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

2.19.     Release.     Subject to the terms of the Financing Orders, each Loan Party hereby acknowledges that no Loan Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Loan Parties' liability to repay the Secured Parties as provided in this Agreement and the Pre-Petition Credit Agreement or to seek affirmative relief or damages of any kind or nature from any Secured Party or any "Secured Party" (as defined in the Pre-Petition Credit Agreement). Subject to the terms of the Financing Orders, each Loan Party, on behalf of itself and its bankruptcy estate, and on behalf of all its successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges each Secured Party and their respective Affiliates, and each of their respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, participants, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the Pre-Petition Credit Agreement and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, in each case other than the obligations of the Released Parties arising under this Agreement and the other Loan Documents.

2.20.     Waiver of any Priming Rights.     Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations or Pre-Petition Obligations shall be outstanding, each Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or in connection with any Insolvency Proceedings or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations or Pre-Petition Obligations, or to approve a claim of equal or greater priority than the Obligations or Pre-Petition Obligations, other than as set forth in a Financing Order.

69

**3.**      **Intentionally Omitted.**

**4.**      **CONDITIONS; TERM OF AGREEMENT.**

     4.1.    <u>Conditions Precedent to the Initial Extension of Credit</u>. The obligation of the Revolving Credit Lenders to make the initial Advance (or otherwise to extend any credit provided for hereunder) on the Closing Date, is subject to the fulfillment, to the satisfaction of Agent, Term Agent, and each of the Lenders, of each of the conditions precedent set forth below:

         (a)      Borrowers shall have paid all fees and expenses required to be paid to the Agent, Term Agent, and Lenders under this Agreement, the Fee Letter, and any other Loan Document shall have been paid in full;

         (b)      Collateral Agent shall have filed all Code financing statements and intellectual property related filings required by Collateral Agent and Collateral Agent shall have received searches reflecting (x) the filing of all such financing statements and (y) that Lenders' Liens in the Collateral are (after giving effect to this Agreement and subject to the Permitted Liens and any UCC-3 termination statements which Collateral Agent has been duly authorized to file) perfected first priority security interests;

         (c)      Administrative Agent and Term Agent shall have received and reviewed lien and judgment search results for the jurisdiction of organization of each Loan Party, the jurisdiction of the chief executive office of each Loan Party and all jurisdictions in which assets of the Loan Parties are located, which search results shall be in form and substance satisfactory to Administrative Agent and Term Agent;

         (d)      Administrative Agent and Term Agent shall have received searches of ownership of intellectual property, and any liens thereon, in the appropriate governmental offices of such patent/trademark/copyright filings as requested by Administrative Agent and Term Agent;

         (e)      Administrative Agent and Term Agent shall have received evidence that originals of the shares of the stock certificates, if any, representing all of the issued and outstanding shares of the Stock of each Loan Party (and any other Person) that is owned by any Loan Party, in each case together with stock powers duly executed in blank with respect thereto have been delivered to the Collateral Agent;

         (f)      Agent, Term Agent, and Lenders shall have received (or confirmed its receipt of) each of the following documents, in form and substance satisfactory to Agent, Term Agent Lenders in their Permitted Discretion, duly executed, and each such document shall be in full force and effect:

             (i)      this Agreement (with all schedules and exhibits attached),

             (ii)      the Revolving Credit Notes;

             (iii)      the Term Loan Notes;

             (iv)      the Confirmation Agreement;

             (v)      the Disbursement Letter,

(vi)     the Perfection Certificate of the Loan Parties,

(vii)     the Fee Letter;

(viii)     Any other documents or agreements required by Agent or Term Agent in their Permitted Discretion;

(g)     Agent shall have received a Borrowing Base Certificate, dated as of March 5, 2018;

(h)     Agent and Term Agent shall have received a certificate from the Secretary (or other officer acceptable to the Agent and Term Agent in their Permitted Discretion) of each Borrower and Parent attesting to the resolutions of such Borrower's or Parent's Board of Directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which such Person is a party and authorizing specific officers of such Borrower or Parent to execute the same;

(i)     Agent and Term Agent shall have received copies of each Borrowers' and Parent's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the Secretary of each respective Loan Party and, each in form and substance satisfactory to Administrative Agent and Term Agent in their Permitted Discretion;

(j)     Agent and Term Agent shall have received an Officer's Closing Certificate, the form and substance of which shall be satisfactory to Agent, Term Agent and each Lender, and Agent, Term Agent and each Lender shall otherwise be satisfied, in their Permitted Discretion, with the capital structure of the Borrowers and their Affiliates; .

(k)     Agent and Term Agent shall have received a certificate of status with respect to each Borrower and Parent, dated within thirty (30) days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of the applicable Borrower or Parent, which certificate shall indicate that such Borrower or Parent is in good standing in such jurisdiction;

(l)     Agent and Term Agent shall have received such certificates of insurance, together with the endorsements thereto, as are required by Section 7.7, the form and substance of which shall be satisfactory to Agent, Term Agent, and Lenders in their Permitted Discretion;

(m)     Agent, Term Agent, and Lenders shall have completed any updated business, legal, and collateral due diligence, including (i) a collateral audit and review of Borrowers' books and records and verification of Borrowers' representations and warranties to the Agent and each Lender, the results of which shall be satisfactory to Agent and each Lender, and (ii) an inspection of each of the locations where Inventory is located, the results of which shall be satisfactory to Agent and each Lender in their sole discretion;

(n)     Agent and Term Agent shall have received an appraisal of the Net Liquidation Value and Net Liquidation Percentage applicable to Borrowers' Inventory, the results of which shall be satisfactory to Agent, Term Agent, and each Lender in their Permitted Discretion;

(o)     Term Agent shall have received an appraisal of the Intellectual Property, the results of which shall be satisfactory to Term Agent in its Permitted Discretion;

71

(p)     Borrower shall have paid all Lender Expenses incurred in connection with the transactions evidenced by this Agreement and the other Loan Documents, and otherwise incurred by Agent or Lender in connection with therewith (including, without limitation, the fees, charges and disbursements of counsel to the Agent and Term Agent);

(q)     Agent shall have received evidence satisfactory in Agent's, Term Agent's and Lenders' Permitted Discretion that: (i) the Loan Parties have received all consents, licenses, approvals or evidence of other actions required by any Person, including any Governmental Authority, in connection with the execution and delivery by the Loan Parties of this Agreement or any other Loan Document or with the consummation of the transactions contemplated hereby and thereby (other than UCC and intellectual property security interest filings to be made on the Closing Date), (ii) the consummation of the transactions contemplated hereby shall not violate and Applicable Law or Governing Document, and (iii) the conditions in Section 4.2(a), (b), (c), and (f) have been satisfied;

(r)     The Agent and Term Agent shall have received the initial Approved Budget;

(s)     Agent and Term Agent shall have received an updated reference check with respect to Loan Parties' senior management, the results of which are satisfactory to Agent, Term Agent, and each Lender in their sole discretion;

(t)     All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered and executed and shall be in form and substance satisfactory to Agent, Term Agent, and Lenders;

(u)     No material adverse change in governmental regulation or policy affecting the Agent, Term Agent, Lender, any Loan Party or this Agreement;

(v)     No material misstatements in or omissions in fact from the materials previously furnished to Administrative Agent, Term Agent, and/or Lenders by or on behalf of the Loan Parties shall have been made; and

(w)     Except with respect to the filing of the Chapter 11 Case and any Material Adverse Effect resulting from the Events and Circumstances, no Material Adverse Change shall have occurred since the date of the last audited financial statements, and

(x)     Borrowers shall have Excess Availability of not less than $5,000,000 after giving effect to the Advances and Letters of Credit made on the Closing Date; and

(y)     Agent, Term Agent, Lenders, and Issuing Lender shall have completed all requirements related to the Patriot Act, anti-money laundering rules and regulations, and all other "know your customer" requirements with respect to Borrowers and Guarantors and their Affiliates.

(z)     The Note Financing Subordination Agreement, Galleria Subordination Agreement, Simon Subordination Agreement, and Intercompany Note shall be in full force and effect.

(aa)    The Agent shall have received duly executed copies of the engagement letter for Consensus Advisors LLC as a Consultant, which shall be on terms and conditions reasonably acceptable to the Agent.

72

(bb)    (i) The Bankruptcy Court shall have entered the Interim Financing Order and the Cash Management Order, and (ii) neither of such orders shall have been (A) stayed, vacated or reversed (in whole or in part) or (B) amended or modified other than with the consent of the Agent.

(cc)    The Borrowers shall have delivered to the Agent, each in form and substance acceptable to the Agent, the following exit commitment letters (collectively, the "Exit Commitment Letters"): (i) a commitment from Agent and Term Agent for a senior secured revolving and term facility in an amount not less than $55,000,000 (the "ABL Exit Commitment"), (ii) a commitment from the Noteholders to, among other things, extend the maturity of the Note Financing, and (iii) a commitment from certain equity holders of the Parent to make an investment of $10,000,000 in the Loan Parties.

4.2.    Conditions Precedent to all Extensions of Credit. The obligation of any Revolving Credit Lender to make any Advance after the Closing Date (or to extend any other credit hereunder), including, without limitation, the Term Loan on the Term Loan Funding Date, shall be subject to the following conditions precedent:

(a)    the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case they shall be true as of such earlier date, and except to the extent that such representations and warranties are already qualified by materiality, in which case they shall be true and correct in all respects);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)    no injunction, writ, restraining order, or other order of any nature prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against the Borrowers, Parent, Agent, Term Agent, Lender, or any of their Affiliates;

(d)    No Material Adverse Change since the Petition Date shall have occurred;

(e)    Neither of the Financing Orders shall have been (i) stayed, vacated or reversed (in whole or in part), or (ii) amended or modified other than with the consent of the Agent; and

(f)    Each Advance (including the Term Loan) shall be for purposes and in amounts consistent with the Approved Budget (subject to the Permitted Variance).

4.3.    Term. This Agreement shall become effective upon the Closing Date. The Lenders shall have the right to terminate their obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default other than an Event of Default pursuant to Sections 9.4 or 9.5 hereof. This Agreement shall automatically terminate without notice upon the occurrence of an Event of Default pursuant to Sections 9.4 or 9.5. The Borrowers shall have the right to terminate this Agreement pursuant to Section 4.5. If not earlier terminated, the Revolving Credit shall terminate on the Maturity Date.

4.4.    Effect of Termination. On the date of termination of this Agreement, all Obligations (including contingent Reimbursement Obligations of any Borrower with respect to any outstanding

73

Letters of Credit and including all Bank Products Obligations) immediately shall become due and payable without notice or demand (including (a) either (i) providing cash collateral to be held by Administrative Agent in an amount equal to 105% of the then extant Letter of Credit Usage (110% for any Letter of Credit Usage denominated in a currency other than Dollars), or (ii) causing the original L/Cs to be returned to the Issuing Lender, and (b) providing cash collateral to be held by Administration Agent for the benefit of Wells Fargo or its Affiliates with respect to the then extant Bank Products Obligations). No termination of this Agreement, however, shall relieve or discharge Loan Parties of their duties, Obligations, or covenants hereunder and the Lenders' Liens in the Collateral shall remain in effect until all Obligations have been fully and finally discharged and the Lenders' obligations to provide additional credit hereunder have been terminated. When this Agreement has been terminated and all of the Obligations have been fully and finally discharged and the Lenders' obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Collateral Agent will, at Borrowers' sole expense, execute and deliver any UCC termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Lenders' Liens and all notices of security interests and liens previously filed by Collateral Agent with respect to the Obligations.

4.5.    Early Termination by Borrower; Reduction of Commitment.

(a)    Borrowers have the option, at any time upon sixty (60) days prior written notice by Lead Borrower to Administrative Agent and Term Agent, to terminate the Revolving Credit by paying to Administrative Agent: (i) for the benefit of the Revolving Credit Lenders, in cash, the Obligations with respect to the Revolving Credit, and (ii) for the benefit of the Term Lenders, in cash, the Obligations with respect to the Term Loan (including (a) either (i) providing cash collateral to be held by Administrative Agent for the benefit of the Revolving Credit Lenders in an amount equal to 105% of the then extant Letter of Credit Usage (110% for any Letter of Credit Usage denominated in a currency other than Dollars), or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral to be held by Administrative Agent for the benefit of Wells Fargo or its Affiliates with respect to the then extant Bank Products Obligations), in full. If Lead Borrower has sent a notice of termination pursuant to the provisions of this Section, then the Revolving Loan Commitments shall terminate and Borrowers shall be obligated to repay the Obligations (including (a) either (A) providing cash collateral to be held by Lender in an amount equal to 105% of the then extant Letter of Credit Usage, or (B) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral to be held by Administrative Agent for the benefit of Wells Fargo or its Affiliates with respect to the then extant Bank Products Obligations), in full, on the date set forth as the date of termination of this Agreement in such notice.

(b)    Reserved.

(c)    Reserved.

(d)    Reserved.

(e)    The Borrowers may from time to time, by written notice to the Agent, reduce the unused Revolving Credit Commitment, provided that (i) the Borrowers shall not reduce the Revolving Credit Commitment if, after giving effect to any concurrent prepayment of any outstanding Obligations in accordance with this Section, the outstanding Obligations would exceed Availability; and (ii) each such reduction shall be in an amount that is an integral multiple of $2,500,000 and not less than $2,500,000.

74

**5. CREATION OF SECURITY INTEREST.**

5.1. <u>Grant of Security Interest</u>. Each Loan Party hereby grants to Collateral Agent, for the benefit of Agent, Term Agent, Issuing Lender, and each Lender, Wells Fargo, and any other holder of Obligations (including Bank Product Obligations provided by Wells Fargo or its Affiliates), a continuing security interest in and a Lien upon all of its right, title, and interest in all currently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Loan Documents (and, with respect to Bank Product Obligations, any Bank Product Agreements) and in order to secure prompt performance by Loan Parties of each of their covenants and duties under the Loan Documents. The Lenders' Liens in and to the Collateral shall attach to all Collateral without further act on the part of Agent, Term Agent, Lenders or Loan Parties. Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, except for Permitted Dispositions, Loan Parties have no authority, express or implied, to dispose of any item or portion of the Collateral.

5.2. <u>Control of Collateral</u>. If from time to time any Collateral, including any proceeds or supporting obligations, consists of property or rights of Loan Parties in which the perfection or priority of Collateral Agent's Encumbrance is dependent upon or enhanced by Collateral Agent's gaining control of such Collateral, Loan Parties shall immediately notify Collateral Agent and, at Collateral Agent's request, deliver the appropriate Control Agreements or take such actions as may be necessary to give Collateral Agent control over such Collateral as provided in the Code.

5.3. <u>Negotiable Collateral</u>. If from time to time any Collateral, including any proceeds, is evidenced by or consists of letters of credit, Instruments, Documents, Goods covered by Documents, Investment Property or Chattel Paper, and if perfection or priority of Collateral Agent's Encumbrance in such Collateral is dependent on or enhanced by possession, the Loan Parties, immediately upon the request of Collateral Agent, shall endorse and deliver physical possession of such Collateral to Collateral Agent.

5.4. <u>Collection of Accounts, General Intangibles, and Negotiable Collateral</u>. At any time after the occurrence and during the continuation of an Event of Default, Collateral Agent or Collateral Agent's designee may (a) notify Account Debtors of Loan Parties that the Accounts, Chattel Paper, or General Intangibles have been assigned to Collateral Agent, for the benefit of Agent, Term Agent, and Lenders, or that Collateral Agent has an Encumbrance therein, or (b) collect the Accounts, Chattel Paper, or General Intangibles directly and charge the collection costs and expenses to the Loan Account or Term Loan Account. Loan Parties shall hold any Collections that it receives in trust for the Collateral Agent, as the Collateral Agent's trustee, and immediately will deliver said Collections to Collateral Agent or a Cash Management Bank in their original form as received by the applicable Loan Party.

5.5. <u>Delivery of Additional Documentation Required</u>. At any time upon the request of Collateral Agent, Loan Parties shall execute and deliver to Agent any and all security agreements, pledges, assignments, endorsements of certificates of title and bailee acknowledgments (together with any and all financing statements, including, without limitation, any amendments thereto and any "in lieu" continuation statements, which Agent deems necessary in its Permitted Discretion, each of the foregoing, an "Additional Documents") that the Collateral Agent may request in its Permitted Discretion, each in form and substance satisfactory to Agent, to perfect and continue perfected or to better perfect the Lenders' Liens in the Collateral (whether now owned or hereafter arising or acquired), and all other documents that Agent may request in its Permitted Discretion in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by Applicable Law, each Loan Party authorizes the Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes the Collateral Agent to file such

75

Additional Documents in any appropriate filing office. Without limiting the foregoing, Loan Parties shall (a) give the Collateral Agent prompt written notice of any Commercial Tort Claim (other than any immaterial Intellectual Property infringement claims) of Loan Parties not specifically identified on Schedule 6.10(c) and any Letter of Credit Right of Loan Parties. Loan Parties shall grant to the Collateral Agent, for the benefit of the Lenders, a security interest in any such Commercial Tort Claim or Letter of Credit Right and the proceeds thereof, and (b) on such periodic basis as the Collateral Agent shall require, (i) provide Collateral Agent with a report of all new patents, registered copyrights and registered trademarks (ii) cause to be prepared, executed, and delivered to Collateral Agent supplemental schedules to the applicable Loan Documents to identify such patents, registered copyrights and registered trademarks as being subject to the security interests created thereunder, and (iii) execute and deliver to Collateral Agent at Collateral Agent's request Patent, Trademark and/or Copyright Security Agreements with respect to such patents, registered trademarks or registered copyrights for filing with the appropriate filing office.

5.6.  Power of Attorney. Each Loan Party hereby irrevocably makes, constitutes, and appoints Collateral Agent upon the occurrence and continuance of an Event of Default (and any of Collateral Agent's employees or agents designated by Collateral Agent) as such Loan Party's true and lawful attorney, with power to (a) if such Loan Party refuses to, or fails timely to execute and deliver any of the documents described in Section 5.5, sign the name of such Loan Party on any of the documents described in Section 5.5, (b) at any time that an Event of Default has occurred and is continuing, sign such Loan Party's name on any invoice or bill of lading relating to the Collateral, drafts against Account Debtors, or notices to Account Debtors, (c) send requests for verification of Accounts, (d) endorse such Loan Party's name on any Collection item that may come into any Lender's possession, (e) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under such Loan Party's policies of insurance and make all determinations and decisions with respect to such policies of insurance, and (f) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting the Accounts, Chattel Paper, or General Intangibles directly with Account Debtors, for amounts and upon terms that Collateral Agent determines to be reasonable, and Collateral Agent may cause to be executed and delivered any documents and releases that Collateral Agent determines to be necessary. The appointment of Collateral Agent as each Loan Party's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and the Agent's and Lenders' obligations hereunder are terminated.

5.7.  Control Agreements. No arrangement contemplated hereby or by any Control Agreement in respect of any DDA or any Securities Account or other Investment Property shall be modified by Loan Parties without the prior written consent of Collateral Agent, which consent shall not be unreasonably withheld.

5.8.  Right to Inspect. Agent and Term Agent (through any of their respective officers, employees, or agents) shall have the right, from time to time hereafter upon reasonable prior notice and at reasonable times to inspect the Books and to check, test, and appraise the Collateral in order to verify Loan Parties' financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral. Without limiting the generality of the foregoing, but, in each case, subject to Section 2.11(c) hereof:

(a)  At Loan Parties' sole cost and expense (subject to Section 2.11(c) hereof), third parties acceptable to Agent shall conduct, at any time and from time to time at Agent's direction, physical inventories at all of Loan Parties' store locations and at Loan Parties' distribution centers, provided, however, that cycle counts may be used in the conduct of such physical inventories consistent with Loan Parties' current practices and otherwise satisfactory to Agent, in

76

its Permitted Discretion. Agent, at the expense of Loan Parties (but subject to <u>Section 2.11(c)</u>,) may participate in and/or observe each physical count and/or inventory of so much of the Collateral as consists of Inventory which is undertaken on behalf of Loan Parties'. The Loan Parties' shall, within fifteen (15) days following completion of such inventory, provide Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory conducted by Loan Parties) and shall post such results to Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Agent, Term Agent, or any Lender may from time to time conduct commercial finance audits (in each event, at the Loan Parties' sole cost and expense) (subject to <u>Section 2.11(c)</u> hereof) of Loan Parties' Books.

(c)     At Loan Parties' sole cost and expense, Agent or Term Agent may from time to time obtain or conduct appraisals of Inventory conducted by such appraisers as are satisfactory to Agent or Term Agent, in its Permitted Discretion. If Collateral Agent determines that there have been changes in markdowns, inventory mix and composition, accounting methods or any other factors affecting the value of the Collateral, Collateral Agent may, in its Permitted Discretion, at all times at Loan Parties' expense, have the Inventory reappraised by a qualified appraisal company selected by Collateral Agent from time to time after the Closing Date for the purpose of redetermining the Net Liquidation Percentage of the Eligible Inventory portion of the Collateral and, as a result, redetermining the Borrowing Base (or any component thereof).

(d)     At Loan Parties' sole cost and expense, Term Agent may obtain or conduct one (1) appraisal of Intellectual Property following the Closing Date (exclusive of any such appraisal in process as of the Petition Date), conducted by such appraisers as are satisfactory to Term Agent, in its Permitted Discretion; provided, however, the Term Agent may obtain additional such appraisals at the Borrowers' sole cost and expense upon the occurrence of a Default or Event of Default, or if required under Applicable Law.

