**EXHIBIT 2**

**Exit Commitment Letter**

March 5, 2018

The Walking Company
25 W. Anapamu Street
Santa Barbara, California 93101

Senior Secured Credit Exit Facility

Ladies and Gentlemen:

Wells Fargo Bank, National Association ("***Wells Fargo***") is pleased to offer to be the sole administrative and collateral agent (in such capacities, the "***Agent***") for a Senior Secured Credit Facility (the "***Exit Facility***" or the "***Exit Financing***") to The Walking Company (the "***Lead Borrower***"; together with the other Loan Parties, as such term is defined in the Summary of Terms, "***you***"), consisting of a $50,000,000 senior secured revolving facility and up to a $5,000,000 senior secured term loan facility. Wells Fargo is pleased to offer its commitment to lend all $55,000,000 of the Exit Facility, upon and subject to the terms and conditions set forth in this letter (this "***Commitment Letter***") and in the Summary of Terms and Conditions attached as Exhibit A hereto and incorporated herein by this reference (the "***Summary of Terms***") and in the fee letter among the Borrowers and Wells Fargo of even date herewith (the "***Fee Letter***").

We understand that you plan to seek bankruptcy protection for you and your subsidiaries by filing chapter 11 cases (collectively, "***Chapter 11 Case***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"). We further understand that you intend to propose a plan of reorganization that will be filed with the Bankruptcy Court on or before three (3) business days after the petition date of the Chapter 11 Case.

Wells Fargo will act as sole Agent for the Exit Facility. No additional agents, co-agents or arrangers will be appointed and no other titles will be awarded without our prior written approval.

The commitment of Wells Fargo hereunder is subject to the satisfaction of each of the following conditions precedent in a manner acceptable to Wells Fargo: (a) the accuracy and completeness in all material respects of all representations that you and your affiliates make to Wells Fargo; (b) your compliance with the terms of this Commitment Letter (including the Summary of Terms) and the Fee Letter; (c) the negotiation, execution and delivery of definitive documentation for the Exit Facility consistent with the Summary of Terms and otherwise satisfactory to Wells Fargo; (d) the payment of the fees required by the Fee Letter that are due and payable; and (e) the other conditions set forth under the "Conditions Precedent to Closing" heading in the Summary of Terms.

You represent, warrant and covenant that (a) all financial projections, budgets and other forward-looking information concerning the Loan Parties that have been or are hereafter made available to Wells Fargo by you or any of your representatives (or on your or their behalf) (the "***Projections***") have been or will be prepared in good faith based upon reasonable assumptions and (b) all Information, other than Projections, which has been or is hereafter made available to Wells Fargo by you or any of your representatives (or on your or their behalf) in connection with any aspect of the transactions contemplated hereby, as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements

contained therein not misleading. You agree to furnish us with further and supplemental information from time to time until the Closing Date (as defined herein) so that the representation, warranty and covenant in the immediately preceding sentence are complete and correct on the Closing Date as if the information were being furnished, and such representation, warranty and covenant were being made, on such date. In issuing this commitment, Wells Fargo is and will be using and relying on the Information without independent verification thereof.

You agree that, upon your acceptance of this Commitment Letter and the Fee Letter, you shall promptly seek an order from the Bankruptcy Court (the "*Exit Facility Order*") (a) authorizing the Borrowers' and Guarantors' performance of their pre-closing obligations and undertakings under this Commitment Letter and the Fee Letter and (b) providing that the rights of the Agent to payment of all costs, fees and expenses and to indemnification (including indemnification rights of Lenders) under the documentation of the Exit Facility shall be entitled to priority as administrative expense claims under section 503(b)(1) of the Bankruptcy Code whether or not the Exit Facility closes.

By executing this Commitment Letter, you agree, whether or not the Closing Date occurs, to jointly and severally reimburse Wells Fargo from time to time on demand for all reasonable out-of-pocket fees, costs, and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of Choate, Hall & Stewart LLP, as counsel to the Agent, and of special and local counsel to the Lenders retained by the Agent, and (b) due diligence costs and expenses) incurred in connection with the Exit Facility and this Commitment Letter (including, without limitation, in connection with the due diligence, approval, negotiation, preparation of the definitive documentation therefor, and closing), and the other transactions contemplated hereby. You also agree to jointly and severally pay all costs and expenses of the Agent (including, without limitation, fees and disbursements of counsel) incurred in connection with the enforcement of any of its rights and remedies hereunder.

