IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WALKING COMPANY HOLDINGS, INC., et al.,[1] | ) ) | Case No.: 18-10474 (LSS) Jointly Administered |
| | ) | |
| Debtors. | ) | |

**NOTICE OF FILING OF PLAN SUPPLEMENT DOCUMENTS PURSUANT TO DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE** that, on April 20, 2018, The Walking Company Holdings, Inc.; The Walking Company; Big Dog USA, Inc.; and FootSmart, Inc. (each, a "Debtor," and collectively, the "Debtors") filed the (i) *Debtors' First Amended Joint Plan of Reorganization* [Docket No. 257] (as may be amended, supplemented, restated, or modified from time to time, and together with the Plan Supplement, the "Plan") and (ii) *First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan of Reorganization* [Docket No. 258] (the "Disclosure Statement").[2]

**PLEASE TAKE FURTHER NOTICE** that the Plan and Disclosure Statement contemplate the submission of certain documents (the "Plan Supplement") in advance of the hearing on confirmation of the Plan (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the following Plan Supplement documents, in substantially final form:

- Exhibit A    Amended Organizational Documents;

- Exhibit B    Amended Subordinated Notes;

---

[1]  The Debtors and the last four digits of their respective taxpayer identification numbers include:  The Walking Company Holdings, Inc. (8665); The Walking Company (2061); Big Dog USA, Inc. (5316); and FootSmart, Inc. (9736).  The headquarters and service address for the above-captioned Debtors is 25 W. Anapamu, Santa Barbara, CA 93101.
[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

- Exhibit C      Exit Facility Loan Agreement;

- Exhibit D      GUC Claims Ombudsman;

- Exhibit E      List of Litigation Claims;

- Exhibit F      Plan Sponsor Investment Agreement;

- Exhibit G      Warrant Agreement;

- Exhibit H      Resignations / Appointments to Board as of Effective Date; and

- Exhibit I      List of Contracts/Leases to be Rejected as of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the forms of the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to alter, amend, modify, or supplement any of the documents contained in the Plan Supplement in accordance with the terms of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement, Plan, and Disclosure Statement may be viewed for free at the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC ("KCC"), at http://www.kccllc.net/twc or for a fee on the Bankruptcy Court's website at http://www.deb.uscourts.gov. To obtain hard copies of the Plan Supplement, Plan, or Disclosure Statement, please contact KCC at (866) 927-7089 or by e-mail at twcinfo@kccllc.com.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be held before the Honorable Laurie Selber Silverstein in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801, on June 12, 2018 at 10:00 a.m. (prevailing Eastern time). Please be advised that the Hearing

may be continued from time to time by the Bankruptcy Court without further notice other than by such adjournment being announced in open court or by a notice of adjournment being filed with the Bankruptcy Court and served on parties entitled to notice under Bankruptcy Rule 2002 and the local rules of the Bankruptcy Court or otherwise.

Dated:   June 1, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Jeffrey N. Pomerantz (CA Bar No. 143717)
Jeffrey W. Dulberg (CA Bar No. 181200)
James E. O'Neill (DE Bar No. 4042)
Victoria A. Newmark (CA Bar No. 183581)
919 N. Market Street, 17th Floor
Wilmington, DE 91899
Tel:  (302) 652-4100 / Fax: (302) 652-4400
E-mail:  jpomerantz@pszjlaw.com
        jdulberg@pszjlaw.com
        joneill@pszjlaw.com
        vnewmark@pszjlaw.com

Attorneys for Debtors and Debtors in Possession

# EXHIBIT A

**Amended Organizational Documents**

**SECOND AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
THE WALKING COMPANY HOLDINGS, INC.**

––––––––––––––––––––––––––––––––––––

Pursuant to Sections 242, 245 and 303 of the
General Corporation Law of the State of Delaware

––––––––––––––––––––––––––––––––––––

The Walking Company Holdings, Inc. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), does hereby certify as follows:

1.      The name of the Corporation is The Walking Company Holdings, Inc.

2.      The original certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on December 31, 1993 under the name "190th Shelf Corporation." Effective August 4, 1997, the certificate of incorporation of the Corporation was amended and restated under the name "Big Dog Holdings, Inc." Effective on May 7, 2008, The Walking Company Holdings, Inc. was merged with and into Big Dog Holdings, Inc. with Big Dog Holdings, Inc. being the surviving corporation with the name "The Walking Company Holdings, Inc." Effective April 26, 2010, the certificate of incorporation of the Corporation was amended and restated under the name "The Walking Company Holdings, Inc."

3.      The Corporation and its subsidiaries are the subject of proceedings under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") of which the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction. Pursuant to such proceedings, the Corporation and its subsidiaries have filed a joint plan of reorganization (the "Joint Plan") with respect to which a confirmation order of the Bankruptcy Court (the "Confirmation Order") has been entered. The Confirmation Order provides for the making and filing of this Second Amended and Restated Certificate of Incorporation.

4.      This Second Amended and Restated Certificate of Incorporation amends and restates in its entirety the certificate of incorporation of the Corporation and has been duly made, executed and acknowledged by the officers of the Corporation in accordance with Sections 242, 245 and 303 of the DGCL.

5.      The text of the certificate of incorporation of the Corporation is amended and restated to read in its entirety as follows:

**ARTICLE I
NAME**

The name of the Corporation is The Walking Company Holdings, Inc.

## ARTICLE II
## REGISTERED OFFICE

The address of the Corporation's registered office in the State of Delaware is The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, County of New Castle 19801. The name of the registered agent of the Corporation at that address is The Corporation Trust Company.

## ARTICLE III
## PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the DGCL.

## ARTICLE IV
## CAPITAL STOCK

Section 1. <u>Authorized Shares</u>.

(a) The total number of shares of capital stock that the Corporation shall have authority to issue is 2,000,000, consisting of (1) 1,000,000 shares of Common Stock, par value $0.01 per share (the "<u>Common Stock</u>"), and (ii) 1,000,000 shares of Preferred Stock, par value $0.01 per share (the "<u>Preferred Stock</u>"), issuable in one or more series as hereinafter provided, of which 10,000 shares have been designated as "Series A Preferred Stock," the powers, preferences, special rights and privileges of which are set forth on Exhibit A attached hereto and hereby incorporated herein by this reference.

(b) Upon the filing of this Second Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware, and in accordance with the Joint Plan and the Confirmation Order, all shares of common stock, par value $.01 per share, and preferred stock, par value $.01 per share, of the Corporation issued and outstanding immediately before the time at which this Second Amended and Restated Certificate of Incorporation becomes effective are hereby automatically cancelled and extinguished without further action.

Section 2. <u>Common Stock</u>. Except as otherwise provided in this Second Amended and Restated Certificate of Incorporation (including any Certificate of Designation (as defined below) for any series of Preferred Stock then outstanding) or by applicable law, the voting, dividend and liquidation rights of the holders of Common Stock are as follows:

(a) *Voting Rights*. Each record holder of Common Stock shall be entitled at any annual or special meeting of stockholders with respect to each share of Common Stock held by such holder as of the applicable record date, to one vote per share in person or by proxy on all matters submitted to a vote of the stockholders of the Corporation.

(b) *Dividends and Distributions*. The holders of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Board of Directors of this Corporation (the "<u>Board of Directors</u>") from time to time out of assets or funds of the Corporation legally available therefor.

(c) *Liquidation Rights*. Subject to the prior rights of creditors of the Corporation, including without limitation the payment of expenses relating to any liquidation, dissolution or

winding up of the Corporation, and the prior rights of the holders of all series of Preferred Stock at the time outstanding as to distributions upon liquidation, dissolution or winding up of the Corporation, in the event of any dissolution, liquidation or winding-up of the affairs of the Corporation, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Corporation, the remaining assets and funds of the Corporation, if any, shall be divided among and paid ratably to the holders of Common Stock then outstanding in proportion to the number of shares held by them.

Section 3. <u>Preferred Stock</u>. The Board of Directors is hereby authorized, subject to compliance with the applicable protective provisions and the other rights which have been or may be granted to the holders of Series A Preferred Stock and any limitations prescribed by law, to provide by resolution or resolutions for the issuance of additional shares of Preferred Stock in one or more series and, by filing a certificate of designation with the Secretary of State pursuant to the DGCL setting forth a copy of such resolution or resolutions (a "<u>Certificate of Designation</u>"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences, and rights of the shares of each such series and the qualifications, limitations, and restrictions thereof. Each such series of the Preferred Stock shall be appropriately designated by a distinguishing letter or title, prior to the issue of any shares thereof.

Notwithstanding the provisions of Section 242(b)(2) of the DGCL, subject to compliance with the applicable protective provisions and the other rights which have been or may be granted to the holders of Series A Preferred Stock and any limitations prescribed by law: (i) the number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) from time to time by the affirmative vote of the holders of at least a majority of the Corporation's then outstanding shares of Preferred Stock, and (ii) the number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) from time to time by the affirmative vote of the holders of at least a majority of the Corporation's then outstanding shares of Common Stock.

Section 4. <u>Non-Voting Securities</u>. Pursuant to Section 1123(a)(6) of chapter 11 of title 11 of the Bankruptcy Code, the Corporation will not issue non-voting equity securities (which shall not be deemed to include any warrants or options to purchase capital stock of the Corporation); provided, however, that this provision (i) will have no further force or effect beyond that required under Section 1123 of the Bankruptcy Code, (ii) will have such force and effect, if any, only for so long as such section is in effect and applicable to the Corporation and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

## ARTICLE V
## BOARD OF DIRECTORS

Section 1. <u>Powers of the Board</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by applicable law or by this Second Amended and Restated Certificate of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Section 2. <u>Number of Directors</u>. The total number of directors constituting the entire Board of Directors shall be determined as set forth in the Bylaws of the Corporation, with the precise number of directors to be determined from time to time exclusively by a vote of a majority of the Board of Directors, but in no case will a decrease in the number of directors shorten the term of any incumbent director.

10504698.7

DOCS_LA:314677.2 91893/002

Section 3. <u>Removal of Directors</u>.  Except as otherwise provided in this Second Amended and Restated Certificate of Incorporation, including any Certificate of Designation for any series of Preferred Stock with respect to any directors elected by the holders of such series and except as otherwise required by applicable law, any or all of the directors of the Corporation may be removed from office, with or without cause, only by the affirmative vote of the holders of a majority of the voting power of the Corporation's then outstanding capital stock entitled to vote generally in the election of directors, voting together as a single class.

Section 4. <u>Vacancies</u>.  Except as otherwise provided in this Second Amended and Restated Certificate of Incorporation, including any Certificate of Designation for any series of Preferred Stock with respect to any directors elected by the holders of such series, any vacancies in the Board of Directors for any reason and any newly created directorship resulting by reason of any increase in the number of directors may be filled only by the Board of Directors (and not by the stockholders), acting by majority of the remaining directors then in office, although less than a quorum, or by a sole remaining director, and any directors so appointed shall hold office until the next meeting of stockholders at which directors are to be elected and until their successors are elected and qualified.

Section 5. <u>Bylaws</u>.  In furtherance and not in limitation of the power conferred upon the Board of Directors by law, the Board of Directors shall have the power to adopt, amend, alter, change or repeal any and all bylaws of the Corporation.  In addition, the stockholders of the Corporation may adopt, amend, alter, change or repeal any and all bylaws of the Corporation by the affirmative vote of the holders of a majority of the voting power of the Corporation's then outstanding capital stock, voting together as a single class.

Section 5. <u>Elections of Directors</u>.  Elections of directors need not be by written ballot unless otherwise provided in the Bylaws of the Corporation.

Section 6. <u>Officers</u>.  Except as otherwise expressly delegated by resolution of the Board of Directors, the Board of Directors shall have the exclusive power and authority to appoint and remove executive officers of the Corporation.

# ARTICLE VI
# STOCKHOLDER ACTION

Section 1. <u>Actions by Consent</u>.  Any action of the stockholders required or permitted to be taken at any regular or special meeting thereof may be taken without any such meeting, notice of meeting or vote if a consent in writing setting forth the action thereby taken is signed by the holders of outstanding stock having not less than the number of votes that would have been necessary to authorize such action at a meeting at which all shares entitled to vote were present and voted.  Prompt notice of the taking of any such action shall be given to any stockholders entitled to vote who have not so consented in writing.

Section 2. <u>Special Meetings of Stockholders</u>.  Except as may be provided in this Second Amended and Restated Certificate of Incorporation, including any Certificate of Designation for any series of Preferred Stock, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board of Directors, the President of the Corporation or by the Secretary upon direction of either the Board of Directors pursuant to a resolution adopted by a majority of the entire Board of Directors or the holders of a majority of the capital stock of this Corporation then outstanding.

10504698.7

DOCS_LA:314677.2 91893/002

# ARTICLE VII
## LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by applicable law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such elimination of liability or limitation thereof is prohibited by the DGCL as it presently exists or may hereafter be amended; provided, that no subsequent amendment shall adversely affect any right of a director with respect to any event occurring prior to the time of such amendment. Any amendment, modification or repeal of the foregoing sentence shall not adversely affect any right or protection of a director of the Corporation with respect to any acts or omissions of such director occurring prior to the time of such amendment, modification or repeal.

# ARTICLE VIII
## INDEMNIFICATION

Section 1. <u>Right of Indemnification</u>. The Corporation shall indemnify and hold harmless, to the fullest extent not prohibited by applicable law as it presently exists or may hereafter be amended, any person (a "<u>Covered Person</u>") who was or is made or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "<u>Proceeding</u>"), by reason of the fact that he or she is or was a director or officer of the Corporation or any predecessor of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation or any predecessor of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liabilities, losses, expenses (including attorneys' fees actually and reasonably incurred by such person), judgments, fines, penalties and amounts paid in settlement actually and reasonably incurred by such Covered Person in connection with any such Proceeding, and such indemnification shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the preceding sentence, except as otherwise provided in Section 3 of this Article VIII, the Corporation shall indemnify a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board of Directors.

Section 2. <u>Prepayment of Expenses</u>. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition, *provided, however*, that, to the extent required by law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified for such amounts under this Article VIII or otherwise.

Section 3. <u>Claims</u>. If a claim for indemnification (following the final disposition of the Proceeding with respect to which indemnification is sought, including any settlement of such Proceeding) or advancement of expenses under this Article VIII is not paid in full within thirty days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim to the fullest extent not prohibited by applicable law. In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under this Article VIII and applicable law.

10504698.7

DOCS_LA:314677.2 91893/002

Section 4.  <u>Insurance</u>.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary or agent of the Corporation or was serving at the request of the Corporation or any predecessor of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity against any liability asserted against him or her or incurred by him or her in any such capacity, whether or not the Corporation would have the power to indemnify such person against liability under this Article VIII.

Section 5.  <u>Non-Exclusivity of Rights</u>.  The rights conferred on any Covered Person by this Article VIII shall not be exclusive of any other rights which such Covered Person may have or hereafter acquire under any statute, any other provision of this Second Amended and Restated Certificate of Incorporation, the Bylaws of the Corporation, or any agreement, vote of stockholders or disinterested directors or otherwise.

Section 6.  <u>Amendment or Repeal</u>.  Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of this Article VIII after the occurrence of the act or omission that is the subject of the Proceeding for which indemnification or advancement of expenses is sought.

Section 7.  <u>Other Indemnification and Advancement of Expenses</u>.  This Article VIII shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

# ARTICLE IX
## AMENDMENT

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate of Incorporation or in any amendment hereto, in the manner now or hereafter prescribed by statute, and, except as otherwise provided in this Second Amended and Restated Certificate of Incorporation or by applicable law, all rights conferred on stockholders and/or directors herein are granted subject to this reservation.

*(Signature page follows)*

\*     \*     \*

10504698.7

DOCS_LA:314677.2 91893/002

**IN WITNESS WHEREOF**, the Corporation has caused this Second Amended and Restated Certificate of Incorporation to be executed by its duly authorized officer on [_____], 2018.

**THE WALKING COMPANY HOLDINGS, INC.**

By:_____
    Name:  Anthony J. Wall
    Title: Executive Vice President, General Counsel and Secretary

**EXHIBIT A**

**TERMS OF**
**SERIES A PREFERRED STOCK**
**OF**
**THE WALKING COMPANY HOLDINGS, INC.**

10504698.7

DOCS_LA:314677.2 91893/002

# POWERS, PREFERENCES, PRIVILEGES AND RIGHTS
## OF
## SERIES A PREFERRED STOCK
## OF
## THE WALKING COMPANY HOLDINGS, INC.

The Walking Company Holdings, Inc. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), pursuant to the authority expressly granted to and vested in the Board of Directors of the Corporation (the "Board of Directors") by the Second Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), which authorizes the issuance, by the Corporation, of up to 1,000,000 shares of preferred stock, par value $.01 per share (the "Preferred Stock"), designates the Series A Preferred Stock of the Corporation pursuant to Section 303 of the DGCL with the following powers, preferences and rights (capitalized terms used herein but not defined in Section 1 through Section 7 below have the meanings ascribed to them in Section 1):

1.      **Definitions**.  For purpose of this Exhibit A, the following definitions apply:

"**Available Funds and Assets**" has the meaning provided in Section 4.

"**Business Day**" means any day except Saturday, Sunday and any day on which banking institutions in the State of California generally are authorized or required by law or other governmental actions to close.

"**Corporation**" means The Walking Company Holdings, Inc., a Delaware corporation.

"**Common Stock**" means the common stock, $0.01 par value of the Corporation.

"**Dividend Payment Date**" means March 31, June 30, September 30 and December 31 of each calendar year or, if such day is a non-Business Day, the immediately succeeding Business Day.

"**Dividend Period**" means each quarterly period commencing on and including the first day after each Dividend Payment Date and ending on and including the next succeeding Dividend Payment Date; *provided, however*, that the first Dividend Period shall commence on and include the Original Issue Date and end on and include [September 30], 2018.

"**Dividend Rate**" means six percent (6.0%) per annum.

"**Exit Facility Loan Documents**" means the Credit Agreement entered into by and among the Corporation, the guarantors named therein Wells Fargo Bank, National Association, as Agent, and any and all documents, instruments and agreements entered into pursuant to the terms thereof, each as amended, supplemented or otherwise modified from time to time.

"**Holders of a Majority of the Series A Preferred Stock**" means, at any time, the holders of more than fifty percent (50%)% of the shares of Series A Preferred Stock then outstanding.

10504698.7

DOCS_LA:314677.2 91893/002

"**Investment Agreement**" means that certain Investment Agreement dated as of April 8, 2010, by and between the Corporation and the initial Investors (as defined therein), as amended, supplemented or otherwise modified from time to time.

"**Junior Stock**" means shares of Common Stock and any other class or series of capital stock of the Corporation.

"**Notes**" means the Corporation's Amended and Restated 8.375% Notes Due 2022, as amended, supplemented or otherwise modified from time to time.

"**Original Issue Date**" means the date on which any shares of Series A Preferred Stock are first issued by the Corporation.

"**Original Issue Price**" means Nine Thousand Sixty Hundred Ninety Dollars ($9,690.00) per share of Series A Preferred Stock.

"**Redemption Date**" has the meaning set forth in Section 5.

"**Redemption Notice**" has the meaning set forth in Section 5.

"**Redemption Price**" has the meaning set forth in Section 5.

"**Series A Preferred Stock**" means the Series A Preferred Stock, $0.01 par value per share, of the Corporation.

2.    **Ranking**. The Series A Preferred Stock shall rank senior and prior to the Common Stock and all other Junior Stock now or hereafter authorized, issued or outstanding.

3.    **Dividend Rights.**

**Series A Preferred Stock**. The holders of each share of Series A Preferred Stock shall accrue cumulative dividends, whether or not declared by the Board of Directors (or any duly authorized committee thereof) and whether or not there are funds legally available for the payment of dividends, in preference to the shares of Junior Stock, in an amount per share equal to the Dividend Rate, <u>multiplied by</u> the sum of (i) Original Issue Price <u>plus</u> (ii) all unpaid accrued and accumulated dividends thereon for any prior Dividend Periods. Dividends on shares of Series A Preferred Stock shall accrue on a daily basis from the Original Issue Date, shall compound quarterly to the extent not paid with respect to any Dividend Period and shall be payable in cash, when, as and if declared by the Board of Directors out of funds legally available therefor, quarterly in arrears on each Dividend Payment Date. The first Dividend Payment Date shall be [October 1, 2018]. Each dividend shall be payable to holders of record as they appear on the stock records of the Corporation at the close of business on such record date, which shall be not more than forty-five (45) days nor less than ten (10) calendar days preceding the applicable Dividend Payment Date (but not precede the date upon which the resolution fixing the record date is adopted). If no record date is fixed, the record date for determining the holders of record for any such purpose shall be at the close of business on the day on which the Board of Directors (or a duly authorized committee thereof) adopts the resolution relating thereto. Dividends shall be calculated on a basis of a 360-day year, consisting of twelve (12) thirty day months, and for the actual number of days elapsed in such Dividend Period.

**No Participation Rights**.  The Corporation shall not declare or pay any additional dividends on the Series A Preferred Stock in excess of the preferential dividends specified in this Section 3.  The Series A Preferred Stock shall not be entitled to participate in any dividends that may be declared or paid with respect to any Junior Stock.

**Priority of Dividends**.  So long as any shares of Series A Preferred Stock remains outstanding, no dividends or distributions with respect to any Junior Stock may be declared or paid or set apart for payment unless and until full cumulative dividends on the Series A Preferred Stock shall have been paid for all prior Dividend Periods and for the current Dividend Period, or declared in full and a sum sufficient for the payment thereof reserved and set apart.

4.      **Liquidation Rights**.  In the event of any liquidation, dissolution, or winding up of the Corporation, whether voluntary or involuntary, the funds and assets that may be legally distributed to the Corporation's stockholders (the "**Available Funds and Assets**") shall be distributed to the stockholders as follows:

4.1     **Series A Preferred Stock**.  The holders of Series A Preferred Stock shall be entitled to be paid, prior and in preference to any payment or distribution to the holders of Junior Stock, an amount per share in cash equal to the Original Issue Price (subject to appropriate adjustments in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares) plus all accrued and unpaid cumulative dividends thereon, to and including the date full payment of such amount shall be tendered to the holders of the Series A Preferred Stock with respect to such liquidation, dissolution or winding up.  If upon any liquidation, dissolution or winding up of Corporation, the Available Funds and Assets to be distributed to the holders of the Series A Preferred Stock shall be insufficient to permit the payment to such holders of their full preferential amount described in this Section 4, then all of the Available Funds and Assets shall be distributed among the holders of the then outstanding shares of Series A Preferred Stock *pro rata* according to the number of outstanding shares of Series A Preferred Stock held by each holder thereof.

4.2     **Merger or Sale of Assets**.  Each of the following transactions shall be deemed to be a liquidation, dissolution or winding up of the Corporation as those terms are used in this Section 4:  (a) any reorganization, recapitalization, consolidation, merger or similar transaction or series of related transactions (each, a "combination transaction") with or into another entity, except for a combination transaction in which the holders of the capital stock of this Corporation outstanding immediately prior to the combination transaction continue to hold more than 50.0% of the combined voting power of the capital stock of the Corporation or surviving or acquiring entity outstanding immediately after the combination transaction (or such surviving or acquiring corporation's parent corporation if the surviving corporation is owned by the parent corporation); or (b) any transfer (whether by merger, consolidation or otherwise) to any person, entity or group of affiliated persons or entities of securities of the Corporation if, immediately after such transfer, such person, entity or group would hold more than 50.0% of the combined voting power of the capital stock of the Corporation; or (c) the sale, transfer or other disposition of all or substantially all of the assets of the Corporation; or (d) a liquidation, dissolution or winding up of the Corporation; *provided, however*, that a transaction the sole purpose of which is to change the state of incorporation of the Corporation shall not constitute a liquidation, dissolution or winding up of the Corporation.

10504698.7

DOCS_LA:314677.2 91893/002

5. **Optional Redemption**.

   5.1 **Optional Redemption**.  The Corporation may at any time, at its option, redeem, in whole or in part, the shares of Series A Preferred Stock then outstanding by the payment therefor in cash in an amount per share (the "Redemption Price") equal to (i) the Original Issue Price (subject to appropriate adjustments in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares) plus all accrued and unpaid cumulative dividends thereon, to and including the Redemption Date.

   5.2 **Redemption Notice**.  At least twenty (20) days, but not more than thirty (30) days, prior the date fixed for any redemption pursuant to Section 4.1 (the "Redemption Date"), written notice (the "Redemption Notice") shall be mailed by the Corporation, first-class, postage prepaid, to each holder of record (at the close of business on the Business Day next proceeding the day on which notice is given) of the Series A Preferred Stock, at the address last shown on the records of the Corporation for such holder, notifying such holder of the redemption to be effected, the Redemption Date, the number of such holder's shares of Series A Preferred Stock to be redeemed and the place at which payment may be obtained and calling up such holder to surrender to the Corporation, in the manner and at the place designated, the certificate or certificates representing the shares of Series A Preferred Stock being redeemed.

   5.3 **Partial Redemption**.  No redemption shall be made under this Section 5 of only a portion of the then-outstanding shares of Series A Preferred Stock unless the Corporation shall effect such redemption pro rata among all holders of the shares of Series A Preferred Stock then outstanding according to the number of shares held by each holder thereon on the designated Redemption Date.

   5.4 **Surrender of Certificates**.  On the Redemption Date, each holder of shares of Series A Preferred Stock shall surrender to the Corporation the certificate or certificates representing such shares, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the record owner thereof, and each surrendered certificate shall be canceled and retired.  If less than all of the shares represented by such certificate are redeemed, the Corporation shall promptly issue a new certificate representing the unredeemed shares.

   5.5 **Effect of Redemption**.  If, on the Redemption Date, the Redemption Price shall have been paid in cash in full or sufficient funds, in cash, shall have been irrevocably deposited in trust to effect such redemption, then notwithstanding that the certificate or certificates evidencing shares Series A Preferred Stock shall not have been surrendered, all dividends with respect to such shares shall cease to accrue after the Redemption Date, such shares shall not thereafter be transferred on the Corporation's books and the rights of the holders of such shares shall terminate after the Redemption Date, except for the right of the holders to receive the Redemption Price without interest upon surrender of their certificates.  Any shares of Series A Preferred Stock not redeemed shall remain outstanding and entitled to all dividend, liquidation and other rights, preferences, privileges and restrictions of the Series A Preferred Stock, respectively, until such shares have been redeemed.

**6. Voting Rights; Protective Provisions**.

**6.1** **Voting Rights**. Except as set forth in this Certificate of Incorporation or as required by law, the holders of shares of Series A Preferred Stock shall not have any voting rights.

**6.2** **Protective Provisions**. For so long as any shares of Series A Preferred Stock remain outstanding, the Corporation shall not, without first obtaining the prior written consent of the Holders of a Majority of the Series A Preferred Stock, take any of the following actions:

a.  authorize, create or issue, or obligate itself to issue, whether by merger, consolidation or otherwise, any class or series of capital stock of the Corporation that is senior to, or on a parity with, the Series A Preferred Stock with respect to any rights, powers, preferences or privileges;

b.  increase or decrease the authorized number of shares of Series A Preferred Stock;

c.  alter or change the rights, powers, preferences or privileges of the Series A Preferred Stock;

d.  declare or pay any dividend or distribution on any Junior Stock;

e.  amend, alter or repeal any provisions of the Certificate of Incorporation or Bylaws of the Corporation so as to adversely affect any right, preference, privilege or power of the Series A Preferred Stock;

f.  take any other action which adversely affects the holders of the Series A Preferred Stock disproportionately to the holders of any Junior Stock;

g.  effectuate any liquidation, dissolution or winding up of the Corporation;

h.  purchase or redeem, or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than the Series A Preferred Stock as expressly authorized herein, or permit any subsidiary of the Corporation to take any such action, except for dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock and other than securities repurchased from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof or other than as approved by the Board of Directors;

i.  take any action that would materially change the nature of the Corporation's business; or

j.  take any action, other than with respect to the Exit Facility Loan Documents, which would impair the rights of the holders of the Notes.

10504698.7

DOCS_LA:314677.2 91893/002

**7. <u>Waiver of Rights Preference or Privileges</u>.** Any right, power, preference or privilege of the Series A Preferred Stock may be waived by a writing signed by the Holders of a Majority of the Series A Preferred Stock, and such waiver shall be binding upon all holders of shares of Series A Preferred Stock.

10504698.7

DOCS_LA:314677.2 91893/002

**SECOND AMENDED AND RESTATED
BYLAWS
OF
THE WALKING COMPANY HOLDINGS, INC.
(Effective _____, 2018)**

## ARTICLE I
## CORPORATE OFFICES

### 1.1 REGISTERED OFFICE.

The registered office of The Walking Company Holdings, Inc., a Delaware corporation (the "Corporation"), shall be fixed in the Corporation's certificate of incorporation, as the same may be amended from time to time (including any exhibits thereto, the "Certificate of Incorporation").

### 1.2 OTHER OFFICES.

The Corporation's board of directors (the "Board") may at any time establish other offices at any place or places where the Corporation is qualified to do business.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

### 2.1 PLACE OF MEETINGS.

Meetings of stockholders shall be held at any place, within or outside the State of Delaware, designated by the Board. The Board may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law (the "DGCL"). In the absence of any such designation or determination, stockholders' meetings shall be held at the Corporation's principal executive office.

### 2.2 ANNUAL MEETING.

The annual meeting of stockholders shall be held each year. The Board shall designate the date and time of the annual meeting. At the annual meeting, directors shall be elected and other proper business properly brought before the meeting in accordance with Section 2.4 of this Article II may be transacted.

### 2.3 SPECIAL MEETING.

A special meeting of the stockholders may be called at any time by the Board, the chairperson of the Board or the holders of a majority of the shares of voting capital stock of the Corporation, but such special meetings may not be called by any other person or persons.

No business may be transacted at such special meeting other than the business specified in such notice to stockholders. Nothing contained in this paragraph of this Section 2.3 shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board may be held.

2.4 ADVANCE NOTICE PROCEDURES FOR BUSINESS BROUGHT BEFORE A MEETING.

(i) At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (a) brought before the meeting by the Corporation and specified in the notice of meeting given by or at the direction of the Board, (b) brought before the meeting by or at the direction of the Board, or (c) otherwise properly brought before the meeting by a stockholder who (A) was a stockholder of record of the Corporation (and, with respect to any beneficial owner, if different, on whose behalf such business is proposed, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 2.4 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with all of the notice procedures set forth in this Section 2.4 as to such business. The foregoing clause (c) shall be the exclusive means for a stockholder to propose business to be brought before an annual meeting of the stockholders. Stockholders shall not be permitted to propose business to be brought before a special meeting of the stockholders, and the only matters that may be brought before a special meeting are the matters specified in the notice of meeting given by or at the direction of the person calling the meeting pursuant to Article II, Section 2.3 of these bylaws. Stockholders seeking to nominate persons for election to the Board must comply with the notice procedures set forth in Article II, Section 2.5 of these bylaws, and this Section 2.4 shall not be applicable to nominations except as expressly provided in Article II, Section 2.5 of these bylaws.

(ii) Without qualification, for business to be properly brought before an annual meeting by a stockholder, the stockholder must (a) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (b) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.4. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the first anniversary of the preceding year's annual meeting; *provided, however,* that in the event that the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the stockholder to be timely must be so delivered, or mailed and received, not earlier than the one hundred twentieth (120) day prior to such annual meeting and not later than the ninetieth (90th) day prior to such annual meeting or, if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made (such notice within such time periods, "Timely Notice"). In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

2.5 ADVANCE NOTICE PROCEDURES FOR NOMINATIONS OF DIRECTORS.

(i) Nominations of any person for election to the Board at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such

10504703.6
DOCS_LA:314678.1 91893/002

meeting only (a) by or at the direction of the Board, including by any committee or persons appointed by the Board, or (b) by a stockholder who (A) was a stockholder of record of the Corporation (and, with respect to any beneficial owner, if different, on whose behalf such nomination is proposed to be made, only if such beneficial owner was the beneficial owner of shares of the Corporation) both at the time of giving the notice provided for in this Section 2.5 and at the time of the meeting, (B) is entitled to vote at the meeting and (C) has complied with this Section 2.5 as to such nomination.  The foregoing clause (b) shall be the exclusive means for a stockholder to make any nomination of a person or persons for election to the Board to be considered by the stockholders at an annual meeting or special meeting.

(ii) Without qualification, for a stockholder to make any nomination of a person or persons for election to the Board at an annual meeting, the stockholder must (a) provide Timely Notice (as defined in Section 2.4(ii) of these bylaws) thereof in writing and in proper form to the Secretary of the Corporation and (b) provide any updates or supplements to such notice at the times and in the forms required by this Section 2.5.

2.6 NOTICE OF STOCKHOLDERS' MEETINGS.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the notice of any meeting of stockholders shall be sent or otherwise given in accordance with either Section 2.7 or Section 8.1 of these bylaws not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting.  The notice shall specify the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

2.7 MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE.

Notice of any meeting of stockholders shall be deemed given:

 (i) if mailed, when deposited in the United States mail, postage prepaid, directed to the stockholder at his or her address as it appears on the Corporation's records; or

(ii) if electronically transmitted as provided in Section 8.1 of these bylaws.

An affidavit of the secretary or an assistant secretary of the Corporation or of the transfer agent or any other agent of the Corporation that the notice has been given by mail or by a form of electronic transmission, as applicable, shall, in the absence of fraud, be prima facie evidence of the facts stated herein.

2.8 QUORUM.

Unless otherwise provided by law, the Certificate of Incorporation or these bylaws, the holders of a majority in voting power of the stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders. If, however, such quorum is not present or

represented at any meeting of the stockholders, then either (i) the chairperson of the meeting or (ii) a majority in voting power of the stockholders entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time in the manner provided in Section 2.9 of these bylaws until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

### 2.9 ADJOURNED MEETING; NOTICE.

When a meeting is adjourned to another time or place, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

### 2.10 CONDUCT OF BUSINESS.

The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of business.

### 2.11 VOTING.

The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2.13 of these bylaws, subject to Section 217 (relating to voting rights of fiduciaries, pledgors and joint owners of stock) and Section 218 (relating to voting trusts and other voting agreements) of the DGCL.

Except as may be otherwise provided in the Certificate of Incorporation or these bylaws, each stockholder shall be entitled to one (1) vote for each share of capital stock held by such stockholder.

At all meetings of stockholders for the election of directors at which a quorum is present a plurality of the votes cast shall be sufficient to elect a director. All other elections and questions presented to the stockholders at a meeting at which a quorum is present shall, unless otherwise provided by the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities, be decided by the affirmative vote of the holders of a majority in voting power of the shares of stock of the Corporation which are present in person or by proxy and entitled to vote thereon.

### 2.12 STOCKHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

Any action of the stockholders required or permitted to be taken at any regular or special meeting thereof may be taken without any such meeting, notice of meeting or vote if a consent in

writing setting forth the action thereby taken is signed by the holders of outstanding stock having not less than the number of votes that would have been necessary to authorize such action at a meeting at which all shares entitled to vote were present and voted. Prompt notice of the taking of any such action shall be given to any stockholders entitled to vote who have not so consented in writing.

2.13   RECORD DATE FOR STOCKHOLDER NOTICE; VOTING; GIVING CONSENTS.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board may fix, in advance, a record date, which record date shall not precede the date on which the resolution fixing the record date is adopted and which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other such action.

If the Board does not so fix a record date:

(i) The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(ii) The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided, however,* that the Board may fix a new record date for the adjourned meeting.

2.14 PROXIES.

Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy authorized by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the DGCL. A proxy may be in the form of a telegram, cablegram or other means of electronic transmission which sets forth or is submitted with information from which it can be determined that the telegram, cablegram or other means of electronic transmission was authorized by the stockholder.

2.15 LIST OF STOCKHOLDERS ENTITLED TO VOTE.

The Officer (as such term is defined in Section 15) who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of

stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the Corporation's principal executive office. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Such list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

2.16 INSPECTORS OF ELECTION.

Before any meeting of stockholders, the Board shall appoint an inspector or inspectors of election to act at the meeting or its adjournment and make a written report thereof. The number of inspectors shall be either one (1) or three (3). If any person appointed as inspector fails to appear or fails or refuses to act, then the chairperson of the meeting may, and upon the request of any stockholder or a stockholder's proxy shall, appoint a person to fill that vacancy.

Such inspectors shall: (i) determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and the authenticity, validity, and effect of proxies; (ii) receive votes or ballots; (iii) hear and determine all challenges and questions in any way arising in connection with the right to vote; (iv) count and tabulate all votes; (v) determine when the polls shall close; (vi) determine the result; and (vii) do any other acts that may be proper to conduct the election or vote with fairness to all stockholders.

The inspectors of election shall perform their duties impartially, in good faith, to the best of their ability and as expeditiously as is practical. If there are three (3) inspectors of election, the decision, act or certificate of a majority is effective in all respects as the decision, act or certificate of all. Any report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein.

**ARTICLE III**
**DIRECTORS**

3.1 POWERS

Subject to the provisions of the DGCL and any limitations in the Certificate of

10504703.6
DOCS_LA:314678.1 91893/002

Incorporation or these bylaws relating to action required to be approved by the stockholders (or any class or series thereof) or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board.

### 3.2 NUMBER OF DIRECTORS.

Subject to the provisions in the Certificate of Incorporation, the authorized number of directors shall be determined from time to time by resolution of the Board, provided that upon the effective date of these bylaws, the authorized number of directors shall initially be four (4). No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

### 3.3 ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS.

Except as provided in Section 3.4 of these bylaws, each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until such director's successor is elected and qualified or until such director's earlier death, resignation or removal. Directors need not be stockholders unless so required by the Certificate of Incorporation or these bylaws. The Certificate of Incorporation or these bylaws may prescribe other qualifications for directors.

### 3.4 RESIGNATION AND VACANCIES.

Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold office as provided in this section in the filling of other vacancies.

Unless otherwise provided in the Certificate of Incorporation or these bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director and each director so chosen shall hold office until the next annual meeting and until his or her successor is duly elected and qualified. If the directors are divided into classes, a person so elected by the directors then in office to fill a vacancy or newly created directorship shall hold office until the next election of the class for which such director shall have been chosen and until his or her successor shall have been duly elected and qualified.

If at any time, by reason of death or resignation or other cause, the Corporation should have no directors in office, then any Officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the Certificate of Incorporation or these bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the DGCL.

If, at the time of filling any vacancy or any newly created directorship, the directors then

in office constitute less than a majority of the whole Board (as constituted immediately prior to any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the DGCL as far as applicable.

3.5 PLACE OF MEETINGS; MEETINGS BY TELEPHONE.

The Board may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting pursuant to this bylaw shall constitute presence in person at the meeting.

3.6 REGULAR MEETINGS.

Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

3.7 SPECIAL MEETINGS; NOTICE.

Special meetings of the Board for any purpose or purposes may be called at any time by the chairperson of the Board, the chief executive officer, the president, the secretary or a majority of the authorized number of directors.

Notice of the time and place of special meetings shall be: (i) delivered personally by hand, by courier or by telephone; (ii) sent by United States first-class mail, postage prepaid; (iii) sent by facsimile; or (iv) sent by electronic mail, directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Corporation's records.

If the notice is (i) delivered personally by hand, by courier or by telephone, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting. If the notice is sent by United States mail, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting. Any oral notice may be communicated to the director. The notice need not specify the place of the meeting (if the meeting is to be held at the Corporation's principal executive office) or the purpose of the meeting.

3.8 QUORUM.

At all meetings of the Board, a majority of the authorized number of directors shall

10504703.6
DOCS_LA:314678.1 91893/002

constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate of Incorporation or these bylaws. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

### 3.9 BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

### 3.10 FEES AND COMPENSATION OF DIRECTORS.

Unless otherwise restricted by the Certificate of Incorporation or these bylaws, the Board shall have the authority to fix the compensation of directors.

### 3.11 REMOVAL OF DIRECTORS.

Except as otherwise provided by the DGCL, the Board of Directors or any individual director may be removed from office at any time with or without cause by the affirmative vote of the holders of a majority of the voting power of all the then outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

### ARTICLE IV
### COMMITTEES

### 4.1 COMMITTEES OF DIRECTORS.

The Board may designate one (1) or more committees, each committee to consist of one (I) or more of the directors of the Corporation. The Board may designate one (1) or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

### 4.2 COMMITTEE MINUTES.

Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

10504703.6
DOCS_LA:314678.1 91893/002

**ARTICLE V**
**OFFICERS**

5.1 OFFICERS.

The officers of the Corporation shall be a president and a secretary. The Corporation may also have, at the discretion of the Board, a chairperson of the Board, a vice chairperson of the Board, a chief executive officer, a chief financial officer or treasurer, one (1) or more vice presidents, one (1) or more assistant vice presidents, one (1) or more assistant treasurers, one (1) or more assistant secretaries, and any such other officers as may be appointed in accordance with the provisions of these bylaws. Any number of offices may be held by the same person.

5.2 APPOINTMENT OF OFFICERS.

The officers of this Corporation (each an "Officer" and together the "Officers") will be those Officers appointed from time to time by the Board or by any other Officer empowered to do so. The Board shall have sole power and authority to appoint executive Officers. As used herein, the term "executive officer" shall mean the President, any Officer in charge of a principal business unit, division, or function, or any other Officer who performs a policy-making function.

5.3 SUBORDINATE OFFICERS.

The Board may appoint, or empower the chief executive officer or, in the absence of a chief executive officer, the president, to appoint, such other Officers and agents as the business of the Corporation may require. Each of such Officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board may from time to time determine.

5.4 REMOVAL AND RESIGNATION OF OFFICERS.

Subject to the rights, if any, of an Officer under any contract of employment, any Officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an Officer chosen by the Board, by any Officer upon whom such power of removal may be conferred by the Board.

Any Officer may resign at any time by giving written notice to the Corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the Officer is a party.

5.5 VACANCIES IN OFFICES.

Any vacancy occurring in any office of the Corporation shall be filled by the Board or as provided in Section 5.2.

5.6 AUTHORITY AND DUTIES OF OFFICERS.

All Officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board or the stockholders and, to the extent not so provided, as generally pertain to

10504703.6
DOCS_LA:314678.1 91893/002

their respective offices, subject to the control of the Board.

## ARTICLE VI
## RECORDS AND REPORTS

### 6.1 MAINTENANCE AND INSPECTION OF RECORDS.

The Corporation shall, either at its principal executive office or at such place or places as designated by the Board, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws as amended to date, accounting books and other records.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent so to act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal executive office.

### 6.2 INSPECTION BY DIRECTORS.

Any director shall have the right to examine the Corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director. The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought. The Court may summarily order the Corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

## ARTICLE VII
## GENERAL MATTERS

### 7.1 EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS.

The Board, except as otherwise provided in these bylaws, may authorize any Officer or Officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an Officer, no Officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

### 7.2 STOCK CERTIFICATES.

The shares of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock

shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of the Corporation by the chairperson or vice-chairperson of the Board, or the president or vice-president, and by the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any Officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such Officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such Officer, transfer agent or registrar at the date of issue.

### 7.3 SPECIAL DESIGNATION ON CERTIFICATES.

If the Corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock; *provided, however,* that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

### 7.4 LOST CERTIFICATES.

Except as provided in this Section 7.4, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

### 7.5 CONSTRUCTION; DEFINITIONS.

Unless the context requires otherwise, the general provisions, rules of construction and definitions in the DGCL shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

### 7.6 DIVIDENDS.

The Board, subject to any restrictions contained in either (i) the DGCL or (ii) the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock.

10504703.6
DOCS_LA:314678.1 91893/002

The Board may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

7.7 FISCAL YEAR.

The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

7.8 SEAL.

The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

7.9 TRANSFER OF STOCK.

Shares of the Corporation shall be transferable in the manner prescribed by law and in these bylaws, subject to any restrictions set forth in any stockholders agreement to which the Corporation is a party.  Shares of stock of the Corporation shall be transferred on the books of the Corporation only by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates representing such shares endorsed by the appropriate person or persons (or by delivery of duly executed instructions with respect  to uncertificated shares), with such evidence of the authenticity of such endorsement or execution, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary   stock  transfer stamps.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing the names of the persons from and to whom it was transferred.

7.10 STOCK TRANSFER AGREEMENTS.

The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

7.11 REGISTERED STOCKHOLDERS.

The Corporation:

(i) shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii) shall be entitled to hold liable for calls and assessments the person registered on its

books as the owner of shares; and

(iii) shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

7.12 WAIVER OF NOTICE.

Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate of Incorporation or these bylaws.

## ARTICLE VIII
## NOTICE BY ELECTRONIC TRANSMISSION

8.1 NOTICE BY ELECTRONIC TRANSMISSION.

Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the DGCL, the Certificate of Incorporation or these bylaws, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if:

(i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices given by the Corporation in accordance with such consent; and

(ii) such inability becomes known to the secretary or an assistant secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice;

10504703.6
DOCS_LA:314678.1 91893/002

(iii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iv) if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

### 8.2 DEFINITION OF ELECTRONIC TRANSMISSION.

An "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.


# ARTICLE IX
## AMENDMENTS

### 9.1 BY THE BOARD OF DIRECTORS.

Subject to the provisions of the Certificate of Incorporation, these bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of a majority of the directors present at any regular or special meeting of the Board of Directors at which a quorum is present; provided, however, that Article X of these bylaws may not be altered, amended or repealed without the prior written consent of the holders of more than 50.0% of the shares of Series A Preferred Stock then outstanding.

### 9.2 BY THE STOCKHOLDERS.

Subject to the provisions of the Certificate of Incorporation, these bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of the holders of at least a majority of the shares of the capital stock of the corporation issued and outstanding and entitled to vote at any regular meeting of stockholders, or at any special meeting of stockholders, provided notice of such alteration, amendment, repeal or adoption of new bylaws shall have been stated in the notice of such special meeting; provided further, however, that Article X of these bylaws may not be altered, amended or repealed without the prior written consent of the holders of more than 50.0% of the shares of Series A Preferred Stock then outstanding.


# ARTICLE X
## SERIES A PREFERRED SHARES

### 10.1 RIGHTS RELATING TO SERIES A PREFERRED SHARES

Notwithstanding anything to the contrary contained herein or otherwise, the provisions

10504703.6
DOCS_LA:314678.1 91893/002

of these bylaws, including, without limitation, the provisions of Articles II and III hereof, shall be subject to (and to that extent limited or otherwise modified by) the powers, preferences, privileges and rights of the Series A Preferred Stock, par value $0.01 per share, of the Corporation as set forth in the Certificate of Incorporation. For the avoidance of doubt, this Article X shall apply to each provision in these bylaws whether or not any such provision expressly refers to the Certificate of Incorporation. In the event of any conflict between the provisions of these bylaws and the provisions of the Certificate of Incorporation, the provisions of the Certificate of Incorporation shall control.

10504703.6
DOCS_LA:314678.1 91893/002

## CERTIFICATE OF SECRETARY

The undersigned, being the duly elected Secretary of The Walking Company Holdings, Inc., a Delaware corporation, hereby certifies that the Second Amended and Restated Bylaws to which this Certificate is attached were duly adopted by the Board of Directors of said Corporation effective _____, 2018.

_____
Anthony Wall, Secretary

10504703.6
DOCS_LA:314678.1 91893/002

**EXHIBIT B**

**Amended Subordinated Notes**

**THE ISSUANCE AND SALE OF THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THIS SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION. [THIS NOTE IS SUBJECT TO A SUBORDINATION AGREEMENT IN FAVOR OF WELLS FARGO BANK, NATIONAL ASSOCIATION (SEE SECTION 3(C) BELOW).]**

## THE WALKING COMPANY HOLDINGS, INC.

## AMENDED AND RESTATED 8.375% NOTE DUE 2022

Original Issuance Date:  April 3, 2007

Amended and Restated Issuance Date:  [_____], 2018[1]

Amended and Restated Principal Amount:  $[_____][2]

FOR VALUE RECEIVED, The Walking Company Holdings, Inc., a Delaware corporation (the "**Company**"), hereby promises to pay to [_____] or its registered assigns (the "**Holder**"), the amount set out above as the Amended and Restated Principal Amount (as reduced pursuant to the terms hereof pursuant to prepayment, redemption or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), acceleration, prepayment, redemption or otherwise (in each case in accordance with the terms hereof), and to pay interest in cash on the outstanding Principal ("**Interest**") at the rate of 8.375% per annum (the "**Interest Rate**") from the date set out above as the Amended and Restated Issuance Date until the same, together with all accrued and unpaid Interest, unpaid Late Charges (as defined below) and other unpaid amounts due and owing under this Note shall have been paid in full in cash, whether upon an Interest Date (as defined below), the Maturity Date, acceleration, prepayment, redemption or otherwise.  This Amended and Restated 8.375% Note due 2022 (including all notes that later may be issued in exchange, transfer or replacement hereof, this "**Note**") is one of a series of identical Amended and Restated 8.375% Notes due 2022 issued simultaneously herewith (collectively, with this Note, the "**Notes**").

The Company and its Subsidiaries were debtors-in-possession under chapter 11 of title 11 of the United States Code in cases no. 18-10474 (LSS),18-10474 (LSS) and 18-10474 (LSS), jointly administered under case no. 18-10474 (LSS), pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  Pursuant to the Debtors' First Amended Joint Plan of Reorganization (the "Joint Plan") filed in such cases, this Note is being

---

[1] Insert the effective date of the Plan.

[2] Insert the holder's pro rata portion of the sum of (a) $11,883,504.54, representing the aggregate unpaid principal amount of the Notes as of the Petition Date, and (b) the amount of all accrued and unpaid interest on the aggregate unpaid principal amount.

issued to amend, restate, extend and continue that certain 8.375% Convertible Note due 2019 (the "**2019 Note**"). The 2019 Note was issued as of May 23, 2014 as an amendment, restatement, extension and continuation of that certain 8.375% Convertible Note due 2015 (the "**2015 Note**"). The 2015 Note was issued as an amendment, restatement, extension and continuation of that certain 8.375% Convertible Note Due 2012 issued on April 3, 2007 (the "**Original 2012 Note**"). The 2015 Note was one of a series of 8.375% Convertible Notes due 2012 originally issued as of April 3, 2007, some of which were subsequently fully redeemed. Certain capitalized terms used herein without definition are defined in Section 25.

(1)  <u>PAYMENTS ON MATURITY</u>. Unless this Note has been earlier redeemed, prepaid in full or accelerated pursuant to the terms hereof, on the Maturity Date, the Company shall pay the Holder an amount in cash equal to all outstanding Principal, <u>plus</u> all accrued and unpaid Interest and any accrued and unpaid Late Charges, <u>plus</u> all other amounts due and owing under this Note. The "**Maturity Date**" shall be March 31, 2022, as such date may be extended pursuant to the terms of this Note.

(2)  <u>INTEREST; INTEREST RATE</u>. Interest on the outstanding Principal shall accrue commencing on the Amended and Restated Issuance Date and continue until this Note shall have been paid in cash in full and shall be computed on the basis of a 365-day year and actual days elapsed. Interest shall be payable quarterly, in arrears, on the last Business Day of each calendar quarter (each, an "**Interest Date**"), commencing on September 28, 2018, to the record holder of this Note on such Interest Date. From and after the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased to 10.375% per annum. In the event that any such Event of Default is subsequently cured or waived by the Holder, the adjustment referred to in the preceding sentence shall cease as of the effective date of such cure or waiver; <u>provided</u> that the Interest as calculated and unpaid at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

(3)  <u>GUARANTY, SECURITY AND SUBORDINATION</u>.

(a)  Payment and performance of this Note is guaranteed by the Company's Subsidiaries, including The Walking Company, a Delaware corporation ("**TWC**"), Big Dog USA, Inc., a California corporation ("**Big Dog**,"), and FootSmart, Inc., a Delaware corporation ("**FootSmart**" and, collectively with TWC and Big Dog, the "**Obligors**"), pursuant to that certain Amended and Restated Guaranty dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Guaranty**") in favor of the Holders.

(b)  In addition, payment and performance of this Note is secured by the security interests and liens granted by the Company and each Obligor in favor of the Holder in substantially all of their respective assets, properties and rights pursuant to that certain Amended and Restated Security Agreement dated of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Security Agreement**").

(c)  [This Note is subject to a [Second Amended and Restated Subordination Agreement of Junior Creditor] dated as of [_____], 2018 among the Holder, the Company, the

Obligors, and Wells Fargo Bank, National Association, a national banking association (as successor in interest to Wells Fargo Retail Finance II, LLC, a Delaware limited liability company), as Arranger and Administrative Agent (the "**Agent**") in favor of the Agent for the benefit of itself and the lenders, as well as Reaffirmation and Confirmation Agreements dated as of [_____], 2018 and as of the Amended and Restated Issuance Date (as so amended and as it may be further amended, restated, modified and/or supplemented from time to time, the "**Subordination Agreement**")].

(4)    Optional Prepayments.

(a)    The Company may voluntarily prepay the aggregate Principal of all Notes (including this Note), in whole or in part, without premium or penalty, at any time. The Holder shall be entitled to share in any such prepayment under this Section 4(a) based upon its Pro Rata Share (as defined below). All prepayments made under this Section 4(a) shall be accompanied by the payment of all accrued and unpaid Interest on the aggregate Principal of the Notes through and including the date of prepayment.

(b)    If the Company wishes to prepay all or any portion of the aggregate Principal of the Notes under Section 4(a), the Company shall deliver a written notice simultaneously to all Holders not less than ten (10) Business Days prior to the proposed date of prepayment. Such notice shall specify the date of prepayment, the outstanding amount of Principal of each of the Notes (including this Note) before such prepayment, the outstanding amount of Principal of each of the Notes (including this Note) to be prepaid and the amount of accrued and unpaid Interest to be paid on each of the Notes. Such notice, once given, shall be irrevocable. Any prepayment of Principal under Section 4(a) must be in an aggregate minimum amount of not less than $1,000,000 and in aggregate multiple integrals of $1,000,000 thereafter. The total amount of any such prepayment to be made on the date of prepayment shall be equal to (i) the aggregate Principal of all Notes to be prepaid on such prepayment date, as specified in such prepayment notice, plus (ii) all accrued and unpaid Interest thereon through the date of prepayment. On the date of prepayment, the Company shall pay to the Holder of each of the Notes (including this Note) its Pro Rata Share of such prepayment.

(c)    All prepayments made under this Section 4 shall be applied as follows: first, to all accrued and unpaid Interest on the Notes through the date of prepayment, (and, with respect to this Note, an amount thereof based upon the Holder's Pro Rata Share), and second, to the repayment of the aggregate Principal of the Notes (and, with respect to this Note, an amount thereof based upon the Holder's Pro Rata Share).

(5)    EVENT OF DEFAULT; ACCELERATION.

(a)    Each of the following events shall constitute an "**Event of Default**":

(i)    the Company's failure to pay to the Holder any amount of Principal (including, without limitation, upon the Maturity Date, acceleration, prepayment, redemption or otherwise), Interest, Late Charges or other amounts when and as due under this Note or any other Note Document, except that, in the case of a failure to pay Interest and Late Charges when and as due, such failure continues for a period of at least five (5) Business Days after the date due; or

(ii)     the Company or any of its Subsidiaries pursuant to or within the meaning of Title 11, U.S. Code, or any similar Federal, foreign or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**"), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due; or

(iii)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries; or

(iv)     the Company's failure to perform, comply with or observe any covenant or agreement under this Note or any other Note Document (other than under clause (i) above) and such failure continues for a period of at least thirty (30) Business Days after discovery thereof by the Company or the date of receipt of written notice thereof by the Holder or any of the other Holders; or

(v)     the Company or any of its Subsidiaries breaches the terms of, or otherwise default under, the Joint Plan as confirmed by the Final Order (as defined in the Joint Plan) entered by the Bankruptcy Court and such breach or default continues for a period of at least thirty (30) Business Days after discovery thereof by the Company or the date of receipt of written notice thereof by the Holder or any of the other Holders.

(b)     If any Event of Default (other than an Event of Default specified in Section 5(a)(ii) or (iii)) occurs and is continuing, then, in addition to all other rights and remedies available to the Holder, the Holder may, by written notice to the Company, declare all outstanding Principal, accrued and unpaid Interest, unpaid Late Charges and all other amounts due under this Note to be due and payable.  Upon any such declaration of acceleration, such Principal, Interest, Late Charges and other amounts shall become immediately due and payable. If an Event of Default specified in Section 5(a)(ii) or (iii) shall occur, all outstanding Principal, accrued and unpaid Interest, unpaid Late Charges and all other amounts due under this Note shall become immediately due and payable without any declaration or other act on the part of the Holder.  The Company hereby waives all presentment for payment, demand, protest, notice of protest and notice of dishonor, and all other notices of any kind to which they may be entitled under applicable law or otherwise.

(6)     RIGHTS UPON A CHANGE OF CONTROL.

(a)     Change of Control Put.  If a Change of Control shall occur, the Holder may elect to require the Company to prepay this Note, in whole or in part (the "**Change of Control Put**"), at a put price in cash (the "**Change of Control Put Price**") equal to the sum of (i) 100% of the Principal to be prepaid, plus (ii) all accrued and unpaid Interest, unpaid Late Charges, if any, and all other amounts due and owing under this Note through and including the date of prepayment.

(b)  Change of Control Notice.  No more than forty-five (45) days and at least twenty (20) days prior to the consummation of a Change of Control, the Company shall deliver a written notice to the Holder (a "**Change of Control Notice**") which shall (i) describe the terms of the Change of Control in reasonable detail and provide the expected date of consummation of the Change of Control and (ii) notify the Holder of its right to exercise a Change of Control Put in connection with the consummation of the Change of Control as provided in Section 6(a).  If the Holder wishes to exercise a Change of Control Put, the Holder shall furnish a written notice to the Company (a "**Change of Control Election Notice**") within ten (10) days after receipt of the Change of Control Notice advising the Company of its election to exercise a Change of Control Put and the amount of Principal it intends to put.

(c)  If the Holder delivers a Change of Control Put Election Notice to the Company pursuant to Section 6(b), the Company shall pay the Change of Control Put Price to the Holder upon consummation of the Change of Control.

(d)  Revocation.  The Holder may revoke the exercise of a Change of Control Put at any time prior to the consummation of the applicable Change of Control.

(e)  No Waiver.  Nothing in this Section 6 shall be construed as a waiver of any default or Event of Default that shall occur as a result of the occurrence of a Change of Control or otherwise.

(7)  [Reserved].

(8)  NONCIRCUMVENTION.  The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(9)  [Reserved].

(10)  [Reserved].

(11)  NO VOTING RIGHTS.  The Holder shall have no voting rights as the holder of this Note, except as required by law, including, but not limited to, the General Corporation Law of the State of Delaware and as expressly provided in this Note.

(12)  CHANGES TO THE TERMS OF NOTE; WAIVERS.  The provisions of this Note may be modified or amended, and any Event of Default hereunder waived, (i) pursuant to a written instrument signed by the Company and the Holder or (ii) pursuant to a written instrument signed by the Company and consented to by the Required Holders, *provided* that any modification or amendment, or waiver of any Event of Default approved by the consent of the Required Holders (i) must be made with respect to all Notes and not adversely affect the Holder without adversely affecting the Holders of all other Notes in the same manner and (ii) may not reduce the then-outstanding Principal, Interest, unpaid Late Charges or other amounts under this

Note, reduce the Interest Rate, change the Interest Date or extend the Maturity Date without the prior written consent of the Holder if the Holder is affected thereby. Subject to the foregoing proviso, the approval of the Required Holders may be obtained by affirmative vote at a meeting called for such purpose or the written consent without a meeting of the Required Holders. No consideration shall be offered or paid to the Holder to amend or consent to a waiver or modification of this Note unless the same consideration also is offered to the Holders of all other Notes.

(13)    ASSIGNMENT. The Company may not assign or otherwise transfer this Note or any of its obligations hereunder without the prior written consent of the Holder. This Note may be assigned or otherwise transferred by the Holder without the consent of the Company, so long as such assignment or transfer complies with applicable federal and state securities law.

(14)    RE-ISSUANCE OF THIS NOTE.

(a)    Transfer. If this Note is to be assigned or otherwise transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new replacement Note (in accordance with Section 14(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 14(d)) to the Holder representing the outstanding Principal not being transferred.

(b)    Lost, Stolen or Mutilated Note. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the outstanding Principal.

(c)    Note Exchangeable for Different Denominations. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) and in principal amounts of at least $1,000.00) representing in the aggregate the outstanding Principal, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d)    Issuance of New Notes. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Amended and Restated Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note,

10504641.8
DOCS_LA:314681.4 91893/002

and (v) shall represent accrued and unpaid Interest and Late Charges on the Principal and Interest of this Note, if any, from the Amended and Restated Issuance Date.

(15)  REMEDIES; CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note.  Amounts set forth or provided for herein with respect to payments and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate.  The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16)  PAYMENT OF COLLECTION ENFORCEMENT AND OTHER COSTS.  If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, financial advisory fees and attorneys' fees and disbursements.

(17)  CONSTRUCTION; HEADINGS.  This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18)  FAILURE OR INDULGENCE NOT WAIVER.  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19)  DISPUTE RESOLUTION.

(a)  All disputes, claims, or controversies between the Company, on the one hand, and the Holder or the Required Holders party thereto, on the other hand, arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity hereof, that cannot be resolved by mutual agreement shall be resolved by litigation, or if the Company, on the one hand, and such Holder or Required Holders agree to resolve any particular dispute by arbitration, then such arbitration shall be conducted in accordance with the procedures set forth in Section 19(b) below.

- 7 -

(b)     In the event the Company, on the one hand, and the Holder or the Required Holders party thereto, on the other hand, agree to resolve any dispute, claim or controversy by arbitration, the following procedures will apply:  Such dispute shall be submitted to arbitration before one arbitrator.    The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures then in effect (the "JAMS Arbitration Rules"). The dispute, claim or controversy shall be determined by one arbitrator who shall be an attorney with at least fifteen (15) years of active practice in negotiating corporate finance transactions for private entities.    In the event that, within fourteen (14) days of the filing of a demand for arbitration, the parties cannot agree upon an individual satisfying such criteria to serve as an arbitrator, the arbitrator shall be selected in accordance with the JAMS Arbitration Rules. Judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof.   The parties agree that the federal and state courts of Los Angeles, California shall have such authority on a non-exclusive basis and hereby submit to the non-exclusive jurisdiction of such courts for this purpose.   There shall be limited discovery prior to the arbitration hearing as follows:  (a) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (b) depositions of all party witnesses and (c) such other depositions as may be allowed by the arbitrators upon a showing of good cause.   Depositions shall be conducted in accordance with the California Rules of Civil Procedure, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings.   In any action, suit, arbitration or similar proceeding, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

(20)   NOTICES; PAYMENTS.

(a)     Notices.    All notices, requests, consents and other communications hereunder shall be in writing, shall be mailed (A) if within the United States by first-class registered or certified airmail, or nationally recognized overnight express courier, postage prepaid, or by facsimile or electronic mail, or (B) if delivered from outside the United States, by International Federal Express (or other recognized international express courier) or facsimile, and shall be deemed given (i) if delivered by first-class registered or certified mail, three Business Days after so mailed, (ii) if delivered by nationally recognized overnight carrier, one Business Day after so mailed, (iii) if delivered by International Federal Express (or other recognized international express courier), two Business Days after so mailed, or (iv) if delivered by facsimile or electronic mail, upon electronic confirmation of receipt and shall be delivered as addressed as follows:

　　　　　　(i)      if to the Company, to:

　　　　　　　　　The Walking Company Holdings, Inc.
　　　　　　　　　25 W. Anapamu Street
　　　　　　　　　Santa Barbara, CA 93 I 0 I
　　　　　　　　　Attention: General Counsel
　　　　　　　　　Facsimile: (805) 962-9460
　　　　　　　　　Email: tonyw@thewalkingcompany.com

10504641.8
DOCS_LA:314681.4 91893/002

(ii)     if to Holder, at such address or addresses as may have been furnished to the Company in writing.

Notwithstanding anything in this Agreement to the contrary, the Company may deliver any documents, information or notices required to be delivered to the Holder under this Agreement by email, in any recognized electronic format, including Portable Document Format (PDF) or Microsoft Word document format.

(b)     <u>Payments</u>.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via U.S. postal service to such Person at such address as previously provided to the Company in writing; *provided* that payments of Principal shall be sent by overnight courier service or the Holder may elect to receive a payment of Principal via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions.  Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day and, in the case of any Interest Date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of Interest due on such date.  Any amount of Principal or other amounts due under this Note which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of two percent (2%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(21)     <u>CANCELLATION</u>.    After all Principal, accrued and unpaid Interest, Late Charges and other amounts at any time owing under this Note have been paid in cash in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22)     <u>WAIVER OF NOTICE</u>.  To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23)     <u>GOVERNING LAW</u>.    This Note shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of law.

(24)     <u>FINANCIAL INFORMATION</u>.  Upon request of Holder, the Company will at any time provide to Holder the Company's then-most-recent audited annual consolidated statement of income and balance sheet, provided the Company may require a non-disclosure agreement in regard thereto.

10504641.8
DOCS_LA:314681.4 91893/002

(25)  <u>CERTAIN DEFINITIONS</u>.  For purposes of this Note, unless otherwise defined herein, the following terms shall have the following meanings:

(a)  "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of Los Angeles are authorized or required by law to remain closed.

(b)  "**Change of Control**" means the occurrence of one or more of the following events:

(i)  the Company shall consolidate, combine, reorganize or merge with or into any other Person, if the holders of the outstanding shares of Voting Stock immediately prior to such consolidation, combination, reorganization or merger (not including any outstanding shares of Voting Stock held by the Person or Persons a party to, or associated or affiliated with the Person or Persons a party to, such consolidation, combination, reorganization or merger) do not own or hold more than 50% of the outstanding shares of Voting Stock or other voting securities of the Company or the surviving or acquiring entity immediately following such consolidation, combination, reorganization or merger, or

(ii)  the sale, transfer, assignment, lease, conveyance or other disposition, directly or indirectly, in one transaction or series of related transactions, of all or substantially all of the assets of the Company or any of its Subsidiaries to another Person, or

(iii)  the Board of Directors or the stockholders of the Company or TWC shall have approved any plan of liquidation, dissolution or bankruptcy of the Company or TWC, as applicable, or

(iv)  any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d) of the Exchange Act), including any group acting for the purpose of acquiring, holding, voting or disposing of securities within the meaning of Rule 13-d-5(b)(1) of the Exchange Act (other than the Majority Stockholder or any of its Affiliates or transferees), shall become after the Amended and Restated Issuance Date the "beneficial owner" (as such term is defined in Rule 13d-3 under the Exchange Act (provided that a Person will be deemed to have "beneficial ownership" of all shares that any such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time)), directly or indirectly, of more than 50% of the outstanding shares of Voting Stock.

The term "**Change of Control**" shall not include a transaction the sole purpose of which is to change the state of domicile of the Company.

(c)  "**Change of Control Election Notice**" has the meaning set forth in Section 6.

(d)  "**Change of Control Notice**" has the meaning set forth in Section 6.

(e)  "**Change of Control Put**" has the meaning set forth in Section 6.

- 10 -

(f)     "**Change of Control Put Price**" has the meaning set forth in Section 6.

(g)     "**Common Stock**" means the common stock, par value $0.01 per share, of the Company.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(i)     "**Guaranty**" has the meaning set forth in Section 3.

(j)     "**Holder**" has the meaning set forth in the preamble and includes its successors and assigns.

(k)     "**Holders**" means, as of any date, the Holder and the holders of all other Notes then outstanding.

(l)     "**Majority Stockholder**" has the meaning set forth in that certain Stockholders Agreement of the Company dated as of the Amended and Restated Issuance Date.

(m)     "**Note Documents**" means, collectively, this Note, the other Notes, the Guaranty, the Security Agreement, UCC financing statements, the Note Purchase Agreement dated as of April 3, 2007 and all agreements, instruments, certificates and other documents executed or delivered from time to time in connection herewith or therewith, in each case as amended, supplemented, reaffirmed or otherwise modified from time to time.

(n)     "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(o)     "**Pro Rata Share**" means an amount (expressed as a percentage) equal to the Principal of this Note, <u>divided by</u> the aggregate Principal of all Notes, <u>multiplied by</u> (C) 100.

(p)     "**Required Holders**" means, at any time, Holders of Notes then outstanding representing more than fifty percent (50%) of the aggregate Principal of all such Notes.

(q)     "**Security Agreement**" has the meaning set forth in Section 3.

(r)     "**Subsidiary**" or "**Subsidiaries**" means, as of the Amended and Restated Issuance Date, TWC, Big Dog and FootSmart and, after the Amended and Restated Issuance Date, any other entities in which the Company, directly or indirectly, owns any of the capital stock or holds an equity or similar interest.

(s)     "**Voting Stock**" means the capital stock of the Company pursuant to which the holders thereof have the general voting power to elect, or the general power to appoint, a majority of the board of directors of the Company (irrespective of whether or not at the time capital stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

10504641.8
DOCS_LA:314681.4 91893/002

(26)    REPRESENTATIONS AND WARRANTIES.  The Company hereby represents and warrants as follows:

(a)    The Company has been duly incorporated and organized, and is validly existing in good standing, under the laws of the State of Delaware.  The Company has the requisite corporate power and authority to enter into and perform this Note and the other Note Documents to which it is a party, to own and operate its properties and assets, if any, and to carry on its business as currently conducted and as presently proposed to be conducted.

(b)    All corporate action on the part of the Company's directors and stockholders necessary for the authorization, execution, delivery of, and the performance of all obligations of the Company under this Note and the other Note Documents to which it is a party has been taken or will be taken prior to the Closing.  This Note and each other Note Document to which the Company is a party, when executed and delivered, will constitute the valid and legally binding obligation of the Company, enforceable against it in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) the effect of rules of law governing the availability of equitable remedies.

(c)    No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in order to enable the Company to execute, deliver and perform its obligations under this Note or any other Note Document to which it is a party, except for such qualifications or filings, if any, under applicable securities laws.  All such qualifications and filings will, in the case of qualifications, be effective on the Closing and will, in the case of filings, be made within the time prescribed by law.

(d)    The security interests in the Collateral (as defined in the Security Agreement) granted by the Company and the other Obligors pursuant to the terms of the Security Agreement constitute valid and enforceable security interests, and such security interests in the Collateral have been perfected with respect to that portion of the Collateral as to which a security interest can be perfected under Article 9 of the Delaware Uniform Commercial Code by the filing of the financing statements that were filed with the Secretary of State of the State of Delaware or under Division 9 of the California Uniform Commercial Code by the filing of the financing statements that were filed with the Secretary of State of the State of California, as applicable.

(27)    CERTAIN COVENANTS.

(a)    Maintenance of Legal Existence.  The Company shall, and shall cause each Subsidiary to, do or cause to be done all things necessary to (a) maintain and preserve its legal existence and its rights, franchises and privileges and (b) become or remain duly qualified and in good standing in each jurisdiction in which the failure to do so could reasonably be expected to have a material adverse effect on the business or operations of the Company or such Subsidiary.

(b)    Additional Subsidiaries.  If the Company forms, creates or acquires at any time any Subsidiary, it shall cause such Subsidiary to execute and deliver to the Holder contemporaneously with such formation, creation or acquisition: (i) a joinder to the Guaranty, in

substantially the form attached as an exhibit thereto, pursuant to which such Subsidiary shall become a "Guarantor" thereunder, (ii) a joinder to the Security Agreement, in substantially the form attached as an exhibit thereto, pursuant to which such Subsidiary shall become a "Grantor" thereunder, and (iii) such additional agreements, instruments, approvals and documents as the Holder may request to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Note Documents to which any Guarantor of Grantor is a party.

(c)    Restrictions on Dividends and Other Payments.  The Company shall not, without the prior written consent of the Required Holders, (i) declare or pay any dividend or other distribution (whether in cash, securities or other property), or incur any liability to make any such payment or other distribution, in each case on account of or with respect to any equity securities of the Company now or hereafter outstanding or (ii) purchase, redeem or otherwise acquire or retire for value any equity securities of the Company.

(d)    Compliance with Laws.  The Company shall, and shall cause each Subsidiary to, comply at all times with applicable law in respect of the conduct of its or their businesses and the ownership of its or their properties in the states or other jurisdictions in which it or they conduct its or their respective businesses.

(e)    Inspection Rights.    The Company permit representatives and independent contractors of the Holder to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances, and accounts with its directors, officers, members, managers and independent public accountants, all at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company.

(f)    Indemnification.  The Company agrees to indemnify, defend and hold harmless the Holder and each of its partners (limited and general), members, managers, officers, directors, stockholders, employees, affiliates, trustees, attorneys, agents, representatives, successors and permitted assigns (collectively, "**Indemnitees**") from and against any and all Losses (as defined below) incurred by such Indemnitee or any other Indemnitee based upon, arising out of or otherwise in respect of (i) any material breach of any representations or warranties made by the Company in this Note or the other Note Documents or the failure of the Company to perform any of its covenants or agreements contained herein or therein or (ii) any third party claims asserted or brought against such Indemnitee in connection with this Note, the other Note Documents or the transactions contemplated hereby or thereby or the business or operations of the Company or any Subsidiary.  The term "Losses" means any and all losses, claims, damages, liabilities, judgments, environmental costs, expenses and costs, including attorneys' fees and other fees and expenses incurred in, and the costs of preparing for, investigating or defending any matter.

(g)    Further Assurances.  Promptly upon request by the Holder, from time to time after the date hereof, the Company shall, and shall cause each Subsidiary to, execute and deliver such instruments, certificates and documents, and to take all such other actions, as may be reasonably desirable to implement or effectuate the provisions of this Note and the other Note Documents.

10504641.8
DOCS_LA:314681.4 91893/002

(28)    JURISDICTION; CONSENT TO SERVICE OF PROCESS.    Any suit, legal action or similar proceeding with respect to any dispute under or relating to this Note or the transactions contemplated hereby shall be brought in the courts of the State of California sitting in the City of Los Angeles, State of California or of the United States for the Central District of California sitting in the City of Los Angeles, State of California, and by execution and delivery of this Note, the Company and the Holder consents, for itself and in respect of its properties and assets, to the exclusive jurisdiction of such courts.  Each party irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection, including any objection to the laying of venue or based on the grounds of FORUM NON CONVENIENS, which it may now or hereafter have to the bringing of any suit, legal action or similar proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.  Each party irrevocably consents to service of process in any manner permitted by applicable law.

(29)    WAIVER OF JURY TRIAL.  EACH OF THE COMPANY AND THE HOLDER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO THIS NOTE, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT IT MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

(30)    JUDICIAL REFERENCE.  IN THE EVENT THE WAIVER PROVIDED IN SECTION 29 IS DEEMED INEFFECTIVE, TO GIVE EFFECT TO THE DESIRE OF EACH OF THE COMPANY AND THE HOLDER THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING THE APPLICABLE LAW, THE PARTIES AGREE TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT AND LAW INVOLVED IN, ARISING OUT OF OR IN ANY WAY RELATING TO THIS NOTE, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS AND POST-TRIAL MOTIONS (E.G., MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE OR OTHERWISE) BETWEEN THE PARTIES, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A JUDICIAL REFERENCE PURSUANT TO SECTION 638 ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON ITS STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  THE PARTIES SHALL SELECT A SINGLE

NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS. IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.

(31) <u>AMENDMENT AND RESTATEMENT</u>. This Note amends and restates the 2019 Note, it being understood that this Note is not a termination of the 2019 Note but is a modification (and, as modified, an extension and continuation) of the 2019 Note. This Note shall supersede the 2019 Note only insofar as the two are inconsistent. The Company hereby affirms, ratifies and approves in all respects the 2019 Note, as amended, restated, extended and continued by this Note, the Liens granted in favor of the Holder under the Security Agreement, the terms and other provisions hereof and thereof and the Company's obligations hereunder and thereunder.

*[Signature Page Follows]*

10504641.8
DOCS_LA:314681.4 91893/002

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Amended and Restated Issuance Date set forth above.

THE WALKING COMPANY HOLDINGS, INC.

By: _____
Name: _____
Title: _____

<u>AMENDED AND RESTATED GUARANTY</u>

THIS AMENDED AND RESTATED GUARANTY (this "<u>Guaranty</u>"), dated as of [_____], 2018, is made by The Walking Company, a Delaware corporation ("<u>TWC</u>"), Big Dog USA, Inc., a California corporation ("<u>Big Dog</u>"), FootSmart, Inc., a Delaware corporation ("<u>FootSmart</u>"), and each other Person that executes and delivers a joinder agreement in substantially the form attached as <u>Exhibit A</u> hereto (a "<u>Joinder Agreement</u>;" TWC, Big Dog, FootSmart and any such other Person are referred to herein each as a "<u>Guarantor</u>" and collectively as the "<u>Guarantors</u>") in favor of the holders of the Amended and Restated Notes (as defined below) from time to time (each a "<u>Holder</u>" and collectively the "<u>Holders</u>"). <u>Schedule I</u> hereto sets forth a list of the Holders as of the date of this Guaranty.

W I T N E S S E T H

WHEREAS, TWC and Big Dog (each an "<u>Existing Guarantor</u>" and collectively the "<u>Existing Guarantors</u>") are party to that certain Guaranty dated as of March 17, 2009, as reaffirmed by that certain Guaranty and Security Reaffirmation Agreement dated as of May 23, 2014, and as further reaffirmed, amended, supplemented or otherwise modified prior to the date hereof (as so reaffirmed, amended, supplemented and modified, the "<u>Existing Guaranty</u>"), pursuant to which the Existing Guarantors jointly and severally guarantied for the benefit of the Holders the full and punctual payment when due of all Obligations (as defined therein). The Obligations include, among other things, all liabilities, agreements and other obligations of The Walking Company Holdings, Inc., a Delaware corporation ("<u>Parent</u>"), owing to the Holders, including, among other things, the unpaid principal amount of, interest on and other amounts owing under a series of identical 8.375% Convertible Notes Due 2019 issued to the Holders on or about May 23, 2014 (each an "<u>Existing Note</u>" and collectively the "<u>Existing Notes</u>");

WHEREAS, Parent, the Existing Guarantors and FootSmart were debtors-in-possession under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in cases no. 18-10474 (LSS),18-10474 (LSS) and 18-10474 (LSS), jointly administered under case no. 18-10474 (LSS) (the "<u>Cases</u>"), pending in the United States Bankruptcy Court for the District of Delaware;

WHEREAS, pursuant to the First Amended Joint Plan of Reorganization filed in the Cases (the "<u>Plan</u>"), the Existing Notes are being amended and restated in their entirety pursuant to the terms of a series of identical Amended and Restated 8.375% Notes due 2022 in the aggregate principal amount of $[_____] (as amended, restated, supplemented, refinanced, replaced, exchanged or otherwise modified, the "<u>Amended and Restated Notes</u>") issued or to be issued concurrently herewith to the Holders listed on <u>Schedule I</u> hereto;

WHEREAS, in connection with the consummation of the Plan, the Existing Guaranty is being amended and restated, and FootSmart has agreed to become an additional guarantor of the Obligations, all on the terms and subject to the conditions contained herein;

WHEREAS, Parent and the Guarantors are members of a consolidated group of entities whose success is mutually interdependent, and each of them has derived, and

expects to continue to derive, substantial direct and indirect benefits from the proceeds of the borrowings made available to Parent under the Existing Notes, as amended and restated by the Amended and Restated Notes; and

WHEREAS, unless otherwise defined herein, capitalized used herein without definition have the meanings ascribed to them in the Amended and Restated Notes.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantors hereby agree to amend and restate the Existing Guaranty as follows:

1.   <u>Unconditional Guaranty</u>.

(a)   The Guarantors hereby, jointly and severally, absolutely, irrevocably and unconditionally guaranty the due and punctual payment and performance in full in cash of any and all Guarantied Obligations outstanding from time to time. All Guarantied Obligations shall be conclusively presumed to have been created in reliance of this Guaranty. In addition, the Guarantors hereby, jointly and severally, agree to pay any and all out-of-pocket costs and expenses (including, without limitation, attorneys' fees and expenses) incurred by the Holders (or any of them) in connection with (i) the collection of all sums guaranteed hereunder and (ii) the exercise or enforcement of any rights, powers or remedies of the Holders under this Guaranty or applicable law.

The term "<u>Guaranteed Obligations</u>" shall mean any and all present and future loans, advances, indebtedness, claims, guarantees, liabilities or obligations (monetary and non-monetary) of Parent owing to the Holders (or any of them), of whatever nature, character or description, including, without limitation, all principal, interest, debts, liabilities and obligations under the Amended and Restated Notes, the Security Agreement and all other Note Documents, in each case whether due or not due, direct or indirect, joint and/or several, absolute or contingent, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, now or hereafter existing, amended, renewed, extended, exchanged, restated, refinanced, refunded or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether for principal, interest, premiums, fees, costs, expenses (including, without limitation, attorneys' fees) or other amounts incurred for administration, collection, enforcement or otherwise, whether or not arising after the commencement of any proceeding under the bankruptcy laws (including, without limitation, post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding, and whether or not recovery of any such obligation or liability may be barred by any statute of limitations or such Indebtedness, claim, liability or obligation may otherwise be unenforceable.

(b)   All payments under this Guaranty shall be made in accordance with written instructions furnished by the Holders (or any of them). All payments under this Guaranty shall be made free and clear of any and all deductions, tax or other withholdings or setoffs. If any deduction or withholding shall be required by applicable law and payments under this Guaranty are to be made free and clear thereof under the prior sentence, the Guarantors shall be required to pay such additional amounts as may be required so that the

net amount received by the Holders, after such deduction or withholding (including with respect to such additional amounts), shall be equal to the amount otherwise required to be paid under this Guaranty.

2. <u>Continuing and Irrevocable Guaranty</u>. Each Guarantor hereby acknowledges and agrees that this Guaranty is a continuing guaranty of the Guaranteed Obligations and may not be revoked and shall not otherwise terminate unless and until all Guaranteed Obligations have been indefeasibly paid and performed in full. If, notwithstanding the foregoing, any Guarantor shall have any right under applicable law to terminate this Guaranty prior to indefeasible payment in full of the Guaranteed Obligations, no such termination shall be effective until noon the next Business Day after the Holders shall receive written notice thereof, signed by such Guarantor. Any such termination shall not affect this Guaranty in relation to (a) any Guaranteed Obligation that was incurred or arose prior to the effective time of such notice, (b) any Guaranteed Obligation incurred or arising after such effective time where such Guaranteed Obligation is incurred or arises either pursuant to commitments existing at such effective time or incurred for the purpose of protecting or enforcing rights against Parent, any Guarantor or other guarantor of or other Person directly or indirectly liable on the Guaranteed Obligations or any portion thereof (Parent, the Guarantors and any such other guarantor or Person being referred to herein as an "<u>Obligor</u>") or any collateral or other security ("<u>Collateral</u>") given for the Guaranteed Obligations or any portion thereof or (c) any renewals, extensions, readvances, modifications or rearrangements of any of the foregoing.

3. <u>Nature of Guaranty</u>. The Guaranteed Obligations are the immediate, direct, primary and absolute liabilities of the Guarantors. The liability of each Guarantor hereunder is independent of, and not in consideration of or contingent upon the liability of any other Obligor, and a separate action or actions may be brought or prosecuted against a Guarantor, whether or not any action is brought or prosecuted against any other Obligor or whether any other Obligor is joined in any such action or actions. This Guaranty shall be construed as a continuing, absolute and unconditional guaranty of payment (and not of collection) and performance, and the liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional, without regard to (and each Guarantor irrevocably waives):

(a) the legality, validity or enforceability of this Guaranty, the Amended and Restated Notes or any other Note Document, any of the Guaranteed Obligations, any Lien or any Collateral;

(b) any renewal, extension or acceleration of, or any increase in the amount of the Guaranteed Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, this Guaranty, the Amended and Restated Notes or any other Note Document;

(c) any defense (other than payment), set-off or counterclaim that may be available to any Obligor at any time against, or any right of setoff at any time held by, the Holders (or any of them);

(d) any acts of commission or omission of any kind at any time on the part of the Holders or any Holder with respect to any matter whatsoever;

(e)     the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any Lien securing, or the release of any or all Collateral securing, or purporting to secure, the Guarantied Obligations, or the impairment of any Collateral;

(f)     the liquidation or dissolution of any Guarantor or any Obligor, any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or similar event or proceeding with respect to any Guarantor or any Obligor, or any action taken by any trustee or receiver of any Guarantor or any Obligor or by any court or any proceeding with respect to any Guarantor or any Obligor;

(g)     any change of ownership of any Guarantor or any other Obligor, or any change in the relationship between any Guarantor and such other Obligor (including, without limitation, the termination of such relationship);

(h)     any assignment or other transfer, in whole or in part, of any Holder's interest in and rights under the Amended and Restated Notes or any other Note Document, including this Guaranty, or of any Holder's interest in the Guarantied Obligations, the Obligations or the Collateral;

(i)     any cancellation, renunciation or surrender of any pledge, guaranty or any debt instrument evidencing the Obligations or the Guarantied Obligations; or

(j)     any other circumstance whatsoever (with or without notice to or knowledge of any Guarantor or any other Obligor), other than payment, whether or not similar to any of the foregoing, that constitutes, or might be construed to constitute, an equitable or legal discharge of any Guarantor or any other Obligor, in bankruptcy or in any other instance.

Any payment by any Obligor or other circumstance that operates to toll any statute of limitations applicable to such Obligor shall also operate to toll the statute of limitations applicable to a Guarantor.  When making any demand hereunder (including by commencement or continuance of any legal proceeding), any Holder may, but shall be under no obligation to, make a similar demand on all other Obligors, and any failure by the Holders to make any such demand shall not relieve a Guarantor of its obligations hereunder.

4.     <u>Authorization</u>.  Each Guarantor authorizes the Holders (and each of them), without notice to or further assent by such Guarantor, and without affecting such Guarantor's liability hereunder (regardless of whether any subrogation or similar right that such Guarantor may have or any other right or remedy of such Guarantor is extinguished or impaired), from time to time to:

(a)     permit any Obligor to increase or create Guarantied Obligations, or terminate, release, compromise, subordinate, extend, accelerate or otherwise change the amount or time, manner or place of payment of, or rescind any demand for payment or acceleration of, the Guarantied Obligations or any part thereof (including increasing or decreasing the rate of interest thereon), or otherwise amend the terms and conditions of this Guaranty, the Amended and Restated Notes or any other Note Document or any provision thereof;

10517926.2
DOCS_LA:314708.2

(b)     take and hold Collateral from any other Obligor, perfect or refrain from perfecting a Lien on such Collateral, and exchange, enforce, subordinate, release (whether intentionally or unintentionally), or take or fail to take any other action in respect of, any such Collateral or Lien or any part thereof;

(c)     exercise in such manner and order as it elects in its sole discretion, fail to exercise, waive, suspend, terminate or suffer expiration of, any of the remedies or rights of the Holders against any other Obligor in respect of any Guarantied Obligations or any Collateral;

(d)     release, add or settle with any other Obligor in respect of this Guaranty, this Guaranty, the Amended and Restated Notes or any other Note Document or the Guarantied Obligations;

(e)     accept partial payments on the Guarantied Obligations and apply any and all payments or recoveries from any other Obligor or Collateral to such of the Guarantied Obligations as it may elect in its sole discretion, whether or not such Guarantied Obligations are secured or guaranteed;

(f)     refund at any time, at its sole discretion, any payments or recoveries received by it in respect of any Guarantied Obligations or any Collateral; and

(g)     otherwise deal with any other Obligor and any Collateral as it may elect, in its sole discretion.

5.     <u>Certain Waivers</u>.  Each Guarantor waives for the benefit of the Holders (and each of them):

(a)     the right to require any Holder to proceed against any other Obligor, to proceed against or exhaust any Collateral or to pursue any other remedy in any Holder's power whatsoever, and the right to have the property of any other Obligor first applied to the discharge of the Guarantied Obligations;

(b)     all rights and benefits under Section 2809 of the California Civil Code and any similar applicable law purporting to reduce a guarantor's obligations in proportion to the obligation of the principal or providing that the obligation of a surety or guarantor must neither be larger nor in other respects more burdensome than that of the principal;

(c)     the benefit of any statute of limitations affecting the Guarantied Obligations or such Guarantor's liability hereunder, including any benefit under Section 359.5 of the California Code of Civil Procedure and any similar applicable law;

(d)     any requirement of marshaling or any other principle of election of remedies;

(e)     any right to assert against any Holder any defense (legal or equitable), set-off, counterclaim and other right that such Guarantor may now or any time hereafter have against any other Obligor;

(f)     presentment, demand for payment or performance (including diligence in making demands hereunder), notice of dishonor or nonperformance, protest, acceptance and notice of acceptance of this Guaranty, and all other notices of any kind;

(g)     any rights, defenses and other benefits that such Guarantor may have by reason of any failure of any Holder to hold a commercially reasonable public or private foreclosure sale or otherwise to comply with applicable law in connection with a disposition of Collateral;

(h)     all defenses that at any time may be available to such Guarantor by virtue of any valuation, stay, moratorium or other law now or hereafter in effect, and ALL RIGHTS AND DEFENSES THAT ARE OR MAY BECOME AVAILABLE TO THE GUARANTOR BY REASON OF SECTIONS 2787 TO 2855, INCLUSIVE, AND SECTION 3433 OF THE CALIFORNIA CIVIL CODE, AND ANY SIMILAR APPLICABLE LAWS; and

(i)     any failure, omission, delay or lack of diligence on the part of the Holders or any Holder to enforce, assert or exercise any right, power or remedy conferred on the Holders or any Holder in respect of the Guarantied Obligations.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH GUARANTOR WAIVES ALL RIGHTS AND DEFENSES THAT IT MAY HAVE BECAUSE THE GUARANTIED OBLIGATIONS OF ANY OTHER OBLIGOR ARE NOW, OR MAY HEREAFTER BE, SECURED BY REAL PROPERTY.  THIS MEANS, AMONG OTHER THINGS, THAT:  (1) THE HOLDERS (OR ANY OF THEM) MAY COLLECT FROM EACH GUARANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY PARENT OR ANY OTHER OBLIGOR; (2) IF THE HOLDERS (OR ANY OF THEM) FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY PARENT OR ANY OTHER OBLIGOR:  (A) THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE; (B) THE HOLDERS (OR ANY OF THEM) MAY COLLECT FROM THE GUARANTOR EVEN IF SUCH HOLDER, BY FORECLOSING ON SUCH REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT THE GUARANTOR MAY HAVE TO COLLECT FROM PARENT OR ANY OTHER OBLIGOR.  THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES ANY GUARANTOR MAY HAVE BECAUSE THE DEBT OF PARENT OR ANY OTHER OBLIGOR IS NOW, OR HEREAFTER MAY BE, SECURED BY REAL PROPERTY.  THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON SECTIONS 580a, 580b, 580d, OR 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE AND ANY SIMILAR APPLICABLE LAWS.

IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN ACCORDANCE WITH SECTION 2856 OF THE CALIFORNIA CIVIL CODE, EACH GUARANTOR WAIVES ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY THE HOLDERS (OR ANY OF THEM), EVEN

THOUGH THAT ELECTION OF REMEDIES, SUCH AS NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A GUARANTIED OBLIGATION, HAS DESTROYED THE GUARANTOR'S RIGHTS OF SUBROGATION AND REIMBURSEMENT AGAINST PARENT OR ANY OTHER GUARANTOR OR OTHER OBLIGOR BY THE OPERATION OF SECTION 580d OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR OTHERWISE.

6. <u>Subrogation; Certain Agreements</u>.

(a) Each Guarantor hereby expressly consents and agrees that, at any time prior to the payment in full in cash of the Guarantied Obligations and all other amounts payable under this Guaranty, it will not exercise any rights that it may now or hereafter have against any other Obligor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification or any right to participate in any claim or remedy of any Holder against any other Obligor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any other Obligor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the payment in full in cash of the Guarantied Obligations and all other amounts payable under this Guaranty, such amount shall be held in trust for the benefit of the Holders and the Holders and shall forthwith be paid to the Holders to be credited and applied to the Guarantied Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of this Guaranty, or to be held as collateral for any Guarantied Obligations or other amounts payable under this Guaranty thereafter arising. If (i) any Guarantor shall make a payment to any Holder of all of the Guarantied Obligations or (ii) all of the Guarantied Obligations and all other amounts payable under this Guaranty shall be paid in full in cash, such Holder will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guarantied Obligations resulting from such payment by such Guarantor.

(b) Each Guarantor assumes the responsibility for being and keeping itself informed of the financial condition of any other Obligor and of all other circumstances bearing upon the risk of non-payment of the Guarantied Obligations that diligent inquiry would reveal, and agrees that no Holder shall have any duty to advise such Guarantor of information regarding such condition or any such circumstances.

(c) Each Guarantor agrees that the Notes and books and records of the Holders showing the account between the Holders, on the one hand, and any other Obligor, on the other hand, shall be admissible in any action, suit or other proceeding and shall constitute prima facie proof of the item therein set forth. Each Guarantor agrees that it shall be bound by each and every ruling, order and judgment obtained by any Holder against any other Obligor in respect of the Guarantied Obligations, whether or not such Guarantor is a

party to, or has received notice of, such action, suit or other proceeding in which such ruling, order or judgment is issued or rendered.

7. Bankruptcy No Discharge.

(a) Without limiting Section 3, this Guaranty shall not be discharged or otherwise affected by any bankruptcy, reorganization, liquidation, dissolution or similar proceeding commenced by or against any other Obligor, including (i) any discharge of, or bar or stay against collecting, all or any part of the Guarantied Obligations in or as a result of any such proceeding, whether or not assented to by any Holder, and (ii) any disallowance of all or any portion of the Holders' claim for repayment of the Guarantied Obligations. Each Guarantor understands and acknowledges that by virtue of this Guaranty, it has specifically assumed any and all risks of any such proceeding with respect to any other Obligor.

(b) Any Event of Default under Section 5(a)(ii) or (iii) of the Amended and Restated Notes shall render all Guarantied Obligations automatically and immediately due and payable for purposes of this Guaranty, notwithstanding any stay of the right of the Holders (or any of them) to accelerate the Guarantied Obligations.

(c) Notwithstanding anything to the contrary herein contained, this Guaranty (and any Lien on Collateral securing this Guaranty or the Guarantied Obligations) shall continue to be effective or be reinstated, as the case may be, if at any time any payment, or any part thereof, of any or all of the Guarantied Obligations is rescinded, invalidated, declared to be fraudulent or voidable as a preference or otherwise required to be restored or returned by any Holder in connection with any bankruptcy, reorganization, liquidation, dissolution or similar proceeding involving any other Obligor or otherwise, if the proceeds of any Collateral are required to be returned by any Holder under any such circumstances, or if any Holder elects to return any such payment or proceeds or any part thereof in its sole discretion, all as though such payment had not been made or such proceeds not been received.

8. Subordination.

(a) Effective upon the occurrence of any Event of Default, each Guarantor hereby absolutely subordinates, both in right of payment and in time of payment, any and all present or future obligations and liabilities of any other Obligor to such Guarantor ("Guarantor Subordinated Debt"), to the prior payment in full in cash of the Guarantied Obligations, whether or not such Guarantor Subordinated Debt constitutes or arises out of any subrogation, reimbursement, contribution, indemnity or similar right attributable to this Guaranty. Without limitation, no payment or distribution of assets of any Obligor of any kind or character, whether in cash, securities or other property, shall be made on or with respect to the Guarantor Subordinated Debt after the occurrence of an Event of Default and prior to the payment in full in cash of the Guarantied Obligations. If, whether or not at any Holder's request, each Guarantor shall receive, after the occurrence of an Event of Default and prior to payment in full in cash of all Guarantied Obligations, payment of any sum from any other Obligor upon any Guarantor Subordinated Debt, any such sum shall be received by such Guarantor as trustee for the Holders and shall forthwith be paid over to the

Holders on account of the Guarantied Obligations, without reducing or affecting in any manner the liability of such Guarantor under this Guaranty.

(b) Each Guarantor shall file in any bankruptcy or reorganization or similar proceeding in which the filing of claims is required by applicable law, all claims that such Guarantor may have against any other Obligor relating to any Guarantor Subordinated Debt. If a Guarantor does not file any such claim, any Holder (or its nominee) as attorney-in-fact for the Guarantor is hereby authorized to do so in the name of such Guarantor. Each Guarantor agrees that, in connection with any such proceeding, it shall not contest or oppose the treatment of claims of the Holders in any plan of reorganization or otherwise and it shall vote any claims that exist by virtue of this Guaranty or the Guarantor Subordinated Debt in connection with any plans of reorganization or otherwise, as may be requested by any Holder.

(c) Each Guarantor hereby grants the Holders a power of attorney for the purposes set forth in this Section 8. Such power of attorney is coupled with an interest and cannot be revoked.

(d) The subordination under this Section 8 shall not apply to payments made in the ordinary course of business for goods and services provided in the ordinary course of business.

9. <u>Maximum Liability of Guarantor</u>. If the obligations of any Guarantor hereunder otherwise would be subject to avoidance under Section 544, 548 or 550 of the Bankruptcy Code, any other bankruptcy law or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law, taking into consideration such Guarantor's (a) rights of reimbursement and indemnity from any Obligor with respect to amounts paid by such Guarantor, (b) rights of subrogation to the rights of the Holders and (c) rights of contribution from each other Obligor, then such obligations are hereby reduced to the largest amount that would make them not subject to such avoidance. Any Person asserting that such Guarantor's obligations are so avoidable shall have the burden (including the burden of production and of persuasion) of proving (i) that, without giving effect to this Section 9, such Guarantor's obligations hereunder would be avoidable and (ii) the extent to which such obligations are reduced by operation of this Section 9.

10. <u>Contribution with Respect to Guarantied Obligations</u>.

To the extent that any Guarantor shall make a payment under this Guaranty of all or any of the Guarantied Obligations (a "<u>Guarantor Payment</u>") that, taking into account all other Guarantor Payments then previously or concurrently made by such Guarantor and any other Guarantor, exceeds the amount that such Guarantor would otherwise have paid if each Guarantor had paid the aggregate Guarantied Obligations satisfied by such Guarantor Payment in the same proportion that such Guarantor's Allocable Amount (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantied Obligations, such Guarantor shall be entitled to receive contribution and

indemnification payments from, and be reimbursed by, each other Guarantor for the amount of such excess, <u>pro rata</u> based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

As of any date of determination, the "<u>Allocable Amount</u>" of any Guarantor shall be equal to the maximum amount of the claim that could then be recovered from such Guarantor under this Guaranty without rendering such claim voidable or avoidable under Section 544, 548 or 550 of the Bankruptcy Code, any other Bankruptcy Law or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

This Section 10 is intended only to define the relative rights of Guarantors and nothing set forth in this Section 10 is intended to or shall impair the Guarantied Obligations of Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Guaranty.

The parties acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Guarantor to which such contribution and indemnification is owing.

The rights of the indemnifying Guarantors against any other Guarantor under this Section 10 shall be exercisable upon the full and indefeasible payment of the Guarantied Obligations.

11.    <u>Representations and Warranties of Guarantor</u>.  Each Guarantor represents and warrants to the Holders that:

(a)    <u>Financial Benefit</u>.  Each Guarantor hereby acknowledges and warrants that it has derived or will derive substantial economic benefits, directly and indirectly, from the issuance of the Amended and Restated Notes and the consummation of the transactions contemplated thereby and by this Guaranty.

(b)    <u>Solvency</u>.  After giving effect to the issuance of the Amended and Restated Notes, the execution and delivery of this Guaranty and the other Note Documents and the consummation of the transactions contemplated hereby and thereby, each Guarantor is solvent (within the meaning of the Bankruptcy Code).  No Guarantor intends to incur, and in connection with this Guaranty and the other Note Document and the performance of its obligations contemplated hereby and thereby no Guarantor will incur, debts beyond its ability to pay as they mature.

(c)    <u>Review of Documents; Understanding with Respect to Waivers</u>.  Each Guarantor hereby acknowledges that it has copies of and is fully familiar with this Guaranty and each of the other Note Documents executed and delivered (or to be executed and delivered) by any Obligor.  Each Guarantor represents, warrants and agrees that each waiver set forth in this Guaranty is made with such Guarantor's full knowledge of its significance and consequences and after opportunity to consult with counsel of its own choosing and that, under the circumstances, each such waiver is reasonable and should not be found contrary to public policy or law.

12.     Guarantor Acknowledgment.  Each Guarantor hereby acknowledges that the Holders would not have agreed to amend and restate the Amended and Restated Notes and consummate the transactions contemplated thereby but for the delivery by such Guarantor of this Guaranty and other covenants and agreements set forth in this Guaranty.

13.     Miscellaneous Provisions.

(a)     Amendments and Other Modifications.    No amendment of any provision of this Guaranty (including a waiver thereof or consent relating thereto) shall be effective unless the same shall be in writing and signed by the Requisite Holders and the Guarantors.  Any waiver or consent relating to any provision of this Guaranty shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on a Guarantor in any case shall entitle such Guarantor to any other or further notice or demand in similar or other circumstances.

(b)     Cumulative Remedies; Failure or Delay.   The rights and remedies provided for under this Guaranty are cumulative and are not exclusive of any rights and remedies that may be available to any Holder under applicable law or otherwise.  No failure or delay on the part of any Holder in the exercise of any power, right or remedy under this Guaranty shall impair such power, right or remedy or shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or remedy preclude other or further exercise of such or any other power, right or remedy.

(c)     Notices.   All notices, requests, demands and other communications which are required or may be given under this Guaranty shall be in writing and shall be deemed to have been duly given if transmitted by telecopier with receipt acknowledged by the recipient, or upon delivery, if delivered personally or by recognized commercial courier with receipt acknowledged, or upon receipt, if mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

If to any Guarantor, to:

The Walking Company Holdings, Inc.
25 Anapamu
Santa Barbara, CA  93101
Attention:      Anthony Wall
Email:           tonyw@thewalkingcompany.com
Fax:              (805) 963-8727

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Attention:      Jeffrey N. Pomerantz, Esq.
Email:           jpomerantz@pszjlaw.com
Fax:              (310) 201-0760

If to any Holder, to the address provided to Parent or the Guarantors;

or at such other address or addresses as the Guarantors or any Holder, as the case may be, may specify by written notice given in accordance with this Section.

(d)    Successors and Assigns.  This Guaranty shall be binding upon each Guarantor and its successors and permitted assigns and shall inure to the benefit of the Holders and their respective successors and assigns.  No Guarantor shall assign any of its rights or delegate any of its obligations under this Guaranty without the prior written consent of the Required Holders (which consent may be withheld for any reason or no reason at all).  The benefits of this Guaranty shall automatically pass with any assignment of the Obligations or any portion thereof, to the extent of such assignment.

(e)    Entire Agreement.  This Guaranty, together with the other Note Documents, constitute the full and entire agreement and understanding between the Guarantors and the Holders relating to the subject matter hereof and supersede all prior oral and written, and all contemporaneous oral, agreements and understandings relating to the subject matter hereof.

(f)    Governing Law.  This Guaranty shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without regard to the choice of law or conflicts of law provisions thereof.

(g)    Jurisdiction; Consent to Service of Process.  Any suit, legal action or similar proceeding with respect to any dispute under or relating to this Guaranty or the transactions contemplated hereby shall be brought in the courts of the State of California sitting in the City of Los Angeles, State of California or of the United States for the Central District of California sitting in the City of Los Angeles, State of California, and by execution and delivery of this Note, each of the Guarantors and, by acceptance hereof, the Holders consents, for itself and in respect of its properties and assets, to the exclusive jurisdiction of such courts.  Each party irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection, including any objection to the laying of venue or based on the grounds of FORUM NON CONVENIENS, which it may now or hereafter have to the bringing of any suit, legal action or similar proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.  Each party irrevocably consents to service of process in any manner permitted by applicable law.

(h)    Severability.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future applicable law during the term thereof, such provision shall be fully severable, this Guaranty shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof, and the remaining provisions thereof shall remain in fill force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Guaranty a legal, valid, and enforceable provision as similar in terms to the illegal, invalid, or unenforceable provision as may be possible.

(i)    Independence of Covenants.  Each covenant under this Guaranty shall be given independent effect so that if a particular action or condition is not permitted by any such covenant, the fact that it would be permitted by another covenant, by an exception

thereto, or be otherwise within the limitations thereof, shall not avoid the occurrence of any Event of Default if such action is taken or condition exists.

(j) <u>Time of the Essence</u>. Time and exactitude in the performance of each of the covenants, conditions and agreements contained in this Guaranty are hereby declared to be of the essence.

(k) <u>Limitation of Liability</u>. No claim shall be made by any Guarantor against any Holder or any of its Affiliates, partners, directors, officers, employees, agents or representatives for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or under any other theory of liability arising out of or related to the transactions contemplated by this Guaranty, or any act, omission or event occurring in connection therewith. Each Guarantor waives, releases and agrees not to sue upon any claim for such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(l) <u>Further Assurances</u>. Each Guarantor covenants and agrees that it will from time to time, at its own expense, upon the request of any Holder, promptly execute and deliver to the Holder any additional instruments or other documents considered necessary by the Holder to cause this Guaranty to be, become or remain valid and effective in accordance with its terms. Each Guarantor will provide each Holder in writing with such financial and other information with respect to it and its assets as the Holder may request from time to time, in form satisfactory to the Holder.

(m) <u>Waiver of Trial by Jury</u>. EACH OF THE GUARANTORS AND THE HOLDERS HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO THIS GUARANTY, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT IT MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

(n) <u>Judicial Referee</u>. IN THE EVENT THE WAIVER PROVIDED IN SECTION 14(m) IS DEEMED INEFFECTIVE, TO GIVE EFFECT TO THE DESIRE OF EACH OF PARENT AND THE HOLDER THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING THE APPLICABLE LAW, THE PARTIES AGREE TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT AND LAW INVOLVED IN, ARISING OUT OF OR IN ANY WAY RELATING TO THIS GUARANTY, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED

HERETO (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS AND POST-TRIAL MOTIONS (E.G., MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE OR OTHERWISE) BETWEEN THE PARTIES, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A JUDICIAL REFERENCE PURSUANT TO SECTION 638 ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON ITS STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS. IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.

(o)     Amendment and Restatement. This Guaranty amends and restates the Existing Guaranty as of the date hereof, it being understood that this Guaranty is not a termination of the Existing Guaranty but is a modification (and, as modified, an extension and continuation) of the Existing Guaranty. This Guaranty shall supersede the Existing Guaranty only insofar as the two are inconsistent. Each of the Existing Guarantors hereby affirms, ratifies and approves in all respects the Existing Guaranty and their respective obligations thereunder, as amended, restated, extended and continued hereby, and each of the Guarantors hereby affirms, ratifies and approves in all respects this Guaranty, the terms and provisions hereof and their respective obligations hereunder.

(p)     Counterparts. This Guaranty may be executed in two or more counterparts and by facsimile transmission, each of which shall be deemed an original, but all of which together shall constitute one instrument.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the Guarantors have caused this Guaranty to be executed and delivered by their duly authorized representatives as of the date first written above.

THE WALKING COMPANY, a Delaware corporation, as a Guarantor

By: _____
Name:
Title:


BIG DOG USA, INC., a California corporation, as a Guarantor

By: _____
Name:
Title:


FOOTSMART, INC., a Delaware corporation, as a Guarantor

By: _____
Name:
Title:

SCHEDULE 1

List of Holders
(As of [_____], 2018)

[COMPANY TO PREPARE AND ATTACH LIST OF
HOLDERS WITH CORRESPONDING PRINCIPAL NOTE AMOUNTS]

EXHIBIT A

Form of
Joinder Agreement to Guaranty

THIS JOINDER AGREEMENT (this "Joinder Agreement"), dated as of [_____], 20[__], is made by [_____] (the "Joining Party"), in favor of the Holders (as defined in the Guaranty (as defined below)).

W I T N E S S E T H:

WHEREAS, The Walking Company, a Delaware corporation ("TWC"), Big Dog USA, Inc., a California corporation ("Big Dog"), FootSmart, Inc., a Delaware corporation ("FootSmart") and [_____] (collectively, the "Guarantors"), are party to that certain Amended and Restated Guaranty dated as of [_____], 2018 (as amended, supplemented and otherwise modified from time to time, the "Guaranty"), pursuant to which the Guarantors jointly and severally guarantied for the benefit of the Holders the full and punctual payment when due of all Guarantied Obligations owing by The Walking Company Holdings, Inc., a Delaware corporation ("Parent"), to the Holders from time to time. Unless otherwise indicated, all capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Guaranty;

WHEREAS, the Joining Party is a direct and wholly owned Subsidiary of Parent; and

WHEREAS, pursuant to the terms of the Amended and Restated Note, the Joining Party is joining, and becoming a party to, the Guaranty as a Guarantor thereunder;

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Joining Party hereby agrees as follows:

1.      The Joining Party hereby acknowledges that it has received and reviewed copies of the Amended and Restated Notes, the Guaranty, the Security Agreement and the other Note Documents and consents to their terms.

2.      The Joining Party hereby (a) joins the Guaranty and becomes a party thereto as a Guarantor with the same force and effect as if originally named therein as a Guarantor and (b) agrees to be bound by, and to perform, the covenants, obligations and agreements required to be performed by a Guarantor under the Guaranty.

3.      The Joining Party hereby acknowledges and agrees that when used in the Security Agreement, the term "Guarantor" or "Guarantors" shall be deemed to include the Joining Party.

4.      The Joining Party hereby represents and warrants that:

(a)      The Joining Party is duly organized or formed, validly existing and in good standing under the laws of [_____];

(b)     The Joining Party has all requisite power and authority to own and hold or lease the properties it purports to own, hold or lease, to carry on its business as currently conducted and as proposed to be conducted and to enter into and deliver this Joinder Agreement and to perform its obligations under the Guaranty;

(c)     Each of this Joinder Agreement and the Guaranty (as supplemented by this Joinder Agreement) constitutes the legal, valid and binding obligation of the Joining Party, enforceable against the Joining Party in accordance with their respective terms; and

(d)     The execution and delivery by the Joining Party of this Joinder Agreement and the performance by the Joining Party of the obligations of a Guarantor under the Guaranty do not and will not violate or conflict with, or cause a default under, or give rise to a right of termination under, (i) the charter or bylaws of the Joining Party, (ii) any applicable laws or (iii) any contract, indenture, note, mortgage, instrument or other agreement to which the Joining Party is a party or by which any of its properties or assets are bound.

5.     This Joinder Agreement shall inure to the benefit of the Holders and be binding upon the Joining Party and its successors and assigns.

6.     This Joinder Agreement may be executed in one or more counterparts and by facsimile transmission, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first written above.

<u>JOINING PARTY</u>

[_____]


By:_____
Name:_____
Title:_____

<u>ACKNOWLEDGED AND AGREED</u>:

[EXISTING GUARANTORS]

FORM OF
AMENDED AND RESTATED SECURITY AGREEMENT

THIS AMENDED AND RESTATED SECURITY AGREEMENT (this "Security Agreement"), dated as of [_____], 2018, is made by The Walking Company Holdings, Inc., a Delaware corporation (the "Parent"), The Walking Company, a Delaware corporation ("TWC"), Big Dog USA, Inc., a California corporation ("Big Dog"), FootSmart, Inc., a Delaware corporation ("FootSmart"), and each other Person that executes and delivers a joinder agreement in substantially the form attached as Exhibit A hereto (a "Joinder Agreement;" Parent, TWC, Big Dog, FootSmart and any such Person are referred to herein each as a "Grantor" and collectively as the "Combined Grantors"), on the one hand, in favor of [_____] (the "Secured Party"), on the other hand.

W I T N E S S E T H

WHEREAS, Parent, TWC and Big Dog (each an "Existing Grantor" and collectively the "Existing Grantors") are party to that certain Security Agreement dated as of March 17, 2009, as reaffirmed by that certain Guaranty and Security Reaffirmation Agreement dated as of May 23, 2014, and as further amended, supplemented or otherwise modified prior to the date hereof (as so amended, supplemented and modified, the "Existing Security Agreement"), pursuant to which the Combined Grantors granted in favor of the Secured Party a security interest in all right, title and interest of the Combined Grantors in and to all of the Collateral to secure the payment and performance when due of all Obligations (as defined therein), on the terms and conditions set forth therein. The Obligations include, among other things, all liabilities, agreements and other obligations of Parent owing to the Secured Party, including, among other things, the unpaid principal amount of, interest on and other amounts owing under a 8.375% Convertible Note Due 2019 issued to the Secured Party on or about May 23, 2014 (the "Existing Note");

WHEREAS, the Combined Grantors were debtors-in-possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in cases no. 18-10474 (LSS),18-10474 (LSS) and 18-10474 (LSS), jointly administered under case no. 18-10474 (LSS) (the "Cases"), pending in the United States Bankruptcy Court for the District of Delaware;

WHEREAS, pursuant to the First Amended Joint Plan of Reorganization filed in the Cases (the "Plan"), the Existing Note is being amended and restated in its entirety pursuant to the terms of an Amended and Restated 8.375% Notes due 2022 issued or to be issued to the Secured Party concurrently herewith (as amended, restated, supplemented, refinanced, replaced, exchanged or otherwise modified, the "Amended and Restated Note");

WHEREAS, in connection with the consummation of the Plan, the Existing Security Agreement is being amended and restated, and FootSmart has agreed to become an additional "Grantor," all on the terms and subject to the conditions contained herein; and

WHEREAS, the Combined Grantors are members of a consolidated group of entities whose success is mutually interdependent, and each of them has derived, and expects to continue to derive, substantial direct and indirect benefits from the proceeds of the borrowings made

available to Parent under the Existing Note, as amended and restated by the Amended and Restated Note;

RECITALS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce the Secured Party to enter into the Amendment, the Combined Grantors hereby amend and restate the Existing Security Agreement as follows:

1.    <u>Defined Terms</u>.  Unless otherwise defined herein, capitalized used herein without definition have the meanings ascribed to them in the Amended and Restated Note, and terms which are defined in the Uniform Commercial Code in effect in the State of New York on the date hereof are used herein as therein defined, and the following terms shall have the following meanings:

"<u>Code</u>" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"<u>Collateral</u>" shall have the meaning assigned to it in Section 2.

"<u>Combined Grantors</u>" shall mean, collectively, Parent and the other Grantors.

"<u>Event of Default</u>" shall have the meaning assigned to it in the Amended and Restated Note.

"<u>Lien</u>" shall mean any lien, security interest, claim, pledge, mortgage, deed of trust, charge or other encumbrance of any kind or nature.

"<u>Note Documents</u>" shall mean, collectively, this Security Agreement, the Amended and Restated Note, the Guaranty, the Note Purchase Agreement dated as of April 3, 2007 and all agreements, instruments or other documents heretofore or hereafter executed or delivered in connection with any of the foregoing, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Permitted Liens</u>" shall mean [Liens in favor of the Exit Facility Agent pursuant to the Exit Facility Loan Documents].

"<u>Secured Obligations</u>" shall mean, collectively, any and all present and future loans, advances, indebtedness, claims, guarantees, liabilities or obligations (monetary and non-monetary) of (i) Parent owing to the Secured Party from time to time, of whatever nature, character or description, including, without limitation, all principal, interest, debts, liabilities and obligations under the Amended and Restated Note and the other Note Documents and (ii) each Grantor owing to the Secured Party under this Security Agreement and any other Note Document to which such Grantor is a party, in each of clauses (i) and (ii), whether due or not due, direct or indirect, joint and/or several, absolute or contingent, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, now or hereafter existing, amended, renewed, extended, exchanged,

restated, refinanced, refunded or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether for principal, interest, premiums, fees, costs, expenses (including, without limitation, attorneys' fees) or other amounts incurred for administration, collection, enforcement or otherwise, whether or not arising after the commencement of any proceeding under the bankruptcy laws (including, without limitation, post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding, and whether or not recovery of any such obligation or liability may be barred by any statute of limitations or such Indebtedness, claim, liability or obligation may otherwise be unenforceable.

2.    Security Interest.

(a)    Grant.  As collateral security for the prompt and complete payment and performance when due (whether at the slated maturity, by acceleration or otherwise) of all Secured Obligations, each of Parent, TWC and Big Dog hereby ratifies its grant to the Secured Party of a continuing security interest in and to all of its right, title and interest in, and the Combined Grantors hereby further grant to the Secured Party a continuing security interest in and to all right, title and interest of the Combined Grantors in, all assets, property and rights of the Combined Grantors, whether now owned or hereafter acquired, including, without limitation: (i) Accounts;  (ii) Chattel  Paper;  (iii) Commercial  Tort  Claims;  (iv) Deposit  Accounts; (v) Documents;  (vi) Equipment;  (vii) Fixtures;  (viii) General  Intangibles  (including,  without limitation, patents, copyrights, trademarks, service marks and trade names and any applications therefor or registrations thereof, including, without limitation, those set forth on Schedule A hereto, payment intangibles and software, but excluding the BIG DOGS® and BIG DOG SPORTSWEAR® trademarks (the "Big Dog Marks")[1], and all other copyrights, graphic artwork, internet domain names, trademarks, patents or other intellectual property owned by Grantor relating to or derivative of the Big Dog Marks or relating to or used in the business of Big Dog); (ix) Goods;  (x) Instruments;  (xi) Inventory;  (xii) Investment  Property  and  Financial  Assets; (xiii) Letter-of-Credit  Rights  and  letters  of  credit;  (xiv) Money;  (xv) Supporting  Obligations; (xvi) insurance claims and proceeds; (xvii) books, records, computer programs, databases and other materials pertaining to any of the foregoing; and (xviii) Proceeds and products of any of the foregoing (collectively, the "Collateral").

3.    Rights of the Secured Party; Limitations on the Secured Party's Liability.

(a)    Combined Grantors Remain Liable.  Anything herein to the contrary notwithstanding, the Combined Grantors shall remain liable under each item of Collateral to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement with respect thereto.  The Secured Party shall not have any obligation or liability under any item of Collateral (or any agreement with respect thereto) by reason of or arising out of this Security Agreement or the receipt by the Secured Party of any payment relating to item of Collateral pursuant hereto, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Combined Grantors under or pursuant to any item of Collateral (or any agreement with respect thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment

---

[1] NTD:  EXCLUDED?

received by it or as to the sufficiency of any performance by any party under item of Collateral (or any agreement with respect thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     Collections.  The Secured Party hereby authorizes any of the Combined Grantors to collect all items of Collateral, provided that the Secured Party may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.  If required by the Secured Party at any time after the occurrence and during the continuance of an Event of Default, any payments on or with respect to any item of Collateral, when collected by any of the Combined Grantors, shall be forthwith (and, in any event, within two Business Days) delivered by any of the Combined Grantors to the Secured Party, in the exact form received, duly endorsed by any of the Combined Grantors to the Secured Party or, if required by the Secured Party, deposited by any of the Combined Grantors in a special collateral account maintained by the Secured Party, subject to withdrawal by the Secured Party only, and, until so delivered or deposited, shall be held by any of the Combined Grantors in trust for the Secured Party, segregated from other funds or assets of the Combined Grantors.  All Proceeds constituting collections of any item of Collateral while held by the Secured Party (or by any of the Combined Grantor in trust for the Secured Party) shall continue to be collateral security for all of the Secured Obligations and shall not constitute payment thereof until applied thereto by the Secured Party.  If an Event of Default shall have occurred and be continuing, at any time at the Secured Party's election, the Secured Party may apply all or any part of the property so delivered or the funds so deposited on account of the Secured Obligations in such order as the Secured Party may elect, and any part of such property or funds which the Secured Party elects not to apply and deems not required as collateral security for the Secured Obligations shall be paid over from time to time by the Secured Party to the Combined Grantors or to whomsoever may be lawfully entitled to receive the same.  At the Secured Party's request, the Combined Grantors shall deliver to the Secured Party all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to any item of Collateral, including, without limitation, all original orders, invoices and shipping receipts and original executed agreements, instruments and documents.

(c)     Title to Collateral.  The Combined Grantors represent and warrant to the Secured Party that it has good title to all of the Collateral, free and clear of all Liens and other adverse interests, other than the Permitted Liens, in favor of any Person other than the Secured Party.

4.     Covenants.  The Combined Grantors covenant and agree with the Secured Party that, from and after the date of this Security Agreement until all Secured Obligations are paid in full:

(a)     Further Documentation; Pledge.  At any time and from time to time, upon the written request of the Secured Party, and at the sole expense of the Combined Grantors, the Combined Grantors will promptly and duly execute and deliver such further instruments and documents and take such further action as the Secured Party may reasonably request for the purpose of obtaining or preserving the full benefits of this Security Agreement and of the rights and powers herein granted.  The Combined Grantors hereby authorize the Secured Party to tile or

record any financing or continuation statements under the Uniform Commercial Code in effect in any jurisdiction with respect to the Liens created hereby. A copy or other reproduction of this Security Agreement shall be sufficient as a financing statement for filing in any jurisdiction. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Chattel Paper, the Combined Grantors shall immediately deliver or cause the delivery to the Secured Party of such Instrument or Chattel Paper, duly endorsed in a manner satisfactory to the Secured Party, to be held as Collateral pursuant to this Security Agreement.

(b) <u>Indemnification</u>. The Combined Grantors agree to pay, and to save the Secured Party harmless from, any and all liabilities, reasonable costs and expenses (including, without limitation, legal fees and expenses) (i) with respect to, or resulting from, any delay in paying, any and all excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral, (ii) with respect to, or resulting from, any delay in complying with any law, rule, regulation or order of any court, arbitrator or governmental entity, jurisdiction or authority applicable to any of the Collateral or (iii) in connection with any of the transactions contemplated by this Security Agreement. In any suit, proceeding or action brought by the Secured Party under any item of Collateral for any sum owing thereunder, or to enforce any provisions of any item of Collateral, the Combined Grantors will save, indemnify and keep the Secured Party harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by the Combined Grantors of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Combined Grantors. The foregoing indemnification shall not apply to any liabilities, costs or expenses resulting directly from the gross negligence or willful misconduct of the Secured Party.

(c) <u>Maintenance of Records</u>. The Combined Grantors will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral, including without limitation, a record of all payments received and all credits granted with respect to all items of Collateral. For the Secured Party's further security, the Combined Grantors hereby grant to the Secured Party a security interest in all of the Combined Grantors' books and records pertaining to the Collateral, and upon the occurrence and during the continuance of an Event of Default, the Combined Grantors shall turn over any such books and records to the Secured Party or to its representatives at the request of the Secured Party.

(d) <u>Right of Inspection</u>. The Secured Party shall at all times have full and free access during normal business hours, and upon reasonable prior notice, to all the books of record and account of the Combined Grantors, and the Secured Party or its representatives may examine the same, take extracts therefrom and make photocopies thereof, and the Combined Grantors agree to render to the Secured Party, at the Combined Grantors' cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto. The Secured Party and its representatives shall at all times also have the right during normal business hours, and upon reasonable prior notice, to enter into and upon any premises where any of the Collateral is located for the purpose of inspecting the same or otherwise protecting its interests therein.

(e)    <u>Compliance with Laws, etc</u>.  The Combined Grantors will comply in all material respects with all laws, rules, regulations and orders of any court, arbitrator or governmental entity, jurisdiction or authority applicable to the Collateral or any part thereof or to the operation of the Combined Grantors' business; <u>provided</u>, <u>however</u>, that the Combined Grantors may contest any such law, rule, regulation or order in any reasonable manner which shall not, in the reasonable opinion of the Secured Party, adversely affect the Secured Party's rights or the priority of its Liens on the Collateral.

(f)    <u>Limitations on Dispositions of Collateral</u>.  The Combined Grantors will not sell, transfer, lease or otherwise dispose of any of the Collateral, or attempt, offer or contract to do so, except for sales of goods or services in the ordinary course of business.

(g)    <u>Maintenance of Collateral</u>.  The Combined Grantors will maintain each item of Collateral in good operating condition, ordinary wear and tear and immaterial impairments of value and damage by the elements excepted, and will provide all maintenance, service and repairs necessary for such purpose.

(h)    <u>Further Identification of Collateral</u>.  The Combined Grantors will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Secured Party may reasonably request, all in reasonable detail.

(i)    <u>Notices</u>.  The Grantor will promptly notify (in reasonable detail) the Security Agent of (i) any damage to or loss (including loss of use) or destruction of any material Collateral and (ii) the occurrence of any event, circumstance or condition giving rise to any Commercial Tort Claim of the Combined Grantors.

5.    <u>Secured Party's Appointment as Attorney-in-Fact</u>.

(a)    <u>Powers</u>.  The Combined Grantors hereby irrevocably constitute and appoint the Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Combined Grantors and in the name of the Combined Grantors or in its own name, from time to time in the Secured Party's discretion, for the purpose of carrying out the terms of this Security Agreement, to take any and all appropriate action and to execute any and all instruments which may be necessary or desirable to accomplish the purposes of this Security Agreement, and, without limiting the generality of the foregoing, the Combined Grantors hereby give the Secured Party the power and right, on behalf of the Combined Grantors, without notice to or assent by the Combined Grantors, to do the following:

(i)    at any time when the authority of the Combined Grantors to collect the item of Collateral has been curtailed or terminated pursuant to the first sentence of Section 3(c) hereof, or in the case of any Collateral, at any time when any Event of Default shall have occurred and is continuing, in the name of the Combined Grantors or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under

any item of Collateral or with respect to any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Secured Party for the purpose of collecting any and all such moneys due with respect to any Collateral whenever payable;

(ii) to pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for the terms of this Security Agreement and to pay all or any part of the premiums therefor and the costs thereof; and

(iii) Upon the occurrence and during the continuance of any Event of Default, (A) to direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Secured Party or as the Secured Party shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action or proceeding brought against the Combined Grantors with respect to any Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Combined Grantors' expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's Liens thereon and to effect the intent of this Security Agreement, all as fully and effectively as the Combined Grantors might do.

At the reasonable request of the Secured Party, the Combined Grantors shall deliver to the Secured Party, one or more further documents ratifying any and all actions that said attorneys shall lawfully take or do or cause to be taken or done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(b) Other Powers. The Combined Grantors also authorize the Secured Party, at any time and from time to time, to execute, in connection with the sales provided for in Section 7 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral.

(c)    No Duty on the Secured Party's Part.    The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interests in the Collateral and shall not impose any duty upon it to exercise any such powers.  The Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Combined Grantors for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

6.    Performance by the Secured Party of Combined Grantors' Obligations.    If the Combined Grantors fail to perform or comply with any of its agreements contained herein and the Secured Party, as provided for by the terms of this Security Agreement, shall itself perform or comply, or otherwise cause performance or compliance, with such agreement, the expenses of the Secured Party incurred in connection with such performance or compliance, together with interest thereon at a rate per annum equal to the Prime Rate plus 5%, shall be payable by the Combined Grantors to the Secured Party on demand and shall constitute Secured Obligations secured hereby.

7.    Remedies.

(a)    Upon Event of Default.    If any Event of Default shall occur and be continuing, the Secured Party may exercise, in addition to all other rights and remedies granted to it in this Security Agreement and in any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the Code.  Without limiting the generality of the foregoing, the Secured Party, without demand of performance or other demand, presentment, protest, or notice of any kind (except any notice required by law referred to below) to or upon the Combined Grantors or any other Person (all and each of which are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any pan of the Collateral so sold, free of any right or equity or redemption in the Combined Grantors, which right or equity is hereby waived or released.  The Combined Grantors further agree, at the Secured Party's request, to assemble the Collateral and make it available to the Secured Party at places which the Secured Party shall reasonably select, whether at the Combined Grantors' premises or elsewhere.  The Secured Party shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, in such order as the Secured Party may elect, and only after such application and after the payment by the Secured Party of any other amount required by any provision of law, including, without limitation, Section 9-615 of the Code, need the Secured

Party account for the surplus, if any, to the Combined Grantors.  To the extent permitted by applicable law, the Combined Grantors waive all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by the Secured Party of any of its rights hereunder, provided that such release shall not apply to any claim, damage or demand resulting directly from the gross negligence, actual willful misconduct or bad faith of the Secured Party.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least seven days before such sale or other disposition.  The Combined Grantors shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of any attorneys employed by the Secured Party to collect such deficiency.

(b)     Limitation Upon Exercise of Remedies.  Notwithstanding anything to the contrary contained in this Security Agreement, the exercise by the Secured Party of any right, power or remedy provided hereunder or by applicable law shall require the prior written consent of the Required Holders (as defined in the Amended and Restated Note), which consent may be withheld for any reason or no reason at all.

8.     Limitation on Duties Regarding Preservation of Collateral.  The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the Code or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account.  Neither the Secured Party nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Combined Grantors or otherwise.

9.     Security Interest Absolute.  All rights of the Secured Party, all security interests granted hereunder, and all obligations of the Grantors hereunder, shall be absolute and unconditional irrespective of (and the Grantors hereby waive):

(a)     the legality, validity or enforceability of this Security Agreement, the Amended and Restated Note, the Guaranty or any other Note Document, any Lien or any Collateral;

(b)     any renewal, extension or acceleration of, or any increase in the amount of the Secured Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, this Security Agreement, the Amended and Restated Note or any other Note Document;

(c)     any defense (other than payment), set-off or counterclaim that may be available to the Grantors at any time against, or any right of setoff at any time held by, the Secured Party;

(d)     any acts of commission or omission of any kind at any time on the part of the Secured Party with respect to any matter whatsoever;

(e)     the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any Lien securing, or the release of any or all Collateral securing, or purporting to secure, the Secured Obligations, or the impairment of any Collateral;

(f)     the liquidation or dissolution of any Grantor, any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or similar event or proceeding with respect to any Grantor, or any action taken by any trustee or receiver of any Grantor or by any court or any proceeding with respect to any Grantor;

(g)     any change of ownership of any Grantor, or any change in the relationship between any Grantor and any other Grantor (including, without limitation, the termination of such relationship);

(h)     any assignment or other transfer, in whole or in part, of the Secured Party's interest in or rights under the Amended and Restated Note or any other Note Document, including this Security Agreement, or of the Secured Party's interest in the Secured Obligations or the Collateral;

(i)     any cancellation, renunciation or surrender of any pledge, guaranty or any debt instrument evidencing the Secured Obligations; or

(j)     any other circumstance whatsoever (with or without notice to or knowledge of any Grantor), other than payment, whether or not similar to any of the foregoing, that constitutes, or might be construed to constitute, an equitable or legal discharge of any Grantor, in bankruptcy or in any other instance.

10.     Certain Waivers.  Each Grantor waives for the benefit of the Secured Party:

(a)     the right to require the Secured Party to proceed against any other Grantor, to proceed against or exhaust any Collateral or to pursue any other remedy in the Secured Party's power whatsoever, and the right to have the property of any other Grantor first applied to the discharge of the Secured Obligations;

(b)     all rights and benefits under Section 2809 of the California Civil Code and any similar applicable law purporting to reduce a surety's obligations in proportion to the obligation of the principal or providing that the obligation of a surety or guarantor must neither be larger nor in other respects more burdensome than that of the principal;

(c)     the benefit of any statute of limitations affecting the Secured Obligations or such Grantor's liability hereunder, including any benefit under Section 359.5 of the California Code of Civil Procedure and any similar applicable law;

(d)     any requirement of marshaling or any other principle of election of remedies;

(e)     any right to assert against the Secured Party any defense (legal or equitable), set-off, counterclaim and other right that such Grantor may now or any time hereafter have against any other Grantor;

10517858.3
DOCS_LA:314707.2 91893/002

(f)     presentment, demand for payment or performance (including diligence in making demands hereunder), notice of dishonor or nonperformance, protest, acceptance and notice of acceptance of this Security Agreement, and all other notices of any kind;

(g)     any rights, defenses and other benefits that such Grantor may have by reason of any failure of the Secured Party to hold a commercially reasonable public or private foreclosure sale or otherwise to comply with applicable law in connection with a disposition of Collateral;

(h)     all defenses that at any time may be available to such Grantor by virtue of any valuation, stay, moratorium or other law now or hereafter in effect, and ALL RIGHTS AND DEFENSES THAT ARE OR MAY BECOME AVAILABLE TO THE GRANTOR BY REASON OF SECTIONS 2787 TO 2855, INCLUSIVE, AND SECTION 3433 OF THE CALIFORNIA CIVIL CODE, AND ANY SIMILAR APPLICABLE LAWS; and

(i)     any failure, omission, delay or lack of diligence on the part of the Secured Party to enforce, assert or exercise any right, power or remedy conferred on the Secured Party in respect of the Secured Obligations.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH GRANTOR WAIVES ALL RIGHTS AND DEFENSES THAT IT MAY HAVE BECAUSE THE SECURED OBLIGATIONS OF ANY OTHER GRANTOR ARE NOW, OR MAY HEREAFTER BE, SECURED BY REAL PROPERTY.  THIS MEANS, AMONG OTHER THINGS, THAT:  (1) THE SECURED PARTY MAY COLLECT FROM EACH GRANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY SUCH GRANTOR OR ANY OTHER GRANTOR; (2) IF THE SECURED PARTY FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY SUCH GRANTOR OR ANY OTHER GRANTOR:  (A) THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE; (B) THE SECURED PARTY MAY COLLECT FROM THE GRANTOR EVEN IF THE SECURED PARTY, BY FORECLOSING ON SUCH REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT THE GRANTOR MAY HAVE TO COLLECT FROM ANY OTHER GRANTOR.  THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES ANY GRANTOR MAY HAVE BECAUSE THE DEBT OF SUCH GRANTOR OR ANY OTHER GRANTOR IS NOW, OR HEREAFTER MAY BE, SECURED BY REAL PROPERTY.  THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON SECTIONS 580a, 580b, 580d, OR 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE AND ANY SIMILAR APPLICABLE LAWS.

IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN ACCORDANCE WITH SECTION 2856 OF THE CALIFORNIA CIVIL CODE, EACH GRANTOR WAIVES ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY THE SECURED PARTY, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A GUARANTEED OBLIGATION, HAS DESTROYED THE GRANTOR'S RIGHTS OF

SUBROGATION AND REIMBURSEMENT AGAINST ANY OTHER GRANTOR OR OTHER OBLIGOR BY THE OPERATION OF SECTION 580d OF THE CODE OF CIVIL PROCEDURE OR OTHERWISE.

11.     Powers Coupled with an Interest.   All authorizations and agencies herein contained with respect to the Collateral are irrevocable and powers coupled with an interest.

12.     Severability.  Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.     Paragraph Headings.  The paragraph headings used in this Security Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

14.     No Waiver; Cumulative Remedies.   The Secured Party shall not by any act (except by a written instrument pursuant to Section 13 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of the Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law.

15.     Waivers and Amendments; Successors and Assigns.   None of the terms or provisions of this Security Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Combined Grantors and the Secured Party, provided that any provision of this Security Agreement may be waived by the Secured Party in a written letter or agreement executed by the Secured Party or by telex or facsimile transmission from the Secured Party.  This Security Agreement shall be binding upon the Combined Grantors and their respective successors and assigns and shall inure to the benefit of the Secured Party and its successors and assigns.

16.     Governing Law.  This Security Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

17.     Jurisdiction; Consent to Service of Process.   Any suit, legal action or similar proceeding with respect to any dispute under or relating to this Guaranty or the transactions contemplated hereby shall be brought in the courts of the State of California sitting in the City of Los Angeles, State of California or of the United States for the Central District of California sitting in the City of Los Angeles, State of California, and by execution and delivery of this Note,

each of the Combined Grantors and the Secured Party consents, for itself and in respect of its properties and assets, to the exclusive jurisdiction of such courts. Each party irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection, including any objection to the laying of venue or based on the grounds of <u>FORUM NON CONVENIENS</u>, which it may now or hereafter have to the bringing of any suit, legal action or similar proceeding in such jurisdiction in respect of this Security Agreement or the transactions contemplated hereby. Each party irrevocably consents to service of process in any manner permitted by applicable law.

18. <u>Waiver of Trial by Jury</u>. EACH OF THE COMBINED GRANTORS AND THE HOLDER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT IT MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

19. <u>Judicial Referee</u>. IN THE EVENT THE WAIVER PROVIDED IN SECTION 16 IS DEEMED INEFFECTIVE, TO GIVE EFFECT TO THE DESIRE OF EACH OF COMBINED GRANTORS AND THE HOLDER THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING THE APPLICABLE LAW, THE PARTIES AGREE TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT AND LAW INVOLVED IN, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS AND POST-TRIAL MOTIONS (E.G., MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE OR OTHERWISE) BETWEEN THE PARTIES, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A JUDICIAL REFERENCE PURSUANT TO SECTION 638 ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON ITS STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT. THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS. IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.

10517858.3
DOCS_LA:314707.2 91893/002

20.    <u>Amendment and Restatement</u>.  This Security Agreement amends and restates the Existing Security Agreement as of the date hereof, it being understood that this Security Agreement is not a termination of the Existing Security Agreement but is a modification (and, as modified, an extension and continuation) of the Existing Security Agreement.  This Security Agreement shall supersede the Existing Security Agreement only insofar as the two are inconsistent.  Each of the Existing Grantors hereby affirms, ratifies and approves in all respects the Existing Security Agreement and their respective obligations thereunder, as amended, restated, extended and continued hereby, and each of the Combined Grantors hereby affirms, ratifies and approves in all respects this Security Agreement, the terms and provisions hereof and their respective obligations hereunder.

21.    <u>Counterparts</u>.  This Security Agreement may be executed in two or more counterparts and by facsimile transmission, each of which shall be deemed an original, but all of which together shall constitute one instrument.

[Signature Page Follows]

10517858.3
DOCS_LA:314707.2 91893/002

IN WITNESS WHEREOF, the Combined Grantors have caused this Security Agreement to be duly executed and delivered in favor of the Secured Party as of the date first above written.

<u>GRANTORS</u>

THE WALKING COMPANY HOLDINGS, INC.


By:_____
Name:
Title:


THE WALKING COMPANY


By:_____
Name:
Title:


BIG DOG USA, INC.


By:_____
Name:
Title:


FOOTSMART, INC.


By:_____
Name:
Title:

SCHEDULE A

<u>List of Trademarks</u>

[COMPANY TO PREPARE UPDATED LIST]

EXHIBIT A

Form of
Joinder Agreement to Security Agreement

THIS JOINDER AGREEMENT (this "Joinder Agreement"), dated as of [_____], 20[__], is made by [_____] (the "Joining Party"), in favor of the "Secured Party" named on the signature page to the Security Agreement (as defined below).

W I T N E S S E T H:

WHEREAS, The Walking Company Holdings, Inc., a Delaware corporation ("Parent"), The Walking Company, a Delaware corporation ("TWC"), Big Dog USA, Inc., a California corporation ("Big Dog"), Footsmart, Inc., a Delaware corporation ("FootSmart"), and [_____] (collectively, the "Grantors"), are party to that certain Security Agreement dated as of [_____], 2018 (as amended, supplemented, reaffirmed or otherwise modified from time to time (as so amended, supplemented or modified from time to time, the "Security Agreement"), pursuant to which the Combined Grantors granted in favor of the Secured Party a security interest in all right, title and interest of the Combined Grantors in and to all of the Collateral to secure the payment and performance when due of the Secured Obligations, on the terms and conditions set forth therein. Unless otherwise indicated, all capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Security Agreement;

WHEREAS, the Joining Party is a direct and wholly owned Subsidiary of Parent; and

WHEREAS, pursuant to the terms of the Amended and Restated Note, the Joining Party is joining, and becoming a party to, the Security Agreement as a Grantor thereunder;

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Joining Party hereby agrees as follows:

1. The Joining Party hereby acknowledges that it has received and reviewed copies of the Security Agreement, the Amended and Restated Note, the Guaranty and all related instruments and agreements.

2. The Joining Party hereby (a) joins the Security Agreement and becomes a party thereto as a Grantor with the same force and effect as if originally named therein as a Grantor and (b) agrees to be bound by, and to perform, the covenants, obligations and agreements required to be performed by a Grantor under the Security Agreement. Without limiting the generality of the foregoing, the Joining Party hereby grants in favor of the Secured Party a security interest in all right, title and interest in and to the Collateral, whether now owned or hereafter acquired by the Joining Party, to secure the payment and performance when due of all Secured Obligations.

3. The Joining Party hereby acknowledges and agrees that each reference to a "Grantor" or "Combined Grantors" shall be deemed to include the Joining Party.

4.      The Joining Party hereby represents and warrants that:

(a)      The Joining Party is duly organized or formed, validly existing and in good standing under the laws of the [_____];

(b)      The Joining Party has all requisite power and authority to own and hold or lease the properties it purports to own, hold or lease, to carry on its business as currently conducted and as proposed to be conducted and to enter into and deliver this Joinder Agreement and to perform its obligations under the Security Agreement;

(c)      Each of this Joinder Agreement and the Security Agreement (as supplemented by this Joinder Agreement) constitutes the legal, valid and binding obligation of the Joining Party, enforceable against the Joining Party in accordance with their respective terms; and

(d)      The execution and delivery by the Joining Party of this Joinder Agreement and the performance by the Joining Party of the obligations of a Grantor under the Security Agreement do not and will not violate or conflict with, or cause a default under, or give rise to a right of termination under, (i) the charter or bylaws of the Joining Party, (ii) any applicable laws or (iii) any contract, indenture, note, mortgage, instrument or other agreement to which the Joining Party is a party or by which any of its properties or assets are bound.

5.      This Joinder Agreement shall inure to the benefit of the Secured Party and be binding upon the Joining Party and its successors and assigns.

6.      This Joinder Agreement may be executed in one or more counterparts and by facsimile transmission, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first written above.

JOINING PARTY

[_____]


By:_____
Name:_____
Title:_____


ACKNOWLEDGED AND AGREED:

[EXISTING GRANTORS]

<u>**EXHIBIT C**</u>

**Exit Facility Loan Agreement**

**CREDIT AGREEMENT**

Dated as of June [＿＿], 2018

among

THE WALKING COMPANY,
as the Lead Borrower

For

The Borrowers Named Herein

The Guarantors Named Herein

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
as Agent, L/C Issuer and Swing Line Lender,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
as Term Loan Agent

and

The Lenders Party Hereto,

**TABLE OF CONTENTS**

Page

Article I DEFINITIONS AND ACCOUNTING TERMS.............................................................. 1
    **1.01**     **Defined Terms.** ........................................................................................ 1
    **1.02**     **Other Interpretive Provisions.** ............................................................ 50
    **1.03**     **Accounting Terms** ................................................................................ 51
    **1.04**     **Rounding.** ............................................................................................. 51
    **1.05**     **Times of Day.** ....................................................................................... 51
    **1.06**     **Letter of Credit Amounts.** ................................................................... 51
    **1.07**     **Currency Equivalents Generally.** ....................................................... 51
Article II THE COMMITMENTS AND CREDIT EXTENSIONS ...................................... 52
    **2.01**     **Loans; Reserves.** .................................................................................. 52
    **2.02**     **Borrowings, Conversions and Continuations of Loans.** ...................... 53
    **2.03**     **Letters of Credit.** ................................................................................. 55
    **2.04**     **Swing Line Loans.** ............................................................................... 64
    **2.05**     **Prepayments.** ....................................................................................... 66
    **2.06**     **Termination or Reduction of Commitments.** ..................................... 68
    **2.07**     **Repayment of Loans.** .......................................................................... 68
    **2.08**     **Interest.** ................................................................................................ 69
    **2.09**     **Fees.** ...................................................................................................... 69
    **2.10**     **Computation of Interest and Fees.** ..................................................... 71
    **2.11**     **Evidence of Debt.** ................................................................................ 71
    **2.12**     **Payments Generally; Agent's Clawback.** ........................................... 72
    **2.13**     **Sharing of Payments by Lenders.** ....................................................... 73
    **2.14**     **Settlement Amongst Lenders.** ............................................................. 74
Article III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF
LEAD BORROWER .............................................................................................................. 75
    **3.01**     **Taxes.** ................................................................................................... 75
    **3.02**     **Illegality.** ............................................................................................. 77
    **3.03**     **Inability to Determine Rates.** ............................................................. 77
    **3.04**     **Increased Costs; Reserves on LIBO Rate Loans.** .............................. 77
    **3.05**     **Compensation for Losses.** ................................................................... 79
    **3.06**     **Mitigation Obligations; Replacement of Lenders.** ............................ 79
    **3.07**     **Survival.** .............................................................................................. 80
    **3.08**     **Designation of Lead Borrower as Borrowers' Agent.** ....................... 80
Article IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ............................. 80
    **4.01**     **Conditions of Initial Credit Extension.** .............................................. 80
    **4.02**     **Conditions to all Credit Extensions** ................................................... 85
Article V REPRESENTATIONS AND WARRANTIES ...................................................... 85
    **5.01**     **Existence, Qualification and Power.** ................................................... 86
    **5.02**     **Authorization; No Contravention.** ..................................................... 86
    **5.03**     **Governmental Authorization; Other Consents.** ................................. 86
    **5.04**     **Binding Effect.** .................................................................................... 86
    **5.05**     **Financial Statements; No Material Adverse Effect.** .......................... 86
    **5.06**     **Litigation.** ............................................................................................ 87
    **5.07**     **No Default.** ........................................................................................... 87
    **5.08**     **Ownership of Property; Liens.** ........................................................... 87

| 5.09 | Environmental Compliance. | 88 |
|---|---|---|
| 5.10 | Insurance. | 89 |
| 5.11 | Taxes. | 89 |
| 5.12 | ERISA Compliance. | 89 |
| 5.13 | Subsidiaries; Equity Interests. | 90 |
| 5.14 | Margin Regulations; Investment Company Act; | 90 |
| 5.15 | Disclosure. | 90 |
| 5.16 | Compliance with Laws. | 90 |
| 5.17 | Intellectual Property; Licenses, Etc. | 91 |
| 5.18 | Labor Matters. | 91 |
| 5.19 | Security Documents. | 91 |
| 5.20 | Solvency. | 92 |
| 5.21 | Deposit Accounts; Credit Card Arrangements. | 92 |
| 5.22 | Brokers. | 92 |
| 5.23 | Customer and Trade Relations. | 92 |
| 5.24 | Material Contracts. | 92 |
| 5.25 | Casualty. | 93 |
| 5.26 | OFAC/Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws. | 93 |
| **5.27** | **Confirmation Order\f c \l** | 93 |
| Article VI | AFFIRMATIVE COVENANTS | 93 |
| 6.01 | Financial Statements. | 93 |
| 6.02 | Certificates; Other Information. | 94 |
| 6.03 | Notices. | 96 |
| 6.04 | Payment of Obligations. | 97 |
| 6.05 | Preservation of Existence, Etc. | 98 |
| 6.06 | Maintenance of Properties. | 98 |
| 6.07 | Maintenance of Insurance. | 98 |
| 6.08 | Compliance with Laws. | 99 |
| 6.09 | Books and Records; Accountants. | 99 |
| 6.10 | Inspection Rights. | 100 |
| 6.11 | Use of Proceeds. | 100 |
| 6.12 | Additional Loan Parties. | 101 |
| 6.13 | Cash Management. | 101 |
| 6.14 | Information Regarding the Collateral. | 102 |
| 6.15 | Physical Inventories. | 103 |
| 6.16 | Environmental Laws. | 103 |
| 6.17 | Further Assurances. | 104 |
| 6.18 | Compliance with Terms of Leaseholds. | 104 |
| 6.19 | Material Contracts. | 104 |
| Article VII | NEGATIVE COVENANTS | 105 |
| 7.01 | Liens. | 105 |
| 7.02 | Investments. | 105 |
| 7.03 | Indebtedness; Disqualified Stock. | 105 |
| 7.04 | Fundamental Changes. | 105 |

| | | |
|---|---|---|
| 7.05 | Dispositions. | 106 |
| 7.06 | Restricted Payments. | 106 |
| 7.07 | Prepayments of Indebtedness. | 106 |
| 7.08 | Change in Nature of Business. | 107 |
| 7.09 | Transactions with Affiliates. | 107 |
| 7.10 | Burdensome Agreements. | 107 |
| 7.11 | Use of Proceeds. | 107 |
| 7.12 | Amendment of Material Documents. | 108 |
| 7.13 | Fiscal Year. | 108 |
| 7.14 | Deposit Accounts; Credit Card Processors. | 108 |
| 7.15 | Financial Covenant. | 108 |
| 7.16 | Confirmation Order. | 109 |
| 7.17 | Consignment. | 109 |

Article VIII EVENTS OF DEFAULT AND REMEDIES ... 109

| | | |
|---|---|---|
| 8.01 | Events of Default. | 109 |
| 8.02 | Remedies Upon Event of Default. | 112 |
| 8.03 | Application of Funds. | 114 |
| 8.04 | Separate Claims and Separate Classifications. | 116 |

Article IX THE AGENT ... 116

| | | |
|---|---|---|
| 9.01 | Appointment and Authority. | 116 |
| 9.02 | Rights as a Lender. | 117 |
| 9.03 | Exculpatory Provisions | 117 |
| 9.04 | Reliance by Agent and Term Loan Agent. | 118 |
| 9.05 | Delegation of Duties. | 118 |
| 9.06 | Resignation of Agent | 118 |
| 9.07 | Non-Reliance on Agent or Term Loan Agent and Other Lenders. | 119 |
| 9.08 | No Other Duties, Etc. | 120 |
| 9.09 | Agent May File Proofs of Claim. | 120 |
| 9.10 | Collateral and Guaranty Matters. | 120 |
| 9.11 | Notice of Transfer. | 121 |
| 9.12 | Reports and Financial Statements. | 121 |
| 9.13 | Agency for Perfection. | 122 |
| 9.14 | Indemnification of Agent. | 122 |
| 9.15 | Relation among Lenders. | 122 |
| 9.16 | Defaulting Lenders. | 122 |
| 9.17 | Co-Syndication Agent; Documentation Agent and Co-Lead Arrangers. | 125 |

Article X MISCELLANEOUS ... 125

| | | |
|---|---|---|
| 10.01 | Amendments, Etc. | 125 |
| 10.02 | Notices; Effectiveness; Electronic Communications. | 127 |
| 10.03 | No Waiver; Cumulative Remedies. | 129 |
| 10.04 | Expenses; Indemnity; Damage Waiver. | 129 |
| 10.05 | Payments Set Aside. | 131 |
| 10.06 | Successors and Assigns. | 131 |
| 10.07 | Treatment of Certain Information; Confidentiality. | 135 |

| | | |
|---|---|---|
| **10.08** | **Right of Setoff**. | 136 |
| **10.09** | **Interest Rate Limitation**. | 136 |
| **10.10** | **Counterparts; Integration; Effectiveness**. | 136 |
| **10.11** | **Survival**. | 136 |
| **10.12** | **Severability**. | 137 |
| **10.13** | **Replacement of Lenders**. | 137 |
| **10.14** | **Governing Law; Jurisdiction; Etc.** | 138 |
| **10.15** | **Waiver of Jury Trial**. | 139 |
| **10.16** | **No Advisory or Fiduciary Responsibility**. | 139 |
| **10.17** | **Patriot Act; Due Diligence.** | 139 |
| **10.18** | **Reserved**. | 140 |
| **10.19** | **Time of the Essence**. | 140 |
| **10.20** | **Press Releases.** | 140 |
| **10.21** | **Additional Waivers.** | 140 |
| **10.22** | **No Strict Construction.** | 142 |
| **10.23** | **Attachments.** | 142 |
| **10.24** | **Keepwell.** | 142 |
| SIGNATURES | | S-1 |

(iv)

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.05 | Supplement to Interim Financial Statements |
| 5.06 | Litigation |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.09 | Environmental Matters |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments; Equity Interests in the Parent |
| 5.17 | Intellectual Property Matters |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 6.02 | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.02(a) | Investment Policy |
| 7.03 | Existing Indebtedness |
| 7.09 | Affiliate Transactions |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

***Form of***

| | |
|---|---|
| A | LIBO Rate Loan Notice |
| B | Swing Line Loan Notice |
| C-1 | Note |
| C-2 | Swing Line Note |
| C-3 | Term Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Borrowing Base Certificate |
| G | Credit Card Notification |
| H | DDA Notification |

CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of June [     ], 2018, among

THE WALKING COMPANY, a Delaware corporation (the "Lead Borrower"),

the Persons named on Schedule 1.01 hereto (together with the Lead Borrower, collectively, the "Borrowers"),

the Persons named on Schedule 1.02 hereto (collectively, the "Guarantors"),

each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"),

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Agent, L/C Issuer and Swing Line Lender; and

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Term Loan Agent;

WHEREAS, on March 6, 2018, the Lead Borrower and the other Loan Parties commenced cases under Chapter 11 of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), case number 18-10474 (LSS) (the "Chapter 11 Case") by filing voluntary petitions for relief under Chapter 11 with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Lead Borrower and such other Loan Parties continued to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on June [15], 2018, the Bankruptcy Court entered a Confirmation Order (as defined below) confirming the Chapter 11 Plan (as defined below); and

The Borrowers have requested that the Lenders provide a revolving credit facility and a term loan facility, and the Lenders have indicated their willingness to lend and the L/C Issuer has indicated its willingness to issue Letters of Credit, in each case on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of the Approved Foreign Vendor or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent, to the order of the Agent, (c) names the Agent as a notify party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent), and (e) is on terms otherwise reasonably acceptable to the Agent.

"Accommodation Payment" as defined in Section 10.21(d).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term "Account" includes health-care-insurance receivables.

"Account Party" has the meaning specified therefor in Section 2.03(i) of this Agreement.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) an investment in, or a purchase of, a Controlling interest in the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit, division or line of business of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or of any business unit, division or line of business of another Person, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations of any Person, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.17.

"Adjustment Date" means the first day of each Fiscal Quarter, commencing October 1, 2018.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 20% or more of any class of the Equity Interests of that Person, and (iv) any other Person 20% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Wells Fargo in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent Parties" shall have the meaning specified in Section 10.02(c).

"Agent's Office" means the Agent's address and account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the Lenders. As of the Closing Date, the Aggregate Revolving Commitments are $50,000,000.

"Agreement" means this Credit Agreement.

"Allocable Amount" has the meaning specified in Section 10.21(d).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Lenders" means the Required Lenders, the Required Revolving Lenders, the Required Term Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means:

(a)    From and after the Closing Date until the first Adjustment Date, the percentages set forth in Level III of the pricing grid below; and

(b)    From and after the first Adjustment Date and on each Adjustment Date thereafter, the Applicable Margin shall be determined from the following pricing grid based upon the Average Daily Availability as of the Fiscal Quarter ended immediately preceding such Adjustment Date; provided, if the foregoing financial statements or any Borrowing Base Certificates are at any time restated or otherwise revised (including as a result of an audit) or if the information set forth in such financial statements or any Borrowing Base Certificates otherwise proves to be false or incorrect such that the Applicable Margin would have been higher than was otherwise in effect during any period, without constituting a waiver of any Default or Event of Default arising as a result thereof, interest due under this Agreement shall be immediately recalculated at such higher rate for any applicable periods and shall be due and payable on demand.

| Level | Average Daily Excess Availability | LIBOR Margin | Base Rate Margin | Commercial Letter of Credit Fee | Standby Letter of Credit Fee |
|---|---|---|---|---|---|
| I | >$15,000,000 | 2.00% | 1.00% | 1.50% | 2.00% |
| II | ≤$15,000,000 but >$7,500,000 | 2.25% | 1.25% | 1.75% | 2.25% |
| III | ≤$7,500,000 | 2.50% | 1.50% | 2.00% | 2.50% |

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Commitment at such time, (b) with respect to any Term Lender at any time, the portion of the Term Loan represented by the outstanding principal balance of such Term Lender's Term Loan at such time, or (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment and the outstanding principal balance of such Lender's Term Loan at such time, in each case as the context provides. If the commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 2.06

or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender shall be determined based on the Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraisal Percentage" means 90%.

"Appraised Value" means the appraised orderly liquidation values, net of costs and expenses to be incurred in connection with any such liquidation, which values are expressed as one or more percentages of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Lead Borrower, which values shall be determined from time to time by the most recent appraisals undertaken by an independent appraisers engaged by the Agent.

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its Permitted Discretion, (b) has received timely payment or performance of all obligations owed to it by the Loan Parties, (c) has not asserted and has no right to assert any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (d), if so requested by the Agent, has entered into and is in full compliance with the terms of a Foreign Vendor Agreement.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit E or any other form approved by the Agent.

"Audited Financial Statements" means the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Year ended December 31, 2017, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Parent and its Subsidiaries, including the notes thereto.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a)    The Loan Cap

Minus

(b)    The Total Revolving Outstandings.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Revolving Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to Section 2.06, and (c) the date of termination of the commitment of each Lender to make Loans and of the obligation of the L/C Issuer to make L/C Credit Extensions pursuant to Section 8.02.

"Availability Reserves" means, without duplication of any other Reserves or items to the extent such items are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (d) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Borrower, (v) customer credit liabilities consisting of the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrowers entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, (b) outstanding merchandise credits of the Borrowers, and (c) liabilities in connection with frequent shopping programs of the Borrowers, (vi) deposits made by customers with respect to the purchase of goods or the performance of services and layaway obligations of the Borrowers, (vii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral, (ix) amounts due to vendors on account of consigned goods, (x) Cash Management Reserves, (xi) Bank Products Reserves, (xii) royalties payable in respect of licensed merchandise; and (xiii) reserves for Plan Payments.

"Average Daily Availability" means, for any Fiscal Quarter, an amount equal to the sum of Availability for each day of such Fiscal Quarter divided by the actual number of days in such Fiscal Quarter, as determined by the Agent, which determination shall be conclusive absent manifest error.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning provided in the recitals to this Agreement.

"Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Bank Products" means any services or facilities provided to any Loan Party by the Agent or any of its Affiliates (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, and (e) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Product Reserves" means such reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate to reflect the liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* one-half of one percent (0.50%); (b) the LIBOR Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis) *plus* one percent (1.00%)), and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero). Any change in such rate announced by Wells Fargo shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Big Dog" means Big Dog USA, Inc., a California corporation.

"Big Dog License Agreement" means that certain Amended and Restated License Agreement, dated as of June 7, 2012 among Big Dog Licensing, LLC and Big Dog, as amended and in effect on the Closing Date.

"Blocked Account" has the meaning provided in Section 6.13(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent and Term Loan Agent, establishing control, pursuant to Section 9-104 of the UCC or other applicable section of the UCC, of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained in which any funds of any of the Loan Parties from one or more DDAs are concentrated and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing" means a Revolving Credit Borrowing, Term Borrowing, or a Swing Line Borrowing, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

> (a)      85% multiplied by the face amount of Eligible Credit Card Receivables of the Borrowers (net of Receivables Reserves applicable thereto);
>
> plus

(b)     the Cost of Eligible Inventory of the Lead Borrower and Big Dog, net of Inventory Reserves, multiplied by the product of Appraisal Percentage multiplied by the Appraised Value of Eligible Inventory; provided, however, the amount of Availability generated by Eligible In-Transit Inventory shall not at any time exceed $7,500,000;

plus

(c)     85% multiplied by the face amount of Eligible Trade Receivables of the Lead Borrower (net of Receivables Reserves applicable thereto);

minus

(d)     the Minimum Excess Availability Reserve;

minus

(e)     the amount of all Availability Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit F hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower, which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent or Term Loan Agent.

"Business" means any business that involves the sale, at retail or wholesale, of footwear, for health and wellness products, casual apparel and/or related accessories, or franchising of businesses selling the same.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located and, if such day relates to any LIBO Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with Wells Fargo, and in the name of, the Agent (or as the Agent shall otherwise direct)

and under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(k) or 8.02(a)(iii).

"Cash Collateralize" has the meaning specified in Section 2.03(k). Derivatives of such term have corresponding meanings.

"Cash Management Reserves " means such reserves as the Agent, from time to time, determines in its Permitted Discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by the Agent or any of its Affiliates, including, without limitation: (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit or debit cards, (d) credit card processing services, and (e) purchase cards.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) Permitted Holders shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in the Parent representing more than fifty percent (50%) of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of the Parent on a fully-diluted basis (and taking into account all such securities that Permitted Holders have the right to acquire pursuant to any option right);

(b) during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals

referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(c)     any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party; or

(d)     the Parent fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Chapter 11 Plan" shall mean the plan of reorganization and related disclosure statement of the Loan Parties filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code and approved by the Bankruptcy Court pursuant to a Confirmation Order, or once obtained, a Final Order.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent and Term Loan Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent or Term Loan Agent may reasonably require.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the L/C Issuer.

"Commitment" means such Lender's Revolving Commitment or Term Commitment, as applicable.

"Committed Revolving Loan" has the meaning specified in Section 2.01.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Concentration Account" has the meaning provided in Section 6.13(b).

"Confirmation Order" shall have the meaning provided in Section 4.01(o)(ii).

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent or Term Loan Agent, as applicable, of a proposed course of action to be followed by the Agent or Term Loan Agent, as applicable, without such Lender's giving the Agent or Term Loan Agent, as applicable, written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consolidated EBITDA" means, at any date of determination, an amount equal to Consolidated Net Income of the Parent and its Subsidiaries on a Consolidated basis for the most recently completed Measurement Period, plus (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges, (ii) the provision for Federal, state, local and foreign income Taxes, (iii) depreciation and amortization expense and (iv) other non-recurring expenses reducing such Consolidated Net Income which do not represent a cash item in such period or any future period (in each case of or by the Parent and its Subsidiaries for such Measurement Period), minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax credits and (ii) all non-cash items increasing Consolidated Net Income (in each case of or by the Parent and its Subsidiaries for such Measurement Period), all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Fixed Charge Coverage Ratio" means, at any date of determination, the ratio of (a) (i) Consolidated EBITDA for such period minus (ii) Capital Expenditures made during such period minus (iii) the aggregate amount of Federal, state, local and foreign income taxes paid in cash during such period to (b) the sum of (i) Debt Service Charges plus (ii) the aggregate amount of all Restricted Payments, in each case, of or by the Parent and its Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Interest Charges" means, for any Measurement Period, the sum of (a) all interest, premium payments, debt discount, fees, charges and related expenses in connection with borrowed money (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts, but excluding any non-cash or deferred interest financing costs, (b) all interest paid or payable with respect to discontinued operations and (c) the portion of rent expense with respect to such period under Capital Lease Obligations that is treated as interest in accordance with GAAP minus (d) interest income during such period (excluding any portion of interest income representing accruals of amounts received in a previous period), in each case of or by the Parent and its Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP.

"Consolidated Net Income" means, as of any date of determination, the net income of the Parent and its Subsidiaries for the most recently completed Measurement Period, all as determined on a Consolidated basis in accordance with GAAP, provided, however, that there shall be excluded therefrom (a) extraordinary gains and extraordinary losses for such Measurement Period, (b) the income (or loss) of such Person during such Measurement Period in which any other Person has a joint interest, except to the extent of the amount of cash dividends or other distributions actually paid in cash to such Person during such period, (c) the income (or loss) of such Person during such Measurement Period and accrued prior to the date it becomes a Subsidiary of a Person or any of such Person's Subsidiaries or is merged into or consolidated with a Person or any of its Subsidiaries or that Person's assets are acquired by such Person or any of its Subsidiaries, and (d) the income of any direct or indirect Subsidiary of a Person to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, except that the Parent's equity in any net loss of any such Subsidiary for such Measurement Period shall be included in determining Consolidated Net Income.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through Visa, U.S.A., Inc. or Visa International and American Express, Discover, and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.13(a)(i).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) the Term Loan Agent, (iv) each L/C Issuer, (v) the Arranger, (vi) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (vii) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (viii) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable out-of-pocket expenses incurred by the Agent and its Affiliates in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements (A) of counsel for the Agent, (B) of outside consultants and advisors for the Agent, (C) of appraisers or third party valuation services , (D) of commercial finance examinations, (E) imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (F) with respect to photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits and (F) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein (including reasonable costs and expenses relative to the rating of any Loan, CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the credit facilities), (B) the preparation, negotiation, administration (including travel, meals, and lodging), management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral, including, without limitation , in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, or (D) third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Credit Parties' relationship with any Loan Party or any of its Subsidiaries, or (E) any workout, restructuring, proceeding under any Debtor Relief Laws or negotiations in respect of any Obligations or (F) defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or (G) in taking any enforcement action or any Remedial Action with respect to the Collateral, and (iii) all customary fees and charges (as adjusted from time to time) (A) of the Agents with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (B) imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party and (b) costs or expenses (including taxes and insurance premiums) required to be paid by any Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by any Credit Party and (c) with respect to the L/C Issuer, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (d) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent, the L/C Issuer or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customs Broker/Carrier Agreement" means an agreement in form and substance satisfactory to the Agent and Term Loan Agent among a Borrower, a customs broker, freight forwarder, consolidator or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject

Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent, Term Loan Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"DDA Notification" has the meaning provided therefor in <u>Section 6.13(b)</u>.

"Debt Repayment Conditions" means, at the time of determination with respect to any specified payment, that each of the following have been satisfied as determined by Agent and Term Agent in their Permitted Discretion: (a) no Default or Event of Default then exists or would arise as a result of making such payment; (b) (1) Borrowers shall have Availability of greater than Seven Million Five Hundred Thousand Dollars ($7,500,000) as of the date of such payment after giving effect to such payment and (2) based on pro forma projections furnished by Borrowers to Agent and Term Agent within ten (10) days prior to the date of such payment which are reasonably satisfactory to Agent, Borrowers are projected to continue to have greater than Seven Million Five Hundred Thousand Dollars ($7,500,000) of Availability at all times during the six (6) month period following such payment and after giving effect to such payment. Prior to, or substantially simultaneously with, the making of any payment which is subject to the Debt Repayment Conditions, the Borrowers shall deliver to the Agent and Term Agent evidence of satisfaction of the conditions contained in clause (b) above on a basis (including, without limitation, giving due consideration to results for prior periods) reasonably satisfactory to the Agent and Term Agent.

"Debt Service Charges" means for any Measurement Period, the sum of (a) Consolidated Interest Charges paid or required to be paid for such Measurement Period, plus (b) principal payments made or required to be made on account of Indebtedness (excluding the Obligations and any Synthetic Lease Obligations but including, without limitation, Capital Lease Obligations) for such Measurement Period, in each case determined on a Consolidated basis in accordance with GAAP.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means (a) when used with respect to Obligations other than Letter of Credit Fees and the Term Loan, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Margin, if any, applicable to Base Rate Loans, plus (iii) 2% per annum; provided, however, that with respect to a LIBO Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Margin) otherwise applicable to such Loan plus 2% per annum, (b) when used with respect to Letter of Credit Fees, a rate equal to the Applicable Margin for Standby Letters of Credit or Commercial Letters of Credit, as applicable, plus 2% per annum, and (c) when used with respect to the Term Loan, a rate equal to the Term Loan Interest Rate plus 2% per annum.

"Defaulting Lender" means any Revolving Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement within two (2) Business Days of the date that it is required to do so under this Agreement (including the failure to make available to the Agent amounts

required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified the Borrowers, the Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by the Agent) under which it has committed to extend credit, (d) failed, within two (2) Business Days after written request by the Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to the Agent or any other Lender any other amount required to be paid by it under the Agreement within two (2) Business Days of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Committed Revolving Loans that are Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale, transfer, license or other disposition of (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith .

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature; provided, however, that (i) only the portion of such Equity Interests which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock and (ii) with respect to any Equity Interests issued to any employee or to any plan for the benefit of employees of the Lead Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Lead Borrower or one of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, resignation, death or disability and if any class of Equity Interest of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of an Equity Interest that is not Disqualified Stock, such Equity Interests shall not be deemed to be Disqualified Stock. Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Stock solely because the holders thereof have the right to require a Loan Party to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Stock.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"Early Termination Fee" has the meaning set forth in Section 2.09(b).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) in the case of an assignment of a Revolving Commitment, a bank, insurance company, or company engaged in the business of making commercial loans, which Person, together with its Affiliates, has a combined capital and surplus in excess of $250,000,000; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) (x) in the case of an assignment of a Revolving Commitment, the Agent, the L/C Issuer and the Swing Line Lender, and (y) in the case of an assignment of any portion of the Term Loan, the Term Loan Agent, and (ii) unless an Event of Default has occurred and is continuing, the Lead Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination, as determined by the Agent in its Permitted Discretion: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to a Borrower from a Credit Card Issuer or Credit Card Processor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (i) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, such Credit Card Receivable shall indicate no Person other than a Borrower as payee or remittance party. In determining the amount to be so included, the face amount of a Credit Card Receivable shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a

Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Credit Card Receivable but not yet applied by the Loan Parties to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

       (a)     Credit Card Receivables which do not constitute a "payment intangible" (as defined in the UCC);

       (b)     Credit Card Receivables that have been outstanding for more than four (4) Business Days from the date of sale;

       (c)     Credit Card Receivables (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

       (d)     Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

       (e)     Credit Card Receivables as to which the Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

       (f)     Credit Card Receivables due from a Credit Card Issuer or Credit Card Processor which is the subject of any bankruptcy or insolvency proceedings;

       (g)     Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or Credit Card Processor with respect thereto;

       (h)     Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables; or

       (i)     Credit Card Receivables which the Agent determines in its Permitted Discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine in its Permitted Discretion.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory of the Lead Borrower or Big Dog:

       (a)     Which has been shipped from a foreign location for receipt by the Lead Borrower or Big Dog, but which has not yet been delivered to such Borrower, which In-Transit Inventory has been in transit for forty-five (45) days or less from the date of shipment of such Inventory;

       (b)     For which the purchase order is in the name of the Lead Borrower or Big Dog and title and risk of loss has passed to such Borrower;

       (c)     For which an Acceptable Document of Title has been issued, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which

evidence ownership of the subject Inventory (such as, if requested by the Agent, by the delivery of a Customs Broker/Carrier Agreement);

      (d)    Which is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

      (e)    the Foreign Vendor with respect to such In-Transit Inventory is an Approved Foreign Vendor; and

      (f)    Which otherwise would constitute Eligible Inventory;

provided that the Agent may, in its discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory, and (ii) items of Inventory of the Lead Borrower and Big Dog that are finished goods, merchantable and readily saleable to the public in the ordinary course of such Borrowers' business and deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrowers in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below as determined by the Agent in its Permitted Discretion. Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

      (a)    Inventory that is not solely owned by the Lead Borrower or Big Dog or such Borrower does not have good and valid title thereto;

      (b)    Inventory that is leased by or is on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party;

      (c)    Inventory (other than Eligible In-Transit Inventory) that is not located in the United States of America (excluding territories or possessions of the United States);

      (d)    Inventory that is not located at a location that is owned or leased by a Borrower, except (i) Inventory in transit between such owned or leased locations or locations which meet the criteria set forth in clause (ii) below, or (ii) to the extent that the Borrowers have furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location on terms reasonably acceptable to the Agent;

      (e)    Inventory that is located: (i) in a distribution center or warehouse leased by a Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement, or (ii) at any leased location in a Landlord Lien State unless the applicable lessor has delivered to the Agent a Collateral Access Agreement or has waived any and all Liens and other rights of distraint in form and substance reasonably satisfactory to the Agent and Term Agent; provided that as to any such location the Administrative Agent, from time to time in its Permitted Discretion, may require a Collateral Access Agreement (except to the extent a Landlord Reserve

is in effect in an amount acceptable to the Collateral Agent in its Permitted Discretion) or the Agent has implemented Reserves for such location;

(f)     Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, restrictive or custom items, work-in-process, raw materials, perishable food product, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in a Borrower's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in material compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, (vi) are bill and hold goods, (vii) have been returned or rejected by the Loan Parties' customers;

(g)     Inventory that is not subject to a perfected first-priority security interest in favor of the Agent;

(h)     Inventory that is not insured in compliance with the provisions of <u>Section 5.10</u> hereof;

(i)     Inventory that has been sold but not yet delivered or as to which a Borrower has accepted a deposit;

(j)     Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which any Loan Party or any of its Subsidiaries has received notice of a dispute in respect of any such agreement; or

(k)     Inventory acquired in a Permitted Acquisition or which is not of the type usually sold in the ordinary course of the Borrowers' business, unless and until the Agent has completed or received (A) an appraisal of such Inventory from appraisers satisfactory to the Agent and establishes an advance rate and Inventory Reserves (if applicable) therefor, and otherwise agrees that such Inventory shall be deemed Eligible Inventory, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Agent.

"Eligible Trade Receivables" means Accounts deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base arising from the sale of the Borrowers' Inventory (but excluding, for the avoidance of doubt, Credit Card Receivables) that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Account (i) has been earned by performance and represents the bona fide amounts due to a Borrower from an account debtor, and in each case originated in the ordinary course of business of such Borrower, and (ii) in each case is acceptable to the Agent in its Permitted Discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (s) below as determined by the Agent in its Permitted Discretion.  Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than a Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Eligible Trade Receivable.  Except as otherwise agreed by

the Agent, any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)      Accounts that are not evidenced by an invoice;

(b)      Accounts that have been outstanding for more than sixty (60) days from the date of sale or more than forty-five (45) days past the due date;

(c)      Accounts due from any account debtor which is obligated on any accounts described in clause (b), above.

(d)      All Accounts owed by an account debtor and/or its Affiliates together exceed twenty-five percent (25%) (or, solely with respect to Accounts owed from Brown's Shoes, thirty-five percent (35%)) of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of the applicable percentages may be deemed Eligible Trade Receivables, in the Agent's Permitted Discretion);

(e)      Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good, valid and marketable title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(f)      Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(g)      Accounts which arise out of any sale made not in the ordinary course of business, made on a basis other than upon credit terms usual to the business of the Borrowers (for the avoidance of doubt, consignment sales in the ordinary course of the Wholesale Account Locations shall not be excluded solely as a result of this clause (g));

(h)      Accounts which are owed by any account debtor whose principal place of business is not within the continental United States;

(i)      Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)      Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agent have been duly obtained, effected or given and are in full force and effect;

(k)      Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)      Accounts due from any Governmental Authority except to the extent that the subject account debtor is the federal government of the United States of America and has complied with the Federal Assignment of Claims Act of 1940 and any similar state legislation;

(m)　　Accounts (i) owing from any Person that is also a supplier to or creditor of a Loan Party or any of its Subsidiaries or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom;

(n)　　Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis (other than consignments in connection with the Wholesale Account Locations) or subject to any right of return, set off or charge back;

(o)　　Accounts arising out of sales to account debtors outside the United States;

(p)　　Accounts payable other than in Dollars or that are otherwise on terms other than those normal and customary in the Loan Parties' business;

(q)　　Accounts evidenced by a promissory note or other instrument;

(r)　　Accounts consisting of amounts due from vendors as rebates or allowances;

(s)　　Accounts which are in excess of the credit limit for such account debtor established by the Loan Parties in the ordinary course of business and consistent with past practices;

(t)　　Accounts owing from any franchisees as franchise fees;

(u)　　Accounts which include extended payment terms (datings) beyond those generally furnished to other account debtors in the ordinary course of business (for the avoidance of doubt, consignment sales in the ordinary course of business of the Wholesale Account Locations shall not be excluded solely as a result of this clause (u));

(v)　　Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity; or

(w)　　Accounts which either the Agent or Term Agent determines in its Permitted Discretion to be unacceptable for borrowing.

"Enforcement Action" means the exercise by the Agent in good faith of any of its enforcement rights and remedies as a secured creditor hereunder or under the other Loan Documents, applicable Law or otherwise at any time upon the occurrence and during the continuance of an Event of Default (including, without limitation, the solicitation of bids from third parties to conduct the liquidation of the Collateral, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers or other third parties for the purposes of valuing, marketing, promoting and selling the Collateral, the commencement of any action to foreclose on the security interests or Liens of Agent in or on all or any material portion of the Collateral, notification of account debtors to make payments to the Agent, any action to take possession of all or any portion of the Collateral or commencement of any legal proceedings or actions against or with respect to all or any portion of the Collateral).

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the

environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 and 4971 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification to the Lead Borrower or any ERISA Affiliate that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination of a Pension Plan or a Multiemployer Plan under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Lead Borrower or any ERISA Affiliate; or (g) the determination that any Pension Plan is considered to be an "at-risk" plan, or that any Multiemployer Plan is considered to be in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 or 305 of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Loan Party of (including by virtue of the joint and several liability provisions of Section 10.21), or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to Section 3.01(a), (d) any U.S. federal, state or local backup withholding tax, and (e) any U.S. federal withholding tax imposed under FATCA.

"Existing Credit Agreements" the Pre-Petition Credit Agreement and the DIP Credit Agreement.

"DIP Credit Agreement" means that certain Debtor-In-Possession Loan and Security Agreement dated as of March 6, 2018 among the Loan Parties, Wells Fargo Bank, National Association, as agent and as term agent, and a syndicate of lenders (as amended and in effect on the date hereof).

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"Facility Guaranty" means the Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Factored Receivables" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with Wells Fargo or any of its Affiliates pursuant to a

factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"Family Member" means, with respect to any individual, any other individual having a relationship by blood (to the second degree of consanguinity), marriage, or adoption to such individual.

"Family Trusts" means, with respect to any individual, trusts or other estate planning vehicles established for the benefit of such individual and Family Members of such individual and in respect of which such individual serves as trustee or in a similar capacity.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and (a) any current or future regulations or official interpretations thereof, (b) any agreements entered into pursuant to Section 1471(b)(1) of the IRC, and (c) any intergovernmental agreement entered into by the United States (or any fiscal or regulatory legislation, rules, or practices adopted pursuant to any such intergovernmental agreement entered into in connection therewith).

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Fee Letter" means the amended and restated letter agreement, dated as of the date hereof, among the Borrowers, the Agent and the Term Loan Agent.

"Final Order" shall mean an order or judgment of the Bankruptcy Court as entered on the docket of the Clerk of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which the time to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last day of each March, June, September and December of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve (12) consecutive months ending on December 31st of any calendar year.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Vendor" means a Person that sells In-Transit Inventory to a Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance satisfactory to the Agent and pursuant to which, among other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of a Borrower purchased from such Foreign Vendor.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means the Parent, each Subsidiary of the Parent (other than any CFC), and each other Subsidiary of the Parent that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) All Indebtedness of such Person (i) in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligations, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in <u>Section 10.04(b)</u>.

"Information" has the meaning specified in <u>Section 10.07</u>.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Intercompany Advances" means loans or advances (i) from either Borrower to each other or Parent, any Subsidiary or any Affiliate, or (ii) from Parent, any Subsidiary or any Affiliate to either Borrower.

"Intercompany Subordinated Note" means that certain master intercompany note entered into between the Loan Parties and their Subsidiaries and Affiliates and TWC-Bermuda, dated as of the Closing Date, as may be amended, restated, replaced or otherwise modified in accordance with the terms thereof, which shall contain, among other provisions, subordination language, whereby the Parent, and each Subsidiary and another Affiliate, as applicable, subordinates the obligations of the Borrowers to Parent, Subsidiary or Affiliate, as applicable, to the Obligations of the Borrowers to Agent, Term Loan Agent, and Lenders hereunder.

"Interest Payment Date" means, (a) as to the Term Loan, the first calendar day of each month and the applicable Maturity Date; (b) as to any other LIBO Rate Loan, the last day of each Interest Period applicable to such Loan and the applicable Maturity Date; and (c) as to any Base Rate Loan (including a Swing Line Loan), the first day after the end of each month and the applicable Maturity Date.

"Interest Period" means, as to each LIBO Rate Loan, the period commencing on the date such LIBO Rate Loan is disbursed or converted to or continued as a LIBO Rate Loan and ending on the date one, two, or three months thereafter, as selected by the Lead Borrower in its LIBO Rate Loan Notice; provided that:

      (i)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

      (ii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period;

      (iii)      no Interest Period shall extend beyond the applicable Maturity Date; and

(iv)    notwithstanding the provisions of clause (iii), no Interest Period shall have a duration of less than one (1) month, and if any Interest Period applicable to a LIBO Borrowing would be for a shorter period, such Interest Period shall not be available hereunder.

For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Parent's and/or its Subsidiaries' internal controls over financial reporting, in each case as described in the Securities Laws.

"In-Transit Inventory" means Inventory of the Lead Borrower or Big Dog which is in the possession of a common carrier and is in transit from a Foreign Vendor of a from a location outside of the continental United States to a location of the Lead Borrower or Big Dog that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its Permitted Discretion with respect to the determination of the salability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's Permitted Discretion, include (but are not limited to) reserves based on:

(a)    Obsolescence;

(b)    Seasonality;

(c)    Shrink;

(d)    Imbalance;

(e)    Change in Inventory character;

(f)    Change in Inventory composition;

(g)    Change in Inventory mix;

(h)    Markdowns (both permanent and point of sale);

(i)    Retail markons and markups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

(j)    Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition, or (d) any other investment of money or capital in order to obtain a profitable return. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any Subsidiary) or in favor of the L/C Issuer and relating to any such Letter of Credit.

"Joinder" means an agreement, in form satisfactory to the Agent and Term Loan Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

"Landlord Lien State" means such state(s) in which a landlord's claim for rent may have priority over the Lien of the Agent in any of the Collateral.

"Laws" means each international, foreign, Federal, state and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof, or the renewal thereof.

"L/C Issuer" means Wells Fargo in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder (which successor may only be a Revolving Lender selected by the Agent in its discretion). The L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the L/C Issuer and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, , the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus (b) the aggregate amount of outstanding reimbursement obligations with respect to Letters of Credit which remain unreimbursed or which have not been paid through a Committed Revolving Loan. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has

expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lead Borrower" has the meaning assigned to such term in the preamble of this Agreement.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means individually, a Revolving Lender or a Term Lender (and, as the context requires, includes the Swing Line Lender), and, collectively, all such Persons.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"Letter of Credit Disbursement" means a payment made by the L/C Issuer pursuant to a Letter of Credit.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Revolving Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Exposure" means, as of any date of determination with respect to any Lender, such Lender's participation in the L/C Obligations pursuant to Section 2.03(f) on such date.

"Letter of Credit Fee" has the meaning specified in Section 2.03(l).

"Letter of Credit Indemnified Costs" has the meaning specified in Section 2.03(f).

"Letter of Credit Related Person" has the meaning specified in Section 2.03(f).

"Letter of Credit Sublimit" means an amount equal to $10,000,000. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Commitments. A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Lead Borrower's option, less than) the Aggregate Revolving Commitments.

"LIBO Borrowing" means a Borrowing comprised of LIBO Rate Loans.

"LIBO Rate" means the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Agent may designate from time to time) as of 11:00 a.m., London time, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the

LIBO Rate Loan requested (whether as an initial LIBO Rate Loan or as a continuation of a LIBO Rate Loan or as a conversion of a Base Rate Loan to a LIBO Rate Loan) by Borrowers in accordance with this Agreement (and, if any such published rate is below zero, then the LIBO Rate shall be deemed to be zero). Each determination of the LIBO Rate shall be made by the Agent and shall be conclusive in the absence of manifest error. If such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate per annum determined by the Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by Wells Fargo and with a term equivalent to such Interest Period would be offered to Wells Fargo by major banks in the London interbank eurodollar market in which Wells Fargo participates at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"LIBO Rate Loan" means a Committed Revolving Loan that bears interest at a rate based on the LIBO Rate.

"LIBO Rate Loan Notice" means a notice for a LIBO Borrowing or continuation pursuant to Section 2.02(b), which shall be substantially in the form of Exhibit A.

"LIBOR Unavailability" means and period of time during which the Lenders have made a determination that it is unlawful or impractical to make, maintain or fund LIBOR Rate Loans or determine or charge interest rates based upon the LIBO Rate in accordance with Section 3.02 or the Lenders are otherwise unable to determine such rate in accordance with Section 3.03.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Law as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going out of business", "store closing", or other similarly themed sale or other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrowers under Article II in the form of a Committed Revolving Loan, a Swing Line Loan, or a Term Loan.

"Loan Account" has the meaning assigned to such term in Section 2.11(a).

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments or (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, each Issuer Document, the Fee Letter, the Intercompany Subordinated Note, Note Financing Subordination Agreement and any other Subordination Agreements, all Borrowing Base Certificates, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, the Security Documents, the Facility Guaranty, each Request for Credit

Extension, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of any Cash Management Services and Bank Products provided by the Agent or any of its Affiliates, each as amended and in effect from time to time.

"Loan Parties" means, collectively, the Borrowers and each Guarantor.

"London Business Day" means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

"Margin Stock" as defined in Regulation U of the FRB as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Loan Party or the Parent and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or any Lender under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other then existing events would result in a Material Adverse Effect.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $2,000,000 or more in any Fiscal Year or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person, excluding any Lease.

"Material Indebtedness" means (a) the Plan Payments and (b) and other Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $2,000,000. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the Revolving Maturity Date or Term Maturity Date, as applicable.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently completed four Fiscal Quarters of the Parent or, if fewer than four consecutive Fiscal Quarters of the Parent have been completed since the Closing Date, the Fiscal Quarters of the Parent that have been completed since the Closing Date.

"Minimum Excess Availability Reserve" means a Reserve in an amount equal to the greater of (a) ten percent (10%) of the Aggregate Revolving Commitments, and (b) $5,000,000.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Lead Borrower or any ERISA Affiliate makes or is obligated

to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents) and (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)); and

(b) with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(iii).

"Note" means (a) a Revolving Note, (b) a Term Note, and (c) the Swing Line Note, as each may be amended, restated, supplemented or modified from time to time.

"Note Financing" means the Amended and Restated 8.375% Convertible Notes Due 2022 issued by the Parent pursuant to that certain Convertible Note Purchase Agreement, dated as of April 13, 2007, by Parent in the original aggregate amount of $18,500,000, as amended and in effect on the date hereof.

"Note Financing Subordination Agreement" means that certain First Amended and Restated Subordination Agreement dated as of March 20, 2009 by, among others, the Noteholders, the Loan Parties and Agent, in form and substance satisfactory to the Agent and Term Agent, as ratified pursuant to those certain Reaffirmation and Confirmation Agreements dated as of April 27, 2010, June 5, 2014, as amended and restated by that certain Second Amended and Restated Subordination Agreement of Junior Creditor dated as of the date hereof, and as may be further amended, restated, or otherwise modified from time to time.

"Noteholders" mean each of the holders of any "Convertible Notes" issued pursuant to the Note Financing.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (a) all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect

of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest ,fees, costs, expenses and indemnities are allowed claims in such proceeding, and (b) any Other Liabilities; provided that the Obligations shall not include any Excluded Swap Obligations.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Liabilities" means (a) any obligation on account of (i) any Cash Management Services furnished to any of the Loan Parties or any of their Subsidiaries and/or (ii) any transaction with the Agent or any of its Affiliates, which arises out of any Bank Product entered into with any Loan Party and any such Person, as each may be amended from time to time.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means (i) with respect to Committed Revolving Loans and Swing Line Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Committed Revolving Loans and Swing Line Loans, as the case may be, occurring on such date; (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, and (iii) with respect to Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of Term Loans occurring on such date.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Parent" means has the meaning assigned to such term in the preamble of this Agreement.

"Participant" has the meaning specified in Section 10.06(d).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended).

"Payment Conditions" means, at the time of determination with respect to any specified transaction or payment, that (a) no Default or Event of Default then exists or would arise as a result of entering into such transaction or the making of such payment, (b) before and after giving effect to such transaction or payment, Availability is greater than $12,500,000, and (c) after giving effect to such transaction or payment, (i) projected Availability as of the end of each Fiscal Month during any subsequent projected six (6) Fiscal Months will be equal to or greater than $12,500,000, and (ii) the Consolidated Fixed Charge Coverage Ratio, for each of the twelve (12) months immediately preceding the date of such transaction or payment for which the Agent and Term Loan Agent have received financial statements shall be equal to or greater than 1.00:1.00 after giving pro forma effect to such transaction or payment as if such transaction had been entered into or such payment had been made as of the first day of such twelve-month period. Prior to undertaking any transaction or payment which is subject to the Payment Conditions, the Loan Parties shall deliver to the Agent and Term Loan Agent (i) an updated Borrowing Base Certificate giving effect to the payment or transaction and (ii) evidence of satisfaction of the conditions contained in clause (c) above on a basis (including, without limitation, giving due consideration to results for prior periods) reasonably satisfactory to the Agent and Term Loan Agent.

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Acquisition" means an Acquisition occurring on or after the first anniversary of the Closing Date, in which all of the following conditions are satisfied:

(a)     No Default or Event of Default then exists or would arise from the consummation of such Acquisition;

(b)     Such Acquisition shall have been approved by the Board of Directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such Acquisition and such Person shall not have announced that it will oppose such Acquisition or shall not have commenced any action which alleges that such Acquisition shall violate applicable Law;

(c)     The Lead Borrower shall have furnished the Agent with fifteen (15) days' prior written notice of such intended Acquisition and shall have furnished the Agent with a current draft of the acquisition documents (and final copies thereof as and when executed), a summary of any due diligence undertaken by the Loan Parties in connection with such Acquisition, appropriate financial statements of the Person which is the subject of such Acquisition, pro forma projected financial statements for the twelve (12) month period following such Acquisition after giving effect to such Acquisition (including balance sheets, cash flows and income statements by month for the acquired Person, individually, and on a Consolidated basis with all Loan Parties), and such other information as the Agent may reasonably require, all of which shall be reasonably satisfactory to the Agent;

(d)     Either (i) the legal structure of the Acquisition shall be acceptable to the Agent and Term Loan Agent in their Permitted Discretion, or (ii) the Loan Parties shall have provided the Agent and Term Loan Agent with a favorable solvency opinion from an unaffiliated third party valuation firm reasonably satisfactory to the Agent and Term Loan Agent;

(e)     After giving effect to the Acquisition, if the Acquisition is an Acquisition of the Equity Interests, a Loan Party shall acquire and own, directly or indirectly, a majority of the Equity Interests in the Person being acquired and shall Control a majority of any voting interests or shall otherwise Control the governance of the Person being acquired;

(f)     Any assets acquired shall be utilized in, and if the Acquisition involves a merger, consolidation or Acquisition of Equity Interests, the Person which is the subject of such Acquisition shall be engaged in, a business otherwise permitted to be engaged in by a Borrower under this Agreement;

(g)     If the Person which is the subject of such Acquisition will be maintained as a Subsidiary of a Loan Party, such Subsidiary shall have been joined as a "Borrower" hereunder or as a Guarantor, as the Agent shall determine, and the Agent shall have received a first priority security and/or mortgage interest in such Subsidiary's Equity Interests, Inventory, Accounts, Real Estate and other property of the same nature as constitutes collateral under the Security Documents; and

(h)     The Loan Parties shall have satisfied the Payment Conditions; provided, however, the Borrowers may make Acquisitions in an aggregate amount not to exceed One Million Dollars ($1,000,000) (whether such compensation is in cash, tangible property, notes or other property) in any Fiscal Year without having to satisfy the Payment Conditions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Disposition" means any of the following:

(a)     Dispositions of inventory in the ordinary course of business;

(b)     non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(c)     licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(d)     Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary and is not replaced with similar property having at least equivalent value;

(e)     sales, transfers and Dispositions among the Loan Parties or by any Subsidiary to a Loan Party;

(f)    delivery of Inventory and Equipment on consignment in connection with the Wholesale Account Locations solely to the extent, and in such amounts, permitted under this Agreement;

(g)    sales, transfers and Dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party; and

(h)    an assignment of assets by Big Dog pursuant to the Big Dog License Agreement;

provided, however, no Dispositions of Related Intellectual Property made to any Person (other than a Loan Party) shall constitute a Permitted Disposition unless such Disposition is subject to a non-exclusive royalty-free license of such Related Intellectual Property in favor of the Agent and Term Loan Agent for use in connection with the exercise of rights and remedies of the Secured Parties under the Loan Documents in respect of the Collateral, which license shall be substantially similar to the license described in Section 6.1 of the Security Agreement (or otherwise reasonably satisfactory to the Agent and Term Loan Agent); provided further that, in the case of a Disposition of Related Intellectual Property licensed by the Parent or one of its Subsidiaries from any Person (other than a Loan Party or any Subsidiary thereof), the transferee shall not be required to provide the license described in the foregoing proviso if not permitted to do so under the license from such other Person.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Law, arising in the ordinary course of business and securing obligations that are not overdue or are being contested in compliance with Section 6.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)    easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)    Liens existing on the Closing Date and listed on Schedule 7.01 and any Permitted Refinancings thereof;

(h)       Liens on fixed or capital assets acquired by any Loan Party which are permitted under clause (c) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of such fixed or capital assets and (iii) such Liens shall not extend to any other property or assets of the Loan Parties;

(i)       Liens in favor of the Agent;

(j)       statutory Liens of landlords and lessors in respect of rent not in default;

(k)       possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and Permitted Investments, provided that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)       Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)       Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n)       voluntary Liens on property (other than property of the type included in the Borrowing Base) in existence at the time such property is acquired pursuant to a Permitted Acquisition or on such property of a Subsidiary of a Loan Party in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition; provided, that such Liens are not incurred in connection with or in anticipation of such Permitted Acquisition and do not attach to any other assets of any Loan Party or any Subsidiary;

(o)       Liens in favor of customs and revenues authorities imposed by applicable Law arising in the ordinary course of business in connection with the importation of goods solely to the extent the following conditions are satisfied: (A) such Liens secure obligations that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation; and

(p)       Liens securing the Note Financing, and Borrowers' guarantees of the Note Financing, which Liens shall be subject and subordinate in all respects to the Liens securing the Obligations to Agent and Lenders under this Agreement and the other Loan Documents pursuant to the terms of the Note Financing Subordination Agreement.

"Permitted Holder"  means each of (a) Fred Kayne, Richard Kayne, and Andrew Feshbach, and each of their respective Family Members and Family Trusts, and (b) additional entities formed for the purpose of holding the Equity Interest of Parent, so long as such entities are wholly-owned by one or more persons described in clause (a).

"Permitted Indebtedness" means each of the following as long as no Default or Event of Default exists or would arise from the incurrence thereof:

(a)     Indebtedness outstanding on the Closing Date and listed on Schedule 7.03 and any Permitted Refinancing thereof;

(b)     Indebtedness of any Loan Party to any other Loan Party;

(c)     purchase money Indebtedness of any Loan Party to finance the acquisition of any personal property consisting solely of fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and Permitted Refinancings thereof, provided, however, that the aggregate principal amount of Indebtedness permitted by this clause (c) shall not exceed $1,500,000 at any time outstanding and further provided that, if requested by the Agent, the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent;

(d)     contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of Stores;

(e)     Indebtedness incurred for the construction or acquisition or improvement of, or to finance or to refinance, any Real Estate owned by any Loan Party (including therein any Indebtedness incurred in connection with sale-leaseback transactions permitted hereunder and any Synthetic Lease Obligations), provided that, (A) all Net Proceeds received in connection with any such Indebtedness are applied to the Obligations, and (B) the Loan Parties shall use commercially reasonable efforts to cause the holders of such Indebtedness and the lessors under any sale-leaseback transaction to enter into a Collateral Access Agreement on terms reasonably satisfactory to the Agent and Term Loan Agent;

(f)     Indebtedness with respect to the deferred purchase price for any Permitted Acquisition, provided that such Indebtedness does not require the payment in cash of principal (other than in respect of working capital adjustments) prior to the Revolving Maturity Date, has a maturity which extends beyond the Revolving Maturity Date, and is subordinated to the Obligations on terms reasonably acceptable to the Agent and Term Loan Agent;

(g)     Indebtedness of any Person that becomes a Subsidiary of a Loan Party in a Permitted Acquisition, which Indebtedness is existing at the time such Person becomes a Subsidiary of a Loan Party (other than Indebtedness incurred solely in contemplation of such Person's becoming a Subsidiary of a Loan Party);

(h)     the Obligations;

(i)     the Plan Payments; and

(j)     Indebtedness not otherwise specifically described herein in an aggregate principal amount not to exceed $500,000 at any time outstanding.

"Permitted Investments" means each of the following as long as no Default or Event of Default exists or would arise from the making of such Investment:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)     commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)     Fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)     Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)     Investments existing on the Closing Date, and set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)     (i)     Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties (other than the Parent), and (iii) additional Investments by Subsidiaries of the Loan Parties that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(h)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)     Guarantees constituting Permitted Indebtedness;

(j)　　　Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(k)　　　advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $100,000 in the aggregate at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(l)　　　Investments constituting Permitted Acquisitions;

(m)　　　Capital contributions made by any Loan Party to another Loan Party; and

(n)　　　Other Investments not otherwise specifically described herein and not exceeding $500,000 in the aggregate at any time outstanding.

provided, however, that notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) and clause (p) shall be permitted unless (i) either (A) no Loans, or, if then required to be Cash Collateralized, Letters of Credit are then outstanding, or (B) the Investment is a temporary Investment pending expiration of an Interest Period for a LIBO Rate Loan, the proceeds of which Investment will be applied to the Obligations after the expiration of such Interest Period, and (ii) such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent;

provided further, that notwithstanding the foregoing, no such Investments specified in clauses (k), (l) or (n) shall be permitted until after the first anniversary of the Closing Date;

provided further, with respect to any Permitted Investment consisting of (a) assets included in the Borrowing Base, the Loan Parties shall, contemporaneously therewith, deliver to the Agent and Term Loan Agent an updated Borrowing Base, giving effect to such Investment; and (b) Related Intellectual Property, such Investment of Related Intellectual Property in any Person (other than a Loan Party) shall not constitute a Permitted Investment unless such Investment is subject to a non-exclusive royalty-free license of such Related Intellectual Property in favor of the Agent and Term Loan Agent for use in connection with the exercise of rights and remedies of the Secured Parties under the Loan Documents in respect of the Collateral, which license shall be substantially similar to the license described in Section 6.1 of the Security Agreement (or otherwise reasonably satisfactory to the Agent and Term Loan Agent); provided further that, in the case of an Investment of Related Intellectual Property licensed by any Loan Party from any Person (other than a Loan Party or any Subsidiary thereof), the transferee shall not be required to provide the license described in the foregoing proviso if not permitted to do so under the license from such other Person.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)　　　Is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)　　　Is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)　　　Is made to pay any other amount chargeable to any Loan Party hereunder; and

(d) Together with all other Permitted Overadvances then outstanding, shall not (i) exceed (A) until the Term Loan has been paid in full, five percent (5%) of the Borrowing Base at any time, unless the Term Loan Agent so consents, in which case, an amount up to ten percent (10%) of the Borrowing Base at any time, and (B) at all times thereafter, ten percent (10%) of the Borrowing Base at any time, or (ii) unless a Liquidation is occurring, remain outstanding for more than forty-five (45) consecutive Business Days, unless in each case, the Required Lenders otherwise agree; provided, however, until the Term Loan shall have been paid in full, such Permitted Overadvances may

provided however, that the foregoing shall not (i) modify or abrogate any of the provisions of Section 2.03 regarding the Revolving Lenders' obligations with respect to Letters of Credit or Section 2.04 regarding the Revolving Lenders' obligations with respect to Swing Line Loans, or (ii) result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder, and further provided that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Commitments, or any portion thereof, pursuant to Section 2.06 or Section 8.02 hereof).

"Permitted Refinancing" means, with respect to any Person, any Indebtedness issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund (collectively, to "Refinance"), the Indebtedness being Refinanced (or previous refinancings thereof constituting a Permitted Refinancing); provided, that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest and premiums thereon and underwriting discounts, defeasance costs, fees, commissions and expenses), (b) the weighted average life to maturity of such Permitted Refinancing is greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced (c) such Permitted Refinancing shall not require any scheduled principal payments due prior to the Revolving Maturity Date, (d) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Credit Parties as those contained in the documentation governing the Indebtedness being Refinanced (e) no Permitted Refinancing shall have direct or indirect obligors who were not also obligors of the Indebtedness being Refinanced, or greater guarantees or security, than the Indebtedness being Refinanced, (f) such Permitted Refinancing shall be otherwise on terms not materially less favorable to the Credit Parties than those contained in the documentation governing the Indebtedness being Refinanced, including, without limitation, with respect to financial and other covenants and events of default, (g) the interest rate applicable to any such Permitted Refinancing shall not exceed the then applicable market interest rate, and (h) at the time thereof, no Default or Event of Default shall have occurred and be continuing.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate, other than a Multiemployer Plan.

"Plan Payments" means those certain disbursement amounts that the Loan Parties are obligated to pay under the Chapter 11 Plan after (but not on) the effective date of such Chapter 11 Plan, including

without limitation, administrative claims, tax priority claims, priority non-tax claims and various other claims, in all cases, in accordance with the Chapter 11 Plan.

"Platform" has the meaning specified in <u>Section 6.02</u>.

"Portal" has the meaning specified in Section 2.02.

"Prepayment Event" means:

      (a)      any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

      (b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

      (c)      the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, (ii) as consideration for a Permitted Acquisition or (iii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

      (d)      the incurrence by a Loan Party of any Indebtedness for borrowed money;

      (e)      the receipt by any Loan Party of any Extraordinary Receipts.

"Pre-Petition Credit Agreement" means that certain Third Amended and Restated Loan and Security Agreement dated as of June 5, 2014, among the Borrowers, the Guarantors, the Lenders, the Agent, and Term Agent (as amended and in effect as of the date hereof).

"Public Lender" has the meaning specified in <u>Section 6.02</u>.

"Public Market" shall exist if (a) a Public Offering has been consummated and (b) any Equity Interests of the Parent have been distributed by means of an effective registration statement under the Securities Act of 1933.

"Public Offering" means a public offering of the Equity Interests of the Parent pursuant to an effective registration statement under the Securities Act of 1933.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in the Agent's Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, on account of dilution.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified by the Securities Laws and shall be independent of the Parent and its Subsidiaries as prescribed by the Securities Laws.

"Related Intellectual Property" means such rights with respect to the Intellectual Property of the Loan Parties as are reasonably necessary to permit the Agent and Term Loan Agent to enforce their respective rights and remedies under the Loan Documents with respect to the Collateral, or the disposition of which would otherwise materially adversely affect the Appraised Value of the Collateral of the Loan Parties.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means (a) with respect to a Borrowing, conversion or continuation of Committed Revolving Loans or the Term Loan (or a portion thereof), an electronic notice via the Portal or LIBO Rate Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"Required Lenders" means, as of any date of determination, the Required Revolving Lenders and Required Term Lenders.

"Required Revolving Lenders" means, as of any date of determination, (a) if only one (1) Revolving Lender, then such Revolving Lender, and (b) if more than one (1) Revolving Lender, then at least two (2) unaffiliated Revolving Lenders holding more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the Commitment of each Revolving Lender to make Committed Revolving Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to Section 8.02, at least two (2) unaffiliated Revolving Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolving Outstandings (with the aggregate amount of each Revolving Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Revolving Lender for purposes of this definition); provided, that the Revolving Commitment of, and the portion of the Total Revolving Outstandings held or deemed held by,

any Defaulting Lender or Deteriorating Lender shall be excluded for purposes of making a determination of Required Revolving Lenders; provided further, if there is more than

"**Required Term Lenders**" means, as of any date of determination, (a) if only one (1) Term Lender, then such Term Lender, and (b) if more than one (1) Term Lender, then at least two (2) unaffiliated Term Lenders holding more than fifty percent (50%) of the then outstanding principal balance of the Term Loan.

"**Revolving Commitment**" means, as to each Revolving Lender, its obligation to (a) make Committed Revolving Loans to the Borrowers pursuant to Section 2.01, (b) purchase participations in L/C Obligations, and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Revolving Credit Borrowing**" means a borrowing consisting of simultaneous Committed Revolving Loans of the same Type and, in the case of LIBO Rate Loans which are Committed Revolving Loans, having the same Interest Period made by each of the Revolving Lenders pursuant to Section 2.01.

"**Revolving Lender**" means each Lender having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which such Person becomes a Revolving Lender.

"**Revolving Loan Priority Collateral**" means all now owned or hereafter acquired Collateral that constitutes: (a) Inventory and Credit Card Receivables; (b) General Intangibles, Chattel Paper, Instruments, Payment Intangibles and Documents that relate to Inventory and Credit Card Receivables; (c) permits and licenses related to any of the foregoing; (d) all books and records related to the foregoing; and (e) all products and proceeds of any and all of the foregoing in whatever form received, including proceeds of insurance and claims against third parties.

"**Revolving Maturity Date**" means the earlier of (i) June [___], 2023, or (ii) the date which is three (3) months prior to the then stated scheduled maturity date of the Note Financing if such debt has not been repaid or otherwise satisfied or discharged in full by such date.

"**Revolving Note**" means a promissory note made by the Borrowers in favor of a Revolving Lender evidencing the Committed Revolving Loan made by such Revolving Lender, substantially in the form of Exhibit C-1.

"**Reserves**" means all Inventory Reserves, Availability Reserves, and Receivables Reserves.

"**Responsible Officer**" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or

similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time, (a) any a Person then named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any relevant Sanctions authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over the Agent, L/C Issuer or any Lender or any Loan Party or any of their respective Subsidiaries or Affiliates.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the DDA Notifications, the Credit Card Notifications, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in <u>Section 2.14(a)</u>.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Solvent" and "Solvency" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Spot Rate" has the meaning given to such term in <u>Section 1.07</u> hereof.

"Standard Letter of Credit Practice" means, for the L/C Issuer, any domestic or foreign Law or letter of credit practices applicable in the city in which the L/C Issuer issued the applicable Letter of Credit or, for its branch or correspondent, such Laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the L/C Issuer.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subordinated Indebtedness" means Indebtedness which is expressly subordinated in right of payment to the prior payment in full of the Obligations and which is in form and on terms approved in writing by the Agent and Term Loan Agent.

"Subordination Provisions" has the meaning specified in <u>Section 8.01(q)</u>.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party. Notwithstanding anything to the contrary herein or in any other Loan Document, TWC-Bermuda shall not be considered a "Subsidiary".

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Swing Line Borrowing" means a borrowing of a Swing Line Loan pursuant to <u>Section 2.04</u>.

"Swing Line Lender" means Wells Fargo, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"Swing Line Loan" has the meaning specified in <u>Section 2.04(a)</u>.

"Swing Line Loan Notice" means a notice of a Swing Line Borrowing pursuant to <u>Section 2.04(b)</u>, which, if in writing, shall be substantially in the form of <u>Exhibit B</u>.

"Swing Note" means the promissory note of the Borrowers substantially in the form of <u>Exhibit C-2</u>, payable to the order of the Swing Line Lender, evidencing the Swing Line Loans made by the Swing Line Lender.

"Swing Line Sublimit" means an amount equal to the lesser of (a) $5,000,000 and (b) the Aggregate Commitments. The Swing Line Sublimit is part of, and not in addition to, the Aggregate Commitments.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means the borrowing of the Term Loan made by each of the Term Lenders on the Closing Date pursuant to Section 2.01(a).

"Term Commitment" means, as to each Term Lender, its obligation to make a portion of the Term Loan to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable. As of the Closing Date, the aggregate amount of Term Commitments is $5,900,000.

"Term Lender" means each Lender having a Term Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Acceptance by which such Person becomes a Term Lender, or after the making of the Term Loan, each Lender holding any portion of the Term Loan.

"Term Loan" means the term loan made by the Term Lenders on the Closing Date pursuant to Section 2.01(a).

"Term Loan Agent" means Wells Fargo Bank, National Association, in such capacity.

"Term Loan Action Notice" shall have the meaning set forth in Section 8.02(b) hereof.

"Term Loan Interest Rate" means a per annum rate equal to (a) (i) the greater of (A) the LIBO Rate for an Interest Period of three (3) months (as determined by the Agent on the first calendar day of each month) and (B) one percent (1%) plus (ii) 8.50%; provided, however, that during any LIBOR Unavailability, a per annum rate equal to the Base Rate plus 7.50%.

"Term Loan Priority Collateral" means all now owned or hereafter acquired Collateral other than Revolving Loan Priority Collateral.

"Term Maturity Date" means the earlier of (i) March [____], 2021, or (ii) the date which is three (3) months prior to the then scheduled maturity date of the Note Financing if such debt has not been repaid or otherwise satisfied or discharged in full by such date.

"Term Note" means a promissory note made by the Borrowers in favor of a Term Lender evidencing the Term Loan made by such Term Lender, substantially in the form of Exhibit C-3.

"Termination Date" means the earliest to occur of (i) the Revolving Maturity Date, (ii) unless the Term Loan shall have repaid in full by such date, the Term Maturity Date, (iii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VIII, or (iv) the termination of the Revolving Commitments in accordance with the provisions of Section 2.06(a) hereof.

"Total Revolving Outstandings" means the aggregate Outstanding Amount of all Committed Revolving Loans, all Swing Line Loans and all L/C Obligations.

"TWC-Bermuda" means The Walking Company International, Limited, a Bermuda corporation.

"Type" means, with respect to a Committed Revolving Loan, its character as a Base Rate Loan or a LIBO Rate Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"UFCA" has the meaning specified in Section 10.21(d).

"UFTA" has the meaning specified in Section 10.21(d).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, increase in Reserves or misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Use Period" means the period commencing on the date that the Agent commences the Liquidation of the Revolving Loan Priority Collateral and ending one hundred and twenty (120) days thereafter. If any stay or other order that prohibits the Agent from commencing and continuing any Enforcement Action or to Dispose of the Revolving Loan Priority Collateral has been entered by a court

of competent jurisdiction, such 120-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

"Wells Fargo" means Wells Fargo Bank, National Association and its successors.

"Wholesale Account Location" means any retail store locations and non-store professional sales agent locations (including offices of podiatrists, orthopedists and other foot specialists) of wholesale accounts to which the Lead Borrower has provided Inventory on a consignment basis, so long as the Borrowers have provided the Agent and Term Loan Agent with prior written notice of same and have taken all steps necessary or advisable to perfect and otherwise protect their interest in such Inventory and Equipment under the UCC.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or

immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and Bank Products (other than Swap Contracts) and any other contingent Obligation, including indemnification obligations, providing Cash Collateralization) or other collateral as may be requested by the Agent of all of the Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Swap Contracts) other than (i) unasserted contingent indemnification Obligations, (ii) any Obligations relating to Bank Products (other than Swap Contracts) that, at such time, are allowed by the applicable Bank Product provider to remain outstanding without being required to be repaid or Cash Collateralized or other collateral as may be requested by the Agent, and (iii) any Obligations relating to Swap Contracts that, at such time, are allowed by the applicable provider of such Swap Contracts to remain outstanding without being required to be repaid.

### 1.03 Accounting Terms

(a)     Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)     Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Term Loan Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent, the Term Loan Agent, and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

### 1.04 Rounding.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

### 1.05 Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

### 1.06 Letter of Credit Amounts.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

### 1.07 Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the

equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars. For purposes of this Section 1.07, the "Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the Spot Rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

2.01    **Loans; Reserves.**

(a)    Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make a loan to the Borrowers on the Closing Date in a principal amount not to exceed the Term Commitment of such Term Lender. Amounts repaid in respect of the Term Loan may not be reborrowed, and upon each Term Lender's making of such Term Loan, the Term Commitment of such Term Lender shall be terminated.

(b)    Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Committed Revolving Loan") to the Borrowers from time to time, on any Business Day during the Availability Period, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Revolving Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Revolving Credit Borrowing, the Total Revolving Outstandings shall not exceed the Loan Cap,

(ii)    after giving effect to any Revolving Credit Borrowing, the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Revolving Commitment,

(iii)    The Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow Committed Revolving Loans under this Section 2.01(b), prepay under Section 2.05, and reborrow under this Section 2.01(b). Committed Revolving Loans may be Base Rate Loans or LIBO Rate Loans, as further provided herein.

(c)    The Inventory Reserves and Availability Reserves as of the Closing Date are set forth in the Borrowing Base Certificate delivered pursuant to Section 4.01(c) hereof.

(d)    The Agent shall have the right, at any time and from time to time after the Closing Date in its Permitted Discretion to establish, modify or eliminate Reserves.

**2.02    Borrowings, Conversions and Continuations of Loans.**

(a)    Committed Revolving Loans (other than Swing Line Loans) shall be either Base Rate Loans or LIBO Rate Loans as the Lead Borrower may request subject to and in accordance with this Section 2.02.  All Swing Line Loans shall be only Base Rate Loans.  Subject to the other provisions of this Section 2.02, Revolving Credit Borrowings of more than one Type may be incurred at the same time.

(b)    Each request for a Revolving Credit Borrowing consisting of a Base Rate Loan shall be made by electronic request of the Lead Borrower through Administrative Agent's Commercial Electronic Office Portal or through such other electronic portal provided by Administrative Agent (the "Portal)", which must be received by the Agent not later than 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans.  The Borrowers hereby acknowledge and agree that any request made through the Portal shall be deemed made by a Responsible Officer of the Borrowers.  Each request for a Revolving Credit Borrowing consisting of a LIBO Rate Loan shall be made pursuant to the Lead Borrower's submission of a LIBO Rate Loan Notice, which **must be received by the Agent not later than 11:00 a.m.** three (3) Business Days prior to the requested date of any Borrowing or continuation of LIBO Rate Loans.  Each LIBO Rate Loan Notice shall specify (i) the requested date of the Borrowing or continuation, as the case may be (which shall be a Business Day), (ii) the principal amount of LIBO Rate Loans to be borrowed or continued (which shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof), and (iii) the duration of the Interest Period with respect thereto.  If the Lead Borrower fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.  On the requested date of any LIBO Rate Loan, (i) in the event that Base Rate Loans are outstanding in an amount equal to or greater than the requested LIBO Rate Loan, all or a portion of such Base Rate Loans shall be automatically converted to a LIBO Rate Loan in the amount requested by the Lead Borrower, and (ii) if Base Rate Loans are not outstanding in an amount at least equal to the requested LIBO Rate Loan, the Lead Borrower shall make an electronic request via the Portal for additional Base Rate Loans in an such amount, when taken with the outstanding Base Rate Loans (which shall be converted automatically at such time), as is necessary to satisfy the requested LIBO Rate Loan.  All Borrowing requests which are not made on-line via Agent's Portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Committed Revolving Loans. All Borrowing requests which are not made on-line via Agent's Portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Committed Revolving Loans.  If the Lead Borrower fails to make such additional request via the Portal as required pursuant to clause (ii) of the foregoing sentence, then the Borrowers shall be responsible for all amounts due pursuant to Section 3.05 hereof arising on account of such failure.  If the Lead Borrower fails to give a timely notice with respect to any continuation of a LIBO Rate Loan, then the applicable Committed Revolving Loans shall be converted to Base Rate Loans effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Rate Loans.  All Revolving Credit Borrowing requests which are not made on-line via the Portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, Revolving Credit Borrowing shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Loan.

(c)    The Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Committed Revolving Loans or Term Loan (or portion thereof), and if no timely notice of a conversion or continuation is provided by the Lead Borrower, the Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(b). In the case of a Revolving Credit Borrowing, each Lender shall make the amount of its Committed Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than

1:00 p.m. on the Business Day specified in the applicable notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so received available to the Borrowers in like funds by no later than 4:00 p.m. on the day of receipt by the Agent either by (i) crediting the account of the Lead Borrower on the books of Wells Fargo with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(d)     The Agent, without the request of the Lead Borrower, may advance as a Revolving Loan, any interest, fee, service charge (including direct wire fees), Credit Party Expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.05(c). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(d) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

(e)     Except as otherwise provided herein, a LIBO Rate Loan may be continued or converted only on the last day of an Interest Period for such LIBO Rate Loan. During the existence of a Default or an Event of Default, no Loans may be requested as, converted to or continued as LIBO Rate Loans without the Consent of the Required Lenders.

(f)     The Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Rate Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(g)     After giving effect to all Revolving Credit Borrowings, all conversions of Committed Revolving Loans from one Type to the other, and all continuations of Committed Revolving Loans as the same Type, there shall not be more than five (5) Interest Periods in effect with respect to LIBO Rate Loans.

(h)     The Agent, the Revolving Lenders, the Swing Line Lender and the L/C Issuer shall have no obligation to make any Revolving Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers, the Lenders, the Swing Line Lender and the L/C Issuer and the Borrowers and each Lender and L/C Issuer shall be bound thereby. Any Permitted Overadvance may constitute a Swing Line Loan. A Permitted Overadvance is for the account of the Borrowers and shall constitute a Revolving Loan which is a Base Rate Loan and an Obligation and shall be repaid by the Borrowers in accordance with the provisions of Section 2.05(c). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The making by the Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of Section 2.03 regarding the Lenders' obligations to purchase participations with respect to Letter of Credits or of Section 2.04 regarding the Revolving Lenders' obligations to purchase participations with respect to Swing Line Loans. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03    Letters of Credit.**

(a)    Subject to the terms and conditions of this Agreement, upon the request of the Lead Borrower made in accordance herewith, and prior to the Revolving Maturity Date, the L/C Issuer agrees to issue a requested Letter of Credit for the account of the Loan Parties.  By submitting a request to the L/C Issuer for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that the L/C Issuer issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be (i) irrevocable and shall be made in writing pursuant to a Letter of Credit Application by a Responsible Officer, (ii) delivered to the L/C Issuer and the Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the L/C Issuer not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment, renewal, or extension, and (iii) subject to the L/C Issuer's authentication process with results satisfactory to the L/C Issuer.  Each such request shall be in form and substance reasonably satisfactory to the L/C Issuer and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Agent or the L/C Issuer may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the L/C Issuer generally requests for Letters of Credit in similar circumstances.  All Borrowing requests which are not made on-line via Agent's Portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Letter of Credit.  The L/C Issuer's records of the content of any such request will be conclusive.

(b)    The L/C Issuer shall have no obligation to issue a Letter of Credit if, after giving effect to the requested issuance, (i) the Total Revolving Outstandings would exceed Loan Cap, (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Lender, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans would exceed such Lender's Revolving Commitment, or (iii) the Outstanding Amount of the L/C Obligations would exceed the Letter of Credit Sublimit;

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the L/C Issuer shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to Section 9.16(b), or (ii) the L/C Issuer has not otherwise entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate the L/C Issuer's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers cash collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with Section 9.16(b).  Additionally, the L/C Issuer shall have no obligation to issue and/or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of Law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit or request that the L/C Issuer refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally, or (C) if the expiry date of such requested Letter of

Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Agent may agree) or all the Revolving Lenders have approved such expiry date.

(d)     Any L/C Issuer (other than Wells Fargo or any of its Affiliates) shall notify the Agent in writing no later than the Business Day immediately following the Business Day on which such L/C Issuer issued any Letter of Credit; provided that (i) until the Agent advises any such L/C Issuer that the provisions of Section 4.02 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by the Agent and such L/C Issuer, such L/C Issuer shall be required to so notify the Agent in writing only once each week of the Letters of Credit issued by such L/C Issuer during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as the Agent and such L/C Issuer may agree. Each Letter of Credit shall be in form and substance reasonably acceptable to the L/C Issuer, including the requirement that the amounts payable thereunder must be payable in Dollars; provided that if the L/C Issuer, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate. If the L/C Issuer makes a payment under a Letter of Credit, the Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Committed Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 4.02 hereof) and, initially, shall bear interest at the rate then applicable to Committed Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Committed Revolving Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the L/C Issuer shall be automatically converted into an obligation to pay the resulting Committed Revolving Loan. Promptly following receipt by the Agent of any payment from the Borrowers pursuant to this paragraph, the Agent shall distribute such payment to the L/C Issuer or, to the extent that the Revolving Lenders have made payments pursuant to Section 2.03(e) to reimburse the L/C Issuer, then to such Revolving Lenders and the L/C Issuer as their interests may appear.

(e)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.03(d), each Revolving Lender agrees to fund its Applicable Percentage of any Committed Revolving Loan deemed made pursuant to Section 2.03(d) on the same terms and conditions as if the Borrowers had requested the amount thereof as a Committed Revolving Loan and the Agent shall promptly pay to the L/C Issuer the amounts so received by it from the Revolving Lenders. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of the L/C Issuer or the Lenders, the L/C Issuer shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by the L/C Issuer, in an amount equal to its Applicable Percentage of such Letter of Credit, and each such Revolving Lender agrees to pay to the Agent, for the account of the L/C Issuer, such Revolving Lender's Applicable Percentage of any Letter of Credit Disbursement made by the L/C Issuer under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Agent, for the account of the L/C Issuer, such Revolving Lender's Applicable Percentage of each Letter of Credit Disbursement made by the L/C Issuer and not reimbursed by Borrowers on the date due as provided in Section 2.03(d), or of any reimbursement payment that is required to be refunded (or that the Agent or the L/C Issuer elects, based upon the advice of counsel, to refund) to the Borrowers for any reason. Each Revolving Lender acknowledges and agrees that its obligation to deliver to the Agent, for the account of the L/C Issuer, an amount equal to its respective Applicable Percentage of each Letter of Credit Disbursement pursuant to this Section 2.03(e) shall be absolute and unconditional and such

remittance shall be made notwithstanding the occurrence or continuation of a Default or Event of Default or the failure to satisfy any condition set forth in Section 4.02 hereof. If any such Revolving Lender fails to make available to the Agent the amount of such Revolving Lender's Applicable Percentage of a Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Agent (for the account of the L/C Issuer) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each Credit Party (including the L/C Issuer and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the L/C Issuer, a "Letter of Credit Related Person") (to the fullest extent permitted by Law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by Section 3.01) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

(i)     any Letter of Credit or any pre-advice of its issuance;

(ii)     any transfer, sale, delivery, surrender or endorsement (or lack thereof) of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)     any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)     any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)     any unauthorized instruction or request made to the L/C Issuer in connection with any Letter of Credit or requested Letter of Credit or any error, omission, interruption or delay in such instruction or request, whether transmitted by mail, courier, electronic transmission, SWIFT, or any other telecommunication including communications through a correspondent;

(vi)     an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)     any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)     the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)     any prohibition on payment or delay in payment of any amount payable by L/C Issuer to a beneficiary or transferee beneficiary of a Letter of Credit arising out of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions;

(x)     the L/C Issuer's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation;

(xi)     any foreign language translation provided to the L/C Issuer in connection with any Letter of Credit;

(xii)     any foreign law or usage as it relates to the L/C Issuer's issuance of a Letter of Credit in support of a foreign guaranty including without limitation the expiration of such guaranty after the related Letter of Credit expiration date and any resulting drawing paid by L/C Issuer in connection therewith; or

(xiii)     the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. The Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all amounts owing under this Section 2.03(f). If and to the extent that the obligations of the Borrowers under this Section 2.03(f) are unenforceable for any reason, the Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable Law. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)     The liability of the L/C Issuer (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that are caused directly by the L/C Issuer's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. The L/C Issuer shall be deemed to have acted with due diligence and reasonable care if the L/C Issuer's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. The Borrowers' aggregate remedies against the L/C Issuer and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by the Borrowers to the L/C Issuer in respect of the honored presentation in connection with such Letter of Credit under Section 2.03(d), plus interest at the rate then applicable to Base Rate Loans hereunder. The Borrowers shall take action to avoid and mitigate the amount of any damages claimed against the L/C Issuer or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by the Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate

any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the L/C Issuer to effect a cure.

(h) The Borrowers are responsible for the final text of the Letter of Credit as issued by the L/C Issuer, irrespective of any assistance the L/C Issuer may provide such as drafting or recommending text or by the L/C Issuer's use or refusal to use text submitted by the Borrowers. The Borrowers understand that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by the L/C Issuer, and the Borrowers hereby consent to such revisions and changes not materially different from the application executed in connection therewith. Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes. If Borrowers request the L/C Issuer to issue a Letter of Credit for an affiliated or unaffiliated third party (an "Account Party"), (i) such Account Party shall have no rights against the L/C Issuer; (ii) Borrowers shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among the L/C Issuer and the Borrowers. The Borrowers will examine the copy of the Letter of Credit and any other documents sent by the L/C Issuer in connection therewith and shall promptly notify the L/C Issuer (not later than three (3) Business Days following the Borrowers' receipt of documents from the L/C Issuer) of any non-compliance with the Borrowers' instructions and of any discrepancy in any document under any presentment or other irregularity. The Borrowers understand and agree that the L/C Issuer is not required to extend the expiration date of any Letter of Credit for any reason. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, the L/C Issuer, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want the then current expiration date of such Letter of Credit to be extended, Borrowers will so notify the Agent and the L/C Issuer at least 30 calendar days before the L/C Issuer is required to notify the beneficiary of such Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Letter of Credit.

(i) The Borrowers' reimbursement and payment obligations under this Section 2.03 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i) any lack of validity, enforceability or legal effect of any Letter of Credit, any Issuer Document, this Agreement, and Loan Document or any term or provision therein or herein;

(ii) payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii) the L/C Issuer or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv) the L/C Issuer or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)     the existence of any claim, set-off, defense or other right that the Parent or any of its Subsidiaries may have at any time against any beneficiary or transferee beneficiary, any assignee of proceeds, the L/C Issuer or any other Person;

(vi)     the L/C Issuer or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(vii)     any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this Section 2.03(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the L/C Issuer, the beneficiary or any other Person; or

(viii)     the fact that any Default or Event of Default shall have occurred and be continuing;

provided, however, that subject to Section 2.03(g) above, the foregoing shall not release the L/C Issuer from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the L/C Issuer following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to the L/C Issuer arising under, or in connection with, this Section 2.03 or any Letter of Credit.

(j)     Without limiting any other provision of this Agreement, the L/C Issuer and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and the L/C Issuer's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse the L/C Issuer for each drawing under each Letter of Credit shall not be impaired by:

(i)     honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)     honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)     acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)     the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the L/C Issuer's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)     acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the L/C Issuer in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)     any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to the Borrowers;

(vii)     any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)     assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)     payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)     acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the L/C Issuer has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)     honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the L/C Issuer if subsequently the L/C Issuer or any court or other finder of fact determines such presentation should have been honored;

(xii)     dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)     honor of a presentation that is subsequently determined by the L/C Issuer to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)     Upon the request of the Agent, (i) if the L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Obligation that remains outstanding, or (ii) if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations.  Sections 2.05 and 8.02(a)(iii) set forth certain additional requirements to deliver Cash Collateral hereunder.  For purposes of this Section 2.03, Section 2.05 and Section 8.02(a)(iii), "Cash Collateralize" means to pledge and deposit with or deliver to the Agent, for the benefit of the L/C Issuer and the Revolving Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 105% of the Outstanding Amount of all L/C Obligations (other than L/C Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which L/C Obligations shall be Cash Collateralized in an amount equal to 115% of the Outstanding Amount of such L/C Obligations), pursuant to documentation in form and substance satisfactory to the Agent and the L/C Issuer (which documents are hereby Consented to by the Lenders).  The Borrowers hereby grant to the Agent a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at Wells Fargo except that Permitted Investments of the type listed in clauses (a) through (f) of the definition thereof  may be made at the request of the Lead Borrower at the option and in the sole

discretion of the Agent (and at the Borrowers' risk and expense); interest or profits, if any, on such investments shall accumulate in such account. If at any time the Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(l)        The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Applicable Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit equal to the Applicable Margin <u>times</u> the daily Stated Amount under each such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit). For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with <u>Section 1.06</u>. Letter of Credit Fees shall be (i) due and payable on the first Business Day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, and after the Letter of Credit Expiration Date, on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in <u>Section 2.08(b)</u> and be due and payable on demand.

(m)        In addition to the Letter of Credit Fees as set forth in <u>Section 2.03(l)</u> above, the Borrowers shall pay immediately upon demand to the Agent for the account of the L/C Issuer as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of <u>Section 2.02(d)</u> shall be deemed to constitute a demand for payment thereof for the purposes of this <u>Section 2.03(m)</u>): (i) a fronting fee which shall be imposed by the L/C Issuer upon the issuance of each Letter of Credit of 0.825% per annum of the face amount thereof, <u>*plus*</u> (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, the L/C Issuer, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations). All fees payable under this clause (m) shall be (i) due and payable on the first Business Day after the end of each month commencing with the first such date to occur after the issuance of such Letter of Credit, and after the Letter of Credit Expiration Date, on demand, and (ii) computed on a monthly basis in arrears. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all such fees shall accrue at the Default Rate as provided in <u>Section 2.08(b)</u> and be due and payable on demand.

(n)        If by reason of (x) any Change in Law, or (y) compliance by the L/C Issuer or any other Credit Party with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of FRB as from time to time in effect (and any successor thereto):

(i)        any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or any Loans or obligations to make Loans hereunder or hereby, or

(ii)     there shall be imposed on the L/C Issuer or any other member of the Lender Group any other condition regarding any Letter of Credit, Loans, or obligations to make Loans hereunder,

and the result of the foregoing is to increase, directly or indirectly, the cost to the L/C Issuer or any other member of the Credit Party of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, the Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay within thirty (30) days after demand therefor, such amounts as the Agent may specify to be necessary to compensate L/C Issuer or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrowers shall not be required to provide any compensation pursuant to this Section 2.03(n) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to the Borrowers, and (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Agent of any amount due pursuant to this Section 2.03(n) as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(o)     Each Standby Letter of Credit shall expire not later than the date that is 12 months after the date of the issuance of such Letter of Credit; provided, that any Standby Letter of Credit may provide for the automatic extension thereof for any number of additional periods each of up to one year in duration; provided further, that with respect to any Letter of Credit which extends beyond the Revolving Maturity Date, Cash Collateralization shall be provided therefor on or before the date that is five Business Days prior to the Revolving Maturity Date.  Each commercial Letter of Credit shall expire on the earlier of (i) 120 days after the date of the issuance of such commercial Letter of Credit and (ii) five Business Days prior to the Revolving Maturity Date

(p)     Unless otherwise expressly agreed by the L/C Issuer and the Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(q)     The L/C Issuer shall act on behalf of the Revolving Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(r)     In the event of a direct conflict between the provisions of this Section 2.03 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.03 shall control and govern.

(s)     At the Borrowers' costs and expense, the Borrowers shall execute and deliver to the L/C Issuer such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by the L/C Issuer to enable the L/C Issuer to issue any Letter of Credit

pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce the L/C Issuer's rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document. Each Borrower irrevocably appoints L/C Issuer as its attorney-in-fact and authorizes L/C Issuer, without notice to the Borrowers, to execute and deliver ancillary documents and letters customary in the letter of credit business that may include but are not limited to advisements, indemnities, checks, bills of exchange and issuance documents. The power of attorney granted by the Borrowers is limited solely to such actions related to the issuance, confirmation or amendment of any Letter of Credit and to ancillary documents or letters customary in the letter of credit business. This appointment is coupled with an interest.

2.04    **Swing Line Loans.**

(a)     The Swing Line. Subject to the terms and conditions set forth herein, the Swing Line Lender may, in reliance upon the agreements of the other Revolving Lenders set forth in this Section 2.04, make loans (each such loan, a "Swing Line Loan") to the Borrowers from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Applicable Percentage of the Outstanding Amount of Committed Revolving Loans and L/C Obligations of the Revolving Lender acting as Swing Line Lender, may exceed the amount of such Lender's Revolving Commitment; provided, however, that after giving effect to any Swing Line Loan, (i) the Total Revolving Outstandings shall not exceed Loan Cap, and (ii) the aggregate Outstanding Amount of the Committed Revolving Loans of any Revolving Lender at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all L/C Obligations at such time, plus such Lender's Applicable Percentage of the Outstanding Amount of all Swing Line Loans at such time shall not exceed such Lender's Revolving Commitment, and provided, further, that the Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall bear interest only at the rate applicable to Base Rate Loans. Immediately upon the making of a Swing Line Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Revolving Lender's Applicable Percentage times the amount of such Swing Line Loan. The Swing Line Lender shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it or proposed to be made by it as if the term "Agent" as used in Article IX included the Swing Line Lender with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Swing Line Lender.

(b)     Borrowing Procedures. Each Swing Line Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Swing Line Lender and the Agent, which may be given by telephone. Each such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day. Each such telephonic notice must be confirmed promptly by delivery to the Swing Line Lender and the Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Lead Borrower. Promptly after receipt by the Swing Line Lender of any telephonic Swing Line Loan Notice, the Swing Line Lender will confirm with the Agent (by telephone or in writing) that the Agent has also received such Swing Line Loan Notice and, if not, the Swing Line Lender will notify the Agent (by telephone or in writing) of the contents thereof. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Agent at the request of the Required Revolving Lenders prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the Swing Line Lender not to

make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Article IV is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender may, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrowers at its office by crediting the account of the Lead Borrower on the books of the Swing Line Lender in immediately available funds. All Borrowing requests which are not made on-line via Agent's Portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Committed Revolving Loans.

(c)     Refinancing of Swing Line Loans.

(i)     The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrowers (which hereby irrevocably authorize the Swing Line Lender to so request on their behalf), that each Revolving Lender make a Base Rate Loan in an amount equal to such Revolving Lender's Applicable Percentage of the amount of Swing Line Loans then outstanding. Such request shall be made in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the Loan Cap and the conditions set forth in Section 4.02. Each Revolving Lender shall make an amount equal to its Applicable Percentage of the amount of such outstanding Swing Line Loan available to the Agent in immediately available funds for the account of the Swing Line Lender at the Agent's Office not later than 1:00 p.m. on the day specified by the Swing Line Lender, whereupon, subject to Section 2.04(c)(ii), each Revolving Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrowers in such amount. The Agent shall remit the funds so received to the Swing Line Lender.

(ii)     If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Lender's payment to the Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)     If any Revolving Lender fails to make available to the Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Revolving Lender (acting through the Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the greater of the Federal Funds Rate and a rate determined by the Swing Line Lender in accordance with banking industry rules on interbank compensation plus any administrative, processing or similar fees customarily charged by the Swing Line Lender in connection with the foregoing. If such Revolving Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in the relevant Revolving Credit Borrowing or funded participation in the relevant Swing Line Loan, as the case may be. A certificate of the Swing Line Lender submitted to any Revolving Lender (through the Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)     Each Revolving Lender's obligation to make Committed Revolving Loans or to purchase and fund risk participations in Swing Line Loans pursuant to this <u>Section 2.04(c)</u> shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Revolving Lender may have against the Swing Line Lender, the Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of a Default or an Event of Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing; <u>provided</u>, <u>however</u>, that each Revolving Lender's obligation to make Committed Revolving Loans pursuant to this <u>Section 2.04(c)</u> is subject to the conditions set forth in <u>Section 4.02</u>. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrowers to repay Swing Line Loans, together with interest as provided herein.

(d)     <u>Repayment of Participations</u>.

(i)     At any time after any Revolving Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Revolving Lender its Applicable Percentage of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

(ii)     If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in <u>Section 10.05</u> (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Lender shall pay to the Swing Line Lender its Applicable Percentage thereof on demand of the Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate. The Agent will make such demand upon the request of the Swing Line Lender. The obligations of the Revolving Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     <u>Interest for Account of Swing Line Lender</u>. The Swing Line Lender shall be responsible for invoicing the Borrowers for interest on the Swing Line Loans. Until each Revolving Lender funds its Base Rate Loan or risk participation pursuant to this <u>Section 2.04</u> to refinance such Revolving Lender's Applicable Percentage of any Swing Line Loan, interest in respect of such Applicable Percentage shall be solely for the account of the Swing Line Lender.

(f)     <u>Payments Directly to Swing Line Lender</u>. The Borrowers shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

**2.05     Prepayments.**

(a)     The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay Committed Revolving Loans in whole or in part without premium or penalty; <u>provided</u> that (i) such notice must be received by the Agent not later than 11:00 a.m. (A) three Business Days prior to any date of prepayment of LIBO Rate Loans and (B) on the date of prepayment of Base Rate Loans; and (ii) any prepayment of LIBO Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof. Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and, if LIBO Rate Loans, the Interest Period(s) of such Loans. The Agent will promptly notify each Revolving Lender of its receipt of each such notice, and of the amount of such Revolving Lender's Applicable

Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a LIBO Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the Committed Revolving Loans of the Lenders in accordance with their respective Applicable Percentages.

(b) The Borrowers may, upon irrevocable notice from the Lead Borrower to the Swing Line Lender (with a copy to the Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; provided that (i) such notice must be received by the Swing Line Lender and the Agent not later than 1:00 p.m. on the date of the prepayment, and (ii) any such prepayment shall be in a minimum principal amount of $100,000. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(c) If for any reason the Total Revolving Outstandings at any time exceed the Loan Cap as then in effect, the Borrowers shall immediately prepay Committed Revolving Loans, Swing Line Loans and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; provided, however, that the Borrowers shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.05(c) unless after the prepayment in full of the Committed Revolving Loans the Total Revolving Outstandings exceed the Loan Cap as then in effect.

(d) The Borrowers shall prepay the Committed Revolving Loans and Cash Collateralize the L/C Obligations with the proceeds and collections received by the Loan Parties to the extent so required under the provisions of Section 6.13 hereof.

(e) The Borrowers shall prepay the Committed Revolving Loans and Cash Collateralize the L/C Obligations in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event (other than, until such time as the Term Loan is repaid in full, with respect to Term Loan Priority Collateral).

(f) The Borrowers may make voluntary prepayments of the Term Loan from time to time so long as the Debt Repayment Conditions have been satisfied.

(g) The Borrowers shall be required to prepay the Term Loan, together with the applicable Term Loan Prepayment Fee, with the Net Proceeds received by the Loan Parties from the Disposition or other sale of all Term Loan Priority Collateral received in excess of $50,000 in the aggregate per annum.

(h) Prepayments made pursuant to Section 2.05(c), (d) and (e) above, first, shall be applied to the Swing Line Loans, second, shall be applied ratably to the outstanding Committed Revolving Loans, third, shall be used to Cash Collateralize the remaining L/C Obligations; and, fourth, the amount remaining, if any, after the prepayment in full of all Swing Line Loans and Committed Revolving Loans outstanding at such time and the Cash Collateralization of the remaining L/C Obligations in full may be retained by the Borrowers for use in the ordinary course of its business. Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrowers or any other Loan Party) to reimburse the L/C Issuer or the Lenders, as applicable. Prepayments made pursuant to Section 2.05(g) above, first, shall be applied to the outstanding Term Loan in the inverse order of principal payments due pursuant to Section 2.07(b) in accordance with the percentage of outstanding Term Loans

owed to each Term Lender; and, <u>second,</u> the amount remaining, if any, shall be applied in accordance with the first sentence of this clause (h).

**2.06    Termination or Reduction of Commitments.**

(a)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, terminate the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit or from time to time permanently reduce the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit; <u>provided</u> that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, (iii) the Borrowers shall not terminate or reduce (A) the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments, (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit, and (C) the Swing Line Sublimit if, after giving effect thereto, and to any concurrent payments hereunder, the Outstanding Amount of Swing Line Loans hereunder would exceed the Swing Line Sublimit.  In connection with any reduction in the Aggregate Revolving Commitments prior to the Revolving Maturity Date, if any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrowers shall deliver to Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Agent shall reasonably request, in order to enable Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the FRB.

(b)    If, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Aggregate Revolving Commitments, such Letter of Credit Sublimit or Swing Line Sublimit shall be automatically reduced by the amount of such excess.

(c)    The Agent will promptly notify the Revolving Lenders of any termination or reduction of the Letter of Credit Sublimit, Swing Line Sublimit or the Aggregate Commitments under this <u>Section 2.06</u>.  Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Revolving Lender shall be reduced by such Revolving Lender's Applicable Percentage of such reduction amount.  All fees (including, without limitation, commitment fees, Early Termination Fees, and Letter of Credit Fees) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

(d)    The Term Commitment of each Term Lender shall automatically terminate upon such Term Lender's funding of its portion of the Term Loan, which shall occur no later than the Closing Date.

**2.07    Repayment of Loans.**

(a)    The Borrowers shall repay to the Lenders on the Termination Date the aggregate principal amount of Loans outstanding on such date.

(b)    The Borrowers shall make monthly principal payments on the Term Loan in the amounts and on the dates set forth in the grid below:

| Date | Payment |
|------|---------|

| | |
|---|---|
| June 30, 2018 | $150,000 |
| July 31, 2018 | $150,000 |
| August 31, 2018 | $150,000 |
| September 30, 2018 | $150,000 |
| October 31, 2018 | $1,050,000 |
| The last day of each Fiscal Month thereafter | $150,000 |
| Term Maturity Date | Any remaining amounts |

(c) To the extent not previously paid, the Borrowers shall repay the outstanding balance of the Swing Line Loans on the Termination Date.

**2.08    Interest.**

(a) Subject to the provisions of Section 2.08(b) below, (i) each Committed Revolving Loan which is a LIBO Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBO Rate for such Interest Period plus the Applicable Margin; (ii) each Committed Revolving Loan which is a each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin; (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Margin; and (iv) the Term Loan shall bear interest on the outstanding principal amount thereof at the Term Loan Interest Rate.

(b) (i) If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any other Event of Default exists, then the Agent may, and upon the request of the Required Revolving Lenders shall (or, solely with respect to the Term Loan, the Term Loan Agent may, and upon request of the Required Term Lenders shall), notify the Lead Borrower that all outstanding Obligations, or all outstanding Obligations with respect to the Term Loan, as applicable, shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    Fees**.  In addition to certain fees described in subsections (l) and (m) of Section 2.03:

(a)     Commitment Fee.  The Borrowers shall pay to the Agent for the account of each Revolving Lender in accordance with its Applicable Percentage, a commitment fee calculated on a per annum basis equal to 0.375% times the actual daily amount by which the Aggregate Revolving Commitments exceed the Total Revolving Outstandings.  The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable monthly in arrears on the first day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.  The commitment fee shall be calculated monthly in arrears.

(b)     Revolving Early Termination Fee.  In the event that the Termination Date occurs, for any reason, prior to the Revolving Maturity Date, or in the event that the Borrowers reduce (but do not terminate) the Aggregate Revolving Commitments prior to the Revolving Maturity Date, the Borrowers shall pay to the Agent, for the account of each Revolving Lender in accordance with its Applicable Percentage, a fee (the "Revolving Early Termination Fee") in respect of amounts which are or become payable by reason thereof equal to the following:  (i) 0.500% of the Revolving Commitments then in effect (without regard to any termination thereof) or of the amount of any reduction in the Aggregate Revolving Commitments, as applicable, if the Termination Date or reduction shall occur at any time on or before the third (3rd) anniversary of the Closing Date; (ii) 0.375% of the Revolving Commitments then in effect (without regard to any termination thereof) or of the amount of any reduction in the Aggregate Revolving Commitments, as applicable, if the Termination Date or reduction shall occur at any time on or after the third (3rd) anniversary of the Closing Date but prior to the fourth (4th) anniversary of the Closing Date; and (iii) 0.250% of the Revolving Commitments then in effect (without regard to any termination thereof) or of the amount of any reduction in the Aggregate Revolving Commitments, as applicable, if the Termination Date or reduction shall occur at any time after the fourth (4th) anniversary of the Closing Date but prior to the fifth (5th) anniversary of the Closing Date.  All parties to this Agreement agree and acknowledge that the Revolving Lenders will have suffered damages on account of the early termination of this Agreement or any portion of the Revolving Commitments and that, in view of the difficulty in ascertaining the amount of such damages, the Revolving Early Termination Fee constitutes reasonable compensation and liquidated damages to compensate the Lenders on account thereof.

(c)     Term Loan Early Termination Fee.     In the event that the Termination Date occurs, for any reason, prior to the Term Maturity Date, or in the event that the Borrowers pay or prepay (or are required to pay or prepay) any portion of the Term Loan prior to the Term Maturity Date (other than any mandatory repayments pursuant to Section 2.05(f)), the Borrowers shall pay to the Agent, for the account of each Term Lender in accordance with its Applicable Percentage, a fee (the "Term Loan Early Termination Fee", and together with the Revolving Early Termination Fee, the "Early Termination Fees") in respect of amounts which are or become payable by reason thereof equal to the following:  (i) 4.00% of the principal amount of the Term Loan repaid, prepaid or required to be repaid or repaid at any time on or before the first (1st) anniversary of the Closing Date; (ii) 3.00% of the principal amount of the Term Loan repaid, prepaid or required to be repaid or repaid after the (1st) anniversary of the Closing Date but prior to the second (2nd) anniversary of the Closing Date; and (iii) 2.00% of the principal amount of the Term Loan repaid, prepaid or required to be repaid or repaid at any time thereafter.  All parties to this Agreement agree and acknowledge that the Term Lenders will have suffered damages on account of the early termination of this Agreement or any portion of the Term Loan and that, in view of the difficulty in ascertaining the amount of such damages, the Term Loan Early Termination Fee constitutes reasonable compensation and liquidated damages to compensate the Lenders on account thereof.

(d)     Early Termination Fees, Generally.     The calculation of the amount of the Early Termination Fees shall be made as of the applicable Termination Date or the date of any commitment reduction or prepayment, as applicable.   All parties to this Agreement agree and acknowledge that the Lenders will have suffered damages on account of any of the foregoing events and

that, in view of the difficulty in ascertaining the amount of such damages, the Early Termination Fees constitutes reasonable compensation and liquidated damages to compensate the Lenders on account thereof. The Early Termination Fees shall be earned and due and payable upon the occurrence of the applicable Termination Date or the date of any commitment reduction or prepayment, as applicable. Without limiting the generality of the foregoing, it is understood and agreed that if the Obligations are accelerated for any reason, including because of an Event of Default or the commencement of any insolvency proceeding or other proceeding pursuant to any Debtor Relief Laws (including acceleration by operation of Law or otherwise), the Early Termination Fees, if any, determined as of the date of acceleration will be due and payable as though the amounts owed to the Lenders were voluntarily prepaid as of such date and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. The Borrowers agree that payment of any Early Termination Fee due hereunder is reasonable under the circumstances currently existing. The Early Termination Fees, if any, shall also be payable in the event the amounts owed to the Lenders are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), agreement by any other means. TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING EARLY TERMINATION FEES IN CONNECTION WITH ANY SUCH ACCELERATION INCLUDING IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION OF THE OBLIGATIONS PURSUANT TO ANY INSOLVENCY PROCEEDING OR OTHER PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAWS OR PURSUANT TO A PLAN OF REORGANIZATION. The Loan Parties expressly agree that: (A) the Early Termination Fees are reasonable and are the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Early Termination Fees shall be payable notwithstanding the then prevailing market rates at the time payment is made; and (C) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Loan Parties expressly acknowledge that their agreement to pay the Early Termination Fees to the Lenders as herein described is a material inducement to the Lenders to enter into this Agreement.

(e)     Other Fees. The Borrowers shall pay to the Arranger, Agent and Term Loan Agent for their own respective accounts fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.10     Computation of Interest and Fees. All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each outstanding Loan beginning, and including the day, such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.11     Evidence of Debt.

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall

not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Revolving Loans or Term Loans, as applicable, in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)        In addition to the accounts and records referred to in <u>Section 2.11(a)</u>, each Revolving Lender and the Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Revolving Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the accounts and records maintained by the Agent and the accounts and records of any Revolving Lender in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.

**2.12    Payments Generally; Agent's Clawback.**

(a)        <u>General</u>. All payments to be made by the Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. Subject to <u>Section 2.14</u> hereof, the Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    <u>Funding by Revolving Lenders; Presumption by Agent</u>. Unless the Agent shall have received notice from a Revolving Lender prior to the proposed date of any Revolving Credit Borrowing of LIBO Rate Loans (or in the case of any Revolving Credit Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Revolving Lender will not make available to the Agent such Revolving Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Revolving Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or in the case of a Revolving Credit Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Revolving Lender has not in fact made its share of the applicable Revolving Credit Borrowing available to the Agent, then the applicable Revolving Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Revolving Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to

be made by the Borrowers, the interest rate applicable to Committed Revolving Loans comprising Base Rate Loans. If the Borrowers and such Revolving Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Revolving Lender pays its share of the applicable Revolving Credit Borrowing to the Agent, then the amount so paid shall constitute such Revolving Lender's Committed Revolving Loan included in such Revolving Credit Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Revolving Lender that shall have failed to make such payment to the Agent.

(ii)     Payments by Borrowers; Presumptions by Agent. Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders or the L/C Issuer hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several. The obligations of the Term Lenders hereunder to make the Term Loan and of the Revolving Lenders hereunder to make Committed Revolving Loans, to fund participations in Letters of Credit and Swing Line Loans and to make payments hereunder are several and not joint. The failure of any Term Lender to make its portion of the Term Loan, or of any Revolving Lender to make any Committed Revolving Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Term Lender or Revolving Lender (as applicable) of its corresponding obligation to do so on such date, and no Term Lender or Revolving Lender (as applicable) shall be responsible for the failure of any other Term Lender or Revolving Lender (as applicable) to so make its portion of the Term Loan or its Committed Revolving Loan (as applicable), to purchase its participation or to make its payment hereunder.

(e)     Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13     Sharing of Payments by Lenders**. If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in (a) any Revolving Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of Committed Revolving Loans greater

than its pro rata share thereof as provided herein, or (b) a Term Lender receiving payment of a proportion of the aggregate amount of Obligations in respect of the Term Loan greater than its pro rata share thereof as provided herein (including, in each case, as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent and the Term Loan Agent, as applicable, of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Revolving Lenders or Term Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03; provided, that:

> (i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

> (ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of the Term Loan, its Committed Revolving Loans or subparticipations in L/C Obligations or Swing Line Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.14     Settlement Amongst Lenders.**

> (a)     The amount of each Revolving Lender's Applicable Percentage of outstanding Committed Revolving Loans (including outstanding Swing Line Loans) shall be computed weekly (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Committed Revolving Loans (including Swing Line Loans) and repayments of Committed Revolving Loans (including Swingline Loans) received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

> (b)     The Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Committed Revolving Loans and Swing Line Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Revolving Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Committed Revolving Loans made by each Revolving Lender shall be equal to such Revolving Lender's Applicable Percentage of all Committed Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day.  The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Revolving Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such

date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY;
## APPOINTMENT OF LEAD BORROWER

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.    Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent, the Term Loan Agent, the applicable Lender or the L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay and remit the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    <u>Payment of Other Taxes by the Loan Parties</u>.    Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay and remit any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    <u>Indemnification by the Loan Parties</u>.    The Loan Parties shall indemnify the Agent, the Term Loan Agent, each Lender and the L/C Issuer, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or remitted by the Agent, the Term Loan Agent, such Lender or the L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.    A certificate as to the amount of such payment, remittance or liability delivered to the Lead Borrower by a Lender or the L/C Issuer (with a copy to the Agent), or by the Agent or the Term Loan Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.    As soon as practicable after any payment or remittance of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, the Lead Borrower shall deliver to the Agent and the Term Loan Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or remittance, a copy of the return reporting such payment or remittance or other evidence of such payment reasonably satisfactory to the Agent or the Term Loan Agent, as applicable.

(e)    <u>Status of Lenders</u>.    Any Foreign Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which any Loan Party is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent), at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent, such properly completed and executed documentation prescribed by applicable Law as will permit such

payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered. In addition, any Lender, if requested by the Lead Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Agent as will enable the Lead Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)        duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)        duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN,

(iv)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable due diligence and reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender shall deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) at the time or times prescribed by law and at such time or times reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation) such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by Agent (or, in the case of a Participant, the Lender granting the participation) as may be necessary for Agent or Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement, or

(v)        any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Lead Borrower to determine the withholding or deduction required to be made.

(f)        _Treatment of Certain Refunds_.  If the Agent, the Term Loan Agent, any Lender or the L/C Issuer determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid or remitted additional amounts pursuant to this Section, it shall pay to

the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent, the Term Loan Agent, such Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of the Agent, the Term Loan Agent, such Lender or the L/C Issuer, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent, the Term Loan Agent, such Lender or the L/C Issuer in the event the Agent, the Term Loan Agent, such Lender or the L/C Issuer is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Agent, the Term Loan Agent, any Lender or the L/C Issuer to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    Illegality**. If any Lender reasonably determines that any change in market conditions, any change in Law has made it unlawful, or impractical, or any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund LIBO Rate Loans, or to determine or charge interest rates based upon the LIBO Rate, in each case, first adopted, changed or asserted after the date of such Lender became a Lender, on notice thereof by such Lender to the Lead Borrower through the Agent, any obligation of such Lender to make or continue LIBO Rate Loans or to convert Base Rate Loans to LIBO Rate Loans shall be suspended until such Lender notifies the Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Agent), prepay or, if applicable, convert all LIBO Rate Loans of such Lender to Base Rate Loans immediately. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**. If the Required Revolving Lenders determine in good faith that for any reason in connection with any request for a Loan which is a LIBO Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBO Rate Loan, (b) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan, or (c) the LIBO Rate for any requested Interest Period with respect to a proposed LIBO Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Agent will promptly so notify in writing the Lead Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain LIBO Rate Loans or Loans based on the LIBOR Rate shall be suspended until the Agent (upon the instruction of the Required Revolving Lenders) revokes such notice, which such revocation of notice shall be provided at the earliest time that the circumstances in clauses (a), (b) and (c) in the immediately preceding sentence no longer exist. Upon receipt of such written notice, the Lead Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBO Rate Loans or, failing that, will be deemed to have converted such request into a request for a Revolving Credit Borrowing of Base Rate Loans in the amount specified therein, without any cost, expense or penalty (including no cost, expense or penalty of the type described in Section 3.05) to the Borrowers.

**3.04    Increased Costs; Reserves on LIBO Rate Loans.**

(a)    Increased Costs Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for

the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate) or the L/C Issuer;

(ii)     subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBO Rate Loan made by it, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the L/C Issuer); or

(iii)     impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or LIBO Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBO Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation, <u>provided</u> that the Borrowers shall not be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Lead Borrower of the Change in Law

giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Reserves on LIBO Rate Loans.  The Borrowers shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional interest on the unpaid principal amount of each LIBO Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Lead Borrower shall have received at least 10 days' prior notice (with a copy to the Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

3.05     **Compensation for Losses**.  Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Lead Borrower; or

(c)     any assignment of a LIBO Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Lead Borrower pursuant to Section 10.13;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each LIBO Rate Loan made by it at the LIBO Rate for such Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period, whether or not such LIBO Rate Loan was in fact so funded.

3.06     **Mitigation Obligations; Replacement of Lenders.**

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or

3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Loan Parties' obligations under this <u>Article III</u> shall survive termination of the Aggregate Revolving Commitments and repayment of the Term Loan, the Committed Revolving Loans, the Swing Line Loans, all other Obligations hereunder.

**3.08    Designation of Lead Borrower as Borrowers' Agent.**

(a)    Each Borrower hereby irrevocably designates and appoints the Lead  Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead  Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)    Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**4.01    Conditions of Initial Credit Extension**.  The obligation of the L/C Issuer and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Agent's and Term Loan Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent and the Term Loan Agent:

(i)        executed counterparts of this Agreement sufficient in number for distribution to the Agent, Term Loan Agent, each Lender and the Lead Borrower;

(ii)        a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)        such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent and Term Loan Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)        copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent and Term Loan Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)        a favorable opinion of Pachulski Stang Ziehl & Jones LLP, counsel to the Loan Parties, addressed to the Agent, Term Loan Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request;

(vi)        a certificate signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied, (B) that there has been no event or circumstance since the date of the Audited Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, (C) to the Solvency of the Loan Parties as of the Closing Date after giving effect to the transactions contemplated hereby, and (D) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)        evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)        payoff letters from the agent for the lenders under each of the Existing Credit Agreements (or other evidence reasonably satisfactory to Agent and Term Loan Agent) satisfactory in form and substance to the Agent and Term Loan Agent evidencing that the Existing Credit Agreements have been or concurrently with the Closing Date are being terminated, all obligations thereunder are being paid in full or otherwise satisfied in accordance with the Chapter 11 Plan, and all Liens securing obligations under the Existing Credit Agreements have been or concurrently with the Closing Date are being released;

(ix)    the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(x)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(xi)    the Intercompany Subordinated Note, duly executed by all applicable parties;

(xii)    the Second Amended and Restated Subordination Agreement of Junior Creditor, in form and substance reasonably acceptable to the Agent and Term Loan Agent, duly executed by all applicable parties;

(xiii)    (A)    appraisals (based on net liquidation value) by a third party appraiser acceptable to the Agent of all Inventory of the Borrowers, the results of which are satisfactory to the Agent and Term Loan Agent and (B) a written report regarding the results of a commercial finance examination of the Loan Parties, which shall be satisfactory to the Agent and Term Loan Agent;

(xiv)    results of searches or other evidence reasonably satisfactory to the Agent and Term Loan Agent (in each case dated as of a date reasonably satisfactory to the Agent and Term Loan Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent and Term Loan Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made; and

(xv)    (A)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent and Term Loan Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent and Term Loan Agent, (B) the DDA Notifications, Credit Card Notifications, and Blocked Account Agreements required pursuant to Section 6.13 hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements as required by the Agent and Term Loan Agent.

(b)    After giving effect to (i) the first funding under the Loans, (ii) any charges to the Loan Account made in connection with the establishment of the credit facility contemplated hereby; (iii) all Letters of Credit to be issued at, or immediately subsequent to, such establishment, and (iv) all payments required to be made on or about the Effective Date of the Chapter 11 Plan (including, without limitation, all administrative claims, any amounts owed to general unsecured creditors, and the funding of any professional fee escrow accounts), Availability shall be not less than $5,000,000.

(c)    The Agent and Term Loan Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to the week ended on June [___], 2018, and executed by a Responsible Officer of the Lead Borrower.

(d)     The Agent and Term Loan Agent shall be reasonably satisfied that any financial statements delivered to it fairly present the business and financial condition of the Loan Parties and that there has been no Material Adverse Effect since March 6, 2018 (it being agreed that the existence of the Chapter 11 Case shall not be deemed to be a Material Adverse Effect).

(e)     The Bankruptcy Court shall have approved the payment of all accrued fees, expenses, charges and disbursements of the Agent, Term Loan Agent and Lenders (including the fees and expenses of counsel (including any local counsel) for the Agent, Term Loan Agent, and Lenders, and any and all fees payable under the Fee Letter) and all such fees, expenses, charges and disbursements shall have been paid or will be paid in full on the Closing Date.

(f)     The Agent and Term Loan Agent shall have received and be satisfied with (i) a detailed forecast, post-emergence projections, and business plan with respect to the Borrowers and Guarantors as the Agent and Term Agent deem appropriate for the period commencing on the Closing Date and ending with the period that is eighteen (18) months after the Closing Date, which shall include an Availability model, Consolidated income statement, balance sheet, and statement of cash flow, by month, each prepared in conformity with GAAP and consistent with the Loan Parties' then current practices, which and which projections (1) are consistent with the preliminary plan submitted to the Agent and Term Agent on February 26, 2018, (2) are acceptable to the Agent and Term Agent in their sole discretion, and (3) evidence consistent levels of leverage (senior and total funded debt to proforma EBITDA), profitability, Availability and additional equity in an amount not less than $10,200,000 on terms acceptable to the Agent and Term Agent,  and (ii) such other information (financial or otherwise) reasonably requested by the Agent.

(g)     There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(h)     There shall not have occurred any default of any Material Contract of any Loan Party.

(i)     The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

(j)     The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act in each case, the results of which are satisfactory to the Agent.

(k)     No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Closing Date.

(l)     There shall not have occurred any disruption or material adverse change in the United States financial or capital markets in general that has had, in the reasonable opinion of the Agent, a material adverse effect on the market for loan syndications or adversely affecting the syndication of the Loans.

(m)     Bankruptcy Matters.

(i)     There shall not be any Bankruptcy Court order or any action, suit, investigation or proceeding pending or, to the knowledge of the Borrowers or Guarantors, threatened in any court or before any arbitrator or governmental authority that could reasonably

be expected to have a Material Adverse Effect or to prevent or restrain the consummation of this Agreement and the transactions contemplated hereby.

(ii)     No later than June [15], 2018, the Borrowers and Guarantors shall have obtained from the Bankruptcy Court the Findings of Fact, Conclusions of Law and Order Confirming the [Plan of Reorganization of The Walking Company and its Debtor Affiliates] Pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order") confirming the Chapter 11 Plan and approving the consummation of the restructuring transactions on the effective date of the Chapter 11 Plan (the "Effective Date").  As of the Effective Date, the Confirmation Order shall be final, and shall not be subject to a stay or injunction (or similar prohibition) in effect with respect thereto, nor shall have been reversed, vacated, amended, supplemented, or otherwise modified in any manner that could reasonably be expected to adversely affect the rights of the Agent, Term Loan Agent or Lenders.  The Effective Date shall occur no later than the deadline for the effective date of the Chapter 11 Plan set forth in the Chapter 11 Plan, and shall be conditioned, in any event, upon, _inter alia_, payment in full in cash of all obligations under the Existing Credit Agreements.  The entry of all orders described herein shall have been upon proper notice as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable bankruptcy rules.

(iii)    Consummation of such exit transactions on terms consistent with those outlined in the Chapter 11 Plan and otherwise on terms and conditions, and pursuant to documentation in form and substance, reasonably acceptable to the Agent and Term Loan Agent.

(iv)    All of the conditions precedent set forth in the Chapter 11 Plan shall have been satisfied, as determined by the Agent and Term Loan Agent in their reasonable discretion.

(n)     The Agent and Term Agent shall have received satisfactory evidence that prior to, or contemporaneously with, the Effective Date certain equity holders of the Parent have made a cash investment of at least $10,200,000 in the Loan Parties on terms and conditions acceptable to Agent and Term Agent (including any investment agreement entered into in connection therewith).

(o)     The Agent and Term Agent shall have received satisfactory evidence that the Noteholders have amended the Note Financing on terms and conditions satisfactory to Agent and Term Loan Agent.

(p)     No Challenge (as such term is defined in the DIP Credit Agreement) is pending as to the obligations under the Pre-Petition Credit Agreement or the Liens granted thereunder.

(q)     The Loan Parties shall have achieved cost savings equal to at least $8,000,000 on an annualized basis (or such other amount as may be agreed to by the Agent), through rent concessions, store closings and/or other cost savings.

(r)     The Agent and Term Agent shall have received a non-exclusive license, in form and substance reasonably acceptable to them, from Big Dog Licensing LLC, with respect to intellectual property licensed from Big Dog Licensing LLC to the Loan Parties.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have Consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be Consented to or approved by or acceptable or satisfactory to a Lender unless the

Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02** **Conditions to all Credit Extensions**. The obligation of each Lender to honor any Request for Credit Extension (other than a LIBO Rate Loan Notice requesting only a continuation of LIBO Rate Loans) and each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a)     The representations and warranties of each Loan Party contained in <u>Article V</u> or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this <u>Section 4.02</u>, the representations and warranties contained in subsections (a) and (b) of <u>Section 5.05</u> shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of <u>Section 6.01</u>;

(b)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)     The Agent and, if applicable, the L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof;

(d)     No event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred; and

(e)     No Overadvance shall result from such Credit Extension.

Each Request for Credit Extension (other than a LIBO Rate Loan Notice requesting only a continuation of LIBO Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in <u>Sections 4.02(a)</u> and <u>(b)</u> have been satisfied on and as of the date of the applicable Credit Extension. The conditions set forth in this <u>Section 4.02</u> are for the sole benefit of the Credit Parties but until the Required Revolving Lenders otherwise direct the Agent to cease making Committed Revolving Loans and issuing Letters of Credit, the Revolving Lenders will fund their Applicable Percentage of all Committed Revolving Loans and participate in all Swing Line Loans and Letters of Credit whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this <u>Article IV</u>, agreed to by the Agent, provided, however, the making of any such Loans or the issuance of any Letters of Credit shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization, or formation (b) after giving effect to the Confirmation Order and the Chapter 11 Plan, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**.  After giving effect to the Confirmation Order and the Chapter 11 Plan, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; No Material Adverse Effect.**

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all

Material Indebtedness and other liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)     The unaudited Consolidated balance sheet of the Parent and its Subsidiaries dated April 30, 2018, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the Fiscal Quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Since the date of the Audited Financial Statements, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect (it being agreed that the existence of the Chapter 11 Case shall not be deemed to be a Material Adverse Effect).

(d)     To the best knowledge of the Lead Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent, Term Loan Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Parent and its Subsidiaries on a Consolidated basis.

**5.06     Litigation**.  After giving effect to the Confirmation Order and the Chapter 11 Plan, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in <u>Schedule 5.06</u>, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect , and since the Closing Date, there has been no adverse change in the status, or financial effect on any Loan Party or any Subsidiary thereof, of the matters described on <u>Schedule 5.06</u>.

**5.07     No Default**.  No Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract or any Material Indebtedness.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08     Ownership of Property; Liens**.

(a)     After giving effect to the Confirmation Order and the Chapter 11 Plan, each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.

(b)     <u>Schedule 5.08(b)(1)</u> sets forth the address (including street address, county and state) of all Real Estate that is owned by the Loan Parties and each of their Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Each Loan Party and

each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances. Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with a list of the lessor and its contact information with respect to each such Lease as of the Closing Date. Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

(c) Schedule 7.01 sets forth a complete and accurate list of all Liens on the property or assets of each Loan Party and each of its Subsidiaries, showing as of the Closing Date the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto. The property of each Loan Party and each of its Subsidiaries is subject to no Liens, other than Permitted Encumbrances.

(d) Schedule 7.02 sets forth a complete and accurate list of all Investments held by any Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity, if any, thereof.

(e) Schedule 7.03 sets forth a complete and accurate list of all Indebtedness of each Loan Party or any Subsidiary of a Loan Party on the Closing Date, showing as of the Closing Date the amount, obligor or issuer and maturity thereof.

**5.09 Environmental Compliance**.

(a) Except as specifically disclosed in Schedule 5.09, no Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Except as otherwise set forth in Schedule 5.09, none of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c) Except as otherwise set forth on Schedule 5.09, no Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

**5.10** **Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. Each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11** **Taxes**.  The Loan Parties and their Subsidiaries have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are not required to be paid pursuant to the Chapter 11 Plan and which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.   There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect. No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12** **ERISA Compliance.**

(a) The Lead Borrower, each of its ERISA Affiliates, and each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Lead Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Sections 412 or 430 of the Code and to each Multiemployer Plan, and no application for a funding waiver or an extension of any amortization period pursuant to Sections 412 or 430 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan or Multiemployer Plan.

(b) There are no pending or, to the best knowledge of the Lead Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests.**

The Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary. All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary. The Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part(b) of Schedule 5.13. All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents. The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act;**

(a)    No Loan Party nor any of their Subsidiaries owns any Margin Stock or is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock. None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB. No Loan Party nor any of their Subsidiaries expects to acquire any Margin Stock.

(b)    None of the Loan Parties is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**. Each Loan Party has disclosed to the Agent, Term Loan Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent, Term Loan Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16    Compliance with Laws**. Each of the Loan Parties and each Subsidiary is in compliance (A) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (ii) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect and (b) in all material respects, with the (i) Trading with the Enemy Act (50 U.S.C. § 1 et seq., as amended) and each of the foreign assets control regulations of the

United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "Patriot Act").

**5.17    Intellectual Property; Licenses, Etc**.  The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person. Except as specifically disclosed in Schedule 5.17, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.18    Labor Matters.**

There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law.  All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19    Security Documents.**

(a)    The Security Agreement creates in favor of the Agent, for the benefit of the Secured Parties referred to therein, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.  The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement.  Upon such filings and/or the

obtaining of "control," (as defined in the UCC) the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, under the UCC (in effect on the date this representation is made) in each case prior and superior in right to any other Person.

(b)  When the Security Agreement (or a short form thereof) is filed in the United States Patent and Trademark Office and the United States Copyright Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified in Schedule II of the Security Agreement, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Parties in the Intellectual Property (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Closing Date).

5.20  **Solvency**.

After giving effect to the transactions contemplated by this Agreement, and before and after giving effect to each Credit Extension, the Loan Parties, on a Consolidated basis, are Solvent. No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

5.21  **Deposit Accounts; Credit Card Arrangements.**

(a)  Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository; (ii) the account number(s) maintained with such depository; (iii) a contact person at such depository, and (iv) the identification of each Blocked Account Bank.

(b)  Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Closing Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

5.22  **Brokers**.  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan  Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.23  **Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

5.24  **Material Contracts**.  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  The Loan Parties

are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract.

**5.25    Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.26    OFAC/Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.**  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Credit Party or other individual or entity participating in any transaction).

**5.27    Confirmation Order.  .** The Confirmation Order (i) is in full force and effect, and is not subject to any stay, injunction, appeal or challenge, and (ii) was not procured by fraud or by any other means that could result in its revocation.

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which a claim has not been asserted), or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in <u>Sections 6.01</u>, <u>6.02</u>, and <u>6.03</u>) cause each Subsidiary to:

**6.01    Financial Statements**.  Deliver to the Agent and Term Loan Agent, in form and detail satisfactory to the Agent and Term Loan Agent:

(a)      (i) as soon as available, but in any event within one hundred five (105) days after the end of each Fiscal Year of the Parent, a Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by (A) a report and unqualified opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Agent and Term Loan Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit and (B) an opinion of such Registered Public Accounting Firm independently

assessing Loan Parties' internal controls over financial reporting in accordance with Item 308 of SEC Regulation S-K, PCAOB Auditing Standard No. 2, and Section 404 of Sarbanes-Oxley expressing a conclusion that contains no statement that there is a material weakness in such internal controls, except for such material weaknesses as to which the Required Lenders do not object; and (ii) as soon as available, but in any event within forty-five (45) days after the end of each Fiscal Year of the Parent, a unaudited Consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year;

(b)        reserved;

(c)        as soon as available, but in any event within thirty (30) days after the end of each of the Fiscal Months of each Fiscal Year of the Parent, a consolidated balance sheet of the Parent and its Subsidiaries as at the end of such Fiscal Month, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month, and for the portion of the Parent's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) such period set forth in the projections delivered pursuant to Section 6.01(d) hereof, (B) the corresponding Fiscal Month of the previous Fiscal Year and (C) the corresponding portion of the previous Fiscal Year, all in reasonable detail, certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Parent and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(d)        as soon as available, but in any event at least fifteen (15) days before the end of each Fiscal Year of the Parent, forecasts prepared by management of the Lead Borrower, in form satisfactory to the Agent and Term Loan Agent, of consolidated balance sheets and statements of income or operations and cash flows of the Parent and its Subsidiaries on a monthly basis for the immediately following Fiscal Year (including the Fiscal Year in which the Revolving Maturity Date occurs), and as soon as available, any significant revisions to such forecast with respect to such Fiscal Year.

**6.02 Certificates; Other Information**. Deliver to the Agent and the Term Loan Agent, in form and detail satisfactory to the Agent and Term Loan Agent:

(a)        Reserved

(b)        concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (c), a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide: (i) a statement of reconciliation conforming such financial statements to GAAP and (ii) a copy of management's discussion and analysis with respect to such financial statements;

(c)        on Tuesday of each week (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the last day of the immediately preceding Sunday (provided that the Appraised Value applied to the Eligible Inventory set forth in each Borrowing Base Certificate shall be the Appraised Value set forth in the most recent appraisal obtained by the Agent pursuant to Section 6.10 hereof for the applicable week to which such Borrowing Base Certificate relates), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Lead Borrower;

(d)      promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its Registered Public Accounting Firm in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(e)      promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange, and in any case not otherwise required to be delivered to the Agent pursuant hereto;

(f)      The financial and collateral reports described on <u>Schedule 6.02</u> hereto, at the times set forth in such Schedule;

(g)      promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to <u>Section 6.01</u> or any other clause of this <u>Section 6.02</u>;

(h)      as soon as available, but in any event within thirty (30) days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent or Term Loan Agent, or any Lender through the Agent, may reasonably specify;

(i)      promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness;

(j)      promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority (including, without limitation, the SEC (or comparable agency in any applicable non-U.S. jurisdiction)) concerning any proceeding with, or investigation or possible investigation or other inquiry by such Governmental Authority regarding financial or other operational results of any Loan Party or any Subsidiary thereof or any other matter which, if adversely determined, could reasonably expected to have a Material Adverse Effect; and

(k)      promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent, Term Loan Agent, or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to <u>Section 6.01(a),</u> (b), or <u>(c)</u> or <u>Section 6.02(d)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on <u>Schedule 10.02</u>; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent and Term Loan Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); <u>provided</u> that: (i) the Lead Borrower shall deliver paper copies of such documents to the Agent, Term Loan Agent or any Lender that requests the Lead Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Agent or such Lender and (ii) the Lead

Borrower shall notify the Agent, Term Loan Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Lead Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Agent and Term Loan Agent. Neither the Agent or Term Loan Agent shall have any obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Loan Parties hereby acknowledge that (a) the Agent, Term Loan Agent and/or the Arranger will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "Public Lender"). The Loan Parties hereby agree that so long as any Loan Party is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Agent, Term Loan Agent, the Arranger, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Agent, Term Loan Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

    **6.03**   **Notices**. Promptly notify the Agent and Term Loan Agent:

    (a)     of the occurrence of any Default or Event of Default;

    (b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

    (c)     of any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof;

    (d)     of any material dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

    (e)     of the occurrence of any ERISA Event;

    (f)     of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(g)     of any change in any Loan Party's senior executive officers;

(h)     of the discharge by any Loan Party of its present Registered Public Accounting Firm or any withdrawal or resignation by such Registered Public Accounting Firm;

(i)     of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)     of the filing of any Lien for unpaid Taxes against any Loan Party in excess of $100,000;

(k)     of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)     of any transaction of the nature contained in <u>Article VII</u> hereof;

(m)     promptly, upon written receipt thereof, copies of any written notice of any alleged material defaults under the Chapter 11 Plan or any pleadings seeking to amend in a manner adverse to the Agent, the Term Loan Agent or Lenders or revoke the Chapter 11 Plan or the Confirmation Order; and

(n)     of any failure by any Loan Party to pay rent or such other amounts due at (i) any distribution centers or warehouses; (ii) five (5%) or more of such Loan Party's locations; or (iii) any of a Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due and such failure would be reasonably likely to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to <u>Section 6.03(a)</u> shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.04     Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent or the Term Loan Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc.**

(a)    Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties.**

(a)    Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance reasonably acceptable to the Agent and Term Loan Agent not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable Law, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent and Term Loan Agent.

(b)    Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent and Term Loan Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent or Term Loan Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(c)    Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(d)    Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent or Term Loan Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(e)    Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(f)     Deliver to the Agent and Term Loan Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent and Term Loan Agent, including an insurance binder) together with evidence satisfactory to the Agent and Term Loan Agent of payment of the premium therefor.

(g)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent or Term Loan Agent furnish the Agent and Term Loan Agent certificates evidencing renewal of each such policy.

(h)     Permit any representatives that are designated by the Agent or Term Loan Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees. If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees. The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08     Compliance with Laws**. Comply (a) in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (i) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP; (ii) such contest effectively suspends enforcement of the contested Laws, and (iii) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect, and (b) with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

**6.09     Books and Records; Accountants.**

(a)     Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)    at all times retain a Registered Public Accounting Firm which is reasonably satisfactory to the Agent and Term Loan Agent and shall instruct such Registered Public Accounting Firm to cooperate with, and be available to, the Agent, the Term Loan Agent or their representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such Registered Public Accounting Firm, as may be raised by the Agent or Term Loan Agent.

**6.10    Inspection Rights.**

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and Registered Public Accounting Firm, and permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct evaluations of the Loan Parties' business plan, forecasts and cash flows, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b)    Upon the request of the Agent after reasonable prior notice (except that prior notice shall not be required if a Default or Event of Default shall have occurred and be continuing), permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Lead Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Loan Parties shall pay the reasonable fees and expenses of the Agent and such professionals with respect to such examinations and evaluations. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may, in its Permitted Discretion, undertake commercial finance examinations at the Loan Parties' expense (including, without limitation, if required by Law or if a Default or Event of Default shall have occurred and be continuing).

(c)    Upon the request of the Agent after reasonable prior notice (except that prior notice shall not be required if a Default or Event of Default shall have occurred and be continuing), permit the Agent or professionals (including appraisers) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the assets included in the Borrowing Base. Additionally, upon the request of the Term Loan Agent, after reasonable prior notice (except that prior notice shall not be required if a Default or Event of Default shall have occurred and be continuing), permit the Term Loan Agent or professionals (including appraisers) retained by the Term Loan Agent to conduct appraisals of the Intellectual Property. The Loan Parties shall pay the reasonable fees and expenses of the Agent (or Term Loan Agent, as applicable) and such professionals with respect to such appraisals. Without limiting the foregoing, the Loan Parties acknowledge that the Agent (or Term Loan Agent, as applicable) may, in its Permitted Discretion, undertake inventory or intellectual property appraisals at the Loan Parties' expense (including, without limitation, if required by Law or if a Default or Event of Default shall have occurred and be continuing).

**6.11    Use of Proceeds**.  Use the proceeds of the Credit Extensions (a) on the Closing Date, (i) to repay the Indebtedness under the Existing Credit Agreements; (ii) for the payment of transaction expenses in connection with this Agreement and the transactions contemplated by the Chapter 11 Plan, and (iii) fund such amounts required under the Confirmation Order, and (b) at all other times thereafter,

(i) to finance the acquisition of working capital assets of the Borrowers, including the purchase of inventory and equipment, in each case in the ordinary course of business, (ii) to finance Capital Expenditures of the Borrowers, and (iii) for general corporate purposes of the Loan Parties, in each case to the extent expressly permitted under applicable Law and the Loan Documents.

**6.12    Additional Loan Parties**.  Notify the Agent at the time that any Person (x) becomes a Subsidiary or (y) who is an Unrestricted Subsidiary becomes a Subsidiary that is no longer an Unrestricted Subsidiary, and in each case promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) which is not a CFC, to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of <u>Section 4.01(a)</u> and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a CFC that is not joined as a Loan Party, the Equity Interests of such Subsidiary to be pledged may be limited to 65% of the outstanding voting Equity Interests of such Subsidiary and 100% of the non-voting Equity Interests of such Subsidiary and such time period may be extended based on local law or practice), in each case in form, content and scope reasonably satisfactory to the Agent and Term Loan Agent.  In no event shall compliance with this <u>Section 6.12</u> waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this <u>Section 6.12</u> if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.13    Cash Management.**

(a)     On or prior to the Closing Date:

(i)     deliver to the Agent copies of notifications (each, a "<u>Credit Card Notification</u>") substantially in the form attached hereto as <u>Exhibit G</u> which have been executed on behalf of such Loan Party and delivered to such Loan Party's Credit Card Issuers and Credit Card Processors  listed on <u>Schedule 5.21(b)</u>; and

(ii)     enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "<u>Blocked Accounts</u>").

(b)     At the request of the Agent, the Loan Parties shall deliver to the Agent copies of notifications (each, a "<u>DDA Notification</u>") substantially in the form attached hereto as <u>Exhibit H</u> which have been executed on behalf of such Loan Party and delivered to each depository institution listed on <u>Schedule 5.21(a)</u>.

(c)     The Loan Parties shall ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to a Blocked Account all amounts on deposit in each DDA and all payments due from all Credit Card Issuers and Credit Card Processors.

(d)     Each Blocked Account Agreement shall require upon notice from Agent the ACH or wire transfer no less frequently than daily (and whether or not there are then any outstanding Obligations) to the concentration account maintained by the Agent at Wells Fargo (the "<u>Concentration</u>

Account"), of all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

        (i)     all available cash receipts from the sale of Inventory and other assets (whether or not constituting Collateral);

        (ii)     all proceeds of collections of Accounts;

        (iii)     all Net Proceeds, and all other cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event;

        (iv)     the then contents of each DDA (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained);

        (v)     the then entire ledger balance of each Blocked Account (net of any minimum balance, not to exceed $2,500.00, as may be required to be kept in the subject Blocked Account by the Blocked Account Bank); and

        (vi)     the proceeds of all credit card charges.

        (e)     The Concentration Account shall at all times be under the sole dominion and control of the Agent. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the Concentration Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Concentration Account shall be applied to the Obligations as provided in this Agreement. In the event that, notwithstanding the provisions of this Section 6.13, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Concentration Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

        (f)     Upon the request of the Agent, the Loan Parties shall cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

        **6.14**    **Information Regarding the Collateral.**

        (a)     Furnish to the Agent and Term Loan Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all

times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)     Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, the Lead Borrower shall advise the Agent and Term Loan Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent or Term Loan Agent, the Lead Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

### 6.15     Physical Inventories.

(a)     Cause not less than one (1) physical inventory to be undertaken, at the expense of the Loan Parties, in each Fiscal Year and periodic cycle counts, in each case, consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent and Term Loan Agent. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party.   The Lead Borrower, within thirty (30) days following the completion of such inventory, shall provide the Agent and Term Loan Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)     Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent or Term Loan Agent determines (each, at the expense of the Loan Parties).

### 6.16     Environmental Laws.

(a)     Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.17    Further Assurances.**

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent or Term Loan Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent and Term Loan Agent, from time to time upon request, evidence satisfactory to the Agent and Term Loan Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent and Term Loan Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.17, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.17(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.17(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c)    Use, and cause each of the Subsidiaries to use, their commercially reasonable efforts to obtain lease terms in any Lease entered into by any Loan Party after the Closing Date not expressly prohibiting the recording in the relevant real estate filing office of an appropriate memorandum of lease and the encumbrancing of the leasehold interest of such Loan Party in the property that is the subject of such Lease.

(d)    Upon the request of the Agent or Term Loan Agent cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent and Term Loan Agent covering such matters and in such form as the Agent or Term Loan Agent may reasonably require.

(e)    Upon the request of the Agent or Term Loan Agent, use commercially reasonable efforts to cause any of its landlords to deliver a Collateral Access Agreement to the Agent and Term Loan Agent in such form as the Agent and Term Loan Agent may reasonably require.

**6.18    Compliance with Terms of Leaseholds.**

Except as otherwise expressly permitted hereunder, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect, (b) not allow such Leases to lapse (except in the ordinary course of business) or be terminated or any rights to renew such Leases to be forfeited or cancelled, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing.

**6.19    Material Contracts**.    (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect, (c) enforce such Material Contract in accordance with its terms, (d) take all such action to such end as may be from time to time requested by the Agent, (e) upon request of the Agent, make to each other party to each such Material Contract such demands and requests for information and

reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (f) cause each of its Subsidiaries to do the foregoing.

**ARTICLE VII**
**NEGATIVE COVENANTS**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (other than contingent indemnification obligations for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Disqualified Stock.**

(a)    Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell any other Equity Interests unless (i) such Equity Interests shall be issued solely by the Parent and not by a Subsidiary of a Loan Party, (ii) such Equity Interests provide that all dividends and other Restricted Payments) in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (iii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party issuing such Equity Interests and in accordance with the limitations contained in this Agreement, and (iv) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a)    any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b)    any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into a Borrower, provided that in any merger involving a Borrower, such Borrower shall be the continuing or surviving Person;

(c)    in connection with a Permitted Acquisition, any Subsidiary of a Loan Party may merge with or into or consolidate with any other Person or permit any other Person to merge with or into or consolidate with it; provided that (i) the Person surviving such merger shall be a wholly-owned

Subsidiary of a Loan Party and such Person shall become a Loan Party in accordance with the provisions of Section 6.12 hereof, and (ii) in the case of any such merger to which any Loan Party is a party, such Loan Party is the surviving Person; and

        (d)     any CFC that is not a Loan Party may merge into any CFC that is not a Loan Party.

        **7.05**     **Dispositions**.   Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

        **7.06**     **Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect  to any action described below or would result therefrom:

        (a)     each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party;

        (b)     the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

        (c)     from and after the first anniversary of the Closing Date, if the Payment Conditions are satisfied:

        (i)     Loan Parties and each Subsidiary may purchase, redeem or otherwise acquire Equity Interests issued by it;

        (ii)     the Parent may declare or pay cash dividends to its stockholders; and

        (iii)     redemptions of the convertible notes that are the subject of the Note Financing and cash distributions by Borrowers to Parent to permit Parent to make payments of principal and interest on Subordinated Debt, in all cases, as and to the extent permitted under Section 7.07.

        **7.07**     **Prepayments of Indebtedness.**  Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except (a) as long as no Default or Event of Default then exists, regularly scheduled or mandatory repayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (other than Subordinated Indebtedness), and (ii) Subordinated Indebtedness in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto, (b) from and after the first anniversary of the Closing Date, voluntary prepayments, repurchases, redemptions or defeasances of (i) Permitted Indebtedness (but excluding on account of any Subordinated Indebtedness) as long as the Payment Conditions are satisfied, and (ii) Subordinated Indebtedness in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto, and as long as the Payment Conditions are satisfied, (c) so long as Default or Event of Default exists or would arise as a result of making such payment, any required Plan Payments, and (d) Permitted Refinancings of any such Indebtedness.

**7.08    Change in Nature of Business.**

(a)    In the case of the Parent, engage in any business or activity other than (i) the direct or indirect ownership of all outstanding Equity Interests in the other Loan Parties, (ii) maintaining its corporate existence, (iii) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (iv) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, and (v) activities incidental to the businesses or activities described in clauses (a) through (iv) of this Section 7.08(a).

(b)    In the case of each of the other Loan Parties, engage in any line of business substantially different from the Business conducted by the Loan Parties and their Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

(c)    In the case of TWC-Bermuda, engage in any business operations or have any material assets or Indebtedness.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) transactions described on Schedule 7.09[1] hereto, (c) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (d) the issuance of Equity Interests in the Parent to any officer, director, employee or consultant of the Parent or any of its Subsidiaries, (e) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Parent or any of its Subsidiaries, and (f) any issuances of securities of the Parent (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Parent) of the Parent or any of its Subsidiaries.

**7.10    Burdensome Agreements**.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (f) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds**.   Use the proceeds of any Credit Extension, whether directly or indirectly, (a) to purchase or carry Margin Stock or to extend credit to others for the purpose of

---

[1] NTD: To include "ABEO Agreement" with Andy Feshbach

purchasing or carrying Margin Stock, to refund Indebtedness originally incurred for such purpose or for any purpose that violates the provisions of Regulation T, U or X of the FRB; (b) to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person), or in any other manner that would result in a violation of Sanctions by any Person; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws or (d) for purposes other than those permitted under this Agreement.

### 7.12    Amendment of Material Documents.

Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness (other than on account of any refinancing thereof otherwise permitted hereunder), in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect.

### 7.13    Fiscal Year.

Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties (including reclassifying any Inventory under the Borrowing Base), except as required by GAAP.

### 7.14    Deposit Accounts; Credit Card Processors.

Open new DDAs or Blocked Accounts unless the Loan Parties shall have delivered to the Agent appropriate DDA Notifications (to the extent requested by Agent pursuant to the provisions of Section 6.13(b) hereof) or Blocked Account Agreements consistent with the provisions of Section 6.13 and otherwise satisfactory to the Agent. No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.13 hereof.

### 7.15    Financial Covenant.

(a)    EBITDA. Until the Term Loan is paid in full, permit Consolidated EBITDA, calculated as of the last day of each quarter, for the four (4) quarters most recently ended on the date of calculation, to be less than the minimum amount set forth in the table below for each applicable period:

| Period | Minimum Consolidated EBITDA |
| --- | --- |
| September 31, 2018 | $3,900,000 |
| December 31, 2018 | $5,800,000 |

(b)    provided, that, for trailing four (4) quarter periods ending after December 31, 2018, the Agent shall set the minimum Consolidated EBITDA covenant level based on the

Consolidated EBITDA values in the business plan delivered to, and approved by, the Agent pursuant to Section 6.02 for the applicable Fiscal year, using a comparable methodology as was used for the Fiscal year ending December 31, 2018. The foregoing covenant shall continue to be tested quarterly, on a trailing four (4) quarter basis, for periods after December 31, 2018.

**7.16    Confirmation Order.** (a) Permit the Final Order approving the Chapter 11 Plan to be revoked or (b) breach, or permit any Subsidiary to breach, any terms or other obligations under such Final Order or Chapter 11 Plan.

**7.17    Consignment.** Consign any Inventory or Equipment or sell any Inventory or Equipment on bill and hold, sale or return, sale on approval, or other conditional terms of sale or accept or sell any Inventory or Equipment on consignment (other than with respect to up to $3,000,000 of Inventory and up to $500,000 of Equipment, in all cases, in connection with the Wholesale Account Locations).

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default**. Any of the following shall constitute an Event of Default:

(a)    Non-Payment. The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13 or 6.14 or Article VII; or

(c)    Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the first to occur of any Loan Party's knowledge thereof or notice thereof from the Agent or Term Loan Agent to the Lead Borrower; or

(d)    Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate), or in completing any request for a Borrowing via the Portal, shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    Cross-Default. Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of

notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)      <u>Insolvency Proceedings, Etc.</u>  Except for the pending Chapter 11 Case, any Loan Party or any of its Subsidiaries institutes, consents to the institution of or declares its intention to institute any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or a proceeding shall be commenced or a petition filed, without the application or consent of such Person, seeking or requesting the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed and the appointment continues undischarged, undismissed or unstayed for 30 calendar days or an order or decree approving or ordering any of the foregoing shall be entered; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 30 calendar days, or an order for relief is entered in any such proceeding; or

(g)      <u>Inability to Pay Debts; Attachment</u>.  (i) Any Loan Party or any Subsidiary thereof becomes unable or admits in writing its inability or fails generally to pay its debts as they become due in the ordinary course of business, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 10 days after its issuance or levy; or

(h)      <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)      <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)      <u>Invalidity of Loan Documents</u>.  (i)  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party, any Subsidiary thereof or any Governmental Authority contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under

any Security Document shall cease to be, or shall be asserted by any Loan Party, any Subsidiary thereof or any Governmental Authority not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

(k)     Change of Control.  There occurs any Change of Control; or

(l)     Cessation of Business.  Except as otherwise expressly permitted hereunder, any Loan Party shall take any action, or shall make a determination, whether or not yet formally approved by any Loan Party's management or board of directors, to (i) suspend the operation of all or a material portion of its business in the ordinary course, (ii) suspend the payment of any material obligations in the ordinary course or suspend the performance under material contracts in the ordinary course, (iii) solicit proposals for the liquidation of, or undertake to liquidate, all or a material portion of its assets or Store locations, or (iv) solicit proposals for the employment of, or employ an agent or other third party to conduct a program of closings, liquidations, or "Going-Out-Of-Business" sales of any material portion of its business; or

(m)     Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

(n)     Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the counterparty to such Material Contract to terminate such Material Contract; or

(o)     Indictment.  Any indictment of any Loan Party or any Loan Party's chief executive officer or chief financial officer under applicable Law where the crime alleged arises from an act of defalcation, breach of fiduciary duty, embezzlement or intentional fraud related to such senior executive's work responsibilities and would constitute a felony under applicable Law unless in the case of an indicted executive, such executive's employment is terminated within thirty (30) days of such indictment or the Agent and Lenders determine, in their Permitted Discretion, that such indictment is not material;

(p)     Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

(q)     Subordination.  (i) The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, or provisions of any intercreditor agreement entered into by Administrative Agent after the date hereof, any such provisions being referred to as the "Subordination Provisions", shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Intercreditor Provisions exist for the benefit of the Credit Parties, or (C) in the case of Subordinated Indebtedness, that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; and

(r)     Bankruptcy Matters.  The entry of any order or judgment (x) reversing, rescinding, vacating or staying the Confirmation Order, or (y) modifying the Chapter 11 Plan in a manner

materially adverse to the Credit Parties, in each case, without the prior written consent of the Agent, Term Loan Agent and the Required Lenders.

**8.02  Remedies Upon Event of Default**.

(a)  If any Event of Default occurs and is continuing,

(i)  the Agent may, or, at the request of the Required Revolving Lenders shall, (A) declare the Revolving Commitments of each Revolving Lender to make Committed Revolving Loans and any obligation of the L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Revolving Commitments and obligation shall be terminated; (B) declare the unpaid principal amount of all outstanding Committed Revolving Loans, all interest accrued and unpaid thereon, and all other Obligations related to the foregoing (other than Obligations under any Swap Contract) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii)  the Term Loan Agent may, or, at the request of the Required Term Lenders shall, declare the unpaid principal amount of the Term Loan, and all interest accrued and unpaid thereon, and any other Obligations related to the foregoing, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and

(iii)  the Agent may, or at the request of the Required Lenders shall:  (A) require that the Loan Parties Cash Collateralize the L/C Obligations; and (B) whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties

provided, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under Section 8.01(f), the obligation of each Lender to make Loans and any obligation of the L/C Issuer to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Loan Parties to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Agent or any Lender.

(b)  Notwithstanding anything to the contrary contained in Section 8.02(a)(iii)(B), the Agent shall demand payment of the Obligations and shall take any or all of the actions set forth in Section 8.02(a)(iii)(B) and commence and pursue such other Enforcement Actions as the Agent is directed by the Required Term Lenders (x) with respect to Events of Default described in Sections 8.01(a) with respect to the Term Loan and Section 8.01(f), within five (5) days after the date of the receipt by the Agent of written notice executed and delivered by the Required Term Lenders or by the Term Loan Agent on behalf of Required Term Lenders requesting that Agent commence Enforcement Actions and (y) otherwise, within sixty (60) days after the date of the receipt by the Agent of written notice executed and delivered by the Required Term Lenders or by the Term Loan Agent on behalf of Required Term Lenders

requesting that Agent commence Enforcement Actions (in either case, the "<u>Term Loan Action Notice</u>"); <u>provided</u>, that in each case: (1) the Agent shall not have commenced such Enforcement Action or the Required Lenders shall not have instructed the Agent to commence an Enforcement Action in accordance with <u>Section 8.02(a)(iii)(B)</u> prior to the expiration of such five (5) or sixty (60) day period, as applicable, (2) such Event of Default has not been waived by the Applicable Lenders prior to the Agent's receipt of the Term Loan Action Notice, (3) such Event of Default has not been waived or such Term Loan Action Notice has not been rescinded, in each case by the Required Lenders after the Agent's receipt of the Term Loan Action Notice, (4) in the good faith determination of the Agent, taking an Enforcement Action is permitted under the terms of the Loan Documents and applicable law, (5) taking an Enforcement Action shall not result in any liability of the Agent, the Term Loan Agent or the Lenders to any Loan Party or any other person, (6) the Agent shall be entitled to all of the benefits of Sections 9.03, 9.04 and 9.14 hereof, and (7) the Agent shall not be required to take an Enforcement Action so long as, within the period provided above, the Agent shall, at its option, either (a) appoint the Term Loan Agent, as an agent of the Agent for purposes of exercising the rights of the Agent to take an Enforcement Action, subject to the terms hereof or (b) resign as Agent, and the Term Loan Agent shall automatically be deemed to be the successor Agent hereunder and under the other Loan Documents for purposes hereof or thereof, except with respect to the provisions of Article II hereof and in connection with all matters relating to the determination of the Revolving Borrowing Base and each of its components (including Eligible Credit Card Receivables, Eligible Trade Receivables, Eligible In-Transit Inventory, Eligible Inventory, Reserves and receiving reports in respect of Collateral and conducting field examinations and appraisals with respect to the Collateral and similar matters), which shall be taken at the direction of the Required Revolving Lenders until a new Agent is appointed at the direction of the Required Revolving Lenders.

(c)    The Term Loan Agent may not sell, assign or otherwise transfer, or require the Agent to sell, assign or otherwise transfer the Term Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee or transferee thereof agrees to be bound by the provisions of this Section 8.02(c). Specifically, in the event of any Disposition (including, without limitation, by means of a sale pursuant to Section 363 of the Bankruptcy Code) of the Revolving Loan Priority Collateral, the Agent or any other Person (including any Revolving Lender) acting with the consent, or on behalf, of the Agent, shall have the right during the Use Period to use the Term Priority Collateral (including, without limitation, Intellectual Property), in order to assemble, inspect, copy or download information stored on, take actions to perfect its Lien on, complete a production run of Inventory involving, take possession of, move, prepare and advertise for sale, sell (by public auction, private sale or a "store closing", "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any Loan Party's business), store or otherwise deal with the Revolving Loan Priority Collateral, in each case without interference by the Term Loan Agent or any Term Lender or liability to the Term Loan Agent or any Term Lender. The Agent and the Revolving Lenders acknowledge and agree that in connection with their use of the Term Loan Priority Collateral consisting of Intellectual Property, they will not intentionally impair the substantial goodwill associated with such Intellectual Property (it being understood that the use of the Intellectual Property in connection with a Liquidation may result in impairment of the goodwill associated with such Intellectual Property and such impairment may be substantial). The Agent and the Revolving Lenders shall not be obligated to pay any licensing fee, royalty fee, rent, fee or other amounts to the Term Loan Agent or the Term Lenders (or any person claiming by, through or under any of them, including any purchaser of the Term Loan Priority Collateral) or to the Loan Parties, for or in respect of the use by the Agent and the Revolving Lenders of the Term Loan Priority Collateral. The Agent and the Revolving Lenders shall use the Term Loan Priority Collateral in accordance with applicable law. The Agent and Revolving Lenders shall not be obligated to pay any amounts to the Term Loan Agent or the Term Lenders (or any person claiming by, through or under the Term Loan Agent or the Term Lenders, including any purchaser of the Term Loan Priority Collateral) or the Borrowers or any other Loan Party for or in respect of the use by the Agent and Revolving Lenders of the Term Loan Priority Collateral and

neither the Agent and Revolving Lenders nor the Term Loan Agent or the Term Lenders shall be obligated to secure, protect, register, insure or otherwise maintain in any way any such Term Loan Priority Collateral (except that the Agent and Revolving Credit Lenders shall be so obligated for damages to the Term Loan Priority Collateral caused by the Agent and/or Revolving Lender or their employees, agents and representatives). The Agent and Revolving Lenders shall not have any liability to the Term Lenders (or any person claiming by, through or under the Term Lenders, including any purchaser of the Term Loan Priority Collateral) as a result of any condition on or with respect to the Term Loan Priority Collateral other than those directly arising from the gross negligence or willful misconduct of the Agent and/or a Revolving Lender or their respective employees, agents, and representatives, and the Agent and/or Revolving Lender shall have no duty or liability to maintain the Term Loan Priority Collateral in a manner better than that in which it was maintained prior to the use thereof by the Agent and Revolving Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

**8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Agent in the following order:

(a)    With respect to any and all proceeds, other than proceeds from Term Loan Priority Collateral,

First, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations (excluding the Other Liabilities) constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Revolving Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Revolving Lenders and the L/C Issuer and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Revolving Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, payment to the Swing Line Lender of that portion of the Obligations constituting accrued and unpaid interest on the Swing Line Loans;

<u>Fifth</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Committed Revolving Loans and other Obligations (other than Obligations owing to the Term Lenders), and fees (including Letter of Credit Fees but excluding any Early Termination Fees), ratably among the Revolving Lenders and the L/C Issuer in proportion to the respective amounts described in this clause <u>Fifth</u> payable to them;

<u>Sixth</u>, to the extent that Swing Line Loans have not been refinanced by a Committed Revolving Loan, to payment to the Swing Line Lender of that portion of the Obligations constituting unpaid principal of the Swing Line Loans;

<u>Seventh</u>, to payment of that portion of the Obligations constituting unpaid principal of the Committed Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause <u>Seventh</u> held by them;

<u>Eighth</u>, to the Agent for the account of the L/C Issuer, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

<u>Ninth</u>, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations, but excluding the Term Loan and any Other Liabilities), ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Ninth</u> held by them;

<u>Tenth</u>, to payment of that portion of the Obligations arising from Cash Management Services to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Tenth</u> held by them;

<u>Eleventh</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Term Loan and other Obligations and fees owing to the Term Lenders, ratably among the Term Lenders in proportion to the respective amounts described in this clause <u>Eleventh</u> payable to them;

<u>Twelfth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Term Loan and all other Obligations related to the Term Loan, ratably among the Term Lenders in proportion to the respective amounts described in this clause <u>Twelfth</u> held by them;

<u>Thirteenth,</u> to payment of all other Obligations arising from Bank Products to the extent secured under the Security Documents, ratably among the Credit Parties in proportion to the respective amounts described in this clause <u>Thirteenth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to 2.03(e), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause <u>Eighth</u> above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

        (b)      With respect to any and all proceeds from Term Loan Priority Collateral:

**First**, to payment of fees, indemnities, Credit Party Expenses and other amounts, including fees, charges and disbursements of counsel to the Agent and counsel to the Term Loan Agent, with respect to the realization on the Term Priority Collateral;

**Second**, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Term Lenders (including fees, charges and disbursements of counsel to the respective Term Lenders), ratably among them in proportion to the amounts described in this clause Second;

**Third**, ratably to pay any fees then due to the Term Lenders until paid in full;

**Fourth**, ratably to pay interest accrued in respect of the Term Loan until paid in full;

**Fifth**, ratably to pay principal due in respect of Term Loan ratably among the Term Lenders, in proportion to the respective amounts described in this clause **Fifth** held by them until paid in full;

**Sixth**, to the cash collateralization of unliquidated indemnification obligations for which a claim has been asserted against the Term Loan Agent or any Term Lender;

**Seventh**, to payment of the remaining Obligations, in accordance with the priorities established pursuant to Section 8.03(a) above; and

**Last**, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

**8.04    Separate Claims and Separate Classifications**.    Each of the Credit Parties hereto acknowledges and agrees that because of, among other things, their differing rights and priorities in the Collateral, the claims of the Revolving Lenders and the Term Lenders in respect of the Collateral are fundamentally different from each other, and the claims of the Committed Revolving Loans and the Term Loan in respect of any Collateral should be separately classified in any bankruptcy or other insolvency proceeding.    To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that, in respect of any Collateral, the Committed Revolving Loans and/or the Term Loan in respect of such Collateral constitute only one secured claim (rather than separate classes of secured claims), then all distributions shall be made as if there were separate classes of secured claims in respect of any Collateral and, to the extent that any holder of the Committed Revolving Loans and/or the Term Loan receives distributions in respect of such Collateral, such distributions shall be held in trust by the receiving party and distributed in accordance with Section 8.03.

**ARTICLE IX**
**THE AGENT**

**9.01    Appointment and Authority.**

Each of the Lenders and the Swing Line Lender hereby irrevocably appoints Wells Fargo to act on its behalf as the Agent hereunder and under the other Loan Documents (other than the Swap Contracts) and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.    The provisions of this Article

are solely for the benefit of the Agent, the Term Loan Agent, the Lenders and the L/C Issuer, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

Each of the Term Lenders hereby irrevocably appoints Wells Fargo to act on its behalf as the Term Loan Agent hereunder and under the other Loan Documents and authorizes the Term Loan Agent to take such actions on its behalf and to exercise such powers as are delegated to the Term Loan Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Term Loan Agent and the Term Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender**.  The Person serving as the Agent or the Term Loan Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent or the Term Loan Agent and the terms "<u>Revolving Lender</u>" or "<u>Revolving Lenders</u>" and "<u>Term Lender</u>" or "<u>Term Lenders</u>"  shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent or the Term Loan Agent, as applicable, hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  Neither the Agent or Term Loan Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent and Term Loan Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent or the Term Loan Agent is required to exercise as directed in writing by the Applicable Lenders, <u>provided</u> that neither the Agent or the Term Loan Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent or Term Loan Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as the Agent or the Term Loan Agent any of their respective Affiliates in any capacity.

Neither the Agent or Term Loan Agent shall be liable for any action taken or not taken by it (i) with the Consent or at the request of the Applicable Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent or Term Loan Agent, as applicable, shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

Neither the Agent nor the Term Loan Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent or the Term Loan Agent, as applicable, by the Loan Parties, a Lender or the L/C Issuer. Upon the occurrence of a Default or Event of Default, the Agent or the Term Loan Agent shall take such action

with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent or the Term Loan Agent shall have received such direction, the Agent or the Term Loan Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent or the Term Loan Agent be required to comply with any such directions to the extent that the Agent or the Term Loan Agent believes that its compliance with such directions would be unlawful.

Neither the Agent nor the Term Loan Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent or the Term Loan Agent.

### 9.04    Reliance by Agent and Term Loan Agent.

The Agent and the Term Loan Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent and the Term Loan Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the L/C Issuer, the Agent and the Term Loan Agent may presume that such condition is satisfactory to such Lender or the L/C Issuer unless the Agent or the Term Loan Agent shall have received written notice to the contrary from such Lender or the L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Agent and the Term Loan Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

### 9.05    Delegation of Duties.    The Agent and the Term Loan Agent may perform any and all of their respective duties and exercise their respective rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent or the Term Loan Agent. The Agent or the Term Loan Agent, and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent, the Term Loan Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent or the Term Loan Agent.

### 9.06    Resignation of Agent.    The Agent or the Term Loan Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation (a) from the Agent, the Required Revolving Lenders shall have the right, in consultation with

the Lead Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States or (b) from the Term Loan Agent, the Required Term Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor, which shall be a Term Loan Lender, or an Affiliate of any such Term Loan Lender.  If no such successor shall have been so appointed by the Required Revolving Lenders or the Required Term Lenders, as applicable, and shall have accepted such appointment within thirty (30) days after the retiring Agent or Term Loan Agent gives notice of its resignation, then the retiring Agent or Term Loan Agent may, on behalf of the Revolving Lenders and the L/C Issuer (in the case of the Agent) or on behalf of the Term Lenders (in the case of the Term Loan Agent), appoint a successor Agent or Term Loan Agent, as applicable, meeting the qualifications set forth above; provided, that if the Agent or the Term Loan Agent, as applicable, shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent or Term Loan Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuer under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent or the Term Loan Agent, as applicable, shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Applicable Lenders appoint a successor Agent or Term Loan Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Agent or Term Loan Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent of Term Loan Agent, and the retiring Agent or Term Loan Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Agent or Term Loan Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.  After the retiring Agent's or Term Loan Agent's resignation hereunder (including pursuant to Section 8.02(b) and this Section 9.06) and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent or Term Loan Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent or Term Loan Agent was acting in such capacity hereunder.

Any resignation by Wells Fargo as Agent pursuant to this Section shall also constitute its resignation as Swing Line Lender and the resignation of Wells Fargo as L/C Issuer.  Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer and Swing Line Lender, (b) the retiring L/C Issuer and Swing Line Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

**9.07    Non-Reliance on Agent or Term Loan Agent and Other Lenders**.  Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Agent, the Term Loan Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent, the Term Loan Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Except as

provided in <u>Section 9.12</u>, neither the Agent or Term Loan Agent shall have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent or Term Loan Agent, as applicable.

**9.08    No Other Duties, Etc**.  Anything herein to the contrary notwithstanding, none of the Bookrunners, Arrangers, Syndication Agent or Documentation Agent listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Agent, a Lender or the L/C Issuer hereunder.

**9.09    Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer, the Agent, the Term Loan Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer, the Agent, the Term Loan Agent such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer the Agent and such Credit Parties under <u>Sections 2.03(l), 2.03(m)</u> and <u>2.03(q)</u> as applicable, <u>2.09</u> and <u>10.04</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Agent and, if the Agent and Term Loan Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Agent or Term Loan Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent, the Term Loan Agent and their respective agents and counsel, and any other amounts due the Agent or Term Loan Agent under <u>Sections 2.09</u> and <u>10.04</u>.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer or to authorize the Agent to vote in respect of the claim of any Lender or the L/C Issuer in any such proceeding.

**9.10    Collateral and Guaranty Matters**.  The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with <u>Section 10.01</u>;

(b)     to subordinate any Lien on any property granted to or held by the Agent under any Loan Document to the holder of any Lien on such property that is permitted by clause (h) of the definition of Permitted Encumbrances; and

(c)     to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10.  In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

**9.11     Notice of Transfer.**

The Agent and Term Loan Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.12     Reports and Financial Statements.**

By signing this Agreement, each Lender:

(a)     agrees to furnish the Agent (and thereafter at such frequency as the Agent may reasonably request) with a summary of all Other Liabilities due or to become due to such Lender. In connection with any distributions to be made hereunder, the Agent shall be entitled to assume that no amounts are due to any Lender on account of Other Liabilities unless the Agent has received written notice thereof from such Lender;

(b)     is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Lead Borrower hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(c)     expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)     expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)     agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(f)       without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent, the Term Loan Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of Loans or Letters of Credit; and (ii) to pay and protect, and indemnify, defend, and hold the Agent, the Term Loan Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent, the Term Loan Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

### 9.13    Agency for Perfection.

Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent, the Term Loan Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession.  Should the Term Loan Agent or any Lender (other than the Agent) obtain possession of any such Collateral, the Term Loan Agent or such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

### 9.14    Indemnification of Agent.    Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent, the Term Loan Agent, the L/C Issuer and any Related Party, as the case may be, to the extent not reimbursed by the Loan Parties, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, the Term Loan Agent, the L/C Issuer and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, the Term Loan Agent, the L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, the Term Loan Agent's, the L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.  Notwithstanding the foregoing, the Term Lenders shall not be required to indemnify the Agent with respect to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from an action taken by the Agent at the direction of the Revolving Lenders not permitted under this Agreement.

### 9.15    Relation among Lenders.    The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent and the Term Loan Agent) authorized to act for, any other Lender.

### 9.16    Defaulting Lenders.

(a)       Notwithstanding the provisions of Section 2.14 hereof, the Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Agent shall transfer any such payments (i) first, to the Swing Line Lender to the extent of any Swing Line Loans that were made by the Swing Line Lender and that were required to be, but were not, paid by the Defaulting

Lender, (ii) second, to the L/C Issuer, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (iii) third, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (iv) to the Cash Collateral Account, the proceeds of which shall be retained by the Agent and may be made available to be re-advanced to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in Section 4.02) as if such Defaulting Lender had made its portion of the Loans (or other funding obligations) hereunder, and (v) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender. Subject to the foregoing, the Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Applicable Percentages in connection therewith) and for the purpose of calculating the fee payable under Section 2.09(a), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 10.01(a) through (c). The provisions of this Section 9.16 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Agent, the L/C Issuer, and the Borrowers shall have waived, in writing, the application of this Section 9.16 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by the Agent pursuant to Section 9.16(b) shall be released to the Borrowers). The operation of this Section 9.16 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Agent, the L/C Issuer, the Swing Line Lender, or to the Lenders other than such Defaulting Lender. Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees (except any Commitment Fees or Letter of Credit Fees not due to such Defaulting Lender in accordance with the terms of this Agreement), and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Applicable Percentage of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund. In the event of a direct conflict between the priority provisions of this Section 9.16 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 9.16 shall control and govern.

(b)     If any Swing Line Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(i)        such Defaulting Lender's participation interest in any Swing Line Loan or Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (x) the Outstanding Amount sum of all Non-Defaulting Lenders' Credit Extensions after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders' Commitments and (y) the conditions set forth in Section 4.02 are satisfied at such time;

(ii)        if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's participation in any outstanding Swing Line Loans (after giving effect to any partial reallocation pursuant to clause (b)(i) above) and (y) second, cash collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause (b)(i) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such L/C Obligations are outstanding; provided, that the Borrowers shall not be obligated to cash collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also the L/C Issuer;

(iii)        if the Borrowers cash collateralize any portion of such Defaulting Lender's participation in Letters of Credit Exposure pursuant to this Section 9.16(b), the Borrowers shall not be required to pay any Letter of Credit Fees to the Agent for the account of such Defaulting Lender pursuant to Section 2.03 with respect to such cash collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is cash collateralized;

(iv)        to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this Section 9.16(b), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.03 shall be adjusted in accordance with such reallocation;

(v)        to the extent any Defaulting Lender's participation in Letters of Credit is neither cash collateralized nor reallocated pursuant to this Section 9.16(b), then, without prejudice to any rights or remedies of the L/C Issuer or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.03 with respect to such portion of such participation shall instead be payable to the L/C Issuer until such portion of such Defaulting Lender's participation is cash collateralized or reallocated;

(vi)        so long as any Lender is a Defaulting Lender, the Swing Line Lender shall not be required to make any Swing Line Loan and the L/C Issuer shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Applicable Percentage of such Swing Line Loans or Letter of Credit cannot be reallocated pursuant to this Section 9.16(b) or (y) the Swing Line Lender or the L/C Issuer, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Line Lender or the L/C Issuer, as applicable, and the Borrowers to eliminate the Swing Line Lender's or L/C Issuer's risk with respect to the Defaulting Lender's participation in Swing Line Loans or Letters of Credit; and

(vii)        The Agent may release any cash collateral provided by the Borrowers pursuant to this Section 9.16(b) to the L/C Issuer and the L/C Issuer may apply any such cash collateral to the payment of such Defaulting Lender's Applicable Percentage of any Letter of Credit Disbursement that is not reimbursed by the Borrowers pursuant to Section 2.03.

**9.17    Co-Syndication Agent; Documentation Agent and Co-Lead Arrangers.**

Notwithstanding the provisions of this Agreement or any of the other Loan Documents, no Person who is or becomes a Co-Syndication Agent or a Documentation Agent nor the Co-Lead Arrangers shall have any powers, rights, duties, responsibilities or liabilities with respect to this Agreement and the other Loan Documents.

## ARTICLE X
## MISCELLANEOUS

**10.01    Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Swap Contracts), and no Consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)        increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(b)        as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including any Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document without the written Consent of such Revolving Lender;

(c)        as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written Consent of each Lender entitled to such amount; provided, however, that only the Consent of (i) the Required Lenders shall be necessary to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder; (ii) the Required Revolving Lenders shall be necessary to amend the definition of "Default Rate" as it applies to the Committed Revolving Loans and the Swing Line Loans or to waive any obligation of the Borrowers to pay interest on the Committed Revolving Loans and the Swing Line Loans or Letter of Credit Fees at the Default Rate; and (iii) the Required Term Lenders shall be necessary to amend the definition of "Default Rate" as it applies to the Term Loan or to waive any obligation of the Borrowers to pay interest on the Term Loan at the Default Rate);

(d)        as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(e)        change any provision of this Section or the definition of "Applicable Lenders", "Required Lenders", "Required Revolving Lenders", "Required Term Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written Consent of each Lender;

(f)        except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(g)        increase the Aggregate Commitments without the written Consent of each Lender;

(h)        change the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written Consent of each Lender, *provided that* the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;

(i)        modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(j)        except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

provided, further, notwithstanding the foregoing (but subject in each case to clauses (a), (b), (c), (d) and (e) of this Section 10.01), only the Consents outlined below shall be necessary to:

(a)        except for Permitted Dispositions, release all or substantially all of the (i) Revolving Loan Priority Collateral from the Liens of the Security Documents without the written Consent of each Revolving Lender; and (ii) Term Loan Priority Collateral from the Liens of the Security Documents without the written Consent of each Term Lender;

(b)        (i) without the written Consent of the Required Term Lenders, in the event that the Lead Borrower or any of the other Loan Parties become subject to a case under any Debtor Relief Laws, no Revolving Lender will propose any debtor-in-possession financing in favor the Loan Parties unless the terms of such debtor-in-possession financing complies with the terms and conditions of this Agreement and the Agent, for the benefit of the Term Lenders, retains a lien on the Collateral with the same priorities as set forth herein (for the avoidance of doubt, in no event shall any such debtor-in-possession financing be secured by a Lien on the Term Loan Priority Collateral senior to the pre-petition Lien of the Agent, for the benefit of the Term Loan Lenders, without the written Consent of each Term Loan Lender), and (ii) without the written Consent of the Required Revolving Lenders, in the event that the Lead Borrower or any of the other Loan Parties become subject to a case under any Debtor Relief Laws, no Term Lender will propose any debtor-in-possession financing in favor the Loan Parties unless the terms of such debtor-in-possession financing complies with the terms and conditions of this Agreement and the Agent, for the benefit of the Revolving Lenders, retains a lien on the Collateral with the same priorities as set forth herein (for the avoidance of doubt, in no event shall any such debtor-in-possession financing be secured by a Lien on the Revolving Loan Priority Collateral senior to the pre-petition Lien of the Agent, for the benefit of the Revolving Lenders, without the written Consent of each Revolving Lender); and

(c)        in the event that the Lead Borrower or any of the other Loan Parties become subject to a case under any Debtor Relief Laws, (i) consent by the Agent to the use of cash collateral from the proceeds of Revolving Loan Priority Collateral without the consent of the Required Revolving Lenders, or (ii) consent by the Agent to the use of cash collateral from the proceeds of Term Loan Priority Collateral without the consent of the Required Term Lenders; provided that adequate protection liens shall in all cases preserve the priorities provided in this Agreement;

provided, further, that notwithstanding the foregoing (but subject in each case to clauses (a), (b), (c), (d) and (e) of this Section 10.01), only the Consent of the Required Revolving Lenders shall be necessary to:

(i)     amend the definitions of "Commercial Letter of Credit", "Commercial Letter of Credit Agreement", "Defaulting Lender", "Honor Date", "Issuer Documents", "L/C Credit Extension", "L/C Issuer", "L/C Obligations", "Letter of Credit", "Letter of Credit Application", "Letter of Credit Expiration Date", "Letter of Credit Fee", "Letter of Credit Sublimit", "Non-Extension Notice Date", "Settlement Date", "Standby Letter of Credit", "Standby Letter of Credit Agreement", "Stated Amount", "Swing Line Borrowing", "Swing Line Lender", "Swing Line Loan", "Swing Line Loan Notice", "Swing Line Note", and "Swing Line Sublimit"; and

(ii)     amend Sections 1.06, 2.01(b), 2.02(d), 2.03, 2.04, 2.05(a), 2.05(b), 2.06(a), 2.06(b), 2.06(c), 2.09(a), 2.14, 9.16 or 10.06(h);

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; (iv) no amendment, waiver or Consent shall, unless in writing and signed by the Term Loan Agent in addition to the Lenders required above, affect the rights or duties of the Term Loan Agent under this Agreement or any other Loan Document, and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Products or Cash Management Services shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any Loan Party.

If any Lender does not Consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the Consent of each Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

**10.02    Notices; Effectiveness; Electronic Communications.**

(a)     Notices Generally.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)     if to the Loan Parties, the Agent, the Term Loan Agent, the L/C Issuer or the Swing Line Lender, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)     if to any other Lender, to the address, telecopier number, or electronic mail address specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection(b).

(b)     Electronic Communications.  Notices and other communications to the Loan Parties, the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Article II if such Lender or the L/C Issuer, as applicable, has notified the Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Agent, the Term Loan Agent, or any of their Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Loan Parties, the Agent, the Term Loan Agent, the L/C Issuer and the Swing Line Lender may change its address or telecopier for notices and

other communications hereunder, or, solely with respect to communications, may change its telephone number, by notice to the other parties hereto. Each other Lender may change its address or telecopier number for notices and other communications hereunder by notice to the Lead Borrower, the Agent, the Term Loan Agent, the L/C Issuer and the Swing Line Lender. In addition, each Lender agrees to notify the Agent and the Term Loan Agent from time to time to ensure that the Agent and the Term Loan Agent each has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     <u>Reliance by Agent, L/C Issuer and Lenders</u>.  The Agent, the Term Loan Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices (including, without limitation, all Requests for Credit Extensions) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, the Term Loan Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties (including, without limitation, pursuant to any Requests for Credit Extensions). All telephonic notices to and other telephonic communications with the Agent or the Term Loan Agent may be recorded by the Agent or Term Loan Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04    Expenses; Indemnity; Damage Waiver.**

(a)     <u>Costs and Expenses</u>.  The Borrowers shall pay all Credit Party Expenses.

(b)     <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent and the Term Loan Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent and the Term Loan Agent (and any sub-agents thereof) and their Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in

connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by Lenders.  Without limiting their obligations under Section 9.14 hereof, but subject to the last sentence of this Section 10.04(c), to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, and each Term Lender severally agrees to pay to the Term Loan Agent or such Related Party (or any such sub-agent thereof) such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent), the Term Loan Agent (or any such sub-agent), or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent), the Term Loan Agent (or any such sub-agent), or the L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).  The Term Lenders shall not be required to pay to the Agent any unpaid amounts arising under clauses (iv) and (v) of Section 10.04(b) and resulting solely from an action taken by the Agent at the direction of the Revolving Lenders not permitted under this Agreement.

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)　　Payments.　All amounts due under this Section shall be payable on demand therefor.

(f)　　Survival.　The agreements in this Section shall survive the resignation of any Agent, the Term Loan Agent, and the L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05　Payments Set Aside**.　To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, (b) each Revolving Lender and the L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Revolving Commitments or the Committed Revolving Loans so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect and (c) each Term Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount relating to the Term Loan so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.　The obligations of the Lenders and the L/C Issuer under clauses (b) and (c) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06　Successors and Assigns.**

(a)　　Successors and Assigns Generally.　The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written Consent of the Agent, the Term Loan Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)　　Assignments by Lenders.　Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this Section 10.06(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)　　Minimum Amounts

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 with respect to Committed Revolving Loans, and not less than $2,500,000 with respect to the Term Loan, unless each of the Agent and, with respect to the Term Loan, the Term Loan Agent, and, so long as no Default or Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and shall be deemed given if the Lead Borrower has not responded to a request for such consent within seven (7) Business Days); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not apply to the Swing Line Lender's rights and obligations in respect of Swing Line Loans;

(iii)     Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Lead Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) a Default or Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)     the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Revolving Commitment and/or Committed Revolving Loans if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(D)     the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment in respect of the assignment of any Revolving Commitment and/or Committed Revolving Loans.

(E)     the consent of the Term Loan Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of the Term Loan (or any portion thereof) if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)     <u>Assignment and Assumption</u>.     The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, <u>provided</u>, <u>however</u>, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 10.06(d)</u>.

(c)     <u>Register</u>.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent, the Term Loan Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower, the Term Loan Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans) owing to it); <u>provided,</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Term Loan Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights

and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 3.01(e) as though it were a Lender.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     Resignation as L/C Issuer or Swing Line Lender after Assignment. Notwithstanding anything to the contrary contained herein, if at any time Wells Fargo assigns all of its Revolving Commitment and Committed Revolving Loans pursuant to subsection (b) above, Wells Fargo may, (i) upon thirty (30) days' notice to the Lead Borrower and the Lenders, resign as L/C Issuer and/or (ii) upon thirty (30) days' notice to the Lead Borrower, Wells Fargo may resign as Swing Line Lender. In the event of any such resignation as L/C Issuer or Swing Line Lender, the Lead Borrower shall be entitled to appoint from among the Revolving Lenders a successor L/C Issuer or Swing Line Lender hereunder; provided, however, that no failure by the Lead Borrower to appoint any such successor shall affect the resignation of Wells Fargo as L/C Issuer or Swing Line Lender, as the case may be. If Wells Fargo resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Revolving Lenders to make Base Rate Loans pursuant to Section 2.03(e). If Wells Fargo resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line

Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Revolving Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c). Upon the appointment of a successor L/C Issuer and/or Swing Line Lender, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer or Swing Line Lender, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Wells Fargo to effectively assume the obligations of Wells Fargo with respect to such Letters of Credit.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

Each of the Credit Parties agrees that Agent may make Borrower Materials available to the Lenders by posting the Communications on the Platform.  The Platform is provided "as is" and "as available."  Agent does not warrant the accuracy or completeness of the Borrower Materials, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by Agent in connection with the Borrower Materials or the

Platform.  In no event shall Agent or any of the Agent-Related Persons have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

**10.08   Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or the L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have.  Each Lender and the L/C Issuer agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09   Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Agent, the Term Loan Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent, the Term Loan Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11   Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith

shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent or Term Loan Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, (y) any obligations that may thereafter arise with respect to the Other Liabilities and (z) any Obligations that may thereafter arise under Section 10.04.

**10.12 Severability**. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13 Replacement of Lenders**. If any Lender requests compensation under Section 3.04, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender, The Agent and the Term Loan Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a) the Borrowers shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d) such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

### 10.14 Governing Law; Jurisdiction; Etc.

(a) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) SUBMISSION TO JURISDICTION. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d) SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e) ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR ANY FEDERAL COURT SITTING THEREIN AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15    Waiver of Jury Trial**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16    No Advisory or Fiduciary Responsibility**.    In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.   Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    Patriot Act; Due Diligence.**    Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act and, as applicable, the Canadian Anti-Money Laundering & Anti-Terrorism Legislation and Canadian Economic Sanctions and Export Control Laws, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act and, as applicable, the Canadian Anti-Money Laundering & Anti-Terrorism Legislation or Canadian Economic Sanctions and Export Control Laws.   In addition, Agent and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and

legal and beneficial owners. Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

**10.18    Reserved**. Reserved.

**10.19    Time of the Essence**. Time is of the essence of the Loan Documents.

**10.20    Press Releases.**

(a)    Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent, the Term Loan Agent or their respective Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and the Term Loan Agent and without the prior written consent of the Agent and Term Loan Agent, as applicable, unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent and Term Loan Agent, as applicable, before issuing such press release or other public disclosure.

(b)    Each Loan Party consents to the publication by the Agent, the Term Loan Agent, any Lender or their respective representatives of advertising material, including any "tombstone," press release or comparable advertising, on its website or in other marketing materials of Agent or the Term Loan Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent, the Term Loan Agent, or such Lender shall provide a draft reasonably in advance of any advertising material, "tomb stone" or press release to the Lead Borrower for review and comment prior to the publication thereof. Each of the Agent and the Term Loan Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.21    Additional Waivers.**

(a)    The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)    The obligations of each Loan Party  shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of

any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement.  Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers.  As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)     Without limiting the generality of the foregoing, or of any other waiver or other provision set forth in this Agreement, each Loan Party hereby absolutely, knowingly, unconditionally,

and expressly waives any and all claim, defense or benefit arising directly or indirectly under any one or more of Sections 2787 to 2855 inclusive of the California Civil Code or any similar law of California.

### 10.22  No Strict Construction.

The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

### 10.23  Attachments.

The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

### 10.24  Keepwell.

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Facility Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.24 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.24, or otherwise under the Facility Guaranty, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations. Each Qualified ECP Guarantor intends that this Section 10.24 constitute, and this Section 10.24 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Signature Pages to Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**THE WALKING COMPANY HOLDINGS, INC.**, as Parent and a Guarantor

By: _____
Name: Roberta Morris
Title: Chief Financial Officer

**BIG DOG USA, INC.**,
as a Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer

**THE WALKING COMPANY**,
as a Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer

**FOOTSMART, INC.**,
as a Borrower

By: _____
Name: Roberta Morris
Title: Chief Financial Officer

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Agent, L/C Issuer, Swing Line Lender and as Revolving Lender

By: _____
Name:
Title:

**WELLS FARGO BANK, NATIONAL ASSOCIATION** as Term Loan Agent and Term Lender

By: _____
Name:
Title:

## EXHIBIT D

## GUC Claims Ombudsman

Justin R. Alberto, Esq.
Bayard, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone:  302.429.4226
Facsimile:  302.658.6395
Email:        jalberto@bayardlaw.com

## EXHIBIT E

## List of Litigation Claims

None

## EXHIBIT F

**Plan Sponsor Investment Agreement**

## INVESTMENT AGREEMENT

This INVESTMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of _____, 2018, by and between Richard Kayne, as trustee of the Richard and Suzanne Kayne Living Trust dtd 1/14/99 (as such trustee, or any designees thereof, "<u>Kayne</u>"), and Andrew Feshbach and Kendra Feshbach, as trustees of the Feshbach Living Trust (as such trustees, or any designee thereof, "<u>Feshbach</u>" and, together with Kayne, the "<u>Investors</u>"), on the one hand, and The Walking Company Holdings, Inc., a Delaware corporation (the "<u>Company</u>"), on the other.

### RECITALS

**A.**     The Company and its subsidiaries, including The Walking Company, a Delaware corporation, Big Dog USA, Inc., a California corporation, and FootSmart, Inc., a Delaware corporation (collectively, the "<u>Subsidiaries</u>," and with the Company, the "<u>Debtors</u>"), are debtors-in-possession under chapter 11 of title 11 of the United States Code (the "<u>Code</u>") in cases no. 18-10474 (LSS), 18-10474 (LSS) and 18-10474 (LSS), jointly administered under case no. 18-10474 (LSS) (the "<u>Cases</u>"), pending in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

**B.**     The Debtors filed a First Amended Joint Plan of Reorganization dated April 20, 2018 (the "<u>Plan</u>") and a First Amended Disclosure Statement in Support of Debtors' Joint Plan of Reorganization dated April 20, 2018 (the "<u>Disclosure Statement</u>") with the Bankruptcy Court.

**C.**     On May 4, 2018, the Bankruptcy Court approved the Disclosure Statement. The Company expects that the Bankruptcy Court will enter the Confirmation Order confirming the Plan on or about June 30, 2018.

**D.**     Pursuant to the Plan, and on the terms and subject to the conditions set forth herein, the Company wishes to issue and sell to the Investors, and the Investors wish to purchase from the Company, severally and not jointly, (a) newly issued shares of common stock, par value $0.01 per share, of the Company (the "<u>Common Shares</u>") and (b) newly issued shares of Series A Preferred Stock, par value $0.01 per share, of the Company (the "<u>Preferred Shares</u>" and, together with the Common Shares, the "<u>Shares</u>").

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the parties agree as follows:

## I.     STOCK PURCHASE

1.1.     <u>Filing of Amended and Restated Certificate</u>.  Prior to the Closing Date, the Company shall duly file with the Secretary of State of Delaware an Amended and Restated Certificate of Incorporation, in substantially the form attached as <u>Exhibit A</u> hereto (the "<u>Amended and Restated Certificate</u>").  The Shares shall have the rights, powers, preferences and privileges set forth in the Amended and Restated Certificate.  Payment of dividends on the Shares, and any redemption of the Shares, shall be subject to the terms set forth in the Exit Facility.

1.2.    Stock Purchase.   On the terms and subject to the conditions herein, at the Closing, the Company will issue, sell and deliver to the Investors, and the Investors shall, severally and not jointly, purchase from the Company, in the respective amounts set forth opposite such Investors' names on Exhibit B hereto, (i) 510,000 newly issued Common Shares and (ii) 1,000 newly issued Preferred Shares.  In this Agreement, the Shares to be issued and purchased hereunder are referred to the "Purchased Shares."

1.3.    [Reserved].

1.4.    Purchase Price.   The aggregate purchase price for the Purchased Shares shall be Ten Million Two Hundred Thousand Dollars ($10,200,000.00), consisting of (a) an aggregate purchase price for the 510,000 Common Shares of Five Hundred Ten Thousand Dollars ($510,000.00) or a purchase price per Common Share (the "Per Common Share Price") of One Dollar ($1.00) and (b) an aggregate purchase price for the 1,000 Preferred Shares of Nine Million Six Hundred Ninety Thousand Dollars ($9,690,000.00) or a purchase price per Preferred Share (the "Per Preferred Share Price") of Nine Thousand Sixty Hundred Ninety Dollars ($9,690.00).

1.5.    Closing.   The closing of the purchase and sale of the Purchased Shares (the "Closing") will take place at the offices of Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, Suite 1300, Los Angeles, California 90067, at 10:00 a.m. local time (provided, however, that the Closing may take place by the exchange of executed documents by facsimile or email transmission), on a date designated by the Company and agreed to by the Investors, which date shall be on or promptly following the date upon which all of the conditions precedent set forth in Article V have been satisfied or waived.  The date on which the Closing occurs is the "Closing Date."

1.6.    Closing Deliveries.   At the Closing:

(a)    Investors shall deliver the Purchase Price to the Company in full by wire transfer in immediately available funds to a bank account designated by the Company; and

(b)    The Company shall issue and deliver to each Investor a certificate or certificates, duly registered in the name of such Investor, evidencing the number of Purchased Shares being purchased by such Investor as set forth opposite such Investor's name on Exhibit B hereto.

II.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each Investor, as of the date hereof and as of the Effective Date of the Plan, as follows:

2.1.    Existence; Authorization, Validity and Effect of Agreement.   Each of the Company and the Subsidiaries (i) is an entity duly organized, validly existing and in good standing under the laws of the state of its organization, (ii) subject to the administration of the Bankruptcy Court in the Cases, has all requisite corporate or equivalent power and authority to own, operate or lease the properties that it purports to own, operate or lease and to conduct its business as currently conducted and (iii) is duly qualified or licensed as a foreign corporation to do business, and is in good standing, in each jurisdiction where the character of its properties owned, operated or leased or the nature of its activities makes such qualification or licensing necessary.  Subject to approval by the Bankruptcy Court pursuant to the entry of the Confirmation Order (as defined below), (a) the Company has the requisite corporate power and authority to execute and deliver this Agreement and the agreements, instruments and other documents related hereto and thereto and contemplated hereby or thereby (collectively, the "Transaction Documents") to be executed and delivered by it, and, subject to entry of the Confirmation Order and the

expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure, respectively, to perform its obligations hereunder and thereunder, including the issuance of the Purchased Shares, (b) this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite corporate action, and (c) this Agreement has been, and at the Closing each other Transaction Document will be, duly and validly executed and delivered by the Company and constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

2.2.    Validity of Purchased Shares, Etc.  Each of the Purchased Shares, when issued to an Investor in accordance with the Plan and this Agreement, will be duly authorized, validly issued, fully paid, and non-assessable and, immediately following the Closing, the Purchased Shares will represent one hundred percent (100%) of the issued and outstanding capital stock of the Company.  At the Closing, each Investor will acquire good and valid title to the Purchased Shares being purchased by it pursuant to this Agreement, free and clear of any and all liens, claims, security interests, encumbrances, restrictions on voting or alienation or otherwise, or adverse interests, except as may be created by the Investor or imposed under the Amended and Restated Certificate or applicable securities laws.

2.3.    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance of this Agreement by the Company, does not, and the consummation by the Company of the transactions contemplated hereby, including the issuance and sale of the Purchased Shares, will not, (i) conflict with or violate the charter or bylaws of the Company or any of its Subsidiaries (as they may be amended or adopted pursuant to the Plan, as applicable), (ii) subject to the entry of the Confirmation Order and the occurrence of the Effective Date, conflict with or violate any domestic or foreign statute, rule, regulation or other legal requirement ("Law") or order, judgment, injunction or decree ("Order") applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) conflict with or violate or result in a breach or default under any contract, agreement or instrument binding upon the Company or any of its Subsidiaries or any of its or their assets, or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject.

(b)    The execution and delivery of this Agreement by the Company does not and the consummation by the Company of the transactions contemplated hereby, including the sale, issuance and delivery of the Purchased Shares will not, require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority, domestic or foreign, including any quasi-governmental, supranational, statutory, environmental entity and any stock exchange, court or arbitral body (each a "Governmental Entity"), other than Bankruptcy Court approval.

2.4.    Authorized Capital Stock.  The authorized capital stock of the Company under the Amended and Restated Certificate will, at the Closing, consist of (i) 1,000,000 shares of Preferred Stock, par value $0.01 per share, of which (A) 1,000 shares have been or will be designated Series A Preferred Stock and will be issued at the Closing and (B) 999,000 shares will be authorized but unissued, and (ii) 1,000,000 shares of Common Stock.  Attached as Exhibit C hereto is a true and correct capitalization table showing the Company's fully diluted capitalization on a pro forma basis as of the Closing Date.  At the Closing, there will be no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, preemptive rights, exchange rights or other contracts or

commitments that could require the Company to issue, sell or otherwise cause to become outstanding any capital stock, other than the Warrants (as defined below). The Company has initially reserved 48,113 shares of Common Stock for issuance upon exercise of the Warrants. There are no outstanding or authorized stock appreciation, phantom stock profit participation or similar rights with respect to the Company, nor has the Company committed to issue any of the foregoing.

2.5. <u>Registration, Voting and Other Rights</u>. The Company has not granted or agreed to grant any registration rights, including demand or piggyback rights, to any Person. Other than the Stockholder Agreement, the Company is not aware of any voting trusts, proxies or other agreements or understandings with respect to the voting of the capital stock of the Company.

2.6. <u>Subsidiaries</u>. Other than The Walking Company, a Delaware corporation ("<u>The Walking Company</u>"), Big Dog USA, Inc., a California corporation ("<u>Big Dogs USA</u>"), and FootSmart, Inc., a Delaware corporation ("<u>FootSmart</u>"), the Company does not presently own or control, directly or indirectly, any interest in any Person. The Company is not a participant in any joint venture, partnership, or similar arrangement.

2.7. <u>Company Financial Statements</u>. The Company has delivered to Investors (a) audited consolidated financial statements of the Company and its Subsidiaries for the calendar year ended December 31, 2017, and (b) an unaudited consolidated balance sheet of the Company and its Subsidiaries at March 31, 2018, and its unaudited statements of operations and statements of cash flows for the calendar quarter then ended (all such financial statements and any notes thereto are hereinafter collectively referred to as the "<u>Company Financial Statements</u>"). The Company Financial Statements (i) have been prepared in accordance with GAAP consistently applied throughout the period covered thereby, (ii) were prepared from and are consistent with the books and records of the Company and (iii) fairly present in all material respects the financial condition of the Company and its Subsidiaries at the dates therein indicated and the results of operations and cash flow for the periods therein specified.

2.8. <u>Projections</u>. The consolidated financial projections of the Company contained in Exhibit "C" of the Disclosure Statement (the "<u>Projections</u>") were prepared by or under the direction of the executive officers of the Company and were prepared by such officers in good faith and are believed by such officers to be reasonable and not incorrect or misleading in any material respect.

2.9. <u>Plan</u>. The Plan has not been amended, supplemented or otherwise modified as of the date of this Agreement, and will not be amended thereafter in a manner that is not consistent in all material respects with the Projections or that makes a material modification to the terms of the Plan.

2.10. <u>No Additional Representations</u>. Except as and to the extent expressly set forth in this Agreement, the Company makes no representations or warranties whatsoever, and disclaims all liability and responsibility for any representation, warranty, statement made or information communicated (orally or in writing) to each Investor.

III. <u>REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF INVESTORS</u>

Each Investor represents and warrants to the Company, severally and not jointly, as follows:

3.1. <u>Existence; Authorization, Validity and Effect of Agreement</u>. Such Investor has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party. This Agreement and the consummation by such Investor of the transactions contemplated hereby have been duly and validly authorized by all requisite action. This

Agreement constitutes the valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms.

3.2.    No Conflict; Required Filings and Consents.

(a)    The execution, delivery and performance of this Agreement by such Investor, and the consummation by such Investor of the transactions contemplated hereby and thereby, does not (i) conflict with or violate any Law or Order applicable to such Investor or by which any property or assets of such Investor is bound or affected or (ii) conflict with or violate or result in a breach or default under any contract, agreement or instrument binding upon such Investor, in each of clauses (i) and (ii), to the extent any such conflict, violation, breach or default would materially adversely affect the ability of such Investor to execute, deliver or perform this Agreement or consummate the transactions contemplated hereby.

(b)    The execution and delivery of this Agreement by such Investor does not, and the performance by such Investor of this Agreement and the consummation of the transactions contemplated hereby will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, other than Bankruptcy Court approval.

3.3.    Investment Intent.  Such Investor is purchasing the Purchased Shares to be purchased by such Investor for its own account and for investment purposes, and not for the purpose of resale or distribution thereof (except in a transaction or transactions exempt from registration under the federal and state securities laws or pursuant to an effective registration statement under such laws).  The Investor also represents that it has not been formed for the specific purpose of acquiring the Purchased Shares.

3.4.    Investor Sophistication.  Such Investor is either an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act or is a sophisticated investor and has such knowledge and experience in financial, business and investment matters as to be capable of evaluating the merits and risks of an investment in the Purchased Shares to be purchased by such Investor.

3.5.    Restricted Securities.  Such Investor acknowledges that the Purchased Shares to be purchased by such Investor have not been and will not, when issued, be registered under the Securities Act, or any state blue sky or securities laws and that the transfer of such shares may be subject to compliance with such Laws unless an exemption is available therefrom. Such Investor understands that the Purchased Shares are characterized as "restricted securities" under the Securities Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under the Securities Act and applicable regulations thereunder such securities may be resold without registration under the Securities Act only in certain limited circumstances.  In this connection, such Investor represents that such Investor is familiar with Rule 144 of the U.S. Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act. Such Investor understands that the Company is under no obligation to register any of the Purchased Shares.

3.6.    Access to Information.  Such Investor acknowledges that such Investor and/or its representatives have received or been afforded the opportunity to review prior to the date hereof all written materials that the Company was requested to deliver or make available, as the case may be, to such Investor in relation to this Agreement on or prior to the date hereof.

3.7.  <u>Legends</u>.  It is understood that the certificates evidencing the Purchased Shares will bear the legends substantially similar to those set forth below:

(a)  THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION.  THESE SECURITIES MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

(b)  Any legends required by applicable state securities laws.

(c)  THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT (AS AMENDED FROM TIME TO TIME) BY AND AMONG THE WALKING COMPANY HOLDINGS, INC. AND THE STOCKHOLDERS IDENTIFIED THEREIN WHICH INCLUDES CERTAIN RESTRICTIONS ON THE VOTING AND TRANSFER OF THE SECURITIES..  A COPY OF SUCH AGREEMENT HAS BEEN FILED WITH THE SECRETARY OF THE WALKING COMPANY HOLDINGS, INC. AND IS AVAILABLE UPON REQUEST.

The legend set forth in clauses (a)  and (b) above shall be removed by the Company from any certificate evidencing Purchased Shares upon delivery to the Company of an opinion by counsel, reasonably satisfactory to the Company, that a registration statement under the Securities Act is at that time in effect with respect to the legended security or that such security can be freely transferred in a public sale without such a registration statement being in effect and that such transfer will not jeopardize the exemption or exemptions from registration pursuant to which the Company issued the Purchased Shares.

3.8.  <u>No Additional Representations</u>. Except as and to the extent expressly set forth in this Agreement, such Investor makes no representations or warranties whatsoever, and disclaims all liability and responsibility for any representation, warranty, statement made or information communicated (orally or in writing) to the Company.

## IV.  COVENANTS

4.1.  <u>Plan and Disclosure Statement</u>.  The Company has filed with the Bankruptcy Court, and agrees to use its reasonable best efforts to cause the Bankruptcy Court to confirm, the Plan. Any amendments to the Plan and Disclosure Statement shall be consistent with this Agreement and the Projections.

4.2.  <u>Reasonable Best Efforts to Close</u>.  The parties agree to use their reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using reasonable efforts to cause the conditions to Closing to be satisfied as promptly as practicable.

# V. CONDITIONS TO CLOSING

5.1. <u>Conditions to Each Party's Obligations</u>.  The respective obligations of each Investor, on the one hand, and the Company, on the other hand, to consummate the purchase and sale of the Purchased Shares as contemplated by this Agreement are subject to the fulfillment (or waived by all parties to the extent permitted by Law) at or prior to the Closing Date of the following conditions:

(a)    All conditions precedent to the effectiveness of the Qualifying Plan shall have been satisfied or waived pursuant to the provisions therein, other than the requirement that the Investors shall have paid the Purchase Price for the Purchased Shares, and the Qualifying Plan shall have become effective.

(b)    A Confirmation Order for a Qualifying Plan shall have been entered by the Bankruptcy Court and such Confirmation Order shall have become a Final Order (as defined in the Plan) on or before July 1, 2018; <u>provided</u>, <u>however</u>, that the parties, in their respective sole discretion, may elect to consummate the purchase and sale of the Purchased Shares as contemplated by this Agreement prior to the Confirmation Order becoming a Final Order.

(c)    The Company, Big Dogs USA, The Walking Company, FootSmart and the Exit Facility Agent shall have entered into definitive documents, in form and substance reasonably satisfactory to the Required Holders (as defined in the Amended and Restated Notes), evidencing the Exit Facility on terms consistent in all material respects with the Qualifying Plan, and the Company shall have delivered true, correct and complete copies of such definitive documents.

5.2. <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to issue and sell the Purchased Shares as contemplated by this Agreement are subject to the satisfaction or waiver by the Company, at or prior to the Closing of the following conditions:

(a)    The closing deliveries set forth in Section 1.6(a) hereof shall have been delivered to the Company.

(b)    All representations and warranties of each Investor in Article III must be true and correct in all material respects on the Closing Date.

5.3. <u>Conditions to Obligations of Each Investor</u>.  The obligations of each Investor to purchase the Purchased Shares to be purchased by it as contemplated by this Agreement are subject to the satisfaction (or waiver by such Investor), at or prior to the Closing, of the following conditions:

(a)    <u>Delivery of Share Certificates</u>.  The other Investor(s) shall have purchased the Purchased Shares to be purchased by it as contemplated by this Agreement concurrently with the purchase of Purchased Shares by such Investor and the certificates to be delivered under Section 1.6(b) hereof shall have been delivered to such Investor and each other Investor(s).

(b)    <u>Representations and Warranties</u>.  Each of the representations and warranties of the Company in Article II shall be true and correct in all material respects on and as of the date made, and shall be true and correct in all respects on and as of the Closing Date, with the same effect as if made on and as of the Closing Date.

10504667.6
DOCS_LA:314679.1 91893/002

(c)     Performance of Covenants.  The Company shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing Date.

(d)     No Material Adverse Change.  No Company Material Adverse Change shall have occurred since December 31, 2017.

(e)     Officers' Certificate.  The Company shall have delivered to such Investor an Officers' Certificate, in form and substance reasonably satisfactory to it and duly executed by the Chief Executive Officer and Chief Financial Officer of the Company, certifying as to the satisfaction or waiver by such Investor of the conditions set forth in clauses (b) through (d) of this Section 5.3.

(f)     Amended and Restated Certificate; Amended and Restated Bylaws.   (i) The Amended and Restated Certificate shall have filed with the Office of the Secretary of State of the State of Delaware and have become effective in accordance with the Delaware General Corporation Law and (ii) the Company shall have duly adopted and approved a Second Amended and Restated Bylaws of the Company, in substantially the form attached as Exhibit D hereto.

(g)     Secretary's Certificates.  Each of the Company and its Subsidiaries shall have delivered to the Investors a Secretary's Certificate, in form and substance satisfactory to the Investors and duly executed by the Secretary of the Company or such Subsidiary, as applicable, certifying as to its charter, bylaws, resolutions and the incumbency of its signatories.

(h)     Qualifications.   All authorizations, approvals, or permits, if any, of any governmental authority or regulatory body of the United States of America or of any state that are required in connection with the lawful issuance of the Purchased Shares pursuant to this Agreement shall be duly obtained and effective as of the date hereof.

(i)     Confirmed Plan.  The Plan confirmed by the Confirmation Order entered by the Bankruptcy Court, which Confirmation Order shall become a Final Order, shall be satisfactory to such Investor in its sole discretion.

(j)     Projected Cost Savings.  The Company shall have delivered written evidence to the Investors, in form and substance reasonably satisfactory to the Investors, that it projects it will achieve cost savings of at least $8 million on an annualized basis, through rent concessions, store closings and other cost savings.

(k)     Amended and Restated Notes.  The Company shall have issued the Amended and Restated Notes and executed and delivered the other Note Documents (as defined in the Amended and Restated Notes) as contemplated thereby.

(l)     Feshbach Release.  The Company shall have provided written evidence that Feshbach has forgiven the Company for, and released the Company from, any and all claims for any amounts due to him under that certain Amended and Restated Royalty Agreement dated as of December 23, 2015, that accrued, arose or first became due and payable on or prior to December 31, 2017.

(m)     Proceedings and Documents.   All other transactions to be completed as contemplated by the Plan, and all corporate and other proceedings in connection with the

transactions contemplated in this Agreement and the other Transaction Documents, shall be satisfactory to such Investor and its special counsel, and such Investor shall have received all such counterpart originals and certified or other copies of such documents as it may reasonably request.

## VI.    TERMINATION

6.1.    <u>Termination</u>.  This Agreement may be terminated by either Investor if:

(a)    all conditions precedent for the Closing have not been satisfied (or waived by Kayne) on or prior to 6:00 p.m. (Pacific time) on the Effective Date (as defined in the Plan); or

(b)    if the Effective Date has not occurred by July 1, 2018 or such subsequent date as may be agreed to by the Investors; or

(c)    if any Governmental Entity with jurisdiction over such matters shall have issued an order or judgment restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such order or judgment shall have become final and non-appealable; or

(d)    if the Company breaches or violates any representation, warranty, covenant or agreement of the Company contained in this Agreement or any other Transaction Document which, in the reasonable judgment of the Investors, prevents, or would prevent, the satisfaction of one or more of the conditions precedent set forth in Article V or the consummation of the transactions contemplated hereby; or

(e)    any event, development or circumstance occurs that, in the reasonable judgment of the Investor, results, or would result, in a Company Material Adverse Change.

No termination of this Agreement pursuant to this Section 6.1 shall relieve the Company of any liability under this Agreement or any other Transaction Document.  Notwithstanding anything to the contrary, this Agreement shall not be terminable by the Investors pursuant to this Section 6.1 if Investors shall have failed in any material respect to fulfill any of its obligations under this Agreement.

## VII.    LEGAL EXPENSES; INDEMNIFICATION

7.1.    <u>Expenses</u>.  The Company shall reimburse the Investors, as applicable, for all legal fees and expenses reasonably incurred by the Investors associated with the negotiation, preparation, filing, execution or delivery of the Plan, this Agreement and the other Transaction Documents, the Amended and Restated Note and the other Note Documents (as defined in the Amended and Restated Note) and the consummation of the transactions contemplated hereby and thereby.

7.2.    <u>Indemnification</u>.  The Company agrees to indemnify, defend and hold harmless each of the Investors and each of its or their partners (limited and general), members, managers, officers, directors, stockholders, employees, affiliates, trustees, attorneys, agents, representatives, successors and permitted assigns (collectively, "<u>Indemnitees</u>") from and against any and all Losses (as defined below) incurred by such Indemnitee or any other Indemnitee based upon, arising out of or otherwise in respect of (i) any material breach of any representations or warranties made by the Company contained in this Agreement or any other Transaction Document or the failure of the Company to perform any of its covenants or agreements contained herein or therein or (ii) any third party claims asserted or brought against such Indemnitee in connection with the purchase of the Purchased Shares or the other transactions

contemplated by this Agreement or any other Transaction Document or the business of the Company or its Subsidiaries.

<h1 style="text-align:center">VIII.   GENERAL PROVISIONS</h1>

8.1.   <u>Notices</u>.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given:  (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 8.1):

<u>If to Kayne, to</u>:

Richard Kayne
c/o Kayne Anderson Capital Advisors, LP
1800 Avenue of the Stars
Second Floor
Los Angeles, CA  90067
Email:  rkayne@kaynecapital.com
Fax:     (310) 284-2548

<u>With copies to</u>:

David Shladovsky
c/o Kayne Anderson Capital Advisors, LP
1800 Avenue of the Stars
Second Floor
Los Angeles, CA  90067
Email:  dshladovsky@kaynecapital.com
Fax:     (310) 284-2548

<u>and</u>

Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
Attention:     Jeff Reisner, Esq.
Email:          jreisner@irell.com
Fax:            (949) 760-5200

<u>If to Feshbach, to</u>:

Andrew Feshbach
c/o The Walking Company Holdings, Inc.
25 Anapamu
Santa Barbara, CA  93101
Email:              [_____]
Fax:                [_____]

If to the Company, to:

The Walking Company Holdings, Inc.
25 Anapamu
Santa Barbara, CA  93101
Attention:      Anthony Wall
Email:          tonyw@thewalkingcompany.com
Fax:            (805) 963-8727

With a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Attention:      Jeffrey N. Pomerantz, Esq.
Email:          jpomerantz@pszjlaw.com
Fax:            (310) 201-0760

or to such other address as any party will specify by written notice so given, and such notice will be deemed to have been delivered as of the date so telecommunicated or personally delivered.

     8.2.  <u>Assignment; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the Company (whether by operation of Law or otherwise) without the prior written consent of the Investors.  Any Investor may, at its sole discretion, assign all or any portion of its rights and obligations under this Agreement without the consent of the Company or any other party.  Any assignment not effected in accordance with the foregoing will be null and void.  This Agreement shall be binding upon and will inure to the benefit of the parties, the Indemnitees and their respective successors and permitted assigns.  Notwithstanding anything contained in this Agreement to the contrary, (a) the obligations of the Company and the Investors to consummate the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and (b) nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties or their respective heirs, successors, executors, administrators and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

     8.3.  <u>Entire Agreement</u>.  This Agreement and the other Transaction Documents constitute the entire understanding and agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto.

     8.4.  <u>Amendments</u>.  (a) Prior to the Closing, subject to applicable law, including the requirements of the Bankruptcy Code and the orders of the Bankruptcy Court, this Agreement may be amended only by an instrument in writing signed on behalf of the Company, on the one hand, and the Investors, on the other, and (b) after the Closing, this Agreement may be amended only by an instrument in writing signed on behalf of the Company, on the one hand, and the holders of a majority of the Purchased Shares then outstanding, on the other.  Any amendment effected in accordance with this Section 8.4 shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which such securities are convertible), each future holder of all such securities, and the Company.

     8.5.  <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles.

8.6.    Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  A facsimile copy of a signature page will be deemed to be an original signature page.

8.7.    Certain Definitions/Interpretations.

(a)    Certain Definitions.  Unless otherwise indicated, capitalized terms used herein have the meanings ascribed to them in the Plan.  In addition, for purposes of this Agreement, the following terms have the following respective meanings:

(i)    "Amended and Restated Notes" means a series of identical Amended and Restated 8.375% Notes due 2022 to be issued under the Plan to the holders of Prepetition Subordinated Notes Claims (as defined in the Plan).

(ii)    "Common Stock" means the common stock, par value $0.01 per share, of the Company.

(iii)    "Company Material Adverse Change" means (i) any change, event, fact, occurrence, effect or development that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect or change on the business, assets, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company taken as a whole or (ii) a material impairment of the Company's ability to perform its obligations under this Agreement or any other Transaction Documents.

(iv)    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

(v)    "Losses" means any and all any and all losses, claims, damages, liabilities, judgments, Indemnified Environmental Costs, expenses and costs, including attorneys' fees and other fees and expenses incurred in, and the costs of preparing for, investigating or defending any matter.

(vi)    "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

(vii)    "Qualifying Plan" means a confirmed chapter 11 plan of reorganization in respect of the Company, in a form reasonably consistent with the Plan filed prior to date of this Agreement, that provides for (i) the amendment and restatement of the terms of the Prepetition Subordinated Notes to, among other things, extend the Maturity Date for three years (to March 31, 2022) and capitalize accrued interest, (ii) the Holders of all Allowed General Unsecured Claims (other than landlords whose leases are assumed by the Company) to receive under the Plan a total distribution in respect of such Claims, in an aggregate amount not to exceed $2,600,000, (iii) the Holders of all Allowed Administrative Claims and Priority Claims shall receive under the Plan a total distribution in respect of such Claims, in the aggregate, an amount not to exceed $[_____]; (iv) all Equity Interests of the Company issued and outstanding as of

immediately before the effective date of the Plan to be cancelled as of the effective date of the Plan, and the issued and outstanding capital stock of the Company as of the Closing Date to consist exclusively of the New Securities; and (v) Andrew Feshbach shall have forgiven the Company for, and to have released the Company from, any and all claims for any amounts due to him under that certain Amended and Restated Royalty Agreement dated as of December 23, 2015, that accrued, arose or first became due and payable on or prior to December 31, 2017.

(viii)    "Stockholders Agreement" means that certain Stockholders Agreement dated as of [the Effective Date] by and among the Company and its stockholders.

(ix)    "Warrants" means a series of Warrants to Purchase Common Shares dated as of [the Effective Date] to be issued to the holders of the Amended and Restated Notes to purchase an aggregate of 48,113 shares of Common Stock, subject to adjustment as set forth therein.

(b)    Headings and Interpretation.    The headings in this Agreement are for convenience of reference only, do not constitute a part of this Agreement and are not to be considered in construing or interpreting this Agreement.  All article, section, preamble, recital, exhibit, schedule, clause and party references contained in this Agreement are to this Agreement unless otherwise stated.  For all purposes of and under this Agreement, (i) the word "including" shall be deemed to be immediately followed by the words "without limitation;" (ii) words (including defined terms) in the singular shall be deemed to include the plural and vice versa; (iii) words of one gender shall be deemed to include the other gender as the context requires; and (iv) the terms "hereof," "herein," "hereto," "herewith" and any other words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole (including all of the Schedules and Exhibits to this Agreement) and not to any particular term or provision of this Agreement, unless otherwise specified.

8.8.    Survival of Representations and Warranties.  The representations and warranties in this Agreement or in any other Transaction Document shall survive the Closing indefinitely.

8.9.    Waivers.  Except as provided in this Agreement, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements contained in this Agreement.  The waiver by any party of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.  At any time prior to the Closing Date, the Company or the Investors may (a) extend the time for the performance of any of the obligations or other acts of the other party(ies), (b) waive any inaccuracies in the representations and warranties of the other party(ies) contained herein or in any document delivered pursuant hereto or (c) waive compliance by the other party(ies) with any of the agreements or conditions contained herein.  Any such extension or waiver will be valid only if set forth in an instrument in writing signed by the Company and the Investors, as the case may be.

8.10.    Severability.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

8.11.   Jurisdiction; Consent to Service of Process.

(a)     If any dispute under or relating to this Agreement or any other Transaction Document or the transactions contemplated hereby arises prior to or on the Effective Date, each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and any appellate court from any such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, or for recognition or enforcement of any judgment resulting from any such suit, action or proceeding, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in the Bankruptcy Court.

(i)     It will be a condition precedent to each party's right to bring any such suit, action or proceeding that such suit, action or proceeding, in the first instance, be brought in the Bankruptcy Court, and if each such court refuses to accept jurisdiction with respect thereto, such suit, action or proceeding may be brought in any other court with jurisdiction.

(ii)    No party may move to (i) transfer any such suit, action or proceeding from the Bankruptcy Court to another jurisdiction, (ii) consolidate any such suit, action or proceeding brought in the Bankruptcy Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such suit, action or proceeding brought in the Bankruptcy Court for the purpose of bringing the same in another jurisdiction.

(iii)   Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in the Bankruptcy Court, (ii) the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (iii) the right to object, with respect to such suit, action or proceeding, that such court does not have jurisdiction over such party.  Each party irrevocably consents to service of process in any manner permitted by applicable law.

(b)     Any suit, legal action or similar proceeding with respect to any dispute under or relating to this Agreement, any other Transaction Document or the transactions contemplated hereby that arises after the Effective Date shall be brought in the courts of the State of California sitting in the City of Los Angeles, State of California or of the United States for the Central District of California sitting in the City of Los Angeles, State of California, and by execution and delivery of this Agreement, each party consents, for itself and in respect of its properties and assets, to the exclusive jurisdiction of such courts.  Each party irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection, including any objection to the laying of venue or based on the grounds of FORUM NON CONVENIENS, which it may now or hereafter have to the bringing of any suit, legal action or similar proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby.  Each party irrevocably consents to service of process in any manner permitted by applicable law.

8.12.   Prevailing Party.   In any suit, legal action, judicial reference or similar proceeding with respect to this Agreement or any other Transaction Document, the prevailing party(ies) shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party(ies) may be entitled.

8.13.  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR RELATED HERETO OR THERETO, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT IT MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

8.14.  <u>JUDICIAL REFERENCE</u>.  IN THE EVENT THE WAIVER PROVIDED IN SECTION 8.13 IS DEEMED INEFFECTIVE, TO GIVE EFFECT TO THE PARTIES' DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING THE APPLICABLE LAW, THE PARTIES AGREE TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT AND LAW INVOLVED IN, ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR RELATED HERETO OR THERETO (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS AND POST-TRIAL MOTIONS (<u>E.G.</u>, MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE OR OTHERWISE) BETWEEN THE PARTIES, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A JUDICIAL REFERENCE PURSUANT TO SECTION 638 <u>ET SEQ</u>. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON ITS STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  THE PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS.  IN THE EVENT THAT THE PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.

8.15.  <u>No Strict Construction</u>.  The parties have been advised by their own counsel and have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

[<i>Remainder of page intentionally blank</i>]

10504667.6
DOCS_LA:314679.1 91893/002

IN WITNESS WHEREOF, the parties have executed this Agreement and caused the same to be duly delivered on their behalf on the day and year first written above.

<u>**COMPANY**</u>

**THE WALKING COMPANY HOLDINGS, INC.**

By: _____

Name: _____

Title: _____

<u>**INVESTORS**</u>

<u>KAYNE</u>

_____
Richard Kayne, as trustee of the Richard
and Suzanne Kayne Living Trust dtd 1/14/99

[_____
Any Designee of Kayne]

<u>FESHBACH</u>

_____
Andrew Feshbach, as trustee of the
Feshbach Living Trust

_____
Kendra Feshbach, as trustee of the
Feshbach Living Trust

[_____
Any Designee of Feshbach]

## LIST OF EXHIBITS

Exhibit A  –  Form of Amended and Restated Certificate of Incorporation

Exhibit B  –  Investor Schedule

Exhibit C  –  Pro Forma Fully Diluted Capitalization Table

Exhibit D  –  Form of Second Amended and Restated Bylaws

**EXHIBIT A**

Form of
Amended and Restated Certificate of Incorporation

[See Attached]

**EXHIBIT B**
Investor Schedule

**Common Stock**

| Investor | Number of Shares To Be Purchased | Purchase Price |
|---|---|---|
| Richard Kayne, as Trustee of the Richard and Suzanne Living Trust dtd 1/14/99 ...... | _____ | $_____ |
| [Designees of Kayne, if any ...................... | _____ | $_____] |
| | **484,500** | **$484,5000** |
| Andrew Feshbach & Kendra Feshbach, as Trustees of the Feshbach Family Trust ......................................................... | _____ | $_____ |
| [Designee of Feshbach, if any ................... | _____ | $_____] |
| | **25,500** | **$25,500** |
| TOTAL...................... | **510,000** | **$510,000** |

| **Series A Preferred Stock** Investor | Number of Shares To Be Purchased | Purchase Price |
|---|---|---|
| Richard Kayne, as Trustee of the Richard and Suzanne Living Trust ......................... | _____ | $_____ |
| [Designee of Kayne, if any......................... | _____ | $_____] |
| | **950** | **$9,205,500** |
| Andrew Feshbach...................................... | _____ | $_____ |
| [Designee of Feshbach, if any ................... | _____ | $_____] |
| | **50** | **$484,500** |
| TOTAL...................... | **1,000** | **$9,690,000** |

**EXHIBIT C**

<u>Pro Forma Fully Diluted Capitalization Table</u>

[See Attached]

**EXHIBIT D**

Form of
<u>Second Amended and Restated Bylaws</u>

[See Attached]

## EXHIBIT G

**Warrant Agreement**

**NEITHER THE WARRANTS REPRESENTED HEREBY NOR ANY SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE THEREOF HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY APPLICABLE STATE SECURITIES LAWS AND NO SUCH SECURITIES MAY BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED OR ASSIGNED FOR VALUE, DIRECTLY OR INDIRECTLY, NOR MAY ANY OF SUCH SECURITIES BE TRANSFERRED ON THE BOOKS OF THE COMPANY, WITHOUT REGISTRATION OF SUCH SECURITIES UNDER ALL APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR COMPLIANCE WITH AN APPLICABLE EXEMPTION THEREFROM.**

**THE TRANSFER OF THE WARRANTS REPRESENTED HEREBY, AND THE VOTING, SALE, TRANSFER, ENCUMBRANCE OR OTHER DISPOSITION OF ANY SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF, ARE SUBJECT TO THE TERMS AND CONDITIONS OF THIS WARRANT TO PURCHASE COMMON SHARES AND THE STOCKHOLDERS AGREEMENT REFERRED TO HEREIN AND ATTACHED HERETO.**

WARRANT CERTIFICATE NO. [__]
[_____], 2018

THE WALKING COMPANY HOLDINGS, INC.
WARRANT TO PURCHASE COMMON SHARES

**WHEREAS**, The Walking Company Holdings, Inc., a Delaware corporation (the "Company"), together with its subsidiaries, including The Walking Company, a Delaware corporation, Big Dog USA, Inc., a California corporation, and FootSmart, Inc., a Delaware corporation (the "Subsidiaries," and collectively with the Company, the "Debtors"), were debtors-in-possession under chapter 11 of title 11 of the United States Code in cases no. 18-10474 (LSS),18-10474 (LSS) and 18-10474 (LSS), jointly administered under case no. 18-10474 (LSS) (the "Cases"), pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, the Debtors filed a First Amended Joint Plan of Reorganization dated April 20, 2018 (the "Plan") with the Bankruptcy Court, and the Bankruptcy Court has entered an order confirming the Plan; and

**WHEREAS**, this Warrant to Purchase Common Shares (this "Warrant") is being entered into pursuant to and in accordance with the Plan, which provides, among other things, that the Company shall issue to the holders of Prepetition Subordinated Notes Claims (as defined in the Plan), in consideration for the amendments and other modifications to be made to the terms of the Prepetition Subordinated Notes (as defined in the Plan), warrants to purchase shares of the Company's Common Stock, par value $.01 per share (the "Shares") in an amount not to exceed an aggregate of 48,113 Shares (as adjusted as provided herein), all as provided herein;

**THIS IS TO CERTIFY THAT**, for value received, [_____][1] or its assigns (the "Holder") shall be entitled, subject to the terms and conditions of this Warrant, to purchase, upon the exercise of this Warrant in accordance with the terms hereof, an aggregate initially of up to [_____][2] Warrant Shares (the

---

[1] Insert name of holder of Prepetition Subordinated Notes Claim.
[2] Rounding off to the nearest Share, insert the holder's Pro Rata Portion (as defined herein) of all of the Initial Warrant Shares as of the Effective Date of the Plan.

"Initial Warrant Shares"), as such amount may be adjusted from time to time pursuant to Section 6 hereof (as so adjusted, the "Warrant Shares").

1.  Term. The expiration date of this Warrant is [_____], 2028 ("Expiry Date"). At 5:00 p.m. PST on the Expiry Date, this Warrant shall be void and of no force and effect.

2.  Exercise Price. The Holder shall have the right to exercise this Warrant at any time and from time to time, in whole or in part, at a price of One Dollar ($1.00) per Warrant Share (the "Exercise Price").

3.  Manner of Exercise. The Holder shall have the right to exercise this Warrant at any time up to 5:00 p.m. PST on the Expiry Date. The Warrant may be exercised by Holder (i) duly completing, executing and delivering to the Company the Form of Election to Exercise attached hereto as Exhibit A, (ii) either (A) duly delivering to the Company by wire transfer or check an amount equal to the Exercise Price or (B) instructing the Company to withhold and cancel a number of Warrant Shares then issuable upon exercise of this Warrant with respect to which the excess, if any, of the Fair Market Value as of the date of exercise over the Exercise Price for such canceled Warrant Shares is at least equal to the Exercise Price for the Warrant Shares being purchased, and (iii) unless the Stockholders Agreement is not then in effect or such Person is already a party to the Stockholders Agreement, duly completing, executing and delivering to the Company a Joinder in the Stockholders Agreement.

4.  Issuance of Share Certificate. Upon the exercise of this Warrant, the Company shall issue and deliver to the Holder share certificate(s) for the Warrant Shares issuable upon such exercise.

5.  No Rights as Stockholder. This Warrant, until exercised, shall not constitute the Holder a stockholder of the Company nor entitle the Holder to any rights or interest in respect of the Company except as herein expressly provided. Notwithstanding the date of delivery of share certificate(s) for the Warrant Shares pursuant to Section 4 above, the Warrant Shares being purchased under this Warrant will be deemed to have been issued to the Holder, as the record owner of such Warrant Shares, as of the close of business on the date on which payment therefor is made by the Holder pursuant to Section 3.

6.  Adjustments. If, between the date hereof and the Expiry Date:

    (a)  Reclassification. The securities issuable upon exercise of this Warrant are changed into the same or a different number of securities of any other class or classes by reclassification, capital reorganization or otherwise (other than as otherwise provided herein) (a "Reclassification"), then, in such event, in lieu of the number of Warrant Shares which the Holder would otherwise have been entitled to receive, the Holder shall have the right thereafter to exercise this Warrant for the number of shares of such other class or classes of stock that a holder of the number of securities deliverable upon exercise of this Warrant immediately before that change would have been entitled to receive in such Reclassification, all subject to further adjustment as provided herein with respect to such other shares.

    (b)  Merger, Etc. There shall be any reorganization, recapitalization, merger or consolidation involving the Company in which shares of Common Stock are converted into or exchanged for securities, cash or other property, then, as part of such reorganization, recapitalization, merger or consolidation, lawful provision shall be made so that the Holder shall thereafter be entitled to receive upon exercise of this

Warrant, the kind and amount of securities, cash or other property of the successor corporation resulting from such reorganization, recapitalization, merger or consolidation, equivalent in value to that which a holder of Shares deliverable upon exercise of this Warrant would have been entitled in such reorganization, recapitalization, merger or consolidation if the right to purchase the Shares hereunder had been exercised immediately prior to such reorganization, recapitalization, merger or consolidation. In any such case, appropriate adjustment (as determined by the Board of Directors of the successor corporation) shall be made in the application of the provisions of this Warrant with respect to the rights and interests of the Holder after such reorganization, recapitalization, merger or consolidation to the end that the provisions of this Warrant shall be applicable after the vent, as near as reasonably may be, in relation to any shares or other securities deliverable after that event up on the exercise of this Warrant.

(c)     <u>Split, Subdivision or Combination</u>.  The outstanding shares of Common Stock shall split or subdivide into a greater number of shares of such securities, the number of Warrant Shares issuable upon exercise of this rights under this Warrant immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately increased, and the Exercise Price shall be proportionately decreased, and in the event that the outstanding shares of Common Stock are combined (by reclassification or otherwise) into a lesser number of shares of such securities, the number of Warrant Shares issuable upon exercise of the rights under this Warrant immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately decreased, and the Exercise Price shall be proportionately increased.

(d)     <u>Dividends in Stock or Other Securities or Property</u>.  The holders of securities as to which purchase rights under this Warrant exist at the time shall have received, or, on or after the record date fixed for the determination of eligible stockholders, shall have become entitled to receive, without payment therefor, other or additional stock or other securities or property (other than cash) of the Company by way of dividend, then and in each case, this Warrant shall represent the right to acquire, in addition to the number of shares of the securities receivable upon exercise of this Warrant, and without payment of any additional consideration therefor, the amount of such other or additional stock or other securities or property (other than cash) of the Company that the Holder would hold on the date of such exercise had it been the holder of record of the securities receivable upon exercise of this Warrant on the date thereof and had thereafter, during the period from the date thereof to and including the date of such event, retained such shares and/or other additional stock available to it during such period, all as adjusted pursuant this Section 6.

(e)     <u>Dissolution, Liquidation or Winding-Up</u>.  There is a voluntary or involuntary dissolution, total liquidation or winding-up of the Company (other than as provided in clause (b) above), the Company shall cause to be mailed (by registered or certified mail, return receipt requested, postage prepaid) to the Holder at the Holder's address as shown on the Warrant register, at the earliest practicable time (and, in any event, not less than thirty (30) calendar days before any date set for definitive action) written notice of the date on which such dissolution, liquidation or winding-up shall take place, as the case may be.  Such notice shall also specify the date as of which the record holders of shares of Common Stock shall be entitled to exchange their shares for securities, money or other property deliverable upon such dissolution, liquidation or

winding-up, as the case may be. On such date, the Holder shall be entitled to receive upon surrender of this Warrant the cash or other property, less the Exercise Price for this Warrant then in effect, that the Holder would have been entitled to receive had this Warrant been exercised immediately prior to such dissolution, liquidation or winding-up. Upon receipt of the cash or other property, any and all rights of the Holder to exercise this Warrant shall terminate in their entirety. If the cash or other property distributable in the dissolution, liquidation or winding-up has a fair market value (as determined in good faith by the Board of Directors of the Company and set forth in a written notice to the Holder, subject to the Holder's right to dispute such determination under Section 3.8(e)) which is less than the Exercise Price for this Warrant then in effect, this Warrant shall terminate and be of no further force or effect upon the dissolution, liquidation or winding-up.

The Company shall, at its own expense, give at least ten (10) Business Days' prior written notice to the Holder of any expected adjustment pursuant to Section 6. Such notice shall state the event giving rise to the adjustment, the Exercise Price as adjusted and the number of securities or other property purchasable upon the exercise of the rights under this Warrant, setting for in reasonable detail the method of calculation of each. The Company shall, upon written request of the Holder, furnish or cause to be furnished to such Holder a certificate setting forth (i) such adjustments, (ii) the Exercise Price at the time in effect and (iii) the number of securities and the amount, if any, of other property that at the time would be received upon exercise of this Warrant.

7.    Restrictions on Transfer.

(a)    A Holder may Transfer this Warrant, provided that such Transfer (i) would be permitted under the terms of the Stockholders Agreement as if this Warrant constituted Common Stock and (ii) is otherwise permitted by the other terms of this Section 7. Shares issued upon exercise of this Warrant will be subject to restrictions on transfer set forth in the Stockholders Agreement.

(b)    In order to provide for effective compliance with this Section 7, a Holder who proposes to effect a Transfer of this Warrant, or who proposes to effect a deemed Transfer pursuant to which Warrant Shares are to be issued in the name of a Person other than the record holder of the applicable Warrant, must submit to the Company in accordance with Section 10, prior to the date of the proposed Transfer, a written request (a "Transfer Request") that the Company review the proposed Transfer and authorize or not authorize the proposed Transfer pursuant to this Section 7. A Transfer Request shall include: (i) the name, address, jurisdiction of organization or citizenship and telephone number of the proposed Transferee, (ii) the number of Warrants proposed to be so Transferred, (iii) the date on which the proposed Transfer is expected to take place, (iv) the name of the Holder proposing such Transfer, and (v) such information as the Company in its discretion may reasonably request (and which may, in the Company's sole discretion, include an opinion of counsel with respect to federal law to be provided at the Transferor's sole cost and expense to such effect) to establish that registration of the proposed Transfer is not required under the Securities Act or any applicable state securities or "blue sky" laws. The Company shall, within ten Business Days after its receipt of a Transfer Request that includes all of the information set forth in the foregoing clauses (i) through (v), determine in its sole and absolute discretion whether to authorize the Transfer proposed in such Transfer Request and shall notify the proposed Transferor in writing of such determination (the "Transfer

<u>Determination</u>"); <u>provided</u>, that if the Company does not notify the proposed Transferor of its determination within such time period, the Transfer proposed in such Transfer Request shall be deemed to be approved hereunder.

(c)     The Warrant Shares to be issued upon the exercise of Warrants will not be registered pursuant to the Securities Act of 1933 (the "<u>Act</u>") and as a result will be subject to certain transfer restrictions under the Act, and the certificates representing the Shares may contain one or more legends in substantially the following forms or other legends as may be required from time to time to comply with the Act:

**"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER FEDERAL OR STATE SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED OR ASSIGNED FOR VALUE, DIRECTLY OR INDIRECTLY, NOR MAY THE SECURITIES BE TRANSFERRED ON THE BOOKS OF THE COMPANY, WITHOUT REGISTRATION OF SUCH SECURITIES UNDER ALL APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR COMPLIANCE WITH AN APPLICABLE EXEMPTION THEREFROM.**

**THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT (AS AMENDED FROM TIME TO TIME) BY AND AMONG THE WALKING COMPANY HOLDINGS, INC. AND THE STOCKHOLDERS IDENTIFIED THEREIN WHICH INCLUDES CERTAIN RESTRICTIONS ON THE VOTING AND TRANSFER OF THE SECURITIES. A COPY OF SUCH AGREEMENT HAS BEEN FILED WITH THE SECRETARY OF THE WALKING COMPANY HOLDINGS, INC. AND IS AVAILABLE UPON REQUEST.**

8.     <u>Validity</u>.  This Warrant shall not be valid for any purpose whatsoever unless and until it has been signed by or on behalf of the Company.

9.     [<u>Reserved</u>.]

10.     <u>Notices</u>.  Any communication to the Holder with respect to this Warrant shall be delivered in writing to [_____], [_____], Attention: [_____] and [_____], Email: [_____], or such other address as shall have been set forth in a notice delivered to the Company in accordance with this <u>Section 10</u>.  Any communication to the Company with respect to this Warrant Agreement shall be delivered in writing to The Walking Company Holdings, Inc., 25 West Anapamu, Santa Barbara, CA 93101, Attention:  General Counsel, or such other address as shall have been set forth in a notice delivered to all Holders in accordance with this <u>Section 10</u>.  Any communication to a Holder with respect to this Warrant shall be deemed to have been effectively given (a) when delivered by hand to the party to be notified, (b) one Business Day after deposit with a national overnight delivery service with next-business-day delivery guaranteed, (c) upon receipt of confirmation of telecopy, (d) upon receipt of confirmation of electronic mail, in the case of each of clause (a), (b), (c) and (d), addressed to the party to be notified at the addresses set forth for such party on the books and records of the Company, or (e) when posted to an Intralinks or similar site to which all Holders have been offered access.

11.     <u>Definitions</u>.  As used in this Warrant, the following terms shall have the meanings given below:

(a) "<u>Business Day</u>" means any day (other than a day which is a Saturday, Sunday or legal holiday in the State of California) on which banks are open for business in the State of California.

(b) "<u>Current Market Price</u>" means per share of Common Stock means, as of any specified date on which the Common Stock is publicly traded, the average of the daily market prices of the Common Stock over the twenty (20) consecutive trading days immediately preceding (and not including) such date. The 'daily market price' for each such trading day shall be (i) the closing sales price on such day on the principal stock exchange on which the Common Stock is then listed or admitted to trading or on Nasdaq, as applicable, (ii) if no sale takes place on such day on any such exchange or system, the average of the closing bid and asked prices, regular way, on such day for the Common Stock as officially quoted on any such exchange or system, (iii) if the Common Stock is not then listed or admitted to trading on any stock exchange or system, the last reported sale price, regular way, on such day for the Common Stock, or if no sale takes place on such day, the average of the closing bid and asked prices for the Common Stock on such day, as reported by Nasdaq or the National Quotation Bureau, or (iv) if the Common Stock is not then listed or admitted to trading on any securities exchange and if no such reported sale price or bid and asked prices are available, the average of the reported high bid and low asked prices on such day, as reported by a reputable quotation service, or a newspaper of general circulation in the City of Los Angeles customarily published on each Business Day. If the daily market price cannot be determined for the twenty (20) consecutive trading days immediately preceding such date in the manner specified in the foregoing sentence, then the Common Stock shall not be deemed to be publicly traded as of such date.

(c) "<u>Fair Market Value</u>" means per share of Common Stock as of any specified date means (i) if the Common Stock is publicly traded on such date, the Current Market Price per share, or (ii) if the Common Stock is not publicly traded (or deemed not to be publicly traded) on such date, the fair market value per share of Common Stock on such date as determined in good faith by the Board of Directors of the Company and set forth in a written notice to the Holder, subject to the Holder's right to dispute such determination under Section 12.

(d) "<u>Investment Agreement</u>" means that certain Investment Agreement dated as of [_____], 2018, between the Company and the "Investors" party thereto.

(e) "<u>Investor Shares</u>" means all of the Shares issued to the Investors as of the Effective Date of the Plan pursuant to the Investment Agreement.

(f) "<u>Pro Rata Portion</u>" means, with respect to the holder of this Warrant, the percentage equivalent of a fraction, the numerator of which is the initial number of Warrant Shares issuable upon exercise of this Warrant and the denominator of which is the aggregate number of Warrant Shares initially issued to all holders of Warrants.

(g) "<u>Stockholders Agreement</u>" shall mean that certain Stockholders Agreement of The Walking Company Holdings, Inc., as may be amended from time to time, in the form attached hereto as <u>Exhibit B</u>.

(h) "<u>Transfer</u>" means, with respect to any security of the Company, to directly or indirectly sell, exchange, transfer, hypothecate, negotiate, gift, bequeath, convey in trust, pledge,

mortgage, grant a security interest in, assign, encumber, or otherwise dispose of all or any portion of such security, including by recapitalization, merger, consolidation, liquidation, dissolution, dividend, distribution or otherwise. "Transferred," "Transferor" and "Transferee" shall have the correlative meanings. Notwithstanding the foregoing, the exercise of a Warrant for Warrant Shares that does not involve the issuance of Warrant Shares in a name other than the record holder of the applicable Warrant shall in no event constitute a "Transfer."

12.  Challenge to Good Faith Determination.  Whenever the Board of Directors is required to make a determination in good faith of the fair market value of any item under this Warrant, or any item that may affect the value of this Warrant, that determination may be challenged or disputed by the Holder, and any such challenge or dispute shall be resolved promptly, but in no event in more than thirty (30) days, by an investment banking firm of recognized national standing or one of the four (4) largest national accounting firms agreed upon by the Company and the Holder and whose decision shall be binding on the Company and the Holder. If the Company and the Holder cannot agree on a mutually acceptable investment bank or accounting firm, then the Holder and the Company shall within five (5) Business Days each choose one investment bank or accounting firm and the respective chosen firms shall within five (5) Business Days jointly select a third investment bank or accounting firm, which shall make the determination promptly, but in no event in more than thirty (30) days, and such determination shall be binding upon all parties thereto. Each of the Company and the Holder shall bear its own costs in connection with such determination.

13.  Fiduciary Duties to Holder.  The Board of Directors of the Company shall at all times, whether or not this Warrant has been exercised, owe the Holder the same fiduciary duties that it would owe to a holder of the Warrant Shares underlying this Warrant.

14.  Other Covenants.  The Company agrees that, as long as this Warrant remains outstanding or any Warrant Shares are issuable with respect to this Warrant, the Company will perform all of the following covenants for the express benefit of the Holder:  (a) the Warrant Shares shall, upon issuance, be duly authorized, validly issued, fully paid and non-assessable shares of Common Stock; (b) the Holder shall, upon the exercise hereof in accordance with the terms hereof, receive good and marketable title to the Warrant Shares, free and clear of all voting and other trust arrangements to which the Company is a party or by which it is bound, preemptive rights of any shareholder, liens, encumbrances, equities and claims whatsoever, other than the Stockholders Agreement; (c) at all times prior to the Expiry Date, the Company shall have reserved for issuance a sufficient number of authorized but unissued shares of Common Stock, or other securities or property for which this Warrant may then be exercisable, to permit this Warrant (or if this Warrant has been divided, all outstanding Warrants) to be exercised in full; and (d) the Company shall provide the Holder with written notice of all corporate actions in the same manner and to the same extent as the shareholders of the Company.

15.  Amendments and Waivers.  This Warrant may be amended or otherwise modified, and any terms hereof may be waived, only by an instrument in writing signed by the Holder.

16.  Governing Law.  This Warrant shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware.

17.  Lost Warrant of Certificates.  Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant or of a stock certificate evidencing Warrant Shares and, in the case of any such loss, theft or destruction, upon receipt of an

indemnity reasonably satisfactory to the Company or, in the case of any such mutilation, upon surrender and cancellation of the Warrant or stock certificate, the Company shall make and deliver to the Holder, within three (3) Business Days of receipt by the Company of such documentation, a new Warrant or stock certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Warrant or stock certificate.

18.  JURISDICTION; CONSENT TO SERVICE OF PROCESS.  Each of the Company and (by acceptance hereof) the Holder agrees that any suit, legal action or similar proceeding with respect to any dispute under or relating to this Warrant or the transactions contemplated hereby shall be brought in the courts of the State of California sitting in the City of Los Angeles, State of California or of the United States for the Central District of California sitting in the City of Los Angeles, State of California, and each of the Company and the Holder (by acceptance hereof) consents, for itself and in respect of its properties and assets, to the exclusive jurisdiction of such courts.  Each such party irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection, including any objection to the laying of venue or based on the grounds of FORUM NON CONVENIENS, which it may now or hereafter have to the bringing of any suit, legal action or similar proceeding in such jurisdiction in respect of this Warrant or the transactions contemplated hereby.  Each such party irrevocably consents to service of process in any manner permitted by applicable law.

19.  WAIVER OF JURY TRIAL; JUDICIAL REFERENCE.

(A)  EACH OF THE COMPANY AND (BY ACCEPTANCE HEREOF) THE HOLDER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY RELATING TO THIS WARRANT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT THEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO, REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION, SUIT OR OTHER PROCEEDING; AND EACH SUCH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH ACTION, SUIT OR OTHER PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF ANY RIGHT IT MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

(B)  IN THE EVENT THE WAIVER PROVIDED IN SECTION 19(A) IS DEEMED INEFFECTIVE, TO GIVE EFFECT TO THE PARTIES' DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING THE APPLICABLE LAW, EACH OF THE COMPANY AND (BY ACCEPTANCE HEREOF) THE HOLDER AGREES TO REFER, FOR A COMPLETE AND FINAL ADJUDICATION, ANY AND ALL ISSUES OF FACT AND LAW INVOLVED IN, ARISING OUT OF OR IN ANY WAY RELATING TO THIS WARRANT, INCLUDING ANY PRESENT OR FUTURE AMENDMENT HEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR RELATED HERETO (INCLUDING ALL DISCOVERY AND LAW AND MOTION MATTERS, PRETRIAL MOTIONS, TRIAL MATTERS AND POST-TRIAL MOTIONS (E.G., MOTIONS FOR RECONSIDERATION, NEW TRIAL AND TO TAX COSTS, ATTORNEY FEES AND PREJUDGMENT INTEREST)) UP TO AND INCLUDING FINAL

JUDGMENT, BROUGHT TO RESOLVE ANY DISPUTE (WHETHER SOUNDING IN CONTRACT, TORT, UNDER ANY STATUTE OR OTHERWISE) BETWEEN THE PARTIES, TO A JUDICIAL REFEREE WHO SHALL BE APPOINTED UNDER A JUDICIAL REFERENCE PURSUANT TO SECTION 638 ET SEQ. OF THE CALIFORNIA CODE OF CIVIL PROCEDURE.  THE REFEREE'S DECISION WOULD STAND AS THE DECISION OF THE COURT, WITH JUDGMENT TO BE ENTERED ON ITS STATEMENT OF DECISION IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  SUCH PARTIES SHALL SELECT A SINGLE NEUTRAL REFEREE, WHO SHALL BE A RETIRED STATE OR FEDERAL JUDGE WITH AT LEAST FIVE YEARS OF JUDICIAL EXPERIENCE IN CIVIL MATTERS.  IN THE EVENT THAT SUCH PARTIES CANNOT AGREE UPON A REFEREE, THE REFEREE SHALL BE APPOINTED BY THE COURT.

*[Signature page follows]*

10504714.6
DOCS_LA:314680.1 91893/002

**IN WITNESS WHEREOF**, the Company has caused this Warrant to be signed by a duly authorized officer as of the first date written above.

<u>**COMPANY:**</u>

**THE WALKING COMPANY HOLDINGS, INC.**

By: _____
Name: _____
Title: _____

EXHIBIT A

Form of Election to Exercise

To:     The Walking Company Holdings, Inc.
        25 Anapamu
        Santa Barbara, CA 93101
        Attn: General Counsel

**ELECTION TO EXERCISE**

The undersigned hereby exercises his, her or its rights to purchase _____ of common stock (the "Shares") of The Walking Company Holdings, Inc. pursuant to the Warrant to Purchase Common Stock dated as of [_____], 2018 (the "Warrant") and held in the name of the undersigned ("Holder"). Holder hereby tenders payment herewith in the amount of $_____ (One Dollar ($1.00) per Share) in accordance with the terms of the Warrant, and requests that certificates for the Shares be issued delivered to Holder at the address set out below and, if such number of Shares shall not be all of the Shares covered by the Warrant, that a new Warrant for the balance of the Shares covered by the Warrant be issued in the name of, and delivered to, Holder at the address stated below.

Dated:_____

_____
[print name of Holder]

By:_____

Name of signatory and title, if
applicable:_____

Address:_____

_____

EXHIBIT B

Form of
<u>Stockholders Agreement</u>

[Omitted]

## <u>EXHIBIT H</u>

### Resignations / Appointments to Board as of Effective Date


Fred Kayne and Stephen Kayne will resign from the Board (Andrew Feshbach and David Walsh will remain). Debtors further anticipate 1-2 new directors to be appointed but such individuals have yet to be identified.

**EXHIBIT I**

**List of Contracts/Leases to be Rejected as of the Effective Date**

| Counterparty Notice Address | Description |
|---|---|
| Estate of Mary S. Orci<br>Andrew Helgesen, Esq.<br>1380 Prosperity Farms Road, Suite 201<br>Palm Beach Gardens, FL 34410<br><br>and<br><br>Geoffrey M. Bohn, Esq.<br>Bohn & Kouretas, PLC<br>P.O. Box 101685<br>Arlington, VA 22210 | Real Property Lease[1]<br>Store #169 –Georgetown<br>3101 M Street NW<br>Washington DC 20007 |
| Horton Plaza LLC<br>c/o Westfield<br>Attention: Legal Department<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067 | Real Property Lease[1]<br>Store #363 – Horton Plaza<br>370 Horton Plaza, Space 231, Level 2<br>San Diego, CA 92101 |
| Maui Outlets Associates, LLC<br>Attention: Outlets of Maui Leasing<br>One Maritime Plaza, Suite 2100<br>San Francisco, CA 94111<br><br>Maui Lahaina Partners, LLC<br>Attention: Thomas Applegate<br>3660 Waialae Avenue, Suite 304<br>Honolulu, HI 96816 | Real Property Lease[1]<br>Store #437 – Outlets of Maui<br>900 Front Street, Suite A-4<br>Lahaina, HI 96761 |
| PFP Columbus II, LLC<br>c/o Glimcher<br>180 East Broad Street<br>Columbus, OH 43215 | Real Property Lease[1]<br>Store #290 – Polaris Fashion Place<br>1500 Polaris Parkway, Space #1038<br>Columbus, OH 43240 |
| Southgate Mall Owner LLC<br>c/o Westfield<br>Attention: Legal Department<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067 | Real Property Lease[1]<br>Store #168 – Westfield Siesta Key<br>3501 S. Tamiami Trail #122<br>Sarasota, FL 34239 |

---

[1] Contract/Lease is the subject of a pending Rejection Notice filed in accordance with the Lease Rejection Procedures in effect in this case. Out of an abundance of caution, Debtors are including this Contract/Lease here as well without prejudice to the effectiveness of the pending Rejection Notice.

| Counterparty Notice Address | Description |
|---|---|
| VF MALL LLC<br>2049 Century Park East, 41st Floor<br>Los Angeles, CA 90067<br>Attention: Legal Department | Real Property Lease[1]<br>Store #228 – Westfield Valley Fair<br>2855 Stevens Creek Blvd., Suite 1130<br>Santa Clara, CA 95050 |
| SHOPPERTRAK RCT CORPORATION<br>233 S. Wacker Drive, Suite 4100<br>Chicago, IL 60606<br>Attention: Contract Administrator | PURCHASE & SERVICE AGREEMENT |
| SPECTROTEL<br>P.O. Box 339<br>3535 NJ-66<br>Neptune City, NJ 07754-0339 | THE WALKING COMPANY #439 - INTERNET SERVICE AGREEMENT |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-7994 | THE WALKING COMPANY#430-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-7995 | THE WALKING COMPANY#430-FIRE SYS - ADT |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-7996 | THE WALKING COMPANY#439-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-7997 | THE WALKING COMPANY#422-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-8001 | THE WALKING COMPANY#2002-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-8005 | THE WALKING COMPANY#2004-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-8006 | BIG DOGS SPORTSWEAR #517-COMM PRO 3000 |
| TYCO INTEGRATED SECURITY<br>P.O. Box 371994<br>Pittsburgh, PA 15250-8011 | THE WALKING COMPANY#437-COMM PRO 3000 |