## 6.     <u>REPRESENTATIONS AND WARRANTIES.</u>

In order to induce the Agent, Term Agent, Lenders, and Issuing Lender to enter into this Agreement, each Loan Party hereby makes the following representations and warranties to the Agent, Term Agent, each Lender, and Issuing Lender which shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of each borrowing hereunder (except to the extent that such representations and warranties relate solely to an earlier date, in which case they shall be true as of such earlier date, and except to the extent that such representations and warranties are already qualified by materiality, in which case they shall be true and correct in all respects) and such representations and warranties shall survive the execution and delivery of this Agreement. Any fact or other information set forth in the Schedules that is disclosed with respect to one section of Article 6 shall be deemed to constitute disclosure of such fact or information with respect to each other section of Article 6 to which such fact or other information is applicable. From and after the Closing Date, Borrowers shall be permitted to update their Schedules and Exhibits to the extent necessary to make the representations and warranties herein, true, correct and complete as of such borrowing date by providing the Agent with written notice of such update to such Schedules and Exhibits; provided, however, that any such updated Schedules and Exhibits shall not be deemed to be incorporated into this Agreement unless and until the Agent and Term Agent shall have approved same in writing.

6.1.     <u>No Encumbrances</u>. Each Loan Party has good and indefeasible title to all of its property composing the Collateral, free and clear of Liens except for Permitted Liens.

6.2.    Eligible Credit Card Receivables.  The Eligible Credit Card Receivables are bona fide existing payment obligations of Account Debtors created by the sale and delivery of Inventory or the rendition of services to such Account Debtors in the ordinary course of Borrowers' business, owed to the applicable Borrower or its assignee without, to such Borrower's knowledge, defenses, disputes, offsets, counterclaims, or rights of return or cancellation.  As to each Account that is identified by Borrowers as an Eligible Credit Card Account in a Borrowing Base Certificate submitted to Administrative Agent, such Account is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Credit Card Receivables.

6.3.    Eligible Inventory.  All Eligible Inventory is of good and merchantable quality, free from defects.  As to each item of Inventory that is identified by the Borrowers as Eligible Inventory in a Borrowing Base Certificate submitted to Administrative Agent, such Inventory is located at one of the locations set forth on Schedule C-1, any such other locations permitted under this Agreement, or is in transit from one such location to another such location and is not otherwise excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Inventory.

6.4.    Equipment.  All of the Equipment (other than obsolete or damaged Equipment) is used or held for use in Loan Party's business (including up to $500,000 to be used in connection with any Wholesale Account Locations as permitted under this Agreement) and is fit for such purposes, except for ordinary wear and tear.  The inability to use such obsolete or damaged Equipment would not cause a Material Adverse Effect.

6.5.    Location of Inventory and Equipment.  As of the Closing Date, except as set forth on Schedule 6.5, the Inventory and Equipment are not stored with a bailee, warehouseman, or similar party.  As of the Closing Date, except for Inventory and Equipment that is in transit to or between one of the locations set forth on Schedule 6.5, the Inventory and Equipment are located only at the locations identified on Schedule 6.5.

6.6.    Inventory Records.  Each Borrower keeps correct and accurate records itemizing and describing the type, quality, and quantity of its Inventory and Equipment and the book value thereof

6.7.    Legal Status.  As of the Closing Date, each Loan Party represents and warrants that (a) such Loan Party's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (b) such Loan Party is an organization of the type, and is organized in the jurisdiction, set forth in the applicable Perfection Certificate; (c) the Perfection Certificate accurately sets forth such Loan Party's organizational identification number or accurately states that such Loan Party has none; (d) the Perfection Certificate accurately sets forth such Loan Party's chief executive office, as well as such Loan Party's mailing address, if different; (e) all other information set forth on the Perfection Certificate pertaining to such Loan Party is accurate and complete as of the Closing Date.

6.8.    Due Organization and Qualification; Subsidiaries.

(a)    Except as set forth on Schedule 6.8(a), each Loan Party is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business in any state where the failure to be so qualified reasonably could be expected to have a Material Adverse Change.

(b)    Set forth on Schedule 6.8(b), is a complete and accurate description of the authorized capital Stock of each Loan Party, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding.  Other than as described on Schedule 6.8(b), there are no subscriptions, options, warrants, or calls relating to any shares of

any Loan Party's capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. Each Loan Party is not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock.

(c)     Set forth on Schedule 6.8(c), is a complete and accurate list of each Loan Party's direct and indirect Subsidiaries, showing: (i) the jurisdiction of such Loan Party's organization; (ii) the number of shares of each class of common and preferred Stock authorized for each of such Subsidiaries; and (iii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by such Loan Party. All of the outstanding capital Stock of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)     Except as set forth on Schedule 6.8 (b) or (c), there are no subscriptions, options, warrants, or calls relating to any shares of any Borrower's or its Subsidiaries capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. None of the Borrowers or any of their Subsidiaries are subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Loan Party's capital Stock or any security convertible into or exchangeable for any such capital Stock.

6.9.     Due Authorization; No Conflict.     Subject in all cases to the entry of the Interim Financing Order and the Final Financing Order, as applicable:

(a)     As to each Loan Party, the execution, delivery, and performance by Loan Party of this Agreement and the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of each Loan Party.

(b)     As to the each Loan Party, the execution, delivery, and performance by such Loan Party of this Agreement and the Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to such Loan Party, the Governing Documents of such Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on such Loan Party, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of such Loan Party, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Loan Party, other than Permitted Liens, or (iv) require any approval of such Loan Party's interest holders or any approval or consent of any Person under any material contractual obligation of such Loan Party, except such consents which shall be obtained and delivered to Administrative Agent on the Closing Date, or as set forth on Schedule 6.9.

(c)     Other than the filing of financing statements, the execution, delivery, and performance by such Loan Party of this Agreement and the Loan Documents to which the Loan Party is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority or other Person other than registrations, consents and approvals which have been already made or obtained prior to the Closing Date, or as set forth on Schedule 6.9.

(d)     As to each Loan Party, this Agreement and the other Loan Documents to which such Loan Party is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Loan Party will be the legally valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms,

79

except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)     The Lenders' Liens are validly created, perfected, and first priority Liens, subject only to Permitted Liens.

6.10.   <u>Litigation</u>.

(a)     Other than those matters disclosed on <u>Schedule 6.10(a)</u> and immaterial matters where the amount in controversy is less than $250,000, there are no actions, suits, or proceedings pending or, to the best knowledge of the Loan Parties, threatened against any Loan Party or any of their Subsidiaries, as applicable. <u>Schedule 6.10(a)</u> includes, as applicable, for each matter set forth thereon (i) the name, docket number and jurisdiction for such matter, (ii) the status of such proceeding, and (iii) whether such matter is covered by an insurance policy and, if so, the insurance carrier, the policy number and the deductible amount associated with such insurance policy.

(b)     There are no actions, suits or proceedings pending or, to the best knowledge of the Loan Parties, threatened against such Loan Party or any of its Subsidiaries that question the validity or enforceability of this Agreement or any other Loan Document or any action taken by such Loan Party in connection therewith.

(c)     <u>Schedule 6.10(c)</u> lists all of each Loan Party's Commercial Tort Claims existing as of the date hereof.

6.11.   <u>No Material Adverse Change</u>. All financial statements relating to a Loan Party that have been delivered by Borrowers to the Administrative Agent and Term Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, such Loan Party's financial condition as of the date thereof and results of operations for the period then ended. Except as set forth on <u>Schedule 6.11</u>, there has not been a Material Adverse Change with respect to Borrowers since the Petition Date.

6.12.   <u>Fraudulent Transfer</u>.

(a)     Reserved;

(b)     No transfer of property is being made by any Loan Party and no obligation is being incurred by such Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party; and

(c)     No transfer of property is being made by a Loan Party without receiving a reasonably equivalent value in exchange for the transfer and such Loan Party's remaining assets are not unreasonably small in relation to its business.

6.13.   <u>Employee Benefits</u>. No Loan Party nor any of its Subsidiaries, or any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

6.14.   <u>Environmental Condition</u>. Except as set forth on <u>Schedule 6.14</u>, (a) to each Loan Party's actual knowledge, such Loan Party's properties or assets have not ever been used by such Loan Party or:

by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such production, storage, handling, treatment, release or transport was in violation, in any material respect, of applicable Environmental Law, (b) to such Loan Party's knowledge, such Loan Party's properties or assets have not ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) such Loan Party has not received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by Loan Party, and (d) such Loan Party has not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by the Loan Party resulting in the releasing or disposing of Hazardous Materials into the environment.

6.15. <u>Brokerage Fees</u>. No Loan Party has utilized the services of any broker or finder in connection with such Loan Party's obtaining financing from the Lenders under this Agreement and no brokerage commission or finder's fee is payable by any Loan Party in connection herewith.

6.16. <u>Intellectual Property</u>.

(a) Each Loan Party owns, or holds licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of its business as currently conducted. Attached hereto as <u>Schedule 6.16</u> is a true, correct, and complete listing of all material patents, patent applications, trademarks, trademark applications, copyrights, and copyright registrations as to which such Loan Party is the owner or is an exclusive licensee as of the Closing Date.

(b) Parent owns, or holds licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of Borrowers' business as currently conducted. Parent has executed and delivered a fully paid, non-cancelable, world-wide license to TWC enabling TWC to use and exploit each of Parent's trademarks, trade names, copyrights, patents, patent rights, and licenses used in TWC's business.

6.17. <u>Leases</u>.

Each Loan Party enjoys peaceful and undisturbed possession under all leases material to the business of such Loan Party and to which such Loan Party is a party or under which such Loan Party is operating. All of such leases are valid and subsisting and no material default by such Loan Party exists under any of them, other than as a result of the Chapter 11 Case.

6.18. <u>DDAs</u>. Set forth on <u>Schedule 6.18</u> are all of the DDAs of the Loan Parties as of the Closing Date, including, with respect to each depository (i) the name and address of that depository, (ii) the account numbers of the accounts maintained with such depository, and (iii) the purpose for which each deposit account is used (i.e., payroll, benefits, collections, disbursement, etc.).

6.19. <u>Credit Card Receipts</u>. Schedule 6.19 sets forth each of the Borrower's Credit Card Processors and all arrangements to which Borrowers are a party with respect to the payment to the Borrowers of the proceeds of all credit card charges for sales by Borrowers.

6.20. <u>Indebtedness</u>. Set forth on <u>Schedule 6.20</u> is a true and complete list of all Indebtedness of the Loan Parties outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date. Such Schedule accurately reflects the aggregate principal amount of such Indebtedness and the principal terms thereof and whether (and to what extent) such Indebtedness is secured.

81

6.21. <u>Filing of Tax Returns and Payment of Taxes</u>. Except where the failure to do so could not reasonably result in a Material Adverse Change:

(a)     Each Loan Party has duly and timely filed, or caused to be duly and timely filed, all Tax Returns required to be filed by it in respect of Taxes, and has duly and timely paid, or caused to be duly and timely paid, all Taxes due and payable by it as required by Applicable Law, including all Taxes assessed, reassessed or for which a demand for payment was made by any Governmental Authority, except when and so long as the validity of any such Taxes is being contested in good faith by it or any other Person on its behalf through appropriate proceedings, such contest is a Permitted Protest, and adequate provisions for such Taxes have been made in its financial statements in accordance with GAAP.

(b)     Each Loan Party has duly and timely withheld, or caused to be duly and timely withheld, all Taxes and other amounts required to be withheld by it in accordance with Applicable Law from any amount paid, or credited, or deemed to be paid or credited by it to or for the account of any Person (including any employees, officers or any nonresident Person), and has duly and timely remitted, or caused to be duly and timely remitted, to the appropriate Governmental Authority such Taxes required by Applicable Law to be remitted by it.

(c)     No Loan Party has failed to pay any Taxes which has or would result in a Lien (other than a Permitted Lien) on its property. Each Loan Party has only contested a Permitted Lien that is subject to a Permitted Protest.

6.22.   <u>Complete Disclosure</u>. All factual information (taken as a whole) furnished by or on behalf of each Loan Party in writing to Agent, Term Agent, or Lenders (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such Loan Party in writing to Agent, Term Agent, or Lenders will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Approved Budget delivered to Agent, Term Agent, and Lenders prior to the Closing Date is, and each additional Approved Budget delivered to the Agent and Term Agent hereunder will be, on the date of its delivery, prepared in good faith based on assumptions believed by management of the Borrowers to be accurate and reasonable at the time made, it being recognized by the Agent, Term Agent, and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that such differences may be material.

6.23.   <u>OFAC; Sanctions</u>. No Loan Party nor any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with the anti-corruption laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with the anti-corruption laws in all material respects. No proceeds of any loan made or Letter of Credit issued hereunder will be

82

used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable sanction by any Person (including any Credit Party or other individual or entity participating in any transaction).

6.24. <u>Insurance</u>. <u>Schedule 6.24</u> annexed hereto, is a schedule of all insurance policies owned by the Loan Parties or under which any Loan Party is the named insured. Each of such policies is in full force and effect. Neither the issuer of any such policy nor the Loan Parties are in default or violation of any such policy. The coverage reflected on <u>Schedule 6.24</u> satisfies the requirements of <u>Section 7.7</u>.

6.25. <u>Requirements of Law</u>. To each Loan Party's knowledge, each Loan Party is in compliance with, and shall hereafter comply with and use its assets in compliance with, all requirements of law except where the failure of such compliance will not be reasonably likely to have a Material Adverse Change. No Loan Party has received any notice of any violation of any requirement of law (other than of a violation which would not be reasonably likely to have a Material Adverse Change) which violation has not been cured or otherwise remedied.

6.26. <u>No Margin Stock</u>. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulations U, T, and X of the Board of Governors of the Federal Reserve System of the United States). No part of the proceeds of any borrowing or Letter of Credit hereunder will be used at any time to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

6.27. <u>Investment Company Status</u>. No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

6.28. <u>Accounts</u>. Unless otherwise indicated in writing to Administrative Agent and except to the extent of reserves for returns and bad debts as reflected in the Borrowers' Books and established in the ordinary course of Borrowers' business: (a) each Account of each Borrower (i) is genuine and in all material respects what it purports to be and is not evidenced by a judgment, (ii) arises out of a completed, bona fide sale and delivery of Goods by such Borrower in the ordinary course of business, (iii) is for a liquidated amount maturing as stated in a claim or invoice covering such sale of Goods, (iv) together with Lenders' Lien therein, is not and will not be in the future (by voluntary act or omission by any Borrower), be subject to any Lien, deduction, defense, dispute, counterclaim or other adverse condition, is absolutely owing to such Borrower and is not contingent in any material respect or for any reason (other than pursuant to Permitted Liens or offsets, deductions, defenses, disputes or counterclaims arising in the ordinary course of business), and (b) to each Borrower's knowledge, there are no facts, events or occurrences which would in any way impair the validity thereof, or tend to reduce in any material respect the amount payable thereunder from the face amount of the claim or invoice or statements delivered to Administrative Agent with respect thereto (other than arising in the ordinary course of business).

6.29. <u>Consignment</u>. No Person maintains any property on consignment with Loan Parties.

6.30. <u>No Events of Default</u>. As of any date of determination, both before and after giving effect to the making of any Advances or the issuance of any Letters of Credit, there are no Defaults or Events of Default.

6.31. <u>Use of Proceeds</u>. The proceeds of the Term Loan, any Advance or any Letter of Credit (a) is neither intended or anticipated to be used nor been used in any way which would cause a breach of <u>Section 8.18</u> or otherwise result in an Event of Default, nor (b) will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to (i) purchase or carry margin stock

(within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or (ii) make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person.

6.32.     Investments.  Schedule 6.32 lists all Investments of the Loan Party, or any agreements or other legally binding commitments made by the Loan Party to invest in any Person, existing as of the Closing Date.

6.33.     Material Agreements.   The grant by the Loan Parties of securities interests in the Collateral pursuant to this Agreement and the other Loan Documents will not conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligations or material lease of any Loan Party.

6.34.     Reserved.

6.35.     Shareholder Agreements.  Schedule 6.35 lists all shareholder agreements to which a Loan Party is a party in place as of the Closing Date, including any voting agreements among shareholders, concerning any class or all classes of any Loan Party's Stock, including preferred stock (collectively, the "Shareholder Agreements").

6.36.     Bankruptcy Matters.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with Applicable Law and notice of (i) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Financing Order, (ii) the hearing for the entry of the Interim Financing Order, and (iii) the hearing for the entry of the Final Financing Order in each case has been or will be given. The Borrowers shall give, on a timely basis as specified in the applicable Financing Order, all notices required to be given to all parties specified in each such Financing Order.

(b)     After the entry of the Interim Financing Order, and pursuant to and to the extent permitted in the Interim Financing Order and the Final Financing Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims (other than (x) the Carve-Out up to, at any date of determination, the amounts in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve, and (y) Prepetition Permitted Liens (as such term is defined in the Financing Orders)) and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the priorities set forth in the Financing Orders.

(c)     After the entry of the Interim Financing Order and pursuant to and to the extent provided in the Financing Orders, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority only, to (x) the Carve-Out up to, at any date of determination, the amounts actually in the Professional Fee Escrow Account and the amount of the Carve-Out Reserve and (y) the Prepetition Permitted Liens (as such term is defined in the Financing Orders).

84

(d)     The Interim Financing Order (with respect to the period on and after entry of the Interim Financing Order and prior to the Final Order Entry Date), the Final Financing Order (with respect to the period on and after the Final Order Entry Date), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), modified or amended without the consent of the Agent, Term Agent, Majority Revolving Lenders and Majority Term Lenders.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Financing Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Secured Parties shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, under the other Loan Documents or under applicable law, without further application to or order by the Bankruptcy Court.

(f)     A true and complete copy of the initial Approved Budget is attached as <u>Exhibit F</u> hereto.

## 7.     <u>AFFIRMATIVE COVENANTS</u>.

Each Loan Party covenants and agrees that, so long as this Agreement and any other Loan Documents remains in effect and until full and final payment of the Obligations, such Loan Party shall and shall cause its Subsidiaries to do all of the following:

7.1.     <u>Accounting System</u>.  Maintain a system of accounting that enables each Loan Party to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Agent, Term Agent, or any Lender.  Borrowers shall keep an inventory reporting system that shows all additions, sales, claims, returns, and allowances with respect to the Inventory.

7.2.     <u>Collateral Reporting</u>.  Provide Agent, Term Agent, and Lenders with (a) the documents set forth on <u>Schedule 7.2</u> in accordance with the delivery schedule set forth thereon and (b) such other information as the Administrative Agent or Term Agent may from time to time reasonably request.

7.3.     <u>Financial Statements, Reports, Certificates</u>.  Deliver to Agent, Term Agent, and Lenders:

(a)     · as soon as available, but in any event within thirty 30 days after the end of each month (or if such day is not a Business Day, then the next Business Day) during each Loan Party's Fiscal year,

(i)     a Parent prepared Consolidated balance sheet, income statement, and statement of cash flow covering the Parent, Borrowers' and their Subsidiaries' operations during such period,

(ii)     a certificate signed by the chief financial officer of the Parent and Borrowers to the effect that:

(A)     the financial statements delivered hereunder have been prepared in accordance with GAAP (except for the lack of footnotes and being subject to fiscal year-end audit adjustments) and fairly present in all material respects the financial condition of the Parent and its Subsidiaries,

(B)     the representations and warranties of Loan Party contained in this Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of such certificate, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case they shall be true as of such earlier date, and except to the extent that such representations and warranties are already qualified by materiality, in which case they shall be true and correct in all respects),

(C)     there does not exist any condition or event that constitutes a Default or Event of Default (or, to the extent of any non-compliance, describing such non-compliance as to which he or she may have knowledge and what action the Borrowers have taken, are taking, or propose to take with respect thereto), and

(iii)     a compliance certificate certifying that each Loan Party has paid all rentals, Taxes and insurance premiums due and payable after the Petition Date during such period without material penalty prior to such date and that all required insurance is in effect or specifying details regarding any non-payment thereof;

(b)     Reserved;

(c)     Budget:

(i)     The Approved Budget may be updated, modified or supplemented (with the consent of the Agent and/or at the reasonable request of the Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance satisfactory to, the Agent and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, that during the eighth (8th) week of the initial Approved Budget (and the eighth (8th) week of each successive Approved Budget thereafter), the Lead Borrower shall submit a budget for the next successive thirteen week period to the Agent, which budget shall be in form and substance acceptable to the Agent, and approved by the Agent; provided, further, that in the event that the Agent and the Lead Borrower cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default hereunder once the period covered by the most recent Approved Budget has terminated.   Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as requested by the Agent.