You agree to indemnify and hold harmless Wells Fargo and each Lender and each of their respective affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "*Indemnified Party*") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transactions or (b) the Exit Facility and any other financings, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the gross negligence or willful misconduct

2

of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction.

This Commitment Letter and the Fee Letter and the contents hereof and thereof are confidential and may not be disclosed in whole or in part to any person or entity without our prior written consent, except for disclosure hereof or thereof (a) on a confidential basis to your accountants, attorneys and other professional advisors retained by you in connection with the Exit Facility or the Chapter 11 Case, or (b) as otherwise required by law; provided, however, that it is understood and agreed that after your acceptance of this Commitment Letter, (i) you may disclose this Commitment Letter (including the Summary of Terms) and the contents hereof and thereof (but not the fees provided for therein) in filings with the Bankruptcy Court in the Chapter 11 Case and to parties in interest in such Chapter 11 Case, (ii) you may make a generic disclosure regarding aggregate fees and expenses (but without disclosing any specific fees) payable in connection with the Exit Facility, and (iii) you may disclose the existence of the Commitment Letter (and the commitments hereunder).

You acknowledge that Wells Fargo or its affiliates may be providing financing or other services to parties whose interests may conflict with your interests. Wells Fargo agrees that it will not furnish confidential information obtained from you to any of its other customers and that it will treat confidential information relating to you and your affiliates with the same degree of care as it treats its own confidential information. Wells Fargo further advises you that it will not make available to you confidential information that it has obtained or may obtain from any other customer. In connection with the services and transactions contemplated hereby, you agree that Wells Fargo is permitted to access, use and share with any of its bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning you or any of your affiliates that is or may come into the possession of Wells Fargo or any of its affiliates.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that: (a) (i) the arranging and other services described herein regarding the Exit Facility are arm's-length commercial transactions between you and your affiliates, on the one hand, and Wells Fargo, on the other hand, (ii) you have each consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are each capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; (b) (i) Wells Fargo has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates, or any other person or entity and (ii) Wells Fargo does not have any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein; and (c) Wells Fargo and its affiliates may be engaged in a broad range of transactions that involve interests that differ from yours, those of your affiliates, and Wells Fargo has no obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against Wells Fargo with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

The provisions of the immediately preceding five paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Exit Facility shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of Wells Fargo hereunder.

This Commitment Letter and the Fee Letter may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter or the Fee Letter

3

by telecopier, facsimile, or other electronic transmission (via PDF or other format) shall be effective as delivery of a manually executed counterpart thereof.

This Commitment Letter (including the Summary of Terms) and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles thereof, but including Section 5-1401 of the New York General Obligations Law. Each of the Loan Parties and Wells Fargo hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including the Summary of Terms), the Fee Letter, the transactions contemplated hereby and thereby or the actions of Wells Fargo in the negotiation, performance or enforcement hereof. The commitments and undertakings of Wells Fargo may be terminated by us if you fail to perform your obligations under this Commitment Letter or the Fee Letter on a timely basis.

This Commitment Letter (including the Summary of Terms) and the Fee Letter embody the entire agreement and understanding among Wells Fargo, you and your affiliates with respect to the Exit Facility and supersedes all prior agreements and understandings relating to the specific matters hereof. However, please note that the terms of the commitment of Wells Fargo are not limited to those set forth herein or in the Summary of Terms. Those matters that are not covered or made clear herein or in the Summary of Terms or the Fee Letter are subject to mutual agreement of the parties. No party has been authorized by Wells Fargo to make any oral or written statements that are inconsistent with this Commitment Letter. This Commitment Letter is not assignable by the Borrowers without our prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties.

Wells Fargo hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***PATRIOT Act***"), Wells Fargo may be required to obtain, verify and record information that identifies the Borrowers and Guarantors (as defined in the Summary of Terms), which information includes the name, address, tax identification number and other information regarding the Borrowers and Guarantors that will allow Wells Fargo to identify the Borrowers and Guarantors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act. You shall provide Wells Fargo, prior to the Closing Date (as defined in the Summary of Terms), with all documentation and other information required by bank regulatory authorities under "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