(ii)     On or before Thursday of each week following the Closing Date, the Lead Borrower shall deliver to the Agent an Approved Budget Variance Report; and

(iii)     Each Approved Budget and each Approved Budget Variance Report shall each be prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of such delivery, the Loan Parties' good faith estimate of its future financial performance;

(d)     if and when filed by any Loan Party (or within three (3) Business Days thereafter),

(i)     any filings made by any Loan Party with the SEC,

86

(ii)     copies of each Loan Party's federal income tax returns, and any amendments thereto, filed with the Internal Revenue Service, and

(iii)     any other information that is provided to Parent to its shareholders generally solely in their capacities as shareholders;

(e)     if and when filed by each Loan Party and as reasonably requested by Agent or Term Agent, satisfactory evidence of payment of applicable excise Taxes in each jurisdiction in which (i) such Loan Party conducts business or is required to pay any such excise tax, (ii) where such Loan Party's failure to pay any such applicable excise tax would result in a Lien on the properties or assets of the Loan Party, or (iii) where such Loan Party's failure to pay any such applicable excise tax reasonably could be expected to result in a Material Adverse Change,

(f)     as soon as a Loan Party has knowledge of any event or condition that constitutes a Default or an Event of Default, notice thereof and a statement of the curative action that such Loan Party proposes to take with respect thereto,

(g)     upon the request of Agent, Term Agent, or any Lender, any other report reasonably requested relating to the financial condition of Loan Party,

(h)     the inventory reconciliation, when and as required under <u>Section 5.8(a)</u>,

(i)     within thirty (30) days after the end of each of the Fiscal Quarters of each Fiscal Year of the Lead Borrower, (i) a report describing in reasonable detail any Intellectual Property which during such Fiscal Quarter was acquired, registered or for which an application for registration was filed by any Loan Party or any Subsidiary thereof and any statement of use or amendment to allege use with respect to intent-to-use trademark applications, in each case in the United States or in any foreign jurisdiction, and (ii) an abstract (which can be in a form prepared by or on behalf of the Loan Parties for their own use) with respect to each license of Intellectual Property entered into by a Loan Party or any Subsidiary thereof during such Fiscal Quarter,

(j)     with respect to any Intellectual Property owned or used by any Loan Party or any Subsidiary in the conduct of its business, within ten (10) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, of any claim, including any claim or infringement or of notice of same, which if adversely determined, would otherwise adversely affect the Loan Parties' rights in any Intellectual Property, and

(k)     within twenty (20) days of the end of each Fiscal quarter, a list of all Wholesale Account Locations as of the last day of such Fiscal quarter.

In addition to the financial statements referred to above, Parent agrees to deliver financial statements prepared on both a consolidated and consolidating basis and agrees that no Subsidiary of Parent will have a fiscal year different from that of Parent. Each Loan Party agrees that its independent certified public accountants are authorized to communicate with Agent, Term Agent, and any Lender and to release to Agent, Term Agent, and any Lender whatever financial information concerning such Loan Party that Agent, Term Agent, or any Lender reasonably may request. Each Loan Party waives the right to assert a confidential relationship, if any, it may have with any accounting firm or service bureau in connection with any information requested by Agent, Term Agent, or any Lender pursuant to or in accordance with this Agreement, provided that representatives of a Loan Party may be present at any conversation between the Agent, Term Agent, or any Lender, on the one hand, and the Loan Party's

certified public accountants, on the other hand, and shall be copied on any correspondence between them.

7.4.     Return.   Account for returns of Inventory and customer credits and record the effects thereof on the general ledger on the same basis and in accordance with the usual customary practices of the Borrower, as they exist at the time of the execution and delivery of this Agreement or as otherwise agreed to by the Administrative Agent in its Permitted Discretion.

7.5.     Maintenance of Properties.   Maintain and preserve all of its properties which are necessary and useful in the proper conduct to their business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the material provisions of all leases to which it is a party as lessee, so as to prevent any loss or forfeiture thereof or thereunder.

7.6.     Tax Matters.

(a)     Duly and timely file, or cause to be duly and timely filed, all Tax Returns required to be filed by it in respect of Taxes, and duly and timely pay, or cause to be duly and timely paid, all Taxes due and payable by it as required by Applicable Law, including all Taxes assessed, reassessed or for which a demand for payment is made by any Governmental Authority, except when and so long as the validity of any such Taxes is being contested in good faith by it or any other Person on its behalf through appropriate proceedings, and such contest is a Permitted Protest and adequate provisions for such Taxes have been made in its financial statements in accordance with GAAP or where failure to pay such Tax will not be reasonably likely to result in, or result in, a Material Adverse Change.

(b)     Each Loan Party will duly and timely withhold, or cause to be duly and timely withheld, all material Taxes required to be withheld by it in accordance with Applicable Law from any amount paid, or credited, or deemed to be paid or credited by it to or for the account of any Person (including any employees, officers or any nonresident Person), and will duly and timely remit, or cause to be duly and timely remitted, to the appropriate Governmental Authority such Taxes required by Applicable Law to be remitted by it.

(c)     Each Loan Party will not fail to pay any Taxes or other amounts which would result in a Lien (other than a Permitted Lien) on its property.  Each Loan Party shall only contest a Permitted Lien that is subject to a Permitted Protest.

(d)     Each Loan Party will, upon written request, furnish to the Agent and Term Agent, on behalf of the Revolving Credit Lenders or Term Lenders, as applicable, satisfactory evidence that such Loan Party has paid such Taxes in each jurisdiction in which the Loan Party is required to pay such Taxes.

7.7.     Insurance.

(a)     At each Loan Party's expense, maintain insurance respecting its property and assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses.  Each Loan Party also shall maintain business interruption, public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation.  All such policies of insurance shall be in such amounts and with such insurance companies as are satisfactory to Agent and Term Agent, in their Permitted Discretion.

88

Each of the Agent and Term Agent acknowledges that the policies of insurance in place on the Closing Date are in amounts and with insurance companies satisfactory to it as of the Closing Date. Each Loan Party shall deliver copies of all such policies to Agent and Term Agent with a satisfactory lender's loss payable endorsement naming Agent as loss payee or additional insured, as appropriate. Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than thirty (30) days' prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever.

(b)     Each Loan Party shall give Agent and Term Agent prompt notice of any loss in excess of $250,000 covered by such insurance. Agent shall have the exclusive right to adjust any losses payable under any such insurance policies in excess of $250,000, without any liability to such Loan Party whatsoever in respect of such adjustments. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Agent to be applied at the option of the Agent , either to the prepayment of the Obligations or shall be disbursed to Lead Borrower under staged payment terms reasonably acceptable to the Agent for application to cost of repairs, replacements and restorations. Any such repairs, replacements or restorations shall be affected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

(c)     Each Loan Party shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 7.7, unless Agent is included thereon as named insured with the loss payable to Agent under a lender's loss payable endorsement or its equivalent. Each Loan Party immediately shall notify Agent whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and copies of such policies promptly shall be provided to Agent.

(d)     In the event that any Loan Party obtains key person life insurance policies with respect to any officer or director of such Loan Party, such Loan Party shall furnish Agent with an "Absolute Assignment" of each such key person life insurance policy, shall record each such "Absolute Assignment" with the issuer of the respective policy, and shall furnish proof of such issuer's acceptance of such assignment. All proceeds payable under such key person life insurance policies shall be payable to Agent to be applied on account of the Obligations in accordance with Section 2.4(b).

7.8.     Location of Inventory and Equipment. Keep the Inventory (other than Inventory on lease to customers in the ordinary course of business) and Equipment only at: (i) the locations identified on Schedule 6.5, (ii) any new store locations opened in accordance with Section 8.15 of this Agreement, and (iii) any retail store locations and non-store professional sales agent locations (including offices of podiatrists, orthopedists and other foot specialists) of wholesale accounts to which The Walking Company has provided Inventory on a consignment basis, so long as the Borrowers have provided the Agent and Term Agent with prior written notice of same and has taken all steps necessary or advisable to perfect and otherwise protect its interest in such Inventory and Equipment under the Code (any such locations, referred to herein as a "Wholesale Account Location"), (except, as to any of the foregoing, when in-transit between any such permitted locations); provided, however, that so long as no Event of Default has occurred and continues to exist, the Loan Parties may amend Schedule 6.5 so long as such amendment occurs by written notice to Collateral Agent not less than thirty (30) days prior to the date on which the Inventory, or ten (10) days prior to the date on which the Equipment is moved to such new location, so long as such new location is within the continental United States, and so long as, at the time

89

of such written notification, the Loan Parties provide any financing statements, fixture filings or other documents necessary to perfect and continue perfected the Lenders' Liens on such assets and also provides to Collateral Agent a Bailee Acknowledgment or Collateral Access Agreement, all as determined by Agent in its Permitted Discretion; provided, however, that, except as provided below, no such Collateral Access Agreement or Bailee Acknowledgment shall be required for any retail store located in a Landlord Lien State if the Agent imposes a Landlord Reserve for such location and so long as no Event of Default has occurred or be continuing, no such Bailee Acknowledgment or Collateral Access Agreement shall be required for any retail store locations not located in a Landlord Lien State at any time and, provided, further, however, that the foregoing shall not restrict Agent's right to establish a rental Reserve for any distribution center or warehouse leased from a third party, or any retail store or other location at which Borrower's maintain Inventory for which there is no such Bailee Acknowledgement or Collateral Access Agreement.

7.9.　　Compliance with Laws.　Comply with: (i) the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, including the Fair Labor Standards Act and the Americans With Disabilities Act, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not result in and reasonably could not be expected to result in a Material Adverse Change, and (ii) Section 21.21 and 21.22 hereof.

7.10.　　Leases.　Pay when due all rents and other amounts due and payable on or after the Petition Date under any leases to which any Loan Party is a party or by which any Loan Party's properties and assets are bound, unless such payments are the subject of a Permitted Protest. Notwithstanding the foregoing, the Loan Party's shall not be deemed to have violated this Section unless such Loan Party has leases that are not in compliance with the foregoing and such leases have reached the Leasehold Threshold.

7.11.　　Brokerage Commissions.　Pay any and all brokerage commission or finder's fees incurred in connection with or as a result of Loan Party's obtaining financing from the Lenders under this Agreement. Loan Party agrees and acknowledges that payment of all such brokerage commissions or finder's fees shall be the sole responsibility of the Loan Party, and each Loan Party agrees to indemnify, defend, and hold Agent, Term Agent, and Lenders harmless from and against any claim of any broker or finder arising out of any Loan Party's obtaining financing from the Agent, Term Agent, and Lenders under this Agreement.

7.12.　　Existence.　At all times preserve and keep in full force and effect the Loan Party's valid existence and good standing and any rights and franchises material to the Loan Party's businesses.

7.13.　　Environmental.　(a) Keep any property either owned or operated by any Loan Party free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens, (b) comply, in all material respects, with Environmental Laws and provide to Collateral Agent documentation of such compliance which Collateral Agent reasonably requests, (c) promptly notify Collateral Agent of any release of a Hazardous Material of any reportable quantity from or onto property owned or operated by the any Loan Party and take any Remedial Actions required to abate said release or otherwise to come into compliance with applicable Environmental Law, and (d) promptly provide Collateral Agent with written notice within ten (10) days of the receipt of any of the following: (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party, and (iii) notice of a violation, citation, or other administrative order which reasonably could be expected to result in a Material Adverse Change.

90

7.14.   Investment Proceeds, Etc.  All cash proceeds (including any checks) of any Investment from any source in a Loan Party or any Subsidiary of a Loan Party and any other funds received by the Loan Parties including, without limitation, sales or other dispositions of any Loan Party's assets (other than in the ordinary course of such Loan Party's business), the proceeds from the issuance of any debt or the incurrence of any Indebtedness by any Loan Party (other than Indebtedness permitted under Section 8.1 hereof), tax refunds, damage awards, or insurance or condemnation proceeds and Net Proceeds shall be deposited directly into a Cash Management Account.

7.15.   Immediate Notice to Administrative Agent and Term Agent.

(a)      Each Loan Party shall provide Agent and Term Agent with written notice promptly upon actual knowledge of the occurrence of any of the following events, which written notice shall state with reasonable particularity the facts and circumstances of the event for which such notice is being given:

(i)      Any change in the Authorized Persons;

(ii)     The completion of any physical count of all or a material portion of Borrowers' Inventory (together with a copy of the results thereof certified by the Borrowers);

(iii)    Any cessation by such Loan Party of its making payment to its creditors with respect to obligations incurred on or after the Petition Date for generally as such Loan Party's debts become due;

(iv)     Any failure by the Borrowers to pay minimum rent at the Borrowers' locations which becomes due after the Petition Date, other than pursuant to a Permitted Protest, which failure continues for more than three (3) Business Days following notice of late payment from the landlord without more than a minimal adverse effect on the Borrowers;

(v)      Any Material Adverse Change;

(vi)     The occurrence of any Default or Event of Default;

(vii)    Any intention on the part of any Loan Party to discharge such Loan Party's present independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity;

(viii)   Any litigation which, if determined adversely to a Loan Party, could reasonably be expected to result in a Material Adverse Change;

(ix)     Provide Administrative Agent, Term Agent, and each Lender, when received by Borrowers, with a copy of any final management letter or similar communications from any accountant of the Borrowers;

(x)      Provide Agent and Term Agent with prompt written notice upon the acquisition or formation of any Subsidiary;

(xi)     the termination, discharge, or resignation of any of the Consultants;

91

(xii)    any breach or default under, or any termination of, any of the Exit Commitment Letters; or

(xiii)    At Agent's or Term Agent's request from time to time, the Lead Borrower shall provide Agent and Term Agent with copies of all national or otherwise material advertising copy (including print advertising and video and radio advertising).

7.16.    <u>Disclosure Updates</u>.  Promptly and in no event later than five (5) Business Days after an Authorized Officer obtains actual knowledge thereof, (a) notify Administrative Agent if any written information, exhibit, or report furnished to the Administrative Agent or Term Agent contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and (b) correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement, filing, or recordation thereof.

7.17.    <u>Reserved</u>.

7.18.    <u>Line of Business</u>.   No Loan Party or Subsidiary shall engage in any business other than the business in which it is currently engaged or a business reasonably related thereto (and if the conduct of such reasonably related business shall require a material capital commitment, it shall be reflected in a business plan); by illustration (and not limitation), any business that involves the sale at retail, wholesale of by the interest of footwear, for health and wellness products, casual apparel and/or related accessories, or franchising of businesses selling the same, shall be deemed to comply with this Section 7.18.

7.19.    <u>Additional Subsidiaries</u>.   If any additional Subsidiary of a Loan Party is formed or acquired after the Closing Date, such Loan Party will notify the Administrative Agent thereof and (a) each Loan Party will cause such Subsidiary to become a Loan Party hereunder and under each applicable Loan Document within ten (10) Business Days after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Administrative Agent shall reasonably request and (b) if any shares of capital Stock or Indebtedness of such Subsidiary are owned by or on behalf of a Loan Party, such Loan Party will cause such shares and promissory notes evidencing such Indebtedness to be pledged to the Collateral Agent for the benefit of Agent, Term Agent, and Lenders, within ten (10) Business Days after such Subsidiary is formed or acquired; provided that notwithstanding the foregoing, in case of a Foreign Subsidiary, no more than 65% of the total outstanding voting equity interests of such Foreign Subsidiary will be pledged to the Collateral Agent for the benefit of Agent, Term Agent, and Lenders.

7.20.    <u>Retention of Consultants; Communication with Accountants and Other Financial Advisors</u>. .

(a)    By no later than three (3) Business Days following the Petition Date, the Loan Parties have filed motions seeking to retain Consensus Advisors LLC, as a Consultant.  The terms and scope of the engagement of and responsibilities of such Consultant shall be acceptable to the Agent and Term Agent.  Subject to Bankruptcy Court approval, to be obtained by no later than forty-five (45) days after the Petition Date, the Loan Parties shall continue to retain such Consultant, the scope and terms of each such engagement to be reasonably satisfactory to the Agent and Term Agent.  There shall be no material modifications to the terms (excluding any decreases in compensation but including any other modification in compensation) of the engagement of such Consultant without the consent of the Agent and Term Agent.  Until such time as all Pre-Petition Obligations and all Obligations have been Paid in Full and all

Commitments have been terminated, the Lead Borrower shall continue to retain such Consultant to assist the Loan Parties with the preparation of the Approved Budget and the other financial and collateral reporting required to be delivered to the Agent and Term Agent pursuant to this Agreement, and approval of all requests for Borrowing and all disbursements by the Borrowers.

(b)     The Lead Borrower authorizes the Agent, the Term Agent, and their respective representatives to communicate directly with the Loan Parties' independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Consultants), which have been engaged from time to time by the Loan Parties, and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agent, the Term Agent and their respective representatives information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party. The Lead Borrower acknowledges and agrees that the Loan Parties and their representatives will reasonably cooperate with the Consultants and any Lender Group Consultant (as defined below). The Consultants shall, together with senior management of the Loan Parties, participate in weekly telephonic calls with the Agent, the Term Agent, and Lenders (and/or their advisors and counsel) to discuss various matters, including, without limitation, the Approved Budget, budget variance, and bankruptcy milestones upon the reasonable request of the Agent and Term Agent.

(c)     Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of the Agent, Term Agent, Issuing Lender, and the Lenders, as the Agent may determine to be necessary or appropriate, in its sole discretion. Each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation with any Lender Group Consultant (including, without limitation, providing unfettered access to such Loan Party's business, books and records and senior management); (ii) all costs and expenses of any such Lender Group Consultant shall be expenses required to be paid by the Loan Parties under Section 12.4 hereof; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

7.21.   <u>Performance within Budget</u>.   At all times following the Closing Date, strictly perform in accordance with the Approved Budget, including having made all scheduled payments to the "Lenders" (as defined in the Pre-Petition Credit Agreement) and Lenders, as applicable, as and when required, subject to the following (the "<u>Permitted Variance</u>"): (a) the Borrowers' actual sales and cash receipts shall not be less than 85% of the projected amounts set forth in the Approved Budget, (b) the Borrowers' actual expenses and cash expenditures shall not be greater than 115% of the projected amounts set forth in the Approved Budget on an aggregate basis (other than with respect to professional fees and expenses, which shall be tested on a separate aggregate basis), and (c) the Borrowers' Inventory shall not be less than 85% of the projected amounts set forth in the Approved Budget. Each of the foregoing covenants shall be tested on Sunday of each week (commencing with the third (3rd) week after the Petition Date) on a cumulative basis from the Petition Date until the fourth week after the Petition Date and then on a rolling four (4) week basis, pursuant to the Approved Budget Variance Report delivered by the Lead Borrower to the Agent in accordance with Section 7.3(c).

7.22.   <u>Bankruptcy Related Affirmative Covenants</u>.

(a)     The Loan Parties shall complete, or shall cause to be completed, the following actions as and when required below, which motions and orders shall, in all cases, be upon terms and conditions acceptable to the Agent and Term Agent in their sole discretion:

(i)     on or before the third (3rd) Business day following the Petition Date, the filing of an Acceptable Plan, Disclosure Statement, and plan solicitation process, upon terms and conditions acceptable to the Agent in its discretion;

(ii)     no later than March 8, 2018, the Bankruptcy Court shall have entered the Interim Financing Order;

(iii)     no later than April 10, 2018, the Bankruptcy Court shall have entered the Final Financing Order;

(iv)     on or before April 25, 2018, the Bankruptcy Court shall have held a hearing seeking approval of the Disclosure Statement;

(v)     on or before April 26, 2018, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(vi)     on or before April 30, 2018, the Loan Parties shall have commenced solicitation with respect to an Acceptable Plan;

(vii)     on or before June 4, 2018, the Bankruptcy Court shall have held a hearing seeking confirmation of an Acceptable Plan;

(viii)     on or before June 5, 2018, the Bankruptcy Court shall have entered an order confirming the Acceptable Plan; and

(ix)     on or before June 14, 2018, consummation of the Acceptable Plan, including, without limitation, the irrevocable Payment in Full of all Pre-Petition Obligations and Obligations on the date of such consummation.

(b)     If an Event of Default pursuant to Section 9.1 or, solely with respect to Section 7.21 or 7.22, Section 9.2(a) has occurred and is continuing (each a "Specified Sale Process Default"), then the Agent may, in accordance with the terms of the Financing Orders, commence a Sales Process (as such term is defined in the Financing Orders) and the Loan Parties shall take such actions as required thereunder in connection therewith.

(c)     The Loan Parties shall fund the Professional Fee Escrow Account on a weekly basis in accordance with the Approved Budget, as and when permitted under the Financing Orders.

7.23.     Lease Extension.     No later than March 19, 2018, the Loan Parties shall have filed a motion seeking an order ("Lease Extension Order") of the Bankruptcy Court extending the time period of the U.S. Loan Parties to assume or reject leases to not less than 210 days from the Petition Date, and on or before April 5, 2018, the Bankruptcy Court shall have entered the Lease Extension Order.

7.24.     Financing Orders.  The Loan Parties shall comply with (i) the terms and conditions of the Financing Orders, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without the prior written consent of the Agent and Term Agent; and (ii) all terms and conditions of all other orders entered by the Bankruptcy Court unless otherwise agreed to by the Agent and Term Agent. Exit Commitments.  The Loan Parties shall comply with all terms and conditions of the Exit Commitment Letters.