This Commitment Letter and all commitments and undertakings of Wells Fargo hereunder will expire at 3:00 p.m. (Boston, Massachusetts time) on March 5, 2018 unless the Borrowers execute this Commitment Letter and the Fee Letter and return them to us prior to that time (which may be by facsimile or other electronic transmission) and pay the Commitment Fee (as defined in the Fee Letter) in accordance the terms of the Fee Letter, whereupon this Commitment Letter (including the Summary of Terms) and the Fee Letter (each of which may be signed in one or more counterparts) shall become binding agreements. Thereafter, all commitments and undertakings of Wells Fargo hereunder will expire on the earlier of (a) June 14, 2018, unless definitive documentation for the Exit Facility is executed and delivered prior to such date and all conditions precedent have been satisfied on or prior to such date, (b) April 10, 2018, unless the Exit Facility Order has been entered prior to such date, or (c) the Bankruptcy enters an order converting the Chapter 11 Case to a proceeding under chapter 7 of the United States Bankruptcy Code or dismissing the Chapter 11 Case. For the avoidance of doubt, the Commitment Fee (as defined in the Fee Letter) shall have been fully earned, due and payable on the execution of the Fee Letter and shall not be returnable to Borrowers if the Commitment Letter and Fee Letter are terminated for any reason.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name:  Y. Sonia Anandraj

Title:    Authorized Officer

*Signature Page to Commitment Letter*

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

**THE WALKING COMPANY**

By: _____

Name: Roberta Morris

Title:   Chief Financial Officer


**BIG DOG USA, INC.**

By: _____

Name: Roberta Morris

Title:   Chief Financial Officer


**FOOTSMART, INC.**

By: _____

Name: Roberta Morris

Title:   Chief Financial Officer


**THE WALKING COMPANY HOLDINGS, INC.**

By: _____

Name: Roberta Morris

Title:   Chief Financial Officer


*Signature Page to Commitment Letter*

EXHIBIT A

**SUMMARY OF INDICATIVE TERMS AND CONDITIONS**
**THE WALKING COMPANY**
**$55,000,000 SENIOR CREDIT EXIT FACILITY**

Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the commitment letter (the *"Commitment Letter"*) to which this Summary of Terms and Conditions is attached.

| | |
|---|---|
| **BORROWERS:** | The Walking Company, a Delaware corporation (the *"Lead Borrower"*), together with Big Dog USA, Inc., a California corporation and Footsmart, Inc., a Delaware corporation (each, a *"Borrower"* and collectively with the Lead Borrower, the *"Borrowers"*), each as reorganized pursuant to the Acceptable Plan (as defined below). The Borrowers shall be jointly and severally liable for all obligations. |
| **GUARANTORS:** | The Walking Company Holdings, Inc., a Delaware corporation (the *"Parent"*) as reorganized pursuant to the Acceptable Plan (as defined below), and each future direct and indirect domestic and, to the extent no material adverse tax consequences would result, foreign subsidiary of the Parent (collectively, the *"Guarantors"*; together with the Borrowers, the *"Loan Parties"*). All guarantees will be guarantees of payment and not of collection. |
| **ADMINISTRATIVE AND COLLATERAL AGENT:** | Wells Fargo will act as sole administrative and collateral agent (in such capacities, the *"Agent"*). |
| **TERM AGENT:** | Wells Fargo (in such capacity, *"Term Agent"*). |
| **LENDERS:** | At closing, Wells Fargo and, following closing, Wells Fargo and any other person (a) who becomes a term lender providing the Term Loan (the *"Term Lenders"*) and (b) who becomes a revolving lender providing Revolving Loans (the *"Revolving Lenders"*, and together with the Term Lenders, the *"Lenders"*). |
| **L/C ISSUER:** | Wells Fargo Bank, National Association (the *"L/C Issuer"*). |
| **SENIOR EXIT FACILITY:** | A $55,000,000 credit facility (the *"Exit Facility"*) consisting of a $50,000,000 senior secured revolving facility ("the *"Revolver"*; loans borrowed thereunder, the *"Revolving Loans"*) and up to a $5,000,000 senior secured term loan facility (the *"Term Loan"*; together with the Revolving Loans, the *"Loans"*), which Revolver will include a |

$10,000,000 sublimit for the issuance of letters of credit (each a "*Letter of Credit*"), and a $5,000,000 sublimit for swing line loans (each a "*Swing Line Loan*"). Letters of Credit will be issued by the L/C Issuer and Swing Line Loans will be made available by Wells Fargo, and each Lender will purchase an irrevocable and unconditional participation in each Letter of Credit and each Swing Line Loan.

**PRE-PETITION CREDIT FACILITY:**

The Pre-Petition Credit Facility (the "*Pre-Petition Credit Facility*") consisting of a $50,000,000 senior secured revolving credit facility and a senior secured term loan facility, evidenced by that certain Third Amended and Restated Loan and Security Agreement (as amended and in effect, the "*Pre-Petition Credit Agreement*") dated as of June 5, 2014, among the Borrowers, the Guarantors, the Lenders, the Agent, and Term Agent.