**8.** **NEGATIVE COVENANTS.**

Each Loan Party covenants and agrees that, so long as this Agreement and the other Loan Documents remains in effect and until full and final payment of the Obligations, each Loan Party will not and will not permit any of their respective Subsidiaries to do any of the following:

8.1. Indebtedness. Create, incur, assume, permit, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a) Indebtedness evidenced by this Agreement and the other Loan Documents, together with Indebtedness owed to Underlying Issuer with respect to Underlying Letters of Credit;

(b) Indebtedness set forth on Schedule 6.20;

(c) Permitted Purchase Money Indebtedness;

(d) refinancings, renewals, or extensions of Indebtedness permitted under clauses (b) and (c) of this Section 8.1 (and continuance or renewal of any Permitted Liens associated therewith) so long as: (i) the terms and conditions of such refinancings, renewals, or extensions do not, in Administrative Agent's reasonable judgment, materially impair the prospects of repayment of the Obligations by Loan Party or materially impair Loan Party's creditworthiness, (ii) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, (iii) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions, that, taken as a whole, are materially more burdensome or restrictive to the Loan Party, and (iv) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must be include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness;

(e) Indebtedness composing Permitted Investments;

(f) Indebtedness of a Borrower resulting from Permitted Intercompany Advances if unsecured, subordinated to the Obligations pursuant to a Subordination Agreement and evidenced by a promissory note satisfactory to Agent and endorsed to Agent as further security for the Obligations;

(g) Indebtedness secured by Permitted Liens;

(h) Reserved;

(i) Indebtedness incurred pursuant to the Note Financing in a principal amount not to exceed $12,237,000; and

(j) Guarantees to the extent permitted under Section 8.6 hereof;

(k) Pre-Petition (i) Indebtedness constituting deferred rental payments pursuant to the Simon Master Agreement not to exceed the Total Deferred Amount as set forth in (and defined under) the Simon Master Agreement as in effect on the Closing Date and the unsecured

95

guaranty of such Indebtedness pursuant to the Simon Guaranty; and (ii) Indebtedness constituting deferred rental payments pursuant to the Galleria Fifth Lease Amendment not to exceed the Deferred Amount as set forth in (and defined under) the Galleria Fifth Lease Amendment as in effect on the Closing Date and the unsecured guaranty of such Indebtedness pursuant to the Galleria Guaranty; and

(l)     other unsecured Pre-Petition Indebtedness constituting deferred rental payments to landlords on or before September 29, 2017, as described, and in amounts not to exceed those reflected, on <u>Schedule E-1</u> attached hereto.

8.2.    <u>Liens</u>.  Create, incur, assume, or permit to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits <u>therefrom</u>, except for Permitted Liens (including Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is refinanced, renewed, or extended under <u>Section 8.1(d)</u> and so long as the replacement Liens only encumber those assets that secured the refinanced, renewed, or extended Indebtedness).

8.3.    <u>Restrictions on Fundamental Changes</u>.

(a)     Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock or otherwise change the Loan Party's type of organization, jurisdiction of organization or other legal or corporate structure,

(b)     Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or

(c)     Convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets (other than the Disposition of Big Dog's assets pursuant to the terms of the Big Dog License Agreement).

8.4.    <u>Disposal of Assets</u>.  Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of the assets of the Loan Party.

8.5.    <u>Change of Name or Address</u>.  Change any Loan Party's name or organizational identification number or relocate such Loan Party's chief executive office to a new location, or cease using the "The Walking Company" brand in connection with more than five percent (5%) of TWC's stores and other retail operations, except as otherwise agreed to by Agent and Term Agent; <u>provided</u>, <u>however</u>, that any Loan Party may change its name or chief executive office location, so long as such Loan Party provides within thirty (30) Business Days prior to the effectiveness of any such change, (i) any financing statements, fixture filings or other agreements or documents necessary to perfect and continue perfected Lenders' Liens and (ii) in the case of such a relocation, if the new chief executive office location is leased by such Loan Party, a Collateral Access Agreement with respect thereto.

8.6.    <u>Guarantee</u>.  Guarantee or otherwise become in any way liable with respect to the obligations of any third Person except (i) by endorsement of instruments or items of payment for deposit to the account of Loan Party or which are transmitted or turned over to Collateral Agent and the Guarantees to be provided to Collateral Agent, (ii) guarantees existing on the Closing Date and set forth on <u>Schedule 8.6</u> hereto or permitted under <u>Section 8.1(d)</u> hereof, (iii) guarantee made by Parent of the Borrowers' Obligations under this Agreement pursuant to the Guaranty, and (iv) guarantees made by Parent of the leases of a Subsidiary Loan Party.

8.7.    <u>TWC-Bermuda</u>. TWC-Bermuda to have any material assets, operations or Indebtedness.

8.8.    Prepayments and Amendments.

(a)    Except for payments not prohibited under Section 8.26 hereof, prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party, other than the Obligations in accordance with this Agreement, and

(b)    Directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning Indebtedness permitted under Section 8.1(b), (c), (e), (f), (g), (i), (j), and (k) to the extent any such changes could have an adverse impact on the rights of the Agent, Term Agent, or Lenders, the Liens granted under the Loan Documents, or ability of the Agent or Term Agent to exercise any rights or remedies under the Loan Documents. The Loan Parties shall not, without the prior consent of the Agent, amend, modify or change in any manner any term or condition of the Exit Commitment Letters, or give any consent, waiver or approval thereunder, without the prior written consent of the Agent.

8.9.    Change of Control.  Cause, permit, or suffer, directly or indirectly, any Change of Control.

8.10.    Consignments.  Consign any Inventory or sell any Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale or accept or sell any Inventory on consignment (other than with respect to up to $3,000,000 of Inventory in connection with the Wholesale Account Locations).

8.11.    Distributions and Payments.  Except for Permitted Distributions or as otherwise expressly permitted hereunder, directly or indirectly (i) declare, order, pay or make any Restricted Payment or (ii) set aside any sum or property therefor or exercise any set-off or similar rights of any Loan Party, if any, with respect to any Subordinated Debt held by any Loan Party.

8.12.    Accounting Methods.  Modify or change its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Loan Party's accounting records without said accounting firm or service bureau agreeing to provide Administrative Agent, Term Agent, and the Lenders information regarding the Collateral or Loan Party's financial condition except to the extent that they can obtain access to the same records directly from any Loan Party.

8.13.    Investments.  Except for Permitted Investments, directly or indirectly, make or acquire any Investment, or incur any liabilities (including contingent obligations) for or in connection with any Investment; provided, however, that the Loan Party and its Subsidiaries shall not have Permitted Investments (other than in the Cash Management Accounts, and other than temporary (i.e., held for less than two (2) Business Days) deposits of retail store receipts made by Borrowers in deposit accounts maintained at banks that are physically proximate to the stores that generated such cash receipts) in deposit accounts or Securities Accounts in excess of $50,000 outstanding at any one time unless such Loan Party or any of its Subsidiaries, as applicable, and the applicable securities intermediary or bank have entered into a Control Agreement or similar arrangements governing such Permitted Investments, as Collateral Agent shall determine in its Permitted Discretion, to perfect (and further establish) the Lenders' Liens in such Permitted Investments.

8.14.    Transactions with Affiliates.  Except for Permitted Intercompany Advances subject to the Approved Budget, directly or indirectly enter into or permit to exist any transaction with any Affiliate of

Loan Party other than transactions that are in the ordinary course of Loan Party's business, upon fair and reasonable terms that are no less favorable to the Loan Party than would be obtained in an arm's length transaction with a non-Affiliate, and, for any transaction of which the book value is $100,000 or greater, that are fully disclosed to the Agent.

8.15. <u>Store Openings and Closings</u>.    With respect to any locations at which any Borrower maintains, offers for sale or stores any of the Collateral, open or close any store locations without the written consent of the Agent; except the Loan Parties may (i) reject or terminate up to five (5) leases for store locations identified to the Agent and Term Agent prior to the Petition Date; and (ii) reject or terminate up to an additional seventy three (73) leases for store locations in accordance with Permitted Store Closings.

8.16. <u>Suspension</u>.    Except as permitted under <u>Section 8.15</u> and in connection with the termination of the Big Dog License Agreement, suspend or go out of a substantial portion of any Loan Party's business.

8.17. <u>Sale Leaseback</u>. In respect to a real estate lease for any new retail store locations opened after the date hereof, enter into a sale/leaseback arrangement or Capital Lease.

8.18. <u>Use of Proceeds</u>. Use the proceeds of the Term Loan or any Advances for any purpose other than to the extent permitted under applicable Law, the Approved Budget (subject to the Permitted Variance), and the Loan Documents, (a) on the Closing Date, for the payment of transaction expenses in connection with this Agreement, and (b) after the Closing Date, (i) with the proceeds of the Term Loan, to Pay in Full the Pre-Petition Term Loan in accordance with <u>Section 2.1(a)</u>, and (ii) with the proceeds of Advances (other than the Term Loan), (1) to Pay in Full all other Pre-Petition Obligations, (2) to finance general corporate purposes of the Loan Parties and to finance the acquisition of working capital assets of the Borrowers, including capital expenditures and the purchase of inventory and equipment, in each case in the ordinary course of business or as otherwise approved by the Lenders, (3) to pay fees, expenses, and costs incurred in connection with the Chapter 11 Case, as well as the payment of any adequate protection payments approved in the Financing Orders, and (4) to pay the Carve-Out up to the Carve-Out Reserve and, prior to the delivery of a Carve-Out Trigger Notice (as defined in the Financing Orders), to fund amounts into the Professional Fee Escrow Account, as and when permitted under the Financing Orders.

8.19. <u>Inventory and Equipment with Bailees</u>. The Inventory and Equipment shall not at any time now or hereafter be stored with a bailee (other than a freight forwarder or customs broker), warehouseman, or a distribution center leased from a third party, or similar party (excluding any Inventory and Equipment on consignment in connection with the Wholesale Account Locations as permitted hereunder) unless Collateral Agent has granted its prior written consent or the Loan Party has delivered to Collateral Agent a Bailee Acknowledgment or Collateral Access Agreement with respect to the applicable Inventory and/or Equipment; provided, however that the foregoing shall not restrict Agent's right to establish a rent Reserve for any distribution center or warehouse leased from a third party at which Borrower maintains Inventory for which there is no such Bailee Acknowledgement or Collateral Access Agreement.

8.20. <u>Securities Accounts</u>. Establish or maintain any Securities Account unless Collateral Agent shall have received a Control Agreement in respect of such Securities Account. No Loan Party shall transfer assets out of the Securities Account.

8.21. <u>Reserved</u>.

8.22. <u>Benefit Plans</u>. No Loan Party, nor any of its Subsidiaries, shall maintain or contribute to any Benefit Plan.

8.23. <u>Shareholder Agreements</u>. None of the Shareholder Agreements described on <u>Schedule 6.35</u> shall be amended, modified, superseded, waived or replaced so as to effect a Change in Control without the Agent's prior written consent (not to be unreasonably withheld or delayed).

8.24. <u>Fiscal Year</u>. No Loan Party shall change its Fiscal year from the current twelve month period that comprises each such Fiscal year. The Fiscal Year currently begins on January 1 and ends on December 31 each calendar year.

8.25. <u>Reclamation Claims</u>. No Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(c) of the Bankruptcy Code or agree to allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $10,000.

8.26. <u>Payments in Respect of Debt</u>. Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Debt, or make any payment on any Subordinated Indebtedness (other than, subject to an Approved Budget, (i) Indebtedness incurred hereunder, (ii) Indebtedness under the Pre-Petition Credit Agreement in accordance with the terms and conditions herein and in the Financing Order, and (iii) as set forth in the Approved Budget and permitted by an order of the Bankruptcy Court.

8.27. <u>Simon/Galleria Agreements</u>. No Loan Party shall amend restate, modify, supplement or waive any provision of the Galleria Fifth Lease Amendment, Galleria Note, Galleria Guaranty, Simon Master Agreement, Simon Note, or Simon Guaranty without the prior written consent of the Administrative Agent and Collateral Agent.

8.28. <u>Bankruptcy Related Negative Covenants</u>. No Loan Party shall seek, consent to, or permit to exist any of the following:

(a) Any order which authorizes the rejection or assumption of any Leases of any Loan Party without the Agent's and Term Agent's prior consent (other than assumptions and rejections in connection with the Permitted Store Closings);

(b) Any modification, stay, vacation or amendment to the Financing Orders to which the Agent, Term Agent, Majority Revolving Lenders, and Majority Term Lenders have not consented in writing;

(c) A priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (after entry of the Final Financing Order), 507(a), 507(b), 546(c), 546(d), 726, 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations and the Pre-Petition Obligations except as set forth in the Financing Orders;

99

(d)     Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations or Pre-Petition Liens including any adequate protection Liens except as set forth in the Financing Orders;

(e)     Any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(f)     Any order which authorizes the payment of any Indebtedness (other than the Pre-Petition Obligations and Pre-Petition Indebtedness reflected in an Approved Budget) incurred prior to the Petition Date or, except as set forth in the Financing Orders, the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(g)     any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

8.29.   Professional Fee Escrow Account.   Until all of the Pre-Petition Obligations and the Obligations have been Paid in Full, pay the fees and expenses of any Case Professionals or Committee Expenses from any source other than (i) the Professional Fee Escrow Account, or (ii) any retainers paid prior to the Petition Date and held by such Case Professional, or (iii) following delivery of the Carve-Out Trigger Notice (as defined in the Financing Orders), up to $250,000 in accordance with the provisions of the Financing Orders to the extent not previously funded into the Professional Fee Escrow Account.

## 9.     EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

9.1.   Payment.   If Loan Party fails to pay when due and payable or when declared due and payable, all or any portion of any of the Obligations or Pre-Petition Obligations whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due any Agent, Term Agent, or any Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations or Pre-Petition Obligations;

9.2.   Covenants.

(a)     If any Loan Party fails to perform, keep, or observe any term, provision, condition, covenant, or agreement contained in Articles 5, 7 or 8 of this Agreement or in any of the other Loan Documents; and

(b)     If any Loan Party fails to perform, keep, or observe any other term, provision, condition, covenant, or agreement contained in this Agreement or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the first to occur of any Borrower's actual knowledge thereof or notice thereof from the Administrative Agent or Term Agent to the Lead Borrower.

9.3.   Attachment.   If any material portion of any Loan Party's or their Subsidiary's assets is attached, seized, subjected to a writ or distress warrant or levied upon.

9.4.   Reserved.

100

9.5.  Reserved.

9.6.  Injunction.  If any Loan Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs.

9.7.  Levy.  If a notice of Lien, levy, or assessment is filed of record with respect to Borrower's or any of its Subsidiary's assets by the United States, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency and not removed within thirty (30) days.

9.8.  Judgment.  One or more judgments or orders for the payment of money is rendered against any Loan Party in excess of $500,000 in the aggregate (provided, that, any judgment covered by insurance where the insurer is defending the action without reservation of rights shall not be included in calculating such amount) and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against any Loan Party or any of the Collateral having a value in excess of $500,000 and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed.

9.9.  Material Agreements.  Except to the extent that non-performance is permitted by the Bankruptcy Code, if there is a default by any Loan Party in an agreement related to Indebtedness in excess of $100,000 or any other agreement the termination of which would cause a Material Adverse Effect, and such default (a) occurs at the final maturity of the obligations thereunder, or (b) results in a right by the other party thereto, irrespective of whether exercised, to accelerate the maturity of any Loan Party's obligations thereunder, to terminate such agreement or to refuse to renew such agreement pursuant to an automatic renewal right therein.

9.10.  Cessation of Business.  Except for the Permitted Store Closings, any event occurs, as a result of which revenue-producing activities (except to the extent such lost revenue is promptly replaced with business interruption insurance) cease at (a) any of Borrowers' principal distribution centers and such cessation or curtailment continues for more than five (5) Business Days or (b) any other facility or facilities of any Borrower generating more than ten percent (10%) of Borrowers' consolidated revenues for Borrowers' Fiscal year preceding such event, and such cessation continues for more than twenty (20) days.

9.11.  Subordinated Payments.  If any Loan Party makes any payment on account of Indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations.

9.12.  Misrepresentation.  If any material misstatement or misrepresentation exists now or hereafter in any or in completing any request for a borrowing under the Portal or in any written warranty, representation, statement, or Record made to the Agent, Term Agent, or Lenders by any Loan Party or any of their Subsidiaries or any of officers, directors, employee or agent of any Loan Party or any of their Subsidiaries.

9.13.  Guaranty.  If the obligation of Parent under the Guaranty is limited or terminated by operation of law or by the Parent thereunder.

9.14.  Liens.  If this Agreement or any other Loan Document that purports to create a Lenders' Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest (subject only to Permitted Liens)

101

in a material portion of the Collateral covered hereby or thereby in which a Lien is required to be perfected under the Loan Documents.

9.15. <u>Loan Documents</u>. Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Loan Party; a proceeding shall be commenced by any Loan Party, or by any Governmental Authority having jurisdiction over the Loan Party, seeking to establish the invalidity or unenforceability thereof (as the case may be), or any Loan Party that Loan Party has any liability or obligation purported to be created under any Loan Document (as the case may be) or any challenge is brought by any Loan Party which seeks to void, avoid, limit or otherwise adversely affect any security interests created by or in any Loan Document or any payment made pursuant thereto or a determination by any court or any other judicial government authority that any Loan Document is not enforceable strictly in accordance with the subject Loan Documents terms or which voids, avoids, limits, or otherwise adversely affects any security interests created by any Loan Document or any payment made pursuant thereto.

9.16. <u>Material Adverse Change</u>. If there is a Material Adverse Change.

9.17. <u>Change of Control</u>. If a Change of Control shall occur.

9.18. <u>Material Restraint</u>. The indictment of, or institution of any legal process or proceeding against any Loan Party that remains unquashed or undismissed for a period of ninety (90) days, where the relief, penalties or remedies sought or available include the forfeiture of any property of any Loan Party and/or the imposition of any stay or other order, in each case, which would have a Material Adverse Effect.

9.19. <u>Guarantor</u>. The termination or attempted termination by Parent or any Subsidiary of its Guaranty.

9.20. <u>License</u>. Any License granting any Loan Party the right to use any trademark, copyright or other intellectual property interest is terminated, cancelled, voided, rescinded or otherwise impaired for any reason if the occurrence of any of the foregoing would be reasonably likely to result in a Material Adverse Effect.

9.21. <u>Indictment</u>. Any indictment of Loan Party's chief executive officer or chief financial officer under Applicable Law where the crime alleged arises from an act of defalcation, breach of fiduciary duty, embezzlement or intentional fraud related to such senior executive's work responsibilities and would constitute a felony under Applicable Law unless in the case of an indicted executive, such executive's employment is terminated within thirty (30) days of such indictment or the Administrative Agent and Lenders determine, in their Permitted Discretion, that such indictment is not material.

9.22. <u>Chapter 11 Case</u>. The occurrence of any of the following in the Chapter 11 Case:

(a)      any Loan Party, without the Agent's prior written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of any Loan Party's assets or capital stock unless the transactions that are the subject of the motion will result in Payment in Full of the Pre-Petition Obligations and the Obligations on the closing of such sale (for the avoidance of doubt, the Permitted Store Closings shall not violate this provision);

(b)      other than in connection with the Payment in Full or refinancing of the Pre-Petition Obligations and the Obligations, the bringing or supporting of a motion, taking of any action by or on behalf of any Loan Party in the Chapter 11 Case: (A) to obtain additional

8478014v8

financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent; (D) that seeks to prohibit Agent or Lenders from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Case; or (E) any other action or actions adverse to the interest of the Agent or the Lenders in their capacities as such or their rights and remedies hereunder or its interest in the Collateral;

(c)    (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which is not an Approved Plan, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization without the consent of the Agent;

(d)    the entry of an order in the Chapter 11 Case confirming a plan other than an Acceptable Plan;

(e)    the entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Pre-Petition Credit Agreement or the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent and Majority Lenders or, in the case of an order that could not reasonably be expected to have a Material Adverse Effect on the Lenders, the Agent, or the filing of a motion for reconsideration by any Loan Party or the Statutory Committee, if any, with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect, in each case, without the consent of the Agent and Majority Lenders or, in the case of an order that would not reasonably be expected to have a material adverse effect on the Lenders, the Agent;

(f)    the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within thirty-five (35) days of the Petition Date;

(g)    except as set forth in any motions which have been delivered to and are acceptable to the Agent and as contemplated by an Approved Budget (subject to the Permitted Variance), the payment of, or application for authority to pay, any Pre-Petition Indebtedness or Pre-Petition claim without the Agent's prior written consent;

(h)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, any other Secured Party or any of the Collateral;

(i)    the filing of a motion by a Loan Party or any of their respective Affiliates for, or the entry of an order directing, the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties (other than, for the avoidance of doubt, a fee examiner or similar examiner); or the sale without the Agent's and Majority Lenders' consent of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for Payment in Full of the Pre-Petition Obligations and the Obligations and termination of the Commitments on the effective date of such plan or the closing of such sale;

103

(j)     the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(k)     the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 (or $250,000 in the aggregate) or more (other than with respect to equipment at store locations after completion of the Permitted Store Closings at such location), or (2) with respect to any Lien or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(l)     the commencement of a suit or action against the Agent, any Lender or any other Secured Party (both under this Agreement and as such terms are defined in the Pre-Petition Credit Agreement) by or on behalf of any Loan Party, its bankruptcy estates, or any of their Affiliates;

(m)     the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of the Indebtedness owing under this Agreement or the other Loan Documents or the Pre-Petition Credit Agreement;

(n)     the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court;

(o)     unless otherwise approved by the Agent, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Case; or

(p)     the entry of an order in the Chapter 11 Case granting any other super-priority administrative claim or Lien equal or superior to that granted to the Agent, the Lenders and Agent (as defined in the Pre-Petition Credit Agreement) except as set forth in the Financing Orders.