**DEBTOR-IN-POSSESSION CREDIT FACILITY:**

The DIP Credit Facility (the "*DIP Credit Facility*" and, collectively with the Pre-Petition Credit Facility, the "*Existing Credit Facilities*") consisting of a $57,250,000 senior secured superpriority credit facility and evidenced by that certain Debtor-In-Possession Loan and Security Agreement (as amended and in effect, the "*DIP Credit Agreement*" and, collectively with the Pre-Petition Credit Agreement, the "*Existing Credit Agreements*") dated as of March 6, 2018, among the Borrowers, the Guarantors, the Lenders, the Agent, and Term Agent.

**PURPOSE:**

The proceeds of the Exit Facility shall be used to pay the outstanding amount of the Existing Credit Facilities in full, to finance certain payments due under the Acceptable Plan, and for working capital, capital expenditures, and other lawful corporate purposes.

As used herein, the term "*Acceptable Plan*" shall mean, a Chapter 11 plan of reorganization proposed by the Loan Parties in the Chapter 11 Case that is in form and substance acceptable to the Agent, in its discretion, together with all modifications and amendments that are in form and substance acceptable to the Agent in its discretion, and which, among other matters, provides for the indefeasible payment in full in cash of the Obligations under the Existing Credit Facilities on the date of such consummation, unless otherwise consented to by the Agent, Term Agent and Lenders in their sole discretion.

**CLOSING DATE:**

The execution of definitive loan documentation and satisfaction of all conditions precedent to closing, to occur on or before June 14, 2018 (the "*Closing Date*").

**INTEREST RATES:**

As set forth in Addendum I.

**MATURITY:**

The Revolver shall terminate and all amounts outstanding thereunder shall be due and payable in full upon the earlier of: (a) five (5) years after the Closing Date, and (b) 90 days prior to the maturity of the Amended Notes (as defined below). The Term Loan shall terminate and all

amounts outstanding there under shall be due and payable in full upon the earlier of: (a) thirty-three (33) months after the Closing Date, and (b) 90 days prior to the maturity of the Amended Notes (as defined below).

**AVAILABILITY /**
**BORROWING BASE:**

Revolving Loans and Letters of Credit (subject to the Letter of Credit sublimit set forth above) under the Exit Facility may be made on a revolving basis up to the lesser of (i) $50,000,000 (the "*Revolving Commitments*") and (ii) the Borrowing Base (as defined below) (the lesser of (i) and (ii) being hereafter referred to as the "*Loan Cap*").

The "*Borrowing Base*" shall be equal to the sum, at the time of calculation of:

(a)  85% of eligible credit card receivables of the Borrowers (net of credit card receivables reserves); plus

(b) 90% of the appraised net orderly liquidation value of eligible inventory of The Walking Company and Big Dogs USA, Inc. (net of inventory reserves); plus

(c)  85% of eligible wholesale receivables of the Borrowers (net of receivables reserves); minus

(d)  the Minimum Excess Availability Reserve (as defined below) and the other reserves established by the Agent in its permitted discretion.

The ***Minimum Excess Availability Reserve*** shall be an amount equal to the greater of (a) $5,000,000 and (b) ten percent (10%) of the Revolving Commitments at all times.

**MANDATORY PREPAYMENTS:**

All proceeds of the following prepayment events will be promptly applied by the Lenders to repay outstanding Revolving Loans or Term Loans, as agreed, and to cash collateralize outstanding Letters of Credit: (a) dispositions, (b) casualty, eminent domain, condemnation and similar proceedings, (c) issuance of equity interests, (d) incurrence of indebtedness (other than permitted indebtedness), and (e) receipt of any extraordinary receipts (such as insurance proceeds, tax refunds, pension plan reversions, indemnity payments and purchase price adjustments). For the avoidance of doubt, such prepayment events shall be subject to customary exceptions and reinvestment provisions and shall not result in the reduction of the Revolving Commitments under the Exit Facility; however, any amounts repaid under the Term Loan may not be reborrowed.

The Term Loan shall be repaid in monthly installments of $150,000, on the last day of each fiscal month, with any outstanding balance due at maturity.

If at any time the aggregate amount of the Revolving Loans and Letters of Credit exceeds the Loan Cap, as of such date of determination, then

3

the Borrowers will immediately repay outstanding Revolving Loans and, if necessary thereafter, cash collateralize Letters of Credit in an aggregate amount equal to such excess.