## 10.     THE AGENT'S RIGHTS AND REMEDIES.

10.1.     Rights and Remedies. Upon the occurrence, and during the continuation, of an Event of Default upon the expiration of the "Remedies Notice Period" referred to in the Financing Orders,

(a)     the Agent may, or, at the request of the Majority Revolving Lenders shall, (A) declare the Revolving Loan Commitments of each Revolving Credit Lender to make Revolving Credit Loans and any obligation of the Issuing Lender to make L/C Advances to be terminated, whereupon such Revolving Loan Commitments and obligation shall be terminated, and (B) declare the unpaid principal amount of all outstanding Advances (both under this Agreement and under the Pre-Petition Credit Agreement), and all interest accrued and unpaid thereon, and any other Obligations or Pre-Petition Obligations related to the foregoing, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(b)     the Term Agent may, or, at the request of the Majority Term Lenders shall, require that the Agent declare the unpaid principal amount of the Term Loan (both under this Agreement and under the Pre-Petition Credit Agreement), and all interest accrued and unpaid thereon, and any other Obligations or Pre-Petition Obligations related to the foregoing, to be

immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)     the Agent may exercise any of the other rights and remedies of a secured party under the Code and any other rights and remedies provided for in this Agreement or any other Loan Document or otherwise available to it at law or in equity, such rights and remedies to include, without limitation, the following, all of which are authorized by the Loan Parties:

(i)     Declare all Obligations and Pre-Petition Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, by the Pre-Petition Credit Agreement or otherwise, immediately due and payable;

(ii)     Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Agent or the Lenders, but without affecting any of the Lenders' Liens in the Collateral and without affecting the Obligations;

(iii)     Notify Account Debtors and other Persons obligated on the Collateral to make payment or otherwise render performance to or for Collateral Agent, and, to the extent permitted under the Code, enforce the obligations of Account Debtors and other Persons obligated on the Collateral and exercise the rights of Loan Parties with respect to such obligations and any property that may secure such obligations;

(iv)     Take any proceeds of the Collateral;

(v)     Cause Loan Parties to hold all returned Inventory in trust for the Lenders, segregate all returned Inventory from all other assets of Borrowers or in Borrowers' possession and conspicuously label said returned Inventory as the property of the Lenders;

(vi)     Without notice to or demand upon any Loan Party, make such payments and do such acts as Collateral Agent considers necessary or reasonable to protect its security interests in the Collateral. Each Loan Party agrees to assemble the Personal Property Collateral if Collateral Agent so requires, and to make the Personal Property Collateral available to Collateral Agent at a place that Collateral Agent may designate which is reasonably convenient to both parties. Each Loan Party authorizes Collateral Agent to enter the premises where the Personal Property Collateral is located, to take and maintain possession of the Personal Property Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Collateral Agent's determination appears to conflict with the Lenders' Liens and to pay all expenses incurred in connection therewith and to charge Borrower's Loan Account or Term Loan Account therefor. With respect to the Loan Parties' owned or leased premises, each Loan Party hereby grants Collateral Agent a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of the Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(vii)     To the maximum extent permitted by law, without notice to any Loan Party (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of any Loan Party held by any Agent or any Lender or any of Affiliate of any Agent or any Lender (including any amounts received in the Cash Management Accounts), or (ii) Indebtedness at any time

105

owing to or for the credit or the account of any Loan Party held by Collateral Agent or any Affiliate of any Agent or any Lender;

(viii)    Hold, as cash collateral, any and all balances and deposits of any Loan Party held by the Agent and the Lenders, and any amounts received in the Cash Management Accounts, to secure the full and final repayment of all of the Obligations and Pre-Petition Obligations;

(ix)    Instruct each Cash Management Bank and any other depositary with whom a DDA subject to a Control Agreement is maintained, to pay any and all balances and deposits in the applicable Cash Management Account or other DDA to the Agent's Account.

(x)    Instruct any securities intermediary to liquidate the applicable Securities Account or any related Investment Property maintained or held thereby and remit the proceeds thereof to the Agent's Account;

(xi)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Personal Property Collateral. Each Loan Party hereby grants to Collateral Agent's a license or other right to use, without charge, such Loan Party's labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Personal Property Collateral, in completing production of, advertising for sale, and selling any Personal Property Collateral and such Loan Party's rights under all licenses and all franchise agreements shall inure to the Collateral Agent's benefit;

(xii)    Subject to receipt of an order by the Bankruptcy Court, sell, or cause to be sold, the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrowers' premises) as Collateral Agent determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(xiii)    Reserved;

(xiv)    Collateral Agent and/or any Lender may credit bid and purchase at any public sale;

(xv)    Collateral Agent and/or any Lender may seek the appointment of a receiver or keeper to take possession of all or any portion of the Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing and may conduct one or more going-out-of-business sales in respect to the Collateral;

(xvi)    The Collateral Agent shall have all other rights and remedies available to it at law or in equity pursuant to any other Loan Documents;

(xvii)    Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrowers. Any excess will be returned, without interest and subject to the rights of third Persons, by Collateral Agent to Lead Borrower (for the benefit of the applicable Loan Party);

(xviii)  Subject to receipt of an order by the Bankruptcy Court, the Collateral Agent, in the exercise of the Collateral Agent's rights and remedies upon default, may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or more agents and contractors.  Such sale(s) may be conducted upon any premises owned, leased, or occupied by any Loan Party.  The Collateral Agent's and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the Collateral Agent's or such agent or contractor).  Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent's or such agent or contractor and none of the Lenders, Loan Parties nor any Person claiming under or in right of the Loan Parties shall have any interest therein;

(xix)  Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Collateral Agent shall provide the Lead Borrower (for the benefit of the applicable Borrower) with such notice as may be practicable under the circumstances), the Collateral Agent shall give the Lead Borrower (for the benefit of the applicable Borrower) at least ten (10) days prior written notice of the date, time, and place of any proposed public sale, and of the date after which any private sale or other disposition of the Collateral may be made.  The Loan Parties agree that such written notice shall satisfy all requirements for notice to the Loan Parties which are imposed under the Code or other applicable law with respect to the exercise of the Collateral Agent's rights and remedies upon default.

(xx)  Subject to receipt of an order by the Bankruptcy Court, in connection with the Collateral Agent's exercise of its rights under this Agreement, the Collateral Agent may enter upon, occupy, and use any premises owned or occupied by any Loan Party, and may exclude the Loan Parties from such premises or portion thereof as may have been so entered upon, occupied, or used by the Collateral Agent.  The Collateral Agent shall not be required to remove any of the Collateral from any such premises upon the Collateral Agent's taking possession thereof, and may render any Collateral unusable to the Loan Parties.  In no event shall the Collateral Agent be liable to the Loan Parties for use or occupancy by the Collateral Agent of any premises pursuant to this Agreement, nor for any charge (such as wages for the Loan Parties' employees and utilities) incurred in connection with the Collateral Agent's exercise of the Collateral Agent's rights and remedies; and

(xxi)  Each Loan Party hereby grants to the Collateral Agent a royalty free nonexclusive irrevocable license to use, apply, and affix any trademark, trade name, logo, or the like in which any of the Loan Parties now or hereafter has rights, such license being with respect to the Collateral Agent's exercise of its rights and remedies hereunder including, without limitation, in connection with any completion of the manufacture of Inventory or sale or other disposition of Inventory.

(d)  Notwithstanding anything to the contrary contained in <u>Section 10.1</u>, the Agent shall demand payment of the Obligations and Pre-Petition Obligations and shall take any or all of the actions set forth in <u>Section 10.1</u> and commence and pursue such other Enforcement Actions as the Agent is directed by the Majority Term Lenders (x) with respect to Events of Default described in <u>Sections 9.1</u> with respect to the Term Loan and <u>Section 9.5 or 9.6</u>, within five (5) days after the date of the receipt by the Agent of written notice executed and delivered by the

Majority Term Lenders or by the Term Agent on behalf of Majority Term Lenders requesting that Agent commence Enforcement Actions and (y) otherwise, within sixty (60) days after the date of the receipt by the Agent of written notice executed and delivered by the Majority Term Lenders or by the Term Agent on behalf of Majority Term Lenders requesting that Agent commence Enforcement Actions (in either case, the "Term Loan Action Notice"); provided, that in each case (1) the Agent shall not have commenced such Enforcement Action or the Required Lenders shall not have instructed the Agent to commence an Enforcement Action in accordance with this section prior to the expiration of such five (5) or sixty (60) day period, as applicable, (2) such Event of Default has not been waived by the applicable Lenders required pursuant to Section 20.3 prior to the Agent's receipt of the Term Loan Action Notice, (3) such Event of Default has not been waived or such Term Loan Action Notice has not been rescinded, in each case by the applicable Lenders required pursuant to Section 20.3 after the Agent's receipt of the Term Loan Action Notice, (4) in the good faith determination of the Agent, taking an Enforcement Action is permitted under the terms of the Loan Documents and Applicable Law, (5) taking an Enforcement Action shall not result in any liability of the Agent, the Term Agent or the Lenders to any Loan Party or any other person, (6) the Agent shall be entitled to all of the benefits of Article 19 hereof, and (7) the Agent shall not be required to take an Enforcement Action so long as, within the period provided above, the Agent shall, at its option, either (a) appoint the Term Agent, as an agent of the Agent for purposes of exercising the rights of the Agent to take an Enforcement Action, subject to the terms hereof or (b) resign as Agent, and the Term Agent shall automatically be deemed to be the successor Agent hereunder and under the other Loan Documents for purposes hereof or thereof, except with respect to the provisions of Article II as it relates to making Advances under the Revolving Credit Loan and in connection with all matters relating to the determination of the Borrowing Base and each of its components, which shall be taken at the direction of the Required Revolving Credit Lenders until a new Agent is appointed at the direction of the Majority Revolving Lenders.

(e)     The Term Agent may not sell, assign or otherwise transfer, or require the Agent to sell, assign or otherwise transfer the Term Loan Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 10.1. Specifically, in the event of any Disposition (including, without limitation, by means of a sale pursuant to Section 363 of the Bankruptcy Code) of the Revolving Loan Priority Collateral, the Agent or any other Person (including any Revolving Credit Lender) acting with the consent, or on behalf, of the Agent, shall have the right during the Use Period to use the Term Loan Priority Collateral (including, without limitation, Intellectual Property), in order to assemble, inspect, copy or download information stored on, take actions to perfect its Lien on, complete a production run of Inventory involving, take possession of, move, prepare and advertise for sale, sell (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any Loan Party's business), store or otherwise deal with the Revolving Loan Priority Collateral, in each case without interference by the Term Agent or any Term Lender or liability to the Term Agent or any Term Lender. The Agent and the Revolving Credit Lenders acknowledge and agree that in connection with their use of the Term Loan Priority Collateral consisting of Intellectual Property, they will not intentionally impair the substantial goodwill associated with such Intellectual Property (it being understood that the use of the Intellectual Property in connection with a Liquidation may result in impairment of the goodwill associated with such Intellectual Property and such impairment may be substantial). The Agent and the Revolving Credit Lenders shall not be obligated to pay any licensing fee, royalty fee, rent, fee or other amounts to the Term Agent or the Term Lenders (or any person claiming by, through or under any of them, including any purchaser of the Term Loan Priority Collateral) or to the Loan Parties, for or in respect of the use

108

by the Agent and the Revolving Credit Lenders of the Term Loan Priority Collateral. The Agent and the Revolving Credit Lenders shall use the Term Loan Priority Collateral in accordance with Applicable Law. The Agent and Revolving Credit Lenders shall not be obligated to pay any amounts to the Term Agent or the Term Lenders (or any person claiming by, through or under the Term Agent or the Term Lenders, including any purchaser of the Term Loan Priority Collateral) or the Borrowers or any other Loan Party for or in respect of the use by the Agent and Revolving Credit Lenders of the Term Loan Priority Collateral and neither the Agent and Revolving Credit Lenders nor the Term Agent or the Term Lenders shall be obligated to secure, protect, register, insure or otherwise maintain in any way such Term Loan Priority Collateral (except that the Agent and Revolving Credit Lenders shall be so obligated for damages to the Term Loan Priority Collateral caused by the Agent and/or Revolving Credit Lender or their employees, agents and representatives). The Agent and Revolving Credit Lenders shall not have any liability to the Term Lenders (or any person claiming by, through or under the Term Lenders, including any purchaser of the Term Loan Priority Collateral) as a result of any condition on or with respect to the Term Loan Priority Collateral other than those directly arising from the gross negligence or willful misconduct of the Agent and/or a Revolving Credit Lender or their respective employees, agents, and representatives, and the Agent and/or Revolving Credit Lender shall have no duty or liability to maintain the Term Loan Priority Collateral in a manner better than that in which it was maintained prior to the use thereof by the Agent and Revolving Credit Lender.

(f)     If a Specified Sale Process Default has occurred and is continuing, then the Agent may, in accordance with the terms of the Financing Orders, commence a Sales Process (as such term is defined in the Financing Orders) and the Loan Parties shall take such actions as required thereunder in connection therewith.

10.2.    <u>Remedies Cumulative</u>.  The rights and remedies of the Agent, Term Agent, and the Lenders under this Agreement, the other Loan Documents, and all other agreements shall be cumulative and may be exercised simultaneously. The Agent, Term Agent, Lenders and Issuing Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Agent, Term Agent, Lenders or Issuing Lender of one right or remedy shall be deemed an election, and no waiver by the Agent, Term Agent, Lenders or the Issuing Lender of any Event of Default shall be deemed a continuing waiver. No delay by the Agent, Term Agent, Lenders or Issuing Lender shall constitute a waiver, election, or acquiescence by it.

## 11.     <u>TAXES AND EXPENSES</u>.

11.1.    <u>Third Party Payments</u>.  If any Loan Party fails to pay any monies (whether Taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Agent, in its sole discretion and without prior notice to any Loan Party, may do any or all of the following: (a) make payment of the same or any part thereof, (b) set up such reserves in Borrowers' Loan Account as Administrative Agent or Collateral Agent deems necessary to protect the Agent and Lenders from the exposure created by such failure, or (c) in the case of the failure to comply with <u>Section 7.7</u> hereof, obtain and maintain insurance policies of the type described in <u>Section 7.7</u> and take any action with respect to such policies as Collateral Agent deems prudent. Any such amounts paid by Agent shall constitute Lender Expenses and any such payments shall not constitute an agreement by the Agent or Lenders to make similar payments in the future or a waiver by the Agent or Lenders of any Event of Default under this Agreement. Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

11.2.  <u>Taxes</u>.

(a)      All payments required to be made by a Loan Party under the Loan Documents shall be made free and clear of, and without deduction or withholding for, or on account of any Indemnified Taxes unless such deduction or withholding is required by Applicable Law; provided the affected Lender has made commercially reasonable efforts to minimize any such Indemnified Taxes.

(b)      If any Indemnified Taxes are required to be deducted or withheld by Applicable Law from any amounts payable under the Loan Documents by a Loan Party, (a) such Loan Party shall promptly pay an additional amount ("<u>Additional Amount</u>") to the Administrative Agent, Term Agent, or the applicable Lender as may be necessary so that after making all required Indemnified Tax deductions or withholdings (including deductions or withholdings applicable to all Indemnified Taxes on, or arising by reason of, the payment of Additional Amounts), the Administrative Agent, Term Agent, or applicable Lender receives and retains, an amount equal to the amount that it would have received had no such deductions or withholdings been required; provided that such Loan Party shall be entitled to deduct and withhold any Indemnified Taxes and shall not be required to increase any such amounts payable to any Lender that is not organized under the laws of the United States of America or any state thereof (or whose "lending office" is located in a jurisdiction outside the United States of America) if such Lender fails to comply with the requirements of <u>Section 11.2(f)</u> whenever any Indemnified Taxes are required to be deducted or withheld by such Borrower, (b) such Loan Party shall deduct or withhold all Indemnified Taxes (including Taxes on Additional Amounts) required to be withheld or deducted under Applicable Law from any payments made to the Administrative Agent, Term Agent, or the Lenders pursuant to the Loan Documents, and (c) such Loan Party shall pay the full amount of all Indemnified Taxes deducted or withheld under this <u>Section 11.2</u> to the relevant Governmental Authority on a timely basis all in accordance with Applicable Law.

(c)      Each Loan Party shall, promptly following receipt of a request from the Administrative Agent, pay to the Agent, on its behalf or on behalf of Term Agent or any Lender, any and all Taxes in the nature of sales, use, goods and services, and harmonized sales Taxes (hereinafter referred to as "<u>Other Taxes</u>") payable under the laws of the United States of America, any State of the United States of America or any other country or jurisdiction with respect to any and all goods and services made available under the Loan Documents to it by the Administrative Agent, Term Agent, and the Lenders.

(d)      Whenever any Indemnified Taxes or Other Taxes are required to be paid by a Loan Party to a Governmental Authority under this <u>Section 11.2</u>, such Loan Party shall send or cause to be sent to the Administrative Agent, for the account of the Administrative Agent, Term Agent, and each affected Lender, a certified copy of an original official receipt evidencing payment of such Taxes, or other evidence of such payment satisfactory to the Administrative Agent, in its Permitted Discretion, within thirty (30) days after the date of any payment of such Taxes thereunder.

(e)      If a Loan Party fails to pay any Indemnified Taxes or Other Taxes under this <u>Section 11.2</u> when due or if a Loan Party fails to send to the Administrative Agent the required documentary evidence of the payment of Indemnified Taxes or Other Taxes pursuant to <u>Section 11.2</u>, the Loan Parties shall jointly and severally indemnify and save harmless the Administrative Agent, Term Agent, and the Lenders from any Taxes, interest, penalties or other liabilities that may become payable by the Administrative Agent or by Term Agent or any Lender or to which the Administrative Agent, Term Agent, or any Lender may be subjected to as a result

110

of any such failure; provided, however that if such Person fails to comply with the requirements of Section 11.2(f), Loan Parties shall not be required to indemnify such Person for such Indemnified Taxes or Other Taxes. A certificate of the Administrative Agent, Term Agent, or any applicable Lender as to the amount of any such Taxes, interest, penalties or other liabilities and containing reasonable details of the calculation of such Taxes, interest, penalties or other liabilities shall be, absent manifest error, prima facie evidence of the amount of such Taxes, interest, penalties or other liabilities, as the case may be. The indemnification in this Section 11.2 shall be made within thirty (30) days after the date the Administrative Agent, Term Agent, or any applicable Lender has submitted a certificate under this Section 11.2.

(f)     Each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the IRC (a "Foreign Lender") shall deliver to the Lead Borrower, Term Agent, and the Administrative Agent, prior to receipt of any payment subject to withholding under the IRC (or after accepting an assignment of or a participation in an interest herein), two duly signed completed copies of either IRS Form W-8BEN or any successor thereto (relating to such Person and entitling it to an exemption from withholding tax on all payments to be made to such Person by the Borrowers pursuant to this Agreement) or IRS Form W-8ECI or any successor thereto (relating to all payments to be made to such Person by the Borrowers pursuant to this Agreement) (together in each case with any additional supporting documentation required pursuant to applicable Treasury Department regulations) or such other evidence satisfactory to the Borrowers and the Administrative Agent that such Person is entitled to an exemption from all United States withholding Taxes. Thereafter and from time to time, each such Person shall (a) promptly submit to the Borrowers and the Administrative Agent such additional duly completed and signed copies of one of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may then be available under then current United States laws and regulations to avoid, or such evidence as is satisfactory to the Borrowers and the Administrative Agent of any available exemption from United States withholding Taxes in respect of all payments to be made to such Person by the Borrowers pursuant to this Agreement, (b) promptly notify the Borrowers and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption, and (c) take such steps, as shall not be materially disadvantageous to it, reasonably necessary (including the re-designation of its "lending office") to avoid any requirement of Applicable Law that the Borrowers make any deduction or withholding for Indemnified Taxes from amounts payable to such Person. If such Person fails to deliver the above forms or other documentation, then the Borrowers and the Administrative Agent may withhold from any interest payment to such Person any amounts required to be withheld by the IRC, without reduction. If any Governmental Authority asserts that the Borrowers or the Administrative Agent did not properly withhold any tax or other amount from payments made in respect of such Person, such Person shall indemnify the Borrowers or the Administrative Agent (as applicable) therefor, including all penalties and interest, any Taxes imposed by any jurisdiction on the amounts payable to the Borrowers and the Administrative Agent under this Section 11.2, and costs and expenses (including all attorney fees and expenses) of the Borrowers and the Administrative Agent.

(g)     If the Administrative Agent, Term Agent, or any Lender subsequently recovers or receives a refund or credit directly attributable to any Indemnified Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section 11.2, it shall pay over such refund or credit to the

Loan Parties (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section 11.2 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, Term Agent, or such Lender directly related thereto and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Loan Parties, upon the request of the Agent, Term Agent, or such Lender, agrees to repay the amount previously paid to the Loan Parties under Section 11.2(f) to the Administrative Agent, Term Agent, or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent, Term Agent, or any Lender to make available its tax returns (or any other information relating to its Taxes which it deems confidential) to the Loan Parties or any other Person.

(h)    Without prejudice to the survival of any other obligation contained in the Loan Documents, the obligations of Loan Parties under this Section 11.2 shall survive the termination of the Loan Documents and the payment of all amounts payable to the Agent, Term Agent, or the Lenders under the Loan Documents or with respect to the Loan Documents.

## 12.    WAIVERS; INDEMNIFICATION.

12.1.    Demand; Protest; etc.  Each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Collateral Agent on which each such Loan Party may in any way be liable.

12.2.    Collateral Agent's Liability for Collateral.  Each Loan Party hereby agrees that:  (a) so long as the Collateral Agent complies with its obligations, if any, under the Code, neither Collateral Agent, nor Term Agent, nor any Lender shall in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties.