All amounts on deposit will be promptly applied by the Agent to repay outstanding Revolving Loans or Term Loans, as agreed, under the Exit Facility and to cash collateralize outstanding Letters of Credit.

**OPTIONAL PREPAYMENTS:** The Borrowers may prepay the Exit Facility substantially consistent with their rights to do so under the Pre-Petition Credit Facility in whole or in part at any time, subject to payment of the prepayment premium set forth in the Fee Letter and subject to reimbursement of breakage and redeployment costs in the case of prepayment of LIBOR borrowings. The Revolving Commitments under the Exit Facility may be irrevocably reduced or terminated by the Borrowers at any time subject to payment of the prepayment premium set forth in the Fee Letter.

**SECURITY:** The Exit Facility will be secured by a valid and perfected first priority security interest in all of the Borrowers' and Guarantors' respective assets, both tangible and intangible, real and personal, and all proceeds and products thereof assets and all proceeds realized thereof (the "*Collateral*"); provided that priority and application of payments shall be substantially consistent with the Pre-Petition Credit Facility. Additionally, the Exit Facility will contain inter-Lender provisions substantially consistent with those in the Pre-Petition Credit Facility.

**CONDITIONS PRECEDENT TO CLOSING:** The closing and the initial extension of credit under the Exit Facility will be subject to satisfaction of the following conditions precedent and shall occur on or after the Effective Date (as defined below) of the Acceptable Plan:

(i)    The negotiation, execution and delivery of definitive documentation with respect to the Exit Facility (including, without limitation, a subordination agreement with the holders of the Amended Notes (as defined below) and any other customary intercreditor agreements and subordination agreements as applicable) on terms and conditions satisfactory to the Agent and Term Agent.

(ii)    All filings, recordations and searches necessary or desirable in connection with the liens and security interests referred to above shall have been duly made; all filing and recording fees and taxes shall have been duly paid and any surveys, title insurance, landlord waivers and access letters requested by the Agent and Term Agent with respect to real property interests of the Loan Parties shall have been obtained. The Agent and Term Agent shall be reasonably satisfied with the amount, types and terms and conditions of all insurance maintained by the Loan Parties; and the Agent and Term Agent shall have received endorsements naming the Agent as an additional insured or lender's loss payee, as the case may be, under all insurance policies to be maintained with respect to the properties of the Loan Parties forming part of the Collateral set forth above.

4

(iii)    All governmental consents and approvals, and all third party consents, required for the Loan Parties to consummate the financing shall have been obtained by the Loan Parties.

(iv)    Compliance with all applicable laws and regulations in all material respects (including compliance with "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, MSB and HRC requirements);

(v)    The Agent and Term Agent shall have received (A) satisfactory opinions of counsel to the Borrower (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documents for the Exit Facility and perfection of the Agent's security interest in the Collateral) and of appropriate local counsel and such corporate resolutions, certificates and other documents as the Agent and Term Agent shall reasonably require and (B) satisfactory evidence that the Agent shall have a valid and perfected first priority lien and security interest in such capital stock and in the other Collateral set forth above.

(vi)    The absence of any Bankruptcy Court order or any action, suit, investigation or proceeding pending or, to the knowledge of the Borrowers or Guarantors, threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a material adverse effect or to prevent or restrain the consummation of the Exit Facility.

(vii)    No changes or developments shall have occurred, and no new or additional information, shall have been received or discovered by the Agent or Term Agent regarding the Borrowers or the Guarantors or the transactions contemplated hereby after the date of the Commitment Letter that (A) either individually or in the aggregate, could reasonably be expected to have a material adverse effect (it being agreed that the commencement of the Chapter 11 Case shall not be deemed to be a material adverse effect) or (B) purports to adversely affect the Exit Facility or any other aspect of the transactions contemplated hereby, and nothing shall have come to the attention of the Agent or Term Agent to lead it to believe that (x) the information provided was or has become misleading, incorrect or incomplete in any material respect or (y) the transactions contemplated hereby will have a material adverse effect.

(viii)    The Bankruptcy Court shall have approved the payment of all accrued fees and expenses of the Agent and Term Agent (including the fees and expenses of counsel (including any local counsel) for the Agent) and all such fees and expenses shall have been paid.

(ix)    The Agent and Term Agent shall have received, in form and substance satisfactory to them, such other reports, audits, collateral examinations, background checks, or certifications as they may reasonably request.

(x)    The capital structure of the Borrowers and Guarantors shall be acceptable to the Agent and Term Agent at closing; provided that the Agent and Term Agent agree that the capital structure contemplated by the Acceptable Plan is acceptable.