12.3.    Indemnification.  Each Loan Party shall pay, indemnify, defend, and hold the Collateral Agent, the Administrative Agent, Term Agent, each of the Lenders, the Lender-Related Persons, each Participant, and each of their respective officers, directors, employees, and attorneys-in-fact (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys' fees and disbursements and other costs and expenses actually incurred in connection therewith (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto (all the foregoing, collectively, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Loan Parties shall have no obligation to any Indemnified Person under this Section 12.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or such Indemnified Person's officers, directors,

112

employees and attorneys-in-fact. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Loan Parties were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Loan Parties with respect thereto. Loan Parties shall be subrogated to an Indemnified Person's rights of recovery to the extent of any liabilities satisfied by the Loan Parties and such Indemnified Person shall execute and deliver such instruments and papers as are necessary to assign such rights and assist in the execution thereof; provided, however, that, and, notwithstanding the foregoing to the contrary, such subrogation rights of Loan Parties may not be exercised until Payment in Full of all Obligations due hereunder and the termination of the Revolving Credit Lenders' obligation to make Advances under the Revolving Credit and shall be subordinate to the Obligations due Agent, Term Agent, Issuing Lender and Lenders in all respects. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION (OTHER THAN GROSS NEGLIGENCE) OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

12.4. <u>Costs and Expenses of the Agent and Lenders</u>.

(a) The Loan Parties shall pay from time to time on demand on demand all costs of collection all Lender Expenses and all reasonable costs, expenses, and disbursements (including reasonable attorneys' fees and expenses) which are incurred by Agents, the Issuing Lender, and/or the Lenders in connection with the preparation, negotiation, execution, administration and delivery of this Agreement and of any other Loan Documents, and all other reasonable costs, expenses, and disbursements which may be incurred in connection with or in respect to the credit facility contemplated hereby or which otherwise are incurred with respect to the Obligations.

(b) The Loan Parties shall pay from time to time on demand all costs and expenses (including reasonable attorneys' fees and expenses) incurred, following the occurrence of any Event of Default, by the Lenders or Agent or Term Agent.

(c) Each Loan Party authorizes the Administrative Agent to pay all such fees and expenses and in the Administrative Agent's discretion, to add such fees and expenses to the Loan Account or Term Loan Account.

(d) The undertaking on the part of each Loan Party in this <u>Section 12.4</u> shall survive payment of the Obligations and/or any termination, release, or discharge executed by any Agent, Term Agent, or any Lender in favor of any Loan Party, other than a termination, release, or discharge which makes specific reference to this <u>Section 12.4</u>.

## 13. **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by any Loan Party, Agent, Term Agent, or Lenders to the others relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as the Loan Parties, Agent or Lenders, as applicable, may designate to each other in accordance herewith), or telefacsimile (with a confirming receipt from the sending machine) to any Loan Party or to Agent or to Term Agent or Lenders, as the case may be, at its address set forth below:

| If to any Loan Party: | **THE WALKING COMPANY HOLDINGS, INC.** |
| --- | --- |
| | **BIG DOG USA, INC.** |
| | **THE WALKING COMPANY** |
| | **FOOTSMART, INC.** |
| | 25 W. Anapamu Street |
| | Santa Barbara, California 93101 |
| | Attn: Andrew Feshbach |
| | Anthony Wall, Esq. |
| | Fax No. (805) 962-9460 |
| | Tel. No. (805) 963-8727 x1363 |

with copies to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com

If to Agent:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
One Boston Place, 18th Floor
Boston, MA 02108
Attn: Y. Sonia Anandraj
Ph: (617) 854-4353
Fax: (855) 842-6361
Email: Y.S.Anandraj@wellsfargo.com

If to Term Agent:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
One Boston Place, 18th Floor
Boston, MA 02108
Attention: D. Michael Murray
Telephone: (617) 854-7267
Facsimile: (855) 471-2616
E-mail: Donald.M.Murray@wellsfargo.com

(for Agent and Term Agent) with copies to:

**Choate Hall & Stewart LLP**
Two International Place
Boston, MA 02110
Attention: Kevin Simard, Esquire
Telephone: (617) 248-4086
Telecopier: (617) 502-4086
E-mail: ksimard@choate.com

Agent, Term Agent, any Lender and Borrowers may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or

114

demands sent in accordance with this Section 13, other than notices by Collateral Agent in connection with enforcement rights against the Collateral under the provisions of the Code, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail. The Borrowers acknowledge and agree that notices sent by the Agent, Term Agent, or Lenders in connection with the exercise of enforcement rights against Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

14. **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a) THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER. OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE..

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, IN THE EVENT THAT THE CHAPTER 11 CASE IS NO LONGER PENDING, THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SUFFOLK, COMMONWEALTH OF MASSACHUSETTS, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWERS AND THE AGENT, TERM AGENT, AND LENDERS WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 14(b).

(c) EACH OF THE BORROWERS, THE AGENT, TERM AGENT, AND EACH OF THE LENDERS HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH OF THE BORROWERS, THE AGENT, TERM AGENT, AND EACH OF THE LENDERS REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

8478014v8

**15.    ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

15.1.    Assignments and Participations.

(a)    Any Lender (an "Assignor") may assign and delegate to one or more assignees (each an "Assignee") all, or any ratable part of all, of the Obligations it owns, the Revolving Loan Commitments it holds and the other rights and obligations of the Assignor hereunder and under the other Loan Documents (except that any documents or agreements concerning Bank Products may only be assigned in accordance with their terms) provided, however, that the Administrative Agent's and Issuing Lender's (with respect to the Revolving Credit Loan) and the Term Agent's (with respect to the Term Loan) consents must be obtained in advance to such proposed Assignee except in respect to an assignment of an interest to an Eligible Assignee. Borrowers and Lenders and Agent and Term Agent may continue to deal solely and directly with such Assignor in connection with the interest so assigned to an Assignee until (A) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Lead Borrower and (B) the Assignor and its Assignee have delivered to Lead Borrower an Assignment and Acceptance substantially in the form of Exhibit 15.1(a) hereto. Any attempted assignment of any rights or obligations under this Loan Agreement or the other Loan Documents in violation of this Section 15.1(a) shall be void and shall not be given effect hereunder.

(b)    Each of the Lenders may at any time, with the written consent of the Agent with respect to the Revolving Credit, or the Term Agent, with respect to the Term Loan, sell to one or more commercial banks, financial institutions, or other Persons (other than to Borrower or its Affiliates) (a "Participant") participating interests in its Obligations, and the other rights and interests of such Lender hereunder (provided that no written consent shall be required in connection with any sale or any such participating interest by a Lender to an Eligible Assignee), provided that, notwithstanding such sale of a participating interest, the Agent may (A) continue to deal solely and directly with the applicable Lender and (B) the applicable Lender shall not delegate its rights to consent to any matter requiring the consent of all Lenders (other than any Delinquent Lender) hereunder in the case of the sale of a participating interest. Each Borrower also agrees that each Participant shall be entitled to the benefits of Section 11.2 with respect to its participation in the Obligations; provided, that no Participant shall be entitled to receive any greater amount pursuant to such Section 11.2 than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred, except to the extent that such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(c)    In connection with any such assignment or participation or proposed assignment or participation, the Assignor may disclose all documents and information which it now or hereafter may have relating to Borrowers or Borrowers' business to any proposed Assignee.

(d)    The Administrative Agent shall maintain a register for the recordation of the names and addresses of the Lenders and any Participants therein and their respective Revolving Loan Commitments and Term Loan (the "Register"). The entries in the Registers shall be conclusive in the absence of manifest error and the Borrowers, the Agent, Term Agent, and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. All payments under this Agreement or the Revolving Credit Note or Term Loan Note in respect of principal or interest shall be made to the appropriate Person named in the Register. The Register

116

shall be available for inspection by the Borrowers, at any reasonable time and from time to time upon reasonable prior notice.

(e) Any other provision in this Agreement notwithstanding, the Agent, Term Agent, or any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR § 203.14, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under Applicable Law.

15.2.    Successors.    This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without the Administrative Agent's, Term Agent's, and each Lender's (other than any Delinquent Lender) prior written consent and any prohibited assignment shall be absolutely void ab initio. No consent to assignment by any Lender shall release any Borrower from its Obligations hereunder. Each Lender may assign its rights under this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 15.1 hereof and no consent or approval by Borrower is required in connection with any such assignment.

## 16:    **AMENDMENTS; WAIVERS.**

16.1.    Amendments and Waivers.    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Borrowers and the applicable parties specified in Article 20 and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

16.2.    No Waivers; Cumulative Remedies.    No failure by the Agent, Term Agent, or any Lender or the Issuing Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document nor any delay by the Agent, Term Agent, or any Lender or the Issuing Lender in exercising the same, will operate as a waiver thereof.  No waiver by the Agent, Term Agent, or any Lender or Issuing Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by any Agent, Term Agent, or any Lender or Issuing Lender on any occasion shall affect or diminish its rights thereafter to require strict performance by Borrowers of any provision of this Agreement.  Each Agent's, Term Agent's, Issuing Lender's, and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or Lenders may have.

16.3.    Replacement of Holdout Lender.    If any action to be taken by the Lenders or Agents or Term Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders, and a Lender ("Holdout Lender") fails to give its consent, authorization, or agreement, then Administrative Agent, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance Agreement, subject only to the Holdout Lender being repaid its share of the outstanding Obligations (including an assumption of its pro rata share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance Agreement prior to the effective date of such replacement,

the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance Agreement. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 15.1. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Revolving Loan Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender, if a Revolving Credit Lender, shall remain obligated to make the Holdout Lender's pro-rata share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its pro-rata share of the Risk Participation Liability of such Letter of Credit.

## 17. DISTRIBUTIONS AND REVOLVING CREDIT FUNDINGS.

### 17.1. Distributions.

(a) On such day as may be set from time to time by the Administrative Agent, not less frequently than weekly (or more frequently at the Administrative Agent's option) the Administrative Agent, each Revolving Credit Lender and the Issuing Lender shall settle up on amounts advanced under the Revolving Credit and, following Payment in Full of all Pre-Petition Obligations (other than the Pre-Petition Term Loan) collected funds received in a Concentration Account.

(b) The Administrative Agent shall distribute to each Lender and the Issuing Lender, such Person's respective pro-rata share of payments of principal, interest and fees on the Obligations when actually received and collected by the Administrative Agent (excluding the one Business Day for settlement provided for in Section 2.8, which shall be for the account of the Administrative Agent only). For purposes of calculating interest due to a Lender, that Lender shall be entitled to receive interest on the actual amount contributed by that Lender towards the principal balance of the Obligations outstanding during the applicable period covered by the interest payment made by the Borrowers. Any net principal reductions to the Obligations received by the Administrative Agent in accordance with the Loan Documents during such period shall not reduce such actual amount so contributed, for purposes of calculation of interest due to that Lender (but will reduce the principal amount for purposes of calculation of interest due from the Borrowers), until the Administrative Agent has distributed to that Lender its pro-rata share thereof.

(c) The Administrative Agent shall distribute fees paid on account of: (i) the Revolving Credit to each Revolving Credit Lender, based upon such Lender's Revolving Loan Commitment Percentage when actually received and collected by the Administrative Agent, and (ii) the Term Loan to each Term Lender, based upon such Lender's portion of the outstanding principal amount of the Term Loan when actually received and collected by the Administrative Agent.

(d) No Lender shall have any interest in, or right to receive any part of any interest which reflects "float" as described in the proviso included in Section 2.8 or in the Commitment Fee (except as otherwise agreed by the Administrative Agent in writing). Any such fees shall be for the account of the Administrative Agent only.

(e) Any amount received by the Administrative Agent or the Collateral Agent as reimbursement for any cost or expense (including without limitation, reasonable attorneys' fees) shall be distributed by the Administrative Agent to that Person which is entitled to such reimbursement as provided in this Agreement (and if such Person(s) is (are) the Lenders, pro-rata based upon their respective Revolving Loan Commitment Percentages or Term Loan

118

Commitment Percentage, as applicable, at the date on which the expense, in respect of which such reimbursement is being made, was incurred).

17.2.  Revolving Credit Funding Procedures.

(a)     The Administrative Agent shall advise each Revolving Credit Lender, no later than 1:00 p.m., Boston, Massachusetts time, on the date on which any Advance is to be made. Such advice, in each instance, may be by telephone or facsimile transmission, provided that if such advice is by telephone, it shall be confirmed in writing.  Advice of an Advance shall include the amount of and interest rate applicable to the subject Advance.

(b)     Subject to that Lender's Revolving Loan Commitment, and the limitations set forth in Section 17.4 below, each Revolving Credit Lender, by no later than the end of business on the day on which the subject Advance is to be made, shall electronically transfer that Lender's Revolving Loan Commitment Percentage of the subject Advance to the Administrative Agent.

17.3.  Administrative Agent's Covering of Fundings.

(a)     Each Revolving Credit Lender shall make available to the Administrative Agent, as provided herein, that Lender's Revolving Loan Commitment Percentage of the following:

(i)     Each Advance, up to the maximum amount of that Lender's Revolving Loan Commitment.

(ii)     Up to the maximum amount of that Lender's Revolving Loan Commitment of each L/C Disbursement (to the extent that such L/C Disbursement is not "covered" by an Advance as provided herein).

(b)     In all circumstances, the Administrative Agent may:

(i)     Assume that each Revolving Credit Lender timely shall make available to the Administrative Agent that Lender's Revolving Loan Commitment Percentage of each Advance, notice of which is provided pursuant to Section 17.2(a) and shall make available, to the extent not "covered" by an Advance, that Lender's Revolving Loan Commitment Percentage of any honoring of a Letter of Credit.

(ii)     In reliance upon such assumption, make available the corresponding amount to the Lead Borrower.

(iii)     Assume that each Revolving Credit Lender timely shall pay, and shall make available, to the Administrative Agent all other amounts which that Lender is obligated to so pay and/or make available hereunder or under any of the Loan Documents.

(c)     In the event that, in reliance upon any of such assumptions, the Administrative Agent makes available, a Lender's Revolving Loan Commitment Percentage of one or more Advances, or any other amount to be made available hereunder or under any of the Loan Documents, which amount a Lender (a "Delinquent Lender") fails to provide to the Administrative Agent within one (1) Business Day of written notice of such failure, then:

(i)      The amount which had been made available by the Administrative Agent is an "Administrative Agent's Cover" (and is so referred to herein).

(ii)      All interest paid by the Borrowers on account of the Advances or coverage of the subject L/C Disbursement which consist of the Administrative Agent's Cover shall be retained by the Administrative Agent and applied by Administrative Agent to Administrative Agent's Cover until the Administrative Agent's Cover, with interest, has been paid.

(iii)      The Delinquent Lender shall pay to the Administrative Agent, on demand, interest at a rate equal to the prevailing federal funds rate on any Administrative Agent's Cover in respect of that Delinquent Lender.

(iv)      The Administrative Agent shall have succeeded to all rights to payment to which the Delinquent Lender otherwise would have been entitled hereunder in respect of those amounts paid by or in respect of the Borrowers on account of the Administrative Agent's Cover together with interest until it is repaid. Such payments shall be deemed made first towards the amounts in respect of which the Administrative Agent's Cover was provided and only then towards amounts in which the Delinquent Lender is then participating. For purposes of distributions to be made hereunder, amounts shall be deemed distributable to a Delinquent Lender (and consequently, to the Administrative Agent to the extent to which the Administrative Agent is then entitled) at the highest level of distribution (if applicable) at which the Delinquent Lender would otherwise have been entitled to a distribution.

(v)      Subject to <u>Section 17.3(c)(iv)</u>, the Delinquent Lender shall be entitled to receive any payments from the Borrowers to which the Delinquent Lender is then entitled, provided however there shall be deducted from such amount and retained by the Administrative Agent any interest to which the Administrative Agent is then entitled on account of <u>Section 17.3(c)(ii)</u>, above.

(d)      A Delinquent Lender shall not be relieved of any obligation of such Delinquent Lender hereunder (all and each of which shall constitute continuing obligations on the part of any Delinquent Lender).

(e)      A Delinquent Lender may cure its status as a Delinquent Lender by paying the Administrative Agent the aggregate of the following:

(i)      The Administrative Agent's Cover (to the extent not previously repaid by the Borrowers and retained by the Administrative Agent in accordance with <u>Section 17.3(c)(iv)</u>, above) with respect to that Delinquent Lender;

plus

(ii)      The aggregate of the amount payable under <u>Section 17.3(c)(iii)</u>, above (which relates to interest to be paid by that Delinquent Lender);

plus

8478014v8

(iii)    All such costs and expenses as may be incurred by the Administrative Agent in the enforcement of the Administrative Agent's rights against such Delinquent Lender.

## 18.    ACCELERATION AND LIQUIDATION.

18.1.    Acceleration Notices.   At any time following the occurrence and during the continuance of an Event of Default, and in all cases in accordance with Section 10.1, (a) the Agent may give the Revolving Credit Lenders an Acceleration Notice with respect to the Revolving Credit (with a copy to Term Agent), (b) the Term Agent may give the Agent an Acceleration Notice with respect to the Term Loan, (c) the Majority Revolving Lenders may give the Agent an Acceleration Notice with respect to the Revolving Credit (with a copy to Term Agent), and (d) the Majority Term Lenders may give the Term Agent an Acceleration Notice with respect to the Term Loan (with a copy to Agent).

18.2.    Acceleration.   Unless stayed by judicial or statutory process, the Agent shall Accelerate the Obligations, either in their entirety or solely with respect to the Term Loan or Revolving Credit, as applicable within a commercially reasonable time following the Agent's giving (or receipt of) of an Acceleration Notice as provided in Section 18.1.

18.3.    Initiation of Liquidation.   Unless stayed by judicial or statutory process, a Liquidation shall be initiated by the Agent within a commercially reasonable time following Acceleration of Obligations.

18.4.    Actions At and Following Initiation of Liquidation.   At the initiation of a Liquidation:

(a)    The Administrative Agent and the Revolving Credit Lenders shall "net out" each Lender's respective contributions towards the Advances, so that each Lender holds that Lender's Revolving Loan Commitment Percentage of the Advances.

(b)    Each Revolving Credit Lender shall contribute, towards any Letter of Credit or Letter of Credit Guaranty thereafter honored and not immediately reimbursed by the Borrowers, that Lender's Revolving Loan Commitment Percentage of such honoring.

18.5.    Agent's Conduct of Liquidation.   Subject to Section 10.1(d) and (e),

(a)    any Liquidation, including, without limitation, the exercise of any rights of set off or offset, shall be conducted solely by the Collateral Agent (or any of the Lenders solely if so directed by Collateral Agent), with the advice and assistance of the Administrative Agent, Term Agent, and the Lenders;

(b)    the Collateral Agent may establish one or more Nominees to "bid in" or otherwise acquire ownership to any Post Foreclosure Asset (provided, however, the Agent shall not be permitted to credit bid against any of the Term Loan Priority Collateral without the consent of the Term Agent);

(c)    the Collateral Agent shall manage the Nominee and manage and dispose of any Post Foreclosure Assets with a view towards the realization of the economic benefits of the ownership of the Post Foreclosure Assets and in such regard, the Collateral Agent and/or the Nominee may operate, repair, manage, maintain, develop, and dispose of any Post Foreclosure Asset in such manner as the Collateral Agent determines as appropriate under the circumstances;

(d)     Agent may decline to undertake or to continue taking a course of action or to execute an action plan (whether proposed by an Agent, Term Agent, or a Lender) unless indemnified to that Agent's satisfaction by the Lenders against any and all liability and expense which may be incurred by that Agent by reason of taking or continuing to take that course of action or action plan if such action was taken in the absence of gross negligence, actual bad faith, or willful misconduct;

(e)     the Administrative Agent, Term Agent, and each Lender shall execute all such instruments and documents not inconsistent with the provisions of this Agreement as the Administrative Agent and/or the Nominee reasonably may request with respect to the creation and governance of any Nominee, the conduct of the Liquidation, and the management and disposition of any Post Foreclosure Asset; and

(f)     the Administrative Agent, with the advice of the Term Agent and Lenders, may Liquidate (through a public or private sale in its discretion) or sell or otherwise dispose of any of the Collateral or all or any portion of the Borrowers' assets or stock following the occurrence and during the continuance of an Event of Default hereunder and in connection therewith release the Lien thereon granted to the Collateral Agent hereunder. Each Lender hereby consents to the Collateral Agent's release of the Liens granted to it in the Collateral in connection with a Liquidation or other sale of the Borrowers' assets or stock following the occurrence and during the continuance of an Event of Default hereunder which the Collateral Agent determines is in the Lenders' best interest.

18.6.     <u>Distribution of Liquidation Proceeds by Collateral Agent</u>.

(a)     The Collateral Agent may establish one or more reasonably funded reserve accounts into which proceeds of the conduct of any Liquidation of any Revolving Loan Priority Collateral may be deposited in anticipation of future expenses which may be incurred by the Agent in the exercise of rights as a secured creditor as against the Revolving Loan Priority Collateral and prior claims which the Agent anticipates may need to be paid in connection therewith. The Collateral Agent may establish one or more reasonably funded reserve accounts into which proceeds of the conduct of any Liquidation of any Term Loan Priority Collateral may be deposited in anticipation of future expenses which may be incurred by the Agent or Term Agent in the exercise of rights as a secured creditor as against the Term Loan Priority Collateral and prior claims which the Agent or Term Agent anticipate may need to be paid in connection therewith.

(b)     The Collateral Agent shall distribute the proceeds of any Liquidation to the Administrative Agent.

(c)     The Administrative Agent shall distribute the net proceeds of Liquidation in accordance with the relative priorities set forth in <u>Section 18.7</u> hereof.