(xi)     Minimum day one Excess Availability of at least $5,000,000, after giving effect to the closing of the Exit Facility and making all payments required to be made on or about the effective date of the Acceptable Plan (including, without limitation, all administrative claims, any amounts owed to general unsecured creditors, and the funding of any professional fee escrow accounts).

> As used herein, "*Excess Availability*" shall mean an amount equal to (a) the Loan Cap <u>minus</u> (b) the amount of Revolving Loans and Letters of Credit outstanding under the Exit Facility.

(xii)     Receipt by the Agent of such historical financial statements, post-emergence projections, and business plan with respect to the Borrowers and Guarantors as the Agent and Term Agent deem appropriate, including, without limitation, final projections for the next eighteen (18) month period (including balance sheet, P&L, cash flows and availability model), which projections (a) are consistent with the preliminary plan submitted to the Agent and Term Agent on February 26, 2018, (b) are acceptable to the Agent and Term Agent in their sole discretion, and (c) evidence consistent levels of leverage (senior and total fund debt to proforma EBITDA), profitability, excess availability and additional equity in an amount not less than $10,000,000 on terms acceptable to the Agent and Term Agent.

(xiii)     The Borrowers and Guarantors shall have, no later than March 6, 2018, commenced the Chapter 11 Case in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") as prenegotiated chapter 11 cases.    In addition, the Borrowers and Guarantors shall have on or before three business days after the petition date of the Chapter 11 Case (or thereafter to the extent that the Agent and Term Agent so consent in writing) filed their Acceptable Plan in form and substance mutually acceptable to the Agent, Term Agent and the Borrowers.  All amendments and modifications to the Acceptable Plan shall be in form and substance acceptable to the Agent and Term Agent.

(xiv)     No later than April 10, 2018, the Borrowers and Guarantors shall have obtained from the Bankruptcy Court the Exit Facility Order.

(xv)     No later than June 5, 2018, the Borrowers and Guarantors shall have obtained from the Bankruptcy Court an order (the "*Confirmation Order*"), in form and substance acceptable to the Agent and Term Agent, confirming the Acceptable Plan and approving the consummation of the restructuring transactions on the effective date of the Acceptable Plan (the "*Effective Date*").   As of the Effective Date, Confirmation Order shall be final, and shall not be subject to a stay or injunction (or similar prohibition) in effect with respect thereto, nor shall have been reversed, vacated, amended supplemented or otherwise modified in any manner that could reasonably be expected to adversely affect the rights of the Agent, Term Agent or Lenders.  The Effective Date shall occur no later than the deadline for the effective date of the Acceptable Plan and shall

be conditioned, in any event, upon, *inter alia*, payment in full in cash of all obligations under the Existing Credit Facilities.

(xvi)    The entry of all orders described or referred to herein or in the body of the Commitment Letter shall have been upon proper notice as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any applicable bankruptcy rules.

(xvii)    No default or event of default shall exist under the DIP Credit Facility.

(xviii)    All of the conditions precedent set forth in the Acceptable Plan shall have been satisfied, as determined by the Agent and Term Agent.

(xix)    The Agent and Term Agent shall have received satisfactory evidence that prior to, or contemporaneously with, the Effective Date certain equity holders of the Parent have made a cash investment of at least $10,000,000 in the Loan Parties on terms and conditions acceptable to Agent and Term Agent (including any investment agreement entered into in connection therewith).

(xx)    The Agent and Term Agent shall have received a payoff letter (or other evidence reasonably satisfactory to Agent and Term Agent) with respect to each of the Existing Credit Agreements (A) evidencing that, upon the making of the initial extension of credit on the Closing Date and the application of such funds in accordance with such payoff letter, all obligations under such facility will have been paid and satisfied in full, and all commitments thereunder will terminate, and (B) confirming that all liens securing such existing indebtedness will be, contemporaneously with the initial funding under the Exit Facility, released.

(xxi)    The Agent and Term Agent shall have received a borrowing base certificate dated as of the Closing Date, executed by a financial officer of the Borrowers, which shall be in form and substance reasonably acceptable to the Agent and Term Agent.

(xxii)    The Agent and Term Agent shall have received satisfactory evidence that the Noteholders (as such term is defined in the Existing Credit Agreement) have amended the Note Financing (as such term is defined in the Existing Credit Agreements) on terms and conditions satisfactory to Agent, to, among other things, extend the maturity to a date that is at least 90 days after the maturity of the Exit Facility (the "*Amended Notes*").

(xxii)    The Agent, Term Agent and Lender shall have received all necessary credit approvals.