(d)     Each Lender, on the written request of the Agent, Term Agent, and/or any Nominee, not more frequently than once each month, shall reimburse the Agent, Term Agent, and/or any Nominee, pro-rata, for any cost or expense reasonably incurred by the Agent, Term Agent, and/or the Nominee in the conduct of a Liquidation, which amount is not covered out of current proceeds of the Liquidation, which reimbursement shall be paid over to and distributed by the Agent.

18.7. <u>Distributions of Liquidation Proceeds by Administrative Agent and Ordinary Loan Payments</u>.

(a)     Proceeds of a Liquidation shall be distributed based on levels of priority with respect to each classification of Collateral as specified below.

(b)     All distributions of proceeds of a Liquidation shall be net of payment over to the Agents and Term Agent as reimbursement for all reasonable third party costs and expenses incurred by the Agents and Term Agent and their counsel and to any funded reserve established pursuant to <u>Section 18.6(a)</u> hereof.

(c)     The relative priorities to the proceeds of a Liquidation or any other sale of Collateral outside of the ordinary course of business, other than with respect to the proceeds of Term Loan Priority Collateral, shall be distributed based on the following relative priorities:

. (i)   .   First, to Payment in Full of the Pre-Petition Obligations, including the funding of indemnity accounts (other than those arising in connection with the Pre-Petition Term Loan);

(ii)     Second, to pay all fees and expenses then due and payable to the Administrative Agent, Collateral Agent, or any Revolving Credit Lender, including, but not limited to, all Agent and Lender Expenses due to either the Administrative Agent or Collateral Agent or any Revolving Credit Lender;

(iii)    Third, to the Revolving Credit Lenders, in respect to the Obligations owed to such Revolving Credit Lenders or their Affiliates in respect of the Revolving Credit until all of such Obligations are indefeasibly paid in full and the Loan Agreement is terminated (which, for the avoidance of doubt, shall not include any Bank Product Obligations);

(iv)     Fourth, to the holders of any and all other Obligations due to the Agents or any Revolving Credit Lender or any of their Affiliates (but excluding any Bank Product Obligations arising under clauses (f)-(h) under the definition of "Bank Products" in excess of $500,000 unless subject to a Reserve);

(v)     Fifth, to pay all fees and expenses then due and payable to the Term Agent or any Term Lender, including, but not limited to, all Lender Expenses due to either the Term Agent or any Term Lender;

(vi)     Sixth, to the Term Lenders, in respect to the Obligations owed to such Term Lenders or their Affiliates in respect of the Term Loan until all of such Obligations are indefeasibly paid in full and the Loan Agreement is terminated;

(vii)    Seventh, to the holders of any and all other Obligations due to the Agents, Term Agent, or any Lender or any of their Affiliates (including, without limitation, any other Bank Product Obligations);

(viii)   Eighth, to payment in full of any remaining Pre-Petition Obligations; and

(ix)     Ninth, to payment in full of any remaining Obligations.

123

(d)     The relative priorities to the proceeds of a Liquidation or any other sale of Term Loan Priority Collateral outside of the ordinary course of business shall be distributed based on the following relative priorities:

(i)     First, to payment in full of the Pre-Petition Obligations arising in connection with the Pre-Petition Term Loan;

(ii)    Second, to pay all fees and expenses then due and payable to the Term Agent or any Term Lender, including, but not limited to, all Lender Expenses due to either the Term Agent or any Term Lender;

(iii)   Third, to the Term Lenders, in respect to the Obligations owed to such Term Lenders or their Affiliates in respect of the Term Loan until all of such Obligations are indefeasibly paid in full (which, for the avoidance of doubt, shall not include any Bank Product Obligations);

(iv)    Fourth, to the holders of any and all other Obligations due to the Term Agent or any Term Lender or any of their Affiliates;

(v)     Fifth, to pay all fees and expenses then due and payable to the Agents or any Revolving Credit Lender, including, but not limited to, all Lender Expenses due to either the Administrative Agent or Collateral Agent or any Revolving Credit Lender;

(vi)    Sixth, to the Revolving Credit Lenders, in respect to the Obligations owed to such Revolving Credit Lenders or their Affiliates in respect of the Revolving Credit until all of such Obligations are indefeasibly paid in full and the Loan Agreement is terminated;

(vii)   Seventh, to the holders of any and all other Obligations due to the Agents, Term Agent, or any Lender or any of their Affiliates (including, without limitation, any other Bank Product Obligations);

(viii)  Eighth, to payment in full of any remaining Pre-Petition Obligations; and

(ix)    Ninth, to payment in full of any remaining Obligations.

## 19.    THE AGENT.

19.1.   Appointment of The Agent.

(a)     Each Lender, the Term Agent, the Issuing Lender and any Affiliate of any Lender providing any Bank Products (by virtue of providing such products) to Borrowers appoints and designates Wells Fargo Bank, National Association, as the "Administrative Agent" hereunder and under the Loan Documents.

(b)     Each Lender, the Term Agent, the Issuing Lender and any Affiliate of any Lender providing any Bank Products (by virtue of providing such products) to Borrowers appoints and designates Wells Fargo Bank, National Association, as the "Collateral Agent" hereunder and under the Loan Documents.

(c)     Each Lender, the Term Agent, the Issuing Lender and any Affiliate of any Lender providing any Bank Products (by virtue of providing such products) to Borrowers authorizes each Agent:

(i)     To the Administrative Agent's Cover (to the extent not previously repaid by the Borrowers and retained by the Administrative Agent in accordance with Section 17.3(c)(iv), above) with respect to that Delinquent Lender.

(ii)     To execute those of the Loan Documents and all other instruments relating thereto to which that Agent is a party.

(iii)     To take such action on behalf of the Lenders, the Term Agent, the Issuing Lender and any Affiliate of any Lender providing any Bank Products to Borrowers and to exercise all such powers as are expressly delegated to that Agent hereunder and in the Loan Documents and all related documents, together with such other powers as are reasonably incident thereto (including, without limitation, appearing in the Chapter 11 Case on behalf of such Persons).

(d)     Each of the Term Lenders hereby irrevocably appoints Wells Fargo to act on its behalf as the Term Agent hereunder and under the other Loan Documents and authorizes the Term Agent to take such actions on its behalf and to exercise such powers as are delegated to the Term Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Term Agent and the Term Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

19.2.     Responsibilities of Agents.

(a)     The Administrative Agent shall have principal responsibilities for and primary authority for the administration of the credit facilities contemplated by the Loan Agreement and for all matters for which the Collateral Agent is not responsible. In all instances where the allocation of responsibility and authority, as between the Collateral Agent and the Administrative Agent is in doubt, the Administrative Agent shall be vested with such responsibility and authority.

(b)     The Collateral Agent shall have principal responsibilities for maintaining the perfection of the Lenders' Liens and primary authority for the conduct of the Liquidation and the distribution of the proceeds of such Liquidation.

(c)     Neither Agent nor Term Agent shall have any duties or responsibilities to, or any fiduciary relationship with, any Lender or any Lender Affiliate except for those expressly set forth in this Agreement.

(d)     Neither Agent nor Term Agent nor any of their Affiliates shall be responsible to any Lender or any Lender Affiliate for any of the following:

(i)     Any recitals, statements, representations or warranties made by any Borrower or any other Person.

(ii)     Any appraisals or other assessments of the assets of any Borrower or of any other Person responsible for or on account of the Obligations.

125

(iii)    The value, validity, effectiveness, genuineness, enforceability, or sufficiency of the Loan Agreement, the Loan Documents or any other document referred to or provided for therein.

(iv)    Any failure by any Borrower or any other Person (other than the subject Agent) to perform its obligations under the Loan Documents or any other document referred to or provided for therein.

(e)    Each Agent and Term Agent may employ attorneys, accountants, and other professionals and agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such attorneys, accountants, and other professionals or agents or attorneys-in-fact selected by the subject Agent or Term Agent, as applicable, with reasonable care.  No such attorney, accountant, other professional, agent, or attorney-in-fact shall be responsible for any action taken or omitted to be taken by any other such Person.

(f) .    Neither Agent nor Term Agent, nor any of their directors, officers, or employees shall be responsible for any action taken or omitted to be taken by any other of them in connection herewith in reliance upon advice of their respective counsel nor, in any other event except for any action taken or omitted to be taken as to which a final judicial determination has been or is made (in a proceeding in which such Person has had an opportunity to be heard) that such Person had acted in a grossly negligent manner, in actual bad faith, or in willful misconduct.

(g)    Neither Agent nor Term Agent shall have any responsibility in any event for more funds than that Agent or Term Agent actually receives and collects.

(h)    The Agents and Term Agent, in their separate capacities as Lenders, shall have the same rights and powers hereunder as any other Lender.

(i)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Collateral Agent deems that by reason of any present or future law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Collateral Agent appoints an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "<u>Supplemental Collateral Agent</u>" and collectively as "<u>Supplemental Collateral Agents</u>").

(j)    If the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Collateral

126

Agent or such Supplemental Collateral Agent, and (ii) the provisions of Articles 19 and 20 of this Agreement that refer to the Collateral Agent or Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Collateral Agent shall be deemed to be references to the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

(k) Should any instrument in writing from a Borrower be required by any Supplemental Collateral Agent so appointed by the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, such Borrower shall execute, acknowledge and deliver any and all such instruments promptly upon request by the Collateral Agent. In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

19.3. Concerning Distributions By the Agents; Lenders' Exercise of Set-Off.

(a) Each Agent, in that Agent's reasonable discretion based upon that Agent's determination of the likelihood that additional payments will be received, expenses incurred, and/or claims made by third parties to all or a portion of such proceeds, may delay the distribution of any payment received on account of the Obligations.

(b) Each Agent may disburse funds prior to determining that the sums that Agent expects to receive have been finally and unconditionally paid to that Agent. If and to the extent that Agent does disburse funds and it later becomes apparent that the Agent did not then receive a payment in an amount equal to the sum paid out, then any Lender to whom the Agent made the funds available, on demand from the Agent, shall refund to the Administrative Agent the sum paid to that Person.

(c) If, in the opinion of an Agent, the distribution of any amount received by that Agent might involve that Agent in liability, or might be prohibited hereby, or might be questioned by any Person, then that Agent may refrain from making distribution until that Agent's right to make distribution has been adjudicated by a court of competent jurisdiction.

(d) The proceeds of any Lender's exercise of any right of, or in the nature of, set-off shall be shared with the other Lenders as if distributed pursuant to (and shall be deemed as distributions under) Section 18.7(c) hereof.

(e) Each Lender recognizes that the crediting the Borrowers with the "proceeds" of any transaction in which a Post Foreclosure Asset is acquired is a non-cash transaction and that, in consequence, no distribution of such "proceeds" will be made by the Administrative Agent to any Lender.

(f) In the event that (x) a court of competent jurisdiction shall adjudge that any amount received and distributed by the Administrative Agent is required to be repaid or disgorged or (y) those Lenders adversely affected thereby determine to effect such repayment or disgorgement, then each Lender to which any such distribution shall have been made shall repay, to the Agent which had made such distribution, that Lender's Pro-Rata share of the amount so adjudged or determined to be repaid or disgorged.

19.4.  Distributions of Notices and Other Documents.  The Administrative Agent will forward to Term Agent and each Lender, promptly after the Administrative Agent's receipt thereof, a copy of each notice or other document furnished to the Administrative Agent pursuant to this Agreement, including monthly, quarterly, and annual financial statements received from the Lead Borrower pursuant to Article 7 of this Agreement, other than any of the following (except upon specific request by a Lender):

(a)  Routine communications associated with requests for Advances and/or the issuance of L/C's.

(b)  Routine or nonmaterial communications.

(c)  Any notice or document required by any of the Loan Documents to be furnished to the Lenders by the Lead Borrower.

(d)  Any notice or document of which the Administrative Agent has knowledge that such notice or document had been forwarded to the Lenders other than by the Administrative Agent.

19.5.  Confidential Information.

(a)  The Agent, Term Agent, and each Lender will maintain, as confidential, all of the following:

(i)  Any recitals, statements, representations or warranties made by any Borrower or any other Person.

(ii)  Proprietary approaches, techniques, and methods of analysis which are applied by the Agent in the administration of the credit facilities contemplated by this Agreement.

(iii)  Proprietary forms and formats utilized by the Administrative Agent in providing reports to the Lenders pursuant hereto, which forms or formats are not of general currency.

(iv)  The results of financial examinations, reviews, inventories, analysis, appraisals, and other information concerning, relating to, or in respect of any Borrower or Parent and prepared by or at the request of, or furnished to any of, the Agent or Lenders by or on behalf of the Borrowers or Parent.

(v)  Nothing included herein shall prohibit the disclosure of any such information as may be required to be provided by judicial process or by regulatory authorities having jurisdiction over any party to this Agreement.

19.6.  Reliance by Agent.  Agent and Term Agent shall be entitled to rely upon any certificate, notice or other document (including any cable, telegram, telex, or facsimile) reasonably believed by that Agent or Term Agent to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of attorneys, solicitors, accountants and other experts selected by that Agent or Term Agent.  As to any matters not expressly provided for in this Agreement, any Loan Document, or in any other document referred to therein, that Agent shall in all events be fully protected in acting, or in refraining from acting, in accordance with the applicable Consent required by this Agreement.  Instructions given with the requisite Consent shall be binding on all Lenders.

128

19.7.    Non-Reliance on Agents and Other Lenders.

(a)    Each Lender represents to all other Lenders and to the Agents and Term Agent that such Lender:

(i)    Independently and without reliance on any representation or act by any Agent, Term Agent, or by any other Lender, and based on such documents and information as that Lender has deemed appropriate, has made such Lender's own appraisal of the financial condition and affairs of the Borrowers and decision to enter into this Agreement.

(ii)    Has relied upon that Lender's review of the Loan Documents by that Lender and by counsel to that Lender as that Lender deemed appropriate under the circumstances.

(iii)    Each Lender agrees that such Lender, independently and without reliance upon any Agent, Term Agent, or any other Lender, and based upon such documents and information as such Lender shall deem appropriate at the time, will continue to make such Lender's own appraisals of the financial condition and affairs of the Borrowers when determining whether to take or not to take any discretionary action under this Agreement.

(b)    Except as otherwise provided herein, neither Agent, nor Term Agent, in the discharge of that Agent's or Term Agent's duties hereunder, shall:

(i)    Be required to make inquiry of, or to inspect the properties or books of, any Person.

(ii)    Have any responsibility for the accuracy or completeness of any financial examination, review, inventory, analysis, appraisal, and other information concerning, relating to, or in respect of any Borrowers and prepared by or at the request of, or furnished to any of, the Lenders by or on behalf of the Administrative Agent.

(iii)    Except for notices, reports, and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Agents nor Term Agent shall not have any affirmative duty or responsibility to provide any Lender with any credit or other information concerning any Person, which information may come into the possession of Agents, Term Agent, or any Affiliate of an Agent.

(iv)    Each Lender, at such Lender's request, shall have reasonable access to all nonprivileged documents in the possession of the Agents, which documents relate to the Agents' or Term Agent's performance of their duties hereunder.

19.8.    Indemnification.    Without limiting the liabilities of the Borrowers under this Agreement or any of the other Loan Documents, each Lender shall indemnify each Agent and Term Agent, pro-rata, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including reasonable attorneys' fees and expenses and other out-of-pocket expenditures) which may at any time be imposed on, incurred by, or asserted against that Agent or Term Agent and in any way relating to or arising out of this Agreement or any other Loan Document or any documents contemplated by or referred to therein or the transactions

129

contemplated thereby or the enforcement of any of terms hereof or thereof or of any such other documents, provided, however, no Lender shall be liable for any of the foregoing to the extent that any of the foregoing arises from any action taken or omitted to be taken by the subject Agent or Term Agent as to which a final judicial determination has been or is made (in a proceeding in which the subject Agent has had an opportunity to be heard) that the subject Agent or Term Agent had acted in a grossly negligent manner, in actual bad faith, or in willful misconduct.

19.9. <u>Resignation of Agent.</u>

(a) An Agent or Term Agent may resign at any time by giving thirty (30) days prior written notice thereof to the Lenders and to the other Agent and Term Agent, if applicable. Upon receipt of any such notice of resignation, the Majority Revolving Lenders, in the case of an Agent, or the Majority Term Lenders, in the case of the Term Agent, shall have the right to appoint a successor to such Agent. If a successor Agent or Term Agent shall not have been so appointed and accepted such appointment within twenty (20) days after the giving of notice by the resigning Agent or Term Agent, then the resigning Agent, or Term Agent, as applicable, may appoint a successor Agent or Term Agent, as applicable, which, in the case of an Agent or Term Agent, shall be a financial institution having a combined capital and surplus in excess of $500,000,000.00.

(b) Upon the acceptance of any appointment as an Agent or Term Agent, as applicable, hereunder by a successor Agent, or Term Agent, as applicable, such successor shall thereupon succeed to, and become vested with, all the rights, powers, privileges, and duties of the (resigning) Agent, or Term Agent as applicable, so replaced, and the (resigning) Agent or Term Agent as applicable, shall be discharged from the (resigning) Agent's or Term Agent's as applicable, duties and obligations hereunder, other than on account of any responsibility for any action taken or omitted to be taken by the (resigning) Agent or Term Agent as applicable, as to which a final judicial determination has been or is made (in a proceeding in which the (resigning) Person has had an opportunity to be heard) that such Person had acted in a grossly negligent manner or in bad faith.

(c) After any retiring Agent's or Term Agent's as applicable, resignation, the provisions of this Agreement and of all other Loan Documents shall continue in effect for the retiring Person's benefit in respect of any actions taken or omitted to be taken by it while it was acting as an Agent or Term Agent as applicable.

19.10. <u>Separate Claims and Separate Classifications.</u> Each of the Lenders, Issuing Bank, their Affiliates, and all other Persons to whom any Obligations are owed hereby acknowledges and agrees that because of, among other things, their differing rights and priorities in the Collateral, the claims of the Revolving Credit Lenders and the Term Lenders in respect of the Collateral are fundamentally different from each other, and the claims of the Revolving Credit Loans and the Term Loan in respect of any Collateral should be separately classified in any bankruptcy or other insolvency proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that, in respect of any Collateral, the Revolving Credit Loans and/or the Term Loan in respect of such Collateral constitute only one secured claim (rather than separate classes of secured claims), then all distributions shall be made as if there were separate classes of secured claims in respect of any Collateral and, to the extent that any holder of the Revolving Credit Loans and/or the Term Loan receives distributions in respect of such Collateral, such distributions shall be held in trust by the receiving party and distributed in accordance with <u>Section 18.7.</u>

**20. ACTION BY AGENT - CONSENTS - AMENDMENTS - WAIVERS.**

    20.1.   Administration of Credit Facilities.

        (a)    Except as otherwise specifically provided in this Agreement, each Agent (and, where applicable, Term Agent) may take any action with respect to the Revolving Credit (or, with respect to the Term Agent, the Term Loan) or the Collateral contemplated by the Loan Documents as such Person determines to be appropriate within their respective areas of responsibility and authority, in each case, as set forth in Article 19, *provided, however,* no such Person is under any affirmative obligation to take any action which it is not required by this Agreement or the Loan Documents specifically to so take.

        (b)    Except as specifically provided in the Sections 20.2, 20.3, 20.4, and 20.6 of this Agreement, whenever a Loan Document or this Agreement provides that action may be taken or omitted to be taken in an Agents' or Term Agent's discretion, such Person shall have the sole right to take, or refrain from taking, such action without, and notwithstanding, any vote of the Lenders.

        (c)    The rights granted to the Lenders in those sections referenced in Section 20.1(b) shall not otherwise limit or impair any Agent's or Term Agent's exercise of their discretion under the Loan Documents.

    20.2.    Actions Requiring or On Direction of Majority Lenders.  Except as otherwise provided in this Article 20, the Consent or direction of only the Majority Lenders is required for any amendment, waiver, or modification of any Loan Document.