(xxiii)    No Challenge (as such term is defined in the DIP Credit Facility) is pending as to the Pre-Petition Obligations or the Pre-Petition Liens

granted thereunder (in both cases, as such terms are defined in the DIP Credit Agreement).

(xxiv)  The Loan Parties shall have obtained concessions as to future rent obligations on leases at least $8,000,000 on an annualized basis (or such other amount as may be agreed to by the Agent), through rent reductions and/or store closings.

(xxv)   The Agent and Term Agent shall have received a consent, in form and substance reasonably acceptable to them, from the Board or Trustees of the Leland Stanford Junior University ("Stanford") in its capacity as licensor under that certain Exclusive Agreement, dated as of July 15, 2008, between Stanford and Parent, as amended and in effect, permitting the Parent's assumption of such license agreement.

(xxvi) The Agent and Term Agent shall have received a non-exclusive license, in form and substance reasonably acceptable to them, from Big Dog Licensing LLC, with respect to intellectual property licensed from Big Dog Licensing LLC to the Loan Parties.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:**

Usual and customary for transactions of this type, including, without limitation, the following:  (i) all of the representations and warranties in the loan documentation shall be true and correct as of the date of such extension of credit; (ii) no default or event of default under the Exit Facility shall have occurred and be continuing, or would result after giving effect to such extension of credit; (iii) with respect to any Revolving Loans, the aggregate principal amount of all Revolving Loans and the aggregate undrawn amount of all Letters of Credit outstanding on such date, after giving effect to the applicable borrowing or issuance or renewal of a Letter of Credit, shall not exceed the Loan Cap on such date; and (iv) no material adverse effect shall have occurred or result from such credit extension.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary for transactions of this type and shall include, without limitation, the following representations and warranties: (i) compliance with all applicable Bankruptcy Code provisions and (ii) Confirmation Order not procured by fraud.

**COVENANTS:**

Usual and customary for transactions of this type and shall include, without limitation, the following covenants:

*Affirmative Covenants*: Customary for transactions and facilities of this type.

*Negative Covenants*: Customary for transactions and facilities of this type; provided that the Loan Parties shall not be permitted to make any restricted payments (including dividends), investments, or acquisitions, or voluntarily prepay any indebtedness for the first twelve (12) months

8

following the Closing Date, after which time such payments and transactions shall be subject to conditions to be agreed.

*Financial Covenant*:  The Loan Parties shall maintain a minimum amount of consolidated EBITDA, calculated as of each quarter (for the four most recently completed fiscal quarters), in amounts to be agreed.

**CASH DOMINION:**

The Borrowers and Guarantors will maintain cash management procedures customary for facilities of this type and reasonably satisfactory to the Agent and Term Agent, including, but not limited to, customary lockbox arrangements and blocked account agreements, which will provide for the Agent to have control of all deposit and securities accounts as required by the Agent.  Beginning on the Closing Date, all cash receipts shall be forwarded on a daily basis to a deposit account which is subject to a control agreement in favor of the Agent and such receipts shall be applied daily in reduction of the obligations under the Exit Facility.

**COLLATERAL MONITORING:**

The Agent, and, with respect to the intellectual property, Term Agent, shall have rights to conduct commercial finance exams and appraisals in its reasonable discretion at the expense of the Borrowers.

**COLLATERAL REPORTING:**

The Borrowers shall provide collateral reporting usual and customary for transactions of this type, including, without limitation, certain collateral reporting requirements which shall be tied to the Borrowers' Excess Availability levels. Borrowing Base reporting to be weekly.   The Borrowers shall include a 13-week cash flow with its weekly Borrowing Base reporting.

**FINANCIAL REPORTING:**

The Borrowers shall provide financial reporting usual and customary for transactions of this type, including, without limitation: (i) financial reporting consistent with the terms of the Pre-Petition Credit Agreement, and (ii) supplemental financial reporting concerning the Borrowers' obligations under the Acceptable Plan. Other requirements may include forecasts and projections, compliance certificates, reports to shareholders and debtholders, management letters, notices of default, litigation and other material events, updates to the budget and other information customarily supplied in a transactions of this type.

**EVENTS OF DEFAULT:**

Usual and customary in transactions of this type.

**ASSIGNMENTS AND PARTICIPATIONS:**

Usual and customary in transactions of this type.

**WAIVERS AND AMENDMENTS:**

Usual and customary for transactions of this type, which shall include provisions that certain amendments, waivers, and/or exercise of certain rights will require consent of Lenders holding a majority of the Exit Facility or unanimous consent of all Lenders, as applicable.

9

**INDEMNIFICATION:** The Borrowers will indemnify and hold harmless the Agent, each Lender and their respective affiliates and their partners, directors, officers, employees, agents and advisors from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Exit Facility, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs. This indemnification shall survive and continue for the benefit of all such persons or entities.

**GOVERNING LAW:** State of New York without giving effect to the conflicts of laws principles thereof.

**PRICING/FEES/ EXPENSES:** As set forth in Addendum I.

**OTHER:** Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. The loan documentation will contain customary increased cost, withholding tax, capital adequacy and yield protection provisions.

## ADDENDUM I
## PRICING, FEES AND EXPENSES

**INTEREST RATES:** The interest rates per annum applicable to the Exit Facility (other than in respect of Swing Line Loans) will be LIBOR *plus* the Applicable Margin (as hereinafter defined) or, at the option of the Borrowers, the Base Rate (to be defined as the highest of (x) the Wells Fargo prime rate and (y) the Federal Funds rate *plus* 0.50%, or (z) LIBOR for an interest period of one month *plus* 1.00%) *plus* the Applicable Margin; provided that such rate shall not be less than zero.

"*Applicable Margin*" means the percentage per annum to be determined in accordance with the applicable pricing grid set forth below, based on Excess Availability. Each Swing Line Loan shall bear interest at the Base Rate plus the Applicable Margin for Base Rate loans under the Exit Facility.

The interest rate applicable to the Term Loan will be (i) the greater of (a) three (3) month LIBOR and (b) 1.00%, *plus* (ii) 8.50%.

The Borrowers may select interest periods of one, two, or three months for LIBOR loans, subject to availability. Interest shall be payable, with respect to Base Rate loans, monthly, in arrears, or, with respect to LIBOR loans, at the end of the selected interest period, but no less frequently than quarterly.

Upon the occurrence of any event default under the loan documentation, the Applicable Margin on obligations owing under the loan documentation shall increase by two percent (2.00)% per annum.

**COMMITMENT FEE:** Commencing on the Closing Date, a commitment fee shall be payable on the average daily unused portions of the Exit Facility at the rate of 0.375% per annum. Such fee shall be payable monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date.

**AGENT FEE:** The Borrowers shall pay an administration fee of $30,000 per annum, which shall be fully earned, due and payable to the Agent, solely for its own account, in advance in monthly installments of $2,500 on the first of each month for so long as any obligation shall be outstanding under the Exit Facility or any Lender shall have any commitment thereunder.

**TERM AGENT FEE:** The Borrowers shall pay an administration fee of $25,000 per annum, which shall be fully earned, due and payable to the Term Agent, solely for its own account, in advance in monthly installments of $2,083.34 on the first of each month for so long as any obligation shall be outstanding under the Term Loan.

**LETTER OF**

| CREDIT FEES: | Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to the Applicable Margin from time to time applicable to either standby Letters of Credit or documentary Letters of Credit, as applicable.  Such fees will be (a) payable monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date, and (b) shared proportionately by the Lenders under the Exit Facility.  In addition, a fronting fee shall be payable to the L/C Issuer for its own account, in the same amount as the fronting fee in the Pre-Petition Credit Agreement, as well as all customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the L/C Issuer for its own account. |
|---|---|

### PRICING GRID
### EXIT FACILITY

| Level | Average Daily Excess Availability | Applicable Margin for LIBOR Loans | Applicable Margin for Base Rate Loans | Applicable Margin for Standby L/Cs | Applicable Margin for Documentary L/Cs |
|---|---|---|---|---|---|
| I | >$15,000,000 | 2.00% | 1.00% | 2.00% | 1.50% |
| II | ≤$15,000,000 but >$7,500,000 | 2.25% | 1.25% | 2.25% | 1.75% |
| III | ≤$7,500,000 | 2.50% | 1.50% | 2.50% | 2.00% |

| CALCULATION OF INTEREST AND FEES: | All calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360-day year. |
|---|---|
| COST AND YIELD PROTECTION: | Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes. |
| EXPENSES: | The Borrowers will pay all reasonable costs and expenses associated with the preparation, due diligence, administration, syndication and closing of all loan documentation, including, without limitation, the legal fees of counsel to the Agent, regardless of whether or not the Exit Facility is closed.  The Borrowers will also pay the expenses of the Agent and each Lender in connection with the enforcement of any of the loan documentation. |
| FEE LETTER: | The Borrowers will also pay all fees set forth in the Fee Letter. |

2