    20.3.    Actions Requiring Certain Consent.  The following Consent shall be required for the following actions:

| ACTION | REQUIRED CONSENT |
|---|---|
| (a)  Any increase in any Lender's Revolving Loan Commitment Percentage or amount (other than by reason of the application of Section 15 (which deals with assignments and participations)), or in the Issuing Lender Commitment, or in the principal amount of the Term Loan, it being understood that this Section 20.3(a) addresses changes to Revolving Loan Commitments and Term Loan inter se and not any increase in the overall size of the Revolving Credit or Term Loan | All Lenders affected thereby other than any Delinquent Lender and, as to any increase in the Issuing Lender Commitment, the Issuing Lender. |
| (b)    Forgiveness of any portion of the Obligations in respect to principal, interest, or fees due in respect of the Revolving Credit or the Term Loan | All Lenders whose payment Obligation is being so forgiven (other than any Delinquent Lender, if otherwise applicable.) |

8478014v8

| ACTION | REQUIRED CONSENT |
|---|---|
| (c) Any decrease in any interest rate, principal, fee or assessment payable under any of the Loan Documents | All Lenders adversely affected thereby (other than any Delinquent Lender, if otherwise applicable). |
| (d) Disgorgement as described in Section 19.3(f). | Majority Lenders. |
| (e) Any extension of the Maturity Date. | Unanimous Consent. |
| (f) Any release of all or substantially all of the Revolving Loan Priority Collateral not otherwise required or provided for in the Loan Documents or to facilitate a Liquidation or sale or other transfer of such Collateral following the occurrence and during the continuance of an Event of Default hereunder as permitted hereunder. | All Revolving Credit Lenders |
| (g) Any release of all or substantially all of the Term Loan Priority Collateral not otherwise required or provided for in the Loan Documents or to facilitate a Liquidation or sale or other transfer of such Collateral following the occurrence and during the continuance of an Event of Default hereunder as permitted hereunder. | All Term Lenders |
| (h) Any release of any Person obligated on account of the Obligations. | Unanimous Consent. |
| (i) The waiver of the obligation of the Borrowers to reduce the unpaid principal balance of Advances or cash collateralize outstanding Letters of Credit under the Revolving Credit to an amount which does not exceed a Protective Overadvance. | Unanimous Consent. |
| (j) [Reserved.] | [Reserved.] |
| (k) Any amendment of this Article 20. | Unanimous Consent. |

8478014v8

| ACTION | REQUIRED CONSENT |
|---|---|
| (l) The sending of an Acceleration Notice with respect to the Revolving Credit pursuant to Section 18.1 hereof. | Super Majority Revolving Lenders. |
| (m) The sending of an Acceleration Notice with respect to the Term Loan pursuant to Section 18.1 hereof. | Super Majority Term Lenders. |
| (n) Any amendment of the definition of the terms "Borrowing Base", "Eligible Inventory", "Eligible In-Transit Inventory", "Eligible Landed Goods", "Availability", "Net Liquidation Percentage", "Revolving Credit Ceiling", or of any definition of any component thereof, such that more credit would be available to the Borrowers, based on the same assets, as would have been available to the Borrowers immediately prior to such amendment, *it being understood, however,* that:<br><br>(i) The foregoing shall not limit the adjustment by the Administrative Agent of any Reserve in the Administrative Agent's administration of the Revolving Credit as otherwise permitted by this Agreement.<br><br>(ii) The foregoing shall not prevent the Administrative Agent, in its administration of the Revolving Credit, from restoring any component of Borrowing Base which had been lowered by the Administrative Agent back to the value of such component, as stated in this Agreement or to an intermediate value. | Unanimous Consent. |
| (o) Any amendment of the definition of the terms Majority Lenders, Majority Revolving Lenders, Majority Term Lenders, Protective Overadvance, Unanimous Consent, Super Majority Revolving Lenders, and Super Majority Term Lenders. | Unanimous Consent. |
| (p) increase the rate of interest applicable to the Revolving Credit Loans (other than in connection with charging the Default Rate) by more than two percent (2.0%) | Majority Term Lenders |
| (q) increase the rate of interest applicable Term Loan (other than in connection with charging the Default Rate) by more than three percent (3.0%) | Majority Revolving Lenders |

133

| ACTION | REQUIRED CONSENT |
|---|---|
| (r) amend the definitions of "Documentary Letter of Credit", "Deteriorating Lender", "Honor Date", "Issuing Lender", "L/C", "L/C Advance", "L/C Borrowing", "L/C Commitment", "L/C Disbursement", "L/C Undertaking", "Letter of Credit", "Letter of Credit Application", "Letter of Credit Expiration Date", "Letter of Credit Fee", "Letter of Credit Rights", "Letter of Credit Sublimit", "Letter of Credit Usage", "Qualified Import Letter of Credit", "Standby L/C", "Stated Amount" | Majority Revolving Lenders |

20.4.   <u>Actions Requiring Agents' or Issuing Lender's Consent</u>.

(a)   No action, amendment, or waiver of compliance with, any provision of the Loan Documents or of this Agreement which affects an Agent, Term Agent, or Issuing Lender in its capacity as an Agent, Term Agent, or Issuing Lender respectively may be undertaken without the written consent of such Agents, Term Agent, or Issuing Lender, as applicable.

(b)   No action referenced herein which affects the rights, duties, obligations, or liabilities of an Agent, Term Agent, or Issuing Lender shall be effective without the written consent of such Agent, Term Agent, or Issuing Lender.

20.5.   <u>Miscellaneous Actions</u>.

(a)   Notwithstanding any other provision of this Agreement, no single Lender independently may exercise any right of action or enforcement against or with respect to any Borrower or Parent.

(b)   Each Agent shall be fully justified in failing or refusing to take action under this Agreement or any Loan Document on behalf of any Lender unless that Agent shall first:

(i)   receive such clear, unambiguous, written instructions as that Agent deems appropriate; and

(ii)   be indemnified to that Agent's satisfaction by the Lenders against any and all liability and expense which may be incurred by that Agent by reason of taking or continuing to take any such action, unless such action had been grossly negligent, in willful misconduct, or in bad faith.

(iii)   Each Agent may establish reasonable procedures for the providing of direction and instructions from the Lenders to that Agent, including its reliance on multiple counterparts, facsimile transmissions, and time limits within which such direction and instructions must be received in order to be included in a determination of whether the requisite Lenders have provided their direction, Consent, or instructions.

8478014v8

20.6.   Actions Requiring Lead Borrower's Consent.  Provided that an Event of Default has not then occurred and is continuing, the Lead Borrower's consent is required for any amendment of this Agreement, except that each of the following Articles of this Agreement may be amended without the consent of the Lead Borrower:

| Article | Title of Article |
|---------|------------------|
| 17 | Revolving Credit Fundings and Distributions |
| 18 | Acceleration and Liquidation |
| 19 | The Agents (except 19.5) |
| 20 | Action By Agents - Consents - Amendments - Waivers (except this Section 20.6) |

20.7.   Actions Requiring Agent's Consent.

(a)   No action, amendment, or waiver of compliance with any provision of the Loan Documents or of this Agreement which affects the Agent in its capacity as Agent or the Term Agent in its capacity as Term Agent may be undertaken without the written consent of such Person.

(b)   No action referenced herein which affects the rights, duties, obligations, or liabilities of the Agent or Term Agent shall be effective without the written consent of such Person.

## 21.   GENERAL PROVISIONS.

21.1.   Effectiveness.  This Agreement shall be binding and deemed effective when executed by Borrower, each Agent, Term Agent, Issuing Lender and the Lenders.

21.2.   Section Headings.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

21.3.   Interpretation.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Agents, Term Agent, Issuing Lender, Lenders or Borrowers, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

21.4.   Severability of Provisions.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

21.5.   Amendments in Writing.  This Agreement only can be amended by writing in accordance with Section 16.1.

21.6.   Counterparts; Telefacsimile Execution.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile (or other electronic transmission) shall be equally as effective as delivery of an original executed counterpart

of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile (or other electronic transmission) also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis, except as otherwise specifically provided therein or therefor.

21.7. <u>Revival and Reinstatement of Obligations</u>. If the incurrence or payment of the Obligations by Borrowers or the transfer to any Lender, Agent, or Term Agent of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "<u>Voidable Transfer</u>"), and if such Lender, Agent, or Term Agent is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that such Person is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of such Person related thereto, the liability of Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

21.8. <u>Integration</u>. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof

21.9. <u>Right of Set-Off</u>. Any and all deposits or other sums at any time credited by or due to any Borrower from any Agent, Term Agent, or any Lender or any Participant or from any Affiliate of any of the foregoing, and any cash, securities, instruments or other property of any Borrower in the possession of any of the foregoing, whether for safekeeping or otherwise (regardless of the reason such Person had received the same) shall at all times constitute security for all Liabilities and for any and all Obligations of each Borrower to each Agent, Term Agent, and such Lender or any Participant or such Affiliate and may be applied or set off against Obligations and against such obligations at any time, whether or not such are then due and whether or not other collateral is then available to any Agent, Term Agent, or that Lender.

21.10. <u>Pledges To Federal Reserve Banks</u>. Nothing included in this Agreement shall prevent or limit any Lender, to the extent that such Lender is subject to any of the twelve Federal Reserve Banks organized under §4 of the Federal Reserve Act (12 U.S.C. § 341) from pledging all or any portion of that Lender's interest and rights under this Agreement, provided, however, neither such pledge nor the enforcement thereof shall release the pledging Lender from any of its obligations hereunder or under any of the Loan Documents.

21.11. <u>Maximum Interest Rate</u>. Regardless of any provision of any Loan Document, neither any Agent nor Term Lender or any Lender shall be entitled to contract for, charge, receive, collect, or apply as interest on any Liability, any amount in excess of the maximum rate imposed by Applicable Law. Any payment which is made which, if treated as interest on a Liability would result in such interest's exceeding such maximum rate shall be held, to the extent of such excess, as additional collateral for the Liabilities as if such excess were "Collateral."

21.12. <u>Credit Decisions</u>. Each Lender acknowledges that it has, independently and without reliance upon any Agent, Term Agent, or any other Lender, and based on the financial statements prepared by the Loan Parties and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property and financial and other condition of the Loan Parties and has made its own decision to enter into this Agreement and

the other Loan Documents. Each Lender also acknowledges that it will, independently and without reliance upon any Agent, Term Agent, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not condition precedent to closing any loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

21.13. <u>Confidentiality</u>. Each of the Agent, Term Agent, and the Lenders agrees that it will not disclose without the prior consent of the Loan Parties (other than to its employees, its Subsidiaries, its Affiliates or to its auditors or counsel) any information with respect to the Loan Parties which is furnished pursuant to this Agreement or any of the other Loan Documents; provided that each of the Agent, Term Agent, and the Lenders may disclose any such information (a) as has become generally available to the public or has been lawfully obtained by such Person from any third party under no duty of confidentiality to any Loan Party, (b) as may be required or appropriate in any report, statement or testimony to, or in respect to any inquiry by, any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Person, including the Board of Governors of the Federal Reserve System of the United States, the Office of the Comptroller of the Currency or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (c) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (d) in order to comply with any law, order, regulation or ruling applicable to such Person, (e) to any permitted transferee or assignee or to any approved participant of, or with respect to, this Agreement and the other Loan Documents, and (f) as may be necessary in connection with the exercise of the Agent's Rights and Remedies under this Agreement or any other Loan Document. Notwithstanding the foregoing, any of the Agent, Term Agent, or Lenders may issue a so-called tombstone announcement or press release regarding its entry into this Loan Agreement with Borrower which includes the amount of the Revolving Loan Commitments hereunder.

21.14. <u>Release of Collateral</u>. Agent shall, upon the written request of Borrower, execute and deliver a proper instrument or instruments acknowledging the release of the security interest and Liens established hereby on any Collateral in each of the following circumstances: (a) upon the Payment in Full (and cash collateralization required hereunder) of all outstanding Obligations (including, but not limited to, any then known indemnification Obligations); (b) upon the sale or other Disposition of Collateral which is a Permitted Disposition hereunder; or (c) if each of the Lenders (other than any Delinquent Revolving Credit Lender) has consented to such Disposition or release or is required to do so under the terms hereof.

21.15. <u>Dispute Resolution</u>. Any dispute among the Lenders and/or any Agent or Term Agent concerning the interpretation, administration, or enforcement of the financing arrangements contemplated by this or any other Loan Document or the interpretation or administration of this or any other Loan Document which cannot be resolved amicably shall be resolved in the Bankruptcy Court or, in the event that the Chapter 11 Case is no longer pending, the United States District Court for the District of Massachusetts, sitting in Boston or in the Superior Court of Suffolk County, Massachusetts, to the jurisdiction of which courts each Lender hereto hereby submits.

21.16. <u>Press Releases</u>. Each Borrower agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of Agents, Term Agent, or their Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to Administrative Agent and Term Agent and without the prior written consent of the Administrative Agent and Term Agent unless (and only to the extent that) such Borrower or Affiliate is required to do so under Applicable Law and then, in any event, such Borrower or Affiliate will consult with Administrative Agent and Term Agent before issuing such press release or other public disclosure. Each Borrower, on their own behalf and on behalf of their Affiliates, consents to the publication by

Administrative Agent, Term Agent, or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Borrower's or Affiliates name, product photographs, logo or trademark. Administrative Agent, Term Agent, or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof. Each of Administrative Agent and Term Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

21.17. <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other Loan Documents. In the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Loan Documents shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement and the other Loan Documents.

21.18. [Reserved.]

21.19. [Reserved.]

21.20. <u>Keepwell</u>. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this <u>Section 21.20</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 10.24</u>, or otherwise under the Guaranty, voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section 21.20 shall remain in full force and effect until Payment in Full of the Obligations. Each Qualified ECP Guarantor intends that this <u>Section 21.20</u> constitute, and this <u>Section 21.20</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

21.21. <u>USA PATRIOT Act Notice and Anti-Money Laundering & Anti-Terrorism Compliance</u>.

Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

21.22. <u>Foreign Asset Control Regulations; Sanctions</u>. Neither of the advance of the Advances (including the Term Loan) nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive

Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).

[The remainder of this page is intentionally left blank]

8478014v8

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** in its capacities as Administrative Agent, Collateral Agent and Revolving Credit Lender

By: _____

Name: Y. Sonia Anandraj

Title: Authorized Officer

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** in its capacity as Term Agent and Term Lender

By: _____

Name: Y. Sonia Anandraj

Title: Authorized Officer

**THE WALKING COMPANY HOLDINGS, INC.,**
Parent

By: _____
Name: Roberta Morris
Title: Chief Financial Officer


**BIG DOG USA, INC.**, Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer


**THE WALKING COMPANY**, Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer


**FOOTSMART, INC.**, Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer

**Exhibit B**
**(Approved Budget)**

# TWC 13 Week Cash Flow

For the week ending, Saturday

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/6/18-3/10/18 | 3/17/2018 | 3/24/2018 | 3/31/2018 | 4/7/2018 | 4/14/2018 | 4/21/2018 | 4/28/2018 | 5/5/2018 | 5/12/2018 | 5/19/2018 | 5/26/2018 | 6/2/2018 | |
| **RECEIPTS:** | | | | | | | | | | | | | | |
| Sales Receipts | 2,931,744 | 3,587,264 | 3,474,538 | 3,989,970 | 4,143,342 | 4,239,333 | 3,986,113 | 4,678,805 | 4,076,934 | 4,133,477 | 4,039,173 | 4,479,756 | 4,378,226 | 52,138,675 |
| Footsmart & Other Receipts | 113,012 | 194,902 | 439,368 | 321,344 | 262,673 | 209,808 | 368,716 | 423,562 | 355,856 | 443,011 | 487,700 | 683,169 | 265,950 | 4,569,072 |
| Sales Tax Receipts - estimate | 154,302 | 188,803 | 182,870 | 209,998 | 218,071 | 223,123 | 209,795 | 246,253 | 214,575 | 217,551 | 212,588 | 235,777 | 230,433 | 2,744,141 |
| **Forecasted Receipts** | 3,199,058 | 3,970,969 | 4,096,776 | 4,521,313 | 4,624,085 | 4,672,264 | 4,564,625 | 5,348,620 | 4,647,366 | 4,794,040 | 4,739,461 | 5,398,702 | 4,874,610 | 59,451,887 |
| **DISBURSEMENTS:** | | | | | | | | | | | | | | |
| Sales Tax | - | 219,000 | 290,000 | 57,000 | 14,000 | 9,000 | 641,000 | 214,000 | 297,000 | - | 555,000 | 539,000 | 15,000 | 2,850,000 |
| Occupancy Costs | - | - | - | 1,000,000 | 1,475,000 | - | - | 800,000 | 1,825,000 | - | - | - | 1,875,000 | 6,975,000 |
| Inventory | 500,000 | 3,340,000 | 1,928,000 | 1,329,000 | 1,957,000 | 2,125,000 | 1,789,000 | 970,000 | 1,630,000 | 680,000 | 1,142,000 | 1,640,000 | 1,714,000 | 20,744,000 |
| Payroll | - | 1,950,000 | 70,000 | 1,862,000 | 70,000 | 1,845,000 | 70,000 | 1,825,000 | 70,000 | 1,883,000 | 80,000 | 1,944,000 | 80,000 | 11,749,000 |
| Fixed Assets | 52,000 | 71,000 | 63,000 | 20,000 | 15,000 | 70,000 | 70,000 | | 32,000 | | | | | 645,000 |
| Operating | 325,000 | 1,375,000 | 800,000 | 708,000 | 677,000 | 704,000 | 898,000 | 899,000 | | 740,000 | 720,000 | 850,000 | | 9,822,000 |
| WFRF - term loan | | | | 150,000 | | | | | 150,000 | | | | 150,000 | 450,000 |
| WFRF - interest | | | | | 90,000 | | | | 90,000 | | | | 90,000 | 270,000 |
| Other - health, 401k, interest, WFRF | 110,000 | 110,000 | 180,000 | 110,000 | 333,000 | 223,000 | 180,000 | 180,000 | 392,000 | 120,000 | 120,000 | 360,000 | 140,000 | 2,558,000 |
| Subtotal | 987,000 | 7,065,000 | 3,331,000 | 5,236,000 | 4,631,000 | 4,976,000 | 3,648,000 | 4,637,000 | 5,385,000 | 3,423,000 | 2,827,000 | 5,103,000 | 4,814,000 | 56,063,000 |
| **Restructure-Related Fees:** | | | | | | | | | | | | | | |
| Professional Fees Funding | 125,000 | 145,000 | 145,000 | 140,000 | 140,000 | 134,000 | 129,000 | 129,000 | 306,000 | 104,000 | 109,000 | 99,000 | 94,000 | 1,799,000 |
| Bank Fees (incl commitment fee) | 286,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 646,000 |
| Subtotal | 411,000 | 175,000 | 175,000 | 170,000 | 170,000 | 164,000 | 159,000 | 159,000 | 336,000 | 134,000 | 139,000 | 129,000 | 124,000 | 2,445,000 |
| **Restructure-Related Other Payments:** | | | | | | | | | | | | | | |
| Lease Cure Costs | | | | | | | | | | | | | | |
| KERP | | | | | | | | | | | | | | |
| Utility Deposits | | 111,000 | | | | | | | | | | | | 111,000 |
| Subtotal | - | 111,000 | - | - | - | - | - | - | - | - | - | - | - | 111,000 |
| **Total Cash Disbursements** | 1,398,000 | 7,351,000 | 3,506,000 | 5,406,000 | 4,801,000 | 5,140,000 | 3,807,000 | 4,796,000 | 5,721,000 | 3,557,000 | 2,966,000 | 5,232,000 | 4,938,000 | 58,619,000 |
| Cumulative disbursements | 1,398,000 | 8,749,000 | 12,255,000 | 17,661,000 | 22,462,000 | 27,588,000 | 31,381,000 | 36,163,000 | 41,869,610 | 45,412,610 | 48,364,610 | 53,582,610 | 58,506,610 | |
| **Weekly NET CASH FLOW** | 1,801,058 | (3,380,031) | 590,776 | (884,687) | (176,915) | (467,736) | 757,625 | 552,620 | (1,073,634) | 1,237,040 | 1,773,461 | 166,702 | (63,390) | 832,887 |

Debtor Professional Expenses
The Walking Company
Petition Period

($ in thousands)

| Week Beg.<br>Week # | 5-Mar<br>1 | 12-Mar<br>2 | 19-Mar<br>3 | 26-Mar<br>4 | 2-Apr<br>5 | 9-Apr<br>6 | 16-Apr<br>7 | 23-Apr<br>8 | 30-Apr<br>9 | 7-May<br>10 | 14-May<br>11 | 21-May<br>12 | 28-May<br>13 | 4-Jun<br>14 | 11-Jun<br>15 | 18-Jun<br>16 | 25-Jun<br>17 | 2-Jul<br>18 | 9-Jul<br>19 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debtors' Professionals and Fees | | | | | | | | | | | | | | | | | | | | |
| Pachulski | 80 | 80 | 80 | 75 | 75 | 50 | 50 | 50 | 50 | 30 | 30 | 20 | 20 | 15 | 15 | 15 | 10 | 10 | 10 | 765.0 |
| Consensus | 25 | 25 | 25 | 25 | 20 | 20 | 15 | 15 | 15 | 10 | 10 | 10 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 250.0 |
| Note holders | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 190.0 |
| Lender fees, legal fees, other | 286 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 826.0 |
| | | | | | | | | | | | | | | | | | | | | |
| UCC Advisors | | | | | | | | | | | | | | | | | | | | |
| UCC Counsel | | 10 | 10 | 10 | 10 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 14 | 275.0 |
| UCC Financial Advisor | | 10 | 10 | 10 | 10 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 14 | 275.0 |
| | | | | | | | | | | | | | | | | | | | | |
| Miscellaneous | | | | | | | | | | | | | | | | | | | | |
| KCC | 10 | 10 | 10 | 10 | 15 | 20 | 20 | 20 | 20 | 20 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 50 | 50 | 430.0 |
| U.S. Trustee | | | | | | | | | 177 | | | | | | | | | | | 177.0 |
| | | | | | | | | | | | | | | | | | | | | |
| Total Debtor Expenses Accrued | 411 | 175 | 175 | 170 | 170 | 164 | 159 | 159 | 336 | 134 | 139 | 129 | 124 | 119 | 119 | 119 | 114 | 139 | 133 | 3,188.0 |
| | | | | | | | | | | | | | | | | | | | | |
| DIP Carve Out - BOP | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | |
| Addition | 411 | 175 | 175 | 170 | 170 | 164 | 159 | 159 | 336 | 134 | 139 | 129 | 124 | 119 | 119 | 119 | 114 | 139 | 133 | |
| Funding of Trust Account | (115) | (135) | (135) | (130) | (130) | (124) | (419) | (119) | (119) | (94) | (99) | (89) | (84) | (79) | (79) | (79) | (74) | (99) | (93) | |
| Paid directly to WF | (286) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | |
| Paid directly to Noteholders | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) | |
| Paid directly to US Trustee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (177) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| DIP Carve Out - EOP | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | |